# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

ROBBIN WARD,

      Plaintiff,

v.                                     Civil Action No: _____

TRANS UNION, LLC, EQUIFAX INFORMATION
SERVICES, LLC, EXPERIAN INFORMATION
SOLUTIONS, INC. and NATIONAL CREDIT
SYSTEMS, INC.,

      Defendants.

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, ROBBIN WARD (hereinafter "Plaintiff"), by and through the undersigned Counsel, sues Defendants, TRANS UNION, LLC (hereinafter "Trans Union"), EQUIFAX INFORMATION SERVICES, LLC (hereinafter "Equifax"), EXPERIAN INFORMATION SOLUTIONS, INC. (hereinafter "Experian"), and NATIONAL CREDIT SYSTEMS, INC. (hereinafter "NCS").  Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

2.      Today in America there are three major consumer reporting agencies ("CRAs"), Trans Union, LLC, Equifax Information Services, LLC and Experian Information Solutions, Inc.

3.      The FCRA demands of reporting agencies like Trans Union, Equifax and Experian, utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4.     Consumer reporting agencies that create consumer reports, like Trans Union, Equifax and Experian are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like National Credit Systems, particularly where a consumer makes a dispute about information reported.

5.     When a consumer like Plaintiff disputes information through the CRAs, those disputes are transmitted to the party furnishing the information, here NCS. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.     Plaintiff brings claims under Section 1681e(b) against all three CRAs because they reported about Plaintiff's inaccurate information regarding National Credit Systems collection account.  When Plaintiff disputed these inaccuracies, the CRAs did not reasonably investigate also violating 1681i.

7.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).  This is particularly true as to how these Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation.   All Defendants have been repeatedly sued by consumers, sanctions by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct.  Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

8.     Likewise, NCS violated the FCRA, § 1681s-2(b), when it received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will

show all National Credit Systems did was consult its own records about the account and confirm to the agencies the inaccurate information it was already reporting.

## JURISDICTION AND VENUE

9.      The jurisdiction for this Court is conferred by 15 U.S.C. § 1681p and 28 § U.S.C. 1367.

10.     Venue is proper in this District and Division as the violations described in this Complaint occurred in this District, and each of the Defendants transact business within this District.

## PARTIES

11.     The Plaintiff is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c).

12.     Trans Union is a limited liability company authorized to do business in the State of Colorado through its registered agent in Littleton, Colorado.

13.     Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

14.     Trans Union disburses such consumer reports to third parties under contract for monetary compensation.

15.     Equifax is a limited liability company, authorized to do business in the State of Colorado through its registered agent in Littleton, Colorado..

16.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f), (hereinafter, a "CRA"). Upon information and belief, Equifax is regularly engaged in the business

of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

17.     Equifax disburses such consumer reports to third parties under contract for monetary compensation.

18.     Experian is a corporation, authorized to do business in the State of Colorado through its registered agent located in Centennial, Colorado.

19.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) (hereinafter, a "CRA"). Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.     Experian disburses such consumer reports to third parties under contract for monetary compensation.

21.     National Credit Systems is a foreign corporation, authorized to conduct business in the State of Colorado through its registered agent, Stokes & Wolf, P.C., located at 1776 S Jackson St., Suite 900, Denver, Colorado, 80210.

22.     National Credit Systems is a "furnisher" as governed by 15 U.S.C. § 1681s-2, and a "debt collector" as defined by 15 U.S.C. § 1692a(6).

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the Defendants' Creditor-Customers*

23.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. See S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); id. at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate

information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

24,    "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

25.    Section 1681i(a) on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through his dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C.A. § 1681i(a)(1)(A).

26.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching

inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

27.     It has long been the law that a CRA, such as Equifax, Trans Union, or Experian, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-CV-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.")

28.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3d Cir.1997).

29.     As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

30.     Further, as the Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

31.     Today, furnishers such as National Credit Systems have their own independent duties under the FCRA, principally those found at 15 U.S.C. §1681s-2.  But while the Defendants' duties under §1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much recent, enacted on in 1996.  THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### *Plaintiff Discovers the CRA Defendants were Inaccurately Reporting a Collection Account as belonging to the Plaintiff*

32.      In mid 2020, Plaintiff was in the process of refinancing his home and discovered an account in collections owed to National Credit Systems for which he was not responsible.

