**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

---

ROBBIN WARD

               Plaintiff,

    vs.

TRANSUNION, LLC. et al,

               Defendants.

CASE NO. 1:21-cv-02597-LTB

---

**DEFENDANT NATIONAL CREDIT SYSTEMS, INC.'S STATEMENT OF FACTS**

Defendant, National Credit Systems, Inc. ("NCS"), by and through the undersigned counsel, Katrina DeMarte of DeMarte Law, PLLC, hereby submits this statement of facts in support of its Motion for Summary Judgment.

**a. The January 30, 2019 application for a rental home from Main Street Renewal (hereinafter, the "Original Creditor").**

1.     On January 30, 2019, an application was submitted to the Original Creditor for a residential home in Dallas Texas. Exhibit 1: Application.

2.     The application was in the name of the Plaintiff and contained his Colorado home address, the last four digits of his social security number, application, email address[1], and also income information. Exhibit 1: Application, pgs. 1-2.

---

[1] The email address provided with the application (which is where most of the communications regarding the account in question transpired) was robbinward61@gmail.com. Exhibit 1 – Rental Application, Pg. 1. Plaintiff cannot definitively answer whether robbinward61@gmail.com is his email address or not. Exhibit 2 – Plaintiff's Responses to NCS Requests for Admissions No. 14; Exhibit 4 – Plaintiff's Supplemental Responses to NCS Interrogatories No. 12, regarding RFA 14, pg. 19.

3.      The application indicates that Plaintiff's daughter, Laquencilla Allen Antoinette Green, a.k.a. Quen Green (hereinafter, "Quen Allen"), was his emergency contact. Exhibit 1, Application.

4.      The phone number provided for Quen Allen, which ends in 7309, matches her confirmed phone number. Exhibit 2: Plaintiff's Responses to NCS's Requests for Admissions No. 13; Exhibit 4: Pg. 24, Supplemental Response to Interrogatory No. 24.

5.      The application contains a confirmed address for Quen Allen of 624 Priscilla Lane, Desoto, TX 75115[2]. Exhibit 1: Application, pg. 2; *see also* Exhibit 4: Pg. 24, Supplemental Response to Interrogatory No. 24.

6.      *Color* copies of the Plaintiff's driver's license and social security card were provided along with the application. Exhibit 3: Communication from Original Creditor; *see also* Exhibit B: Declaration of Ronald V. Sapp, ¶ 50.

7.      Plaintiff has admitted he had provided his daughter with his social security number and driver's license. Exhibit 2 - Plaintiff's Responses to NCS Requests for Admissions No. 24-25.

8.      Income verification was submitted with the rental application by way of pay stubs from the company Neiman Marcus bearing Plaintiff's name. Exhibit 5 – Pay Stubs Accompanying Application.

9.      These pay stubs indicate that between the dates of December 16, 2018 – January 12, 2019, a period of time which immediately preceded the submission of the application, the employee whose payment and employment information is reflected on the pay stubs utilized forty hours of vacation and personal time. *Id.* pgs. 2-3; *see also* Exhibit 35: Plaintiff's Timecard, pg. 2 (indicating at least 32 hours of vacation pay for the same period of time).

---

[2] Quen Allen is also listed as the beneficiary of the lease, permitting her to access the property in the event that all tenants above the age of majority have passed away – again citing to a known address for Ms. Green on 624 Priscilla Lane, Desoto, TX 75115,

10. Plaintiff maintains that he never been an employee of Neiman Marcus, but that his daughter, Quen Allen, was. Exhibit 4 – Plaintiff's Supplemental Responses to NCS Interrogatories No. 5, pgs. 9-10.

11. Following the filing of this case, and pursuant to a subpoena, Neiman Marcus provided pay stubs for Quen Allen that matched the pay periods of the pay stubs submitted in conjunction with the rental application. Exhibit 7 – Quen Allen Pay Stubs.

12. A comparison of these pay stubs reveals they are nearly identical, with the exceptions being a different employee name, address, and bank deposit information (which was redacted by Neiman Marcus on the bottom of the pay stubs bearing Quen Allen's name, and which were "whited-out" on the pay stubs provided with the application). Exhibit 5 – Pay Stubs Accompanying Application; *see also* Exhibit 7 – Quen Allen Pay Stubs.

