WARD V. NCS
EXHIBIT 39

Craig C. Marchiando (SBN 283829)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel: (757) 930-3660
Fax: (757) 257-3450
craig@clalegal.com
*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION**

| | |
|---|---|
| MELISSA MILLER,<br><br>Plaintiff,<br><br>v.<br><br>WESTLAKE FINANCIAL SERVICES, INC.,<br><br>Defendant. | Case No.: _____<br><br>**PLAINTIFF'S COMPLAINT FOR FCRA AND CCRAA VIOLATIONS**<br><br>**JURY TRIAL DEMANDED** |

COMES NOW the Plaintiff, MELISSA MILLER, by and through the undersigned Counsel, and sues Defendant, WESTLAKE FINANCIAL SERVICES, INC. (hereinafter "Westlake" and "Furnisher"). Plaintiff respectfully alleges violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x ("FCRA") and the California Consumer Credit Reporting Agencies Act, California Civil Code §§ 1785.1–1785.36 ("CCRAA").

**PRELIMINARY STATEMENT**

1.      This is an action for actual damages, punitive damages, costs, and attorneys' fees brought pursuant to the FCRA and CCRAA.

2.      Non-parties Equifax, Experian, and TransUnion comprise the three major consumer reporting agencies ("CRAs") in the United States.

3.      CRAs that create and sell consumer reports are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the

Robbin Ward 3rd Suppl. Prod. Bates No. 000870

information they report. It is not enough for them to simply parrot information they receive from entities that furnish them information, like Defendant, particularly where a consumer makes a dispute about information the CRAs are reporting.

4.    When a consumer like Plaintiff disputes information through the CRAs, those disputes are electronically transmitted to the parties furnishing the information, in this case the furnisher is the Defendant.

5.    The FCRA demands that each furnisher conduct a reasonable investigation of the consumer's dispute(s) and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.    Since furnishers generally have no duty to accurately report information to CRAs, individuals like Plaintiff have little recourse when creditors like Defendant are duped into granting credit by identity thieves and then improperly attribute those accounts to consumers who never opened them or authorized them to be opened.

7.    Statutes like the FCRA and CCRAA therefore provide consumers with the only mechanism by which they can force furnishers to report accurate information about them.

### JURISDICTION AND VENUE

8.    The jurisdiction for this Court is conferred by 15 U.S.C. § 1681p and 28 U.S.C. § 1367.

### PARTIES

9.    Plaintiff is a natural person and resident of Orange County, California. She is a "consumer" as defined by 15 U.S.C. § 1681a(c).

10.    Westlake is a financial institution providing consumer loans and conducting business in the State of California from its headquarters at 4751 Wilshire Boulevard, Suite 100, Los Angeles, California 90010. Westlake is a "furnisher" as that term is defined and interpreted under the FCRA and CCRAA.

Robbin Ward 3rd Suppl. Prod. Bates No. 000871
PLAINTIFF'S COMPLAINT

## FACTUAL ALLEGATIONS

### *Plaintiff's Experiences with Defendant*

11.     Plaintiff is a natural person who is alleged to owe a debt to Westlake in Los Angeles, California.

12.     On or around October 22, 2019, Plaintiff received a letter from Synchrony Bank stating her credit line for her TJX MasterCard was lowered because of delinquent accounts in her credit reports.

13.     Surprised by this letter and reference to supposedly delinquent accounts where she has none, Plaintiff set about investigating the claims by Synchrony Bank.

14.     On or around December 12, 2019, Plaintiff obtained her report from TransUnion, FIN 405253163, report number BAL45-002 00663. On or around December 18, 2019, Plaintiff obtained her Experian credit report, report number 1313-0443-96. On January 19, 2020, Plaintiff obtained her report from Equifax, with confirmation number 0019000253. All three CRAs' reports about Plaintiff showed an auto loan account from Defendant which Plaintiff had never opened nor authorized anyone to open in her name.

15.     The fraudulent auto loan account which appeared on Plaintiff's Experian, Equifax and TransUnion reports was a 'Westlake Financial SVCS' account for $13,749, opened in July of 2019 in the State of California. Plaintiff did not authorize her information to be used by Westlake or anyone else on this date, nor did she purchase a vehicle in the city of Los Angeles.

16.     The fraudulent Westlake auto account reflected a balance of $13,589 as of November of 2019. It reflected that November's payment was 90 days late for $507. This inaccurate reporting significantly lowered Plaintiff's credit score.

