WARD V. NCS
EXHIBIT 44

# Expert Report of John Ulzheimer

## In the Matter of *Ward v. National Credit Systems, Inc.*

## United States District Court for the District of Colorado

## No. 1:21-cv-02597-LTB

September 20, 2022, Expert Report of John Ulzheimer                                    Page 2

# I.   QUALIFICATIONS

## A.   Employment History

I have worked in the consumer credit industry since November of 1991. I spent six years with Equifax Credit Information Services (hereinafter, "Equifax", or "EIS"), and spent several of those years both performing the consumer dispute process and managing a team of consumer service agents that also performed the consumer dispute process, including disputes related to identity theft and fraud. My team and I also handled the process of generating the appropriate dispute forms, manual verification, credit report corrections, and disclosures to consumers.

While at Equifax, I gained a first-hand understanding of how credit files are compiled, stored, retrieved, and delivered. I also sold various Equifax Credit Marketing Services (CMS) products, which included lists for preapproved credit card offers.

At the Fair Isaac Corporation (which shall hereinafter be referred to as "Fair Isaac", and Fair Isaac's best known product being FICO credit scores referred to as "FICO" scores, scorecards, credit scores, etc., as appropriate), I spent an additional seven years gaining a first-hand understanding of credit scoring, including how credit scores are designed, developed, used by lenders, and impacted by the information in consumer credit files. From time to time, I was involved with the development of FICO credit bureau scorecards, which are the heart of credit scores.

At Credit.com, I spent six years teaching consumers and the media how the consumer credit system works, including topics such as credit reporting, credit scoring, credit cards, and debt settlement, to name but a few. I was also the developer of the Credit Report Card, a credit-scoring tool that interprets Trans Union, LLC's (hereinafter, "Trans Union", or "TU"),  credit data, and then gives the consumer an easy-to-understand summary of their credit risk. The tool won several awards in 2009 when it was released.

As a former employee of Equifax, Fair Isaac, and Credit.com, I have worked with, helped train, and have supervised employees on processes and procedures involved in credit reporting, credit report dispute resolution, Fair Credit Reporting Act compliance, credit score model design and development, and consumer credit risk management.

I am also familiar with general underwriting practices, including what prospective lenders consider when determining credit risk. This includes a general understanding of what lenders consider important and not so important when considering a consumer's credit report. I gained this knowledge from many years of working with various lenders during my employment with Equifax, Fair Isaac, and Credit.com. In fact, during the first four years of my time at Fair Isaac, I taught members of the mortgage industry how to properly implement credit scoring into their processes.

At the time, Fannie Mae and Freddie Mac had just mandated the use of FICO scoring in their respective underwriting systems, Loan Prospector and Desktop Underwriter. My role, among other things, was to teach industry trade associations, large national mortgage lenders, Fannie Mae, and Freddie Mac how FICO scoring worked, how consumer risk changed as deal

September 20, 2022, Expert Report of John Ulzheimer                                    Page 3

variables changed, and how to educate their home-buying customers on the importance of solid credit management.

### B.    Presentations and Academia

I have made hundreds of credit reporting and credit scoring presentations during my time working in the credit industry. These presentations were delivered to consumers, consumer groups, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, members of Congress, and banking authorities, and consisted of varying levels of complexity depending on the audience.

I guest lectured for many years about credit reporting and credit scoring at The University of Georgia in Athens, GA. I taught at Emory University's Center for Lifelong Learning, where I was rated by the students as the top instructor in the Personal Finance and Investments category during the 2005-06 term. I guest lectured for many years about credit reporting to graduating seniors at The Westminster Schools in Atlanta. Since 2016, I have been a regular guest lecturer on the topic of the use of expert witnesses to 2nd and 3rd year students at the Emory University School of Law. I also volunteer my time teaching credit reporting and credit scoring fundamentals to members of the Georgia Consortium on Personal Financial Literacy.

I received a Bachelor of Science in Criminal Justice from the University of West Georgia in June 1991. I am well qualified to interpret and discuss the issues at hand in this case. My background and qualifications are set forth in my resume, which is attached as Exhibit A.

### C.    Publications

I am a frequent contributor on consumer credit issues to Associated Press, Consumer Reports, USA Today, The New York Times, The Wall Street Journal, Forbes, Yahoo Finance, CNBC, Kiplinger's, Money Magazine, American Banker, U.S. News and World Reports, Bankrate.com, and other regional business and consumer media outlets.

I have written or contributed to the following on the same or related topics,

- *The Smart Consumer's Guide to Good Credit (with Deanna Templeton)*
- *You're Nothing but a Number*
- *Surviving Identity Theft (with Emily Peters)*
- *The Get Credit Wise ToolKit*
- *The Use of Compliance Condition Codes,* CO Bar Assn. Newsletter *(with Matt Peterson)*
- *Trends in Credit-Related Lawsuits*, CCFL, Quarterly Report, Vol.73, No.3

I have been an author since 2004 and have written thousands of articles. I currently write or have written reoccurring articles on credit issues for newsletters, websites, and blogs. Examples include or included a monthly column, "Ask John," for Credit.com's monthly e-newsletter, for Boardroom, Inc.'s monthly newsletter, *BottomLine Personal*, and for CreditBloggers.com, Credit.com, Enloop.com, CNBC.com, IMS Expert Services Newsletter, Mint.com, SmartCredit.com, CreditSesame.com, the National Foundation for Credit Counseling, Credit Card Insider, Experian, The New York Times, JD Byrider, MagnifyMoney, The Simple Dollar, Zillow, VantageScore Solutions, and The Wall Street Journal Buy Side. More specificity as to my publications can be found at Exhibit D.

### D.      Certifications

I have twice been Fair Credit Reporting Act (hereafter, "FCRA") certified by the credit reporting trade association, the Consumer Data Industry Association (hereafter, "CDIA"), and its predecessor, the Associated Credit Bureaus (ACB). The FCRA Certificate Program was developed to prepare consumer reporting agencies and companies that furnish information to the consumer reporting agencies to meet the requirements set forth in the FCRA. The course covers how consumers, credit grantors, and those who use and furnish information to consumer reporting agencies are impacted by the FCRA.

### E.      Previous Expert Witness Work and Testimony

I first served as an expert witness in 2005. Since then, I have been retained as an expert in more than 600 lawsuits concerning credit issues, have been qualified and admitted to testify as an expert in both federal and state courts, and have provided sworn testimony over 100 times in depositions, trials, and arbitration settings.

I have served as an expert for both plaintiffs and defendants, and for creditors, consumers, and other types of companies. A list of matters on which I have testified in the last four years is attached as Exhibit B to this report.

## II.     SCOPE OF WORK

I was retained by counsel for National Credit Systems, Inc. (hereafter, "NCS") and asked to provide an expert opinion on credit reporting, credit scoring, credit reporting investigations and standards, Plaintiff's credit damage allegations, and to provide rebuttal opinions, as necessary.

## III.    COMPENSATION

I am being paid $625 per hour for my work. I have no financial interest in the outcome of this matter.

## IV.     DOCUMENTS REVIEWED

A list of documents and other information upon which I have considered and relied in forming my opinions set forth in this Report are attached as Exhibit C.

## V.      SUMMARY OF OPINIONS

Having reviewed the facts and materials in this case and based on my analyses presented in this Report, it is my opinion that:

1. Opinions regarding the completeness of NCS's investigations, and rebuttal to Plaintiff's expert's opinions of the same.

2. There is no evidence the Plaintiff experienced the credit related damages, as alleged, as a result of NCS furnishing and verifying information on the Plaintiff's credit reports.

## VI.     COMPLETE STATEMENT OF ALL OPINIONS AND BASIS FOR OPINIONS

### A.     Background Regarding the Credit Reporting Industry

#### 1.     Credit Reporting Agency Background

A credit report is a record of an individual's current and past financial liability experience. The report includes information about a consumer's personal identity, their employment, collection agency accounts (if any), public records (liens, judgments, and bankruptcies only), as well as their account history (also called "trade"). There are a number of companies that maintain consumer credit files and generate credit reports when requested by the consumer, a lender, an insurer, or another organization with a right to view such data.

These companies are called credit reporting agencies, consumer reporting agencies, or credit bureaus. They collect and store credit data and then generate and deliver credit reports using that data in response, for example, to requests from lenders or insurance companies who have received an application for credit or to bind insurance. There are three major, commonly recognized credit reporting agencies in the United States: Equifax, Experian, and Trans Union. Equifax, a public company, is headquartered in Atlanta, Georgia. Experian (hereinafter, "EXP"),, a public company in the U.K., has its U.S. headquarters in Costa Mesa, California. Trans Union, a public company, is headquartered in Chicago, Illinois. Each of the three companies maintains over 200 million credit files. There are roughly 675 million consumer credit files in circulation.

#### 2.     Data Furnisher Background

Information that is sent to the credit reporting agencies comes from companies generally referred to as "data furnishers." NCS is an example of one of the ~14,000 data furnishers in the U.S credit market. These companies are almost always going to be some sort of financial institution (e.g., a bank, credit union, finance company, loan servicer, or credit card issuer) or a debt collector. These furnishers will generally send their customer or debtor's account information to the credit reporting agencies once every statement cycle period, which is normally once per month.

The furnisher's information is generally sent to the credit reporting agencies via a system-to-system communication. Once the credit reporting agency receives the furnisher's information, they will load it into their credit file database and include it on a consumer's credit report when requested. Furnishers can also provide information to consumer reporting agencies through the dispute resolution process.

The language furnishers use to communicate their customers' or debtors' information to the credit reporting agencies is called Metro 2. This language is the exclusive industry standard and there is no other reporting format available to furnishers. All consumer data reported by furnishers must be in the specific language and format dictated by Metro 2 for it to be relayed to and accepted by the CRAs.

