Ward v NCS
Exhibit 25

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

---

_

ROBBIN WARD

              CASE NO. 1:21-cv-02597-LTB

        Plaintiff,

      vs.

TRANSUNION, LLC. et al,

        Defendants.

---

**DECLARATION OF RONALD V. SAPP**

Pursuant to 28 U.S.C. § 1746, Ronald V. Sapp states as follows:

1.      I am the Vice President of Operations for Defendant, National Credit Systems, Inc. (hereinafter, "NCS").

2.      I am authorized to submit this Declaration in support of NCS's Motion for Summary Judgment.

3.      As the Vice President of Operations, I am charged with oversight of NCS's day-to-day collection activities which include, *inter alia*, ensuring that NCS's employees comply with company policies and procedures, client requirements and all collection laws including, but not limited to, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (the "FCRA"), and any state law equivalent statutes/regulations.

4.      I am personally familiar with NCS's collection practices and procedures including NCS's system for maintaining account records.  All records for accounts placed with NCS are maintained on this system. I am personally familiar with NCS' collection practices and procedures including NCS' system for maintaining account records.  All records for accounts placed with NCS are maintained on this system.

5. I am also familiar with NCS's system for maintaining records and I am a custodian of NCS's records.

6. While also performing collection related services NCS collects debts from responsible parties that allegedly breach lease agreements. NCS has performed these lease debt collection services for approximately thirty (30) years. Typically, the original creditor, or its property manager, hires NCS to collect its outstanding receivables.

7. To initiate collection of a delinquent account, the property manager forwards (1) a final account statement or other similar document that provides a description of the charges due under the lease that comprises the alleged principal amount of the debt that is verified as accurate, and (2) other documents from the leasing file such as the applicable lease and lease application to assist with verification of parties responsible for the alleged debt.

8. Plaintiff's alleged debt described below, followed that pattern with the property manager providing the verified principal amount of the debt in the form of a *Resident Ledger* and *Lease* – both of which they confirmed were provided to the Plaintiff during his tenancy or shortly thereafter. As property managers and leasing offices are familiar with the calculation of amounts owed pursuant to their leases, it is NCS's experience that it can rely on the accuracy of those final account statements when collecting these alleged debts. *See* Exhibit 46 (Lease); Exhibit 48 (Account Balance Documents and Ledger).

9. Main Street Renewal (hereinafter, the "Original Creditor") has given NCS no reason to doubt that the information that they have provided in this case – or in any other case – would be untrustworthy in any respect.

10. I have personally reviewed NCS' business records pertaining to Plaintiff.

11. If sworn as a witness, I can testify competently to the facts stated herein.

**NCS's Policies and Procedures**

12.    NCS has internal policies and procedures in place that govern the placement of accounts with NCS for collection.

13.    Likewise, NCS has internal policies and procedures in place that govern how NCS employees are to conduct themselves when attempting to collect debts placed with NCS for collection.

14.    Updates to policies and procedures, as necessitated by operational changes or legal developments, are promptly communicated to all NCS employees to ensure their continued familiarity with and adherence to all such policies.

15.    Additionally, it is NCS's routine practice to perform regular and ongoing audits of all such policies and procedures to ensure adherence, consistency and ongoing process improvements.

16.    It is NCS's routine practice to promptly communicate updates to policies and procedures to all NCS employees to ensure their continued familiarity with and adherence to all such policies, as necessitated by operational changes or legal developments.

17.    It is NCS's routine practice to train employees regarding each of these policies and procedures at the time of hire and to test employees regarding their understanding of such policies and procedures at regular intervals thereafter.

18.    Specifically, NCS employees are trained to look for any irregularities in the documents (regardless of the document type) which are submitted by its clients and from any consumer disputes.

19.    Employees who do not follow NCS' policies and procedures are subject to discipline up to and including termination.

20.    With regard to the specific subject matter of this lawsuit, NCS has developed and implemented policies and procedures for vetting accounts placed with NCS for collection prior to the commencement of any collection activity.  These policies and procedures are reasonably adapted to ensure that collection activity is only initiated on valid debts.

