**UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

---

ROBBIN WARD

        Plaintiff,

    vs.                            CASE NO. 1:21-cv-02597-LTB

TRANSUNION, LLC, *et al.*,

        Defendants.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT
NATIONAL CREDIT SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robbin Ward, by Counsel, opposes Defendant National Credit Systems, Inc.'s

Motion for Summary Judgment. (ECF 55.) For the reasons below, the Court should deny NCS's

Motion.

**OVERVIEW**

NCS's Motion is prefaced largely on the notion that if a family member commits identity

theft, then the victim must somehow still be liable for the fraudulent account. That is the reason

there are so many references to Plaintiff's daughter, her history, her alleged presence at the

residence, and the like—if it was Plaintiff's daughter who committed identity theft, then Plaintiff

is complicit and must be held to the debt he did not incur, did not authorize anyone to incur, and

had no idea about until it appeared on his credit reports. NCS's entire view of the case suffers from

this persistent problem, and NCS offers no genuine argument, let alone fact, that Plaintiff is

responsible for the account at issue. That is because he is not.

The cornerstone of NCS's Motion is the implication that because Plaintiff's daughter

appears to have been the one that stole his identity in applying for the Dallas residence, Plaintiff's

assertions that the account does not belong to him are false. There is of course no genuine basis for this position, as Plaintiff has been resolute from his first contact with NCS that he did not apply for the residence, did not authorize anyone to do that, and did not provide anyone his identifying information so they could apply for the residence. Nothing has changed during this litigation. So whatever might be made of the daughter's conduct, there is nothing that meaningfully ties Plaintiff to the account at issue. NCS therefore strains to make that connection, but fails.

NCS's view of the case is particularly skewed because it did not take Plaintiff's deposition. It therefore lacks the testimony that starkly shows the factual truth—Plaintiff did not apply to lease the Dallas residence, he did not provide his identifying information to anyone so they may do so, he did not authorize anyone to apply for or rent the residence, and he did not know about the application or account NCS reported to the credit bureaus as belonging to him. While no doubt a strategic decision to not depose Plaintiff for fear of establishing a record unfavorable to NCS, the evidence Plaintiff offers in opposition to NCS's Motion compels denying it.

### FACTUAL BACKGROUND

**I.    A Fraudster Uses Plaintiff's Identifying Information To Lease A Residence In Dallas, Texas, And Eventually Defaults On The Lease Payments.**

Plaintiff has lived in Colorado since 1989, who has never lived, or sought to live, in Texas. (Plt.'s Stmt. of Facts ("PSOF") ¶ 1.  In January of 2019, someone applied to rent a property in Dallas, Texas. (ECF 55-1 ¶ 1.) The landlord accepted an online application in the name of Robbin Ward, which included Plaintiff's address in Colorado, a portion of his Social Security Number, false income information, and falsified records from the Social Security Administration. (ECF 55-1 ¶¶ 2, 21; PSOF ¶ 2.  Plaintiff was not aware of this application, did not submit it, did not authorize anyone to submit it, and did not provide anyone his identifying information so that they could apply. (PSOF ¶ 4.

2

As proof of income, the fraudster included with the application paystubs from Neiman Marcus, a place Plaintiff has never worked. (ECF 55-1 ¶ 8; PSOF ¶ 5.  Neiman Marcus has confirmed this fact. (PSOF ¶ 5).  Neither the landlord, nor later NCS, ever bothered to verify whether Plaintiff worked at Neiman Marcus. (PSOF ¶¶ 5, 25.

The fraudulent application also included forged statements from the Social Security Administration suggesting the applicant was eligible for benefits Plaintiff would not have been able to receive at the income level listed on the application. (PSOF ¶ 6 [the forged credit application lists Plaintiff's monthly income as $3,000 per month, and the most an individual may earn per month on disability is $1,220 for non-blind persons, and $2,040 for blind persons. https://www.ssa.gov/oact/cola/sga.html].) This benefits letter provided with the application bears a claim number ending in "2993DI" – which indicates that the benefits are being paid to a disabled individual, rather than traditional benefits received when reaching age 63. (ECF 55-1 ¶ 16.) Either way, the application showed Plaintiff met neither the disability nor age requirement.

The application also included Money Grams that bore a signature that was supposedly that of Plaintiff. (ECF 55-1 ¶ 33.) Plaintiff denies signing the Money Grams, and the signature on them looks nothing like Plaintiff's. (PSOF ¶ 7-8. Whatever the landlord made of these signatures, NCS should certainly have noticed the easily recognizable differences when it investigated Plaintiff's disputes.

Not surprisingly, the identity thief defaulted on the lease payments, and the landlord instigated eviction proceedings. (ECF 55-1 ¶ 36.) Because Plaintiff did not apply for the residence and never lived there, he was not aware of the eviction proceedings. PSOF ¶ 4.  Those proceedings therefore ran their course without Plaintiff's knowledge. (ECF 55-1 ¶¶ 38–39.)

**II.     NCS Attempts To Collect The Defaulted Debt, And Begins Reporting To The Credit Bureaus That The Defaulted Account Belongs To Plaintiff.**

The landlord eventually placed the $5,375.82 defaulted debt with NCS for collection. (ECF 55-1 ¶ 41.) NCS supposedly "verified" with the landlord that the account was due and owing, but the conclusion is impossible because Plaintiff did not apply to lease the residence, did not authorize anyone to do that, did not provide his identifying information to anyone so that could do that, and was never aware a debt was being incurred in his name. (PSOF ¶¶ 3-4). All the landlord could have verified is that the information in its records was used to lease the residence and the payment history.

After NCS became responsible for collecting the debt, it began attributing the account to Plaintiff and reporting it as "in collection" to the credit bureaus. PSOF ¶¶ 12.  Reporting an account as "in collection" is a major derogatory notation on a consumer's credit. PSOF ¶ 13.  Because Plaintiff never applied to lease the residence, did not authorize anyone to do that, did not provide his identifying information to anyone so that could do that, and was never aware a debt was being incurred in his name, attributing the account to him—with any payment history at all, let alone a derogatory one—was inaccurate. PSOF ¶¶ 3-4.

### III.    Plaintiff Learns Of NCS's Derogatory Reporting, And Disputes With NCS And The Credit Bureaus.

Plaintiff learned of NCS's inaccurate reporting of the account when he applied to refinance his mortgage in 2020. PSOF ¶ 14.Each credit bureau was reporting the account as "in collection." PSOF ¶ 15.  Plaintiff disputed directly with NCS, calling and writing to it repeatedly and stating that the account resulted from identity theft or confusion of him with another person. PSOF ¶ 16. Plaintiff provided NCS with meaningful evidence that the account did not belong to him, including pay stubs from his actual employer, mortgage statements confirming his Colorado residence, and a letter from the Social Security Administration confirming he was not receiving the benefits the

applicant claimed. PSOF ¶ 17.   None of this information convinced NCS to change its reporting.

