**UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

ROBBIN WARD

        Plaintiff,

    vs.                                      CASE NO. 1:21-cv-02597-LTB

TRANSUNION, LLC, *et al.*,

        Defendants.

**PLAINTIFF'S RESPONSES TO DEFENDANT
NATIONAL CREDIT SYSTEMS, INC.'S STATEMENT OF FACTS**

Plaintiff, Robbin Ward, by Counsel, provides the following responses to Defendant National Credit Systems, Inc.'s statement of facts in support of its Motion for Summary Judgment. (ECF 55-1.)

**a. The January 30, 2019 application for a rental home from Main Street Renewal (hereinafter, the "Original Creditor").**

1.      On January 30, 2019, an application was submitted to the Original Creditor for a residential home in Dallas Texas. Exhibit 1: Application.

**RESPONSE:** Undisputed.

2.      The application was in the name of the Plaintiff and contained his Colorado home address, the last four digits of his social security number, application, email address[1], and also income information. Exhibit 1: Application, pgs. 1-2.

---

[1] The email address provided with the application (which is where most of the communications regarding the account in question transpired) was robbinward61@gmail.com. Exhibit 1 – Rental Application, Pg. 1. Plaintiff cannot definitively answer whether robbinward61@gmail.com is his email address or not. Exhibit 2 – Plaintiff's Responses to NCS Requests for Admissions No. 14; Exhibit 4 – Plaintiff's Supplemental Responses to NCS Interrogatories No. 12, regarding RFA 14,

**RESPONSE:** Undisputed.

3.      The application indicates that Plaintiff's daughter, Laquencilla Allen Antoinette Green, a.k.a. Quen Green (hereinafter, "Quen Allen"), was his emergency contact. Exhibit 1, Application.

**RESPONSE:** Disputed to the extent this statement suggests Plaintiff completed the application. He denies having done that nor provided anyone with his identifying information so they may do that. (Ex. 51, Declaration of Robbin Ward ("Ward Decl.") ¶ 5-6.)

4.      The phone number provided for Quen Allen, which ends in 7309, matches her confirmed phone number. Exhibit 2: Plaintiff's Responses to NCS's Requests for Admissions No. 13; Exhibit 4: Pg. 24, Supplemental Response to Interrogatory No. 24.

**RESPONSE:** Undisputed.

5.      The application contains a confirmed address for Quen Allen of 624 Priscilla Lane, Desoto, TX 75115[2]. Exhibit 1: Application, pg. 2; *see also* Exhibit 4: Pg. 24, Supplemental Response to Interrogatory No. 24.

**RESPONSE:** Undisputed.

6.      *Color* copies of the Plaintiff's driver's license and social security card were provided along with the application. Exhibit 3: Communication from Original Creditor; *see also* Exhibit B: Declaration of Ronald V. Sapp, ¶ 50.

**RESPONSE:** Disputed as suggesting the actual drivers license and Social Security Card were presented to the landlord, as there is no evidence that occurred.

---

pg. 19.

[2] Quen Allen is also listed as the beneficiary of the lease, permitting her to access the property in the event that all tenants above the age of majority have passed away – again citing to a known address for Ms. Green on 624 Priscilla Lane, Desoto, TX 75115.

2

7.      Plaintiff has admitted he had provided his daughter with his social security number and driver's license. Exhibit 2 - Plaintiff's Responses to NCS Requests for Admissions No. 24-25.

**RESPONSE:** Disputed as suggesting Plaintiff provided his SSN and drivers license to his daughter for purposes of completing the application. He denies having done that. (Ex. 51, Ward Decl. ¶ 24.)  The reason Plaintiff provided his daughter with copies of his SSN and driver's license is she told him she needed them to add him as a beneficiary to a life insurance policy. (*Id.* ¶ 24.)

8.      Income verification was submitted with the rental application by way of pay stubs from the company Neiman Marcus bearing Plaintiff's name. Exhibit 5 – Pay Stubs Accompanying Application.

**RESPONSE:** Disputed as suggesting Plaintiff provided this information or that it is accurate. Plaintiff denies having worked at Neiman Marcus, and there is no evidence that he did. (Ex. 51, Ward Decl. ¶ 13; *see also*, Ex. 76, [affidavit from Neiman Marcus affirming that Plaintiff never worked at Neiman Marcus].) The paystubs are obviously fake because Plaintiff's name and address are slanted, in a different font, have a CO address, and the tax exemptions list Texas, not Colorado. (ECF 55-7, fake paystubs.)

9.      These pay stubs indicate that between the dates of December 16, 2018 – January 12, 2019, a period of time which immediately preceded the submission of the application, the employee whose payment and employment information is reflected on the pay stubs utilized forty hours of vacation and personal time. *Id.* pgs. 2-3; *see also* Exhibit 35: Plaintiff's Timecard, pg. 2 (indicating at least 32 hours of vacation pay for the same period of time).

**RESPONSE:** Since ECF 55-7 is a fake and fraudulent document, Plaintiff disputes that the information in those fake documents is in any way accurate or reliable. With respect to Ex. 35 (ECF 55-36), Plaintiff admits that his real timecards show that he used vacation time. Disputed as

suggesting Plaintiff provided this information or that it is accurate. Plaintiff denies having worked at Neiman Marcus, and there is no evidence that he did. (Ex. 51, Ward Decl. ¶ 13.)

10. Plaintiff maintains that he never been an employee of Neiman Marcus, but that his daughter, Quen Allen, was. Exhibit 4 – Plaintiff's Supplemental Responses to NCS Interrogatories No. 5, pgs. 9-10.

**RESPONSE:** Undisputed.

11. Following the filing of this case, and pursuant to a subpoena, Neiman Marcus provided pay stubs for Quen Allen that matched the pay periods of the pay stubs submitted in conjunction with the rental application. Exhibit 7 – Quen Allen Pay Stubs.

**RESPONSE:** Undisputed.

12. A comparison of these pay stubs reveals they are nearly identical, with the exceptions being a different employee name, address, and bank deposit information (which was redacted by Neiman Marcus on the bottom of the pay stubs bearing Quen Allen's name, and which were "whited-out" on the pay stubs provided with the application). Exhibit 5 – Pay Stubs Accompanying Application; *see also* Exhibit 7 – Quen Allen Pay Stubs.

**RESPONSE:** Undisputed.

13. The payment advice numbers on these documents are identical to that which was provided by the Original Creditor. *Id.*

**RESPONSE:** Undisputed.

14. Additional income information was submitted in the form of a letter from the Social Security Administration bearing Plaintiff's name. Exhibit 6 – Social Security Notice.

**RESPONSE:** Disputed, as Exhibit 6 (ECF 55-8) is yet another fake and fraudulent document (it is not from the Social Security Administration), which is easily determined by the

fact that the SSA address on the document, 2431 Reigndale Dr, Littleton, CO 80121, does not exist.

https://www.google.com/search?q=2431+Reigndale+Dr%2C+Littleton%2C+CO+80121&oq=2431+Reigndale+Dr%2C+Littleton%2C+CO+80121&aqs=chrome..69i57j33i299.1368j0j7&sourceid=chrome&ie=UTF-8.  Further, the document is also an obvious fake because in January 2019, Plaintiff was 58 years old, and ineligible for SSA benefits because the minimum age is 62. https://www.ssa.gov/benefits/retirement/planner/agereduction.html#:~:text=You%20can%20start%20receiving%20your,your%20benefit%20amount%20will%20increase.  To    the    extent Defendant argues that it would be possible for Plaintiff to be on SSA disability, the forged credit application lists Plaintiff's monthly income as $3,000 per month, and the most a consumer can earn per month on disability is $1,220 for non-blind persons, and $2,040 for blind persons. https://www.ssa.gov/oact/cola/sga.html.

Further disputed as suggesting Plaintiff provided this information or that it is accurate. Plaintiff denies having submitted this information or seeking it from the Social Security Administration. (Ex. 51, Ward Decl. ¶ 11-12.)

15.    Plaintiff stated that he does not receive Social Security Benefits, but that his daughter Quen Allen does. Exhibit 4 – Plaintiff's Supplemental Responses to NCS Interrogatories No. 12 regarding RTAs 16-17.

