## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

ROBBIN WARD

        Plaintiff,

    vs.                                     CASE NO. 1:21-cv-02597-LTB

TRANSUNION, LLC, *et al.*,

        Defendants.

### PLAINTIFF'S STATEMENT OF UNDISPUTED
### FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT
### NATIONAL CREDIT SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Robbin Ward, by Counsel, provides the following undisputed facts in support of his opposition to Defendant National Credit Systems, Inc.'s Motion for Summary Judgment. (ECF 55.)

1.    Plaintiff has lived in Colorado since 1989, who has never lived, or sought to live, in Texas. (Ex. 51, Declaration of Robbin Ward ("Ward Decl.") ¶ 4,7.)

2.    Sometime in 2019, an individual applied to rent a property in Dallas Texas, and submitted Plaintiff's personal identifying information with the application. (Ex. 51, Ward Decl. ¶ 4.)

3.    The individual also submitted falsified income information and falsified information purporting to be from the Social Security Administration. (Ex. 51, Ward Decl. ¶ 11-12.)

4.    Plaintiff was not aware of this application, did not submit it, did not authorize anyone to submit it, and did not provide anyone his identifying information so that they could apply. (Ex. 51, Ward Decl. ¶ 4-8.)

5.      Plaintiff has never worked at Neiman Marcus. (Ex. 51, Ward Decl. ¶ 13.); see also Ex. 76.

6.      The forged application submitted to the landlord lists Plaintiff's monthly income as $3,000 per month, and the most an individual may earn per month on disability is $1,220 for non-blind persons, and $2,040 for blind persons. https://www.ssa.gov/oact/cola/sga.html.

7.      Plaintiff also did not sign the Money Grams that were submitted with the application. (Ex. 51, Ward Decl. ¶ 8.)

8.      A signature comparison verifies this:



Ex. 14, ECF 55-16 (forged signature).

versus

Robbin Undra. Ward

Ex. 37, ECF 55-38 (real signature)

to the best of my knowledge.

9.      gnature)

Ex. 36, ECF 55-37, p. 6 (real signature).

10.      Because Plaintiff did not apply for the Dallas residence and never lived there, he was not aware of eviction proceedings the landlord eventually brought against the tenant.  Ex. 51,

2

Ward Decl. ¶ 9.)

11. Plaintiff did not apply to lease the residence, did not authorize anyone to do that, did not provide his identifying information to anyone so that could do that, and was never aware a debt was being incurred in his name. Ex. 51, Ward Decl. ¶ 4-8.)

12. After NCS became responsible for collecting the debt, it began attributing the account to Plaintiff and reporting it as "in collection" to the credit bureaus. (Exs. 52-54), bates nos. EXP-WARD 000001–2; TU 10; EIS-Ward000004–6.)

13. Reporting an account as "in collection" is a major derogatory notation on a consumer's credit. (Ex. 55, Expert Report of Evan Hendricks ("Hendricks Rpt.") at 3.)

14. Plaintiff learned of NCS's inaccurate reporting of the account when he applied to refinance his mortgage in 2020. (Ex. 51, Ward Decl. ¶ 27.)

15. Each credit bureau was reporting the account as "in collection." (Ex. 51, Ward Decl. ¶ 27.)

16. Plaintiff disputed directly with NCS, calling and writing to it repeatedly and stating that the account resulted from identity theft or confusion of him with another person. (Ex. 51, Ward Decl. ¶ 20.)

17. Plaintiff provided NCS with documents showing that the account did not belong to him, including pay stubs from his actual employer, mortgage statements confirming his Colorado residence, and a letter from the Social Security Administration confirming he was not receiving the benefits the applicant claimed. (Ex. 56, bates nos. NCS_0151–53; Ex. 57, bates no. NCS_0154; Ex. 58, bates no. NCS_0155.)

18. When disputing with NCS did not work, Plaintiff disputed in writing to the credit bureaus. (Ex. 51, Ward Decl. ¶ 21.)

3

19.     In those letters, Plaintiff noted that he was "the victim of identity theft," and explained that he was including as an attachment an Identity Theft Report he filed with the Federal Trade Commission in June 2020. (Ex. 59, bates nos. NCS_0129–43.)

