# PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT

I, Evan Hendricks, provide the following Expert Report pursuant to Federal Rule of Civil Procedure 26(a)(2) in connection with the action entitled ***Robbin Ward v. Equifax Information Services, LLC, National Credit Systems, et al.***:  U.S. District Court for the District of Colorado (1:21-CV-02597-LTB-SKC)

**Part 1** of this report addresses issues that are specific to this case, including how Defendant National Credit Systems' ("NCS," or "Defendant") credit reporting was inaccurate and/or incomplete, how and why NCS failed to adequately investigate Plaintiff's disputes of inaccurate, fraudulent information, and how the inaccurate reporting harmed Plaintiff's creditworthiness and reputation. This section of the report also includes a context and history that robustly put Defendant on notice of the importance of investigating and correcting inaccurate and incomplete information, and how it failed to do so due to defects in its disregard of relevant information and defective investigations. This section also describes relevant accuracy- and completeness-related standards which are well-known in the credit reporting industry.

**Part 2** includes opinions on and descriptions of credit scores and credit reports, my qualifications, list of prior cases in which I have testified and my fee. I reserve the right to supplement this report at a future date.

## Presumed Facts

Plaintiff Robbin Ward ("Plaintiff") became a victim of identity theft. This resulted in NCS furnishing information on a fraudulent account ("tradeline") to Plaintiff's files maintained by each of the "Big Three" consumer reporting agencies ("CRAs" or "credit bureaus") – Equifax, Experian and Trans Union. After Plaintiff disputed the accuracy and completeness of the account to the credit bureaus, NCS wrongly "verified" that the disputed, fraudulent tradeline should remain in Plaintiff's CRA files.

## Summary of Opinions

- Plaintiff's case involves two major, well-known and long-standing causes of credit report inaccuracy. The first cause is the furnishing of erroneous data by furnishers such as NCS.[1]

---

[1] Knowledge of and consensus about this problem was so widespread that in 1996, Congress amended the Fair Credit Reporting Act ("FCRA") to place duties on furnishers such as NCS (1) to report accurate information to consumer reporting agencies ("CRAs"), and (2) to investigate consumers' disputes of inaccurate and/or incomplete data that were forwarded to furnishers by CRAs, and (3) to correct and/or delete inaccurate/or incomplete data or information that cannot be verified.

Exhibit 55 - 001

- The second cause is identity theft.[2] This is because the fraudulent data and tradeline generated by the fraudster were then furnished by NCS, after it became the collector for its client, purchased that data from a "creditor," Main Street Renewal LLC) to consumer reporting agencies ("CRAs" or "credit bureaus") per Plaintiff's Social Security number ("SSN") and Plaintiff's date of birth, as typically happens in identity theft cases. This caused the derogatory data generated by the fraudster to be added to Plaintiff's credit bureau files, as typically happens in identity theft cases.

- Furnishers such as NCS have several important responsibilities when it comes to credit report accuracy. The most important responsibility is upon receiving a notice of a consumers' dispute of inaccurate information from a CRA, NCS must conduct an investigation to determine if the disputed information is inaccurate, incomplete, or cannot be verified. (These types of CRA-sourced disputes electronically come in the form of "Automated Consumer Dispute Verifications," or "ACDVs.").

- NCS failed to adequately investigate the false, fraud-related data disputed by Plaintiff.  Plaintiff's dispute and the information related to it should have made it clear to NCS that Plaintiff was a victim of fraud. This information included an FTC Fraud Affidavit, a plethora of well-established "red flags," and contradictory or discrepancies in residential and work addresses, pay stubs, emails and signatures.

- But rather than use any of all of this relevant information to investigate Plaintiff's dispute, NCS effectively disregarded it.

- NCS's response to Plaintiff's dispute essentially involved comparing data, including identifiers, on the ACDVs to the information in its computer system. This rather robotic process was integral to NCS's failure to conduct an investigation which was reasonably calculated to determine whether the disputed information was in fact inaccurate, incomplete and/or fraudulent, or could not be verified.

- NCS's ACDV dispute investigations were foreseeably defective because, as was the case here, the identity thief typically uses the name and SSN of the innocent victim to commit fraud. The fraudulently-used name, date of birth, and SSN are therefor in the records of the original creditor which are sold to NCS. Thus, the identifying information in NCS's records predictably will "match" the identifying information of the disputing consumer/victim.

- NCS and its dispute investigators never met the standards for "verifying" whether Plaintiff was a victim of identity theft or whether the inaccurate information it

---

[2] The FTC's final rule defines "identity theft" as a fraud that is committed or attempted, using a person's identifying information without authority.  Knowledge of and consensus about the problem of identity theft causing  credit report inaccuracy was so widespread that in 2003, Congress amended the FCRA to strengthen protections for consumers from identity theft, and to heighten the duties on furnishers such as NCS (1) to report accurate information to consumer reporting agencies ("CRAs"), and (2) to investigate consumers' disputes of inaccurate and/or incomplete data that were forwarded to furnishers by CRAs, and (3) to correct and/or delete inaccurate/or incomplete data or information that cannot be verified.

Exhibit 55 - 002

furnished to CRAs could be "verified." In fact, NCS did not even follow some of its own policies/procedures for investigating identity theft disputes.

- In other words, Plaintiff provided to NCS relevant information it needed to investigate his disputes and determine the information should be deleted from Plaintiff's CRA files. But this did not happen, according to NCS, because it was fixated on the fact that its records contained an account it associated with Plaintiff, not whether that account actually belonged to Plaintiff.

- NCS's repeated failures to adequately investigate Plaintiff's disputes, which resulted in inaccurate, derogatory data remaining in Plaintiff's credit files, reflected its serious disregard for established standards of accuracy.

- NCS's inaccurate reporting damaged Plaintiff's creditworthiness and reputation in at least two ways:

   First, by reporting a current "status" of "collection," and with a past-due balance of $5,375, NCS, for all practical purposes, rendered Plaintiff ineligible for nearly all – if not all – forms of credit because creditors typically will not extend credit to consumers until they remove all past-due balances from their credit reports.

   Second, the a current "status" of "collection," and with a past-due balance of $5,375, constituted a major derogatory under the FICO scoring model, and consequently, lowered his FICO scores.

- It is well known in the field of credit reporting and credit scoring that victims of chronic credit report inaccuracy are subjected to and endure a common pattern of problems.  This meant that the kinds of problems NCS inflicted upon Plaintiff, which were consistent with those experienced by previous victims of chronic credit report inaccuracy, were or should have been foreseeable to NCS.

### NCS & The 'ACDV-Exchange'

Participants in the credit reporting industry system like NCS rely on the ACDV-exchange, operated through an industry-created system known as "e-OSCAR," as the principal means of responding to a consumer's dispute.  When relied on exclusively and operated defectively, as NCS did in Plaintiff's case, the ACDV-exchange has been widely criticized for being inadequate to reasonably investigate disputes such as Plaintiff's that require careful consideration and the goal of determining whether the disputed information is inaccurate and incomplete, or cannot be verified.[3]

To be clear, the problem is not that NCS exchanges ACDVs with CRAs. The ACDV is simply a form response confirming what the numbers in each field in the ACDV form are. The ACDV is **not an investigation** into whether or not NCS's reporting is inaccurate or misleading.

[3] "Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking To Fix Errors in Their Credit Reports, National Consumer Law Center ("NCLC") (2009)

Exhibit 55 - 003

Thus, the problem is that NCS's ACDV department returns an ACDV to CRAs without conducting an investigation of the disputed data.

The ACDV-exchange essentially consists of an exchange of messages known as "Automated Consumer Dispute Verifications" (ACDVs).  When consumers send their dispute to the CRA, the CRA populates the ACDV form with their identifying information (name, address, city-state-zip, SSN, sometimes previous address),[4] and a digital code that cryptically describes the dispute and instructs a furnisher like NCS to investigate what aspects of the account can be verified.

Upon receipt of the ACDV, a furnisher such as NCS is supposed to conduct an investigation with respect to the disputed information, and review all relevant information, including that provided by the CRA, and then determine whether the information is inaccurate or incomplete or cannot be verified.

The Webster's New Collegiate Dictionary defines "investigate" as, "v.  To observe or study by close examination and systematic inquiry. Systematic—adj.  Marked by thoroughness and regularity."  For the reasons I described above, NCS's responses to Plaintiff's disputes were neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion.

NCS's responses were better described as a comparison of information, rather than an investigation of whether the disputed, fraudulent data were inaccurate and could not be verified.

Q …So where you said, "I reviewed name, address, SSN, DOB account information. Checked for accuracy and matching."· What does that mean?

A. That is checking the name, the address that we have on file. All the information that we have in our collection system and any documentation that is – that we have in our system and any information that is provided by the consumer.

Q Okay. So essentially, you're making sure that the name, address, SSN, date of birth matches in the collection system versus e-OSCAR; is that right?

A. Right. We're comparing the two, yes.

[Deposition of Cathy Boehler, pgs. 57-58.]

For a furnisher like NCS to conduct an adequate investigation, it is crucial that it competently consider all information that is relevant to the dispute. This is particularly crucial in an identity theft dispute, because the fraudster's use of the victim's identifiers creates an initial semblance of similarity. Unless adequate attention is paid to all relevant information, then the discrepancies and contradictory data indicating identity theft will not be discovered.

Compounding the difficulty is that NCS's operation of the ACDV Exchange occurs in a conveyor-belt like atmosphere. This conveyor-belt styled atmosphere is conducive to a dispute operator overlooking, missing or just "whiffing" on important information due to volume, speed or attention issues. This meant that in Plaintiff's case, NCS failed to review or adequately review

---

[4] The CRAs often refer to identifiers as "indicative data"

Exhibit 55 - 004

or sufficiently consider quite relevant information, including that which was in its possession or which was readily available to it, which clearly supported Plaintiff's disputes.

This is what happened in Plaintiff's case.

**NCS's So-Called Investigation Disregarded Several Red Flags In Plaintiff's Case**

An important set of standards for credit report accuracy in identity theft cases are the "Red Flags" guidelines.

In, 2009, the FTC and federal banking agencies, pursuant to the 2003 FCRA Amendments, established "Red Flag" guidelines for furnishers to help combat identity theft. A red flag is "a pattern, practice, or specific activity that indicates the possible existence of identity theft.'' [12 CFR Part 41, 16 CFR Part 681, etc.; 15 U.S.C. 1681m(c)(2)(A).]

The following "Red Flags" in Plaintiff's case must be viewed in the context of his dispute, which specified that he was a victim of identity theft, and that he never lived in Texas or applied for the Texas apartment in question, that the pay stubs were his daughter's, from Nieman Marcus, but had his name on them, and that the phone number was also his daughter's.

Here are some examples of established "Red Flags" and their relevance to Plaintiff's case:

(2) The presentation of suspicious documents;

**(i.e., Contradictory pay stubs. On one hand, for the application for the Texas apartment, a pay stub with a Colorado home address, but with a reference to "TX" – "No State Income Tax," from an employer, Nieman Marcus, with an address in Texas.**

(3) The presentation of suspicious personal identifying information, such as a suspicious address change; … Personal identifying information provided is inconsistent when compared against external information sources used by the financial institution or creditor.

**(i.e., As mentioned above, the pay stubs presented by the applicant for the Texas apartment contained suspicious Texas-related information.**
**(A) This information was all the more suspicious because Plaintiff's disputes included his pay stubs from EMJD Corporation, based in Englewood, CO.**
**(B) The tenant had a different email address than Plaintiff.**
**(C) The lease was application was "signed" online via DocuSign, so it did not match Plaintiff's signature.**
**(D) The unpaid collection was for a deadbeat tenant, while Plaintiff provided a Mortgage Statement for a Colorado property (amount due for the month of January 2020 was $2,236.97), with his disputes.**
**(E) The applicant included a statement of Social Security benefits for a 58-year old, which was less than the eligible age, and the income on the fake paystubs exceeded the amount someone on Social Security Disability could receive.**

Exhibit 55 - 005

(4) The unusual use of, or other suspicious activity related to, a covered account; **(i.e., it was suspicious that Plaintiff (actually the fraudster) supposedly rented an apartment in Texas when Plaintiff was actually paying a mortgage in Colorado.**

(5) Notice from customers, victims of identity theft, law enforcement authorities, or other persons regarding possible identity theft in connection with covered accounts held by the financial institution or creditor. **(i.e., Plaintiff notified the CRAs and Defendant the account was the result of identity theft, and provided an FTC Identity Theft Affidavit.)**

(6)  The customer fails to make the first payment or makes an initial payment but no subsequent payments. (**i.e., The latter scenario was precisely the fraudster's payment/non-payment pattern for the Texas apartment.**

Instead of heeding these red flags as signs of identity theft, which would have been the logical and reasonable thing to do under industry standards, NCS essentially disregarded them. As mentioned above, NCS essentially disregarded Plaintiff's FTC Identity Theft Affidavit.

This meant that NCS failed to give due regard to this compelling information. Importantly, this resulted in NCS claiming to CRAs via ACDVs that, "23: Disputed information accurate, Updated account information unrelated to the dispute." – **without actually verifying whether or not the information was in fact accurate.**

Thus, NCS's inadequate and/or non-existent investigations resulted in its unreasonable conclusions that Plaintiff signed the lease and was responsible for the fraudulent debt.

NCS's defective responses to Plaintiff's ACDV fraud disputes reflected its disregard of the robust notice from FCRA enforcement authorities that the type of superficial responses in which it engaged were wholly unacceptable.