33.     Each CRA was inaccurately reporting and misattributing a collection account with National Credit Systems.  Plaintiff learned that the underlying account that National Credit Systems sought to collect was a rental account with Main Street Renewal, LLC.  Plaintiff never applied for such a rental, or authorize such an account.  Plaintiff never had any business dealings involving this account and it did not belong him.

34.     Plaintiff contacted the NCS multiple times in an attempt to correct the error. In these calls and letters, Plaintiff detailed why the account did not belong to him: that he was either

the victim of identity theft, or the creditors or CRAs had mistakenly mixed his identity with that of a stranger.

35.     On June 12, 2020, Plaintiff filed an Identity Theft Report with the Federal Trade Commission in reference to the erroneous reporting on his Credit Reports.

36.     On June 29, 2020, Plaintiff attempted to file a police report with the Dallas Police Department in reference to the erroneous reporting on his Credit Reports and was notified that it had to be filed in the state in which he resides.

37.     Following the instructions of the Dallas Police Department, Plaintiff attempted to file a police report in Colorado and was instructed to file in the state where the crime occurred.

38.     Plaintiff continued his efforts to resolve this issue directly with the creditor while the Federal Trade Commission investigated the matter.

### *Plaintiff Disputes the Inaccuracy with The CRAs*

39.     Having learned that National Credit Systems inaccurately reported the collection account to the CRA Defendants, Plaintiff sent disputes to Trans Union, Equifax and Experian in an attempt to have them remove the inaccurate account from his credit reports.

40.     Plaintiff sent correspondence to Equifax requesting that Equifax verify and correct the inaccurate, erroneous, and unverified representation made by NCS.

41.     In that letter, Plaintiff explained that the NCS account Equifax was attributing to him was not his and he did not authorize it.

42.     Plaintiff sent correspondence to Trans Union requesting that Trans Union verify and correct the inaccurate, erroneous, and unverified representation made by NCS.

43.     In that letter, Plaintiff explained that the NCS account Trans Union was attributing to him was not his and he did not authorize it.

44.     Plaintiff sent correspondence to Experian requesting that Experian verify and correct the inaccurate, erroneous, and unverified representation made by NCS.

45.     In that letter, Plaintiff explained that the NCS account Experian was attributing to him was not his and he did not authorize it.

46.     Subsequent to Plaintiff's numerous disputes, Equifax, Trans Union, and Experian failed to remove the inaccurate information regarding the NCS account contained within Plaintiff's credit reports.

### The CRA Defendants Did Not and Do Not Conduct Any Investigation of Most Consumer Disputes

47.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of both Equifax and Trans Union to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas.  Both these Defendants use the same vendor, previously known as Intelenet Global Services and now as Teleperformace.

48.     It has long been the practice of Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to an affiliated company, Experian Services Chile, S.S. in Santiago, Chile.[1]

---

[1] Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). In recent litigation by Plaintiff's Counsel in the Eastern District of Virginia, *Sublett v. Nissan of Richmond, et al.*, No. 3:20-cv-00156 (E.D. Va.), however, Experian presented the supposed third-party Chilean dispute investigator pursuant to Plaintiff's notice of deposition under Rule 30. To the extent Experian would argue here that it cannot produce the Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the theory that no investigation was conducted by the CRA.

49.     The CRAs' dispute processing vendor is not hired to perform an actual FCRA investigation. Instead, its sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

50.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication.  That mailbox company receives consumer disputes, and scans them into a batch of other disputes.

51.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania. Experian's dispute processing simply takes the disputes out of its hands and places them into what Experian has argued is an unrelated third party.

52.     Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India.   Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.   For example, the most common relevant code is: "01 Not his/her."

53.     Teleperformance agents are not allowed to do any of these things:  contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

54.     Equifax and Trans Union have both taken the position in other litigation that they have no control over the Teleperformance.   For example, under oath before this Court just this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax.

Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." Miller v. Equifax Info. Serv., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

55.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB, Dkt. #71 (D. Md.) (ruling that Trans Union did not have control or the ability to produce Indian employees of Intelenet).

56.     Regardless of whether or not these statements are correct, Equifax and Trans Union believe that they cannot direct, control, manage or reliably influence the employees of their third-party Indian outsource vendor.

57.     Equifax, Experian, and Trans Union themselves did not conduct any reinvestigation of Plaintiff's many disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data processing vendor.

58.     Experian uses a similar process, but instead of a third party, it relies largely on an affiliate entity in Chile.