13. The payment advice numbers on these documents are identical to that which was provided by the Original Creditor. *Id.*

14. Additional income information was submitted in the form of a letter from the Social Security Administration bearing Plaintiff's name. Exhibit 6 – Social Security Notice.

15. Plaintiff stated that he does not receive Social Security Benefits, but that his daughter Quen Allen does. Exhibit 4 – Plaintiff's Supplemental Responses to NCS Interrogatories No. 12 regarding RTAs 16-17.

16.     The letter provided with the application bears a claim number ending in "2993DI" – which indicates that the benefits are being paid to a disabled individual, rather than traditional benefits received when reaching age 63. Exhibit 6: Social Security Notice.[3]

17.     The application also requires full and complete disclosure of any felony convictions and pending criminal charges. Exhibit 1: Application, pg. 1.

18.     Further, the lease provides that only the _tenant_ may use the property exclusively as a private residence, and that other persons may only occupy the property if disclosed and approved by the Original Creditor. Exhibit 46: pg. 5.

19.     Moreover, if the tenant (here, Robbin Ward), seeks a replacement tenant, that tenant must meet the specific approval of the landlord – which includes disclosure of any criminal activity/convictions/history. _Id._ at pg. 13.

20.     The lease also states that payments must be made in the name of the tenant – meaning, Quen Allen could not submit payments in her own name, payments must have been submitted in the name or Robbin Ward, the tenant.[4] _Id._ at pg. 2.

21.     The rental application includes the date and time for certain milestones which were completed throughout the online application process – including the IP address of the computer which was used to complete the application and initiate other pertinent communications.  Exhibit 1 – Rental Application, pg. 4.

---

[3] _See also_ https://secure.ssa.gov/poms.nsf/lnx/0428084005, which contains literature from the Social Security administration explaining a label of "DI" when appended to a claim number – last visited by the undersigned counsel on November 14, 2022.

[4] The fully-executed lease also provides consent that any unpaid rent or other such amount are reportable to the CRAs.

22.     This data indicates that on January 30, 2019, the rental application was being completed during the timeframe of 12:00 pm to 12:16 pm and the individual completing the application was accessing the internet via IP address 192.100.72.2. Exhibit 1 – Rental Application, Pg. 4.

23.     This email address traces back to Neiman Marcus. Exhibit 8 – Declaration of Neal Maynard, ¶ 11.

24.     Pursuant to a subpoena, Neiman Marcus provided the time clock data for Quen Allen, which reveals that on January 30, 2019, between the times of 12:00 - 12:16 PM (which is when the online rental application was being completed, referenced *supra*), Quen Allen was on the clock working at Neiman Marcus. Exhibit 9 – Neiman Marcus Time Clock Data, pg. 2.

25.     Additionally, and pursuant to a subpoena, Google provided information which reveals that the "robbinward61@gmail.com" account was created on January 23, 2019, using IP address 192.100.72.2. Exhibit 10 – Google User Info.

26.     IP address 192.100.72.2 is an IP address associated with Neiman Marcus. Exhibit 8 – Declaration of Neal Maynard, ¶ 9.

27.     The Original Creditor provided payment information for each payment they received from the tenant and included is an application fee that was submitted with the rental application. Exhibit 11 – Main Street Payment Report, Pg. 2.

28.     The payment report also tracks the IP address the computer user was using to make the payment, and for the application fee (and all subsequent payments except one) the IP address was 192.100.72.2. Exhibit 11 – Main Street Payment Report, Pg. 4.

29.     The IP address of 192.100.72.2 is an IP address associated with Neiman Marcus. Exhibit 8 – Declaration of Neal Maynard, ¶ 12.

30.     Ultimately, the Original Creditor notified the applicant via email (to robbinward61@gmail.com) that the application was approved, and further detailed the next steps in the process. Exhibit 12 – Approval email.

31.     The approval also provided a move-in date of February 19, 2019. *Id.* at pg. 1.

32.     On February 01, 2019, robbinward61@gmail.com responded to the approval e-mail by stating that his daughter would be there to drop off the security deposit for him.  Exhibit 13 – Deposit email.