17.     Plaintiff's credit limits were decreased by her actual creditors, and she began getting denied new credit due to the inaccurate reporting on her credit report by Defendant.

Robbin Ward 3rd Suppl. Prod. Bates No. 000872

PLAINTIFF'S COMPLAINT

18.    On January 22, 2020, Plaintiff disputed in writing to Experian, Equifax, and TransUnion the Westlake auto loan account, as well as the erroneous reporting of her name, address, and phone number(s). Within the very detailed disputes, Plaintiff included a copy of her California Driver's License, as well as her Social Security Card, to prove both her residence and her social security information. She clearly detailed the fraudulent account from Westlake as well as noted the impermissible inquiries on her credit reports.

19.    Within the dispute letters to Experian, Equifax and TransUnion, Plaintiff included the numbers of three police reports she had filed with the Huntington Beach Police Department (2018-601027, T18001230, and 2020-00001696). Plaintiff also included the number of an identity fraud report number that she filed with the Federal Trade Commission (109743860).

20.    When CRAs receive disputes like Plaintiff's, the FCRA demands that they immediately forward them, and all relevant information, to the furnishers whose credit accounts or tradelines are the subject of the disputes.

21.    The CRAs use a uniform electronic system, known as e-OSCAR, to transmit disputes to furnishers. The substance of the disputes and accompanying documents are transmitted using forms called automated consumer dispute verification ("ACDV") forms.

22.    Despite the Defendant receiving the ACDVs from all three CRAs (including the detailed dispute letter) and being informed that Plaintiff had never purchased a car in the city of Los Angeles where the vehicle was purchased, the Defendant failed to investigate or rectify the fraudulent information and inexplicably verified the information as "accurate" to all three CRAs.

23.    On February 19, 2020, Equifax responded to Plaintiff's dispute with confirmation number 0028026973. Equifax responded to the Westlake auto loan account by stating "[w]e verified that this account belongs to you."

Robbin Ward 3rd Suppl. Prod. Bates No. 000873
PLAINTIFF'S COMPLAINT

24.    Based apparently on the supposed verification by Westlake, Equifax continued to report the fraudulent accounts after the disputes from Plaintiff.

25.    On February 20, 2020, Experian responded to Plaintiff's dispute with report number 1585-0248-64. Experian responded to Plaintiff's dispute regarding the Westlake account by indicating "Outcome: Updated" and stated "Please contract Credit Grantor at 888-739-9192".

26.    Based on these apparent outcomes of its investigations, Experian continued to report the fraudulent account after the disputes from Plaintiff and was now the account in Collections for January and February of 2020 after being over 120 days past due. This negative reporting of the erroneous account significantly lowered Plaintiff's credit score.

27.    On February 22, 2020, TransUnion responded to Plaintiff's dispute with FIN 405253163, report number BNWHL-003 01632. TransUnion verified as accurate based on Defendant's validation of the fraudulent account.  TransUnion continued to report the derogatory fraudulent account after the dispute from Plaintiff.

28.    Discovery will confirm that Experian, Equifax, and TransUnion sent Plaintiff's disputes to Westlake according to the process discussed more thoroughly below. Receipt is also confirmed by the verification of the Westlake account as supposedly accurate.

29.    Rather than doing any sort of investigation of its own, Defendant chose to simply verify Plaintiff's information that she indicated had been stolen from her (name, SS, DOB).  Defendant continued the negative fraudulent reporting to all three CRAs.

30.    Defendant had more than enough information to learn the illicit nature of the account. Plaintiff had detailed that she was the victim of identity theft, therefore simply verifying the above information served no purpose.

31.    This is particularly true given the nature of identity theft. Of course, Defendant's records contained at least Plaintiff's name, date of birth, and Social

5

Robbin Ward 3rd Suppl. Prod. Bates No. 000874

Security Number tied to the fraudulent account, as that is the type of information thieves take and use to open fraudulent accounts.

32.    Plaintiff included within her disputes three police report numbers and an FTC Report number which should have demonstrated to Defendant that this account was fraudulent. The production of the three police report numbers and the FTC report should have triggered an independent investigation by Defendant.

33.    Instead, Defendant failed to investigate the location of the purchase (Los Angeles), to contact any of the law enforcement agencies involved, or to call Plaintiff by phone to collect evidence of the fraud, Defendant took the inexpensive avenue of simply verifying the fraudulent account.