The Metro 2 language represents the entire universe of codes and characters which furnishers can choose from and use to populate the data fields defined by the credit reporting agencies. Once received, the credit reporting agencies process and display this information on

their Consumer Disclosures and Authentic Credit Reports their own way without further input from furnishers.

Every year the Consumer Data Industry Association publishes a manual called the Credit Reporting Resource Guide (hereafter, "CRRG") or, informally, the Metro 2 Manual. This manual, which is over 350 pages, contains not only the Metro 2 language field layout but also a comprehensive list of the numerous codes used to furnish information to the credit reporting agencies, and a description of the conditions or scenarios when the codes should be used.

### 3.     Preparation of Credit Reports

A credit report is normally delivered to the lender, insurance company, consumer service provider or other requesting party when a consumer submits an application for some sort of benefit, such as a home loan, auto loan, credit card, subscription service, or insurance. The requestor or lender, referred to by the credit bureaus as a subscriber or user, submits a request for the consumer credit file. Using proprietary search logic, the credit bureau compiles a credit report using its stored data. This process is virtually instantaneous, giving lenders the ability to make instant credit decisions.

The information in a consumer credit report can be scored using a sophisticated algorithm called a credit-scoring model. The report and credit score are then used by lenders to determine an individual's credit risk. The information in a consumer credit report is not "real time," meaning it is not updated dynamically.

### 4.     Credit Scoring

A credit score is a number that summarizes an individual's credit risk based on a snapshot of their credit report at some point in time. A credit score helps lenders evaluate an individual's entire credit report *by estimating their likelihood of becoming 90 days late or worse on any credit obligation in the 24 months after the score is calculated.*

No one item on a consumer's credit report is the basis for their credit scores. Credit scoring models, instead, consider a wide-ranging universe of credit report attributes including account information, credit inquiries, debt related metrics, the presence or lack of credit experience, and public record information.

The most widely used credit scores are FICO branded scores, which are the credit scores created by FICO (formally known as Fair Isaac Corporation), my former employer. Lenders can buy the various FICO scores from any of the three major credit reporting agencies. The first generation of FICO's credit scores was made available via Equifax in 1989.

FICO develops its scores based on information in the consumer credit files maintained by the credit reporting agencies. A credit score may influence the credit available to the consumer and the terms that lenders offer to the consumer (e.g., interest rate, credit limits). Credit scores can be calculated using different scoring models, although FICO's are the most common in the United States, Canada, and other countries that maintain sophisticated credit reporting systems.

Even under the FICO brand there are dozens of credit scores commercially available and in use in the United States. No consumer has one credit score but rather has hundreds of scores, most of which are credit bureau based scoring systems such as FICO and VantageScore, custom scoring models or pooled scoring models, which are developed by analytics companies for use by one company or a small group of companies.

### a.        Factors Affecting Credit Scoring

FICO's commonly used credit-risk scores take into account a number of credit report components. Those components that contribute to a FICO credit score and the relative weight of each (expressed as a percentage) are:

35%   **Payment History**: The presence or lack of negative information
30%   **Debt**: How much and what type
15%   **Length of Credit History**: How long an individual has had credit
10%   **Account Diversity**: The variety of credit experiences
10%   **Hard Inquiries**: A record of when an individual's credit report is accessed

**Payment History** (**35%** contribution on the FICO scale)    A record of negative information can potentially lower a consumer's credit rating or score. In general, risk scoring systems look for any of the following negative events: charge-offs, collections, late payments, repossessions, foreclosures, settlements, bankruptcies, liens, and judgments. Within this category, FICO considers the severity of the negative item (minor derogatory versus major derogatory), the age of the negative items, and the prevalence of multiple negative items.[1]

**Debt** (**30%** contribution on the FICO scale)    FICO considers the amount and type of debt carried by a consumer. There are three types of debt considered:

> **Revolving debt:** This is credit card, retail card, and some gas card debt. While home equity lines of credit have revolving terms, the bulk of debt considered in this category is unsecured revolving debt incurred on "plastic." The most important measurement from this category is called "Revolving Utilization," which is the relationship between the consumer's aggregate credit card balances and available credit card limits, also called "open to buy."
>
> This is expressed as a percentage and is calculated by dividing aggregate credit card balances by aggregate credit limits and multiplying the result by 100, yielding the Revolving Utilization percentage. The higher the percentage, the lower an individual's FICO score likely will be. This is why simply closing credit cards is generally not a good method for improving one's credit score. Closing one or more credit card accounts will reduce an individual's total available credit limit and, in turn, likely increase the

---

1. In the FICO and VantageScore scoring systems, a severe/major derogatory event is any open and active account with a past due balance, any account that includes a record of being historically 90 days past due or worse, a public record, collection accounts, or any account status or narrative that indicates default or severe delinquency (e.g., repossession, foreclosure, settlement/short sale, collection, charge-offs). Accounts with only historical 30 and 60 day delinquencies are considered to be minor derogatory events.

individual's Revolving Utilization percentage, unless the cardholder also reduces their outstanding balances as well.

**Installment debt:** This is debt where there is a fixed payment for a set period of time, such as an auto retail installment account requiring the same payment for 36, 48, or 60 months.

**Open debt:** This is the least common type of debt. Open debt must be paid in full each month. A certain variety of credit cards require a consumer to "pay in full" each month. The American Express Green card is a common example.

**Length of Credit History** (Credit File Age) (**15%** contribution on the FICO scale)    The older an individual's credit report, the more stable it likely is. The credit file "age" is determined by looking at (1) the date the oldest account was opened, and (2) the average age of the accounts in the credit file. The age of the credit file is measured from the oldest account's "date opened" field. The average age is calculated using the "date opened" field on all accounts, whether they are currently open or closed.

**Account Diversity** (**10%** contribution on the FICO scale)    An individual's credit score will benefit from having a diverse set of account types in his or her credit file. Having experience across multiple account types (revolving, auto, mortgage, etc.) benefits an individual's credit score because the individual is proving an ability to manage different types of debt.

**Hard Inquiries** (**10%** contribution on the FICO scale)    An inquiry is noted every time a company requests some information from a consumer's credit file. There are several kinds of inquiries that may or may not affect one's credit score. Inquiries that have no effect on the credit score of a consumer (including so-called "soft inquiries") can stay on a credit report for as little as 6 months and are never visible to lenders or credit scoring models. There are several types of soft inquiries:

- Prescreening or promotional inquiries, where a credit bureau may sell contact information to credit card companies, lenders, or insurers for consumers who meet criteria set by the inquirer. Pre-approved credit card offers are mailed to consumers identified through a prescreening or promotional inquiry.

- Creditors check current customers' credit files on a periodic basis through an account management, account maintenance, or account review inquiry.

- When a consumer checks his or her own credit report it is referred to as a consumer disclosure inquiry.

- Employment screening inquiries.

- Insurance related inquiries.

- Utility related inquiries.

Other types of inquiries (known as "hard inquiries") can have an impact on the credit score of a consumer. These inquiries are visible to lenders and credit scoring models. These inquiries usually result from a lender requesting a consumer's credit report when the consumer

September 20, 2022, Expert Report of John Ulzheimer                                    Page 9

applies for an extension of credit. Hard inquiries can, but do not always, impact the borrower's credit score. Limiting the number of credit inquiries can help a consumer's credit score.

Only information appearing on a consumer's authentic credit report is subject to the credit scoring process. These are solely the credit reports compiled by the credit reporting agencies in the Metro 2 credit report format. Consumer disclosures, free credit reports given away on websites, and credit reports sold by compilers are NOT authentic credit reports. Such documents are not in the standardized Metro 2 credit reporting format, are never available to the users of credit reports (such as lenders) and are also never the basis for credit scores.

### b.    Scoring Models

#### i.    Multivariate Systems

Credit scoring models are multivariate, meaning they evaluate a variety of information or combinations of information on a credit report to generate a final score. No single credit item determines an individual's credit score. In fact, the impact of any one item on an individual's credit score is dependent on all of the other items on their credit report, and may not have any impact at all.

#### ii.    Multi-Scorecard Systems

Credit scoring models are actually a consolidation of multiple credit scoring systems called scorecards. A scorecard is a credit scoring model designed to evaluate the risk of a group of consumers who have certain similarities in their credit file (homogenous populations). For example, a consumer with a bankruptcy on his credit report is scored using a model or scorecard designed specifically to evaluate the credit risk of consumers who have filed bankruptcy. Similarly, a consumer with limited credit information (known as a "thin file") is scored using a model or scorecard designed to evaluate the credit risk of consumers with thin files. Most credit scoring systems have many scorecards, as there are many unique consumer profiles, each with different risk levels. The selection of the appropriate scorecard is made by the credit scoring system prior to calculating and rendering a final score.

#### iii.    Characteristics, Variables, and Weights

Each scorecard contains a series of characteristics, variables, and weights. A characteristic is a question asked of the credit report by the scoring system. For example, a common characteristic in most credit risk models asks, "how many accounts with a balance are present?"

Other examples[2] include:

- Does the consumer have any delinquencies on his or her credit report?

- How long has it been since the consumer's most recent delinquency?

---

[2] These are intended to illustrate the characteristic, variable and weighting process and are not meant to mimic the variable classing or weights of any particular credit scoring systems.

September 20, 2022, Expert Report of John Ulzheimer                              Page 10

- Does the consumer have a bankruptcy on his or her credit report?

While these examples are plain English questions, credit scoring systems answer the questions by reading the data embedded in the credit report. Scorecards regularly use at least 12 characteristics, and, in some cases, significantly more.