21.     Furthermore, NCS' clients represent in writing that all accounts are accurate at the time of placement with NCS, as the Original Creditor did in this matter.

22.     Here, the Original Creditor represented in writing to verify that the full balance was, in fact, due and owing on the Plaintiff's account, and that the Plaintiff was the appropriate party to the lease (and not that there was any validity regarding alleged identity theft or mistaken identity).

23.     The Original Creditor *continues* to verify that the full balance is due and owing, and that the Plaintiff is the appropriate party, through even the filing of this Motion for Summary Judgment.

24.     When an account is received for collection, NCS inputs the data provided by the client into its internal account management software (WinDebt).

25.     Additionally, NCS has policies and procedures which  are reasonably adapted to ensure that all disputes are promptly and accurately noted in NCS's account management system.

26.     It did so in this case, as its notes reflect.

27.     NCS' employees are required to contemporaneously notate all activities related to an account.

28.     NCS made notes in its system, WinDebt, regarding Plaintiff's account.

29.     NCS enters notes into Windebt, which keeps notes contemporaneously, and is NCS's account management system, whereby notes are kept in the regular course of NCS's business. More specifically, Win-Debt, keeps records of *all* actions that transpire on an account in real-time and are memorialized by the entry of a note which is not altered, amended, or changed following its entry into the system.

30.     These notes include the receipt of any inbound and outgoing calls or written correspondence, including the text of any emails with the original creditor, within this system.  Such records are kept within the ordinary course of NCS' business.

### NCS' Policies Regarding Dispute Investigation

31.     It is NCS' policy to provide accurate information to credit bureaus.  Further, it is NCS' policy to conduct a reasonable investigation when a dispute is received.

32.     When a dispute is received by the consumer, the scope of the investigation is determined by the information provided by the consumer and NCS' clients.

33.     When a dispute is received, without exception, NCS' employees immediately notate the account and initiate an investigation.

34.     Failure to do so will result in disciplinary actions, up-to and including termination.

35.     NCS conducts audits to ensure that these regular, integral, and important measures are being executed without fail on an ongoing basis.

36.     These dispute investigation procedures are also memorialized in a written compliance manual which is distributed to new employees upon hire. New employees are tested following extensive training.

37.     Following hire, employees are given extensive supplemental training on a continual, frequent, and ongoing basis as updates in the law requires, but also as updates to policies dictate, and also to re-certify employees in this special area of the law.

38.     In some investigations, third parties or entities might also submit information to determine if the amount of the debt is correctly charged to the consumer.  NCS would consider that documentation, if any, if provided to them.  As a matter of practice, however, NCS does not reach out to third parties regarding potential debtors/consumers so as not to violate any third party disclosure rules under the FDCPA.

39.     Additionally, NCS _only_ reports to all three major bureaus: Trans Union, Equifax, and Experian.

40.    NCS did not receive any requests from anyone to disclose the balance or status of Plaintiff's account, and NCS did not transmit the Plaintiff's information to any third party, nor was there a request for the Plaintiff's information.

### Plaintiff's Accounts

41.    On or about December 12, 2019, the Original Creditor referred the Plaintiff's account to NCS with a balance owed in the amount of $5,375.83. *See* Exhibit 23 to Motion for Summary Judgment.

42.    The Original Creditor represented in writing that Plaintiff's account was accurate at the time of placement with NCS.

43.    Subsequent to placement, Plaintiff disputed the account telephonically with the Law Office of Brett Borland on June 15, 2020, claiming that the account contained "fraud." *See* Exhibit 23 to Motion for Summary Judgment, pg. 1.

44.    NCS noted the Plaintiff's account as disputed with the credit bureaus, which would have placed a dispute flag on Plaintiff's credit report next to any furnishings made by NCS, and initiated thereafter an investigation into Plaintiff's dispute. *See* Exhibit 23 to Motion for Summary Judgment.

45.    This dispute flag has been present ever since his June 2020 dispute.

46.    Plaintiff initiated two separate disputes – the first of which was where the Plaintiff stated that the account was "not his". *Id.* at pgs. 2-3.