When disputing with NCS did not work, Plaintiff disputed in writing to the credit bureaus. PSOF ¶ 18.  In those letters, Plaintiff noted that he was "the victim of identity theft," and explained that he was including as an attachment an Identity Theft Report he filed with the Federal Trade Commission in June 2020. PSOF ¶ 19.   The letters also included copies of Plaintiff's driver's license and Social Security Card, as well as an Identity Theft Affidavit, which was notarized and Plaintiff signed under penalty of perjury. (*Id.*) The Identity Theft Affidavit confirmed that Plaintiff had informed the police of the identity theft, but the police did not issue a report. *Id.*

## IV.    NCS Is Duty Bound To Investigate Plaintiff's Disputes, And Knows Plaintiff Claims The Account Resulted From Identity Theft, But Does Precious Little.

When it received Plaintiff's disputes from the consumer reporting agencies ("CRAs"), NCS became bound by Section 1681s-2(b) of the FCRA to investigate Plaintiff's disputes. 15 U.S.C. § 1681s-2(b). NCS did a bare minimum, cursory investigation of Plaintiff's disputes.

As set out just above, Plaintiff has disputed the account as not belonging to him because of identity theft from the beginning. He provided NCS with significant proof that the account was not his, even before formally disputing with the CRAs. And while Plaintiff's direct disputes to NCS did not trigger any duty to investigate under the FCRA, they provide meaningful background to show the amount of information NCS ignored when it actually did what it claims was an investigation of Plaintiff's disputes.

Plaintiff provided his notarized Identity Theft Affidavit, copies of his drivers license and Social Security Card, and F.T.C. Identity Theft Report in June of 2020. PSOF ¶ 20. NCS claims that it considered information in the hands of the original creditor during its investigations of Plaintiff's disputes, yet nowhere does it claim to have taken these documents into account. (*See*

*generally* ECF 55-1.)[1] Plaintiff also pointed out to NCS that he never worked at Neiman Marcus, the applicant's supposed employer, and that the Neiman Marcus paystubs were falsified. PSOF ¶ 23.  Plaintiff further submitted his own, genuine paystubs showing his employment in Colorado and mortgage statements confirming he was a Colorado resident. PSOF ¶ 24.  Again, NCS does not state, let alone prove, that it considered any of this evidence when it investigated Plaintiff's disputes. (*See generally* ECF 55-1.)

While its dispute investigators were aware Plaintiff claimed to have never worked at Neiman Marcus, NCS's policies and procedures for investigations of disputes do not permit the investigators to contact employers. PSOF ¶ 25. This makes little sense given that NCS collects no behalf of landlords, and landlords will always have employer information for NCS to verify. Likewise, Plaintiff told NCS that the letter supposedly from the Social Security Administration regarding the applicant's benefits was fraudulent, but NCS's investigators did not contact the SSA. PSOF ¶ 26.  And though Plaintiff stated in his communications with NCS that NCS could contact him if it needed any additional information to assist in the investigation, no one at NCS did. (PSOF ¶ 27.

Despite having enough information to at least suspect that the application and supporting documentation were fraudulent, and that Plaintiff was disputing the credit reporting as being the result of identity theft, all NCS did was compare Plaintiff's identifying information with information submitted with the application. (ECF 55-1 ¶¶ 64, 70; ECF 56-2 ¶¶ 48–49.) That information included the falsified pay stubs; Plaintiff's Social Security Card and driver's license submitted with the application and without his knowledge or permission; documents like move-in statements that would not show either way whether Plaintiff was the actual applicant; and

---

[1] Since these documents bear NCS's bates numbers, it obviously possessed them.

Plaintiff's F.T.C. Theft Report. (ECF 56-2 ¶ 48.) NCS did not consider Plaintiff's notarized Identity Theft Affidavit, did not contact Neiman Marcus or the Social Security Administration, and did not contact Plaintiff. *Id.*; PSOF ¶ 29.

More egregious than NCS's failures in the original dispute investigations is what it undertook after Plaintiff sued. NCS headlines one section of its Statement of Facts "Facts discovered after the filing of this lawsuit," after which NCS discusses a great deal about the history of Plaintiff's Daughter, Quen Allen. (ECF 55-1 ¶¶ 72–80.) NCS dedicates a great deal of its summary-judgment discussion to Ms. Allen (ECF 55 at 17–19), but that discussion, if anything, suggests that Plaintiff is telling the truth and his identity was stolen—perhaps by his daughter.

Whatever is indeed the truth about the perpetrator of Plaintiff's identity theft, what matters here is that NCS knew Plaintiff was complaining of identity theft and all it did was consult documents that were created by the original creditor with information submitted by the identity thief. Of course, such information matched—that is how identity theft works. Under such circumstances, more was necessary for NCS to have conducted reasonable investigations of Plaintiff's disputes.

## LEGAL FRAMEWORK

### I.    Article III Standing.

A federal court's subject-matter jurisdiction stems from Article III of the United States Constitution, which limits such jurisdiction to "Cases" and "Controversies." U.S. CONST. art. III, § 2. The Supreme Court has interpreted the standing requirement to mean, simply, that the plaintiff must have a personal stake in the litigation. *TransUnion LLC v. Ramirez*, 210 L. Ed. 2d 568, 141 S. Ct. 2190, 2203 (2021). In other words, the Court has noted, the standing analysis boils down to a simple question: "What's it to you?" *Id.*

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Put another way, "[i]f 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.'" *Id.* *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) (Though concreteness may be more easily satisfied for tangible injuries like physical or monetary harms, intangible injuries may nevertheless be concrete for standing purposes).

## II.    Summary Judgment Standards.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Under this well-settled standard, the moving party initially bears the burden of establishing a lack of true dispute of any material fact. *Couture v. United Airlines, Inc.*, No. 1:20-cv-03181-CNS-SKC, 2022 WL 16961718, at *1 (D. Colo. Nov. 16, 2022). The burden then shifts to the non-party to show, through admissible evidence, that there is such a dispute of triable fact. *Id.* To avoid summary judgment, the non-movant must show more than just a dispute of *some* fact—it must show there is *genuine* dispute of *material* fact. *Wasatch Transp., Inc. v. Forest River, Inc.*, 53 F.4th 577 (10th Cir. 2022).

## III.    The Fair Credit Reporting Act Provisions At Issue.

Plaintiff asserts a claim against NCS for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b). To prevail on his claim, Plaintiff "must show that (1) the

8

information [NCS reported about Plaintiff] was inaccurate, incomplete, or materially misleading;

and (2) the inaccuracy was due to the furnisher's negligent or willful failure to perform reasonable

investigations into Plaintiff's disputes." *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173,

1178-79 (10th Cir. 2013); *see also Remaly v. Wyndham Resort Dev. Corp.*, No. 20-cv-3028-LTB-

NYW, 2021 U.S. Dist. LEXIS 226267, at *6 (D. Colo. Nov. 23, 2021). Mechanically, to meet its

investigation obligations under Section 1681s-2(b), NCS must:

> (1) investigate the disputed information;
>
> (2) review all relevant information provided by the CRA;
>
> (3) report the results of the investigation to the CRA;
>
> (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and
>
> (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable.