**RESPONSE:** Undisputed.

16.    The letter provided with the application bears a claim number ending in "2993DI" – which indicates that the benefits are being paid to a disabled individual, rather than traditional benefits received when reaching age 63. Exhibit 6: Social Security Notice.[3]

---

[3] *See also* https://secure.ssa.gov/poms.nsf/lnx/0428084005, which contains literature from the Social Security administration explaining a label of "DI" when appended to a claim number – last

**RESPONSE:** Undisputed.

17.      The application also requires full and complete disclosure of any felony convictions and pending criminal charges. Exhibit 1: Application, pg. 1.

**RESPONSE:** Undisputed.

18.      Further, the lease provides that only the *tenant* may use the property exclusively as a private residence, and that other persons may only occupy the property if disclosed and approved by the Original Creditor. Exhibit 46: pg. 5.

**RESPONSE:** Undisputed.

19.      Moreover, if the tenant (here, Robbin Ward), seeks a replacement tenant, that tenant must meet the specific approval of the landlord – which includes disclosure of any criminal activity/convictions/history. *Id.* at pg. 13.

**RESPONSE:** Disputed as claiming Plaintiff is the person who applied for and rented this house. Plaintiff denies applying for this house, renting the house, authorizing anyone to do so on his behalf, or providing anyone his identifying information so that they could rent this house. (Ex. 51, Ward Decl. ¶ 4-8.)

20.      The lease also states that payments must be made in the name of the tenant – meaning, Quen Allen could not submit payments in her own name, payments must have been submitted in the name or Robbin Ward, the tenant.[4] *Id.* at pg. 2.

**RESPONSE:** Disputed as claiming Plaintiff is the person who applied for and rented this house. Plaintiff denies applying for this house, renting the house, authorizing anyone to do so on

---

visited by the undersigned counsel on November 14, 2022.
[4] The fully-executed lease also provides consent that any unpaid rent or other such amount are reportable to the CRAs.

6

his behalf, or providing anyone his identifying information so that they could rent this house. (Ex. 51, Ward Decl. ¶ 4-8.)

21.     The rental application includes the date and time for certain milestones which were completed throughout the online application process – including the IP address of the computer which was used to complete the application and initiate other pertinent communications. Exhibit 1 – Rental Application, pg. 4.

**RESPONSE:** Undisputed.

22.     This data indicates that on January 30, 2019, the rental application was being completed during the timeframe of 12:00 pm to 12:16 pm and the individual completing the application was accessing the internet via IP address 192.100.72.2. Exhibit 1 – Rental Application, Pg. 4.

**RESPONSE:** Undisputed.

23.     This email address traces back to Neiman Marcus. Exhibit 8 – Declaration of Neal Maynard, ¶ 11.

**RESPONSE:** Disputed as supported by incompetent and inadmissible evidence. Mr. Maynard offers expert testimony regarding the meaning of information obtained from third parties, yet he was not disclosed as an expert in this case. Plaintiff will separately move to have evidence offered through Mr. Maynard struck as untimely and not properly disclosed under Federal Rules of Civil Procedure 26(a)(2) and 37(c)(1).

24.     Pursuant to a subpoena, Neiman Marcus provided the time clock data for Quen Allen, which reveals that on January 30, 2019, between the times of 12:00 - 12:16 PM (which is when the online rental application was being completed, referenced *supra*), Quen Allen was on the clock working at Neiman Marcus. Exhibit 9 – Neiman Marcus Time Clock Data, pg. 2.

**RESPONSE:** Undisputed.

25.     Additionally, and pursuant to a subpoena, Google provided information which reveals that the "robbinward61@gmail.com" account was created on January 23, 2019, using IP address 192.100.72.2. Exhibit 10 – Google User Info.

**RESPONSE:** Undisputed.

26.     IP address 192.100.72.2 is an IP address associated with Neiman Marcus. Exhibit 8 – Declaration of Neal Maynard, ¶ 9.

**RESPONSE:** Disputed as supported by incompetent and inadmissible evidence. Mr. Maynard offers expert testimony regarding the meaning of information obtained from third parties, yet he was not disclosed as an expert in this case. Plaintiff will separately move to have evidence offered through Mr. Maynard struck as untimely and not properly disclosed under Federal Rules of Civil Procedure 26(a)(2) and 37(c)(1).

27.     The Original Creditor provided payment information for each payment they received from the tenant and included is an application fee that was submitted with the rental application. Exhibit 11 – Main Street Payment Report, Pg. 2.

**RESPONSE:** Undisputed.

28.     The payment report also tracks the IP address the computer user was using to make the payment, and for the application fee (and all subsequent payments except one) the IP address was 192.100.72.2. Exhibit 11 – Main Street Payment Report, Pg. 4.

**RESPONSE:** Undisputed.

29.     The IP address of 192.100.72.2 is an IP address associated with Neiman Marcus. Exhibit 8 – Declaration of Neal Maynard, ¶ 12.

**RESPONSE:** Disputed as supported by incompetent and inadmissible evidence. Mr. Maynard offers expert testimony regarding the meaning of information obtained from third parties, yet he was not disclosed as an expert in this case. Plaintiff will separately move to have evidence offered through Mr. Maynard struck as untimely and not properly disclosed under Federal Rules of Civil Procedure 26(a)(2) and 37(c)(1).

30.    Ultimately, the Original Creditor notified the applicant via email (to robbinward61@gmail.com) that the application was approved, and further detailed the next steps in the process. Exhibit 12 – Approval email.

**RESPONSE:** Undisputed.

31.    The approval also provided a move-in date of February 19, 2019. *Id.* at pg. 1.

**RESPONSE:** Undisputed.

32.    On February 01, 2019, robbinward61@gmail.com responded to the approval e-mail by stating that his daughter would be there to drop off the security deposit for him. Exhibit 13 – Deposit email.

**RESPONSE:** Disputed as suggesting Plaintiff sent this responsive message. He denies having done that. (Ex. 51, Ward Decl. ¶ 14-15.)

33.    The tenant provided the Original Creditor with MoneyGrams bearing Robbin Ward's name and dated February 01, 2019, to cover the initial deposit. Exhibit 14 – MoneyGrams; *compare to* Exhibit 36, pg. 6, and also Exhibit 37, which both bear a known signature of the Plaintiff which are strikingly similar to that contained within Exhibit 14.

**RESPONSE:** Undisputed as to the contents of the MoneyGrams, but disputed as suggesting the signature is Plaintiff's. He denies having signed the MoneyGrams. (Ex. 51, Ward

Decl. ¶ 8.)   Further, when comparing the signatures, there are a far cry from being "strikingly

similar":



Ex. 14 (forged signature)

Vs.



Robbin Undra. Ward

Ex. 37 (real signature)

to the best of my knowledge.

gnature)

Ex. 36, p. 6 (real signature). The only things similar about these signatures are the letters the words

contain. In the forged signature, the capital "R" is tilted to the left, in the real ones, they are titled

to the right, nor do the "Rs" appear similar when comparing the forged vs. real signatures. Further,

the "bb" in the forged signature is much different than in the real signatures, as is the "o," the "I"

and the "n."

34.    The emails dated February 01, 2019 and February 13, 2019, as depicted in Exhibits

12 & 13, were sent by robinward61@gmail.com using the IP address of 192.100.72.2, which as

previously stated is an IP address associated with Neiman Marcus. Exhibit 8 – Declaration of Neal

Maynard ⁋ 20; *see also* Exhibit 17: Google Email Records and IP Addresses.[5]

**RESPONSE:** Disputed as supported by incompetent and inadmissible evidence. Mr.

Maynard offers expert testimony regarding the meaning of information obtained from third parties,

yet he was not disclosed as an expert in this case. Plaintiff will separately move to have evidence

offered through Mr. Maynard struck as untimely and not properly disclosed under Federal Rules

of Civil Procedure 26(a)(2) and 37(c)(1).

35.     Subsequently, the tenant moved into the property where the Original Creditor made

note that the tenant was enjoying the property and also that they were cooperating with the Original

Creditor to fix various ongoing utility and appliance issues. Exhibit 16 – Main Street Account

Notes, pg. 1.