20.     The letters also included copies of Plaintiff's drivers license and Social Security Card, as well as an Identity Theft Affidavit, which was notarized and Plaintiff signed under penalty of perjury. (Ex. 59, bates nos. NCS_0129–43.)

21.     The Identity Theft Affidavit confirmed that Plaintiff had informed the police of the identity theft, but the police did not issue a report. (*Id.*, bates no. NCS_0141.)

22.     Plaintiff also provided his notarized Identity Theft Affidavit, copies of his drivers license and Social Security Card, and F.T.C. Identity Theft Report in June of 2020. (Ex. 60, bates nos. NCS_0090–100.)

23.     Plaintiff also pointed out to NCS that he never worked at Neiman Marcus, the applicant's supposed employer, and that the Neiman Marcus paystubs were falsified. (Ex. 61, bates nos. NCS_0149–50.)

24.     Plaintiff further submitted his own, genuine paystubs showing his employment in Colorado and mortgage statements confirming he was a Colorado resident. (Ex. 56, bates nos. NCS_0151–53; Ex. 57, bates no. NCS_0154.)

25.     While its dispute investigators were aware Plaintiff claimed to have never worked at Neiman Marcus, NCS's policies and procedures for investigations of disputes do not permit the investigators to contact employers. (Ex. 62, Boehler Dep. at 44:19–45:3, 46:5–47:4.)  Ms. Boehler did not bother to verify if Plaintiff worked at Neiman Marcus.  Boehler Dep. at 23:15–18.

26.    Plaintiff told NCS that the letter supposedly from the Social Security Administration regarding the applicant's benefits was fraudulent, but NCS's investigators did not contact the SSA. (Ex. 62, Boehler Dep. at 44:6–12.)

27.    Plaintiff stated in his communications with NCS that NCS could contact him if it needed any additional information to assist in the investigation, but no one at NCS did. (Ex. 63, bates no. NCS_0114.

28.    NCS had in its possession from the original application falsified pay stubs; Plaintiff's Social Security Card and drivers license submitted with the application and without his knowledge or permission; documents like move-in statements that would not show either way whether Plaintiff was the actual applicant; and Plaintiff's F.T.C. Theft Report. (ECF 56-2 ¶ 48.)

29.    NCS did not consider Plaintiff's notarized Identity Theft Affidavit, did not contact Neiman Marcus or the Social Security Administration. (ECF 56-2 ¶ 48.)

30.    NCS published the false reporting of the account as belonging to Plaintiff to Experian, Equifax and Trans Union on multiple occasions.  (Ex. 64, bates nos. TU 20, 32, 74, 91; Ex. 65, bates nos. EIS-Ward 000001, 6, 30, 36; Ex. 66, bates nos. EXP-Ward 000001–2, 21.)

31.    Plaintiff's June 11, 2020 Experian credit report confirms that NCS reported the account at issue as "collection" and did not include any notation that the account was in dispute. (Ex. 67, bates nos. EXP-WARD 000030–31.)

32.    This reporting remained even after Plaintiff disputed the account as not belonging to him. (Ex. 68, bates nos. EXP-WARD 000022–23.)

33.    Experian's report confirms that multiple parties obtained Plaintiff's report with the inaccurate NCS account. (Ex. 69, bates nos. EXP-WARD 000035 (noting hard inquiries by nine creditors.)

34.   Including an account that does not belong to Plaintiff and that is derogatorily noted as in collection on his credit report is inaccurate. (Ex. 55, Hendricks Rpt. at 18.)

35.   In his responses to NCS's Interrogatory No. 1, which requests a recitation of Plaintiff's damages, he explains:

> Plaintiff was unable to refinance his mortgage from 4.35 to a lower interest rate of approximately 2.75 – 3% because of the derogatory collection account reporting on his credit report, that resulted in a low credit score of 671. Plaintiff was advised that because of his credit score he would not qualify for the best rate. One of the main risk factors was that a derogatory collection or public record had been filed. This information was provided by Experian. (Plaintiff_000001 – 000003) The reduction in interest rate would have been approximately $300 per month and over the life of the loan would have been a savings of approximately $108,000.

(Ex. 70, Plt.'s Resp. to ROG 1.)