For instance, FCRA enforcement authorities have put furnishers on notice that for certain ACDV investigations, they need to look at underlying documents and consider underlying facts. But in responding to Plaintiff's ACDV dispute, NCS's operator did not "review the account notes before" responding, or any e-mails. The operator did "not have access to" document in NCS's files. [Deposition of Diana Woodward, pgs. 16-17.]

In my opinion, the NCS operator handling Plaintiff's ACDV dispute had a very low awareness of identity theft. [Deposition of Diana Woodward, pgs. 22-24.]

NCS failed and continues to fail to understand when it comes to its accuracy-related responsibilities that it essentially has three choices regarding how it handles ACDV disputes: (1) it can verify/determine disputed information is accurate; (2) it can conclude the disputed information is "unverifiable;" or (3) it can conclude the disputed information is "inaccurate or incomplete."

Exhibit 55 - 006

However, NCS failed and continues to fail to recognize that by choosing to "verify"/"determine disputed information is accurate," NCS must undertake certain obligations in order to investigate adequately. This includes finding evidence the disputed information is true before reporting the information as "verified" or "accurate." Finding such evidence should not have been overly intensive or burdensome because NCS had sufficient data to determine the information could not be verified. (See below.)

In my opinion, Plaintiff's experiences indicated that NCS too readily dismissed legitimate identity theft disputes, rather than adequately investigate them. Accordingly, NCS thereby too often perpetuated credit report inaccuracy rather than facilitating correction of inaccuracies – as it did in Plaintiff's case.

In my opinion, NCS did not follow its own procedures for investigating identity theft disputes, including the highlighted ones listed below:

**[Beginning of Excerpts from NCS's Direct and Indirect Disputes
and Identity Theft Policies and Procedures]**

The investigation will include the following, but not limited to, procedure:
a. Documentation/information provided is to be compared to documentation/information on file provided by the client …

c. Comparison of information should include a combination of the following:

i. Name
ii. Race, age, gender
iii. **Address, including dates of residency if applicable**
iv. **Signatures**
v. **Email addresses**
**vi. Phone numbers**
vii. Photo identification will be compared if provided and on file
viii. **Presence of ID theft claims in system notes from previous contact**
d. Review of the identity theft packet and/or police report. Careful review to see if a suspect was already identified and account notated properly.
e. **Any discrepancies found during the investigation should be properly documented and the client advised.**  [WARD_ROBBIN_APRIL 1, 2022 BATES PRODUCTION NO. 431; Exhibit 13 - 010.] (Emphasis added.)

**[End of Excerpts from NCS's Direct and Indirect Disputes
and Identity Theft Policies and Procedures]**

**Accuracy & Completeness**

**Opinions:** Possibly the most important standard in consumer credit reporting is accuracy. If consumer report information is inaccurate, then it can harm consumers, financial institutions, users of credit reports, and even the economy as a whole.

Exhibit 55 - 007

Another important standard in credit reporting coinciding with accuracy is completeness. Thus, in order to achieve credit reporting accuracy and completeness, it would be necessary for a creditor-furnisher to portray the tradeline in its proper context.

**Basis For Opinion**

This point was driven home during the 2003 Congressional hearings on the FCRA, when Senator Richard Shelby (R-AL), Chairman of the Senate Banking Committee opened the July 10, 2003 hearing, which was entitled, "The Accuracy of Credit Report Information and the Fair Credit Reporting Act," by stating, "This morning, we take up one of the most important issues, if not the most important, associated with the FCRA: the accuracy of the information contained in consumer credit reports. Changes in our financial services industries have made accuracy more important than ever. Credit report information is increasingly used as the key determinant of the cost of credit or insurance… With the rewards for good credit so meaningful, and the penalties for bad credit so severe, it is absolutely critical that credit reports accurately portray consumers' true credit histories."[5]

The importance of accuracy is emphasized throughout the consumer credit reporting industry through such common items as the subscriber contracts and user agreements between consumer reporting agencies and creditors. (Creditors typically are both "furnishers" of consumer data, and users of CRAs' data in the form of credit reports.)

Moreover, in the Consumer Data Industry Association's ("CDIA") "2015 Credit Reporting Resource Guide ®," (also known as the "CDIA Manual"), which sets forth the industry standards for participants in the credit reporting industry, and which Experian was intimately involved in establishing and publishing, accuracy is the first standard addressed:

Credit reporting information is sensitive data. The issues of accuracy and completeness of information and fairness to consumers are not just a concern of the consumer reporting agencies; credit grantor participation is also required. Federal and state laws already regulate certain aspects of credit reporting. In order to protect your ability to conduct business without the further intervention of external forces, you must participate in the accuracy process.

Both credit grantors and consumers depend on consumer reporting agencies to acquire and maintain accurate credit histories. This can only be accomplished if the provider of consumer data understands the tools that are available and adheres to the standards for credit reporting.

The above-mentioned CDIA Manual, the creation of which directly involved the CRAs, is designed to assure compliance with the accuracy standards set forth by the federal and state credit reporting statutes. And the CDIA is the trade organization created to represent the

---

[5] "The Accuracy of Credit Report Information and the Fair Credit Reporting Act," Senate Banking Committee; July 10, 2003.

Exhibit 55 - 008

interests of Experian, Equifax and Trans Union, and is the principal source of nearly all of the industry-created implementation standards for consumer credit reporting in the credit reporting industry.

On the issue of "accuracy," the CDIA manual sets forth the following standards:

**[Beginning of Excerpt from CDIA Manual]**

**ACCURACY AND INTEGRITY DEFINITIONS**

The 2010 FACT Act Data Furnisher rules define the term "Accuracy" to mean that information that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer correctly:

☐ Reflects the terms of and **liability** for the account or other relationship;
☐ Reflects the **consumer's performance and other conduct** with respect to the account or other relationship; and
☐ **Identifies the appropriate consumer**. [Emphasis added.]

**[End of Excerpt from CDIA Manual]**

The CDIA adopted and published these standards after they were first established by the FTC[6] pursuant to its authority under the FCRA.

The FTC rules also stated that information should be:

- Substantiated by the furnisher's records at the time it is furnished.

- Furnished in a form and manner that is designed to minimize the likelihood that the information may be incorrectly reflected in a consumer report

Applying these standards listed above, we can see that by wrongly furnishing the fraudulent NCS tradeline to CRAs, the NCS tradeline was not accurate because:

(1) It did not reflect Plaintiff's liability in relation to the NCS collection.

(2) It did not reflect Plaintiff's performance and other conduct with respect to the NCS collection.

(3) It did not appropriately identify Plaintiff.

(4) It was not substantiated by NCS's records at the time it was furnished.

---

[6] Federal Trade Commission, 16 CFR Part 660. "Procedures To Enhance the Accuracy and Integrity of Information Furnished to Consumer Reporting Agencies Under Section 312 of the Fair and Accurate Credit Transactions Act; Final Rule; Guidelines for Furnishers of Information to Consumer Reporting Agencies.

Exhibit 55 - 009

**Consequence of Wrongfully 'Parking' Debt in Consumer's Credit Files**

It should be noted that it is conceivable that a creditor can have an economic incentive to err on the side of reporting to CRAs all debts that might or might not be owed. This is because if a consumer seeks to obtain credit, but has an unpaid debt showing on his/her credit report, the creditor typically will require the consumer to resolve the matter before the creditor will agree to approve the consumers' application for credit. One simple and straightforward way for consumers to resolve such a debt is to pay it off so that the other creditor mis-reporting the debt will then instruct the CRAs to show the debt as paid with a zero balance.

In other words, creditors know that if they "park" a debt on a consumer's credit report, odds are that said consumer eventually will have to pay off that debt.

Accordingly, NCS (like other furnishers) knew or should have known that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms."[7] As I wrote in my book, "Credit Scores and Credit Reports":

> … Creditors view credit reporting as an arm of debt collection – a sort of last resort that will catch up with non-paying consumers sooner or later. This practice "crosses the line" when creditors and collectors threaten to report debts – or actually report debts – that they know or should know are not the responsibility of the consumer. [Pg. 31 – 3rd Ed.]

However, at least in part because of creditors' economic incentive to err on the side of reporting to CRAs all debts that might or might not be owed, the problem has persisted.

**Notice: FCRA Enforcement Authorities Provided Notice of What
Constituted Inadequate Investigations To Furnishers Like NCS**

**Opinion: The FCRA has various and several enforcement authorities. Some of the FCRA's very important enforcement authorities have unequivocally put furnishers such as NCS on notice that the type of ACDV-Exchange-and-ID/data-comparison conducted by a furnisher in response to an ACDV dispute – as NCS conducted in Plaintiff's case – did not amount to a reasonable investigation under the FCRA.**

**The remainder of this section of the report is to provide the basis for this opinion. I quote at length from the following three opinions not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to furnishers like NCS regarding the need to carefully evaluate – and probably change – its ACDV investigation procedures.**

---

[7] Such explicit notice, for example, was provided in (Rivera v. Bank One, 145 F.R.D. 614, 623 (D.P.R. 1993)). I cite this court case solely because it goes to notice, not to express legal opinions or conclusions.

Exhibit 55 - 010

**Notice – Bumpus v National Credit Systems, 1:16-cv-01209, Northern District of Georgia**

On April 12, 2018, a jury verdict was entered against NCS for willfully violating the FCRA in the amount of $107,834.70, which included $2,734.70 actual damages on plaintiffs claim of negligence; $100.00 statutory damages and $105,000 punitive damages under the FCRA.

**Notice – Fourth Circuit's Opinion in *Johnson v. MBNA***

**Opinion: The FCRA's enforcement authorities have put furnishers such as NCS on notice that it needs to conduct a reasonable investigation in response to ACDV disputes, and that the kind of superficial, data comparison exercise that NCS conducted in Plaintiff's case was not acceptable because it did not constitute a reasonable investigation.**

**The following provides the bases for this opinion:**

Notably two federal courts – U.S. District Court for the Eastern District of Virginia and the U.S. Court of Appeals for the Fourth Circuit – issued opinions[8] that held unequivocally that the type of ACDV-Exchange-and-ID-data-comparison conducted by a furnisher did not amount to a reasonable investigation under the FCRA.  I quote at length from these two opinions not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to furnishers like NCS regarding the need to carefully evaluate – and probably change – its ACDV investigation procedures.

By way of background, the FCRA lawsuit stemmed from an MBNA MasterCard opened by  Linda Johnson's ex-husband, Edward Slater, in 1987 – four years before he married her. They had since divorced. Johnson said she was only an authorized user, which meant she was not responsible for paying the account. In December 2000, Slater filed for bankruptcy, and MBNA promptly removed his name from the account. That same month, MBNA contacted Johnson and informed her that she was responsible for the approximately $17,000 balance on the account. After obtaining copies of her credit report from Experian, Equifax, and Trans Union, Johnson disputed the MBNA account with each of them. Experian and Trans Union sent automated consumer dispute verifications (ACDVs) to MBNA specifically indicating Johnson's claim that she was not a co-obligor on the account.

MBNA agents responded by conducting the ACDV-Exchange, comparing the disputed data with the account information contained in MBNA's computerized Customer Information System (CIS).  Since the two were identical, MBNA "verified" that the disputed information was correct.  In other words, MBNA did nothing more than confirm that it indeed reported the original (inaccurate) data. The CRAs continued to report it on Johnson's credit report.

---

[8] I quote from these cases, not to express any legal opinions or conclusions, but because, in my expert opinion, this very important court rulings provided important notice to furnishers such as NCS that they must conduct reasonable investigation in response to ACDV disputes, and that the kind of superficial, data comparison exercise that NCS conducted in Plaintiff's case was not acceptable because it did not constitute a reasonable investigation.

Exhibit 55 - 011

Tricia Furr, an MBNA credit reporting specialist, confirmed that MBNA's "Desktop Procedure" manual directs specialists to confirm a match of two out of three identifiers – name, address and/or SSN.  Once a two-out-of-three match is established, MBNA can inform the CRA that the disputed information is "verified as reported."  Ms. Furr said that MBNA's "reinvestigations" did not go beyond the information contained in its own CIS.[9]

Reading from MBNA's internal records, MBNA Vice President Edward Hughes quoted an MBNA employee's communication to a customer's attorney: "It would be up to (c)ard holder to prove MBNA was reporting wrong, not MBNA proving right."

The jury disagreed with MBNA's argument that its actions did not violate the FCRA, and awarded Johnson $90,300 in damages.

Judge Richard Williams affirmed the jury verdict.  "According to [MBNA], the duty to investigate means that any investigation is sufficient, no matter how cursory.  Such a construction is illogical.  There would be no point in having the statute, and the requirement of an investigation, if there was no qualitative component to the investigation.  The statute itself does impose a qualitative component to the [MBNA's] negligence," Judge Williams said.[10]

MBNA appealed Judge Williams' decision.  But on February 11, 2004, a three-member panel of the U.S. Court of Appeals for the Fourth Circuit affirmed, finding that MBNA's standard response to consumer disputes did not amount to a true "investigation" under the FCRA.

"MBNA argues that the language of § 1681s-2(b)(1)(A), requiring furnishers of credit information to 'conduct an investigation' regarding disputed information, imposes only a minimal duty on creditors to briefly review their records to determine whether the disputed information is correct," the panel wrote, in an opinion authored by Chief Judge William W. Wilkens. "Stated differently, MBNA contends that this provision does not contain any qualitative component that would allow courts or juries to assess whether the creditor's investigation was reasonable."[11]

"The key term at issue here, 'investigation,' is defined [by the dictionary] as 'a detailed inquiry or systematic examination.'  Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors," he wrote.