59.     This dispute processing vendor and agents are not hired to perform an actual FCRA investigation.  Instead, its sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

60.     In fact, the CRAs strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account.").  The online dispute is then outputted into the "e-

Oscar" system described below without ever touching human hands or being read by human eyes at Trans Union, Equifax or Experian.   It gets sent to the CRAs' creditor customer (such as NCS) for its sole discretion.

### *The CRA Defendants Forwarded Plaintiff's Disputes to NCS, which did Nothing*

61.     In each instance in which Plaintiff disputed the NCS account with the CRAs, the CRAs forwarded Plaintiff's disputes to NCS using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to the CRAs.

62.     e-Oscar is also the system by which NCS has agreed it will accept such consumer disputes from the CRAs.

63.     Under such circumstances, NCS became obligated under the FCRA to investigate Plaintiff's disputes.

64.     Discovery will show that NCS received notice from Trans Union, Equifax and Experian of Plaintiff's disputes.

65.     NCS failed to reasonably reinvestigate Plaintiff's disputes that it received.

### *Plaintiff suffered Actual Harm*
### *Defendants' Violations Were Willful*

66.     The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).   A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

67.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff" and a failure to make the correction

right away. *Dalton.*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

68.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

69.     The CRA Defendants have received many thousands of disputes and other complaints regarding the furnisher at issue in this case – sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

70.     Just in federal court alone, during the last decade NCS disputed by Plaintiff has had to defend collectively over  400 consumers lawsuits.

71.     In many of these FCRA lawsuits brought by a consumer against, one or more of the CRA Defendants was a named co-defendant.

72.     Defendants knew or should have known of this litigation history.  They use and have access to PACER to investigate and monitor such consumer complaints.

73.     The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

74.     Each Defendant regularly receives unredacted consumer dispute details from this database.

75.     Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

76.     Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

77.     Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

78.     Further, over 35,000 of the CFPB complaints against Equifax, more than 33,000 complaints as to Experian, and just shy of 38,000 against Trans Union were based largely on their failure to reasonably investigate consumer disputes.

79.     Just in the last 12 months alone, Equifax, Trans Union, and Experian have each been sued on by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

80.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

81.     Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc*., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting

agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

82.     Equifax has even been warned by its home District Court, the Northern District of Georgia (even citing an important decision of this Court), which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir.1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla. 1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

83.     Defendants have long and specific notice in this Court. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was

a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997). TransUnion's notice was so substantial that this Court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed… that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888 (E.D. Va. Aug. 27, 2007)

84.     Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

85.     Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

86.     In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA[2] The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

87.     The AG Settlement also required the CRA Defendants to conduct significant research and data gathering – even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

88.     Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law

---

[2]  Available at https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx

89.     Center ("NCLC"), the organization that publishes the leading egal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.    That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[3]

90.     The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

91.     Amongst many of the Defendants' accuracy failures, the NCLC Report discovered:

> **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly-automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.
>
> **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

---

[3] Available at https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf

> **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.
>
> **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

92.     Similarly, Defendant NCS has had actual notice of establish law defining its duties under § 1681s-2(b).  The leading case in this regard is the Fourth Circuit's decision, *Johnson v. MBNA Am. Bank, NA*. 357 F.3d 426 (4th Cir. 2004). *Johnson* and its progeny long ago established that the § 1681s-2(b)(1)(A) directive to furnishers to "conduct an investigation with respect to the disputed information" required a "reasonable investigation," that is, a "careful" or "searching inquiry," as opposed to a "superficial" one, "to determine whether the disputed information can be verified." *Johnson*, 357 F.3d at 430–31.

93.     This standard for an investigation requires more than a superficial data conformity check of verifying that the data contained in a furnisher's computer records is the same as that reported to the CRAs. In a decision adopting the Fourth Circuit's *Johnson* standard, the Court of Appeals for the Ninth Circuit explained:

> The Fourth Circuit's reasoning in *Johnson* is entirely persuasive. *By its ordinary meaning, an "investigation" requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute.* Moreover, like the Fourth Circuit, we have observed that "a primary purpose for the FCRA [is] to protect consumers against inaccurate and incomplete credit reporting." *Nelson*, 282 F.3d at 1060. *A provision that required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber*

> *stamping their earlier submissions, even where circumstances demanded a more thorough inquiry.*

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162–63 (9th Cir. 2009). (emphasis added).

94.    Despite the notice and judicial, regulatory and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

95.    A subsequent check of Plaintiff's consumer reports revealed that each of the CRAs were reporting the NCS accounts a belonging to him.