33.     The tenant provided the Original Creditor with MoneyGrams bearing Robbin Ward's name and dated February 01, 2019, to cover the initial deposit.  Exhibit 14 – MoneyGrams; *compare to* Exhibit 36, pg. 6, and also Exhibit 37, which both bear a known signature of the Plaintiff which are strikingly similar to that contained within Exhibit 14.

34.     The emails dated February 01, 2019 and February 13, 2019, as depicted in Exhibits 12 & 13, were sent by robinward61@gmail.com using the IP address of 192.100.72.2, which as previously stated is an IP address associated with Neiman Marcus. Exhibit 8 – Declaration of Neal Maynard ℙ 20; *see also* Exhibit 17: Google Email Records and IP Addresses.[5]

35.     Subsequently, the tenant moved into the property where the Original Creditor made note that the tenant was enjoying the property and also that they were cooperating with the Original Creditor to fix various ongoing utility and appliance issues. Exhibit 16 – Main Street Account Notes, pg. 1.

---

[5] Additional emails were sent by robbinward61@gmail.com on April 5th, May 17th, June 6th, and June 24th, all originating from the IP address of 192.100.72.2 which, as referenced *supra*, that IP address is associated with Neiman Marcus. Exhibit 17, Emails regarding payment status between Original Creditor and robbinward61@gmail.com; *see also* Exhibit 8: Declaration of Neal Maynard, ℙ 23; *see also* Exhibit 10.

36.     When the tenant failed to pay rent in a timely manner, the Original Creditor initiated eviction proceedings for all occupants of 229 Cliff Heights Circle, and a three-day notice to vacate was served on the occupants on May 6, 2019 via First Class Mail. Exhibit 18, Eviction Documents, pg. 1.

37.     On June 4, 2019, Main Street Renewal's attorney sent the Clerk of Court the filing letter for the eviction.  Exhibit 18, Eviction Documents, pg. 2.

38.     The Original Creditor's attorney reported in a letter dated July 08, 2019, that on June 25, 2019, the court entered a final judgment in the eviction matter in favor of the Original Creditor and as a result, a Writ of Possession was entered. Exhibit 18, Eviction Documents, Pg. 3.

39.     On July 6, 2019, which was mere days before the eviction was materialized on July 12, 2019,  Quen Green threw a birthday party in her kitchen with a group of her peers. On that date, Quen Allen went live on Facebook[6] and captured a video celebrating her birthday in a kitchen with a group of peers. Exhibit 8 – Declaration of Neal Maynard; *see also* Exhibit 19 – Facebook Video of Quen Allen's birthday party (to be submitted pursuant to ECF procedures via jump drive to clerk); *see also* Exhibit 45: confirmed picture of Quen Allen.

40.     Comparisons drawn between the background and placement of items in the kitchen in Quen Allen's Facebook video, and the photos from the Original Creditor regarding the subject property reveal that Quen Allen is, in fact, celebrating with comrades in the kitchen of the rental home at 229 Cliff Heights Circle. Exhibit 8 – Declaration of Neal Maynard, ¶¶ 24-31.

//

---

[6] Quen Allen maintained a Facebook page with the URL facebook.com/laquenallen. Exhibit 8 – Declaration of Neal Maynard. *See also* Exhibit 45: Confirmed Picture of Quen Allen and Robbin Ward produced in text message chain from Plaintiff.

**b. The Original Creditor placed the Robbin Ward account at 229 Cliff Heights Circle with National Credit Systems in an attempt to collect the rental deficiency.**

41.     On December 04, 2019 the Original Creditor placed the subject account, encompassing the placement balance of $5,375.82, with NCS for collections. *see* Exhibit 16 – Main Street Account Notes; *see also* Exhibit 23 – NCS Account Notes for Main Street Account.

42.     On December 13, 2019 NCS sent a placement acknowledgement e-mail to Main Street Renewal listing all other Main Street Renewal accounts NCS is currently collecting and also imploring Main Street Renewal to review the report and confirm the accuracy so that verifiably correct account balances are listed from the parties who are legally responsible. Exhibit 24 – Placement Acknowledgment Report, Pg. 1.