34.    In late February and early March 2020, Plaintiff desperately disputed again, in writing, with Experian, Trans Union and Equifax. She provided an almost identical copy of the first dispute letter with some brief additional information.  She detailed the mistake with Westlake, as well as noted the impermissible inquiry in her credit reports. Plaintiff again included three police report numbers she had filed in Huntington Beach, where she has resided for over two years. Plaintiff also included the fourth report number filed with Federal Trade Commission. Again, this dispute was almost a duplicative dispute of the first one she had sent out that was ignored by Defendant.

35.    Plaintiff disputes to Experian, Equifax and Trans Union contained color images of her social security card, her California Driver's License, a Mercury Insurance bill with her current address and an image of Huntington Beach Police Report verifying her demographics.

36.    On March 19, 2020, Trans Union responded to Plaintiff's second dispute FIN 386077645, report number BT58X-003 00057 and the disputed account with Westlake was not addressed but was also not appearing.

37.    After the response from Trans Union and not seeing the account, Plaintiff was hopeful the error by Defendant may have been fixed.

Robbin Ward 3rd Suppl. Prod. Bates No. 000875
PLAINTIFF'S COMPLAINT

38.    On April 9, 2020, Equifax responded to Plaintiff's second dispute with confirmation # 0077038885. Equifax finally agreed with Plaintiff's evidence, and responded to the auto loan disputes as follows, "We have researched the credit account... The results are: This item has been deleted from the credit file." Defendant had received the same information in Plaintiff's original dispute from the three CRAs but the error was not corrected until March or April of 2020.

39.    Since the time of the purchase, Defendant should have known that Plaintiff was not the actual debtor yet continued to report and to verify to Experian, Equifax, and TransUnion that she was the true debtor. Defendant had in its possession account-level information that could easily have confirmed that Plaintiff did not owe the debt they were alleging.

40.    Defendant should have possessed copies of picture identifications used during the purchase and comparing those to the documents Plaintiff submitted with her disputes should have confirmed to Defendant that Plaintiff was not liable on the account.

### The Automated Handling of Credit Disputes

41.    When Plaintiff mailed her detailed, written disputes and enclosures to the CRAs, they use a dispute system named "e-Oscar," which has been adopted by the credit reporting agencies and by their furnisher-customers such as Westlake. It is an automated system and the procedures used by the CRAs are systemic and uniform.

42.    When a CRA receives a consumer dispute, it (usually via an off-shore, outsource vendor) translates that dispute into an "ACDV" form.

43.    The ACDV form is the method by which the Defendant have elected to receive consumer disputes pursuant to 15 U.S.C. §§ 1681i(a) and 1681s-2.

44.    Based on the manner in which Experian, TransUnion, and Equifax responded to Plaintiff's disputes, representing that Defendant had "updated" or "verified" the supposed accuracy of their reporting, Plaintiff alleges that Experian,

Robbin Ward 3rd Suppl. Prod. Bates No. 000876
PLAINTIFF'S COMPLAINT

Equifax, and TransUnion did in fact forward the Plaintiff's disputes via an ACDV to the Furnisher Defendant.

45.    The Defendant understood the nature of the Plaintiff's disputes when they received the ACDVs from Experian, TransUnion, and Equifax (including the detailed letter).

46.    When the Defendant received the ACDVs from Experian, TransUnion, and Equifax, it could have reviewed its own systems and previous communications with the Plaintiff and discovered that it in fact had connected Plaintiff to an account she never opened or authorized, and the debt for which should not have made it onto Plaintiff's consumer reports.

47.    Notwithstanding the above, discovery will show Defendant follows a standard and systemically unlawful process when they receive ACDV disputes. Basically, all Defendant does is review their own internal computer screens with basic data for the accounts and repeat back to the ACDV system the same information they had already reported to the CRAs.

48.    Defendant at all times had possession of the applications, identification of the buyers, and additional information that could have easily discovered the fraud of which Plaintiff complained. They chose to ignore that information in favor of slipshod investigations that are by design perfunctory so the Defendant can save money and also feign FCRA compliance.

49.    When Defendant receives consumer disputes through e-Oscar, it does not conduct a substantive review of any sort to determine whether or not the information already in their computer systems is itself accurate.