Each characteristic has what are referred to as variables. Variables are the series of available answers to the characteristics (or questions). The set of potential variables (or answers) to the sample[3] characteristics above might be:

- Does the consumer have any delinquencies on his or her credit report?
  (Yes or No)

- How long has it been since the consumer's most recent delinquency?
  (Less than 36 months ago or more than 36 months ago)

- Does the consumer have a bankruptcy on his or her credit report?
  (Yes or No)

While these examples are simplistic, most characteristics have a much larger set of available variables. Once the credit scoring system has completed the process of selecting the scorecard and determining the proper variable for each characteristic in that scorecard, the model assigns weights or points to each variable. For example, the model might assign points as follows:

- Does the consumer have any delinquencies on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 100.
  If the answer is No, 100 points are awarded out of 100.

- How long has it been since the consumer's most recent delinquency?
  If the answer is Less than 36 months ago, 25 points are awarded out of 75.
  If the answer is More than 36 months ago, 75 points are awarded out of 75.

- Does the consumer have a bankruptcy on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 50.
  If the answer is No, 50 points are awarded out of 50.

Once the model has assigned weights or points to each variable, the points are tabulated, resulting in a final credit score. The entire process is computerized and can be accomplished rather quickly. The credit score is usually appended to a credit report and delivered to the lender for use in risk management decisions.

As it pertains to credit scoring, it would be factually inaccurate to suggest that everything on a credit report has an impact on a credit score. Everything that is legal to consider, predictive of risk, and seen by scoring models through their programming might have an impact on a

---

[3] The preceding and following characteristic and variable breakdowns, as well as the weights assigned on this report are EXAMPLES and do not represent the reality of any credit scoring system. These examples are simply meant to illustrate how a credit scoring model considers information on a credit report.

consumer's credit score. However, it would be patently false to suggest everything that a credit score considers has a measurable impact on a consumer's credit scores.

### 5.      How The Data is Used – Risk Based Pricing

Risk-based pricing is a process used by creditors, insurance companies, landlords, retailers, and utility companies ("data users" or "subscribers"). Data users attempt to measure the downside financial risk of doing business with a particular consumer against upside gain if the product being offered to the consumer is priced appropriately. For example, if a consumer presents little risk, a lender can be more aggressive with the interest rate it offers because the consumer's credit score suggests that the consumer will pay on time. If a consumer presents a higher risk, the lender may decline the application or charge a higher interest rate in order to subsidize the risk posed by extending a loan to that consumer. Credit reports and credit scores have become synonymous with credit risk and risk-based pricing.

### 6.      The Dispute Resolution Process

A consumer can challenge information on a credit report by contacting the credit reporting agencies or furnishing party, although the consumer's rights may be different depending on what party they contact. A consumer can file a dispute with the credit reporting agencies on their websites, by U.S. mail, via telephone, or in person.

When a dispute is filed with a credit bureau, several things happen. First the credit bureaus, sometimes with the assistance of trained vendors, review the relevant information sent by the consumer regarding the dispute.  This allows the credit bureau to determine the nature of the dispute, such as whether it is fraud related, a mixed credit report issue, a credit clinic dispute, or some other type of dispute.

Once the nature of the dispute is identified, the credit bureau will either direct it to the appropriate internal group for handling or communicate the consumer's dispute to the furnishing party. Further, consumers may provide supporting documents with their dispute.  When the credit reporting agencies receive such supporting documents, they will generally provide copies of the documents as an attachment to the data furnisher as part of its reinvestigation process.

The item in dispute may, in certain circumstances, be marked on the credit report as being "in dispute" by appending a specific code to the disputed item. One such Compliance Condition Code[4] ("CCC") is represented by the letters "XB." When an XB code is associated with a credit report entry that particular item is excluded from any credit score characteristics that measure payment history or debt, until the dispute is resolved or closed and the XB code is removed. This allows the credit reporting agency and data furnisher to conduct the requested investigations without the disputed item impacting the consumer's credit score while the investigation is open and ongoing.

---

[4] A Compliance Condition Code ("CCC") is one of the variety of codes in the Metro 2 credit reporting language. According to the Credit Reporting Resource Guide, a CCC "allows the reporting of a condition that is required for legal compliance according to the Fair Credit Reporting Act or the Fair Credit Billing Act."

**Dispute Codes**

When a consumer's dispute is received by the credit reporting agency they distill the dispute into a three-digit dispute code. These dispute codes assist the credit bureaus in communicating the type and nature of the dispute to the furnisher and guide (or limit) the investigative actions of the furnisher. For example, dispute code "001" refers to the situation where the "Consumer says [the account is] not his or hers, Provide or confirm complete ID."

These dispute codes and other consumer information are then pre-populated on a form called an Automated Consumer Dispute Verification (hereafter, "ACDV") and sent to the furnisher via a web-based system called Online Solution for Complete and Accurate Reporting or "e-OSCAR."

e-OSCAR allows documents sent by the consumer to the credit reporting agencies to be attached to the ACDV communication and sent to the furnisher of the information. Once the data furnisher receives the ACDV via the e-OSCAR system, they can see the name and identification of the consumer, as well as the nature of the dispute and any attachments.

The data furnisher usually has 30 days to determine if the consumer's dispute requires a modification to their credit report, or if the disputed item is already reported accurately. Either way, the data furnisher will fill out the "response" portion of the ACDV form with directions to modify the item, delete the item, delete the item due to fraud, or leave the item unchanged.

The data furnisher's response is sent back the credit bureaus via e-OSCAR. Once the credit bureaus receive the data furnisher's response, they will modify, delete, or leave the entry as previously reported.

The credit bureau then sends, or causes to be sent, correspondence, usually by mail, to the consumer with the results of the investigation. Under the Fair Credit Reporting Act, this entire process must be completed within 30 days[5], although the Consumer Data Industry Association reports that the process generally takes less time thanks to automation.

**Credit Repair**

While I'm not suggesting the Plaintiff used a credit repair organization, it is not uncommon for consumers to hire 3rd party companies in an attempt to have derogatory information removed from their credit reports prematurely and/or under false pretenses. These Credit Repair Organizations ("CRO"), also known as "credit clinics", charge fees to file repetitive and often duplicative disputes of the derogatory information on consumer credit reports to the credit bureaus, the Federal Trade Commission ("FTC"), and the Consumer Financial Protection Bureau ("CFPB"), a process the credit reporting industry's trade association has referred to as either "Jamming" or "Gunking."

---

[5] The 30-day period may be extended an additional 15 days if the consumer provides supplemental information during the initial 30-day reinvestigation period.

September 20, 2022, Expert Report of John Ulzheimer                                    Page 13

According Stuart Pratt, former President of the CDIA, Eric Ellman, the current Senior Vice President for Public Policy and Legal Affairs at the CDIA, and Francis Creighton, the former President at the CDIA, some 50%[6] of all consumer disputes received by the credit reporting agencies are being submitted by credit repair companies, most of them frivolous attempts to have accurate information removed from credit reports prematurely.

More recently, credit repair organizations have cultivated relationships with plaintiffs' attorneys and serve as lead generators for potential Fair Credit Reporting Act, (hereinafter, the "FCRA"), Fair Debt Collection Practices Act, (hereinafter, the "FDCPA"), or other forms of consumer litigation. These relationships are borne out of connections via Facebook groups, as well as via credit repair conventions/trade shows, where plaintiffs' attorneys are commonly present as either guest speakers, event sponsors, or attendees.

### 7.    The Fair Credit Reporting Act, Adverse Action and Risk Based Pricing Notices and Investigations

The FCRA is the federal statute that defines, among other things, when credit reports can be accessed, consumer's rights, obligations of the credit bureaus and the data furnishers to perform reasonable investigations, and various notice requirements.

For example, when a consumer applies for and is denied a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a notice of adverse action (hereafter, "NOAA"), more commonly referred to as a denial letter. This NOAA form letter is not optional but is rather automatic, meaning the applicant doesn't have to overtly request the letter after they've been denied.

The form notice must contain certain elements including the applicant's credit score, from what credit bureau the lender obtained the credit report, the credit bureau's address, and a notice of a consumer's right to obtain a free copy of their credit report because of the denial.

Further, when a consumer applies for and is adversely approved[7] for a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a Risk Based Pricing notice (hereafter, "RBP"). This form letter, like the adverse action letter, is automatic. The absence of adverse action or risk-based pricing notices means the applicant was approved and given a lender's best or near best available terms, or the consumer did not actually submit a formal application for credit where a full underwriting occurred.

The FCRA also obligates the credit reporting agencies and the data furnishers to perform investigations when they've been put on notice that the consumer challenges the accuracy of information on their credit reports.  What is ultimately found to be a reasonable investigation will depend on the facts and nature of the consumer's dispute and the actions taken by the furnisher.

---

[6] CFPB-FTC Workshop on Accuracy in Consumer Reporting, December 10, 2019.

[7] An Adverse Approval is an approval for credit, but not with the lender's best terms.

Most furnishers of information will review the dispute form submitted by the credit bureaus, follow the guidance provided by the dispute codes, review internal account records or logs, deploy company policies and procedures, access multiple systems containing account related information, discuss internally with peers or higher level associates, review prior dispute results, request information directly from the consumer/debtor, and may also have access to review attachments to the dispute which the consumer may have included with their communication to the credit bureau(s). Steps like these are often part of common investigations performed by a furnisher.

### Opinion #1 – Opinions regarding the completeness of NCS's investigations, and rebuttal to Plaintiff's expert's opinions of the same.

The Plaintiff and Plaintiff's expert (hereafter, "Mr. Hendricks") allege NCS's investigations pursuant to various credit bureau sourced disputes lodged in June and July 2020 were not reasonable, not adequate, and "Plaintiff's dispute and the information related to it should have made it clear to NCS that Plaintiff was a victim of fraud."[8] While expert witnesses are not permitted to give legal opinions as to the "reasonableness" of investigations, I respectfully disagree with Mr. Hendricks that "Plaintiff's dispute should have made it clear to NCS that Plaintiff was a victim of fraud."