47.    Plaintiff's second dispute regarded allegations of identity theft, which Plaintiff based his theory solely on his claims that he has never been an employee of Neiman Marcus and that he does not receive social security benefits. *Id.* at pg. 3.

48.    Based upon the information from the Original Creditor, which included Plaintiff's lease, correspondence between the Plaintiff & the Original Creditor, a move-out statement, a verification of the amount as due-and-owing (with which NCS confirmed the amount as due-and-owing), color copies of

Plaintiff's driver's license and social security card, and, as supplied by Plaintiff's wife Megan Ward, the Plaintiff's FTC theft affidavit, paystubs from Plaintiff's employer Plaintiff's allegations that the Neiman Marcus pay advices and social security statement were "fake" and "slightly slanted", both the Original Creditor and NCS determined that the account was not opened based upon "identity theft" or "fraud." *See* Account Notes at Exhibit 23 to Motion for Summary Judgment, pgs. 3-6.

49.     Specifically, even if Plaintiff's allegations were taken as true, "fake" paystubs are not indicative of residency or an incorrect identity/identifying documents. *Id.*

50.     Furthermore, it is the Original Creditor's representation that Plaintiff's driver's license and social security card were provided personally and are color copies. Generally, it is unlikely that, in the event of identity theft, that the thief would procure *color* copies of any identifying information. *See* Exhibit 3.

51.     Importantly, NCS has a *second* account for the Plaintiff with Berkshire Square, which is an account placed in 2003 for a former rental property for the Plaintiff. Exhibit 26: Berkshire Square account notes.

52.     The Berkshire account notes indicate that someone applied for a rental property using the same identifying information as was supplied to Berkshire, which caused NCS to generate and send a letter to the Plaintiff, Robbin Ward, at the address of 5390 S Sherman St., Littleton, CO 80121. *Id.* at pg. 1.

53.     NCS has no record of return mail regarding this letter.

54.     When someone applied with Plaintiff's information, NCS was alerted as to this fact on January 24, 2019, and thereafter sent a letter to Plaintiff on January 25, 2019, remind the Plaintiff of his other open account with NCS as well as a notification that it received notice of Plaintiff's application for a residential lease elsewhere. Exhibit 40: Template of January 2019 Letter Mailed to Plaintiff.

55.     NCS does not retain copies of original letters, though, the template of the January 2019 letter mailed to the Plaintiff is attached to the Motion for Summary Judgment at Exhibit 40.

56.     The letter states the name "Michael Stevenson", which is the name of a test account which is a part of this template document, where the original would have stated "Robbin Ward" along with Mr. Ward's Colorado address as opposed to that of "Michael Stevenson."

57.     It would have been physically impossible, that when conducting an investigation, that any such investigator could ignore the fact that Mr. Ward has two accounts with NCS. This is because when you search for Mr. Ward, both accounts populate and there is no way to prevent that. *See* Exhibit A attached hereto – capture of screen displaying query for Mr. Ward and displaying both accounts.

58.     Following the conclusion of NCS's June and July investigations, NCS sent the Plaintiff a letter confirming the results of its investigation, inviting the Plaintiff to provide additional documentation to support their assertions.

59.     Importantly, no additional documentation and no police report were ever provided by the Plaintiff.

60.     Plaintiff's "documentation" has only ever consisted of his assertions that he has never lived in Texas, that he has never worked for Neiman Marcus nor received social security benefits, pay advices from his current employer, and a mortgage statement for his property in Colorado.

61.     No documentation was provided which would show that Mr. Ward, in fact, had his identity stolen, nor information to support such a claim, was ever provided.

62.     Plaintiff has been unwilling to accept this explanation and continues to dispute the amounts due and owing.

63.     NCS continues to notate the account as disputed reporting compliance code "XB."

64.     Plaintiff has not provided any documentation or information regarding credit denials, and NCS does not otherwise have any documents to support the same.

65.     Plaintiff has not provided any documentation or information regarding damages beyond mere declaration, and NCS does not otherwise have any documents to support the same.