*Id.* The touchstone of the furnisher's investigation responsibilities is reasonableness, measured

against an objective standard. *Id.* Reasonableness in this context is a jury question in the

overwhelming majority of cases, with summary judgment appropriate only where the

reasonableness of the investigation "is beyond question." *Id.*

**ARGUMENT AND AUTHORITIES**

**I.      Plaintiff Maintains Article III Standing To Remain In Federal Court.**

> **A.      Injury In Fact And Economic Damages Are Not The Same Thing, And Economic Damages Are Not Necessary To Establish Standing.**

NCS's arguments that Plaintiff lacks standing focus exclusively on his supposed lack of

economic damages. (ECF 55 at 6–7.)[2] As best as Plaintiff can ascertain, according to NCS, because

---

[2] Because the pages of NCS's Motion are not numbered, Plaintiff cites to the page numbers in the header attached by the Clerk upon filing.

Plaintiff "has not provided any consumer reports with which to analyze *or* to gauge his claims or alleged damages," he cannot establish an Article III harm or that NCS violated the FCRA. (*Id.* at 6 (emphasis in original).) Neither position is correct.

As to Plaintiff's standing to sue, courts have agreed that Article III's injury-in-fact requirement "is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co*., 432 F.3d 286, 294 (3d Cir. 2005); *see Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (citing *Danvers* for this proposition). As even NCS's key case, *TransUnion LLC v. Ramirez*, 210 L. Ed. 2d 568, 141 S. Ct. 2190, 2203 (2021), confirms, the provision of negative, inaccurate information about a consumer is—standing alone—a sufficiently concrete injury to confer Article III standing. *Id.* at 2208–09 (holding that class members whose consumer reports with derogatory entries and that were published to third parties suffered Article III harm). Here, NCS published the false reporting to Experian, Equifax and Trans Union on multiple occasions.  PSOF ¶ 30. Thus, Plaintiff easily satisfies the standing requirements set forth in *Ramirez* because Defendant published the false information to the credit bureaus at least eight times.

Plaintiff's June 11, 2020 Experian credit report confirms that NCS reported the account at issue as "collection," a derogatory characterization, and did not include any notation that the account was in dispute. PSOF ¶ 31.  This reporting remained even after Plaintiff disputed the account as not belonging to him. PSOF ¶ 32. Experian's report confirms that multiple parties obtained Plaintiff's report with the inaccurate NCS account. *Id.* ¶ 33. In other words, just as in *Ramirez*, NCS published false information to the credit bureaus, who in turn re-published the false information to third parties, namely an entry of an account that does not belong to him and that is derogatorily noted as in collection. (*Id.* ¶ 34 [Hendricks Rpt. at 18].) That is textbook Article III injury in fact.

B.        **Plaintiff Has Also Established The Actual Damages NCS Claims Are Absent.**

While the publication of derogatory, inaccurate information about Plaintiff is enough to confer Article III standing per *Ramirez*, Plaintiff has also established the economic damages from the reporting NCS claims do not exist. In his responses to NCS's Interrogatory No. 1, which requests a recitation of Plaintiff's damages, he explains:

> Plaintiff was unable to refinance his mortgage from 4.35 to a lower interest rate of approximately 2.75 – 3% because of the derogatory collection account reporting on his credit report, that resulted in a low credit score of 671. Plaintiff was advised that because of his credit score he would not qualify for the best rate. One of the main risk factors was that a derogatory collection or public record had been filed. This information was provided by Experian. (Plaintiff_000001 – 000003) The reduction in interest rate would have been approximately $300 per month and over the life of the loan would have been a savings of approximately $108,000.

(PSOF ¶ 35.  NCS offers no evidence to rebut these statements.

Plaintiff's expert, Evan Hendricks, further confirms the existence of Plaintiff's monetary damages. He notes:

> NCS's inaccurate reporting damaged Plaintiff's creditworthiness and reputation in at least two ways.
>
> First, by reporting a current "status" of "collection account," and with a past-due balance of $5,375, NCS, for all practical purposes, rendered Plaintiff ineligible for nearly all – if not all – forms of credit because creditors typically will not extend credit to consumers until they remove all past-due balances from their credit reports.
>
> Second, the "status" of "collection account," and with a past-due balance of $5,375, constituted a major derogatory under the FICO scoring model, and consequently, lowered his FICO scores.
>
> This would have had a major negative impact on his credit score because (1), the date of first delinquency was in July of 2019, and (2) Plaintiff had pristine credit, with no other derogatory tradelines or collections.
>
> The significant negative impact of the NCS collection on Plaintiff's FICO score is demonstrated by the June 2020 response of a mortgage lender. The credit report it pulled showed Plaintiff with a 660 Equifax FICO score, a 682 Trans Union FICO score, and a 671 Experian FICO score. In my opinion, without the inaccurate,

> fraudulent, NCS collection, Plaintiff's FICO scores would have been well above
> 700, possibly above 740.

PSOF ¶ 36. Indeed, once the NCS account was removed, Plaintiff's Experian FICO score was

803. PSOF ¶ 37. Again, NCS offers nothing in retort, instead baldly arguing that such plainly

present damages do not exist. (ECF 55 at 7.) Yet these damages do exist, and they are more-than

sufficient to confer on Plaintiff Article III standing. *Ramirez*, 141 S. Ct. at 2204 ("If a defendant

has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury

in fact under Article III."); *see Hampton v. Gen. Motors, LLC*, No. 21-cv-250-RAW, 2022 WL

4538440, at *2 (E.D. Okla. Sept. 28, 2022) (holding that "economic injury is sufficient for standing

under Article III").

Further, Plaintiff has testified by declaration as to his non-economic damages, including

such categories as emotional distress, humiliation, embarrassment, and the like. PSOF ¶ 38. With

both economic and non-economic damages established, the Court should have no difficulty

concluding Plaintiff has standing to maintain this suit.

To the extent NCS would argue in reply that its expert, John Ulzheimer, has a different

opinion regarding Plaintiff's damages, such opinions show, at best, a dispute of material fact that

would preclude summary judgment on this issue. Given that Plaintiff's testimony and that of his

expert contravene NCS's evidence and assertions, the Court should conclude that genuine issues

of material fact as to damages preclude summary judgment in favor of NCS. *See Anderson v.

Equifax Info. Servs. LLC*, 292 F. Supp. 3d 1211, 1220 (D. Kan. 2017) (finding, when viewing the

record in the light most favorable to plaintiff, that there were genuine issues of material fact

regarding plaintiff's damages).