**RESPONSE:** Disputed, as the notes actually say "Resident is happy with **HER** home. We

are in the process of fixing **HER** dishwasher and HVAC." (ECF 55-18 at 1.) They also say "adv

resident the 'proof' **SHE** sent was not enough" when discussing an eviction. (*Id.* at 2.0 Robbin

Ward is a man, he would never be mistaken for a female. (Ex. 45, he is the man with the beard on

the right.) This proves definitely that Robbin Ward was not the "tenant" and that his identity was

stolen.

36.     When the tenant failed to pay rent in a timely manner, the Original Creditor initiated

eviction proceedings for all occupants of 229 Cliff Heights Circle, and a three-day notice to vacate

---

[5] Additional emails were sent by robbinward61@gmail.com on April 5th, May 17th, June 6th, and
June 24th, all originating from the IP address of 192.100.72.2 which, as referenced *supra*, that IP
address is associated with Neiman Marcus. Exhibit 17, Emails regarding payment status between
Original Creditor and robbinward61@gmail.com; *see also* Exhibit 8: Declaration of Neal
Maynard, ⁋ 23; *see also* Exhibit 10.

was served on the occupants on May 6, 2019 via First Class Mail. Exhibit 18, Eviction Documents, pg. 1.

**RESPONSE:** Disputed. The eviction proceeding lists "Robbin Ward" as an occupant – but he has never lived there, or been to that address, nor did he ever authorize anyone to use his information to open the account. (Ex. 51, Ward Decl. ¶¶ 4-8.)

37.    On June 4, 2019, Main Street Renewal's attorney sent the Clerk of Court the filing letter for the eviction. Exhibit 18, Eviction Documents, pg. 2.

**RESPONSE:** Undisputed.

38.    The Original Creditor's attorney reported in a letter dated July 08, 2019, that on June 25, 2019, the court entered a final judgment in the eviction matter in favor of the Original Creditor and as a result, a Writ of Possession was entered. Exhibit 18, Eviction Documents, Pg. 3.

**RESPONSE:** Undisputed.

39.    On July 6, 2019, which was mere days before the eviction was materialized on July 12, 2019, Quen Green threw a birthday party in her kitchen with a group of her peers. On that date, Quen Allen went live on Facebook[6] and captured a video celebrating her birthday in a kitchen with a group of peers. Exhibit 8 – Declaration of Neal Maynard; *see also* Exhibit 19 – Facebook Video of Quen Allen's birthday party (to be submitted pursuant to ECF procedures via jump drive to clerk); *see also* Exhibit 45: confirmed picture of Quen Allen.

**RESPONSE:** Disputed as supported by incompetent and inadmissible evidence. Mr. Maynard offers expert testimony regarding the meaning of information obtained from third parties, yet he was not disclosed as an expert in this case. Plaintiff will separately move to have evidence

---

[6] Quen Allen maintained a Facebook page with the URL facebook.com/laquenallen. Exhibit 8 – Declaration of Neal Maynard. *See also* Exhibit 45: Confirmed Picture of Quen Allen and Robbin Ward produced in text message chain from Plaintiff.

offered through Mr. Maynard struck as untimely and not properly disclosed under Federal Rules of Civil Procedure 26(a)(2) and 37(c)(1).

Further disputed because the Facebook video has not been properly authenticated, nor the individuals depicted in the video identified by a person with knowledge.

40.     Comparisons drawn between the background and placement of items in the kitchen in Quen Allen's Facebook video, and the photos from the Original Creditor regarding the subject property reveal that Quen Allen is, in fact, celebrating with comrades in the kitchen of the rental home at 229 Cliff Heights Circle. Exhibit 8 – Declaration of Neal Maynard, ⁋⁋ 24-31.

**RESPONSE:** Disputed as supported by incompetent and inadmissible evidence. Mr. Maynard offers expert testimony regarding the meaning of information obtained from third parties, yet he was not disclosed as an expert in this case. Plaintiff will separately move to have evidence offered through Mr. Maynard struck as untimely and not properly disclosed under Federal Rules of Civil Procedure 26(a)(2) and 37(c)(1).

Further disputed because the Facebook video has not been properly authenticated, nor the individuals or images depicted in the video identified by a person with knowledge.

b. **The Original Creditor placed the Robbin Ward account at 229 Cliff Heights Circle with National Credit Systems in an attempt to collect the rental deficiency.**

41.     On December 04, 2019 the Original Creditor placed the subject account, encompassing the placement balance of $5,375.82, with NCS for collections. *see* Exhibit 16 – Main Street Account Notes; *see also* Exhibit 23 – NCS Account Notes for Main Street Account.

**RESPONSE:** Undisputed.

42.     On December 13, 2019 NCS sent a placement acknowledgement e-mail to Main Street Renewal listing all other Main Street Renewal accounts NCS is currently collecting and also imploring Main Street Renewal to review the report and confirm the accuracy so that verifiably

correct account balances are listed from the parties who are legally responsible. Exhibit 24 – Placement Acknowledgment Report, Pg. 1.

**RESPONSE:** Disputed, as the word "imploring" does not appear in Exhibit 24, and also disputed because there are a host of improper redactions in the document, and Plaintiff is unable to guess what is under the redactions.

43.    The Robbin Ward account is included in the list with a debt amount of $5,375.82. Exhibit 24 – Placement Acknowledgment Report, Pg. 4, whereby the Original Creditor verified all amounts as due and owing.

**RESPONSE:** Disputed as suggesting the account belongs to Plaintiff, that he authorized it, or was ever legally obligated on it. He denies all of this. (Ex. 51, Ward Decl. ¶¶ 4-8.)  Disputed that the original creditor "verified" all amounts as due and owing because it would be impossible to "verify" that an identity theft victim owed the money. https://www.dictionary.com/browse/verified (defining "verified" as "confirmed as to accuracy or truth by acceptable evidence, action, etc"). Further, nothing in Ex. 24 (ECF 55-25) is a response from Main Street, where they claim to "verify" the accuracy. At best, Ex. 24 was a request to verify by Defendant, and no response from Main Street.

44.    Importantly, the account with the Original Creditor was not the first account Robbin Ward has had placed with NCS from a rental property.[7]

**RESPONSE:** Disputed as suggesting the account for the Dallas residence belongs to Plaintiff, that he authorized it, or was ever legally obligated on it. He denies all of this. (Ex. 51, Ward Decl. ¶¶ 4-8.)  Admitted that Plaintiff did have an eviction almost 20 years ago in either 2002 or 2003, but deny that this is remotely relevant to whether Plaintiff was an identity theft

---

[7] *See* Exhibit 42, pg. 8, RFP 7. *See also* Exhibit 26, Berkshire Account Notes reflecting deficiency.

victim in 2019.

45.    On August 20, 2003, an account in the amount of $1,696.40 was placed with NCS for an account alleged to be owed to Berkshire Square Mountain Crest Apartments. Exhibit 26 – NCS Account Notes for Berkshire Square, pg. 1.

**RESPONSE:** Undisputed.

46.    Because the Berkshire Account was previously placed with NCS in 2003, NCS was set up to receive notifications from its vendor whenever someone with the same identifying information applied for a property. *See* Exhibit 26: Berkshire Account Notes dated January 24, 2019, pg. 1.

**RESPONSE:** Disputed, Ex. 26 (ECF 55-27) does not match the allegation – no vendor is mentioned, nor does the exhibit discussion when notifications would be sent.  Disputed, to the extent it alleges that Plaintiff applied for a rental property in Dallas, TX – he did not.  (Ex. 51, Ward Decl. ¶ 4-8.)

47.    When someone applied with Plaintiff's information, NCS was alerted as to this fact on January 24, 2019, and thereafter sent a letter to Plaintiff on January 25, 2019, remind the Plaintiff of his other open account with NCS as well as a notification that it received notice of Plaintiff's application for a residential lease elsewhere. Exhibit 40: Template of January 2019 Letter Mailed to Plaintiff.[8]

**RESPONSE:** Disputed, as the evidenced referenced in support of these statements does not support them. Further disputed as suggesting NCS sent a letter to Plaintiff, as the evidence referenced does not establish that fact, and Plaintiff denies having received such a letter. (Ex. 51,

---

[8] "Michael Stevenson" is the name of a test account which is a part of this template document, where the original would have stated "Robbin Ward" along with Mr. Ward's Colorado address as opposed to that of "Michael Stevenson."