36.   Plaintiff's expert, Evan Hendricks, confirms the existence of Plaintiff's monetary damages. (Ex. 55 Hendricks Rpt. at 18.)

37.   Once the NCS account was removed from Plaintiff's credit file, his Experian FICO score was 803. (Ex. 71, Experian report)

38.   Plaintiff has explained his non-economic damages, including such categories as emotional distress, humiliation, embarrassment, and similar injuries. (Ex. 51, Ward Decl. ¶¶ 27-30.)

39.   Plaintiff stated in his June 30, 2020 dispute letter to Trans Union (and which NCS produced in this case), "I am the victim of *identity theft* and this [Main Street Renewal, L.L.C.] account is not mine." (Ex. 59, bates NCS_0129.)

40.    NCS also possessed Plaintiff's Federal Trade Commission Identity Theft Report and Identity Theft Affidavit at the time it was undertaking its investigations of Plaintiff's disputes. (Ex. 59, bates nos. NCS_0131–32; NCS_0137–38.)

41.    Placing on Plaintiff's consumer reports information that is derogatory and does not belong to him is plainly inaccurate. (Ex. 55, Hendricks Rpt. at 3, 7.)

42.    NCS, however, did more than that, as it reported to the CRAs that it verified the account as belonging to Plaintiff, but without noting that the account was in dispute. (Ex. 67, bates nos. EXP-WARD 000030–31.)

43.    In Plaintiff's notarized Affidavit, he confirms that he visited the police regarding the theft of his identity, yet the police did not issue a report. (Ex. 69, bates NCS_0141.)

44.    Plaintiff's expert, Evan Hendricks, confirms NCS's supposed investigation fell below industry standards for reasonableness. He notes an established set of industry-standard red flags that NCS disregarded in its investigation of Plaintiff's disputes. (Ex. 55, Hendricks Rpt. at 5–6.)

45.    Mr. Hendricks further highlights inherent problems with NCS's investigation process, noting that its investigators disregarded NCS's own procedures in conducting their investigations. (Ex. 55, Hendricks Rpt. at 7.)

46.    NCS testified that it intended its employees to follow the exact procedures used to rebuff Plaintiff's disputes. (Ex. 72, Rule 30(b)(6) Dep. at 23:21–24:4, 30:22–31:13, 42:19–43:10, 71:2–15.)

47.    In *Bumpus v. National Credit Systems*, No. 1:16-cv-01209-TWT (N.D. Ga.), a federal jury in the Northern District of Georgia concluded not only that NCS violated Section 1681s-2(b), but that its violations were willful. (Ex. 73, *Bumpus* Verdict Sheet.)

48.    The *Bumpus* jury assessed $105,000 in punitive damages against NCS. (*Id.*)

49.    NCS's Rule 30(b)(6) witness confirmed its knowledge of *Bumpus*, noting "we lost," and that the jury assessed punitive damages. (Ex. 72, Rule 30(b)(6) Dep. at 41:9–15.)

50.     NCS failed to append Compliance Conditions Codes to results it posted to the CRAs in ACDVs processed in June 2020. (Ex. 66, bates EXP-WARD 000021; Ex. 65, EIS-Ward-000001; Ex. 44, TU 20].)

51.     Prior to Defendant receiving the June ACDVs, Plaintiff contacted NCS on June 11, 2020 and told them he was an identity theft victim. (ECF 55-24, p.1.)

52.     Plaintiff's spouse, Megan Henderson, contacted NCS to dispute the account on Plaintiff's behalf, and was told to contact the Boreland Law Firm. (Ex. 70, Plt.'s Suppl. Resps. to NCS's ROGs, ROGs 3, 4.)

53.     Ms. Henderson also contacted the original creditor, Main Street Renewal, and was advised about the false information used to rent the residence. (*Id.* [ROG 4].)

54.     NCS also had in its possession Plaintiff's communications with Boreland, which further evidenced his dispute of the validity of the account. (Ex. 60, bates no. NCS_0090; Ex. 74, bates no. NCS_0102; Ex. 63, bates no. NCS_0114; Ex. Ex. 61, bates nos. NCS_0149–50; Ex. 75, bates nos. NCS_0175–77; Ex. 76, bates nos. NCS_0181; Ex. 77, bates nos. NCS_0186–91.)