Further, he said, the statute "uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA.  It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute – and, ultimately, correct – inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, unreasonable inquiries by creditors.  We therefore hold that

---

[9] The depositions of MBNA personnel were taken in the case, *Linda Johnson v. MBNA America Bank, N.A.*, Slip Op. No. 3:02 cv 523, U.S. District Court for the Eastern District of Virginia (Richmond Division).
[10] *Johnson v. MBNA America Bank*, op. cit., bench ruling February 24, 2003
[11] *Johnson v. MBNA America Bank*: 357 F.3d 426 (4th Cir. 2004).

Exhibit 55 - 012

§ 1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified."

MBNA also tried to argue that its investigation in Johnson's case was reasonable. But the court pointed to the specific nature of Johnson's dispute, and the testimony of MBNA agents that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the Customer Information System, and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account.

*"The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications.  Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably* in failing to verify the accuracy of the information contained in the CIS," Judge Wilkins wrote. [Emphasis added.]

When read in conjunction with the Third Circuit's opinion in *Cushman v. Trans Union Corp.*, 115 F. 3d 220, 225 (3d Cir. 1997)), which held that "parroting" did not amount to an adequate investigation, Johnson should have made it perfectly clear to NCS that it needed to conduct a true, qualitative investigation in response to Plaintiff's disputes.

### Notice – Ninth Circuit's Opinion in *Gorman v. Wolpoff & Abramson*

In my opinion, *Johnson* provided important notice to participants in the credit reporting system like NCS of adequate standards for conducting reasonable investigations, in my opinion. Additional important notice was provided by the U.S. Court of Appeals for the Ninth Circuit in *Gorman v. Wolpoff & Abramson,* 584 F.3d 1147 (9th Cir. 2009). Here are some relevant excerpts from that opinion:

[1] The text of the FCRA states only that the creditor shall conduct "an investigation with respect to the disputed information." § 1681s-2(b)(1)(A). MBNA urges that because there is no "reasonableness" requirement expressly enunciated in the text, the FCRA does not require an investigation of any particular quality; *any* investigation into a consumer's dispute — even an entirely unreasonable one — satisfies the statute.

[2] This court has not addressed MBNA's contention about the FCRA's investigation requirement.**10** But, MBNA made — and lost — the same argument before the Fourth Circuit. *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 429-31 (4th Cir. 2004). Concluding that the statute includes a requirement that a furnisher's investigation not be unreasonable, the Fourth Circuit first noted that the plain meaning of the term "investigation" is a "'detailed inquiry or systematic examination,'" which necessarily "requires some degree of careful inquiry." *Id.* at 430 (quoting *Am. Heritage Dictionary* 920 (4th ed. 2000)). Second, the Fourth Circuit reasoned that because the purpose of the provision is "to give consumers a

Exhibit 55 - 013

means to dispute — and, ultimately, correct — inaccurate information on their credit reports," *id.* at 430-31, a "superficial, *un*reasonable inquir[y]" would hardly satisfy Congress' objective. *Id.* at 431. The Seventh Circuit, without discussing the issue, has also found an implicit reasonableness requirement. *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) ("Whether a defendant's investigation [pursuant to § 1681s-2(b)(1)(A)] is reasonable is a factual question normally reserved for trial."); *see also Johnson*, 357 F.3d at 430 n.2 ("[D]istrict courts that have considered the issue have consistently recognized that the creditor's investigation must be a reasonable one."

**[3]** The Fourth Circuit's reasoning in *Johnson* is entirely persuasive. By its ordinary meaning, an "investigation" requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute. Moreover, like the Fourth Circuit, we have observed that "a primary purpose for the FCRA [is] to protect consumers against inaccurate and incomplete credit reporting." *Nelson*, 282 F.3d at 1060. A provision that required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry …

As we have noted, the term "investigation" on its own force implies a fairly searching inquiry.

Nevertheless, MBNA urges that "Congress intended to impose a more rigorous duty of investigation on CRAs than on furnishers of information." But MBNA does not tell us why Congress would mandate shoddy or superficial furnisher investigations, not calculated to resolve or to explain the actual disagreement or to aid in the CRA's "reasonable reinvestigation."

Indeed, as the statute recognizes, ***the furnisher of credit information stands in a far better position to make a thorough investigation of a disputed debt*** than the CRA does on reinvestigation. With respect to the accuracy of disputed information, the CRA is a third party, lacking any direct relationship with the consumer, and its responsibility is to "*re*investigate" a matter once already investigated in the first place. §1681i(a)(1) (*emphasis added*). It would therefore make little sense to impose a more rigorous requirement on the CRAs than the furnishers. Instead, the more sensible conclusion is that, if anything, the "reasonable" qualifier attached to a CRA's duty to reinvestigate limits its obligations on account of its third-party status and the fact that it is repeating a task already completed once. Requiring furnishers, on inquiry by a CRA, to conduct at least a reasonable, non-cursory investigation comports with the aim of the statute to "protect consumers from the transmission of inaccurate information about them." *Kates v. Crocker Nat'l Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985).

Exhibit 55 - 014

**[5]** We thus follow the Fourth and Seventh Circuits and hold that the furnisher's investigation pursuant to § 1681s-2(b)(1)(A) may not be unreasonable.

In *Johnson*, the CRA's notice to MBNA read: "CONSUMER STATES BELONGS TO HUSBAND ONLY;" "WAS NEVER A SIGNER ON ACCOUNT. WAS AN AUTHORIZED USER." *Id.* at 429. The underlying facts were that Johnson's future husband opened an MBNA credit card account. Some years later, after they were married, Johnson's husband filed for bankruptcy, and MBNA told Johnson she was responsible for the balance, maintaining that she was a co-applicant, and therefore a co-obligor, on the account. *Johnson*, 357 F.3d at 428-29. Johnson argued that she was merely an authorized user. *Id.* In response to the notice to the CRAs, MBNA only confirmed Johnson's identifying information and confirmed that its internal computer system indicated she was the sole responsible party on the account. *Id.* at 431. At no time did MBNA try to ascertain whether Johnson's information — that she had not signed the application form — was correct.

The Fourth Circuit held this investigation was unreasonable:

> The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS [MBNA's internal computer system] and never consult underlying documents such as account applications. Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS. *Id.*

**[13]** In contrast to *Johnson*, in Gorman's case MBNA did review all the pertinent records in its possession, which revealed that an *initial* investigation had taken place in which MBNA contacted both Gorman and the merchant. Thus, unlike in *Johnson*, MBNA had — albeit earlier — gone outside its own records to investigate the allegations contained in the CRA notice, and on reading the notice, did consult the relevant information in its possession. *Johnson* does not indicate that a furnisher has an obligation to repeat an earlier investigation, the record of which is in the furnisher's records.

[End of Excerpt *Gorman v. Wolpoff & Abramson*.]

### Notice – Eleventh Circuit's Opinion in *Hinkle v. Midland*

In my opinion, *Johnson* and *Gorman* provided important notice to participants in the credit reporting system like Defendant of adequate standards for conducting reasonable investigations. Additional important notice was provided by the U.S. Court of Appeals for the Eleventh Circuit in *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F. 3d 1295 - Court of Appeals, 11th Circuit, (2016). **Here are some relevant excerpts from that opinion**:

> Should the investigation determine that the disputed information is inaccurate or incomplete or cannot be verified, the furnisher must as appropriate,

Exhibit 55 - 015

based on the results of the reinvestigation promptly modify, delete or permanently block the reporting of that information to CRAs. *§ 1681s-2(b)(1)(E)* …

Section *1681i(a)* imposes a duty to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer. Given the interrelated nature of *§§ 1681s-2(b)* and *1681i(a)*, reasonableness is an appropriate touchstone for evaluating investigations under *§ 1681s-2(b)* …

Dictionary definitions of "verify" and "investigation" support the conclusion that *15 U.S.C.S. § 1681s-2(b)* requires some degree of careful inquiry by furnishers of information.

In particular, when a furnisher does not already possess evidence establishing that an item of disputed information is true, *§ 1681s-2(b)* requires the furnisher to seek out and obtain such evidence before reporting the information as verified. A claim for failure to investigate is properly raised when a particular credit report contains a factual deficiency or error that could have been remedied by uncovering additional facts. The requirement to uncover additional facts will be more or less intensive depending on what evidence the furnisher already possesses.

*15 U.S.C.S. § 1681s-2(b)* does not impose an unduly burdensome investigation requirement on furnishers of information; rather, it presents them with a choice regarding how they handle disputed information. The first option is to satisfy *§1681s-2(b)* by conducting an investigation, verifying the disputed information, and reporting to the credit reporting agencies that the information has been verified. Verification might be accomplished by uncovering documentary evidence that is sufficient to prove that the information is true. Or it might be accomplished by relying on personal knowledge sufficient to establish the truth of the information. *Fed. R. Civ. P. 56(c)(4)* (summary judgment affidavit); *Fed. R. Evid. 602* (trial testimony).

When a furnisher reports that disputed information has been verified, the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true. This is a factual question, and it will normally be reserved for trial.

A second way for a furnisher of information to satisfy *15 U.S.C.S. § 1681s-2(b)* is to conduct an investigation and conclude, based on that investigation, that the disputed information is unverifiable. Furnishers can avail themselves of this option if they determine that the evidence necessary to verify disputed information either does not exist or is too burdensome to acquire. Having made such a determination, furnishers are entitled to cease investigation and notify the credit reporting agency that the information cannot be verified. *15 U.S.C.S. § 1681s-2(b)(1)(E)*. When a furnisher reports that disputed information cannot be verified,

Exhibit 55 - 016

the question of whether the furnisher complied with *§ 1681s-2(b)* will likely turn on whether the furnisher reasonably determined that further investigation would be fruitless or unduly burdensome. The final way to satisfy *§ 1681s-2(b)* is to conduct an investigation and conclude that the disputed information is inaccurate or incomplete. *§ 1681s-2(b)*.

By characterizing *15 U.S.C.S. §1681s-2(b)* as presenting a furnishers of information with a choice, the U.S. Court of Appeals for the Eleventh Circuit does not mean to suggest that furnishers have complete discretion to cease investigation and report accounts as cannot be verified.

The framework of the Fair Credit Reporting Act reflects the fact that *15 U.S.C.S. § 1681s-2(b)* is designed not only to exclude false information from credit reports, but also to prevent the reporting of unverifiable information. When a furnisher of information determines that disputed information is false or cannot be verified, the furnisher must notify the credit reporting agencies (CRAs) of this result pursuant to *§ 1681s-2(b)(1)*. The furnisher must also as appropriate, based on the results of the reinvestigation promptly modify, delete or permanently block the reporting of that information to CRAs. *§ 1681s-2(b)(1)(E)*. What the results of the reinvestigation require may vary depending on the nature of the disputed information. But when a furnisher is unable to verify the identity of an alleged debtor, the U.S. Court of Appeals for the Eleventh Circuit is persuaded by the parallel structure of *15 U.S.C.S. §§ 1681s* and *1681i* that the appropriate response will be to delete the account or cease reporting it entirely. …

Although whether an investigation is reasonable under the Fair Credit Reporting Act will depend on what the furnisher of information knows about the dispute, the U.S. Court of Appeals for the Eleventh Circuit rejects the proposition that a furnisher may truncate its investigation simply because the credit reporting agency (CRA) failed to exhaustively describe the dispute in its *15 U.S.C.S. § 1681i(a)(2)* notice. Although the notice determines the nature of the dispute to be investigated it does not cabin the scope of the investigation once undertaken. When a furnisher has access to dispute-related information beyond the information provided by the CRA, it will often be reasonable for the furnisher to review that additional information and conduct its investigation accordingly.

[End of Excerpts from *Hinkle*.]

**Notice: NCLC Study On ACDV-Exchange Defects**

In 2009, the National Consumer Law Center ("NCLC") released the study, "Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking To Fix Errors in Their Credit Reports," which stated:

As if the automated and perfunctory nature of the e-OSCAR system were not bad enough, furnishers contribute to the problem by conducting inadequate

Exhibit 55 - 017

investigations. Often, furnishers will merely verify the existence of disputed information, instead of actually investigating the dispute. They will not actually research the underlying dispute, review documents, or speak to consumers about the dispute. Instead, these furnishers simply confirm that the information in the ACDV matches their computer records, and then verify the disputed information to the credit bureaus.

## NCS's Credit Reporting Harmed Plaintiff's Creditworthiness

NCS's inaccurate reporting damaged Plaintiff's creditworthiness and reputation in at least two ways.

First, by reporting a current "status" of "collection account," and with a past-due balance of $5,375, NCS, for all practical purposes, rendered Plaintiff ineligible for nearly all – if not all – forms of credit because creditors typically will not extend credit to consumers until they remove all past-due balances from their credit reports.

Second, the "status" of "collection account," and with a past-due balance of $5,375, constituted a major derogatory under the FICO scoring model, and consequently, lowered his FICO scores.

This would have had a major negative impact on his credit score because (1), the date of first delinquency was in July of 2019, and (2) Plaintiff had pristine credit, with no other derogatory tradelines or collections.

The significant negative impact of the NCS collection on Plaintiff's FICO score is demonstrated by the June 2020 response of a mortgage lender. The credit report it pulled showed Plaintiff with a 660 Equifax FICO score, a 682 Trans Union FICO score, and a 671 Experian FICO score.  In my opinion, without the inaccurate, fraudulent, NCS collection, Plaintiff's FICO scores would have been well above 700, possibly above 740.

## Areas of Testimony: Problems Known & Common To Victims of Chronic Credit Report Inaccuracy

In my opinion, Plaintiff became a victim of "chronic credit report inaccuracy" because of Defendant's actions.