## COUNT I:
## VIOLATION OF THE FAIR CREDIT REPORTING ACT – 15 U.S.C. §1681e(b)
### (Trans Union, Equifax and Experian)

96.    The Plaintiff re-alleges and incorporates each of the above paragraphs as if fully set out herein.

97.    Defendants Trans Union, Equifax and Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files they published and maintained concerning the Plaintiff.

98.    As a result of this conduct, action, and inaction of Trans Union, Equifax and Experian, the Plaintiff actual damages, including but not limited to:  loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress

99.    The violations by Trans Union, Equifax and Experian were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, if Defendants are negligent, Plaintiff is entitled to recover under 15 U.S.C. § 1681o.

100.     Plaintiff is entitled to recover costs and attorneys' fees from Trans Union, Equifax, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II:**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT 15 U.S.C. §1681i(a)(1)**
**(Trans Union, Equifax and Experian)**

101.     The Plaintiff re-alleges and incorporates all other factual allegations set forth in the Complaint.

102.     Trans Union, Equifax and Experian violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from the Plaintiff's credit files.

103.     Trans Union, Equifax and Experian each violated 15 U.S.C. §1681i(a)(4) by failing to consider all relevant information submitted by Plaintiff.

104.     Trans Union, Equifax and Experain each violated 15 U.S.C. §1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

105.     As a result of Trans Union, Experian and Equifax's violations of 15 U.S.C. § 1681i(a), the Plaintiff suffered actual damages, including but not limited to:  loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

106.     The violations by Trans Union, Equifax and Experian were willful rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Trans Union, Equifax and Experian were

negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681n.  In the alternative, Trans Union, Equifax and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

107.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Trans Union, Equifax and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

**COUNT III:**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681s-2(b)(1)(A) AND (B)**
**(National Credit Systems)**

108.    The Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

109.    On at least one occasion within the past two years, by example only and without limitation, NCS violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiff's disputes.

110.    On one or more occasions within the past two years, by example only and without limitation, NCS violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the CRAs.

111.    Based on the manner in which the CRAs responded to – or did not respond to Plaintiff's disputes, representing that NCS had "verified" the supposed accuracy of its reporting , Plaintiff alleges Trans Union, Equifax and Experian did in fact forward the Plaintiff's dispute via an ACDV to NCS.

112.    NCS understood the nature of Plaintiff's disputes when it received the ACDVs from Trans Union, Equifax and Experian.

Notwithstanding the above, NCS follows a standard and systemically unlawful process when it receives the ACDV dispute.  Basically, all NCS does is review its own internal computer screens

for the account and repeat back to the ACDV system the same information it already has reported to the CRAs.

113.     When NCS receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether or not the information already in its computer system is itself accurate.

114.     As a result of NCS' violations of 15 U.S.C. §1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages, including but not limited to:  loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

115.     NCS' FCRA violations were willful rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, NCS was negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

116.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from NCS in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT IV:
## VIOLATION OF THE FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(1)(E)
### (National Credit Systems)

117.     The Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

118.     NCS violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's dispute from Trans Union, Equifax and Experian prior to the commencement of this action. This failure to correct Plaintiff's information resulted from NCS' failure to investigate as articulated herein, after NCS received notice of Plaintiff's dispute from Trans Union, Equifax and Experian.

119.    As a result of this conduct, action and inaction of NCS, the Plaintiff suffered Plaintiff suffered actual damages, including but not limited to:  loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

120.    NCS' FCRA violations were willful rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, NCS was negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

121.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from NCS in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment and actual, statutory, and punitive damages against Defendants, jointly and severally; for his attorneys' fees and costs; for pre-judgment and post-judgment interest at the legal rate, specific performance and injunctive relief, and such other relief the Court does deem just and proper.

Respectfully submitted,

**ROBBIN WARD**

By:    *Matthew R. Osborne*
Matthew R. Osborne
11178 Huron Street, Suite 7
Northglenn, CO 80234
(303) 759-7018
(720) 210-9870 fax
Email: matt@mrosbornelawpc.com

Leonard A. Bennett, VSB #37523 *Pro Hac Vice forthcoming*
Craig Marchiando, VSB #89736 – *Pro Hac Vice forthcoming*
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
Email:  lenbennett@clalegal.com
Email:  craig@clalegal.com

*Counsel for the Plaintiff*