43.     The Robbin Ward account is included in the list with a debt amount of $5,375.82.  Exhibit 24 – Placement Acknowledgment Report, Pg. 4, whereby the Original Creditor verified all amounts as due and owing.

44.     Importantly, the account with the Original Creditor was not the first account Robbin Ward has had placed with NCS from a rental property.[7]

45.     On August 20, 2003, an account in the amount of $1,696.40 was placed with NCS for an account alleged to be owed to Berkshire Square Mountain Crest Apartments. Exhibit 26 – NCS Account Notes for Berkshire Square*,* pg. 1.

46.     Because the Berkshire Account was previously placed with NCS in 2003, NCS was set up to receive notifications from its vendor whenever someone with the same identifying information applied for a property. *See* Exhibit 26: Berkshire Account Notes dated January 24, 2019, pg. 1.

---

[7] *See* Exhibit 42, pg. 8, RFP 7. *See also* Exhibit 26, Berkshire Account Notes reflecting deficiency.

47.     When someone applied with Plaintiff's information, NCS was alerted as to this fact on January 24, 2019, and thereafter sent a letter to Plaintiff on January 25, 2019, remind the Plaintiff of his other open account with NCS as well as a notification that it received notice of Plaintiff's application for a residential lease elsewhere. Exhibit 40: Template of January 2019 Letter Mailed to Plaintiff.[8]

c.  **Information provided with Plaintiff's Disputes and/or information available discovered prior to the filing of this lawsuit.**

48.     As was customary for the Plaintiff, Megan Henderson (hereinafter, "Ms. Henderson"), Plaintiff's spouse, was the primary contact on his disputes, just as Quen Green primarily handled any communications with the Original Creditor (and as requested by Robbinward61@gmail.com). Exhibit 4: Plaintiff's Supplemental Responses to NCS's Interrogatory No. 4, pgs. 6-12; *see also* Exhibit 15 – Prior to Move-in email.

49.     Ms. Henderson stated that she believed that someone obtained Quen Green's pay stubs and forged Plaintiff's name on the same. *Id.* at pg. 9.

50.     Ms. Henderson – and not Mr. Ward – claims to have requested that "anyone" complete an employment verification for Mr. Ward through Neiman Marcus. *Id.* at pg. 10.

51.     At no point did the Plaintiff or his spouse, Ms. Henderson, provide documentation from Neiman Marcus regarding Plaintiff's employment status. Instead, Ms. Henderson reported that, on July 21, 2020, Neiman Marcus *could not* provide her with information regarding the Plaintiff. *Id.*

52.     Further, the Plaintiff – through Ms. Henderson – admits to receiving a fraud affidavit and form to aide in the dispute process. *Id.* at 11.

---

[8] "Michael Stevenson" is the name of a test account which is a part of this template document, where the original would have stated "Robbin Ward" along with Mr. Ward's Colorado address as opposed to that of "Michael Stevenson."

53.    However, Ms. Henderson claimed to have already provided all information responsive to such a request – blatantly ignoring the request for a police report (which is arguably the *most* important piece of information that one can receive in the midst of an identity theft investigation), and further failed to provide any specificity regarding the alleged theft. *Id.*

54.    Plaintiff openly admits that he has never submitted a police report regarding his purported identity theft in any jurisdiction. Exhibit 2: Plaintiff's Responses to NCS's Requests for Admissions No. 9.

55.    Plaintiff also states that, to his knowledge, Quen Allen has never been convicted of a crime and that he *did not* consider Quen Allen or her history effect his decision to *not* submit a police report with regard to the alleged theft. *Id.* at No. 8, 11.

56.    Moreover, Plaintiff states that Quen Allen *could not have* stolen his identity. *Id.* at No. 10; Exhibit 4: Plaintiff's Supplemental Responses to NCS's Interrogatory No. 12 regarding RTA #3, pg. 17.

57.    Instead, Plaintiff submitted an FTC affidavit. Exhibit 36. The FTC affidavit states that the "fraud" began in December of 2019. *Id.* pg. 1.