50.    The law in this District, the Ninth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a CRA.

8

51.  As a result of the inaccurate credit reporting and inadequate investigation of Plaintiff's disputes, Plaintiff has suffered damages including, but not limited to:

    i.    Higher interest

    ii.    Deceased credit limits on existing credit cards;

    iii.    Denial in application for new credit card use or higher limits;

    iv.    Monies lost by attempting to fix her credit, such as communication costs, postage for disputes;

    v.    Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life;

    vi.    Stress associated with hundreds of hours attempting to resolve this matter,

52.  All conditions precedent to the filing of this action has occurred.

## CAUSES OF ACTION

### COUNT I
### Westlake's Violations of FCRA § 1681s-2(b)(1)(A) and (B)

53.  On at least one occasion within the past two years, by example only and without limitation, Westlake violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate the Plaintiff's disputes.

54.  On one or more occasions within the past two years, by example only and without limitation, Westlake violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agencies.

55.  When the Plaintiff mailed her detailed, written disputes and enclosures to the CRAs, they used e-Oscar to transmit those disputes to Westlake via ACDV forms

56.  The ACDV form is the method by which Defendant has elected to receive consumer disputes pursuant to 15 U.S.C. §§ 1681i(a) and 1681s-2(b).

57.  Westlake understood the nature of the Plaintiff's dispute when it received the ACDV from Experian, TransUnion and Equifax.

9

Robbin Ward 3rd Suppl. Prod. Bates No. 000878

PLAINTIFF'S COMPLAINT

58.    When Westlake received the ACDV from Experian, TransUnion and Equifax, it as well could have reviewed its own systems and previous communications with the Plaintiff and discovered that Westlake in fact had connected Plaintiff to an account within a State at which she has never resided, and the debt for which should not have made it onto Plaintiff's consumer report.

59.    Notwithstanding the above, discovery will show Westlake follows a standard and systemically unlawful process when it receives the ACDV dispute. Basically, all Westlake does is review its own internal computer screen with basic data for the account and repeat back to the ACDV system the same information Westlake already had reported to the CRAs. Westlake at all times had possession of the application, identification of the buyer, and additional information that could have easily discovered the fraud. Westlake never attempted to contact the law enforcement agencies Plaintiff reported the crime to.

60.    When Westlake receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether or not the information already in its computer system is itself accurate.

61.    As a result of Westlake's violations of 15 U.S.C. § 1681s-2(b)(1)(A) and (B), the Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

62.    The violations by Westlake were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Westlake was negligent, entitling the Plaintiff to recovery under 15 U.S.C. § 1681o.

63.    The law in this District, the Ninth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a CRA.

Robbin Ward 3rd Suppl. Prod. Bates No. 000879

PLAINTIFF'S COMPLAINT

64. Westlake was aware of the FCRA decisions by the Ninth Circuit setting out furnishers' obligations to reasonably investigate disputes when it followed the ACDV procedures used regarding the Plaintiff's dispute.

65. Discovery will confirm that the procedures followed regarding the FCRA dispute through e-Oscar were the procedures that Westlake intended its employees or agents to follow.

66. Because of Defendant's failure in investigating Plaintiff's disputes, Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

WHEREFORE, Plaintiff respectfully demands a trial by jury on all issues so triable and judgment against Defendant, WESTLAKE FINANCIAL SERVICES, INC., for statutory damages, punitive damages, actual damages, costs, interest, attorneys' fees, enjoinder from further violations of these parts, and any other such relief the Court may deem just and proper.

## COUNT II
### Westlake's Violations of FCRA § 1681s-2(b)(1)(C) and (D)

67. On one or more occasions within the past two years, by example only and without limitation, Westlake violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the Westlake's inaccuracies within Plaintiff's credit files with Experian, TransUnion and Equifax, without also including a notation that this debt was disputed and by failing to correctly report results of an accurate investigation to Experian, Trans Union and Equifax.

68. Specifically, discovery will show Westlake failed to add the "XB" code to the CCC (Compliance Condition Code) field in the ACDV dispute forms when it responded to Experian, TransUnion, and Equifax.

69. The XB code will cause the CRAs to include in subsequent reporting of the account tradeline a notation that the information reported is disputed by the consumer and in investigation is ongoing.

11

70. Discovery will further show that Westlake failed to add the "XC" CCC in the ACDVs when it responded to Experian, TransUnion, and Equifax.

71. The XC code will cause the CRAs to include in subsequent reporting of the account tradeline a notation that the information reported is disputed by the consumer.

72. Discovery will also show that Westlake rarely, if ever, adds the XB or XC code or other notation that an account is disputed when it responds to e-Oscar ACDVs.