Plaintiff's expert's report (hereafter, "Hendricks Report") and opinions regarding NCS's investigations are, at the very least, based on an incomplete set of information given that Plaintiff's expert did not have documents that were produced after the date of his expert report, or the ability to consider the testimony of Ron Sapp, NCS's Vice President of Operations. Mr. Sapp described in great detail why NCS took the position the Plaintiff's claim of identity theft was false. Mr. Sapp's deposition took place on August 30, 2022. The Hendricks Report was submitted on July 8, 2022.

In his report Mr. Hendricks describes NCS's responses to Plaintiff's disputes universally as nothing more than "comparing data, including identifiers…to the information in its (NCS's) computer system" and a "robotic process."[9] This is, of course, not representative of what NCS did to investigate the two different categories of disputes it received from the credit bureaus. This is why it is critical to review all relevant documents and testimony before rendering conclusory opinions. Not waiting to review documents and testimony means that opinions are based on incomplete information.

### The June 2020 ACDVs – "Not his/hers, Provide Complete ID"

NCS received three credit bureau sourced disputes in early June 2020, one each from Trans Union, Equifax and Experian.[10] These disputes were sent to NCS by the credit bureaus and were received by NCS via the industry standard Automated Consumer Dispute Verification ("ACDV") forms via the industry standard e-OSCAR dispute communication protocol. None

---

[8] See Complaint at 65 and the Hendricks Report at 2.

[9] See Hendricks Report at 2.

[10] See Exp Ward 21, TU 20, and EIS Ward 1.

of these June 2020 disputes were identity theft disputes and none of the June 2020 ACDVs included attachments.

As addressed on pages 11-12 of this report, ACDV's include dispute codes which capture the nature of the consumer's dispute, as interpreted by the credit reporting agencies when they receive dispute communications from consumers. These dispute codes act to guide and limit the furnisher's investigative actions to be responsive to a consumer's specific dispute. ACDV's also allow freehand text to accompany the table-based dispute code language. This language, formally referred to as FCRA Relevant Information, can either provide helpful (or meaningless) context to the data furnisher, or serve to obfuscate the data furnisher's investigation process.

The dispute codes communicated by the credit bureau to NCS via the June 2020 ACDVs were:

**(From Experian) "Not his/hers. Provide Complete ID." And,
(From Equifax) "Not his/hers. Provide Complete ID." And,
(From Trans Union) "Not aware of collection. Provide or confirm complete ID and verify account information."**

In addition to the dispute codes above, the ACDVs also included the following FCRA Relevant Information text:

**(From Experian) "I have no knowledge of this account. I have not opened a new account and do not recognize this credit lender." And,
(From Equifax) "I have no idea why this is reported. I am wondering if someone stole my identity to access Main Street Renewal LLC." And,
(From Trans Union) "I have not opened any new credit or had any interaction with the original creditor."**

Generally, it's been my experience that when a furnisher receives ACDVs with the "Not his/hers. Provide Complete ID" dispute code (formally, the "001" dispute code), that's exactly what they do, which is to provide and confirm the identification associated with the account relative to that of the alleged debtor. You would not expect a furnisher to investigation balances or other unrelated aspects of an account if they receive the "not my account" dispute code.

The only language in the entirety of Plaintiff's June 2020 disputes, as received by NCS, regarding fraud was a rhetorical comment on the Equifax ACDV. This is not the same as a furnisher receiving bonafide identity theft dispute that included dispute code 103 ("Claims true identity fraud/account fraudulently opened. Provide or confirm ID") on an ACDV.

There were also no attachments to any of the June 2020 ACDVs. This serves to disprove Mr. Hendricks' assertion that "Plaintiff's dispute **and the information related to it** should have made it clear to NCS that Plaintiff was a victim of fraud." There was no "information" other than the ACDV.

Accordingly, it's my opinion that Plaintiff's expert's opinion that "Plaintiff's dispute should have made it clear to NCS that Plaintiff was a victim of fraud" cannot be accurate as it pertains to the June 2020 ACDVs as none of these ACDVs could reasonably be interpreted as "making it clear to NCS that Plaintiff was a victim of fraud."

**The July 2020 ACDVs – "Claims true identity fraud"**

NCS received two credit bureau sourced disputes in July 2020, one each from Trans Union and Equifax.[11] These disputes were sent, again, to NCS by the credit bureaus and were received by NCS via the industry standard ACDV forms via the industry standard e-OSCAR dispute communication protocol. Both of the July 2020 ACDVs included attachments, which appear to be FTC Identity Theft Reports.[12]

The dispute codes communicated by the credit bureau to NCS via their July 2020 ACDVs were:

**(From Equifax) "Claims true identity fraud – Account fraudulently opened, Initiate Investigation."** And,
**(From Trans Union) "Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID."**

Generally, it's been my experience when a furnisher receives ACDVs with the "Claims True Identity Fraud" dispute code (formally, the "103" dispute code), that's exactly what they do, which is to investigate for indicia of liability versus indicia of fraud and then make a decision based on the story told by the information, and/or lack of information.

NCS still takes the position, based on their research, that the Plaintiff's claim of identity theft is false and Plaintiff was, in fact, complicit in the fraud.[13] NCS based this decision on a variety of factors[14], including:

- The Plaintiff did not provide a police report to NCS, despite the request for a police report in the identity theft affidavit sent to the Plaintiff.[15] According to NCS and in their multi-decade experiences, most "true victims" of identity theft who have no idea who is using their personal information file a police report.[16]

  It's also been my long experience that the importance of an alleged victim of fraud providing a police report, or refusing to provide a police report, cannot be overstated. Providing an inauthentic dispute to a credit bureau or a debt collector is not a crime.

---

[11] See TU 74, and EIS Ward 30.

[12] See EIS-Ward 23-26 and TU 53-56.

[13] See Sapp deposition at 16, 39-40.

[14] Ibid at 20-21, 23-26, 43, 93-94.

[15] Ibid at 45-47 and Boehler deposition at 58.

[16] Ibid at 46-47.

Filing a false police report, on the other hand, is a crime. This requirement for a police report helps to differentiate true victims of fraud from those who allege fraud in order to skirt their legitimate debt obligations. One of the common aspects of a police report is a request for the alleged victim to name a suspect, if one is known. In the context of Ward v NCS, Mr. Ward would have had to identify his daughter as the suspected perpetrator of the alleged fraud, especially given where the daughter lived relative to Main Street (both in Dallas), where the daughter worked (and her exact rate of pay) relative to the fake paystubs (Nieman Marcus, and the use of the daughter's actual paystubs, to the dollar[17]), and the daughters criminal background. Simply put, asking an alleged victim of fraud to file a police report is an entirely reasonable, and quite common, request/policy.

- NCS had/has record the Plaintiff was notified via letter, by NCS, when the subject Main Street application was submitted. Accordingly, NCS takes the position the Plaintiff knew about the Main Street application in Dallas, TX (where his daughter lived and worked at the time) and did nothing about it.[18] Doing nothing is not what you would expect from someone who has just been informed that a credit application for housing has been submitted in their name and in a state where the consumer doesn't live. A reasonable course of action would be for the consumer to suspect they've been the victim of fraud, and then do something about it.

- NCS had record the Plaintiff was evicted from an apartment in 2002.[19]

- Someone from Main Street had a color photocopy of the Plaintiff's ID, and provided it to NCS when NCS reached out to them as part of their investigation. This copy of the Plaintiff's ID, as provided by Main Street, matched the ID as provided by the Plaintiff to NCS.[20] In their investigation, Mr. Sapp found this to be suspicious.[21] I agree with Mr. Sapp. A fraudster having an actual government issued color identification, like an original driver's license, would be much more difficult to procure, and could reasonably be considered indicia of liability/knowledge of the transaction.

- Plaintiff's daughter, who lived in Dallas (the same city where Main Street is located) and worked for Neiman Marcus (the same employer from where allegedly fraudulent pay stubs were replicated, and also using her identical paystubs)[22], has a history of criminal activity of providing false information, intentionally providing a fictitious

---

[17] See Neiman Marcus/Green 4-5 and Plaintiff's 99-100.

[18] See Sapp deposition at 16-18, 24 and NCS 438 (template of the letter sent by NCS to Plaintiff).

[19] Ibid at 17 and NCS 439.

[20] See Sapp deposition at 26-30. I recognize the information about the color ID was provided verbally to NCS by an unnamed former employee of Main Street.

[21] See Sapp deposition at 26-27.

[22] See Boehler deposition at 22-23, and Neiman Marcus/Green 4-5.

name, address and DOB to law enforcement, and she also pled guilty to fraudulent use of identification documents, though it's my understanding this case may remain open or pending.[23] While this criminal background of Plaintiff's daughter was not part of NCS's July 2020 or June 2020 investigations, it serves to, at the very least, contribute to and validate Mr. Sapp's and NCS's suspicion that the fraud claim was false and the Plaintiff was aware of the Main Street application, and was possibly complicit in the fraud.

Accordingly, it's my opinion that Plaintiff's expert's opinion that "Plaintiff's dispute should have made it clear to NCS that Plaintiff was a victim of fraud" cannot be accurate as it pertains to the July 2020 ACDVs as there is considerable evidence indicating Plaintiff knew about the Main Street application, was perhaps a party to it in some respect, and did nothing about it. It's been my long experience that consumers who are put on notice that they've been the victim of fraud, regardless of the method, do something about it. Here, it appears the Plaintiff did nothing.