66.     No further documentation, other than what has been noted herein, was provided by the Plaintiff.

### NCS's Dispute Department

67.     NCS' procedures regarding vetting of accounts are specifically designed to ensure that NCS does not attempt to collect on invalid debt.

68.     The procedures at issue in this case are continually monitored and tested to ensure they are reasonably adapted to prevent the specific errors alleged in this case.

69.     I am personally familiar with our dispute department employees and contractors, including those that were employed in and around the time of Plaintiff's disputes.

70.     Both myself and Mr. Joel Lackey, who is the president of NCS, were the direct supervisors of all employees working in the dispute department.

71.     These employees were supervised on a daily basis, and are contemporaneously monitored by CCTV/recorded camera.

72.     These employees received annual performance reviews, which always exceed any expectations set by both myself and Mr. Lackey.

73.     By all accounts, members of the dispute department are highly-valued, well liked, and respected employees of NCS.

74.    I can also confirm that both Ms. Boehler, Ms. Woodward, and any contractors which we have engaged also demonstrate good moral character and I am unaware of any complaints or disciplinary action relating to their work.

75.    NCS trains all new employees for their roles upon hire.

76.    When a new employee struggles, NCS provides remediation training.

77.    When a new employee cannot be brought up to speed, NCS must make difficult business decisions.

78.    If the employee is no longer new, and though it does not happen with any regularity, NCS has had to discipline employees for poor work performance.

79.    NCS would not hesitate to discipline for poor work performance, as compliance is NCS's #1 goal, above all else.

### No Evidence to Support Plaintiff's Claims

80.    NCS does not possess records or other evidence to suggest that the Plaintiff actually _turned down_ opportunities because of the NCS account – or that his income was positively or negatively impacted either before or after his account was turned over to NCS for collections. Nor is there documentation to support Plaintiff's assertions that he received less than favorable financing as a result of the NCS tradeline. _See also_ Exhibit 27: Confirmation of receipt of dispute and request for additional information.

81.    The documents confirming the credit freeze with each individual consumer reporting agency requested additional information to verify Plaintiff's identity – including a drivers' license, ID card, passport, or birth certificate, and one additional item to validate an address, such as a drivers' license, utility bill, paystub, or tax documents. _Id._

82.    Contemporaneously with submitting the dispute, Plaintiff submitted an FTC identity theft report. _Id._ at pg. 45. Plaintiff never submitted a police report.

83.    Additionally, Plaintiff's allegations that, if taking the Original Creditor at their word, and giving credence to Plaintiff's claims that he was never employed with Neiman Marcus, did not live in Texas, and did not receive social security benefits – which appears to be Plaintiff's argument supporting the contention that any properties applied for with this information – even when accepted as true, those allegations do not materially alter the meaning and interpretation of the subject lease.

84.    There is no evidence that, if taking Plaintiff's allegations on their face as true, that Plaintiff was not, in fact, an employee of Neiman Marcus, nor is it alleged (or could it be said) that an answering confirming the same could have in any way materially changed matters.

85.    As such, when considering all of the forgoing, and when investigating Plaintiffs June 2020 claim that he "h[ad] no knowledge of this account," or the July 2020 claim of "true identity theft", the accounts were verified as accurate following a complete and thorough investigation.

### Custodian of Records Statement

Lastly, as a custodian of records for NCS, I represent that  Exhibits 1, 2, 5-6, 11-15, 20, 23-24, 26, 35-36, 40, 46, and 48, which are  attached to the Motion for Summary Judgment are business records of NCS  for  Plaintiff's Accounts with Main Street Renewal, the Berkshire, and NCS. These records are kept by NCS in the regular course of business, and it was the regular course of business of NCS. for an employee or representative of NCS, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached are the original or exact duplicates of the original. If sworn as a witness, I can testify competently to the facts stated herein.

Executed within the United States, in Atlanta, Fulton County, Georgia on November 15, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

NATIONAL CREDIT SYSTEMS, INC.

By:_____

RON SAPP, VICE PRESIDENT OF OPERATIONS