## II. NCS Has Not Shown Its Entitlement To Judgment As A Matter Of Law.

### A. NCS Inaccurately Reported Information About The Account To The CRAs.

NCS largely brushes past the question of accuracy of its reporting, arguing just that all it needed to do to investigate was check its own records because a court has stated such is not necessary "[a]bsent allegations of fraud, identity theft, or other issues not identifiable from the face of its records." (ECF 55 at 13.) That argument is particularly puzzling here, because Plaintiff plainly stated in his June 30, 2020 dispute letter to Trans Union (and which NCS produced in this case), "I am the victim of *identity theft* and this [Main Street Renewal, L.L.C.] account is not mine." PSOF ¶ 39 (emphasis added).  NCS also possessed Plaintiff's Federal Trade Commission Identity Theft Report and Identity Theft Affidavit at the time it was undertaking its investigations of Plaintiff's disputes. (*Id.*  ¶ 40 [bates NCS_0131–32; NCS_0137–38].) NCS has not presented any evidence that it considered these obviously pertinent documents during its investigations. Instead, because NCS can give no meaningful explanation for not taking these documents into account, it pretends they do not exist. Since NCS itself admits that accuracy is impacted by statements and evidence of identity theft, and those things exist and were in NCS's possession at the pertinent times, the accuracy of NCS's reporting is most-certainly in dispute.

Simply put, placing on Plaintiff's consumer reports information that is derogatory and does not belong to him is plainly inaccurate. PSOF ¶ 41.  NCS, however, did more than that, as it reported to the CRAs that it verified the account as belonging to Plaintiff, but without noting that the account was in dispute. PSOF ¶ 42. Such failure is an additional inaccuracy that can support a violation of Section 1681s-2(b). *See Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 854 (E.D. Va. 2017) (granting summary judgment to plaintiff on accuracy when furnisher bank reported to CRAs that the plaintiff's disputes had been resolved when they had not). At the very least, there are genuine issues of material fact as to whether NCS's reporting of the account at issue was accurate.

13

NCS does not meaningfully argue, let alone show as a matter of law, that its reporting of the account as belonging to Plaintiff, and without a designation of it being in dispute, was accurate. (*See generally* ECF 55.) NCS has therefore conceded that element, particularly where Plaintiff has stated under oath that the account is not his, and the summary-judgment standards do not permit the Court to conclude that the many inferences NCS asks the Court to entertain overcome Plaintiff's sworn testimony that the account is not his. *Painter v. Midwest Health, Inc.*, __ F.4th __, No. 21-3195, 2022 WL 17332734, at *2 (10th Cir. Nov. 30, 2022) ("Under this standard, we 'view facts in the light most favorable to the non-moving party and draw all reasonable inferences in her favor.'"). The Court should therefore conclude there are genuine issues of material fact on the issue of the accuracy of NCS's reporting of the account to the CRAs.

**B.      A Reasonable Jury Could Conclude That NCS Failed To Conduct Reasonable Investigations Of Plaintiff's Disputes.**

**1.      Section 1681s-2(b) demands a substantive, searching investigation.**

Section 1681s-2(b) requires that furnishers like NCS investigate disputes they receive from the CRAs. *Llewellyn v. Allstate Home Loans, Inc*., 711 F.3d 1173, 1178–79 (10th Cir. 2013). The touchstone of this investigation process is reasonableness, measured against an objective standard. *Adkins v. SLM Corp.*, No. 22-2082-SAC-TJJ, 2022 WL 1302805, at *4 (D. Kan. May 2, 2022). Following the seminal case *Johnson v. MBNA Am. Bank*, 357 F.3d 426 (4th Cir. 2004), courts generally hold that an investigation must be a "searching inquiry," and "clearly requires some degree of careful inquiry by creditors." *Id.* at 430; *see Collins v. Diversified Consultants Inc.*, No. 15-cv-02115-RBJ-NYW, 2016 WL 11693446, at *4 (D. Colo. July 19, 2016) (citing *Johnson* with approval). Whether an investigation is thorough enough to qualify as reasonable depends on the information provided to the furnisher with the dispute. *Adkins*, 2022 WL 1302805, at *4. Courts routinely conclude that the ultimate question of reasonableness should be saved for

the jury. *Id.*; *Maiteki v. Marten Transp. Ltd.*, 828 F.3d 1272, 1275 (10th Cir. 2016) (making this same pronouncement, and noting that summary judgment is only appropriate where reasonableness of procedures "is beyond question").

*Johnson* remains the fountainhead decision articulating the standard for conducting a reasonable investigation of a consumer's dispute under § 1681s-2(b). An FCRA "investigation" must consist of more than a cursory review of a dispute and instead, must be a "a detailed inquiry or systematic examination" and at a minimum "requires some degree of careful inquiry by creditors." *Johnson*, 357 F.3d at 430. The Courts of Appeals continue to unanimously follow this "reasonable investigation" standard. *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616 (6th Cir. 2012) ("We join every circuit to have addressed this duty in holding that the investigation an information furnisher undertakes must be a reasonable one."). As the leading FCRA treatise summarizes, NCS's data conformity or matching process is insufficient:

> [T]he Fourth Circuit's seminal *Johnson* opinion and its progeny have established that the substantive inquiry into consumers' disputes required by the reasonable investigation standard is not satisfied by the blatantly inadequate industry practice of conducting a mere "data conformity" review that simply confirms that the disputed information in the CRA computer accurately reflects the information in the furnisher's computer that generated the report in the first place[.]

National Consumer Law Center, FAIR CREDIT REPORTING § 6.10.4.2 (9th ed. 2017), updated through 2022 at www.nclc.org/library.

### 2. There are genuine issues of material fact as to whether simply matching data NCS knows already is suspect is a reasonable investigation.

NCS spills considerable ink citing cases and stating legal standards relating to reasonableness (ECF 55 at 14–16), but its discussion is light on substance. It claims that "the reasonableness of NCS's procedures in this case were beyond question" because it compared the information it was already reporting—but that Plaintiff disputed as resulting from identity theft—

with the application materials from the original creditor and concluded that nothing should be changed. (*Id.* at 16.) That of course is not enough when the dispute involves identity theft, as NCS itself confirms one page before,[3] because of course the information on application materials matches the Plaintiff's information—that is how identity theft works. As the prevailing authorities state, to be reasonable, the investigation must be "a detailed inquiry or systematic examination," and "requires some degree of careful inquiry by creditors." *Johnson*, 357 F.3d at 430. NCS fails to address the glaring flaw in its investigation, namely that it makes little sense to simply match data when the consumer disputes the reporting as resulting from identity theft, throughout its briefing.

The record facts here are clear and, frankly, not meaningfully disputed. Plaintiff did not apply for the residence NCS attributes to him. (PSOF ¶ 4.  He did not authorize anyone to apply on his behalf, and he did not provide anyone with his personal identifying information so they could apply. NCS cannot offer anything meaningful in response, except to advocate its theory that evidence suggests Plaintiff's daughter stole his identity and applied for the residence. (ECF 55 at 17–18.) Even if that is accurate—an inference from which NCS may not benefit as the summary judgment movant—it does not establish that Plaintiff is then somehow obligated on the account. Whether it was reasonable for NCS to conduct a data-matching exercise in these circumstances should be left to the jury. As one court addressed a similar data-matching "investigation" against a dispute of identity theft:

> It was unreasonable for Credit One to simply match Wood's personal identifiers with those associated with the Account when Wood continued to dispute the Account for years, claiming identity fraud. . . .