Ward Decl. ¶ 23.)

    c. **Information provided with Plaintiff's Disputes and/or information available discovered prior to the filing of this lawsuit.**

48.     As was customary for the Plaintiff, Megan Henderson (hereinafter, "<u>Ms. Henderson</u>"), Plaintiff's spouse, was the primary contact on his disputes, just as Quen Green primarily handled any communications with the Original Creditor (and as requested by Robbinward61@gmail.com). Exhibit 4: Plaintiff's Supplemental Responses to NCS's Interrogatory No. 4, pgs. 6-12; *see also* Exhibit 15 – Prior to Move-in email.

**RESPONSE:** Disputed as suggesting Plaintiff provided Ms. Green with any permission to communicate with anyone, including the landlord, on his behalf. Plaintiff did not grant Ms. Green any such permission. (Ex. 51, Ward Decl. ¶ 15-16.)

49.     Ms. Henderson stated that she believed that someone obtained Quen Green's pay stubs and forged Plaintiff's name on the same. *Id.* at pg. 9.

**RESPONSE:** Undisputed.

50.     Ms. Henderson – and not Mr. Ward – claims to have requested that "anyone" complete an employment verification for Mr. Ward through Neiman Marcus. *Id.* at pg. 10.

**RESPONSE:** Disputed. Ms. Henderson was clearly acting on Plaintiff's behalf as a spouse, and the very first day that Plaintiff ever spoke to Defendant was June 11, 2020, Plaintiff provided permission for Defendant to communicate with Ms. Henderson. (ECF 55-24 at 1, entry of 6/11/20 at 7:26pm.) Further disputed as not raised by NCS as any impediment to NCS's investigations at the time it was conducing those investigations.

51.     At no point did the Plaintiff or his spouse, Ms. Henderson, provide documentation from Neiman Marcus regarding Plaintiff's employment status. Instead, Ms. Henderson reported

that, on July 21, 2020, Neiman Marcus *could not* provide her with information regarding the Plaintiff. *Id.*

**RESPONSE:** Disputed. Ms. Henderson stated in an email to NCS "It seems to me that there was no employment verification just acceptance of pay stubs that are falsified. I encourage Main Street LLC or anyone else involved in this case to contact the HR department at Neiman Marcus to confirm that Robbin Ward has never been employed with their company. (Ex. 61, [ bates NCS_0149]; *see also* Ex. 76, [Neiman Marcus affidavit that Plaintiff never worked for them].) Disputed as suggesting Plaintiff could have provided employment-related documentation from Neiman Marcus, or that he had any obligation to do so. Nothing in the FCRA requires that. 15 U.S.C. § 1681s-2(b). Further disputed as not raised by NCS as any impediment to NCS's investigations at the time it was conducing those investigations.

52.     Further, the Plaintiff – through Ms. Henderson – admits to receiving a fraud affidavit and form to aide in the dispute process. *Id.* at 11.

**RESPONSE:** Undisputed.

53.     However, Ms. Henderson claimed to have already provided all information responsive to such a request – blatantly ignoring the request for a police report (which is arguably the *most* important piece of information that one can receive in the midst of an identity theft investigation), and further failed to provide any specificity regarding the alleged theft. *Id.*

**RESPONSE:** Disputed. Absolutely nothing in the request asked Plaintiff for a police report. *Id.* Plaintiff had already provided an FTC identity theft affidavit to Defendant. (Ex. 36, ECF 55-37.) Further, Plaintiff did not know specifically how his identity was stolen, or who did it at that time. (Ex. 51, Ward Decl. ¶ 25.) Plaintiff provided Defendant with as much information as he could, such as by telling Defendant he never worked for Neiman Marcus (Ex. 61, bates

17

NCS_0149), providing his real timecards and letter from his employer (Ex. 56 bates nos. NCS_105–53), a mortgage statement with his Colorado address (Ex. 57, bates no. NCS_0154), a letter from the Social Security Administration confirming he did not receive the benefits the applicant claimed (Ex. 58, bates no. NCS_0155), and offering to provide any information needed. (Ex. 60, bates no. NCS_090.) Further disputed as suggesting Plaintiff had any obligation to provide specific information to NCS. Nothing in the FCRA requires that. 15 U.S.C. § 1681s-2(b).

Further disputed because Plaintiff provided to NCS a notarized identity-theft affidavit with his disputes, as well as a complaint he lodged with the Federal Trade Commission Complaint. (Ex. 59, bates nos. NCS_0091–96; Ex. 9, bates nos. NCS_0099–100.)

54.    Plaintiff openly admits that he has never submitted a police report regarding his purported identity theft in any jurisdiction. Exhibit 2: Plaintiff's Responses to NCS's Requests for Admissions No. 9.

**RESPONSE:** Disputed as suggesting Plaintiff had any obligation to provide specific information to NCS. Nothing in the FCRA requires that. 15 U.S.C. § 1681s-2(b).

Further disputed because Plaintiff provided to NCS a notarized identity-theft affidavit with his disputes, as well as a complaint he lodged with the Federal Trade Commission Complaint. (Ex. 59.  Also disputed because, as NCS's Rule 30(b)(6) witness testified, providing a police report to a furnisher "is an option." (Ex. 72, Rule 30(b)(6) Dep. at 47:4–8.)

55.    Plaintiff also states that, to his knowledge, Quen Allen has never been convicted of a crime and that he *did not* consider Quen Allen or her history effect his decision to *not* submit a police report with regard to the alleged theft. *Id.* at No. 8, 11. Moreover, Plaintiff states that Quen Allen *could not have* stolen his identity. *Id.* at No. 10; Exhibit 4: Plaintiff's Supplemental Responses to NCS's Interrogatory No. 12 regarding RTA #3, pg. 17. Instead, Plaintiff submitted

18

an FTC affidavit. Exhibit 36. The FTC affidavit states that the "fraud" began in December of 2019. *Id.* pg. 1.

**RESPONSE:** Undisputed, however Plaintiff did not know of Quen Allen's criminal convictions when he submitted his discovery responses, and at that time, he did not believe that she would have stolen his identity. (Ex. 51, Ward Decl. ¶ 26.)

56.     The account that is the subject of this lawsuit was opened in February of 2019 – well before the alleged dates of fraud in Plaintiff's FTC affidavit. *See* Exhibit 1, Application; *compare to* Exhibit 36, pg. 1, FTC Fraud Affidavit.

**RESPONSE:** Disputed, as Plaintiff was merely estimating the date on which the fraud began. (Ex. 51, Ward Decl. ¶ 25.)

57.     Plaintiff claims that he attempted to submit a police report to the Dallas Police Department, only to be turned away and instructed to file a police report in the "state in which he resides." ECF 1, ⁋⁋ 36-37.

**RESPONSE:** Undisputed.

58.     Plaintiff – or at least, at the very minimum, Plaintiff's counsel was clearly aware that a police report was required as this is a point that Plaintiff's counsel has used to aide in other disputes regarding alleged identity theft. Exhibit 39: *Westlake* Complaint ⁋⁋ 32, 35.

**RESPONSE:** Disputed, the holding of *Westlake* was:

> "Given the undisputed facts here, the Court concludes that Defendant's investigation of Plaintiff's disputes was unreasonable as a matter of law." *Miller v. Westlake Servs. LLC*, No. 8:21-cv-00692-JLS-KES, 2022 U.S. Dist. LEXIS 197076, at \*30 (C.D. Cal. Oct. 28, 2022) (rejecting defendant's argument that it did not have to investigate consumer's dispute unless a police report was submitted to the furnisher).[9]

---

[9] It is with great irony that Defendant cites *Miller* as somehow being against Plaintiff's Counsel or favoring NCS's arguments.  In reality, that Court found that the finance company violated the FCRA as a matter of law by advancing the same arguments NCS makes—that a police report is required to appropriately investigate a consumer's dispute.