55.     NCS's Rule 30(b)(6) witness repeatedly testified that its investigators followed NCS's protocols. (Ex. 72, Rule 30(b)(6) Dep. at 30:22–31:2, 43:3–10, 71:20–72:2.)

56.     Those protocols fall short of reasonable when considering disputes of identity theft because, for instance, NCS's Rule 30(b)(6) witness testified that it would have liked a police report in response from Plaintiff to a letter NCS supposedly sent him, yet it did not seek one as part of its investigations of Plaintiff's disputes. (Ex. 72, Rule 30(b)(6) Dep. at 71:20–72:23.)

57.     That witness also testified that NCS knew about the statements in Plaintiff's F.T.C. Affidavit that he was authorizing the release of information to law enforcement and that he reported the events to law enforcement and the F.T.C. (Ex. 72, Rule 30(b)(6) Dep. at 86:1–12.)

58.     NCS repeatedly complains that Plaintiff did not provide a police report, but its dispute investigator testified she did not contact Plaintiff and request a police report or F.T.C. affidavit, and that is not something she does as a matter of course. (Ex. 82, Woodward Dep. at 60:22–61:8.)

59.     NCS's dispute investigator confirmed that she had Plaintiff's Identity Theft Affidavit as part of the documentation she was able to review as part of the investigation she conducted, but that document played no role in the outcome of her investigation. (Ex. 62, Boehler Dep. at 20:4–10.)

60.     That investigator also knew about Plaintiff's communications with Boreland, but did not contact Boreland as part of her investigation. (Ex. 62, Boehler Dep. at 20:15–17.)

61.     In instances where the disputing consumer claims a particular residence—here, Plaintiff claimed Colorado—NCS would have sent a letter asking for additional information if it believed the residence was not adequately documented. (Ex. 62, Boehler Dep. at 20:21–21:1.)

62.     No such letter was sent to Plaintiff (Ex. 51, Ward Decl. ¶ 23.)

63.     NCS's dispute investigator confirmed that if additional information is needed, another department at NCS writes the consumer a letter and asks for that information. (Ex. 62, Boehler Dep. at 21:8–15.)

64.     That request would be made at the same time the investigator responds to the ACDV, meaning NCS responds to the credit bureaus that it has "verified" its reporting even though it believes it needs additional information to properly investigate the dispute. (Ex. 62, Boehler Dep. at 21:8–15.)

65.     The investigators did not contact Neiman Marcus to determine whether Plaintiff ever worked there, and they would not normally do that. (Ex. 62, Boehler Dep. at 23:5–18.)

66.    One investigator testified that such information would have impacted the results of her investigation, and would have likely resulted in her believing Plaintiff's claims of identity theft. (Ex. 62, Boehler Dep. at 23:19–24:2.)

67.    Defendant's policies do not allow their investigators to contact employers to verify employment. (Ex. 72, Rule 30(b)(6) Dep. at 68:9–24.)

68.    NCS's investigator agreed that the pay stubs submitted with the application for the residence looked suspicious, but she did not know if she considered that as part of her investigation. (Ex. 62, Boehler Dep. at 31:10–19.)

69.    NCS's Rule 30(b)(6) witness testified that NCS's investigators are not trained to recognize such forgeries. (Ex. 72, Rule 30(b)(6) Dep. at 33:13–17.)

70.    NCS's investigators likewise do not contact consumers and request information like police reports. (Ex. 82, Woodward Dep. at 61:4–8.)

71.    All NCS did in response to *Bumpus* was seek additional information from original creditors. (Ex. 72, Rule 30(b)(6) Dep. at 42:19–43:2.)

72.    The documentation that the original creditor gave NCS proved Plaintiff was an identity theft victim because the maintenance records described the tenant as "her" several times. (Ex. 16, ECF 55-18, p.1.)

73.    Plaintiff is obviously a male. (Ex. 45, ECF 55-45, (showing Plaintiff as the person on the right).)

74.    Following *Bumpus*, NCS did not do a comprehensive review of its processes to make sure they complied with the FCRA. (Ex. 72, Rule 30(b)(6) Dep. at 42:19–43:2.)

Dated: December 20, 2022                                    Respectfully submitted,


                                                     _____*/s/ Matthew Osborne*___

11