It is important that the jury understands that victims of chronic credit report inaccuracy or identity theft often experience a series of several known and common types of negative impacts. The primary purpose of the following section is to provide the jury with a methodology and/or guidance for identifying and assessing the kinds of problems and/or damages Plaintiff experienced because of the inaccuracies wrongly inflicted upon him by NCS's failures.

I first published the categories and factors listed below in my Congressional testimony (Senate and House) in 2003, and in the First Edition of my book, "Credit Scores and Credit Reports," in 2004, as well as the Second and Third Editions (2007). In fact, my book is one of

Exhibit 55 - 018

the few books – it not the only book – with an entire chapter dedicated to examining the typical problems experienced by consumers who are victims of chronic credit report inaccuracy. (See Chapter 20, "Damage and Damages.")

These categories are based upon the specialized knowledge which I have accumulated since 1978, including, but not limited to, reading, listening to or otherwise becoming aware of consumers describing what it is like to become a victim of chronic credit report inaccuracy, which I define as being unable to correct inaccuracies in one's credit reports within a reasonable period of time.

I was able to read, listen to or otherwise become aware of consumers describing what it was like to become a victim of chronic inaccuracy through a myriad of channels, including research studies and surveys, Congressional and state legislative testimony, media reports, both print and electronic, conferences, attorneys, and through the hundreds of cases in which I have been retained as an expert in which consumers have described their experiences and damages. (See, for example, the attached CV.)

Despite some minor refinements in special cases, these categories and factors have withstood the test of time in understanding the nature of problems for consumers typically arising from chronic credit report inaccuracy. Importantly, they also demonstrate that such damages are foreseeable to companies involved in credit reporting that are responsible for causing a consumer to become a victim of chronic credit report inaccuracy.

To be clear, that apart on harm to Plaintiff's creditworthiness, on which I am qualified and expect to opine, I want to emphasize my understanding that most, if not all, of the testimony regarding Plaintiff's specific actual damages will come from fact witnesses.

However, the trier of fact still could be helped by expert testimony in this area in understanding the context and the foreseeability of Plaintiff's problems and experiences.

Importantly, as stated above, the analysis below helps the jury put Plaintiff problems and experiences in the proper context, and is relevant for several reasons, including the foreseeability of the types of problems that Defendants knew or should have known they would inflict on Plaintiff if, as happened in his case, it made him a victim of chronic credit report inaccuracy.

Moreover, if the trier of fact determines that Plaintiff was damaged, then the Factors listed below the Categories could help the jury evaluate the severity of Plaintiff's damages.

**Some Categories of Typical Negative Impacts of Chronic Inaccuracy**

It is important that the trier of fact understands that victims of chronic credit report inaccuracy often experience a series of several known and common types of problems or negative impacts.

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties

Exhibit 55 - 019

(2) Improperly denied credit or employment because of inaccurate data, or only able to obtain credit at less favorable rates, or only able maintain employment status upon facing unfavorable scrutiny.

(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity

(4) Wrongfully received debt collection calls

(5) Chilled from applying for credit

(6) Sleeplessness, physical symptoms

(7) Sense of helplessness, loss of control over personal data

(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

### Plaintiff's Problems Were Consistent with Other Victims of Credit Report Inaccuracy

In my opinion, the problems Plaintiff experienced were consistent with other victims of chronic credit report inaccuracy. His experiences touched on many of the eight categories cited above.

In addition to the categories above, it is important for the trier of fact to understand that victims of chronic inaccuracy state that it can be very distressful not knowing everyone who may have associated them with highly derogatory credit data. They also state it can be difficult to maintain constructive personal relationships under stress,[12] and it can be difficult to perform adequately at one's job.

### NCS Harmed Plaintiff's Privacy Interests

In addition to the problems described above, NCS harmed Plaintiff's privacy interests – both by making him a victim of chronic inaccuracy, and by forcing Plaintiff to repeatedly dispute the inaccurate information.

As the U.S. Supreme Court has recognized, "To begin with, both the common law and the literal understandings of privacy encompass the individual's control of information

---

[12] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifies its use of credit reports in setting insurance rates. (See comments of Allstate Insurance General Counsel Steven Sheffey, "Credit Scores and Credit Reports," *op cit.*)

Exhibit 55 - 020

concerning his or her person." (See *U.S. Dept. Of Justice v. Reporters Committee*, 489 U.S. 749 [1989].)

And, as the Supreme Court also has recognized, "… the concept of personal privacy … is not some limited or 'cramped notion' of that idea."  (See *Favish v. National Archives & Records Administration*, 541 *U.S.* 157 [2004].)

These are some of well-known, long-standing *privacy interests* of Plaintiff that NCS harmed:

- The Right To Be Let Alone – The Right To Protection of Private Life
- Reasonable Control Over Personal Information
- Intrusion upon seclusion or solitude, or into private affairs
- Public disclosure of embarrassing private facts
- Publicity which places a person in a false light in the public eye

Again, this section on harm to Plaintiff's privacy is not intended to express legal opinion or conclusions, but to identify, according to a consensus among privacy experts, the kinds of *privacy interests* that are relevant to Plaintiff's case.

### NCS Knew or Should Have Known Its Actions Would Have Negative Impact

The history of credit reporting cited above, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, made it abundantly clear to NCS that failing to prevent Plaintiff from becoming a victim of chronic inaccuracy would have a highly negative impact on him.

### Context – Inaccuracy & Furnishers

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from furnisher practices and policies, are long-standing and well-known problems.  An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[13]  Accordingly, I provide a brief history.  An important theme emerging from this history is that Defendant was consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies.  This history also put Defendant on notice of the potential

---

[13] Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury."  (January 18, 2005; Transcript available upon request.)

Exhibit 55 - 021

problems it would cause to a consumer like Plaintiff if it wrongly reported erroneous information into the CRA file of an innocent consumer, and also if it failed to correct it.

## History of Significant Inaccuracy Problems

To understand the extent and nature of NCS's failures in Plaintiff's it is necessary to put his case in the proper context.

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to the credit system as well.[14]

[14] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me? The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993,
Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" ConsumerReports.org, July 2000.

Consumer Federation of America and National Credit Reporting Association, Credit Score Accuracy and Implications for Consumers, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," Federal Reserve Bulletin, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

Turner, Michael A., Robin Varghese, and Patrick D. Walker, Policy and Research Council (PERC), "U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts." (2011).

Jill Riepenhoff & Mike Wagner, ""Credit Scars: Mixed and marred. When credit-reporting agencies blend your files with others', the financial damage can be devastating;" *Columbus Dispatch*, May 7, 2012. "… About six percent of nearly 21,500 consumers who complained to the FTC during a 30-month period beginning in 2009, and nearly

Exhibit 55 - 022

The steady rise in complaints and heightened public attention to credit report inaccuracy and mixed files resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding and preventing mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

In 1991, TRW, (Experian's predecessor) signed separate but similar "Consent Orders" with the Federal Trade Commission and a myriad of State AGs in which the first problem identified, and the one which TRW pledged to improve its performance in preventing, was mixed files. For example, the Consent Order stated:

> Continuing its current efforts to improve its information gathering, storing, and generating systems to reduce the occurrence of Mixed Files, though modification of its software system to enable such system to accommodate and use, or matching and identification purposes, a Consumer's Full Identifying Information …

In 1992, TU signed a Consent Order with 17 State AGs in which the first problem identified, and the one which TU pledged to improve its performance in preventing, was mixed files. Like the consent agreements signed by TRW and Equifax, TU pledged to use Full Identifying Information. "Full Identifying Information" was defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations. This resulted in the 1996 legislative amendments to the FCRA to improve protections for accuracy, fairness and privacy.

This history is covered in Chapter 10 of my book, "Credit Scores and Credit Reports."

---

8 percent of 1,842 who complained to state attorneys general in 2009 and 2010, said their credit reports had been mixed with another person's. Consumers' files had been merged with those of their mothers, fathers, brothers, sisters, in-laws and neighbors. They were mixed with strangers with the same name, a similar name, a similar Social Security number or no known similarities whatsoever." www.dispatch.com/content/stories/local/2012/05/07/mixed-and-marred.html

Federal Trade Commission, "Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003." (December 2012)

"40 Million Mistakes: Is your credit report accurate? : A government study indicates as many as 40 million consumers have a mistake on their credit report and Steve Kroft finds it's hard to get them fixed." (http://www.cbsnews.com/news/40-million-mistakes-is-your-credit-report-accurate-25-08-2013/) (August 25, 2013)

Exhibit 55 - 023

**History: Increased Attention on Role of Furnisher**

This history is relevant because it provided the foundation for the 1996 Amendments to the FCRA, which was the first major strengthening of the Act's consumer protections, and which was the first to impose duties on furnishers like NCS and to create a private right of action for consumers when furnishers violated the new investigation requirements.

As the April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary:

> Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. ***Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors.*** [Emphasis Added]

Thus, NCS has been expected since 1997 to comply with the FCRA provisions that are relevant in this case.

All of the above sections on "context" are relevant for several reasons, including foreseeability,[15] in my opinion.

---

[15] See *Eric R. Drew v. Equifax Information Services, LLC*: USDC-N.D. Calif. – No. C 07-00726 SI, "Order Denying Defendant's Renewed Motion For Judgment As A Matter Of Law And Alternative Motion For A New Trial," Judge Susan Illston, writing, "Plaintiff's expert witness, Evan Hendricks, testified not only as to the unreasonableness of defendant's reinvestigation procedures, but also as to the foreseeability of the problems that arose in this case. As part of his testimony, and over defendant's objection, Mr. Hendricks discussed a 1995 consent order between defendant and the Federal Trade Commission and a 1992 "Agreement of Assurances" between defendant and a number of states." …

"Defendant objects to the admissibility of the FTC and state Agreement of Assurances documents, and to Mr. Hendricks's testimony regarding them. Defendant argues that the documents are irrelevant, since they relate to mixed files and not identify theft, and because they predate any serious problems with identity theft. As discussed above, however, Mr. Hendricks's testimony explained why mixed files and identity theft present problems that are similarly difficult to resolve for a credit reporting agency. *See* TR 621:5–621:15. This shows that the documents are, in fact, relevant to the question of foreseeability and thus the question of willfulness." …

"Even if the agreements themselves (and Mr. Hendricks's testimony regarding them) were not admissible, the logic of Mr. Hendricks's conclusion would be supported by his expertise and the record.

A reasonable jury could determine that a credit reporting agency runs an unjustifiable risk of violating FCRA's reinvestigation requirement when it asks a bank to reconfirm the existence of a challenged account simply by asking the bank to reconfirm the account, without even indicating that the consumer has reported that his identity was

Exhibit 55 - 024

**Notice: 2003 FACT Act Amendments, Congressional Testimony**

In fact, Congress re-visited the FCRA, devoting all of 2003 to extensive hearings and concluding with sweeping amendments to bolster consumers' rights to accuracy and fairness.

Included in the amendments were new provisions that strengthened the duty on furnishers like NCS to ensure the accuracy of the information they furnish to CRAs. Below is the original standard from the 1996 Amendments, which is then followed by the 2003 strengthened, amended provision, which Congress felt was necessary because furnishers like NCS continued to be a consistent source of inaccuracy:

**§ 623. Responsibilities of furnishers of information to consumer reporting agencies**   [15 U.S.C. § 1681s-2]

(a) Duty of Furnishers of Information to Provide Accurate Information
(1) Prohibition
(A) *Reporting information with actual knowledge of errors.* A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate.

In the 2003 FCRA Amendments, known as the FACT Act, Congress tightened this standard by replacing the rather weak "knows or consciously avoids knowing" standard with the "knows or has reasonable cause to believe" standard.

During the 2003 House hearings on the FACT Act Amendments, several witnesses testified about some furnishers' consistent failure to live up to their accuracy duties, both in furnishing and in responding to consumer disputes.

Also in the 2003 FACT Act Amendments, the following new provision was added to promote accuracy:

(8) Ability of Consumer to Dispute Information Directly with Furnisher

(A) *In general.* The Federal banking agencies, the National Credit Union Administration, and the Commission shall jointly prescribe regulations that shall identify the circumstances under

stolen. Such a conclusion would be particularly reasonable in this case, where fraud alerts were placed on the account and other credit cards had been deleted." …

"Defendant is not entitled to JMOL on the question of willfulness."

In a footnote, Judge Illston added, "Defendant argues that it is being punished for earlier, dissimilar acts that were the subject of the FTC order and the Agreement of Assurances about which Mr. Hendricks testified. Any danger that defendant was punished for the actions that were subject to the FTC order and the Agreement of Assurances is outweighed by the relevance of the documents and Mr. Hendricks's testimony to the question of foreseeability and thus willfulness, which are properly considered by a jury when calculating punitive damages."

Exhibit 55 - 025

which a furnisher shall be required to reinvestigate a dispute concerning the accuracy of information contained in a consumer report on the consumer, based on a direct request of a consumer.

The federal agencies named in the paragraph above issued regulations further notifying furnishers like NCS of the importance of conducting reinvestigations when a consumer directly disputes the accuracy of information furnished to CRAs.