58.    The account that is the subject of this lawsuit was opened in February of 2019 – well before the alleged dates of fraud in Plaintiff's FTC affidavit. *See* Exhibit 1, Application; *compare to* Exhibit 36, pg. 1, FTC Fraud Affidavit.

59.    Plaintiff claims that he attempted to submit a police report to the Dallas Police Department, only to be turned away and instructed to file a police report in the "state in which he resides." ECF 1, ¶¶ 36-37.

60.    Plaintiff – or at least, at the very minimum, Plaintiff's counsel was clearly aware that a police report was required as this is a point that Plaintiff's counsel has used to aide in other disputes regarding alleged identity theft. Exhibit 39: *Westlake* Complaint ¶¶ 32, 35.

61.    Similarly, Plaintiff or his counsel were aware that compliance code XB is pertinent in identity theft disputes, because in *Westlake*, the debt collector's failure to indicate compliance code XB was a negative fact cited by the Plaintiff. *Id.* at ¶ 72.

62.    One other distinguishing factor noted by Plaintiff's counsel was the fact that a color copy of Plaintiff's drivers' license and social security card were provided during the course of the dispute. *Id.* at ¶ 35.

63.    Here – it is undisputed that Plaintiff's license and social security card were provided to the Original Creditor in *color* when the application was submitted. Exhibit 3, pg. 2.

64.    The Original Creditor also verified the account as due and owing at the time of placement, at every turn thereafter, and also that Mr. Ward is the appropriate responsible party. Exhibit 25: Declaration of Ronald V. Sapp, ¶¶ 12-26.

65.    NCS's policies and procedures are designed to ensure that all information available is assessed so that it does not collect on accounts which are not properly due and payable. Exhibit 25: Declaration of Ronald V. Sapp, ¶¶ 27-40.

66.    Lastly, Plaintiff has two open accounts with NCS – one with the Original Creditor and the other with Berkshire Square/Mountain Crest. Exhibit 25, Declaration of Ronald V. Sapp, ¶¶ 51-52.

67.    Per Ronald V. Sapp, Vice President of Operations at NCS, it would be impossible to login to WinDebt (NCS's collection software) and look-up the Plaintiff *without* noticing that Plaintiff has two accounts in NCS's office. Declaration of Ron Sapp, ¶¶ 51-52.

68.     This is because when searching for "Robbin Ward" – and regardless of which account you wish to select or open – both accounts are displayed for the user to pick which account they seek to work. *Id.*

69.     It would be impossible to look up "Robbin Ward" and only be shown one account (and totally disregarding the other). *Id.*

70.     In all other respects, NCS states that it performed a reasonable investigation having reviewed all documentation provided by the Plaintiff and determining that any potential claims that the account did not belong to the Plaintiff to be without merit. Declaration of Ron Sapp, ¶¶ 41-85.

71.     This included an analysis of Plaintiff's claims that the pay advices from Neiman Marcus and the Social Security Administration being "false." *Id.*

**d.      Facts discovered after the filing of this lawsuit.**

**i.      Queen Allen has a documented history of criminal activity involving both her identity and the identity of others.**

72.     There was a car accident on February 13, 2011 in which an individual named Ellis Elliot was driving and his vehicle was struck in a parking lot.  Exhibit 21 – 1358587 Case Documents, Pg. 5.

73.     The individual who struck Ellis identified herself as Brandy Bass.  Bass is the maiden name of randy Andrews, a woman who filed a claim regarding a lost and/or stolen wallet and checks in 2011. *Id.*

74.     Ms. Andrews claimed that a vehicle was purchased in her name fraudulently, checks were written to Quen Allen for cash with a forged signature, and also that there were traffic tickets and a car accident associated with her name given the perpetual fraud. *Id.*

75.     Quen Allen was identified from a photo lineup as Ms. Andrews' imposter, for which she was indicted by a grand jury in Tarrant County, Texas. Exhibit 21 – 1358587 Case Documents, Pg. 12.

76.    Then, on July 11, 2014 an Order of Deferred Adjudication was entered in Case 1358587 whereby Quen Allen entered a plea of guilty to the state jail felony of fraud use / possession of identity information under five items which is codified in Texas law as 32.51(C)(1) PC. Exhibit 21 – 1358587 Case Documents, Pg. 16.