73. Plaintiff's disputes were, at a minimum, bone fide.

74. In fact, the Plaintiff's disputes were justified because they showed that the signature used for the vehicles were not the same signature used by Plaintiff.

75. Westlake was aware of FCRA decisions by the Ninth Circuit setting out reporting requirements when consumers have bona fide disputes when it followed the ACDV procedures used regarding Plaintiff's dispute.

76. Discovery will confirm that the procedures followed regarding the Plaintiff's FCRA dispute through e-Oscar were the procedures that Westlake intended its employees or agents to follow.

77. Discovery will further confirm that Westlake's employee or agent did not make a mistake (in the way in which he or she followed Westlake's procedures) when he or she received, processed and responded to Experian and TransUnion's ACDVs and did not include the XB or XC code in the CCC field.

78. Discovery will also show Westlake has not materially changed its FCRA investigation procedures regarding the CCC field in ACDVs after learning of its failures in this case.

79. As a result of Westlake's violations of 15 U.S.C. § 1681s-2(b)(1)(C) and (D), the Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

Robbin Ward 3rd Suppl. Prod. Bates No. 000881
PLAINTIFF'S COMPLAINT

80.    The violations by Westlake were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Westlake was negligent, entitling the Plaintiff to recovery under 15 U.S.C. § 1681o.

81.    The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorneys' fees from Defendant, Westlake, in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

WHEREFORE, Plaintiff respectfully demands a trial by jury on all issues so triable and judgment against Defendant, WESTLAKE FINANCIAL SERVICES, INC., for statutory damages, punitive damages, actual damages, costs, interest, attorneys' fees, enjoinder from further violations of these parts, and any other such relief the Court may deem just and proper.

## COUNT III
### Westlake's Violations of CCRAA § 1785.25(a)

82.    On one or more occasions within the past two years, by example only and without limitation, Westlake violated CAL. CIV. CODE § 1785.25(a) by knowingly furnishing to the CRAs information about Plaintiff that it knew or should have known was inaccurate.

83.    Specifically, discovery will show that through Plaintiff's disputes and its own records Westlake had ample information to raise a doubt, if not confirm outright, that the account it attributed to Plaintiff was not opened by or authorized by her.

84.    Despite this evidence and knowledge, Westlake soldiered-on in reporting to the CRAs that the account belonged to Plaintiff.

85.    Such reporting of information constitutes a violation of CAL. CIV. CODE § 1785.25(a) on its face.

86.    As a result of each and every negligent violation of the CCRAA, Plaintiff is entitled to damages as the Court may allow pursuant to CAL. CIV. CODE § 1785.16(a).

Robbin Ward 3rd Suppl. Prod. Bates No. 000882

13

87. As a result of each and every willful violation of the CCRAA, Plaintiff is entitled to damages as the court pay allow pursuant to CAL. CIV. CODE § 1785.31(a)(2) against Westlake, including punitive damages of $100 to $5,000 per willful violation.

88. Plaintiff is also entitled to injunctive relief against Westlake pursuant to CAL. CIV. CODE § 1785.31(b).

89. Plaintiff is further entitled to recover her court costs and attorneys' fees pursuant to CAL. CIV. CODE § 1785.31(d).

WHEREFORE, Plaintiff respectfully demands a trial by jury on all issues so triable and judgment against Defendant, WESTLAKE FINANCIAL SERVICES, INC., for statutory damages, punitive damages, actual damages, costs, interest, attorney fees, enjoinder from further violations of these parts, and any other such relief the Court may deem just and proper.

## PRAYER FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1) Award Plaintiff actual and punitive damages for Westlake Financial Services, Inc.'s violations of the FCRA;

(2) Award Plaintiff injunctive relief for Defendant's violations of the CCRAA;

(3) Award Plaintiff attorneys' fees and costs under the FCRA and CCRAA;

(4) Award Plaintiff post-judgment interest; and

(5) Award all other relief, including equitable relief, as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**MELISSA MILLER**

By: */s/ Craig C. Marchiando*
Craig C. Marchiando (SBN 283829)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A

Robbin Ward 3rd Suppl. Prod. Bates No. 000883

14

Newport News, VA 23601
Tel: (757) 930-3660
Fax: (757) 257-3450
craig@clalegal.com
***Attorney for Plaintiff***

Robbin Ward 3rd Suppl. Prod. Bates No. 000884

PLAINTIFF'S COMPLAINT