**Note**: At the time of the July 2020 disputes, the NCS account as it appeared on Plaintiff's credit reports was coded with the XB Compliance Condition Code. The relevance of this will fully explained in my Opinion #2.

> **Opinion #2 – There is no evidence the Plaintiff experienced the credit related damages, as alleged, as a result of NCS furnishing and verifying information on Plaintiff's credit reports.**

The Plaintiff has alleged he suffered a variety of economic and credit related damages as a result of the NCS collection account appearing on his credit reports. For example, Plaintiff suggests he experienced a "loss of credit" due to NCS.[24] Plaintiff also suggests a mortgage loan refinance application was denied, that he did not receive prescreened credit offers as a result of NCS's actions, and lowered credit scores.[25]

**Mortgage Loan Refinance**

In support of Plaintiff's mortgage refinance damage allegations, Plaintiff has produced a Credit Score Disclosure Notice dated June 8, 2020. On June 8, 2020, Plaintiff alleges that his Experian, Equifax, and Trans Union credit reports were procured by Fairway Independent Mortgage through Advantage Credit, a mortgage reporting company or "reseller" of credit reports to mortgage lenders and brokers.[26] Plaintiff alleges these documents are evidence of a denial of credit for a refinance application.

---

[23] See NCS 505-573.

[24] See Complaint at 119.

[25] See Plaintiff's Response to NCS's Interrogatories, Number 1.

[26] See Plaintiff 1-3.

It's my opinion that a Score Disclosure Notice is not evidence of a denial of credit because Score Disclosure Notices are routinely sent to *everyone* who applies for a mortgage loan secured by between 1-4 pieces of property, and not only to applicants who have been denied.

To be clear, Score Disclosure Notices are not evidence of credit denials. Instead, these notices are sent to everyone who applies for residential mortgage loans, and have been a required disclosure since 2003.[27]

### No Adverse Action Notices

The notice sent to applicants that are denied credit based on their credit report information is the Notice of Adverse Action, more commonly and informally referred to as denial letters. In the absence of an Adverse Action Notice there still remains no evidence the Plaintiff was denied anything from Fairway Independent Mortgage, or why any alleged denial took place.

Additionally, the alleged denial of credit, if you were to interpret the Score Disclosure Notice the same way as Plaintiff is incorrectly interpreting it, had to have happened on June 8, 2020. June 8, 2020 is the date Plaintiff's credit reports and scores were procured by Fairway Independent Mortgage.

June 8, 2020 **predates** the date of the first salvo of dispute forms received by NCS, where the ACDVs did not include identity theft dispute codes but rather simply indicated that the NCS account was "not his/hers, provide complete ID." The earliest date the Equifax, Experian and Trans Union dispute forms or "ACDVs" could have been received by NCS was June 10th or 11th of 2020. Accordingly, NCS would not have been put on notice that the Plaintiff disputed anything on his credit reports until after the date of his alleged credit application with Fairway Independent Mortgage, and certainly would not have had an opportunity yet to perform any credit related investigations. Obviously, June 8, 2020 also **predates** the date of the second salvo of dispute forms received by NCS, in July 2020.

Finally, and as I addressed in my Opinion #1, the afore-referenced ACDV dispute forms received by NCS on or about June 10th, 2020 did not indicate the NCS account was possibly the result of fraudulent activity, an did not include any attachments. Instead these ACDV dispute forms contained dispute coding that simply indicated that the collection account was "not his/hers Provide complete ID." This dispute code is **not** the industry standard identity theft/fraud dispute code. And, it would not be a reasonable expectation for a consumer to expect a furnisher to perform an identity theft investigation in response to a dispute code that isn't the identity theft dispute code.

### Prescreened Credit Offers

Plaintiff also suggests he was damaged because he did not receive prescreened credit offers because of the NCS collection account. I was involved in the prescreen process, extensively, when I worked at Equifax and tacitly when I worked at FICO. This of Plaintiff's claims is dubious for a variety of reasons.

---

[27] https://www.congress.gov/bill/108th-congress/house-bill/2622

A prescreened credit offer, commonly referred to as "junk mail", occurs when a lender purchases a list of consumer names and addresses from one or more of the credit bureaus. The consumer's credit report/FICO score has to have passed either canned or custom selection criteria, and the consumer must also live in a certain geographic area. Credit card issuers are the most frequent users of prescreen services and send billions of preapproved credit card offers each year based off of prescreened lists.

Given the highly complex and never-disclosed practice of any lender's prescreening processes, there is no way for a consumer to know if their name was excluded from a prescreened list sold by a credit bureau to any particular lender. There is no way for a consumer to know if their name was even included in the universe of possible names/addresses prior to the credit bureau applying selection criteria to the list for any particular lender. The credit bureaus don't publish the names of consumers who have failed some lender's selection criteria and there is also no requirement to send a consumer any sort of notice if they failed selection criteria, for whatever reason.

It is also entirely possible that a consumer who was included on a prescreened list was then excluded from the list at a later time because the lender simply wanted to reduce the number of mail pieces sent for a particular prescreen/marketing campaign. This process is referred to as "n-thing" (pronounced "en-thing"). N-thing is done to control the costs associated with prescreening and account acquisition efforts and has nothing to do with criteria-based exclusions from mailing lists. A consumer would not know if they were the subject of n-thing.

The Plaintiff has not and likely would never be able to corroborate any alleged criteria-based exclusion from a prescreened list, or identify the reason/s for exclusion. There are hundreds of organizations that perform prescreening and Plaintiff doesn't know which one or ones may have purchased a list that "should" have included his name/address. Plaintiff does not know what selection criteria may or may not have been applied to any such prescreened list. Plaintiff does not know the timing of any such prescreening process, or whether it occurred prior to the initial furnishing of the NCS account, prior to or after the Plaintiff disputed the NCS account, or after the removal of the NCS account from Plaintiff's credit reports. Plaintiff does not know which credit bureau may or may not have sold a prescreened list that "should" have included his name/address. And, finally, even if the Plaintiff's name/address was included on a lender's prescreened list, the chances the Plaintiff would have taken advantage of any preapproved offer is almost zero. When I was at Equifax the industry average response rate to prescreened offers ("response rate" is not the same as the activation or usage rates) for prescreened offers was about ½ of 1%, which is why the volume of offers sent each year is so high.

Finally, at the time of the Plaintiff's disputes of the NCS account, Plaintiff had 7 credit cards representing roughly $31,000 of buying power.[28] Point being, the Plaintiff's capacity to buy goods and services using credit cards was certainly not impacted, even if he did not receive any particular preapproved credit card offer.

---

[28] See TU 64-69.

**Credit Score Damage Allegations and the Relevance of the "XB" Code**[29]

As part of his damage allegations, Plaintiff alleges he has suffered a lowered credit score as a result of NCS. While it is likely true that, prior to the Plaintiff's first salvo of disputes in June 2020, the NCS collection had a measurable (but unknown) impact on Plaintiff's FICO scores, the exact impact has not been quantified using any means by Plaintiff or Mr. Hendricks.[30]

Regardless, any credit score impact would have been temporary, and would have ceased in early June 2020. The production documents indicate the NCS collection account was coded with the "XB" Compliance Condition Code after Plaintiff's initial salvo of disputes in June 2020, indicating that the Plaintiff disputed the accuracy of the NCS collection and that an investigation was still in progress, both of which were true as NCS sent a letter to the Plaintiff asking him to provide more information.[31] The XB code was present on the second set of dispute forms received by NCS in July 2020, meaning the XB code would have been placed as a result of the June 2020 disputes and remained there because the XB code is "sticky."[32] The XB code prevents collection accounts from having any measurable impact on a consumer's credit scores because it is bypassed in the scoring process.

Plaintiff's expert fully agrees and acknowledges this reality of the XB code, although his 59-page report in this case conspicuously excludes all mention of this issue.

The practical impact of the XB code is more fully explained on page 11 of this Expert Report. Specifically, when an XB code is associated with a credit report entry that particular item is excluded from any of FICO's credit score characteristics that measure payment history or debt until the dispute is resolved or closed *and* the XB code is removed. In cases of 3rd party collection accounts, like those furnished by NCS, the account is entirely excluded from scoring as there are no metrics outside of the "Payment History" category of FICO's credit scoring systems that consider collection accounts. This allows the credit reporting agencies and data furnisher to conduct or continue to conduct investigations without the disputed item impacting the consumer's credit score while the investigation is open and ongoing, as was happening with respect to the subject NCS collection account even after NCS responded to the credit reporting agencies.[33]

---

[29] When associated with an account on a consumer's credit reports, the XB code reads "Consumer Disputes, Investigation in progress" or some reasonable derivative.

[30] Over the last 17 years I've been an Expert Witness in hundreds of cases where Mr. Hendricks was the adverse expert witness. In none (zero) of those cases has Mr. Hendricks even attempted to perform any such scientific analysis quantifying the impact of anything on a consumer's credit scores.

[31] See Sapp deposition at 94-95.

[32] See EIS-Ward 30 and TU 74. The July 2020 ACDVs received by NCS from Trans Union and Equifax had the XB code already in place. "Sticky" indicates a credit reporting code that will remain indefinitely until an account is removed from a consumer's credit reports or the appropriate removal code is applied.

[33] See deposition of Ron Sapp at 94-95, 97-100.

What this means, in practical terms, is during the time after Plaintiff's June 2020 disputes of the NCS collection account, the NCS account wasn't being considered in Plaintiff's credit scores. This means it is systemically impossible for there to be any "lowered credit score" damage. Mr. Hendricks agrees with this commonly known aspect of the XB code, he just didn't acknowledge as much in this rendition of his expert reports, as he's done many times in the past.