---

[3] NCS notes that "[a]bsent allegations of fraud, identity theft, or other issues not identifiable from the face of its records, the furnisher need not do more than verify that the reported information is consistent with the information in its records" (ECF 55 at 15), but as Plaintiff explains above, such allegations are present here and therefore require a more-robust investigation.

> Such actions are especially unreasonable when, as here, the alleged identity thief is a family member who could have knowledge of or access to an individual's personal information—including social security number, address, and birthdate—and who might use that information to fraudulently open a credit account.

*Wood*, 277 F. Supp. 3d at 853, 853 n.53. Here, NCS had ample evidence that simply looking at the underlying records was not enough.

Plaintiff disputed NCS's reporting, explaining that the account resulted from identity theft, and included with those disputes an F.T.C. Identity Theft Report and a notarized Identity Theft Affidavit. (PSOF ¶¶ 39-41. Importantly, in the notarized Affidavit, Plaintiff confirms that he visited the police regarding the theft of his identity, yet the police did not issue a report:

> (19) (check all that apply) I ☒have ☐ have not reported the events described in this affidavit to the police or other law enforcement agency. The police ☐ did ☒did not write a report. *In the event you have contacted the police or other law enforcement agency, please complete the following:*

*Id.* ¶ 43. And while NCS appears to argue that there is some vital need for a police report, it never states why such was needed for its investigation, how having one would have made any difference in what NCS did, or why the affidavit or report that Plaintiff *did* submit are subordinate to a police report. NCS is simply pointing to this (and several other irrelevant bits) as what it perceives to be something it can claim Plaintiff did wrong and that justifies its substandard investigation. But nothing justifies it.

The Consumer Financial Protection Bureau recently opined on the problem with CRAs and furnishers erecting unnecessary barriers—like the supposed need for particular information like a police report—in their dispute-investigation processes. In discussing the reasonableness of dispute investigations with the notion of the need for particular information in mind, the CFPB explains:

> Consumer reporting agencies and furnishers are liable under the FCRA if they fail to investigate any dispute that meets the statutory and regulatory requirements, as described in more detail below. Enforcers may bring claims if consumer reporting agencies and furnishers limit consumers' dispute rights by requiring any specific

format or requiring any specific attachment such as a copy of a police report or consumer report beyond what the statute and regulations permit.

CONSUMER FINANCIAL PROTECTION BUREAU, *Consumer Fin. Protection Circular 2022-07*, *available at* https://www.consumerfinance.gov/compliance/circulars/consumer-financial-protection-circular-2022-07-reasonable-investigation-of-consumer-reporting-disputes/.[4] In its discussion, the CFPB further highlighted its awareness that CRAs and furnishers hope to abdicate their investigative duty by demanding particular items of information, pointing to particular instances of misconduct, such as: "Furnishers that require a consumer to provide additional specific documents even though the consumer has already provided the supporting documentation or other information reasonably required to substantiate the basis of a direct dispute." *Id.* It is therefore unreasonable for NCS to continue to point to the need of a police report as justifying its subpar investigation, as the CFPB's opinion confirms such demands are improper.

Further, Plaintiff's expert, Evan Hendricks, confirms NCS's supposed investigation fell below industry standards for reasonableness. He notes an established set of industry-standard red flags that NCS disregarded in its investigation of Plaintiff's disputes:

- the presentation of suspicious documents with the application for the residence, including contradictory pay stubs;

- the use of suspicious personal identifying information, such as a suspicious address change, and which is inconsistent when compared against external information sources used by the financial institution or creditor, such as the Colorado-employer information Plaintiff included with his disputes;

- disregarding the consumer's claims of identity theft and not accounting for documents like the F.T.C. Dispute and Identity Theft Affidavit; and

- payment activity—not making any payments or making one payment and no more—

---

[4] Since 2010, the CFPB has possessed the authority "'to prescribe rules' or 'issue guidelines' regarding the FCRA." *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 106 n.8 (2d Cir. 2019). Courts grant such guidance persuasive authority, *id.* at 106, and consider the CFPB and FTC "authoritative sources" in interpreting the FCRA. *Henderson v. Trans Union, LLC*, Civ. No. JAG-14-0679, 2017 WL 1734036, at *2 (E.D. Va. May 2, 2017); *Fernandez v. RentGrow, Inc.*, 341 F.R.D. 174, 193 (D. Md. 2022) (citing *Henderson* with approval for this point).

that signals fraud.

PSOF ¶ 44. Mr. Hendricks further highlights inherent problems with NCS's investigation process, noting that its investigators disregarded NCS's own procedures in conducting their investigations. *Id.* ¶ 45 [Hendricks Rpt. at 7. Given that these shortcomings run counter to established standards in the credit-reporting industry and NCS's own procedures, they are further evidence that NCS fell short of a reasonable investigation of Plaintiff's disputes.

Also noteworthy is the investigation NCS undertook after Plaintiff sued. NCS contacted Neiman Marcus in an attempt to verify Plaintiff's employment there, researched IP addresses of devices used to apply for the residence, dug up criminal history about Plaintiff's daughter, obtained videos about her from Facebook, and attempted to place her in the residence at issue. (ECF 55 at 18–19.) All of this, of course, tilts the scale in favor of Plaintiff's claim that someone applied for the residence without his knowledge, even if that person may end up being his daughter. Nevertheless, nothing so thorough occurred during the time Plaintiff was disputing the inaccurate reporting, further underscoring things NCS felt appropriate now but it would not do during the time Plaintiff was disputing with NCS.

NCS's reliance on *Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295 (11th Cir. 2016), is misplaced. NCS reads that case to stand for the proposition that "a 'jury could' find that the furnishers [sic] reliance on its own records did not constitute a reasonable investigation." (ECF 55 at 14 (citing *Hinkle*, 827 F.3d at 1305).) On one hand, if NCS's statement is taken at face value, it favors Plaintiff because it confirms that reliance on internal records is likely not enough to garner summary judgment. On the other hand, if NCS's statement is accurate, there is nothing remarkable about that conclusion, as reasonableness of an investigation is nearly always a jury question. (*See supra* at 9 (addressing this issue).)

*Hinkle* further undermines NCS's arguments because it addresses the supposed need for a

police report and NCS's complaints about lacking one—which it did not request—while still

verifying the reporting as accurate. The *Hinkle* court noted, in responding to that argument:

> Midland argues that when Hinkle failed to support her dispute by sending Midland
> a police report or a signed fraud affidavit, Midland was entitled to cease its
> investigation and inform the CRAs that the debts were accurate and had been
> "verified." Although the failure to respond to a letter requesting assistance might
> be relevant to a jury's determination of whether Midland was entitled to report the
> debt as "verified"—as evidence, for example, that Hinkle's dispute was
> disingenuous—we are unprepared to say that it is dispositive at summary judgment.
> Midland cites nothing in the FCRA that permits a furnisher to shift its burden of
> "reasonable investigation" to the consumer in the case of a § 1681s–2(b) dispute. .
> . .
>
> A reasonable jury could find that Midland acted unreasonably when it conditioned
> further investigation on a response from Hinkle without informing Hinkle of that
> requirement.