19

Further disputed as suggesting Plaintiff had any obligation to provide specific information to NCS. Nothing in the FCRA requires that. 15 U.S.C. § 1681s-2(b).

Further disputed because Plaintiff provided to NCS a notarized identity-theft affidavit with his disputes, as well as a complaint he lodged with the Federal Trade Commission. (Ex. 56). Additionally disputed because NCS does not explain why a police report was necessary or would have impacted its investigations of Plaintiff's disputes.

59.     Similarly, Plaintiff or his counsel were aware that compliance code XB is pertinent in identity theft disputes, because in *Westlake*, the debt collector's failure to indicate compliance code XB was a negative fact cited by the Plaintiff. *Id.* at ⁋ 72.

**RESPONSE:** Undisputed that Defendant also did not report Compliance Condition Code XB, or any CCC at all. (Exs. 64 – 66), bates nos. EXP-WARD 000021; EIS-Ward-000001; TU 20.)

60.     One other distinguishing factor noted by Plaintiff's counsel was the fact that a color copy of Plaintiff's drivers' license and social security card were provided during the course of the dispute. *Id.* at ⁋ 35.

**RESPONSE:** Disputed because Defendant's own file shows it did indeed have a color copy of Plaintiff's driver's license. Ex. 43 (ECF 56-3) at 23 (which was sent to the Defendant by the credit bureaus as part of Plaintiff's disputes). Disputed as suggesting Plaintiff had any obligation to provide specific information to NCS. Nothing in the FCRA requires that. 15 U.S.C. § 1681s-2(b).

Further disputed because Plaintiff provided to NCS a notarized identity-theft affidavit with his disputes, as well as a complaint he lodged with the Federal Trade Commission. Ex. 59.

20

Additionally disputed because NCS does not explain why a color versus black-and-white copy of a driver's license was necessary or would have impacted its investigations of Plaintiff's disputes.

61.     Here – it is undisputed that Plaintiff's license and social security card were provided to the Original Creditor in *color* when the application was submitted. Exhibit 3, pg. 2.

**RESPONSE:** Disputed because the cited exhibit does not mention any Social Security card, and does not state that a color copy of the identification was presented or that the identification that is appended to that Exhibit was actually presented to the landlord.

62.     The Original Creditor also verified the account as due and owing at the time of placement, at every turn thereafter, and also that Mr. Ward is the appropriate responsible party. Exhibit 25: Declaration of Ronald V. Sapp, ¶¶ 12-26.

**RESPONSE:** Disputed. Plaintiff is not the responsible party on the account because he did not apply for the residence, did not live there, did not authorize anyone to apply for the residence on his behalf, and did not provide anyone his identifying information so they could do so. (Ex. 51, Ward Decl. ¶ 4-8.)  Disputed that the original creditor "verified" all amounts as due and owing because it would be impossible to "verify" that an identity theft victim owed the money. https://www.dictionary.com/browse/verified (defining "verified" as 'confirmed as to accuracy or truth by acceptable evidence, action, etc').

63.     NCS's policies and procedures are designed to ensure that all information available is assessed so that it does not collect on accounts which are not properly due and payable. Exhibit 25: Declaration of Ronald V. Sapp, ¶¶ 27-40.

**RESPONSE:** Disputed. Plaintiff's spouse encouraged Defendant to call Neiman Marcus to confirm that he never worked there. (Ex. 615, bates no. NCS_0149.) Defendant's policies do not allow their investigators to contact employers under *any circumstances* when investigating id

theft disputes.  (Ex. 72, Rule 30(b)(6) Dep. at 68:9–24.) The Tenth Circuit has specifically ruled that debt collectors can verify employment without violating the FDCPA. *Marx v. Gen. Revenue Corp.,* 668 F.3d 1174, 1177 (10th Cir. 2011). All Defendant did to "investigate" Plaintiff's disputes of identity theft was to match the SSN, name, DOB in the computer system vs the prior reporting (which is not designed to turn up information about whether a person is an identity theft victim because by definition this information already matches. (Ex. 23, ECF 55, p. 3, which states:

> 07/21/2020 08:29:26 AM (MAM) Received escalation to Level 2 investigation: reviewed information submitted by consumer who claims true identity fraud/account fraudulently opened with information supplied by client. I reviewed name, address, ssn/dob, account information, checked for accuracy and matching information. I have also reviewed the system notes for past efforts. Documentation supporting the consumer's claim was provided. The initial DUN letter was sent to the address provided by the
>
> client upon placement. The account will report as disputed and an active collection account, unless the consumer provides other supporting information allowing us to further investigate the claim. RPC 23 – Accurate as of date reported.

In other words, Defendant's policies are to match irrelevant data and then to shift its duties to investigate onto the consumer. Such a policy can hardly be described as reasonable.

Ms. Boehler (one of the investigators into Plaintiff's disputes) testified that she did not call Neiman Marcus pursuant to company policy, but if she had, and they confirmed that Mr. Ward did not work there, it would have made it more likely that Plaintiff was an identity theft victim. (Ex. 62, Boehler Dep. at 23:5–25; 24:1–2.)

64.   Lastly, Plaintiff has two open accounts with NCS – one with the Original Creditor and the other with Berkshire Square/Mountain Crest. Exhibit 25, Declaration of Ronald V. Sapp, ¶¶ 51-52.

**RESPONSE:** Disputed. Plaintiff is not the responsible party on the account for the Dallas residence because he did not apply for the residence, did not live there, did not authorize anyone to apply for the residence on his behalf, and did not provide anyone his identifying information so they could do so. (Ex. 51, Ward Decl. ¶ 4-8, 16.)

65.     Per Ronald V. Sapp, Vice President of Operations at NCS, it would be impossible to login to WinDebt (NCS's collection software) and look-up the Plaintiff *without* noticing that Plaintiff has two accounts in NCS's office. Declaration of Ron Sapp, ₱₱ 51-52.

**RESPONSE:** Disputed. Plaintiff is not the responsible party on the account for the Dallas residence because he did not apply for the residence, did not live there, did not authorize anyone to apply for the residence on his behalf, and did not provide anyone his identifying information so they could do so. (Ex. 51, Ward Decl. ¶ 4-8)

66.     This is because when searching for "Robbin Ward" – and regardless of which account you wish to select or open – both accounts are displayed for the user to pick which account they seek to work. *Id.*

**RESPONSE:** Disputed. Plaintiff is not the responsible party on the account for the Dallas residence because he did not apply for the residence, did not live there, did not authorize anyone to apply for the residence on his behalf, and did not provide anyone his identifying information so they could do so. (Ex. 51, Ward Decl. ¶ 4-8.)

67.     It would be impossible to look up "Robbin Ward" and only be shown one account (and totally disregarding the other). *Id.*

**RESPONSE:** Disputed. Plaintiff is not the responsible party on the account for the Dallas residence because he did not apply for the residence, did not live there, did not authorize anyone to apply for the residence on his behalf, and did not provide anyone his identifying information so they could do so. (Ex. 51, Ward Decl. ¶ 4-8.)

68.     In all other respects, NCS states that it performed a reasonable investigation having reviewed all documentation provided by the Plaintiff and determining that any potential claims

that the account did not belong to the Plaintiff to be without merit. Declaration of Ron Sapp, ¶¶ 41-85.

**RESPONSE:** Disputed as stating a legal conclusion. Further, Plaintiff's expert, Evan Hendricks provides a litany of problems with NCS's investigation procedures. (Ex. 55, Hendricks Rpt. at 5–20.)

69.    This included an analysis of Plaintiff's claims that the pay advices from Neiman Marcus and the Social Security Administration being "false." *Id.*

**RESPONSE:** Disputed as stating a legal conclusion.   Further disputed because Defendant's notes do not say that they reviewed the paystubs. (*See generally* Ex. 23, ECF 55-24.) Further, the people that did the investigations specifically testified that they could not remember if they received any training from Defendant on how to spot fake paystubs, or even reviewing the pay stubs. (Ex. 62, Boehler Dep. at 13:23–25; 14:1–6; Ex. 18, Woodward Dep. at 17:17–19, 38:5.) Nothing in the collection notes says that Defendant ever reviewed the paystubs, and Defendant's employee admitted there is a saying in the collection industry that if it is not in the notes, it did not happen. (Ex. 62, Boehler Dep. at 22:20–23.)