Leonard Bennett, a consumer attorney specializing in FCRA cases who previously had sued other furnishers over inadequate investigations, was sharply critical of their "investigations" procedures in his 2003 House testimony, stating that these furnishers "confessed to a policy of automated investigations in which the consumer has almost no hope of obtaining relief. The furnishers merely proofread the form from the CRA and match it to the data within their computer's account screen." (Testimony Leonard Bennett before the Subcommittee on Financial Institutions And Consumer Credit of the Committee on Financial Services, Regarding, "Fair Credit Reporting Act: How it Functions for Consumers and the Economy;" June 4, 2003. http://financialservices.house.gov/media/pdf/060403lb.pdf)

### Identity Theft

**Opinions: It is essential that the trier of fact understand that another problem that poses a direct threat to the accuracy and integrity of personal data furnished by creditors and held by CRAs is identity theft. Identity theft occurs when an imposter steals a consumer's identity, usually through the use of the consumer's Social Security number, to exploit the innocent consumer's credit-worthiness. Identity theft is a sub-category of the more general category of Mixed Files, as the imposter-generated fraudulent activity is mixed into the consumer report of the innocent victim.**

**Identity theft is a well-known, long-standing and prevalent problem in the United States. Authoritative surveys have consistently found there are some nine million victims per year.**

**Plaintiff's experiences indicate that NCS too readily dismisses identity theft disputes, rather than adequately investigating them, thereby perpetuating credit report inaccuracy rather than facilitating correction of inaccuracies.**

**Bases for Opinions:**

Trans Union statistics found that consumer inquiries about identity theft grew from 35,235 in 1992 to 522,922 in 1997. Subsequent GAO reports confirmed that identity theft continues to escalate in the United States. In 1999, Congress passed the Identity Theft Deterrence Act, specifically making it a federal crime to steal someone's identity.

By 2004, it was well known by CRAs, furnishers and the public that identity theft was a significant and growing problem that threatened the accuracy and integrity of credit report data. In addition to Congress devoting the entire year of 2003 amending the FCRA to strengthen

Exhibit 55 - 026

consumer protections against identity theft, there was also a multitude of media coverage of the issue and even often-run television commercials highlighting it.  Moreover, even previous to that the cover page to Equifax's credit reports began featuring a box stating:

**The FBI Has Named Identity Theft
As The Fastest Growing Crime In America**

Protect yourself with  Equifax Credit Watch$^{TM}$, a service that monitors your credit file every business day and notifies you within 24 hours of any activity.  To order, go to: www.creditwatch.equifax.com

A 2003 FTC survey confirmed that identity theft was indeed a serious national problem, estimating in that year there were 9.9 million victims of identity theft, up from an estimated 6.9 million victims in 2002 and 3.4 million victims in 2001.   Identity theft victims reported a wide range of problems, including wrongful bank and credit card charges, harassment by collectors, loan or insurance rejection, cut off of utilities, civil lawsuits, and criminal investigations.

Subsequent FTC surveys, and similar surveys conducted by Javelin Research, found that in the past 15 years, the estimated annual number of identity theft victims remained around 9 million.[16]

The Identity Theft Resource Center (ITRC) published a survey of identity theft victims in 2003.  The study concluded that the most severe damages might be the emotional distress that victims endure.  Paul Colins, a credit industry analyst and consultant who worked with the ITRC, commented, "The range of emotions is wide and rather painful to read.  Three-fourths of victims were left with a feeling of financial insecurity, 88% experienced anger, and 75% expressed a feeling of helplessness. While these feelings do appear to subside a little over time, the survey clearly shows for many victims the feelings linger on. While most surveys have focused on the financial costs to victims, these psychological impacts are generally unreported. They may, however, have far worse consequences for victims."

Dr. Charles Nelson, a licensed psychologist, and director of both the Crime and Trauma Recovery Program at the Family Treatment Institute, also reviewed the study:

"Identity theft has been classified in many realms as a victimless crime," Nelson wrote. "This survey was designed to test the emotional impact of identity theft and to discover if sufferers of this crime exhibit similar responses as those of more commonly recognized victims including rape, repeated abuse, and violent assault victims. Many of the listed symptoms are classic examples of Post-Traumatic Stress Disorder and secondary PTSD (from secondary wounding)."

On March 7, 2000, Jodie Bernstein, then head of the FTC's Bureau of Consumer Protection, testified before Senate Judiciary Subcommittee on Technology, Terrorism and Government.  She gave similar testimony before Congress on July 12, 2000, emphasizing the difficulty that consumers had correcting records:

---

[16] https://www.javelinstrategy.com/coverage-area/2020-identity-fraud-study-genesis-identity-fraud-crisis

Exhibit 55 - 027

The leading complaints by identity theft victims against the consumer reporting agencies are that they provide inadequate assistance over the phone, or that they will not reinvestigate or correct an inaccurate entry in the consumer's credit report. In one fairly typical case, a consumer reported that two years after initially notifying the consumer reporting agencies of the identity theft, following up with them numerous times by phone, and sending several copies of documents that they requested, the suspect's address and other inaccurate information continues to appear on her credit report. In another case, although the consumer has sent documents requested by the consumer reporting agency three separate times, the consumer reporting agency involved still claims that it has not received the information.

While credit report inaccuracy was the leading cause of complaints to the FTC in the early 1990s, for five years in a row (2001-2005), identity theft has been the leading cause of complaints to the FTC, far outpacing other categories.  For instance, here was the FTC's Top 10 Consumer Fraud Complaints list on January 23, 2002:

1)    *Identity Theft* (42%);
2)    Internet Auctions (10%)
3)    Internet Services and Computer Complaints (7%)
4)    Shop-at-Home and Catalog Offers (6%)
5)    Advance Fee Loans and Credit Protection (5%)
6)    Prizes/Sweepstakes/Gifts (4%)
7)    Business Opps. and Work at Home Plans (4%)
8)    Foreign Money Offers (4%)
9)    Magazines and Buyers Clubs (3%)
10)    Telephone Pay-Per-Call/Info Services (2%)

The percentage of FTC complaints over identity theft have remained consistent to this day. Similarly, the number of estimated identity theft victims also has remained consistent. For example, on its Web page for identity theft, US Bank states, "The identities of roughly nine million Americans are stolen each year."[17]

Improving consumers' ability to ensure the accuracy of their credit reports was a top priority of Congress in 2003, when it devoted the entire year to reviewing and strengthening the FCRA with enactment of the FACT Act (Fair And Accurate Credit Transactions Act).  Relevant to this case was the clear message from virtually all parties that identity theft posed a direct threat to the accuracy and integrity of data in credit reports, and that the inaccuracies to credit reports caused by identity theft were highly damaging to innocent victims.

Here's what Sen. Richard Shelby (R-AL), Chairman of the Senate Banking Committee, and principal sponsor of the FACT Act, said during his committee's hearing on identity theft:

---

[17] https://www.usbank.com/about-us-bank/online-security/first-aid-for-identity-theft.html; visited June 2, 2019.

Exhibit 55 - 028

Soon thereafter, when the criminals' handiwork shows up on their credit reports, they face the considerable task of restoring their good name and credit. Plainly, this crime has many victims. Firms lose profits. ***Individuals lose time, money, and peace of mind when their good name and reputation are tarnished***. [Emphasis added]

In light of the serious nature of the consequences of identity theft, this issue would merit attention even if there were only a limited number of victims. Unfortunately, there are thousands of victims whose numbers are growing at an increasingly faster pace. Indeed, it has been asserted that identity theft is the fastest growing crime in America.

This issue tracks across credit reporting in so many ways that it is essential that we consider it in the context of the reauthorization of the preemption provisions of the Fair Credit Reporting Act."[18]

Sen. Paul Sarbanes (D-MD), the Committee's ranking member, stated:

Americans have strong concerns about protecting their confidential information. Honest citizens who are victims of identity theft incur a high cost in money, time, anxiety and effort to correct and restore their spoiled credit histories and good names."[19]

All of the above sections on "context" are relevant for several reasons, including foreseeability, in my opinion.

### Areas of Testimony: General Issues, Context

**A.**  Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems.  If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time.  The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others.  The scoring range for the FICO "classic" model is 300-850.  The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union, are based upon the FICO model. The higher the credit score, the

---

[18] "The Growing Problem of Identity Theft and Its Relationship to the Fair Credit Reporting Act" June, 19 2003
http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Testimony&TestimonyID=108&HearingID=43
[19] Id.

Exhibit 55 - 029

less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[20] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $500,000 30-year, fixed-rate mortgage:

| FICO® Score | Interest Rate | Monthly Payment | Total Interest Paid |
|---|---|---|---|
| 760 – 850 | 3.202 % | $2,163 | $278,637 |
| 700 – 759 | 3.424 % | $2,224 | $300,664 |
| 680 – 699 | 3.601 % | $2,274 | $318,463 |
| 660 – 679 | 3.815 % | $2,334 | $340,261 |
| 640 – 659 | 4.245 % | $2,458 | $384,965 |
| 620 – 639 | 4.791 % | $2,621 | $443,419 |

A similar chart exists for auto loans. Moreover, major credit card companies will reduce their cardholders' credit limits if those cardholders' credit scores drop below certain levels – even if the cardholder never had a late payment with the company.

1.    The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:[21]

**35% -- Payment history.** Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

**15% -- Length of Credit History.** The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?** This relates to "inquiries" that creditors make when you apply for credit.

---

[20] Visited September 6, 2019; https://www.myfico.com/credit-education/calculators/loan-savings-calculator/
[21]  These parameters are published in Chapter 1 of both Editions of "Credit Scores and Credit Reports," op. cit. They are available at www.myfico.com.

Exhibit 55 - 030

**10% -- Healthy Mix of Credit?**  The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2.      It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months.  The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has the greatest negative impact, while a major delinquency between 1-2 years-old is still substantial. A major delinquency between 2-3 years-old is still substantial, but the negative impact lessens as the years pass.

**Previous credit performance**



Copyright © 2003 Fair Isaac Corporation. All rights reserved.                                    1

### B.  Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports.  Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN).  There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian.  The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others.  The consumer report typically contains highly sensitive details about a consumer's

Exhibit 55 - 031

finances, including account numbers, loan amounts, credit limits and payment history.  It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)    A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

(2)    A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

(3)    If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.

(4)    A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format.  A fundamental purpose of the credit report is to describe a consumer's creditworthiness.  For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time.  Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan).  The code for someone who always paid his credit card on time would be "R1."  Here are the numeric codes:

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 :  On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries.  It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Exhibit 55 - 032

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

## Methodology

As a specialized knowledge expert, a fundamental methodology that I employ and follow is to apply my experience with, and specialized knowledge of, such relevant matters as (1) the credit reporting and credit scoring systems and industries and standards associated with them, and privacy, to the facts at hand.

The application of my experience- and specialized knowledge-based methodology has several important purposes. One purpose is to put the case in its proper context, particularly regarding well-known, decades-old standards of credit reporting accuracy, and the problem of systemic inaccuracy which spurred their creation and evolution. Providing this context is intended to help the trier of fact evaluate whether Defendant failed to adhere to these standards – or even disregarded them – and my opinions related to such. Additional opinions and analysis is intended to help the trier of fact understand the logistics of inaccuracy in Plaintiff's case.

Another purpose is to help the trier of fact evaluate how Defendant's actions damaged Plaintiff's creditworthiness under long-standing, well-known industry standards. Still another important purpose in providing the proper context is to help the trier of fact evaluate if the damages which Defendant inflicted on Plaintiff were foreseeable (provided that the trier of fact determines Plaintiff was damaged).

Exhibit 55 - 033

**Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that for 33 years covered credit reporting, Fair Information practices and related matters;

(2) Author of the book Credit Scores and Credit Reports: How The System Really Works, What You Can Do, 3rd Edition, (Privacy Times 2007), and co-author of a book with a chapter on credit reporting.

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation.

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and who has appeared on or been quoted by major news media.

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Beginning in 1981, I served as Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, Credit Scores and Credit Reports: How The System Really Works, What You Can Do (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be

Exhibit 55 - 034

proprietary and/or trade secrets.  To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.  Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information.  (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee.  Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices."  First developed in the United States in the late 1960s,

Exhibit 55 - 035

Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services.  Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

Exhibit 55 - 036

## *Evan D. Hendricks*
### *CURRICULUM VITAE*

**Professional Activities**

**1981- December 2013**          **Editor/Publisher** of *Privacy Times*

From 1981 to December 2013, I was Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA).  The newsletter ranges from 8-12 pages, 23 issues per year.  Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present**        **Expert Witness**

Qualified by the federal courts in FCRA cases and cases involving credit reporting, credit scoring, privacy, and identity theft. (Complete list attached). I have  read extensive deposition testimony by credit bureau and credit grantor personnel. This is  significant because CRAs and credit grantors do not openly discuss or publish information on  their procedures and practices for handling personal data, and the best (and possibly only)  sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in  relation to credit reporting data are the depositions of CRA and credit grantor employees in  FCRA litigation.

**May 2014 – Present      Member, Board of Directors, Privacy Rights Clearinghouse**

**2005 – 2009        Consultant, ID Watchdog**

**1998 – 2006          Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004      Member, Experian Consumer Advisory Council**
Along with other Council members, I provide an outsider's view on credit reporting,  marketing and other privacy issues.

**July – October 2002        Consultant to U.S. Postal Service**
Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks          P.O. Box 302          Cabin John, MD 20818**
**(301) 229 7002  (301) 229 8011 [fax]  evan@privacytimes.com**

---

Exhibit 55 - 037

**Testimony Before Congress & The FTC**

"Keeping Score on Credit Scores: An Overview of Credit Scores, Credit Reports and their Impact on  Consumers," House Financial Services Committee, Subcommittee on Financial Institutions and   Consumer Credit Hearing, March 24, 2010.

"What Borrowers Need to Know About Credit Scoring Models and Credit Scores," House Financial Services Subcommittee on Oversight, July 29, 2008.

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006.

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005.

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005.

**"**Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[24] Senate Banking Committee, March 15, 2005.

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003.

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003.

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003.

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003.

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do  [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Exhibit 55 - 038

<u>Former Secrets: Government Records Made Public Through The Freedom of Information Act</u>
(Campaign For Political Rights, 1982)

**International Lectures**
24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales –
Presentation published in conference proceedings, 2002)

The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne –
Presentation published in conference proceedings, 2001)

The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)

The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).