77.    Among the terms of the plea bargain were a $500 fine, five years of deferred adjudication, five years of community supervision, random urinalysis, and restitution to Ellis Elliot. Exhibit 21 – 1358587 Case Documents, Pg. 16.

78.    On July 11, 2014, Quen Allen signed a judicial confession admitting to committing the crimes in the indictment, and that she would abide by the conditions imposed under community supervision.  Exhibit 21 – 1358587 Case Documents, Pg. 28-29.

79.    Quen Allen violated various terms of her probation and plea bargain, and her overall term of supervision was extended with additional conditions imposed. Exhibit 21 – 1358587 Case Documents, Pg. 38.

80.    At the time that the application was submitted to the Original Creditor, Quen Allen's case (a felony) was still open and pending in Tarrant County, Texas. Exhibit 21 – 1358587 Case Documents, Pg. 39.[9]

ii.    **Plaintiff has not suffered any damages as a result of the allegations against NCS in the Complaint at ECF 1.**

81.    Plaintiff claims to have suffered some measure of actual damages (which he claims cannot be calculated but only determined by a jury) as a result of his allegations against NCS. Exhibit 4: Plaintiff's Supplemental Responses to NCS's Interrogatories No. 1 & 2, pg. 3-5.

---

[9] Additionally, similar charges were pressed against Quen Allen by the Irving Police Department in 2014. *See* Exhibit 22 – MA1432990 Case Documents, Pgs. 1-2.

82.     However, despite Plaintiff's assertions that he only applied for financing with one company in the past two years, Plaintiff's Experian consumer report tell a different story. *See* Exhibit 4: Interrogatory No. 7 (not naming any credit applications or denials from 2017 through present), 21; *see also* Exhibit 34, pg. 16 (indicating hard inquiries/applications with Bellco Credit Union and Mountain America Credit Union).

83.     Plaintiff also applied for a residential mortgage with Fairway Independent. Exhibit 38: Fairway Residential Application. With Plaintiff's application to Fairway Independent, Plaintiff indicated that the purpose of taking out such a loan was for "debt consolidation." *Id.*[10]

84.     Plaintiff has not presented any information or evidence to NCS which would support his position that he received unfavorable financing as a result of any actions that NCS may have taken.

85.     The only documentation or information which could support Plaintiff's claim for actual damages is a "Notice to the Home Loan Applicant." Exhibit 47, pg. 1.

86.     This document was prepared on June 8, 2020. *Id.* This bare-bones document indicates that the Plaintiff's Experian Fair Isaac Corporation Score (hereinafter, "<u>FICO</u>") score of 621. *Id.* at pg. 3.

87.     FICO scores are utilized to score the different information on a consumer report. *Id.*

88.     The fact that Plaintiff does not have actual damages (and has failed to provide any information or documentation to support the same) is supported by the testimony of NCS's proffered expert, Mr. John Ulzheimer. Mr. Ulzheimer concluded that NCS's investigation was complete, and that

---

[10] Plaintiff's discovery responses indicate that he has never been past-due on any of his accounts. Exhibit 42, pg. 8, RFP 7. However, Exhibit 26 makes clear that the Plaintiff has at least one other rental deficiency. Additionally, Plaintiff's application for a loan to consolidate all of his debt further calls in to question Plaintiff's statement regarding delinquent accounts – and, namely, which statement made by the Plaintiff is true and which one is false.

there was absolutely no evidence that the Plaintiff experienced credit-related damages as a result of any action taken by NCS. Exhibit 44 – Report of John Ulzheimer, pg. 4, "Summary of Opinions."

89.      First, Mr. Ulzheimer notes that the information reviewed by Plaintiff's proffered expert, Mr. Evan Hendricks, is based upon incomplete information as not all pertinent information (or deposition transcripts) were available as of the date of Mr. Hendricks' report. *Id.* at pg. 14.

90.      Mr. Ulzheimer also notes that the investigation was not as "robotic" as Mr. Hendricks painted the investigation to be, either. *Id.*

91.      However, most importantly, Mr. Ulzheimer lays bare the content and purpose of Plaintiff's disputes and any response thereto. Specifically, following receipt of the June 2020 ACDVs, the dispute codes communicated to NCS were that the account was "[n]ot his/hers," "[n]ot aware of collection," and to verify the account information as it relates to the Plaintiff. *Id.* at Pg. 15.