In *Cramer v Equifax and Bay Area Credit*[34] Mr. Hendricks provided sworn deposition testimony on June 10, 2019 about the issue of the XB "in-dispute" code and its impact on a consumer's credit scores. *See* Exhibit E: Excerpts from *Cramer* deposition. Specifically, Mr. Hendricks testified as to the following,[35]

**Question**: Do you see the last sentence of that beginning at the end of line 2, beginning "It is?"

**Hendricks**: Yes

**Question**: Would you read that sentence?

**Hendricks**: "It is also important to note that when a creditor reports negative trade line as disputed (sic), **that trade line typically is not scored and, therefore does not negative impact the credit score.**"

**Question**: Is that true?

**Hendricks**: **Yes.** That is the way the system is supposed to work, that **when they mark it with the proper Metro 2 code, XB code, it's not supposed to score the status or the balance, which would be—otherwise would be two negative fields that would lower the credit score**. And there is some ambiguity to the extent that this applies to collection accounts but I've never been able to resolve it."

**Question**: So would it be your understanding that after November, 2017 that anything reported by Bay Area Credit would not affect Amber Cramer's credit score?

**Hendricks**: **If it was marked with the XB code** and if collection accounts are like other trade lines where it doesn't score the status, which would be a collection...**that trade line should not lower the FICO score." (All emphasis added)**

---

[34] *Cramer v Equifax, et al.*, United States District Court for the Eastern District of Missouri, Eastern Division, case no. 4:18-cv-01078-CAS. *See also*: Exhibit E. Bay Area Credit is a 3rd party debt collector, like NCS. Bay Area Credit and NCS furnish identical 3rd party collection style accounts to the credit reporting agencies.

[35] See deposition of Evan Hendricks in *Cramer v Equifax, et al.*, United States District Court for the Eastern District of Missouri, Eastern Division, case no. 4:18-cv-01078-CAS, pages 107-109. *See also*: Exhibit F.

In *Harris v Nelnet, Inc., et al.,*[36] Mr. Hendricks provided sworn deposition testimony on April 23, 2021 again about the issue of the XB "in-dispute" code and its impact on a consumer's credit scores.  Specifically, Mr. Hendricks testified as to the following:[37]

Question: So how would listing an account as in dispute negate its impact on the credit score? Do you have an understanding how the FICO scoring model treats that information?

Hendricks: **Yes. When it's properly notated with the Metro 2 XB code, then this FICO scoring model does not score the status, which here is collections/charge off, and doesn't score the balance. So those two fields would be negative. But with the XB code and notated, disputed by consumer, it doesn't score those**. So it—the XB code mitigates harm to the credit score itself." (Emphasis added).

With this testimony, Mr. Hendricks is unequivocally admitting and acknowledging that collection accounts that are XB-coded have no impact on credit scores. Mr. Hendricks was, and still is, correct in this respect. As such, Mr. Hendricks is also acknowledging that the NCS collection account did not and could not have any measurable impact to Plaintiff's credit scores while associated with the XB code.

The influence of the XB code on 3rd party collection accounts is the same with respect to FICO's scoring systems as it is with respect to VantageScore's credit scoring systems, as I've written about in the past.[38] Collectively, FICO's credit scores and VantageScore's credit scores represent ~100% of the credit bureau scores used in the U.S. lending market.

*        *        *        *        *

This expert report is based on my 30+ years of experience and knowledge gained as a professional in the consumer credit industry, specifically as an employee or contractor of Equifax Credit Information Services, Fair Isaac Corporation, Credit.com, and Credit.com Educational Services, on my review of relevant documents produced in this matter, and as a result of my previous expert witness work, which includes more than 600 cases.

All of my comments are accurate to the best of my knowledge as of the time I prepared this report. All of the opinions and comments stated in this report are expressed to a reasonable degree of professional certainty.

I reserve the right to supplement or amend my opinions. I declare that the foregoing is true and accurate to the best of my ability based on the documents I have reviewed, my education, my experience, my training, and my expertise.

---

[36] Harris v Nelnet Inc, et al. USDC District of New Jersey, 2:20-cv-00788-WJM.

[37] See deposition of Evan Hendricks in re Harris v Nelnet Inc, et al. USDC District of New Jersey, 2:20-cv-00788-WJM, pages 112-113.

[38] See Exhibit C for the full, and lengthy, Citation of the referenced article.

Executed this 20th of September 2022,
in Atlanta, Georgia



_____

John Ulzheimer

**Exhibit A**

# John Ulzheimer

## The Ulzheimer Group, LLC, President
## 1160 Buckhead Valley Court
## Atlanta, Georgia 30324

John Ulzheimer, President of The Ulzheimer Group, LLC and Founder of www.creditex-pertwitness.com, is a nationally recognized expert on credit reporting, credit scoring and identity theft. In addition, his expertise includes FCRA, FDCPA, CROA, credit report damages and the resulting economic damages. He serves as an expert witness/legal consultant for those involved in credit related litigation and has been qualified and admitted as an expert in Federal and State court.

John is <u>twice</u> FCRA certified by the Consumer Data Industry Association (the trade association of the credit reporting agencies) and has over 29 years of experience in the consumer credit industry including positions with Equifax Credit Information Services (6 years), Fair Isaac, which is the inventor of the FICO® credit scoring system (7 years), Credit.com (6 years), and years of concurrent work with a number of consumer credit related companies.

John currently is or was the credit blogger for the New York Times, Mint, CreditSesame, CreditSimple, CreditVersio, Zillow, JD Byrider Systems, Credit.com, SmartCredit, VantageScore Solutions, The Simple Dollar and the National Foundation for Credit Counseling. John has been published over 5,000 times in the past 16 years on the topic of consumer credit. He has authored or co-authored numerous educational materials on the subject including:

- The book, *The Smart Consumer's Guide to Good Credit*
- The book, *You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies.*
- The consumer handbook, *Surviving Identity Theft.*
- The consumer handbook, *The Get Credit Wise ToolKit*
- *Use of Compliance Condition Codes,* CO Bar Association Newsletter

**Relevant Experience at Equifax**   Managed consumer dispute process including consumer interview, logging consumer dispute onto credit report, communicating with data furnisher to validate credit file accuracy, modified consumer credit report according to results of investigation, and communicate dispute resolution results to consumers.

Managed relationship between Equifax and thousands of small customers, such as credit unions, car dealerships, banks, and collection agencies. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, credit scores, fraud detection services and data access software.

Managed relationship between Equifax and large strategic clients based in Jacksonville, Florida including large regional bank and national credit card issuer. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, and credit scores.

**Relevant Experience at Fair Isaac**   Supported all of Fair Isaac's credit bureau based scores sold by North American credit reporting agencies; Equifax, Equifax Canada, TransUnion, TransUnion Canada, and Experian. Managed credit score pricing for several years. Well versed in credit score validations, impact analyses, score migration studies, credit scorecard development and what influences credit scores. Performed hundreds of credit score trainings to audiences of all levels of sophistication including lenders, credit bureaus, and members of Congress, consumer groups and consumers.

John has appeared multiple times on CNBC, FOX News, CNN and NPR. He has contributed content for CNBC's "On The Money", Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show. He is also a frequent commentator on credit-related issues in various outlets including USA TODAY, Associated Press, CNBC, NPR, Los Angeles Times, CNN, FOX, Washington Post, Money Magazine, American Banker, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, US News and World Reports, Chicago Tribune, Bankrate.com, and other regional business and consumer media.

In his hometown of Atlanta, John is regular guest lecturer at The University of Georgia and the Georgia Consortium for Personal Financial Literacy. Between 2004 and 2007 John taught a course on credit reporting and scoring at The Emory University Center for Lifelong Learning and was named by the students the Top Personal Finance and Investments Instructor for the 2005/2006 term. In April 2016 John began guest lecturing at Emory University's School of Law. John graduated in 1991 from The University of West Georgia with a B.S. in Criminal Justice.