*Hinkle*, 827 F.3d at 1306. In short, there is more for Plaintiff to gain from *Hinkle* than NCS.

NCS further relies on *Howard v. Pinnacle Credit Services, LLC*, No. 4:09-cv-85 (CDL),

2010 WL 2600753, at *3 (M.D. Ga. June 24, 2010), an out-of-Circuit decision that supposedly

establishes standards for conducting reinvestigations. (*See* ECF 55 at 16 (citing *Howard* as

supporting the notion that an audit confirming no errors, reviewing all information on file, and

communicating with the original creditor was reasonable as a matter of law).) Not only is *Howard*

easily distinguishable from this case, it does not definitively establish standards for investigating

disputes. Even if it did, the holding is not binding on this Court.

*Howard* involved a dispute over a credit card that the plaintiff's daughter opened without

plaintiff's knowledge. Plaintiff later learned of the account, and allowed payments to be made on

the balance from a bank account she shared with her daughter. 2010 WL 2600753, at *1–2. After

the account went into default and the daughter filed for bankruptcy, the creditor pursued plaintiff

for the balance on the account, which she discovered was also appearing on her credit reports. *Id.*

at *2. Her lawyer helped her dispute with the CRAs, demanding "that the credit reporting agencies investigate the 'completeness or accuracy' of [p]laintiff's dispute without any explanation as to what Plaintiff was disputing." *Id.* The CRAs communicated to the defendant just that "[c]onsumer states inaccurate information. Provide or confirm complete ID and account information." *Id.* With so little to go on the defendant reviewed its account records and compared the data therein to that provided by the CRAs. *Id.* at *3.

The court concluded that because the defendant had such scant evidence, and no indications from the plaintiff that he was the victim of identity theft or the account did not belong to him, a data-matching investigation was reasonable. *Id.* at *4. Here, by contrast, what was lacking in *Howard* is present. Plaintiff clearly stated in his dispute letters that he was the victim of identity theft, his report and affidavit confirmed this, and he submitted proof he did not work at the employer the applicant claimed was hers, that worked elsewhere, and lived in Colorado so would have no reason to lease a residence in Texas. There was therefore more information than was present in *Howard*, meaning the data-matching procedure approved in *Howard* is insufficient here. The Court should therefore conclude that *Howard* does not counsel approving NCS's perfunctory investigation.

### C.    Plaintiff Has Not Raised A Legal Dispute.

Without a genuine reason for conducting its subpar investigation, NCS raises the tired defense argument that Plaintiff's disputes were not factual, they were legal in nature and beyond the purview of a furnisher to resolve. (ECF 55 at 12.) NCS fails to meaningfully set out this argument, stating just that "what the Plaintiff's dispute alleges constitutes a question of law as whether or not the Plaintiff is, in fact, <u>not</u> liable on the account is a contested matter which can only be resolved with the assistance of the judiciary." (*Id.* at 16 (emphasis in original).)

21

Absent from this curt discussion is context. NCS presents no evidence this issue was on NCS's mind at the time it was investigating, so it cannot now argue that the legal/factual dichotomy somehow influenced the outcome of its disputes. The Court should therefore disregard this argument out of hand.

More problematic for NCS is the idea that when faced with a dispute it may just throw up its hands and say "this is a legal dispute we can't resolve." There is of course no definitive line between a legal versus a factual dispute, which could lead a furnisher to simply categorize all disputes as legal ones and therefore do nothing. The FCRA does not permit that, as the Ninth Circuit recently recognized while discussing the heightened investigation responsibilities of furnishers like NCS:

> Although FCRA requires both agencies and furnishers to conduct "reasonable" investigations, a furnisher's investigatory obligations will often be more extensive and more thorough. Credit reporting agencies are third parties that "lack[ ] any direct relationship with the consumer," so they must rely on the representations of the furnishers who usually own the debt. *Gorman*, 584 F.3d at 1156–57; *see Carvalho*, 629 F.3d at 891 (agencies "simply collect and report information furnished by others."). Furnishers, on the other hand, "stand[ ] in a far better position to make a thorough investigation of a disputed debt . . ." *Gorman*, 584 F.3d at 1156. This means that FCRA will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance. As the Consumer Financial Protection Bureau emphasized in its amicus brief, FCRA does not categorically exempt legal issues from the investigations that furnishers must conduct. The distinction between "legal" and "factual" issues is ambiguous, potentially unworkable, and could invite furnishers to "evade their investigation obligation by construing the relevant dispute as a 'legal' one."

*Gross v. CitiMortgage, Inc*., 33 F.4th 1246, 1253 (9th Cir. 2022). In other words, courts are wise to furnishers' attempts to abdicate their investigation responsibilities or avoid liability by classifying disputes as legal in nature, and they are loathe to continue to entertain such arguments.

NCS offers this argument bereft of any real discussion, apparently implying that Plaintiff cannot succeed unless a court determines he was indeed the victim of identity theft. There is no

such requirement, probably because of the inherent problems with NCS's proposal. NCS would apparently require a consumer to litigate the issue of identity theft with whatever court was appropriate, obtain a finding in his or her favor, and only then would the consumer be able to validly dispute an account as being the result of fraud. All this, while the inaccurate reporting remains a burden to Plaintiff's ability to obtain credit. The difficulties this approach presents are obvious.

Further, nothing to which NCS directs the Court shows as a matter of law that Plaintiff is liable on the account, yet those facts are what are meaningful to the evaluation of Plaintiff's disputes. To the contrary, in light of Plaintiff's sworn evidence that the account is not his and he did not authorize anyone to agree to the lease on his behalf, NCS has no ability to show Plaintiff is liable on the account. And while these circumstances will no doubt doom NCS at trial, they certainly prevent the Court from concluding on summary judgment that NCS's dispute results—that Plaintiff was liable on the account—were the result of the required searching inquiry.

### D.      Misdirection Does Not Make NCS's Investigations Reasonable.

Without any real basis to counter Plaintiff's sworn testimony that the account is not his, NCS hopes to place the blame on him because he did not submit to NCS an "identity theft report." (ECF 55 at 16.) NCS points to FCRA Section 1681c-2(a) for support, arguing that the report is required before a furnisher can block any information on a consumer report claimed to be the result of identity theft. (*Id.*) This suggestion badly misreads the statutory scheme, as Section 1681c-2(a) applies to the credit bureaus, not to furnishers, and merely sets out what a consumer reporting agency must do if it receives such a report:

> (a) Block
>
> > Except as otherwise provided in this section, *a consumer reporting agency* shall block the reporting of any information in the file of a consumer that the

23

consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of—

(1) appropriate proof of the identity of the consumer;

(2) a copy of an identity theft report;

(3) the identification of such information by the consumer; and

(4) a statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a) (emphasis added). Nothing here requires a consumer to submit anything, it simply states what a credit bureau must do when it receives such information. Even still, contrary to NCS's suggestion, another section of the FCRA requires or permits a furnisher to block information.