**d.   Facts discovered after the filing of this lawsuit.**

**i.    Queen Allen has a documented history of criminal activity involving both her identity and the identity of others.**

70.    There was a car accident on February 13, 2011 in which an individual named Ellis Elliot was driving and his vehicle was struck in a parking lot. Exhibit 21 – 1358587 Case Documents, Pg. 5.

**RESPONSE:** Undisputed.

71.     The individual who struck Ellis identified herself as Brandy Bass. Bass is the maiden name of randy Andrews, a woman who filed a claim regarding a lost and/or stolen wallet and checks in 2011. *Id.*

**RESPONSE:** Undisputed.

72.     Ms. Andrews claimed that a vehicle was purchased in her name fraudulently, checks were written to Quen Allen for cash with a forged signature, and also that there were traffic tickets and a car accident associated with her name given the perpetual fraud. *Id.*

**RESPONSE:** Undisputed.

73.     Quen Allen was identified from a photo lineup as Ms. Andrews' imposter, for which she was indicted by a grand jury in Tarrant County, Texas. Exhibit 21 – 1358587 Case Documents, Pg. 12.

**RESPONSE:** Undisputed.

74.     Then, on July 11, 2014 an Order of Deferred Adjudication was entered in Case 1358587 whereby Quen Allen entered a plea of guilty to the state jail felony of fraud use / possession of identity information under five items which is codified in Texas law as 32.51(C)(1) PC. Exhibit 21 – 1358587 Case Documents, Pg. 16.

**RESPONSE:** Undisputed.

75.     Among the terms of the plea bargain were a $500 fine, five years of deferred adjudication, five years of community supervision, random urinalysis, and restitution to Ellis Elliot. Exhibit 21 – 1358587 Case Documents, Pg. 16.

**RESPONSE:** Undisputed.

76.    On July 11, 2014, Quen Allen signed a judicial confession admitting to committing the crimes in the indictment, and that she would abide by the conditions imposed under community supervision. Exhibit 21 – 1358587 Case Documents, Pg. 28-29.

**RESPONSE:** Undisputed.

77.    Quen Allen violated various terms of her probation and plea bargain, and her overall term of supervision was extended with additional conditions imposed. Exhibit 21 – 1358587 Case Documents, Pg. 38.

**RESPONSE:** Undisputed.

78.    At the time that the application was submitted to the Original Creditor, Quen Allen's case (a felony) was still open and pending in Tarrant County, Texas. Exhibit 21 – 1358587 Case Documents, Pg. 39.[10]

**RESPONSE:** Undisputed.

### ii. Plaintiff has not suffered any damages as a result of the allegations against NCS in the Complaint at ECF 1.

79.    Plaintiff claims to have suffered some measure of actual damages (which he claims cannot be calculated but only determined by a jury) as a result of his allegations against NCS. Exhibit 4: Plaintiff's Supplemental Responses to NCS's Interrogatories No. 1 & 2, pg. 3-5.

**RESPONSE:** Undisputed.

80.    However, despite Plaintiff's assertions that he only applied for financing with one company in the past two years, Plaintiff's Experian consumer report tell a different story. *See* Exhibit 4: Interrogatory No. 7 (not naming any credit applications or denials from 2017 through

---

[10] Additionally, similar charges were pressed against Quen Allen by the Irving Police Department in 2014. *See* Exhibit 22 – MA1432990 Case Documents, Pgs. 1-2.

present), 21; *see also* Exhibit 34, pg. 16 (indicating hard inquiries/applications with Bellco Credit Union and Mountain America Credit Union).

**RESPONSE:** Disputed. Experian is not the only source of Plaintiff's credit history. His December 8, 2020 Equifax report (Ex. 83, Plt.'s bates 000149–210) shows the NCS collection account (bates 204) and 84 credit inquiries (bates 151), including by Freedom Mortgage and Advantage Credit (bates 199). Plaintiff applied for credit with Fairway Independent, but was not able to get the best available rate due to the fraudulent NCS account. (Ex. 51, Ward Decl. ¶ 27.)

81.    Plaintiff also applied for a residential mortgage with Fairway Independent. Exhibit 38: Fairway Residential Application. With Plaintiff's application to Fairway Independent, Plaintiff indicated that the purpose of taking out such a loan was for "debt consolidation." *Id.*[11]

**RESPONSE:** Plaintiff's disputes footnote 11 – the RFP asks for past due accounts *since 2017*, the "rental deficiency" Defendant refers to is from 2002 or 2003, see Ex. 26. Also, it is disputed that a debt consolidation loan somehow means past due accounts – a debt consolidation loan is simply a loan to pay off existing current debt (which is usually credit cards, auto loans, etc). If a person had past due accounts, they probably would not get approved for a debt consolidation loan.

82.    Plaintiff has not presented any information or evidence to NCS which would support his position that he received unfavorable financing as a result of any actions that NCS may have taken.

---

[11] Plaintiff's discovery responses indicate that he has never been past-due on any of his accounts. Exhibit 42, pg. 8, RFP 7. However, Exhibit 26 makes clear that the Plaintiff has at least one other rental deficiency. Additionally, Plaintiff's application for a loan to consolidate all of his debt further calls in to question Plaintiff's statement regarding delinquent accounts – and, namely, which statement made by the Plaintiff is true and which one is false.

**RESPONSE:** Disputed. Plaintiff applied for credit with Fairway Independent, but was not able to get the best available rate due to the fraudulent NCS account. (Ex. 51, Ward Decl. ¶ 27.)

83.    The only documentation or information which could support Plaintiff's claim for actual damages is a "Notice to the Home Loan Applicant." Exhibit 47, pg. 1.

**RESPONSE:** Disputed. Plaintiff's actual damages are not limited solely to economic losses. Under the FCRA, he may recover for, among other things, emotional distress. *See Remaly v. Wyndham Resort Dev. Corp.*, No. 20-cv-3028-LTB-NYW, 2021 WL 5504628, at *5 (D. Colo. Nov. 23, 2021) (declining to grant furnisher summary judgment because plaintiff sufficiently proved emotional-distress damages). Courts also regularly recognize as facets of plaintiffs' actual damages in FCRA cases embarrassment, humiliation, injury to creditworthiness, as well as withdrawal from credit markets due to fear of having credit applications rejected. *Robbins v. Resident Verify, LLC*, No. 2:20-cv-578-TC, 2021 WL 3292652, at *3 (D. Utah Aug. 2, 2021); *Miller v. Westlake Servs. LLC*, __ F. Supp. 3d __, No. 8:21-cv-00692-JLS-KES, 2022 WL 16556836, at *10 (C.D. Cal. Oct. 28, 2022); *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 845 (E.D. Va. 2017).

Plaintiff states in the accompanying Declaration that he suffered actual damages including loss of sleep, difficultly concentrating at work, sadness, depression, being withdrawn, harm to credit score, embarrassment, inconvenience, and feeling hopeless, because of NCS's violations of the FCRA. (Ex. 51, Ward Decl. ¶¶ 27-30.)

84.    This document was prepared on June 8, 2020. *Id.* This bare-bones document indicates that the Plaintiff's Experian Fair Isaac Corporation Score (hereinafter, "FICO") score of 621. *Id.* at pg. 3.

28

**RESPONSE:** Undisputed.

85.    FICO scores are utilized to score the different information on a consumer report. *Id.*

**RESPONSE:** Disputed as not supported by evidence.

86.    The fact that Plaintiff does not have actual damages (and has failed to provide any information or documentation to support the same) is supported by the testimony of NCS's proffered expert, Mr. John Ulzheimer. Mr. Ulzheimer concluded that NCS's investigation was complete, and that there was absolutely no evidence that the Plaintiff experienced credit-related damages as a result of any action taken by NCS. Exhibit 44 – Report of John Ulzheimer, pg. 4, "Summary of Opinions."