In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and
Privacy Commissioner of Australia.

**Presentations/Instruction At CLE & Professional Seminars**

"Key Privacy Statutes - FCRA and Background Check Problems," Conference on Effective
Consumer Privacy Enforcement, Univ. of California-Berkeley Samuelson Law, Technology &
Public Policy Clinic. Oct. 13-14, 2011. Berkeley, Calif.

"Annual FCRA Conference," National Association of Consumer Advocates. May 20-21, 2011.
Memphis, Tenn.

"91st Annual New York Meeting," Commercial Law League of America (CLLA)
November 12, 2010

"2010 NCLC Consumer Rights Litigation Conference," National Consumer Law Center.
November 13, 2010.  Boston, Mass.
"26th Annual Consumer Bankruptcy Course," State Bar of Texas. June 3, 2010. Dallas.

"Consumer Protection Law Comm. Representing Main Street: A Consumer Law Primer"  Florida
Bar Association; June 26, 2009.  Orlando.

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in
the Information Society," Presenter, "Credit Report Cases – Effective Remedies?"  Center on
Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)

"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How
can victims of privacy violations prove that they have been harmed?  The George Washington
University Law School, Washington, DC, June 12-13, 2008.

Exhibit 55 - 039

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)

"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005

"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute,  February 28-March 1, 2005 (New York City)

"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004

"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004

"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President & Board Member, American Society of Access Professionals www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

Exhibit 55 - 040

**Testimony & Expert Reports**

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird presiding. The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (See 225 F.3d 1063 (2000)).

Julie Miller v. Equifax Credit Information Services, LLC: U.S. District Court for the District of Oregon. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge Anna J. Brown rejected Equifax's Daubert motion to exclude me from testifying.

Shuthima Pongsai v. American Express Company, et al.: U.S. District Court for the Central District of California.] (Case No. CV19-1628 DOC (JDEx).) Deposition. Trial Testimony. (2021)

Matthew Sponer v. Equifax Information Services, LLC, Wells Fargo Bank N.A.: U.S. District Court for the District of Oregon. [Portland Div.] (No. 3:17-cv-2035-HZ). Expert Report. Deposition. Trial Testimony. (2019)

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588. Credit reporting and credit scoring. Deposition. Trial Testimony. Judge Daniel Gaul rejected Ford Motor Credit's motion to exclude me from testifying. (2019)

Richard Alexander Williams v. First Advantage LNS Screening Solutions, et al.: U.S. District Court Northern District of Florida [Gainesville Div.]. (Case No. 1:13-cv-00222-MW-GRJ). Judge Mark E. Walker rejected Equifax's Daubert motion to exclude me from testifying.

Rachael Macik v. JP Morgan Chase, N.A., et al.: U.S. District Court for the Southern District of Texas (Case 3:14-cv-44). Expert report and affidavit. Trial Testimony. Judge George C. Hanks, Jr. presiding.

David M. Daugherty v. Equifax Information Services, Ocwen Loan Servicing, et al.: U.S. District Court for the Southern District of West Virginia (Beckley Div.); No.: 5:14-cv-24506. Deposition. Trial Testimony. In rejecting Ocwen's Daubert motion to exclude me from testifying, Judge Irene C. Berger ruled:

> I find that he has experience, related experience, counsel, and that he should be allowed to give expert testimony … I find that that testimony could be helpful to the jury …

Exhibit 55 - 041

I specifically find that in order for him to have specialized knowledge that's useful to the jury, it is not necessary that he have first-hand experience with working with one of the credit reporting agencies.

In rejecting Ocwen's motion to overturn the jury's $2.5 million punitive damages verdict against Ocwen, the U.S. Court of Appeals for the Fourth Circuit wrote:

Ocwen next argues that the district court should have excluded the testimony of Daugherty's expert witness, Evan Hendricks, on two bases. Ocwen contends that Hendricks' expert witness report was too vague to provide the basis for, or the substance of, his expert opinion. Additionally, Ocwen argues that the district court improperly permitted Hendricks to testify about the legal standard to which furnishers of credit information are held under the FCRA. We disagree with Ocwen's arguments.

First, we conclude that Hendricks' expert witness report provided adequate notice to Ocwen concerning the substance of his anticipated testimony. His report disclosed that he relied on "Bates-Stamped documents produced by Defendant Equifax" in forming his expert opinion. His examination of these documents led him to conclude in his report that "Ocwen did nothing more than engage in the superficial [exchange of dispute verification requests], reflecting its disregard of the history and context that clearly put it on notice" that its investigation was not reasonable for a dispute of this nature. Thus, Hendricks' expert report provided sufficient notice that he was prepared to testify about Ocwen's inadequate responses to particular dispute verification requests. Additionally, Hendricks' report placed Ocwen on notice that the content of the dispute verification requests would be central to Hendricks' opinion that comprehensive investigation procedures were required under the circumstances but were not undertaken by Ocwen.

We also are not persuaded by Ocwen's argument that Hendricks improperly provided legal conclusions during his testimony. We recognize the general rule that expert witnesses are not permitted to "state[ ] a legal standard or draw [ ] a legal conclusion." United States v. Offill, 666 F.3d 168, 175 (4th Cir. 2011) (quoting United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006)). However, Hendricks' testimony did not violate this general rule. Reasonableness is a subject on which experts routinely testify. See United States v. Barile, 286 F.3d 749, 761 (4th Cir. 2002) (holding that an expert could properly give his opinion whether certain actions by the defendant were "reasonable" in light of the defendant's legal obligations under section 510(k) of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360(k)). Here, Hendricks' testimony addressed the reasonableness of Ocwen's conduct in light of the regulatory framework of the FCRA. This testimony did not draw legal conclusions but was offered as an explanation why Ocwen's cursory investigation in response to the dispute verification requests was deficient. Therefore, we conclude that the district court did not abuse its discretion in permitting Hendricks to testify regarding the reasonableness of Ocwen's investigations.

Exhibit 55 - 042

Richard and Kristin Zabriskie v. Federal National Mortgage Association, et al: U.S. District Court for the District of Arizona – (No. 2:13-cv-02260-DKD). Expert Report. Trial Testimony (2016). Deposition. (2015). Judge Susan Bolton rejected Defendant "Fannie Mae's" Daubert motion to exclude me from testifying.

April K. Barnett v. Chase Bank (USA) N.A. et al.: U.S. District Court for the Northern District of Alabama [Eastern Div.] (1:12-CV-1745-VEH). Expert disclosure and report. Deposition. Judge Virginia Emerson Hopkins rejected Chase's Daubert motion to exclude my testimony.

Eric Robert Drew vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No. CV 07-00726-SI. Trial testimony. Expert report, deposition. Judge Susan Illston presiding.

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Laura Jones v. Capital One: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case 09-14499-BFK, Chapter 7. Post-bankruptcy credit reporting. Expert report. Trial Testimony. Judge Brian F. Kenney presiding, said from the bench:

"Before we begin with Mr. Hendricks, a brief disclosure. I had a case a few years ago. Mr. Hendricks may recall that I was representing a creditor in which Mr. Hendricks was identified as an expert witness in the Eastern District of Virginia. I believe it was the Sloane case, Mr. Hendricks. I took Mr. Hendricks' deposition and I subsequently moved to exclude him as an expert in the case on a Daubert challenge. I lost the Daubert challenge. The court allowed him to testify as an expert witness; and I will say, during the course of his deposition and the Daubert challenge, I learned quite a bit about credit reporting. Just in the interest of full disclosure, I'll disclose that to the parties."

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.: 07-9322 CA 09. Trial Testimony. Judge Jerald Bagley presiding.

In Re: MicroBilt Corp. et al., U.S. Bankruptcy Court for the District of New Jersey (Trenton Div.); Case No. 11-18143 (MBK). Deposition, Trial Testimony. (I was retained by MicroBilt counsel Bruce Luckman, who in previous years as counsel for TransUnion, unsuccessfully opposed me with a Daubert challenge in the Sandra Cortez case (see below).

Vernon Singleton v. Universal Credit Services, et al.: U.S. District Court for the Eastern District of Pennsylvania; 2:14-cv-06380. Expert report, Trial Testimony.

Rowan DeSantis v Willard Merkel: Multnomah County Circuit Court. Trial Testimony.

Exhibit 55 - 043

In Re: Residential Capital, LLC, et al.: U.S. Bankruptcy Court for the Southern District of New York; Case No. 12-12020 (MG). Expert report, Trial Testimony. Judge Martin Glenn presiding.

Alison Bastek v. Comenity Bank, et al: Superior Court for the State of California, County of San Diego; No. 37-2016-17012-CU-BC-CTL. California Credit Reporting Act. Deposition. Trial Testimony. Judge Richard E.L Strauss presiding.

Roger Chang, Thomas Wong v. Hamni Bank: Superior Court of the State of California, County of Santa Clara. (110CV181546) Expert report, deposition. Trial Testimony. Judge Joseph Huber presiding.

Steven W. Haberman v. PNC Mortgage Company, et al.: U.S. District Court for the Eastern District of Texas [Sherman Div]. Case No. 4:11cv126. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Magistrate Judge Amos L. Mazzant presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514). FCRA. Expert report, deposition. Trial Testimony. Judge Nanette K. Laughrey presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO). FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.: U.S. District Court for the District of Connecticut. 3:07-cv-01035-JCH. FCRA. Expert report, deposition. Trial Testimony. Judge Warren W. Eginton presiding.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.). FCRA. Expert report. Deposition. Trial Testimony. Chief District Judge Todd J. Campbell presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony Judge Leonie M. Brinkema presiding.

Exhibit 55 - 044

Matthew Kirkpatrick v. Equifax, LLC, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO.  FCRA Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05–cv-05684-JF.  FCRA.  Expert Report. Daubert Hearing. Trial Testimony. Senior Judge John P. Fullam qualified me to testify at trial, and rejected the Trans Union motion to exclude me filed by attorney Bruce Luckman.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5.  Expert Report.  U.S. Magistrate Judge William C. Beaman rejected Defendants' motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia:  No. 4:04CV82. FCRA.  Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD.  FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report.  Fairness hearing testimony.  Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Exhibit 55 - 045

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE.  FCRA. Expert report, deposition, trial testimony.  Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition.  Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr. v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition.  On the eve of trial, Judge Richard Williams rejected Defendants' motion to disqualify me.  The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony.  Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22.  Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

William Munson, and Sharon Munson, Claimants, v. San Diego County Credit Union, Respondent, American Arbitration Association, Case No.:  01-19-0001-2485. Testimony (2020)

In Re Arbitration – James Ellis Neal, Claimant, v. Navient Services, LLC, Respondent, JAMS, JAMS Ref. No. 1110019867. Testimony (2018)

Lisa Lombardo v. Equifax Information Services LLC, JP Morgan Chase Bank, N.A., et al.; Case No. 7:20-cv-06813. (U.S. District Court the Southern District of New York.) Expert Report. Deposition. (2022).

Duane E. Norman, on behalf of himself and all others similarly situated, v. Trans Union: U.S. District Court for the Eastern District of Pennsylvania (Case No.: 18-cv-05225-GAM). Expert Report. Depositions. (2022 & 2019)

Edward Coleman v. Experian Information Solutions, Inc. et al., pending in the United States District Court for the Northern District of Georgia, Civil Action No. 1:21-cv-01095-CAP-CMS. Expert Rebuttal Report. Deposition. (2022).

Reylene Sanchez v. JP Morgan Chase Bank, N.A..: U.S. District Court for the District of Arizona [Phoenix Div.] (Case No.  2:21-cv-00896-JAT.) Expert Report. Deposition. (2022).

Marcus Anthony Forslund and Melissa Carrigan Forslund v. Experian Information Solutions, Inc. et al., United States District Court for District of Minnesota, Civil Action No. 0:21-cv-00731. Expert Rebuttal Report. Deposition. (2022).

Exhibit 55 - 046

Virgil Campbell v. Experian Information Solutions, Inc. et al.: United States District Court for District of Minnesota, Civil Action No. 0:21-cv-00731. Expert Rebuttal Report. Deposition. (2022).

Maurice Konig, v. Trans Union, LLC, Equifax Information Services, LLC, and Bank of America, N.A.: U.S. District Court for the Southern District of New York. (No. 6:18-cv-1599-Orl-41LRH) Expert Report. Deposition. (2021).

Cynthia Soler v. Nelnet Inc., et al.: U.S. District Court for the Central District of California. (Case No. 2:20-cv-08459). Expert Report. Deposition. (2021).

Fred Ponder v. Ocwen Loan Servicing, LLC: Case No. 1:16-cv-04125-ODE-LTW (U.S. District Court the Northern District of Georgia.) Expert Report. Deposition. (2021).

Michael Sosa v. Greater Alliance Federal Credit Union; Trans Union LLC: U.S. District Court for the District of New Jersey. (Case No. 2:20-cv-00818-CCC-ESK.)

Helen Swan, et al v. Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, and United Consumer Financial Services Company,: U.S. District Court for the Middle District of Florida [Tampa Div.] Nos. 20-cv-01540.) Expert Report. Deposition. (2021).

Duane A. Hines v. Equifax Information Services LLC, Case No. 1:19-cv-06701-RPK-RER (E.D.N.Y.). Expert Report. Deposition. (2021).

Mike Brinkman v. Account Revolution Services, LLC: U.S. District Court for the Middle District of Florida. [Tampa Div.] (Case No. 8:20-cv-02453-VMC-AAS.) Expert Report. Deposition. (2021).