92.      Mr. Ulzheimer makes clear that claims of "true" identity theft are different than that of "not my account," and that they are investigated according to those standards. As an initial matter, the June 2020 ACDVs contained the sum and substance of Plaintiff's dispute – which is about as barren as could be (with *no* attachments, documents, letters, or additional explanation provided other than the notations of "not his/hers" and "not aware of collection" as noted above). *Id.* at pg. 15.

93.      Mr. Ulzheimer notes that the two July 2020 ACDVs "claim[] true identity fraud" from Trans Union and Equifax appear to attach FTC identity theft reports. *Id.* at pg. 16.

94.      Based upon Mr. Ulzheimer's experience, he states that when a furnisher receives a dispute such as this, the furnisher investigates the "indicia of liability" – and, as is pertinent here, they make a determination if the identity theft claims are false and if the Plaintiff was complicit in any of the alleged fraudulent acts. *Id.*

95.    Mr. Ulzheimer ultimately concludes that the Plaintiff was not the victim or fraud as there was "considerable evidence" indicating that Plaintiff knew of the Main Street Renewal lease application – and was possibly a party to it in some respect. *Id.* at page 18.

96.    Moreover, and as it relates to damages, Plaintiff's accounts were all designated with the compliance code "XB," which would preclude a claim for damages. *Id.* Specifically, though Plaintiff claimed that he had a loan refinance application denied (despite not providing documentation regarding the same), that he did not receive promotional offers, and that he suffered lower FICO score, compliance code "XB" would have precluded actual damages as it relates to the NCS account. *Id.*

97.    Mr. Ulzheimer makes clear that the "score disclosure" notice which was provided by the Plaintiff could not serve as evidence of a credit denial because those documents are sent to anyone who has applied for a residential mortgage following 2003. *Id.* at pg. 19.

98.    The consumer reports produced by the CRAs in this matter all indicate that compliance code XB is present, which would prevent a collection account from being taken into account when determining a FICO score. *Id.* at pg. 21.

99.    Where a consumer report states that the consumer disputes the account and that an investigation is underway, or another derivative of the same, that is indicative of an account reflecting compliance code XB. *Id.*

100.    Moreover, once compliance code XB has been added to an account, that moniker cannot be removed unless separate and explicit action requesting removal of the same. *Id.*

101.    There is no such indication that there ever was a request to remove this compliance code at *any* point in time. *Id.*

102.    Practically speaking, this means that the NCS account was not taken into consideration whatsoever when determining a credit/FICO score, rendering it impossible for the NCS account to have had any impact on the Plaintiff's consumer report in any manner whatsoever. *Id.* at pg. 22.

103.    Perhaps more tellingly, Plaintiff has completely failed to provide any "adverse action" notices – which is what would evidence a credit denial and any pertinent reasons therefor. *Id.*

104.    Importantly, the documents provided by the Plaintiff also *predate* any of Plaintiff's disputes as to the NCS account. Further, as it relates to "prescreened" offers – there is no evidence presented that Plaintiff did not receive any such prescreened offers that he would have originally expected to receive. This is also evidenced by the fact that Plaintiff had approximately $31,000.00 in credit spread across seven different accounts with which he could have obtained goods or services with – and those accounts and that credit were not impacted one way or another by any sort of preapproved offers (whether sent or withheld). *Id.*

Dated: November 15, 2022                                      Respectfully submitted,


                                                             */s/ Katrina M. DeMarte*
                                                             KATRINA M. DEMARTE (MI Bar No.
                                                             P81476; CO Bar No. 43135)
                                                             **DEMARTE LAW, PLLC**
                                                             39555 Orchard Hill Place Suite 600
                                                             Novi, MI 48375
                                                             Telephone: (313) 509-7047
                                                             katrina@demartelaw.com

## **CERTIFICATE OF SERVICE**

I certify that the foregoing has been served by the Court's CM/ECF service to all counsel of record on November 15, 2022.

<u>      /s/ Katrina M. DeMarte</u>