**Certifications and Awards:**

**FCRA Certified – Consumer Data Industry Association - 2011. Perfect score on certification test.**

**Associate Credit Executive – International Credit Association. 1997.**

**FCRA Certified – Associated Credit Bureaus - 1992.**

**Consumer Credit Interviewer – Designation Conferred by Equifax as part of their employee training program.**

**Graduate – American Bankers Association School of Bankcard Management held at The University of Delaware – 2000.**

**2014 Consumer Advocate Award – National Foundation for Credit Counseling.**

**Exhibit B**

## Expert Testimony in the Last Four Years

***Rennick v Equifax***    Deposition (USDC Middle Dist of Fl., 8:17-cv-01617)
***Liera v US Bank***    Deposition (USDC Cent Dist of CA., CV17-603 CJC)
***Morris v Carrington Mortgage***    Deposition (USDC Dist of NV., 2:18-cv-01829)
***McCullough v US Bank***    Trial (Sup Ct of CA, Marin Co., CIV1702928)
***Littlejohn v Vivint Solar***    Deposition (USDC Dist of NJ., 1:16-cv-09446)
***Cramer v Bay Area Credit***    Deposition (USDC Eastern Dist of MO., 4:18-cv-1078)
***Berry v Equifax***    Deposition (USDC Northern Dist of AL., 4:18-cv-00356)
***Willett v Equifax***    Deposition (USDC Eastern Dist of VA., 1:19-cv-00323)
***Coulter v Chase***    Deposition (USDC Eastern Dist of PA., 5:18-cv-1538)
***Perez v Wells Fargo***    Deposition (USDC Northern Dist of CA., 17-cv-454)
***Toland v Nationstar***    Deposition (USDC Northern Dist of CA., 3:17-cv-02575)
***Musial v Nationstar***    Trial (Superior Court, Riverside CA., MCC1900057)
***Melton v Specialized Portfolio Servicing***    Deposition (USDC Dist of MD., 8:19-cv-209)
***Cagle v Westfield***    Deposition (Jackson Co Circuit Court, MO., 1816-cv22073)
***Pongsai v American Express***    Deposition, Trial (USDC Central Dist of CA, CV19-1628)
***Pulipati v Vivint Solar***    Deposition (Superior CT, State of CA, Alameda Co., RG18891702)
***Murphy v Indiana Finance Company***    Deposition (USDC, No Dist of IN., 3:19-cv-00270)
***Champagne v CENLAR***    Trial (58th District Court of Jefferson Co., Texas A-202999)
***Santos v Account Resolution Services***    Deposition (USDC, So Dist of FL., 1:19-cv-23084)
***Abu-Eid v Discover***    Deposition (USDC, EDVA, Alexandria Division 1:20-cv-01450)
***Petras v Chase***    Deposition (USDC, Central Dist of CA 20-cv-874-RFB-BNW)
***In Re: Capital One Consumer Data Security Breach Litigation***    Deposition (USDC, EDVA, Alexandria Division, MDL No. 1:19md2915-AJT/JFA)
***King v Westlake Services***    Deposition (USDC, Central Dist of CA 20-cv-530-JLS-JDE)
***Shipley v Hunter Warfield***    Deposition (USDC, Middle Dist of FL, Tampa 8:20-CV-02285)
***Brinkman v Account Resolution Services***    Deposition (USDC, Middle Dist of FL, Tampa 8:20-CV-02453)
***Bultemeyer v CenturyLink, Inc.***    Deposition (USDC, Dist of AZ, 2:14-CV-02530)
***Soler v Nelnet***    Deposition (USDC, Cent Dist of CA, 2:20-CV-08459)
***CFPB v Progrexion Marketing***    Deposition (USDC, Dist of UT., 2:19-cv-00298)
***Larios v Specialized Loan Servicing* –** Deposition, Trial    (Sup Ct of CA, LA. 18STCP02482)
***Norman v TransUnion* –** Deposition    (USDC, Eastern Dist of PA, 18-5225)
***Lombardo v Chase* –** Deposition    (USDC, Southern Dist of NY, 7:20-cv-06813-VB)
***Jeffers v FNBO* –** Deposition    (USDC, Central Dist of IL, 2:21-cv-2169)
***Ntam v Paramount Residential Mortgage Group* –** Deposition    (USDC, Dist of Columbia, 1:21-cv-01583)
***Charles Cole, Individually and on behalf of others v Lawrence Kia* –** Arbitration    (District Court of Douglas County, Kansas, 2020-cv-000174)

September 20, 2022, Expert Report of John Ulzheimer                                    Page 28

**Exhibit C**

## Documents Reviewed As Basis for Opinions

Complaint
Plaintiff Exhibits 1-3279
Plaintiff's Discovery Responses to Equifax
Plaintiff's Discovery Responses to NCS
Equifax's Discovery Requests to Plaintiff
Equifax's Discovery Responses to Plaintiff
Experian's Discovery Responses to Plaintiff
NCS's Discovery Responses to Plaintiff
NCS's Initial and Supplemental Disclosures
NCS Document Production, hereafter "NCS 1-574"
EXP-Ward 1-115
TU 1-109
EIS-Ward 1-137, Equifax Business Records Affidavit
Main Street Responses to Plaintiff's Subpoena
Nieman Marcus Subpoena Response, including Nieman Marcus/Green 1-5
Google Subpoena Response
Report of Evan Hendricks
Petition to Investigate Quen Green
Depositions of Cathy Boehler, Diana Woodward, and Ron Sapp
Deposition of Evan Hendricks in re *Cramer v Bay Area Credit*, United States District Court for the Eastern District of Missouri, Eastern Division, case no. 4:18-cv-01078-CAS, pgs. 107-109 (excerpt attached at Exhibit E).
Deposition of Evan Hendricks in re *Harris v Nelnet Inc, et al*. United States District Court for the  District of New Jersey, case no. 2:20-cv-00788-WJM, pgs. 87-89, 91, 94-96, 107, and  112-113 (excerpt attached at Exhibit F).

Full Citation for Footnote 38.

https://mint.intuit.com/blog/credit/what-happens-to-your-credit-score-when-you-dis-pute-items-on-your-credit-report-0513/

**Exhibit D**

## Publications

For over 20 years, I have been a frequent contributor regarding consumer credit issues to the media including U.S. News and World Report, Consumer Reports, Yahoo!, NerdWallet, USA Today, The New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Washington Post, Money Magazine, American Banker, SmartMoney, MarketWatch, FOX, CNN, MSNBC, Bankrate, and other regional business and consumer media outlets.

I have been an author since 2004 and have written thousands of articles. I currently write or have written articles and create content about credit issues for newsletters, websites, blogs and vlogs. My former or current clients include Credit.com,  Boardroom, Enloop, Digital Brands, CreditVersio, InfoUp Publications, CNBC, IMS Expert Services, Mint/Intuit, SmartCredit, CreditSesame, the National Foundation for Credit Counseling, Credit Card Insider, Tradeline Supply Company,  Credit Simple, Experian, The New York Times, JD Byrider, MagnifyMoney, The Simple Dollar,  Zillow, Digital Brands, VantageScore Solutions, and the Wall Street Journal.

I do not maintain a comprehensive list of, or the locations of, my writings, which are all owned either by my clients or a publishing house and are published and/or unpublished at their sole discretion. The most comprehensive list of my authorships can be found using Google under the search terms "John Ulzheimer" and "John Ulzheimer Credit."[39]

I have written the following traditional hardcopy books on credit related topics:

*You're Nothing but a Number* (2007),

*The GetCreditWise Tool Kit* (2007),

*Surviving Identity Theft* (2007, with Emily Peters),

*The Smart Consumer's Guide to Good Credit: How to Earn Good Credit in a Bad Economy* (2012, with Deanna Templeton).

I have also written or contributed to the following articles:

In 2018, I contributed to the following article: *The Use of Compliance Condition Codes,* CO Bar Association Newsletter.

In 2019 I authored *Current Trends in Credit-Related Lawsuits*, Conference on Consumer Finance Law, Quarterly Report, Vol.73, No.3.

---

[39] My articles are periodically subjected to publisher edits. Accordingly, I cannot affirm that my published articles will contain solely my originally drafted content, or now contain content with which I fully agree.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

DAVID HARRIS,        <span style="color:red">EXHIBIT F</span>

     Plaintiff,

                       CIVIL ACTION NO.

NELNET, INC., EQUIFAX     2:20-CV-00788-WJM-MF

INFORMATION SERVICES,

LLC, and TRANSUNION,

LLC.,

     Defendants

_____/

The Virtual Zoom deposition of EVAN HENDRICKS was held on Friday, April 23, 2021, commencing at 1:00 p.m., at the Home of Evan Hendricks, 8321 Tomlinson Avenue, Bethesda, Maryland 20817 before Susan Wootton, Notary Public.

REPORTED BY:  Susan Wootton, RPR, CLR

APPEARANCES:

ON BEHALF OF PLAINTIFF:

NICHOLAS LINKER, ESQUIRE

Zemel Law, LLC

1373 Broad Street

Suite 203-C

Clifton, New Jersey 07013

Telephone: 862-227-3106

Email: nlinker@zemellawllc.com

ON BEHALF OF THE DEFENDANT,

NELNET SERVICING, LLC

CORINNE SAMLER BRENNAN, ESQUIRE

KLEHR HARRISON HARVEY

BRANZBURG, LLP

10000 Lincoln Drive East

Marlton, NJ 08053

Telephone: (856) 486-7900

Email: cbrennan@klehr.com

is it's applied to the information in the

consumer's credit file.

So it's basically analyzing that

information and then describing it in a three

digit code that reflects the consumer's credit

worthiness.

Q    Specifically what information does it

analyze?

A    Well, it analyzes payment history.  It

analyzes credit utilization ratio.  It analyzes

length of credit history.

It analyzes mix, the mix of credit the

consumer has, and it analyzes new credit and

inquiries.

Q    So Mr. Hendricks, your understanding

of the FICO scoring model -- if we're talking

about a tradeline like we're talking about here

where the payment rating, which is listed as the

pay status on a tradeline as 120 days plus, do you

have any understanding as to how FICO looks at

that in conjunction with the other information in

the tradeline?

A    Yes.  It looks -- the FICO scoring

model looks at it like it's currently past due.

So that slams the consumer's, excuse me, credit -- credit score over the recency issue.

Q    So how would that change if the payment status read current, but all of the other information in the tradeline related to the historic payments on the account were negative; negative meaning that account payments had been missed for over 120 days?

MR. LINKER:  Objection to form.

A    Yeah.  I apologize, I did not understand that question.

Q    Susan, can you repeat that?

THE REPORTER:  Sure.

(The reporter read back as requested.)

Q    So Mr. Hendricks in a tradeline there's a -- there's a box at the bottom that reflects the historic payments that were made on an account; is that correct?

A    Yes.

Q    Do you know if the FICO scoring model analyzes or uses that specific information in coming up with a score?

A    The -- oh, you mean the payment history, like in the boxes showing past derogatory

Evan Hendricks

history, right?

Q    Right.  Yes.

A    No.  It uses the -- to -- no.  It doesn't, it doesn't utilize that information in calculating the score.

Q    Why not, do you know?

A    Because it uses the status and the balance and the date of first delinquency.

Q    Why would payment history -- and by payment history, I mean that box at the bottom of the tradeline we're talking about -- why would that not be considered?

A    Because the -- it determines I think the history that's important through the date of first delinquency.

Q    What do you mean by that?

A    That's the date that the -- the tradeline first went 30 days late.

Q    So, Mr. Hendricks, is it your opinion then if a tradeline reflected in the payment history box that payments had not been made for over 240 days, but the pay status listed the account as current, would that be accurate?