Plaintiff's claim arises under Section 1681s-2(b), which establishes the furnisher's FCRA duties. There is nothing in Section 1681s-2(b) that prohibits a furnisher from deleting or blocking anything from a consumer's report without having an identity theft report. To the contrary, Section 1681s-2(b) does not mention identity theft reports at all, and it establishes a lower bar for deletion of information that is inaccurate, incomplete, or cannot be verified. *See* 15 U.S.C. § 1681s-2(b) (noting that if a furnisher cannot verify information or it is inaccurate or incomplete, the furnisher must modify it, delete it, or permanently block it). Thus, NCS could have, and should have, deleted or blocked the reporting of the account it was unable to definitively attribute to Plaintiff. NCS's attempt to misdirect its shortcomings back onto Plaintiff wholly fails.

## III.    A Reasonable Factfinder Could Conclude NCS Acted Willfully.

Under the FCRA, a person who "negligently" violates its provisions is liable for actual damages under 15 U.S.C. § 1681o.  If a jury finds that the violations were "willful," then the defendant can be liable for punitive damages under 15 U.S.C. § 1681n. Courts in this Circuit

routinely hold that questions of state of mind are for the jury to answer, making summary judgment regarding issues like willfulness inappropriate. *RV Horizons, Inc. v. Smith*, No. 18-cv-02780-NYW, 2020 WL 6701119, at *18 (D. Colo. Nov. 13, 2020); *Wilson v. Schlumberger Tech. Corp.*, No. 17-cv-00281-RBJ, 2019 WL 1916200, at *4 (D. Colo. Apr. 24, 2019); *Beyer Laser Ctr., LLC v. Polomsky*, No. 16-cv-03099-MEH, 2018 WL 1334843, at *4 (D. Colo. Mar. 15, 2018) (collecting cases so holding). Yet, NCS still asks the Court to take from the jury the question of whether its conduct and policies were willful.[5] The Court should decline this invitation to narrowly and unreasonably constrain the FCRA.

Unlike many common law torts, a showing of malice or evil motive is not required to prove willfulness under the FCRA. *Cole v. Am. Fam. Mut. Ins. Co.*, 410 F. Supp. 2d 1020, 1024 (D. Kan. 2006). A defendant may "willfully violate the FCRA by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA." *Cortez v. Trans Union*, LLC, 617 F.3d 688, 721–22 (3d Cir. 2010) (citing *Safeco Ins. Co. of Am. v. Burr*, 127 S. Ct. 2201 (2007)). The "FCRA is concerned with whether the defendant ran an unjustifiably high risk of violating the law." *Drew v. Equifax Info. Servs., LLC*, C 07-00726 SI, 2010 WL 5022466, at *5 (N.D. Cal. Dec. 3, 2010) (emphasis in original).

While here there were several disputes over a one-year period, even a single FCRA dispute can support a willfulness verdict. *Saunders v. Branch Banking & Trust Co. of Va*., 526

---

[5] Courts here are not alone, as willfulness is nearly always a question of fact for the jury. *Healy v. Milliman, Inc.*, No. C20-1473-JCC, 2022 WL 1061921, at *4 (W.D. Wash. Apr. 8, 2022) (denying summary judgment on accuracy and investigation claims because "a reasonableness determination for these purposes is generally, by definition, a genuine issue of material fact"); *Lenox v. Equifax Info. Servs. LLC,* 2007 WL 1406914, at *6 (D. Or. May 7, 2007) (reasoning "whether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact"); *Spector v. Equifax Info. Servs.*, 338 F. Supp. 2d 378, 390 (D. Conn. 2004); *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (recognizing "[t]he reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases"); *Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir. 1991); *Centuouri v. Experian Info. Sols., Inc.,* 431 F. Supp. 2d 1002, 1007 (D. Ariz. 2006) (refusing to grant summary judgment on the issue of willfulness in a case involving the reasonableness of consumer protection procedures); *Holmes v. Telecheck Int'l, Inc.,* 556 F. Supp. 2d 819, 847 (M.D. Tenn. 2008).

F.3d 142, 151 (4th Cir. 2008). And certainly, there was no mistake or human error. Instead, NCS testified that it intended its employees to follow the exact procedures used to rebuff Plaintiff's disputes. PSOF ¶ 46. Worse, Defendant is but a few years removed from a jury verdict in the Northern District of Georgia, *Bumpus v. National Credit Systems*, No. 1:16-cv-01209-TWT (N.D. Ga.), in which the jury concluded not only that NCS violated Section 1681s-2(b), but that its violations were willful. PSOF ¶ 47. The *Bumpus* jury assessed $105,000 in punitive damages against NCS. (*Id.*) NCS's Rule 30(b)(6) witness confirmed its knowledge of *Bumpus*, noting "we lost," and that the jury assessed punitive damages. PSOF ¶ 49. Because it was sued and lost another FCRA furnisher case, a jury could fairly find that NCS knowingly ignored or disobeyed its statutory duties once again.

NCS claims that it is entitled to judgment as a matter of law that it did not willfully violate the FCRA because it reasonably investigated Plaintiff's disputes and because its conduct was not reckless. (ECF 55 at 11.) NCS fails on both points, as well as a third it fails to address. Plaintiff handles that point first.

**A.    A Reasonable Jury Could Find NCS Knowingly Violated The FCRA.**

Remarkably, NCS skips over the question of whether it knowingly violated the FCRA, boldly stating that "there is no evidence that NCS purposefully failed to conduct a reasonable investigation in this matter," which Plaintiff interprets to embrace a potentially knowing violation, and argues that there is no evidence that it acted in reckless disregard of its FCRA duties. (ECF 55 at 11.) Wrong. There is substantial evidence that NCS knowingly violated the FCRA. And since NCS devoted no analysis or evidence to this element, such undisputed evidence is more-than sufficient for the Court to deny summary judgment on willfulness without further analysis.

First, as set out at length above, NCS had multiple reasons to know that a more-robust

investigation was necessary because of Plaintiff's disputes that the account resulted from the theft

of his identity, yet all NCS did was compare data that it was already reporting yet was on notice

was suspect. And NCS's corporate representative confirmed that the dispute investigators followed

NCS's dispute-investigation policies, PSOF ¶ 4, meaning NCS knowingly fell short of a reasonable

identity-theft investigation when all it did was match data used fraudulently.