**RESPONSE:** Disputed. Plaintiff's actual damages are not limited solely to economic losses. Under the FCRA, he may recover for, among other things, emotional distress. *See Remaly v. Wyndham Resort Dev. Corp.*, No. 20-cv-3028-LTB-NYW, 2021 WL 5504628, at *5 (D. Colo. Nov. 23, 2021) (declining to grant furnisher summary judgment because plaintiff sufficiently proved emotional-distress damages). Courts also regularly recognize as facets of plaintiffs' actual damages in FCRA cases embarrassment, humiliation, injury to creditworthiness, as well as withdrawal from credit markets due to fear of having credit applications rejected. *Robbins v. Resident Verify, LLC*, No. 2:20-cv-578-TC, 2021 WL 3292652, at *3 (D. Utah Aug. 2, 2021); *Miller v. Westlake Servs. LLC*, __ F. Supp. 3d __, No. 8:21-cv-00692-JLS-KES, 2022 WL 16556836, at *10 (C.D. Cal. Oct. 28, 2022); *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 845 (E.D. Va. 2017).

Plaintiff states in the accompanying declaration that he suffered actual damages because of NCS's misreporting of the account as belonging to him including loss of sleep, difficultly concentrating

at work, sadness, depression, being withdrawn, harm to credit score, embarrassment, inconvenience, and feeling hopeless, because of NCS's violations of the FCRA. (Ex. 51, Ward Decl. ¶¶ 27-30.)

Further, Plaintiff's expert opines that NCS's investigations were not reasonable. (Ex. 55, Hendricks Rpt. at 2–5.)

87.    First, Mr. Ulzheimer notes that the information reviewed by Plaintiff's proffered expert, Mr. Evan Hendricks, is based upon incomplete information as not all pertinent information (or deposition transcripts) were available as of the date of Mr. Hendricks' report. *Id.* at pg. 14.

**RESPONSE:** Undisputed that this is Mr. Ulzheimer's statement.

88.    Mr. Ulzheimer also notes that the investigation was not as "robotic" as Mr. Hendricks painted the investigation to be, either. *Id.*

**RESPONSE:** Undisputed that this is Mr. Ulzheimer's statement.

89.    However, most importantly, Mr. Ulzheimer lays bare the content and purpose of Plaintiff's disputes and any response thereto. Specifically, following receipt of the June 2020 ACDVs, the dispute codes communicated to NCS were that the account was "[n]ot his/hers," "[n]ot aware of collection," and to verify the account information as it relates to the Plaintiff. *Id.* at Pg. 15.

**RESPONSE:** Undisputed that this is Mr. Ulzheimer's statement.  Disputed as incomplete, because the June 2020 ACDV from Trans Union stated "I have not opened any new credit or had any interaction with the original creditor" (Ex. 64, bates no. TU 20.) The June 2020 ACDV from Equifax stated "I have no idea why this is reported. I am wondering if someone stole my identity to access Main Street Renewal LLC. (Ex. 65, bates no. EIS-Ward-000001.) The June 2020 ACDV

from Experian states "I have no knowledge of this account. I have not opened a new account and do not recognize this credit lender." (Ex. 66, bates no. EXP-WARD 000021.)

90.    Mr. Ulzheimer makes clear that claims of "true" identity theft are different than that of "not my account," and that they are investigated according to those standards. As an initial matter, the June 2020 ACDVs contained the sum and substance of Plaintiff's dispute – which is about as barren as could be (with *no* attachments, documents, letters, or additional explanation provided other than the notations of "not his/hers" and "not aware of collection" as noted above). *Id.* at pg. 15.

**RESPONSE:** Undisputed that this is Mr. Ulzheimer's statement. Disputed for the same reasons as Response to No. 89 above. Further, it is disputed that Mr. Ulzehimer is qualified to offer this opinion – after all, he has never done any investigations for a furnisher. (Ex. 86, Ulzheimer Dep. at 29:12–16.) Nor has he supervised any. (*Id.* at 17–21.) And he has not written any policies and procedures on investigating identity theft for furnishers. (*Id.* at 22–25.) And he has never recommended to any furnisher to make any policy changes. (*Id.* at 26:1–9.)

91.    Mr. Ulzheimer notes that the two July 2020 ACDVs "claim[] true identity fraud" from Trans Union and Equifax appear to attach FTC identity theft reports. *Id.* at pg. 16.

**RESPONSE:** Undisputed.

92.    Based upon Mr. Ulzheimer's experience, he states that when a furnisher receives a dispute such as this, the furnisher investigates the "indicia of liability" – and, as is pertinent here, they make a determination if the identity theft claims are false and if the Plaintiff was complicit in any of the alleged fraudulent acts. *Id.*

**RESPONSE:** Undisputed that this is Mr. Ulzheimer's statement, but disputed as suggesting that NCS engaged in the investigation Mr. Ulzheimer posits or that Plaintiff was

31

complicit in the identity theft. As Plaintiff has repeatedly stated, he did not apply for the Dallas residence, did not live there, did not authorize anyone to apply for the residence on his behalf, and did not provide anyone his identifying information so they could apply for the residence. (Ex. 51, Ward Decl. ¶¶ 4-8.) Further, Defendant's collection notes do not say they even considered Plaintiff's ID theft affidavit; instead, Defendant simply matched the name, DOB, SSN, etc. (Ex. 23, ECF 55-24 p.3, 7/21/2020 08:29:26 AM; *see also id.* at 7/21/2020 08:30:12 AM; *see also* Ex. 62, Boehler Dep. at 57:10–25; 58:1–13.) Defendant's other investigator, Diana Woodward, was asked point blank whether she considered herself an investigator of id theft or more of a data matcher, and she answered, it was more data, and a little research. (Ex. 82, Woodward Dep. at 12:14–23.)

93.    Mr. Ulzheimer ultimately concludes that the Plaintiff was not the victim or fraud as there was "considerable evidence" indicating that Plaintiff knew of the Main Street Renewal lease application – and was possibly a party to it in some respect. *Id.* at page 18.

**RESPONSE:** Undisputed that this is Mr. Ulzheimer's statement, but disputed there is "considerable evidence" that Plaintiff was not the victim of fraud. To the contrary, there is considerable evidence that Plaintiff was the victim of fraud. As Plaintiff has repeatedly stated, he did not apply for the Dallas residence, did not live there, did not authorize anyone to apply for the residence on his behalf, and did not provide anyone his identifying information so they could apply for the residence. (Ex. 51, Ward Decl. ¶¶ 4-8.)  Fake paystubs were created and submitted to the original creditor falsely claiming that Plaintiff worked for Neiman Marcus, when in reality Plaintiff never worked for Neiman Marcus. (*See supra*, Response to No. 8.) A fake SSA benefits letter was submitted to the original creditor, when Plaintiff does not receive SSA benefits, and the "address" for the SSA is a fictitious address that does not exist. (*See supra*, Response to No. 14.)  Plaintiff's

credit score without the NCS account reporting is an 803, and shows all legitimate accounts paid on time. (Ex. 71, current Experian disclosure.) There would no motive for Mr. Ward to destroy his excellent credit rating. Plaintiff provided NCS with his real paystubs from EJMD, plus a letter from his employer affirming he worked in Colorado, Plaintiff also provided his Colorado mortgage statement. (*See supra*, Response to No. 53.)

94. Moreover, and as it relates to damages, Plaintiff's accounts were all designated with the compliance code "XB," which would preclude a claim for damages. *Id.* Specifically, though Plaintiff claimed that he had a loan refinance application denied (despite not providing documentation regarding the same), that he did not receive promotional offers, and that he suffered lower FICO score, compliance code "XB" would have precluded actual damages as it relates to the NCS account. *Id.*

**RESPONSE:** Disputed, the ACDVs do not show that Defendant reported compliance condition code 'XB' – in fact, the compliance condition codes are blank. (*See supra*, Response to No. 59.) Further, there is evidence in the record that the false reporting had a substantial impact on Plaintiff's credit score (131 points) – his score with the NCS account on his file was a 671 with Experian (Ex. 47, ECF 55-47, p.1), and when the NCS account was deleted, Plaintiff's Experian credit score rose to 803. (*See supra*, Response to No. 93.)