Steele Bray v. Santander Bank, N.A., Experian Information Solutions, Inc.: U.S. District Court for the District of Connecticut. (Case No. 3:19-CV-01759)  Expert Report. Deposition. (2021).

Blake Ferrin v. Experian Information Solutions, Inc.: U.S. District Court for the District of Minnesota. No. 0:20-cv-00841-NEB-TNL. Expert Report. Deposition. (2021)

David Gross v. Chase Bank USA, N.A..: U.S. District Court for the District of New Jersey. (Case No. 3:19-cv-19125.) Expert Report. Deposition. (2021)

Christopher Petras v. NFCU, Chase Bank USA, N.A., Experian Information Solutions, Inc., et al.:  U.S. District Court for the District of Nevada. (No. 20-cv-00874) Expert Report. Deposition. (2021)

Rateb M. Abu-Eid v. Discover Products, Inc.:  U.S. District Court for the Eastern District of Virginia. (No. 1:20-cv-01450-TSE-IDD) Expert Report. Deposition. (2021)

Exhibit 55 - 047

David Harris v. Nelnet Inc., et al.: U.S. District Court for the District of New Jersey. (Case No. 2:20-cv-788.) Expert Report. Deposition. (2021)

Elizabeth and Jonathan Perez v. El Paso Area Teachers Federal Credit Union; Equifax Information Services LLC, et al.: U.S. District Court for the Western District of Texas [. (No. 3:19-cv-00218.) Expert Report. Deposition. (2021)

Omar Santos and Amanda Clements on behalf of themselves and all others similarly situated v. Healthcare Revenue Recovery Group, LLC d/b/a ARS Account Resolution Services and Experian Information Solutions, Inc.: U.S. District Court for the Southern District of Florida, Miami Division, (Civil Action No. 1:19-cv-23084-KMW) Expert Report. Deposition. (2021)

Christa L. Peterson v. Experian Information Solutions, Inc.: U.S. District Court for the District of Minnesota. No. 0:20-cv-00606. Expert Report. Deposition. (2021)

Gia Sessa v. Linear Motors, LLC d/b/a Curry Hyundai Subaru, Hudson Valley Federal Credit Union, Trans Union, LLC, et al.: U.S. District Court for the Southern District of New York, Case No.: 19-cv-9914(KMK) Expert Report. Deposition. (2021)

Lisa Bettcher, et al v. Experian Information Solutions, Inc.: U.S. District Court for the District of Minnesota. Nos. 20-cv-00319-WMW-HB.) Expert Report. Deposition. (2021)

Georgina C. Sandoval and Todd M. North, et al. v. Midland Funding, LLC and Midland Credit Management, Inc.: U.S. District Court for the District of New Jersey. No.: 2:18-cv-09396-SDW-LDW. Expert Report. Deposition. (2021)

Kevin Joseph Kelly and Karriem Bey v RealPage, Inc., d/b/a On-Site and RP On-Site, LLC: U.S. District Court Eastern District of Pennsylvania; No. 2:19-cv-01706-RK. Expert Report. Deposition. (2021)

Angel Fernandez v. Trans Union, Great Lakes Educational Loan Services, Inc.: U.S. District Court for the Eastern District of Pennsylvania. (Case No. 5:18-cv-144.) Expert Report. Deposition. (2020)

Mark Sofia v. Trans Union, LLC, JPMorgan Chase Bank, N.A.: U.S. District Court for the Southern District of California Chase (No.  1:20-cv-00697-GHW). Expert Report. Deposition. (2020)

Stevan L. Denenberg v. Citibank, N.A.: U.S. District Court for the Southern District of California. Civil Action No. 3:19-cv-02063-MMA-NLS. Expert Report. Deposition. (2020)

Vasudev Pulipati vs. Vivint Solar: Superior Court for the State of California, For the County of Alameda – Northern Division. Case No. RG18891702. Expert Report. Deposition. (2020)

Exhibit 55 - 048

Andres Romero v. Monterey Financial Services, LLC; Equifax Information Services, LLC, et al.: U.S. District Court for the Southern District of California. (No. 3:19-cv-01781-JM-KSC) Expert Report. Deposition. (2020)

Francisco Joel Rivera, on behalf of himself and all others similarly situated: U.S. District Court for the Northern District of Georgia (Case No.: 1:18-cv-04639-AT-CCB). Expert Report. Deposition. (2020)

Shuthima Pongsai v. American Express Company, et al.: U.S. District Court for the Central District of California.] (Case No. CV19-1628 DOC (JDEx).) Expert Report. Deposition. (2020)

Velma Melton v. Select Portfolio Servicing, et al.: District of Maryland [Greenbelt Div.] (Case No.  8:19-cv-209.) Expert Report. Deposition. (2020)

Scott J. Huffman, v. JP MorganChase Bank, N.A., and Experian Information Solutions, Inc.: U.S. District Court for the Northern District of California. Civil Action No.: 3:19-cv-07408-JSW. Expert Rebuttal Report. Deposition. (2020)

Jacob Fowles v. Equifax Information Services, LLC: U.S. District Court for District of Oregon. [Portland Div.] (Case No. 3:18-CV-00164-HZ) Expert Report. Deposition. (2020)

The Estate Of James C. Rennick, Sr. vs. Universal Credit Services, LLC: U.S. District Court for the Eastern District of Pennsylvania. (No. 3:18-CV-00819-MPS.)  Expert Report. Deposition. (2020)

Jose R. Perez v. General Information Services, Inc., et al.: U.S. District Court Central District of California. (Case No. 2:19-cv-05184)  Expert Report. Deposition. (2020)

Thomas Hayworth v. 1st Financial Bank USA, Equifax Information Services, LLC: U.S. District Court for the District of Colorado. (No. 1:18-cv-03106-RM-KLM.) Expert Report. Deposition. (2019)

Marshall Gross v. CitiMortgage Incorporated: U.S. District Court for the District of Arizona. (CV-18-02103-PHX-ROS). Expert Report. Deposition. (2019)

Toland v. Nationstar Mortgage LLC, et al.: U.S. District Court for the Northern District of California. (Case 17-cv-02575-JD). Expert and Rebuttal Report. Deposition. (2019)

Christine Droney and Timothy Droney v. vs. Vivint Solar: U.S. District Court for the District of New Jersey (Case 1:18-cv-00849-RBK-KMW). James Reilly v. vs. Vivint Solar: U.S. District Court for the District of New Jersey. (Case 1:16-cv-09446-NLH-JS).  Expert Reports. Deposition. (2019)

Exhibit 55 - 049

Richard M. Salazar vs. ABC Automotive Investments, LLC, d/b/a Las Vegas Mitsubishi:
U.S. District Court for the District of Nevada. (Case 2:19-cv-00039). Expert Report. Deposition.
(2019)

Al Savage v. Chase Bank (USA) N.A. et al: U.S. District Court for the Northern District
of Georgia. [Atlanta Div.] (Case No. 17-cv-02901-MLB-RGV). Expert Report. Deposition.
(2019)

William Franklin Jennings Crouch v. Equifax Information Services, LLC: U.S. District
Court for the Eastern District of Kentucky. [Central Div. – Lexington] (Case No. 5:18-cv-00643-
JMH-EBA) Expert Report. Deposition. (2019)

Catherine Nichols v. Credit Union 1, Experian Information Solutions, Inc.: U.S. District
Court for the District of Nevada. Civil Action No.:  2:17-cv-02337-APG-GWF. Expert Report.
Deposition. (2019)

William Franklin Jennings Crouch v. Equifax Information Services, LLC: U.S. District
Court for the Eastern District of Kentucky. [Central Div. – Lexington] (Case No. 5:18-cv-00643-
JMH-EBA) (2019)

Paula Williams v. Midland Funding LLC, et al.:  U.S. District Court for the Eastern
District of Kentucky [Lexington Div.] (Case 5:18-cv-00530-JMH.) Expert Report. Deposition.
(2019)

Douglas Littlejohn vs. Vivint Solar: U.S. District Court for the District of New Jersey
(Case 1:16-cv-09446-NLH-JS).

Phyllis Sandigo v. Ocwen Loan Servicing, LLC: U.S. District Court for the Northern
District of California  (Case 5:17-cv-02727-BLF-NC.) Expert Report. Deposition. (2019)

Chandra Shekar v. Accurate Background, Inc.: U.S. District Court Eastern District of
Wisconsin [Milwaukee Division]; No. 2:17-cv-00585. Expert Report. Deposition. (2019)

James C. Rennick, Sr. and Michele Malverty v. Equifax Information Services, LLC: U.S.
District Court for the Middle District of Florida. (Case No. 8:17-cv-01617-JDW-AAS.) Expert
Report. Deposition. (2018)

James Banneck v. Federal National Mortgage Association, et. al: U.S. District Court for
the Northern District of California – (No. Case No. 3:17-cv-04657-WHO). Expert Report.
Deposition. (2018)

John Ashcraft and all similarly situated individuals, v. Experian Information Solutions,
Inc., et al.: U.S. District Court for the District of Nevada. (Case No.:  2:16-cv-2978-JAD-NJK.)
Expert Report. Deposition. (2018)

David E. Slattery, Jr. v. Trans Union, LLC and Equifax Information Services, LLC:

Exhibit 55 - 050

U.S. District Court for the District of Arizona. (Case No. 2:17-cv-01486-JAT) Expert Report. Deposition. (2018)

David Leoni and all similarly situated individuals, v. Experian Information Solutions, Inc., et al.: U.S. District Court for the District of Nevada. Civil Action No.:  17-cv-1486-APG-PAL. Expert Report. Deposition. (2018)

Carol Mainor v. Acctcorp of Southern Nevada, Ocwen Loan Servicing & Experian Information Solutions, Inc., et al.: U.S. District Court for the District of Nevada. Civil Action No.:  2:16 -cv- 00183 -RFB –PAL. Expert Report. Deposition. (2018)

Antonio A. Lopez v. Pre-Employ.com Inc.: U.S. District Court Eastern District of California (Case No. 2:16-cv-02205-TLN-KJN). (2018)

Sharon Barnum, et al. v. Equifax Information Services, LLC, U.S. District Court District of Nevada. (Case No. 3:16-cv-02807-GPC-WVG)  Expert Report. Deposition. (2018)

David W. Banks v. Employment Background Investigations, Inc.: U.S. District Court Western District of Missouri. (Case No. 17-CV-01005 DGK) Expert Report. Deposition. (2018)

Lee C. Kamimura, individually, and all others similarly situated v. Ditech Financial LLC, formally, known as Green Tree Servicing, LLC: United States District Court for the District of Nevada; Case No. 2:16-cv-00783-APG-CWH). Expert Report. Deposition. (2018)

Thomas Foskaris and all similarly situated individuals, Defendant Experian Information Solutions, Inc.: U.S. District Court for the District of Nevada. Civil Action No.: 17-cv-506-KJD-GWF. Expert Report. Deposition. (2018)

Brandon Walsh v. Federal National Mortgage Association, et al: U.S. District Court for the District of Arizona – (No. 2:15-cv-00761-JJT). Expert Report. Deposition. (2018)

Richard C. Merz v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 3:16-cv-00259-PGS-LHG. Expert Report. Deposition. (2017)

Camila S. Ruvalcaba, v. Ocwen Loan Servicing, LLC., Prospect Mortgage LLC., People's Escrow Inc., Equity Title Company, and Dennise Gurfinkiel: U.S. District Court for the Southern District of California; Case No. 15-CV-00744-BAS-DHB. Expert Report. Deposition. (2017)

Ahmed S. Adan v. Insight Investigations, Inc., et al.: U.S. District Court Southern District of California. (Case No. 3:16-cv-02807-GPC-WVG) Expert Report. Deposition. (2017)

Lisa Brancato v. Specialized Loan Servicing, LLC: U.S. District Court for the District of New Jersey; No. 16-cv-05504-PGS-LHG.) Expert Report. Deposition. (2017)

Exhibit 55 - 051

Thomas Black v. General Information Services, LLC: U.S. District Court for the Northern District of Ohio [Eastern Div.] 1:15-cv-01731. Expert Report. Deposition. (2017)

Foley Ma v. Equifax Information Services, LLC: U.S. District Court for the Northern District of Georgia [Atlanta Div.]. (Case No. 1:16-cv-01055-LMM-CMS.) Expert Report. Deposition. (2017)

Cynthia Todd v. AT&T Corp., Equifax Information Services, LLC, National Consumer Telecom and Utilities Exchange, Inc., ("NCTUE"), et al.: U.S. District Court for the Northern District of California. (Case No. 3:16-cv-03357-EDL.) Expert Report. Deposition. (2017)

Tammy Brown v. Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union LLC: U.S. District Court for the Middle District of North Carolina [Durham Div.]. (Case No. 1:16-cv-00488-LCB-JLW.) Expert Report. Deposition. (2017)

Angela Anderson v. Equifax Information Services, LLC: U.S. District Court for the District of Kansas. (Case No. 2:16-cv-02038). Expert Report. Deposition. (2016)

Kirk McDonough v. JPMorgan Chase Bank, N.A., Trans Union LLC, et al., in the U.S. District Court for the Eastern District of Missouri [Eastern Div.]; No. 4:15-cv-00617-JCH. Expert Report. Deposition. (2016). Judge Jean C. Hamilton rejected Chase's Daubert motion to exclude me from testifying. (Case settled shortly thereafter.)