MR. LINKER:  Objection to form.

Evan Hendricks

is reflected, that would be most likely to be

considered by the -- starting with the lender, but

I don't think the FICO scoring model scores that

history, per se, no.

Q    Just going back into your opinion here

that says that, the inaccurate Nelnet tradeline

showed him in the eyes of the FICO scoring model

and in the eyes of many lenders and underwriters

to be currently past due 120 days.

Do you have the identity of any

lenders or underwriters that specifically viewed

the Nelnet account as currently past due 120 days?

A    No.

Q    Because you don't know the name of any

lender or underwriter that specifically viewed

that tradeline, you wouldn't know what software

was used, correct?

A    That's correct.

Q    I'm just going to scroll back --

scroll down a little bit to page 8.

And on page 8 of your report there's

an excerpt from the Macik case.  There's a little

number 2 and it says Desktop Underwriter; do you

see that there?

plaintiff's credit reports, looking at the Nelnet

tradelines being -- showing a pay status or

payment status of currently past due, and

comparing that to the other information in his

credit report and saying that, concluding that

that clearly was a substantial factor in harming

his credit worthiness.

Q    Do you recall if the Nelnet tradelines

were the only tradelines that showed plaintiff had

a payment status of currently past due?

A    No.  I believe there are others.  I

think.  That's my recollection.

THE REPORTER:  Hold on.  You faded out

in that answer.

A    Okay.  I said no.  My recollection

was -- and sometimes my recollection is not

correct -- my recollection was that there were

other derogatory tradelines, including ones that

were currently past due.

Q    Did your impact analysis take into

account the somewhere between 3 to 6 delinquent

accounts that were identified on the report?

MR. LINKER:  Objection to form.

A    Yes.

Q    Did your impact analysis take into account the one to five derogatory accounts that were identified on the report?

MR. LINKER:  Objection to form.

A    Yes.

Q    Okay.  Did your impact analysis take into account the account that was in collection on the report?

MR. LINKER:  Objection to form.

A    Yes.  Yes.

Q    Mr. Hendricks, how do you specifically analyze the impact of the Nelnet tradeline on a FICO score or on one's credit worthiness when there are other delinquent accounts?

A    Well, it's the severity of having a pay status or a payment status of currently past due.

So, if that's the case, so when you have a tradeline with that pay status or payment status currently past due, it's going to be a substantial factor in harming someone's credit report.

Q    So your recollection is that Nelnet was not the only creditor with a payment status of

currently past due, in your opinion?

A    I think I understood the question, but yes; not withstanding that, there are other derogatory tradelines that the -- the Nelnet inaccurate status of currently past due is going to be a substantial factor.

Q    Did you speak to any of the lenders that plaintiff claims to have sought credit from?

A    No.

Q    So on page 8 of the report, you list reason codes here.  You say, on plaintiff's IQ Identity credit report, his Equifax FICO score was 570, his TU FICO score is 575.

In the reason codes provided for the lowering of his FICO score -- which are provided in order of performance are -- and then you list two here; too many installment accounts with a delinquent or derogatory payment status and too many of the delinquencies on your account are recent.  Did I read that right?

A    Yes.

Q    Were those the -- those the only reason codes provided for the lowering of plaintiff's FICO score?

affect or impact Mr. Harris's credit score?

A     Essentially, yes.

Q     Okay.  That would overall impact his credit worthiness, the lowering of his credit score; is that correct?

A     Yes.  Lowering of the credit score impacts your credit worthiness, yes.

Q     Okay.  Scroll down to BMW Financial. The same thing with this credit line, Mr. Hendricks.

Is it your understanding that that -- it looks like he had sporadic late payments in the two-year payment history at the bottom of the tradeline for the BMW Financial Services tradeline.

Is it your understanding that these sporadic late payments would also lower his credit score?

A     They could, but since they're three years old, and they're not serious delinquencies, if they did lower the score, it would be minimal.

Q     Again, when we're talking about a major or a serious delinquency, that would be over 90 days?

Evan Hendricks

score?

        A       Yes.

        Q       Okay.  And also his credit worthiness?

        A       Yes.

        Q       Scrolling down here to --

        A       The thing is, I did, I did see above there -- there was, if you scroll back up just a second, on the TransUnion -- well, actually on both TransUnion and Experian, this one is disputed, it's disputed by consumer.

                So actually that negates the harm it does to the credit score.  But in terms of something like Fannie Mae, it would still harm in the -- in the underwriting by Fannie Mae.

        Q       So how would listing an account as in dispute negate it's impact on the credit score?  Do you have an understanding how the FICO scoring model treats that information?

        A       Yes.  When it's properly notated with the Metro 2 XB code, then this FICO scoring model does not score the status, which here is collections/charge-off, and doesn't score the balance.

                So those two fields would be negative.

Evan Hendricks

But with the XB code and notated, disputed by consumer, it doesn't score those.  So it -- the XB code mitigates harm to the credit score itself.

Q    So we look at the next item here, it says Ascendium.  Do you see that there?

A    Yes.

Q    Okay.  So here we have another account status of derogatory, at least for TransUnion and Experian.  Do you see that there?

A    Yes.

Q    And that would impact Mr. Harris's credit score negatively?

A    Yeah.  I mean, the -- and I answered just to make sure I'm consistent before it's -- the status is actually being -- is the collection and collection is a derogatory status.

So it's the collection which negatively impacts on this one and the other one we talked about.

Q    Okay.  So we're looking at also the payment status here which says collection/charge-off?

A    Yes.

Q    How about the past due amount?  So it

Deposition of Evan Hendricks                    Amber J. Cramer v. Equifax Information Services, LLC, et al.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

AMBER J. CRAMER,              *

        Plaintiff,      *

v.                           *   Case No.

EQUIFAX INFORMATION          *   4:18-cv-01078-CAS

SERVICES, LLC, et al.,       *

        Defendants.     *

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

The deposition of EVAN HENDRICKS, was

taken on Monday, June 10, 2019, commencing at

2:10 p.m., at 6701 Democracy Boulevard, Bethesda,

Maryland, before Delcia Jones, Notary Public.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

REPORTED BY:

D. JONES

Deposition of Evan Hendricks                    Amber J. Cramer v. Equifax Information Services, LLC, et al.

APPEARANCES:



            SYLVIA A. GOLDSMITH, ESQUIRE

            Goldsmith & Associates, LLC

            20545 Center Ridge Road, Suite 415

            Rocky River, Ohio  44116

            866-396-0926

               On behalf of the Plaintiff (by phone)



            LOUIS J. WADE, ESQUIRE

            McDowell Rice Smith & Buchanan, P.C.

            605 W. 47th Street, Suite 350

            Kansas City, Missouri 64112

            816-960-7369

               On behalf of Defendant Bay Area

               Credit

credit reporting agencies when they receive an

identity theft complaint on a debt?

        MS. GOLDSMITH:  Object to form.

    **A     I do have specialized knowledge of**

**that, yes.**

    Q     And what do they do with that?

    **A     Well, it depends.  I mean, in some**

**cases, they look at the -- they get sufficiently**

**compelling documentation that meets their**

**criteria, they will, on their own, delete trade**

**lines that are disputed as fraud, and in other**

**cases they will send a CBV to the furnisher of**

**the disputed trade line.**

    Q     Are you aware in this case of whether,

after November, 2017 any debt that Bay Area

Credit reported ever appeared on her credit

report?

        MS. GOLDSMITH:  Object to form.

    **A     Let me make sure I understand.  After**

**November, 2017?**

    Q     Correct?  In other words, after the

Deposition of Evan Hendricks                    Amber J. Cramer v. Equifax Information Services, LLC, et al.

dispute through the --

A    After the dispute, did it ever reappear on her credit report subsequent to that dispute. I'm not sure.  I'd have to go look at the documentation.

Q    Would it affect your opinion if it did not?

MS. GOLDSMITH:  Object to form.

A    Well, it depends.  If Bay Area conducted an adequate investigation and then instructed the bureaus to remove it from their files, then, yes, that would change my opinion.

Q    On page 26 of your report, Exhibit 49, the next to the last paragraph begins, "It is important to note."  Do you see that paragraph?

A    Yes.

Q    Do you see the last sentence of that beginning at the end of line 2, beginning "It is"?

A    Yes.

Q    Would you read that sentence?

Deposition of Evan Hendricks                        Amber J. Cramer v. Equifax Information Services, LLC, et al.

A    "It is also important to note that when a creditor reports negative trade line as disputed, that trade line typically is not scored and, therefore, does not negatively impact the credit score."

Q    Is that true?

A    Yes.  That is the way the system is supposed to work, that when they mark it with the proper Metro 2 code, XB code, it's not supposed to score the status or the balance, which would be -- otherwise would be two negative fields that would lower the credit score.  And there is some ambiguity to the extent that this applies to collection accounts but I've never been able to resolve it.

Q    So would it be your understanding that after November, 2017 that anything reported by Bay Area Credit would not affect Amber Cramer's credit score?

MS. GOLDSMITH:  Object to form.

A    If it was marked with the XB code and

if collection accounts are like other trade lines where it doesn't score the status, which would be a collection, it would be a negative status, and it doesn't include a collection balance, which would be another negative item of information, then that is the way system is supposed to work. It should not -- that trade line should not lower the FICO score.

Q     Would it matter, at that point, whether a reasonable investigation, in your opinion, had occurred?

A     Sure.

Q     How would it matter?

MS. GOLDSMITH:  Object to form.

A     Well, it matters because -- for several reasons.  One, because, in my opinion, there is a lot of consumers, what they care most about is their good name and their reputation and, when credit reports are involved, their good credit name and their good credit reputation is what is being represented.  And so, if someone has