Second, while NCS touts its inclusion of Compliance Condition Codes ("CCC") with its

ACDV results, it excludes the fact that it failed to append those codes to results it posted to the

CRAs in ACDVs processed in June 2020. PSOF ¶ 50. While NCS may attempt to argue that it

was not aware of an ongoing dispute regarding the account so it had no obligation to include a

CCC with these disputes, that is simply untrue—prior to Defendant receiving the June ACDVs,

Plaintiff contacted NCS on June 11, 2020 and told them he was an identity theft victim. (PSOF ¶

51. Plaintiff's spouse, Megan Henderson, contacted NCS to dispute the account on Plaintiff's

behalf, and was told to contact the Boreland Law Firm. PSOF ¶ 52. Ms. Henderson also contacted

the original creditor, Main Street Renewal, and was advised about the false information used to

rent the residence. Id. NCS also had in its possession Plaintiff's communications with Boreland,

which further evidenced his dispute of the validity of the account. PSOF ¶ 54. With all its purported

contact with Main Street Renewal, as well as possession of emails from Plaintiff to Boreland that

predated Plaintiff's disputes, NCS undoubtedly learned of Plaintiff's disputes of the account

independent of the communications from the CRAs. Any failure to mark an ACDV response as

"in dispute" was therefore inaccurate, and NCS knew this. (ECF 56-2 ¶ 63 (noting the supposed

use of CCCs)); *see Miller v. Westlake Servs. LLC*, __ F. Supp. 3d __, No. 8:21-cv-00692-JLS-

KES, 2022 WL 16556836, at *10 (C.D. Cal. Oct. 28, 2022) (finding reporting inaccurate as a

matter of law where furnisher knew the account was in dispute but did not mark that in its dispute

responses to the CRAs).

For either of these reasons, the Court should conclude that there are genuine issues of material fact as to whether NCS knowingly violated the FCRA.

**B.     A Reasonable Jury Could Find That NCS's Process For Investigating Disputes Of Identity Theft Is Objectively Unreasonable.**

Apart from the knowing violations addressed just above, there are multiple examples showing that NCS disregarded—in applying its policies and procedures—key evidence appended to Plaintiff's disputes, showing perfunctory investigations that recklessly violate the FCRA. To begin, NCS's Rule 30(b)(6) witness repeatedly testified that its investigators followed NCS's protocols. (PSOF ¶ 55. Yet, those protocols fall woefully short of reasonable when considering disputes of identity theft. For instance, NCS's Rule 30(b)(6) witness testified that it would have liked a police report in response from Plaintiff to a letter NCS supposedly sent him, yet it did not seek one as part of its investigations of Plaintiff's disputes. PSOF ¶ 56. That witness also testified that NCS knew about the statements in Plaintiff's F.T.C. Affidavit that he was authorizing the release of information to law enforcement and that he reported the events to law enforcement and the F.T.C. PSOF ¶ 57.  And while NCS repeatedly complains that Plaintiff did not provide a police report, its dispute investigator testified she did not contact Plaintiff and request a police report or F.T.C. affidavit, and that is not something she does as a matter of course. PSOF ¶ 58. All told, NCS never explains why a police report would have been so meaningful in its investigations of Plaintiff's disputes.

Along these lines, NCS's dispute investigator confirmed that she had Plaintiff's Identity Theft Affidavit as part of the documentation she was able to review as part of the investigation she conducted, but that document played no role in the outcome of her investigation. PSOF ¶ 59. Notably, NCS does not argue or provide any facts that it considered Plaintiff's F.T.C. Report or

Identity Theft Affidavit *at all*. (*See generally* ECFs 55, 55-1.) That investigator also knew about Plaintiff's communications with Boreland, but did not contact Boreland as part of her investigation. *Id.* ¶ 60. Moreover, in instances like this one, where the disputing consumer claims a particular residence—here, Plaintiff claimed Colorado—NCS would have sent a letter asking for additional information if it believed the residence was not adequately documented. *Id.* ¶ 61. No such letter was sent to Plaintiff, PSOF ¶ 62, meaning NCS's dispute investigator believed Plaintiff's statement that lived in Colorado since 1989. In other words, regardless of what a reasonable person might consider doing—contacting outside parties or the disputing consumer, for instance—NCS's procedures do not permit its investigators to do that.

NCS's procedures further favor quick, cursory investigations rather than thorough, searching ones. Its dispute investigator confirmed that if additional information is needed, another department at NCS writes the consumer a letter and asks for that information. PSOF ¶ 63. That request would be made at the same time the investigator responds to the ACDV, meaning NCS responds to the credit bureaus that it has "verified" its reporting even though it believes it needs additional information to properly investigate the dispute. PSOF ¶ 64. The investigators did not contact Neiman Marcus to determine whether Plaintiff ever worked there, and they would not normally do that. PSOF ¶ 65. But, one investigator testified that such information would have impacted the results of her investigation, and would have likely resulted in her believing Plaintiff's claims of identity theft. PSOF ¶ 66. Worse, Defendant's policies do not allow their investigators to contact employers to verify employment. PSOF ¶ 67. Although Defendant attempts to feign a concern that verifying employment would somehow violate the FDCPA, the Tenth Circuit has ruled to the contrary. *Marx v. Gen. Revenue Corp*., 668 F.3d 1174, 1177 (10th Cir. 2011). The same investigator agreed that the pay stubs submitted with the application for the residence looked

suspicious, but she did not know if she considered that as part of her investigation. PSOF ¶ 68.

NCS's Rule 30(b)(6) witness testified that NCS's investigators are not trained to recognize such

forgeries. PSOF ¶ 69.

NCS's investigators likewise do not contact consumers and request information like police

reports, despite the lack of such information forming the centerpiece of NCS's claim that it acted

reasonably in verifying the reporting after Plaintiff disputed. PSOF ¶ 70; *see* ECF 55 at 16, 19

(repeatedly noting the supposed need for a police report).) Such arguments also run headlong into

the CFPB's opinion regarding placing needless barriers in disputing consumers' way. *See*

*Consumer Fin. Protection Circular 2022-07* (noting that "furnishers must reasonably investigate

all indirect disputes received from consumer reporting agencies – even if such disputes do not

include the entity's preferred format, preferred intake forms, or preferred documentation or

forms").

And, of course, the jury in *Bumpus* found that NCS's dispute investigation process violated

the FCRA, showing NCS that it had institutional problems with its investigation process. All NCS

did in response to that case was seek additional information from original creditors. PSOF ¶ 74.

Ironically, the documentation that the original creditor gave NCS proved Plaintiff was an identity

theft victim because the maintenance records described the tenant as "her" several times. ECF 55-

18, p.1.  Plaintiff is a male, and nobody would ever mistake him for a female. ECF 55-45, (showing

Plaintiff as the man with the beard on the right.  Following *Bumpus*, NCS did not do a

comprehensive review of its processes to make sure they complied with the FCRA. PSOF ¶ 74.  In

sum, given the above evidence and discussion, the Court should conclude that genuine issues of

material fact exist regarding whether NCS willfully violated the FCRA.

CONCLUSION

NCS has failed to show its entitlement to judgment as a matter of law. Disputes of material

fact abound, so the case should be tried to a jury.

Dated: December 20, 2022                                    Respectfully submitted,


                                                            */s/ Matthew Osborne*
                                                            11178 Huron St., Ste 7
                                                            Northglenn, CO 80234
                                                            (303) 759-7018
                                                            matt@mrosbornelawpc.com

                                                            *Attorney for Plaintiff*


CERTIFICATE OF SERVICE

I certify that on 12/20/2020, I served a true and correct copy of the Plaintiff's Response to Defendant's
Motion for Summary Judgment, and all exhibits and supporting documents to:

Katrina DeMarte, Attorney for Defendant NCS

s/ Mike Nobel


31