Further disputed, as credit denials are not the only aspects of Plaintiff's damages. Under the FCRA, he may recover for, among other things, emotional distress. *See Remaly v. Wyndham Resort Dev. Corp.*, No. 20-cv-3028-LTB-NYW, 2021 WL 5504628, at *5 (D. Colo. Nov. 23, 2021) (declining to grant furnisher summary judgment because plaintiff sufficiently proved emotional-distress damages). Courts also regularly recognize as facets of plaintiffs' actual damages in FCRA cases embarrassment, humiliation, injury to creditworthiness, as well as

withdrawal from credit markets due to fear of having credit applications rejected. *Robbins v. Resident Verify, LLC*, No. 2:20-cv-578-TC, 2021 WL 3292652, at *3 (D. Utah Aug. 2, 2021); *Miller v. Westlake Servs. LLC*, __ F. Supp. 3d __, No. 8:21-cv-00692-JLS-KES, 2022 WL 16556836, at *10 (C.D. Cal. Oct. 28, 2022); *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 845 (E.D. Va. 2017).

Plaintiff states in the accompanying declaration that he suffered actual damages because of NCS's misreporting of the account as belonging to him. (Ex. 51, Ward Decl. ¶¶ 27-30.)

95.     Mr. Ulzheimer makes clear that the "score disclosure" notice which was provided by the Plaintiff could not serve as evidence of a credit denial because those documents are sent to anyone who has applied for a residential mortgage following 2003. *Id.* at pg. 19.

**RESPONSE:** Undisputed that this is Mr. Ulzheimer's statement.

96.     The consumer reports produced by the CRAs in this matter all indicate that compliance code XB is present, which would prevent a collection account from being taken into account when determining a FICO score. *Id.* at pg. 21.

**RESPONSE:** Disputed, for the same reasons as No. 93, above. (*See supra*, Response to No. 93.)  Undisputed that this is Mr. Ulzheimer's statement. Further disputed as suggesting this statement somehow limits Plaintiff's actual damages. Credit scoring aside, derogatory credit reporting still results in humiliation, embarrassment, anxiety, and the like.  *Shimon v. Equifax Info. Servs. LLC*, 431 F. Supp. 3d 115, 123 (E.D.N.Y. 2020), *aff'd*, 994 F.3d 88 (2d Cir. 2021) ("Denial of credit and other similarly adverse consequences are often the basis of FCRA damages, but 'emotional damages may also be freestanding . . . where an inaccuracy alone causes emotional damages.'"). Mr. Ulzheimer also testified that a furnisher is not allowed to report false

information simply because they use compliance condition code XB. (Ex. 84, Ulzehimer Dep. at 57:17–19.)

97.     Where a consumer report states that the consumer disputes the account and that an investigation is underway, or another derivative of the same, that is indicative of an account reflecting compliance code XB. *Id.*

**RESPONSE:** Disputed, as Defendant's notes show that on June 11, 2020, Plaintiff called and notified Defendant it was fraud and identity theft. (Ex. 23, ECF 55-24, p.1, 6/11/2020 06:56:38PM and 06:59:21PM.) The next day, June 12, 2020, Defendant did not report that Plaintiff disputed the debt. (Exs. 64 to 66), bates nos. EXP-WARD 000021; EIS-Ward-000001; TU 20].)

98.     Moreover, once compliance code XB has been added to an account, that moniker cannot be removed unless separate and explicit action requesting removal of the same. *Id.*

**RESPONSE:** Undisputed that this is Mr. Ulzheimer's statement, disputed that CCC was added to any of NCS's dispute replies.  Ex. 64 to 66. (Compliance Condition Code is blank).

99.     There is no such indication that there ever was a request to remove this compliance code at *any* point in time. *Id.*

**RESPONSE:** Undisputed that this is Mr. Ulzheimer's statement.

100.    Practically speaking, this means that the NCS account was not taken into consideration whatsoever when determining a credit/FICO score, rendering it impossible for the NCS account to have had any impact on the Plaintiff's consumer report in any manner whatsoever. *Id.* at pg. 22.

**RESPONSE:** Disputed, as the ACDVs do not show that Defendant reported compliance condition code 'XB' – in fact, the compliance condition codes are blank. (Exs. 64 to 66), bates nos. EXP-WARD 000021; EIS-Ward-000001; TU 20].) Further, there is evidence in the record

that the false reporting had a substantial impact on Plaintiff's credit score (131 points) – his score with the NCS account on his file was a 671 with Experian (Ex. 47, p.1), and when the NCS account was deleted, Plaintiff's Experian credit score rose to 803. Ex. 71.

101.    Perhaps more tellingly, Plaintiff has completely failed to provide any "adverse action" notices – which is what would evidence a credit denial and any pertinent reasons therefor. *Id.*

**RESPONSE:**  Disputed, because this assumes that a creditor making the denial complied with the ECOA in sending an adverse action notice, *see, e.g.*, 12 C.F.R. 1002.9(a)(1). Plaintiff did not get the mortgage refinance in June 2020, and he also did not receive an adverse action notice from the creditor. Ex. 51, Ward Decl. ¶ 27.) Disputed as suggesting credit denials are the sole source of Plaintiff's damages. Under the FCRA, he may recover for, among other things, emotional distress. *See Remaly v. Wyndham Resort Dev. Corp.*, No. 20-cv-3028-LTB-NYW, 2021 WL 5504628, at *5 (D. Colo. Nov. 23, 2021) (declining to grant furnisher summary judgment because plaintiff sufficiently proved emotional-distress damages). Courts also regularly recognize as facets of plaintiffs' actual damages in FCRA cases embarrassment, humiliation, injury to creditworthiness, as well as withdrawal from credit markets due to fear of having credit applications rejected. *Robbins v. Resident Verify, LLC*, No. 2:20-cv-578-TC, 2021 WL 3292652, at *3 (D. Utah Aug. 2, 2021); *Miller v. Westlake Servs. LLC*, __ F. Supp. 3d __, No. 8:21-cv-00692-JLS-KES, 2022 WL 16556836, at *10 (C.D. Cal. Oct. 28, 2022); *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 845 (E.D. Va. 2017).

Plaintiff states in the accompanying declaration that he suffered actual damages including because of NCS's misreporting of the account as belonging to him. (Ex. 51, Ward Decl. ¶¶ 27-30.)

36

102.    Importantly, the documents provided by the Plaintiff also *predate* any of Plaintiff's disputes as to the NCS account. Further, as it relates to "prescreened" offers – there is no evidence presented that Plaintiff did not receive any such prescreened offers that he would have originally expected to receive. This is also evidenced by the fact that Plaintiff had approximately $31,000.00 in credit spread across seven different accounts with which he could have obtained goods or services with – and those accounts and that credit were not impacted one way or another by any sort of preapproved offers (whether sent or withheld). *Id.*

**RESPONSE:** Disputed as suggesting credit denials are the sole source of Plaintiff's damages. Under the FCRA, he may recover for, among other things, emotional distress. *See Remaly v. Wyndham Resort Dev. Corp.*, No. 20-cv-3028-LTB-NYW, 2021 WL 5504628, at *5 (D. Colo. Nov. 23, 2021) (declining to grant furnisher summary judgment because plaintiff sufficiently proved emotional-distress damages). Courts also regularly recognize as facets of plaintiffs' actual damages in FCRA cases embarrassment, humiliation, injury to creditworthiness, as well as withdrawal from credit markets due to fear of having credit applications rejected. *Robbins v. Resident Verify, LLC*, No. 2:20-cv-578-TC, 2021 WL 3292652, at *3 (D. Utah Aug. 2, 2021); *Miller v. Westlake Servs. LLC*, __ F. Supp. 3d __, No. 8:21-cv-00692-JLS-KES, 2022 WL 16556836, at *10 (C.D. Cal. Oct. 28, 2022); *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 845 (E.D. Va. 2017).

Plaintiff states in the accompanying declaration that he suffered actual damages because of NCS's misreporting of the account as belonging to him. (Ex. 51, Ward Decl. ¶¶ 27-30.)

Dated: December 20, 2022                                    Respectfully submitted,


                                             */s/ Matthew Osborne*