Jim M. Peckey v. Bank of America, et al.: U.S. District Court for the District of Maryland [Baltimore Div.]; No.: 1:14-cv-00433- RDB. Expert Report. Deposition. (2016)

Marci Curliss, v. Ocwen Loan Servicing, LLC: U.S. District Court for the Western District of Missouri [Western Div.]; Case No. 4:14-cv-00428-SRB. Expert Report. Deposition. (2016)

Robert James Anthony v. Experian Information Solutions: U.S. District Court for the Eastern District of California (No. 2:14-cv-01230-MCE-EFB). Expert Report. Deposition. (2016)

Peter Blasi, Jr., et al., v. United Debt Services, LLC, et al.,: U.S. District Court for the Southern District of Ohio [Eastern Div.]; (Case No.: 2:14-cv-0083). Expert Report. Deposition. (2016)

Henry L. Farrin, Jr., et al. v. Ocwen Loan Servicing, LLC, in the United States District Court for the District of New Hampshire (Case No. 1:15-cv-00145-JL) Expert Report. Deposition. (2016)

Karen Duell v. First National Bank of Omaha; and, The Dunning Law Firm: U.S. District Court for the Southern District of California; No.: 14-cv-2774 WQH (JLB). Expert Report. Deposition. (2016)

Exhibit 55 - 052

Debra B. Croft v. Bayview Loan Servicing, LLC: in the United States District Court for the District of South Carolina [Columbia Div.] (Case No. 3:14-cv-04630-MGL). Expert Report. Deposition. (2015)

Carlos A. Vasquez-Estrada v. Collecto Inc.: U.S. District Court for the District of Oregon [Portland Div.]; No. 3:14-CV-01422-ST. Expert Report. Deposition. (2015)

Charles Edward Steed, on behalf of himself and all others similarly situated, and Amy Summers, on behalf of herself and all others similarly situated: U.S. District Court for the Northern District of Georgia [Atlanta Div.] (Case 1:14-cv-00437-SCJ-ECS). Expert Report. Deposition. (2015)

Johnnie Teresa Marchisio & Adrian Marchisio v. Carrington Mortgage Services, LLC: in the United States District Court for the Southern District of Florida (Case # 14-cv-14011-KAM). Expert Report. Deposition. (2015)

Elizabeth Roberts v. Vincent St. John & Safeco Insurance Co. of America: In the District  Court of Oklahoma County, State of Oklahoma (Case No. CJ-2012-1051). Expert Report. Deposition. (2015)

Roy Jack Williams v. Allstate Fire & Casualty Co., U.S. District Court for the Eastern District of Oklahoma (Case No. 5:13-cv-00828-D). Expert Report. Deposition. (2015)

John Mark Cowan v. GE Capital Retail Bank, et al.: U.S. District Court for the Northern District of California [San Jose Division]; 5:13-cv-3935-BLF-PSG. Expert Report. Deposition. (2015)

Martin Kevin Sammy v. Equifax Information Services, LLC: U.S. District Court for  the Eastern District of Pennsylvania. (Case No. 2:14-cv-00307-BMS) Expert Report. (2014)   Deposition. (2014)

Richard G. Beck, et al. v. Eric K. Shinseki, et al.: U.S. District Court for the District of South Carolina [Columbia Div.] (No. 3:13-cv-999-TLW). Expert Report. Deposition. (2014)

Roberto Sevi v. Experian Information Solutions, Inc., Trans Union LLC & Nationstar Mortgage, LLC.: U.S. District Court for the Middle District of Florida [Orlando Div.]; No. 6:13-cv-1433-Orl-37KRS. Expert Report. Deposition. (2014)

Jean Gardy Lacroix v. Equifax Information Services, LLC: U.S. District Court for the Southern District of Florida. (Case No. 9:14-cv-80334) Expert Report. Deposition. (2014)

Thanh Cham Thi Thach v. Virginia. U.S. District Court for the Eastern District of Virginia [Alexandria Div.] (Case No. 3:14-cv-00070-HEH)  Expert Report. Deposition. (2014)

Lee Pele v. Pennsylvania Higher Education Authority, Inc., U.S. District Court for the Eastern District of Virginia [Alexandria Div.] (Case No. 1:13-cv-01531-JCC-TRJ)  Expert Report. Deposition. (2014)

Exhibit 55 - 053

Anthony Peck v. Equifax Information Services, LLC, Experian Information Solutions, Inc., & DTE Energy Co.: U.S. District Court for the District of Colorado (No. 13-cv-02924-PAB-CBS).  Expert Report. Deposition. (2014)

Timothy Lawrence v. National Grid USA Service Co., National Recovery Agency, et al.: U.S. District Court for the Eastern District of New York (13 CV 4979 – CBA/VMS).

Rockwell Scharer III v. OneWest Bank, Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union LLC, et al.,: U.S. District Court for the Central District of California; No.: 2:13-cv-00080-DSF-AGR.  Expert report. Deposition. (2014)

Ronald A. Jackson, et al. v. Equifax Information Services, LLC, et al.: U.S. District Court for the Southern District of Florida. 1:13-cv-21691-DLG

James A. Davenport v.  Sallie Mae, Inc., et al.: U.S. District Court for the District of Maryland; PJM 12-1475. Expert report. Deposition. (2014)

Steven Strong v. Collecto, et al., Experian Information Solutions, LLC: U.S. District Court for the Northern District of Texas [Dallas Div.]; No. 3-12-cv-05115-P. Expert report. Deposition. (2014)

Kovalerchik v. Experian Information Solutions, LLC: U.S. District Court for the Central District of California (No. 2:13-cv-05419 – GHK-FFMx).  Expert report. Deposition. (2014)

Michael Dreher v. Experian Information Solutions, Inc., et al.: U.S. District Court for the Eastern District of Virginia (Case 3:11-cv-00624-JAG). Expert report. Deposition. (2014)

Gary Wright v. Equifax Information Solutions, LLC, et al: U.S. District Court for the District of Colorado (No 1:12-cv-3268). Expert Report. Deposition. (2013)

Patriot General Insurance Company v. Lisa Krebs and Carmen McReynolds: U.S. District Court for the Northern District of Georgia [Atlanta Div.] (1:12-CV-0997-RWS). Expert Report. Deposition. (2013)

Courtney Douglass v. Convergent Outsourcing.  (U.S. District Court for the Eastern District of Pennsylvania; Civil No. 2-12-cv-01524). Expert Declaration. Deposition. (2013)

Amanda Ellis v. Experian Information Solutions, Inc., Trans Union LLC, Equifax Information Services, LLC &: U.S. District Court for the Northern District of Alabama [Middle Div.]; No.: 4:12-cv-02779 RBP.  Expert report. Deposition.

Denese Toliver v. Experian Information Solutions, Inc., Trans Union LLC, et al.: U.S. District Court for the Southern District of Texas [Houston Div].  No. 4:12-cv-02436; Expert report. Expert rebuttal report. Declaration. Deposition.

David Osada, et al. v. Experian Information Solutions, Inc.: U.S. District Court for the Northern District of Illinois (Eastern Division), No. 11-CV-02856. Expert report. Deposition.

Exhibit 55 - 054

Kathleen Jane Ferguson v. Asset Acceptance Services, LLC, et al.: U.S. District Court for the District of Missouri [Eastern Div.]. (4:11-cv-00425--AGF).  Expert report. Deposition.

Arin A. Bovay, et al. v. Sears, Roebuck, and Co.: U.S. Circuit Court of Cook County, Illinois [County Dept., Chancery Div.]; Case No. 01-CH-18096; consolidated with Case Nos. 02-CH-4693 & 03-CH-07605. Expert report. Deposition.

Mary Perkins White v. Green Tree Servicing LLC, GMAC Mortgage LLC, Trans Union LLC, Equifax Information Services, LLC & Experian Information Solutions, Inc.,: U.S. District Court for the Western District of Washington [Tacoma Div.]; No.: 3:11-CV-005439RBL  Expert report. Deposition.

Ilene Modica v. American Suzuki Financial Services, TransUnion, LLC, & Equifax Information Services, LLC: U.S. District Court for the District of Arizona. (2:11-CV-02183-PHX-DGC) Expert report. Deposition.

Denise Acquafredda v. Experian Information Solutions, et. al: U.S. District Court for the District of Arizona – (No. CV 2011-054368).  Expert report. Deposition.

Jose Calderon v. Experian Information Solutions: U.S. District Court for the District of Idaho (No. 1:11-cv-00386-EJL).  Expert report. Deposition.

First Carolina Banks v. Charles S. McCue, et al.:  In The Court of Common Please, Fourteenth Judicial Circuit, State of South Carolina, County of Beaufort.  Civil Action No: 07-CP-07-03027.  Expert report. Deposition.

Maria Pintos v. Pacific Creditors Assoc., et al.:  U.S. District Court for the Northern District of California [Oakland Div.]  C 03-5471 CW. Expert report. Deposition.

Marie Ann Fuges v. Southwest Financial Services, LTD: U.S. District Court for the Eastern District of Pennsylvania (No 09-699).  Expert report. Deposition.

Alisha Wilkes v. Experian Information Solutions, et al.: U.S. District Court for the Eastern District of Virginia (CV- 1:10-cv-01160-CMH -TRJ).  Expert report. Deposition.

Serena Beachley v. PNC Bank N.A..: U.S. District Court for the District of Maryland [Northern Div., Case No. CCB-10-1774. Expert report. Deposition.

In re: Pammalla Shannon Uplinger v. Rees Broome, P.C,,: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria Div.); Case No. 90-13129-RGM. Expert report. Deposition.

Jose Soto v. Capital One Auto Finance, et al.: U.S. District Court for the District of Western Washington (2:08-cv-01838-RSM).  Expert report, deposition.

Terri N. White, Jose Hernandez, et al. v. Experian Information Solutions, et al.: USDC-Central Dist. Of California; Case No. 05-cv-1070- DOC (MLGx).  Declarations, Deposition.

Exhibit 55 - 055

Tara Andrews v. Equifax Information Solutions, Inc., et al.: U.S. District Court for the Western District of Washington; (No. 2:09–CV–00817–JJC).  Expert report. Deposition.

Michelle Jansen v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. 05-CV 0385-BR.  Expert report. Deposition.

James Parker Byrd v. TransUnion LLC, Experian Information Solutions, Inc., Equifax Credit Information Services, LLC: U.S. District Court for the District of South Carolina Case No.: 3:09-cv-00609-JFA [Columbia Div.]. FCRA, mixed file. Expert report, deposition.

David L. Jackson v. Trans Union, et al.: U.S. District Court for the District of Oregon. FCRA. No. CV-08-0060-MO. Expert report. Deposition.

Richard Chakejian v. Equifax Information Services, LLC. : U.S. District Court for the Eastern District of Pennsylvania; No. 07-2211.  Bruce A. Summerfield v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 08-1450.   FCRA.  Expert reports.  Consolidated deposition.

Marlos Uzzell v. Experian Information Systems, Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 2:08-CV-02538-CMR). Expert report. Deposition.

Baxter Robinson v. Chase Mortgage Services, Inc., et al.: U.S. District Court for the District of South Carolina (Charleston Div.) (2:08-cv-02087-PMD).  Expert report, deposition.

Risa Joyce Deutsch v. Arrow Financial Services LLC, et al: U.S. District Court for Middle the District of Florida [Tampa]; No. 8:08-cv-01469. Damage to credit.  Expert report, deposition.

Michael D. Scott, et al. v. Graphic Center, CalPERS, et al.:  Superior Court of the State of California, County of Los Angeles.  Case No. BC390593397636.  Data breach. Declaration.

Christopher K. Jung v. Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 07-2514). Expert report, deposition.

Robert Saindon v. Equifax Information Services, et al.: U.S. District Court for the Northern District of California (08-cv-01744 WHA).  Expert report, declaration. Deposition.

Christina Lee v. TransUnion, et al.: U.S. District Court for the District of Oregon (CV-07-0998-MO).  Expert report, deposition.

Emelia Pasternak v. TransUnion, et al.: U.S. District Court for the Northern District of California. Case No. 4:07-cv-04980-CW Expert report, deposition.

Stacy Fiano v. Experian Information Solutions, et al., U.S. District Circuit Court of the Southern District of Florida 9:08-cv-80555.  Expert report, deposition.

Exhibit 55 - 056

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM.  Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332.  Deposition.

Karl Benedikt v. ChoicePoint, Inc.: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA.  Expert report, deposition.

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662.  Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA.  Expert report, deposition.

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc.: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE.  Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc.: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE.   FCRA. Expert reports. Deposition

Exhibit 55 - 057

Bruce Danielson v. Experian Information Solutions:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div.  FCRA. Expert report.  Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438.  FCRA. Expert report.  Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433.  FCRA.  Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

**FEE**

My fee for this report is $4,500. Going forward my fee is $300 per hour for preparation and for consulting; $400 per hour, or a minimum of $1,200 per day, for deposition testimony, plus reasonable travel time, plus travel costs and expenses.

**Exhibits That Will Be Used to Summarize or Support Opinions**

I may use the documents that I have reviewed or mentioned, as identified in this Report, as well as graphs, charts and tables in this Report, as exhibits.

Exhibit 55 - 058

## Materials Considered

In addition to the material cited in this report, in specific preparation for this case, I have reviewed the following:

Plaintiff's Complaint
Bates-stamped documents produced by Plaintiff, and NCS
Depositions of Cathy Boehler and Diana Woodward, and Exhibits
Pleadings
Protective Order

I also generally rely upon:

The Fair Credit Reporting Act
Fair Credit Reporting Act, National Consumer Law Center, 2013 – 8th Edition (Boston)
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement, National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can Do (3rd Edition, Privacy Times 2007),
 "Credit Reporting Resource Guide ®," published by the Consumer Data Industry Association's ("CDIA") [2015-2018]

My opinions in this case are also based on my 41-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert.  My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

### Executed This The 8th Day of July 2022 in Bethesda, Maryland

**/s/  Evan D. Hendricks**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

## Exhibit 55 - 059