## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

ROBBIN WARD

Plaintiff,

vs.                                                          CASE NO. 1:21-cv-02597-LTB

TRANSUNION, LLC, *et al.*,

Defendants.

### NATIONAL CREDIT SYSTEM'S RESPONSE TO
### PLAINTIFF'S STATEMENT OF UNDISPUTED AT FACTS AT ECF 62-2

National Credit Systems, Inc. ("NCS" or "Defendant") provides its responses to Plaintiff's statement of undisputed facts in support of its Motion for Summary Judgment at ECF 55.

1.        Plaintiff has lived in Colorado since 1989, who has never lived, or sought to live, in Texas. (Ex. 51, Declaration of Robbin Ward ("Ward Decl.") ¶ 4,7.)

**Response: NCS does not dispute that Plaintiff's declaration states this. NCS does dispute that this information is dispositive on the issue of identity theft as one does not have to live in a specific location or state to enter into a contract. Further disputed because Plaintiff's self-serving declaration is in direct contrast to the application submitted for the Main Street Renewal ("MSR") Account at ECF 55-3, the lease at ECF 55-46, and also because MSR states that Robbin Ward submitted his driver's license, in person, when completing his application. ECF 55-5.**

2.   Sometime in 2019, an individual applied to rent a property in Dallas Texas, and submitted Plaintiff's personal identifying information with the application. (Ex. 51, Ward Decl. ¶ 4.)

**Response: NCS does not dispute that Plaintiff's declaration states this. NCS does dispute that this information is dispositive on the issue of identity theft as one does not have to live in a specific location or state to enter into a contract. Further disputed because Plaintiff's self-serving declaration is in direct contrast to the application submitted for the MSR Account at ECF 55-3, the lease at ECF 55-46, eviction paperwork at ECF 55-20, and also because MSR states that Robbin Ward submitted his driver's license, in person, when completing his application. ECF 55-5.**

3.        The individual also submitted falsified income information and falsified information

purporting to be from the Social Security Administration. (Ex. 51, Ward Decl. ¶ 11- 12.)

**Response: NCS does not dispute that Plaintiff's declaration states this. NCS does dispute that this information is dispositive on the issue of identity theft. Further disputed because Plaintiff's self-serving declaration is in direct contrast to the application submitted for the MSR Account at ECF 55-3, the lease at ECF 55-46, and also because MSR states that Robbin Ward submitted his driver's license, in person, when completing his application. ECF 55-5.  Additionally, absent a police report, or other corroborating evidence regarding "identity theft" claims, one cannot reasonably preclude the fact that Plaintiff and his daughter, Quen Allen, applied for this account together as indicated on the application at ECF 55-3.**

4.          Plaintiff was not aware of this application, did not submit it, did not authorize anyone to submit it, and did not provide anyone his identifying information so that they could apply. (Ex. 51, Ward Decl. ¶ 4-8.)

**Response: NCS does not dispute that Plaintiff's declaration states this. NCS does dispute that this information is dispositive on the issue of identity theft. Further disputed because Plaintiff's self-serving declaration is in direct contrast to the application submitted for the MSR Account at ECF 55-3, the lease at ECF 55-46, and also because MSR states that Robbin Ward submitted his driver's license, in person, when completing his application. ECF 55-5.  Additionally, NCS denies that the Plaintiff did not provide his personally identifying information to "anyone" – as he states he did provide it to Quen Allen. ECF 55-4, NCS Requests for Admissions No. 24-25.**

5.          Plaintiff has never worked at Neiman Marcus. (Ex. 51, Ward Decl. ¶ 13.); see also

Ex. 76.

**Response: Undisputed.**

6.          The forged application submitted to the landlord lists Plaintiff's monthly income as

$3,000 per month, and the most an individual may earn per month on disability is $1,220 for non- blind

persons, and $2,040 for blind persons. https://www.ssa.gov/oact/cola/sga.html.

**Response: Plaintiff's citation regarding the application does not support his conclusions. There is no evidence that any application has been "forged" – nor has any been cited to support such a proposition. Moreover, Quen Allen is the recipient of social security benefits *and* also was employed with Neiman Marcus – both of which at the same rate of pay in the documents submitted with the application, which destroys Plaintiff's theory in this regard. ECF 55-4, pg. 3, RFA 17; see also ECF 55-9.**

7.          Plaintiff also did not sign the Money Grams that were submitted with the

application. (Ex. 51, Ward Decl. ¶ 8.)

**Response: NCS does not dispute that Plaintiff's declaration states this. NCS does dispute that this information is dispositive on the issue of identity theft, as it also does not rule out Megan Henderson signing on behalf of Robbin Ward. Further disputed because Plaintiff's self-serving declaration is in direct contrast to the application submitted for the MSR Account at ECF 55-3, the lease at ECF 55-46, and also because MSR states that Robbin Ward submitted his driver's license, in person, when completing his application and dropping off the security deposit. ECF 55-5. Additionally, Plaintiff's signature (and those confirmed to speak on his behalf – Megan Henderson) does provide similar results when comparing handwriting: see, Bellco Signatures at ECF 55-38; FTC Affidavit at 55-37; Moneygrams at ECF 55-16; see also, email records with robbinward61@gmail.com at ECF 55-17.**

8.          A signature comparison verifies this:



Ex. 14, ECF 55-16 (forged signature).

**Response: Disputed. NCS incorporates its response as stated in its response to Plaintiff's statement of undisputed facts No. 8, and further states that Plaintiff has only provided selective sampling, ignoring the body of handwriting at issue in this matter as cited to in NCS's response to No. 8.**



Ex. 37, ECF 55-38 (real signature)



Ex. 36, ECF 55-37, p. 6 (real signature).

**Response: Disputed. NCS incorporates its response as stated in its response to Plaintiff's statement of undisputed facts No. 8, and further states that Plaintiff has only provided selective sampling, ignoring the body of handwriting at issue in this matter as cited to in NCS's response to No. 8.**

10.     Because Plaintiff did not apply for the Dallas residence and never lived there, he was not aware of eviction proceedings the landlord eventually brought against the tenant.

**Response: NCS does not dispute that Plaintiff's declaration states this. NCS does dispute that this information is dispositive on the issue of identity theft as one does not have to live in a specific location or state to enter into a contract. Further disputed because Plaintiff's self-serving**

4

declaration is in direct contrast to the application submitted for the Main Street Renewal ("MSR") Account at ECF 55-3, the lease at ECF 55-46, and also because MSR states that Robbin Ward submitted his driver's license, in person, when completing his application. ECF 55-5. Moreover, service was accomplished as to the eviction proceeding as to "Robbin Ward" and all other occupants. ECF 55-20.

11.        Plaintiff did not apply to lease the residence, did not authorize anyone to do that, did not provide his identifying information to anyone so that could do that, and was never aware a debt was being incurred in his name.  Ex. 51, Ward Decl. ¶ 4-8.)

**Response: NCS does not dispute that Plaintiff's declaration states this. NCS does dispute that this information is dispositive on the issue of identity theft as one does not have to live in a specific location or state to enter into a contract. Further disputed because Plaintiff's self-serving declaration is in direct contrast to the application submitted for the Main Street Renewal ("MSR") Account at ECF 55-3, the lease at ECF 55-46, and also because MSR states that Robbin Ward submitted his driver's license, in person, when completing his application. ECF 55-5, that there was an eviction proceeding where he was served at ECF 55-20, and also, because NCS sent Plaintiff a letter when a lease was applied for in Texas in 2019 _before_ the MSR account (see: ECF 55-41 – template of letter sent to Robbin Ward; account notes for Berkshire at ECF 55-27, pg. 1, note on 1/24/2019; Declaration of Ronald Sapp – ECF 56-2, ℙℙ 51-57); see also ECF 55-44, pgs. 16-18.  Additionally, NCS denies that the Plaintiff did not provide his personally identifying information to "anyone" – as he states he did provide it to Quen Allen. ECF 55-4, NCS Requests for Admissions No. 24-25.**

12.        After NCS became responsible for collecting the debt, it began attributing the account to Plaintiff and reporting it as "in collection" to the credit bureaus. (Exs. 52-54), bates nos. EXP-WARD 000001–2; TU 10; EIS-Ward000004–6.)

**Response: The citations provided by the Plaintiff do not support his assertions. Specifically, there is no evidence that the account _was not_ being attributed to the Plaintiff before MSR placed it with NCS. Clearly, MSR told NCS that the account was the Plaintiff's – NCS did not just pull that out of thin air. ECF 55-24. MSR also verified the account as due and owing by Robbin Ward. Declaration of Ronald Sapp – ECF 56-2, ℙℙ 22, 23. Otherwise, NCS does not dispute that it furnished information regarding the MSR account to the three credit bureaus – Experian, Trans Union, and Equifax.**

13.        Reporting an account as "in collection" is a major derogatory notation on a consumer's credit. (Ex. 55, Expert Report of Evan Hendricks ("Hendricks Rpt.") at 3.)

6

**Response: Disputed. In this case, Plaintiff's account was labeled with compliance code condition "XB" which precludes the account from being taken into consideration in a FICO score. ECF 55-44, pg. 11; see also ECF 56-3, pg. 1 (Equifax ACDV reflecting compliance code XB); ECF 56-3, pg. 8 "Compl Cond Code" XB (Trans Union ACDV reflecting compliance condition XB); see also ECF 55-44, pg. 21-22 (citing Plaintiff's proposed expert for agreement regarding compliance code XB).**

**Additionally, NCS intends to file a motion to exclude the report of Evan Hendricks as it is incomplete, Plaintiff only supplied partial information for Mr. Hendricks to render an opinion, he has provided opinions he is not qualified to make, and his opinion is otherwise not based in fact or law. Mr. Hendricks has also been disqualified (in part) on previous occasions, such as *Indich v. Equifax Info. Servs., Civil Action* No. 16-cv-02484-RM-MEH, 2017 U.S. Dist. LEXIS 178909, at \*8-9 (D. Colo. Oct. 30, 2017).**

14.     Plaintiff learned of NCS's inaccurate reporting of the account when he applied to refinance his mortgage in 2020. (Ex. 51, Ward Decl. ¶ 27.)

**Response: The citations provided by the Plaintiff do not support his assertions. There are no mortgage applications present in Plaintiff's file or his evidence. In fact, the document that Plaintiff relies upon to support this supposed allegation is ECF 55-47, which is a consumer solicitation disclosure – and not an application for credit. Moreover, this document is dated June 8, 2020, which is *before* any of Plaintiff's disputes. There can be no private cause of action under the FCRA absent a dispute to a consumer reporting agency, which was not present at that time. *See* also, ECF 55-44, pgs 17-19.**

15.     Each credit bureau was reporting the account as "in collection." (Ex. 51, Ward Decl. ¶ 27.)

**Response: NCS admits that Plaintiff's affidavit states this, however, Plaintiff has not cited to record evidence – such as a consumer report – which would support this assertion.**

16.         Plaintiff disputed directly with NCS, calling and writing to it repeatedly and stating that the account resulted from identity theft or confusion of him with another person. (Ex. 51, Ward Decl. ¶ 20.)

**Response: Disputed. NCS admits that Plaintiff initiated two different series of disputes through the consumer reporting agencies – June of 2020, and July of 2020. NCS denies that the Plaintiff was "calling and writing it repeatedly". In fact, most of Plaintiff's communications were directed to the Law Office of Brett Borland, and not NCS directly. NCS is unaware of any communication sent directly to it other than the ACDVs from the credit bureaus – and Plaintiff has not cited to anything, either. Moreover, a dispute is limited to the information provided in the dispute. ECF 62-17 – Equifax ACDV reflecting dispute as "not his/hers" indicating no documentation attached; ECF 62-16, pg. 1, Trans Union June 12, 2020 dispute as "not his/hers" indicating no documentation provided; Experian ACDV (there was only one Experian dispute dated 6/10/22), reflecting "I have no knowledge of this account. I have not opened a new account and to not recognize this credit lender." ECF 62-18, pg. 3; and, all July 4, 2020 disputes (with the documentation submitted attached thereto) at ECF 56-3.**

17.         Plaintiff provided NCS with documents showing that the account did not belong to him, including pay stubs from his actual employer, mortgage statements confirming his Colorado residence, and a letter from the Social Security Administration confirming he was not receiving the benefits the applicant claimed. (Ex. 56, bates nos. NCS_0151–53; Ex. 57, bates no. NCS_0154; Ex. 58, bates no. NCS_0155.)

**Response: Disputed. The information cited to does not support the position as asserted by Plaintiff. Firstly, the letter at ECF 58 _does not_ state that Robbin Ward is not the recipient of social security benefits – it states that he is the recipient of benefits. Secondly, paystubs and mortgage statements are not indicative of residency – tax returns, alternatively, could be. NCS disputes that this information is dispositive on the issue of identity theft. Further disputed because this information is in direct contrast to the application submitted for the MSR Account**

8

at ECF 55-3, the lease at ECF 55-46, eviction paperwork at ECF 55-20, and also because MSR states that Robbin Ward submitted his driver's license, in person, when completing his application. ECF 55-5.

18.    When disputing with NCS did not work, Plaintiff disputed in writing to the credit bureaus. (Ex. 51, Ward Decl. ¶ 21.)

**Response: Disputed. The citation by the Plaintiff does not support his assertion and presumption that he communicated with NCS. The record reflects no direct communications by the Plaintiff to NCS – but, rather, to the Law Office of Brett Borland.   ECF 55-24, generally,  see also, ECF 62-12.  NCS does not otherwise dispute that the Plaintiff submitted disputes to  all three bureaus on or around June 10, 2020, and to two bureaus on or around July 4, 2020.**

19.    In those letters, Plaintiff noted that he was "the victim of identity theft," and explained that he was including as an attachment an Identity Theft Report he filed with the Federal Trade Commission in June 2020. (Ex. 59, bates nos. NCS_0129–43.)

**Response: Disputed as not reasonably specific as to what "disputes" or "letters" Plaintiff means to refer to. Plaintiff's first set of disputes to the bureaus contained little to no detail. NCS refers the Plaintiff to its response to Plaintiff's statement of fact No. 19. NCS also cites to ECF 56-3, which contains the sum and substance of all of the documents submitted with his July 2020 dispute. NCS also denies that sufficient information has been provided to corroborate identity theft.**

20.    The letters also included copies of Plaintiff's drivers license and Social Security Card, as well as an Identity Theft Affidavit, which was notarized and Plaintiff signed under penalty of perjury. (Ex. 59, bates nos. NCS_0129–43.)

**Response: NCS incorporates its response to Plaintiff's Statement of Fact No. 22 as if fully stated herein.**

21.    The Identity Theft Affidavit confirmed that Plaintiff had informed the police of the identity theft, but the police did not issue a report. (*Id.*, bates no. NCS_0141.)

**Response: Denied. The citation does not support Plaintiff's conclusion. Instead, what it actually says is that Plaintiff contacted the Federal Trade Commission to attempt to file a police report – as evidenced by Plaintiff naming the "Federal Trade Commission" on 6/12/2020, as the "police" they reported the purported crime to. ECF 62-11, pg. 13.**

22.    Plaintiff also provided his notarized Identity Theft Affidavit, copies of his drivers license and Social Security Card, and F.T.C. Identity Theft Report in June of 2020. (Ex. 60, bates nos. NCS_0090–100.)

**Response: NCS clarifies that the FTC report reflects a date of June 12, 2020. As to the timing of disputes, NCS incorporates its response to Plaintiff's Statement of Fact No. 22 as if fully stated herein.**

23.    Plaintiff also pointed out to NCS that he never worked at Neiman Marcus, the applicant's supposed employer, and that the Neiman Marcus paystubs were falsified. (Ex. 61, bates nos. NCS_0149–50.)

**Response: The cited material does not support the proposition which Plaintiff claims it to. ECF 62-13 is an email between Megan Henderson and Richard Chin of the Law Office of Brett Borland, not NCS. NCS likewise denies that any such communication is dispositive of identity theft.**

24.    Plaintiff further submitted his own, genuine paystubs showing his employment in Colorado and mortgage statements confirming he was a Colorado resident. (Ex. 56, bates nos. NCS_0151–53; Ex. 57, bates no. NCS_0154.)

**Response: The cited material does not support the proposition which Plaintiff claims it to. Plaintiff did not submit his paystubs to NCS, Megan Henderson submitted them to Richard Chin of the Law Office of Brett Borland, as reflected on June 29, 2020. Moreover, the communication with Richard Chin was not a part of the dispute submitted to the CRAs. NCS likewise denies that any such communication is dispositive of identity theft.**

10

25.         While its dispute investigators were aware Plaintiff claimed to have never worked at Neiman Marcus, NCS's policies and procedures for investigations of disputes do not permit the investigators to contact employers. (Ex. 62, Boehler Dep. at 44:19–45:3, 46:5–47:4.)  Ms. Boehler did not bother to verify if Plaintiff worked at Neiman Marcus.  Boehler Dep. at 23:15–18.

**Response: Disputed in the manner and form asserted. This presupposes an obligation to contact someone's purported employer (or, in this case, non-employer), or that Neiman Marcus would have otherwise responded to any such inquiry from NCS.**

26.          Plaintiff told NCS that the letter supposedly from the Social Security Administration regarding the applicant's benefits was fraudulent, but NCS's investigators did not contact the SSA. (Ex. 62, Boehler Dep. at 44:6–12.)

**Response: Disputed in the manner and form asserted. This presupposes an obligation to contact the Social Security Administration - or, that the Social Security Administration would otherwise respond to any such inquiry from NCS.**

27.         Plaintiff stated in his communications with NCS that NCS could contact him if it needed any additional information to assist in the investigation, but no one at NCS did. (Ex. 63, bates no. NCS_0114.

**Response: The cited material does not support the proposition which Plaintiff claims it to. The cited exhibit shows a communication between Megan Henderson and Richard Chin of the Law Office of Brett Borland, as reflected on June 12, 2020. ECF 62-15. Moreover, the communication with Richard Chin was not a part of the dispute submitted to the CRAs. NCS likewise denies that any such communication is dispositive of identity theft. Conversely, Plaintiff admits, via Megan Henderson, that he received a dispute packet, which contained a request for a police report. ECF 55-6, pg. 11.**

28.         NCS had in its possession from the original application falsified pay stubs; Plaintiff's

Social Security Card and drivers license submitted with the application and without his knowledge or permission; documents like move-in statements that would not show either way whether Plaintiff was the actual applicant; and Plaintiff's F.T.C. Theft Report. (ECF 56-2 ¶ 48.)

**Response: NCS denies that the declaration of Ron Sapp determines that there were "falsified" paystubs, that any information was submitted "without his knowledge" or that the move-in statements cannot say that he was or was not the actual applicant. In fact, Mr. Sapp details how and why a color ID is important, that the original creditor verified that the applicant and occupant was Robbin Ward, and also the importance of a police report. ECF 56-2, ¶¶ 41-66.**

29.     NCS did not consider Plaintiff's notarized Identity Theft Affidavit, did not contact Neiman Marcus or the Social Security Administration. (ECF 56-2 ¶ 48.)

**Response: Disputed. ECF ECF 56-2, ¶ 48 states nothing of the sort. In fact, it states that the FTC affidavit, with a whole host of other documents, _were_ in fact considered. NCS does not deny that it did not contact Neiman Marcus or the Social Security Administration, but also denies that it was required to do the same, or that those entities would have even responded to NCS. NCS also raises concerns about contacting a third party regarding the collection of a debt.**

30.     NCS published the false reporting of the account as belonging to Plaintiff to Experian, Equifax and Trans Union on multiple occasions. (Ex. 64, bates nos. TU 20, 32, 74, 91; Ex. 65, bates nos. EIS-Ward 000001, 6, 30, 36; Ex. 66, bates nos. EXP-Ward 000001–2, 21.)

**Response: NCS disputes that the citation provided by the Plaintiff reflects that NCS furnished "false" information. NCS also denies that there is a private cause of action absent a dispute being submitted to the bureaus. In this case, only one dispute relates to "identity theft" – and Plaintiff's claims as to why it is "identity theft" – i.e., paperwork that was scanned being slightly "slanted" – or questions raised regarding taxes and payors/payees, is wholly insufficient.**

31.     Plaintiff's June 11, 2020 Experian credit report confirms that NCS reported the account at issue as "collection" and did not include any notation that the account was in dispute. (Ex. 67, bates

nos. EXP-WARD 000030–31.)

**Response: Disputed. The evidence cited to does not support Plaintiff's conclusion. Plaintiff did not submit a dispute to Experian until June 10, 2020. ECF 62-18, pg. 3. NCS did not receive the dispute until five days later on June 15, 2020 (which is the allowable amount of time under the FCRA). ECF 55-24, pg. 1. Therefore, it is irrelevant what Plaintiff's June 10, 2020 consumer report states, as the dispute was submitted that day, and not even received by NCS until June 15, 2020. Moreover, there is no evidence to suggest that Plaintiff pulled his report _after_ he submitted his dispute.**

32.     This reporting remained even after Plaintiff disputed the account as not belonging to him. (Ex. 68, bates nos. EXP-WARD 000022–23.)

**Response: Disputed. Plaintiff's citation does not support his conclusion. A dispute is limited to the information provided in the dispute. ECF 62-17 – Equifax ACDV reflecting dispute as "not his/hers" indicating no documentation attached; ECF 62-16, pg. 1, Trans Union June 12, 2020 dispute as "not his/hers" indicating no documentation provided; Experian ACDV (there was only one Experian dispute dated 6/10/22), reflecting "I have no knowledge of this account. I have not opened a new account and to not recognize this credit lender." ECF 62-18, pg. 3; and, all July 4, 2020 disputes (with the documentation submitted attached thereto) at ECF 56-3. Moreover, there is a difference between a code of "not his/hers" (particularly here where no documentation or description was provided) and "identity theft." ECF 55-44, pgs. 14-18.**

33.     Experian's report confirms that multiple parties obtained Plaintiff's report with the inaccurate NCS account. (Ex. 69, bates nos. EXP-WARD 000035 (noting hard inquiries by nine creditors.)

**Response: Denied.  NCS incorporates its response from Plaintiff's Statement of Facts No. 35. Plaintiff did not submit his dispute to Experian until  June 10, 2020, and the Experian Report was not dated until June 11, 2020. NCS did not receive Plaintiff's dispute until June 15, 2020.**

**There can be no private cause of action against a furnisher absent their receipt of a dispute from a furnisher – which is not present here.  Moreover, there is no evidence to corroborate Plaintiff's claims that the account is "false".**

34.    Including an account that does not belong to Plaintiff and that is derogatorily noted as in collection on his credit report is inaccurate. (Ex. 55, Hendricks Rpt. at 18.)

**Response: Denied.  NCS incorporates its response from Plaintiff's Statement of Facts No. 35. Plaintiff did not submit his dispute to Experian until  June 10, 2020, and the Experian Report was not dated until June 11, 2020. NCS did not receive Plaintiff's dispute until June 15, 2020. There can be no private cause of action against a furnisher absent their receipt of a dispute from a furnisher – which is not present here.  Moreover, there is no evidence to corroborate Plaintiff's claims that the account does not belong to the Plaintiff.**

**Additionally, NCS intends to file a motion to exclude the report of Evan Hendricks as it is incomplete, Plaintiff only supplied partial information for Mr. Hendricks to render an opinion, he has provided opinions he is not qualified to make, and his opinion is otherwise not based in fact or law. Mr. Hendricks has also been disqualified (in part) on previous occasions, such as *Indich v. Equifax Info. Servs., Civil Action* No. 16-cv-02484-RM-MEH, 2017 U.S. Dist. LEXIS 178909, at \*8-9 (D. Colo. Oct. 30, 2017).**

35.    In his responses to NCS's Interrogatory No. 1, which requests a recitation of Plaintiff's damages, he explains:

Plaintiff was unable to refinance his mortgage from 4.35 to a lower interest rate of approximately 2.75 – 3% because of the derogatory collection account reporting on his credit report, that resulted in a low credit score of 671. Plaintiff was advised that because of his credit score he would not qualify for the best rate. One of the main risk factors was that a derogatory collection or public record had been filed. This information was provided by Experian. (Plaintiff_000001 – 000003) The reduction in interest rate would have been approximately $300 per month and over the life of the loan would have been a savings of approximately $108,000.

(Ex. 70, Plt.'s Resp. to ROG 1.)

**Response: Denied and not supported by the cited materials.  NCS incorporates its response from**

14

**Plaintiff's Statement of Facts No. 35. Plaintiff did not submit his dispute until on or around June 10, 2020. There can be no private cause of action against a furnisher unless and until a dispute is received by it from the credit reporting agencies. Moreover, Plaintiff has not provided any documentation regarding any purported "loan application" – or offered interest rates. The only documentation he has provided is a solicitation – and even then, that was issued before Plaintiff first disputed the MSR account. This is not indicative of damages.  Moreover, once disputed as "identity theft" – compliance code XB was present on the account, which precludes the account from being taken into consideration in a FICO score. ECF 55-44, pg. 11; see also ECF 56-3, pg. 1 (Equifax ACDV reflecting compliance code XB); ECF 56-3, pg. 8 "Compl Cond Code" XB (Trans Union ACDV reflecting compliance condition XB); see also ECF 55-44, pg. 21-22 (citing Plaintiff's proposed expert for agreement regarding compliance code XB).**

36.          Plaintiff's expert, Evan Hendricks, confirms the existence of Plaintiff's monetary damages. (Ex. 55 Hendricks Rpt. at 18.)

**Response: Denied. Hendrick's report does not review all documentation available as Plaintiff only provided partial information. Moreover, Hendricks has admitted that compliance code "XB" blocks an account from being taken into consideration re: FICO score. ECF 55-44, pg. 11; see also ECF 56-3, pg. 1 (Equifax ACDV reflecting compliance code XB); ECF 56-3, pg. 8 "Compl Cond Code" XB (Trans Union ACDV reflecting compliance condition XB); see also ECF 55-44, pg. 21-22 (citing Plaintiff's proposed expert for agreement regarding compliance code XB).  There can be no private cause of action against a furnisher absent their receipt of a dispute from a furnisher – which is not present here.  Moreover, there is no evidence to corroborate Plaintiff's claims that the account does not belong to the Plaintiff.**

**Additionally, NCS intends to file a motion to exclude the report of Evan Hendricks as it is incomplete, Plaintiff only supplied partial information for Mr. Hendricks to render an**

15

opinion, he has provided opinions he is not qualified to make, and his opinion is otherwise not based in fact or law. Mr. Hendricks has also been disqualified (in part) on previous occasions, such as *Indich v. Equifax Info. Servs., Civil Action* No. 16-cv-02484-RM-MEH, 2017 U.S. Dist. LEXIS 178909, at *8-9 (D. Colo. Oct. 30, 2017).

37.	Once the NCS account was removed from Plaintiff's credit file, his Experian FICO score was 803. (Ex. 71, Experian report)

**Response: Disputed. Plaintiff only obtained limited consumer reports – ones from June of 2020 which were from *before* he disputed the account, and then ones after the date of the filing of this case. Plaintiff cannot show that compliance code XB did not preclude the MSR account from being taken into consideration for a FICO score, as his expert also admits. ECF 55-44, pg. 11; see also ECF 56-3, pg. 1 (Equifax ACDV reflecting compliance code XB); ECF 56-3, pg. 8 "Compl Cond Code" XB (Trans Union ACDV reflecting compliance condition XB); see also ECF 55-44, pg. 21-22 (citing Plaintiff's proposed expert for agreement regarding compliance code XB).**

38.	Plaintiff has explained his non-economic damages, including such categories as emotional distress, humiliation, embarrassment, and similar injuries. (Ex. 51, Ward Decl. ¶¶ 27- 30.)

**Response: NCS denies that Plaintiff has "detailed" any "non-economic damages" as his declaration is conclusory. Moreover, ECF 55-43, pgs. 9-10, RFP 11-13, which contains Plaintiff's responses to NCS's requests for production of documents, refuses to provide additional information regarding these supposed "non-economic" damages. Where Plaintiff will not participate in discovery, or where his discovery is otherwise absent where one would expect to see substance, such as with regard to these alleged damages, recovery should be barred.**

39.	Plaintiff stated in his June 30, 2020 dispute letter to Trans Union (and which NCS produced in this case), "I am the victim of *identity theft* and this [Main Street Renewal, L.L.C.] account is not mine." (Ex. 59, bates NCS_0129.)

**Response: NCS admits that ECF 56-3 contains the sum and substance of Plaintiff's July 2020 disputes**

16

**with Equifax and Trans Union, which does contain a letter quoting the portion noted by the Plaintiff, above. NCS denies that this is indicative of, or evidence of, identity theft. The only materials submitted with Plaintiff's identity theft disputes were his FTC Affidavit/Report and the letter quoted by Plaintiff in this note.**

40.         NCS also possessed Plaintiff's Federal Trade Commission Identity Theft Report and Identity Theft Affidavit at the time it was undertaking its investigations of Plaintiff's disputes. (Ex. 59, bates nos. NCS_0131–32; NCS_0137–38.)

**Response: Disputed. Plaintiff's response is not responsive to the facts and allegations in this paragraph, as Plaintiff does not specify what dispute he refers to.  NCS only admits to having received Plaintiff's FTC Report/Affidavit in conjunction with his July 2020 disputes, as depicted in ECF 56-3, which contains the sum and substance of Plaintiff's July 2020 disputes.**

41.    Placing on Plaintiff's consumer reports information that is derogatory and does not belong to him is plainly inaccurate. (Ex. 55, Hendricks Rpt. at 3, 7.)

**Response: Denied.  NCS incorporates its response from Plaintiff's Statement of Facts No. 35. Plaintiff did not submit his dispute to Experian until  June 10, 2020, and the Experian Report was not dated until June 11, 2020. NCS did not receive Plaintiff's dispute until June 15, 2020. There can be no private cause of action against a furnisher absent their receipt of a dispute from a furnisher – which is not present here. The Fair Credit Reporting Act does create a private right of action against a furnisher of data for willful or negligent noncompliance with its requirements, when the consumer disputes the reporting through a credit reporting agency ("CRA"). §§ 1681n & o; § 1681-s2(b); *see also Gorman v. Wolpoff & Abramson, LLP,* 584 F. 3d 1147, 1154 (9th Cir. 2009). The statute allows consumers to enforce the duty of accurate reporting through the FCRA's dispute process. *Nelson v. Chase Manhattan Mortg. Corp*, 282 F. 3d 1057, 1060 (9th. Cir. 2002). Duties imposed on furnishers under subsection (a) (when the consumer disputes the reporting directly with the furnisher) are enforceable only by federal or state agencies. *Id.*; *Sanders v. Mountain America Credit Union*, 689 F.3d 1138, 1147 (10th Cir. 2012)(dismissing**

**plaintiff/consumer FCRA claim against lender because plaintiff did not initiate the claim through**

**a CRA).**

**Moreover, there is no evidence to corroborate Plaintiff's claims that the account does not**

**belong to the Plaintiff. Additionally, NCS intends to file a motion to exclude the report of Evan**

**Hendricks as it is incomplete, Plaintiff only supplied partial information for Mr. Hendricks to**

**render an opinion, he has provided opinions he is not qualified to make, and his opinion is**

**otherwise not based in fact or law. Mr. Hendricks has also been disqualified (in part) on**

**previous occasions, such as** *Indich v. Equifax Info. Servs., Civil Action* **No. 16-cv-02484-RM-**

**MEH, 2017 U.S. Dist. LEXIS 178909, at \*8-9 (D. Colo. Oct. 30, 2017).**

42.        NCS, however, did more than that, as it reported to the CRAs that it verified the

account as belonging to Plaintiff, but without noting that the account was in dispute. (Ex. 67, bates nos.

EXP-WARD 000030–31.)

**Response: Disputed. The evidence cited to does not support Plaintiff's conclusion. Plaintiff did**

**not submit a dispute to Experian until June 10, 2020. ECF 62-18, pg. 3. NCS did not receive the**

**dispute until five days later on June 15, 2020 (which is the allowable amount of time under the**

**FCRA). ECF 55-24, pg. 1. Therefore, it is irrelevant what Plaintiff's June 10, 2020 consumer**

**report states, as the dispute was submitted that day, and not even received by NCS until June**

**15, 2020. Moreover, there is no evidence to suggest that Plaintiff pulled his report** *after* **he**

**submitted his dispute.**

43.        In Plaintiff's notarized Affidavit, he confirms that he visited the police regarding the

theft of his identity, yet the police did not issue a report. (Ex. 69, bates NCS_0141.)

**Response: Denied. The citation does not support Plaintiff's conclusion. Instead, what it actually**

**says is that Plaintiff contacted the Federal Trade Commission to attempt to file a police report –**

**as evidenced by Plaintiff naming the "Federal Trade Commission" on 6/12/2020, as the "police"**

**they reported the purported crime to. ECF 62-11, pg. 13. There is literally no other reason given**

18

**by the Plaintiff that he could not fill out a police report, except if he was trying to protect his daughter or he was working with his daughter. But, taking Plaintiff at his word, Quen Allen/Green could _not_ have stolen his identity. ECF 55-4, RTA 11.**

44.         Plaintiff's expert, Evan Hendricks, confirms NCS's supposed investigation fell below industry standards for reasonableness. He notes an established set of industry-standard red flags that NCS disregarded in its investigation of Plaintiff's disputes. (Ex. 55, Hendricks Rpt. at 5–6.)

**Response: Plaintiff's citation does not support his claims in this paragraph. Specifically, Mr. Hendricks believes NCS did not follow its own procedures – but, Plaintiff does not cite to what would support such a conclusion. In fact, NCS did compare Plaintiff's address, the phone numbers provided in the application and of the Plaintiff and his known associates (his daughter), and also, Plaintiff claims that he "cannot determine" whether or not the email address used to open the account was in fact, his email address or not. _See_ Plaintiff's Response to NCS's Undisputed Facts, ECF 62-1, ℙℙ 1, 4, ECF 55-4, RTA 14. NCS also reviewed the _color_ copies of Plaintiff's driver's license Exhibit 3: Communication from Original Creditor; see also Exhibit B: Declaration of Ronald V. Sapp, ℙ 50. Additionally, NCS reviewed the other notes in its system as it relates to the Plaintiff – and namely, that of the second account for Plaintiff. ECF 56-2, ℙℙ 51-62. NCS _could not_ have opened the Plaintiff's account with MSR and _not_ seen Plaintiff's second account. _Id._**

**Moreover, there is no evidence to corroborate Plaintiff's claims that the account does not belong to the Plaintiff. Additionally, NCS intends to file a motion to exclude the report of Evan Hendricks as it is incomplete, Plaintiff only supplied partial information for Mr. Hendricks to render an opinion, he has provided opinions he is not qualified to make, and his opinion is otherwise not based in fact or law. Mr. Hendricks has also been disqualified (in part) on previous occasions, such as _Indich v. Equifax Info. Servs., Civil Action_ No. 16-cv-02484-RM-MEH, 2017 U.S. Dist. LEXIS 178909, at \*8-9 (D. Colo. Oct. 30, 2017).**

45.         Mr. Hendricks further highlights inherent problems with NCS's investigation process,

noting that its investigators disregarded NCS's own procedures in conducting their investigations. (Ex. 55, Hendricks Rpt. at 7.)

**Response: Disputed. NCS incorporates its response to statement No. 48, above.**

46.        NCS testified that it intended its employees to follow the exact procedures used to rebuff Plaintiff's disputes. (Ex. 72, Rule 30(b)(6) Dep. at 23:21–24:4, 30:22–31:13, 42:19–43:10, 71:2–15.)

**Response: Denied. The citation does not support Plaintiff's conclusion, and is wholly incomplete in reference to the quoted materials. Instead, what it actually says is that NCS reviewed all documentation provided, including that of a second account, and also information from the original creditor MSR stating that the driver's license and social security card – which were in color – were provided at the time of application. Exhibit 85, full and complete copy of Deposition or Ronald v. Sapp at 23:21-40:19. This testimony shows that NCS considered all evidence submitted, it just disagrees with the result reached by the Plaintiff. Moreover, it shows that NCS does train on how to investigate "fraud" – even if they do not use fancy labels when teaching their employees, that it would be exceedingly rare to have an instance of identity theft and actually have a copy of the consumer's driver's license – particularly in color, and that it is common to collect the same when you actually apply for an apartment. *Id.***

47.        In *Bumpus v. National Credit Systems*, No. 1:16-cv-01209-TWT (N.D. Ga.), a federal jury in the Northern District of Georgia concluded not only that NCS violated Section 1681s-2(b), but that its violations were willful. (Ex. 73, *Bumpus* Verdict Sheet.)

**Response: NCS does not dispute the *Bumpus* verdict, but does dispute that *Bumpus* is in any way similar to this case, where *Bumpus* involved a matter that <u>was not </u>a legal dispute. Namely, in *Bumpus*, there was a balance dispute (where no evidence was presented at the time of dispute showing that Plaintiff's assertions were correct, though NCS does admit this verdict exists).**

20

48.          The *Bumpus* jury assessed $105,000 in punitive damages against NCS. (*Id.*)

**Response: NCS does not dispute the *Bumpus* verdict, but does dispute that *Bumpus* is in any way similar to this case, where *Bumpus* involved a matter that <u>was not</u> a legal dispute. Namely, in *Bumpus*, there was a balance dispute (where no evidence was presented at the time of dispute showing that Plaintiff's assertions were correct, though NCS does admit this verdict exists).**

49.          NCS's Rule 30(b)(6) witness confirmed its knowledge of *Bumpus*, noting "we lost," and that the jury assessed punitive damages. (Ex. 72, Rule 30(b)(6) Dep. at 41:9–15.)

**NCS does not dispute the *Bumpus* verdict, but does dispute that *Bumpus* is in any way similar to this case, where *Bumpus* involved a matter that <u>was not</u> a legal dispute. Namely, in *Bumpus*, there was a balance dispute (where no evidence was presented at the time of dispute showing that Plaintiff's assertions were correct, though NCS does admit this verdict exists).**

50.          NCS failed to append Compliance Conditions Codes to results it posted to the CRAs in ACDVs processed in June 2020. (Ex. 66, bates EXP-WARD 000021; Ex. 65, EIS-Ward- 000001; Ex. 44, TU 20].)

**Response: Disputed. See ECF 55-44, pg. 21, indicating that the XB code would have been added in June 2020 because XB codes are "sticky." Neither Plaintiff nor his expert rebut this allegation, and Plaintiff is not capable of rendering a conclusion regarding how and when codes are added to accounts.[1]**

51.          Prior to Defendant receiving the June ACDVs, Plaintiff contacted NCS on June 11, 2020 and told them he was an identity theft victim. (ECF 55-24, p.1.)

**Response: Undisputed.**

52.          Plaintiff's spouse, Megan Henderson, contacted NCS to dispute the account on

[1] Plaintiff also objects to Neal Maynard's declaration in his Response in Opposition to NCS's statement of facts. However, Mr. Maynard's declaration was provided merely to provide foundation as to where certain documents were received from, and how any lay-person could interpret them (particularly, IP addresses, which anyone can do as long as they have access to the internet).

Plaintiff's behalf, and was told to contact the Boreland Law Firm. (Ex. 70, Plt.'s Suppl. Resps. to NCS's ROGs, ROGs 3, 4.)

**Response: Disputed. Plaintiff's cited "evidence" does not support these assertions. NCS's notes are also devoid of any such "request. *See* ECF 55-24.**

53.     Ms. Henderson also contacted the original creditor, Main Street Renewal, and was advised about the false information used to rent the residence. (*Id.* [ROG 4].)

**Response: Disputed. Plaintiff's cited "evidence" does not support these assertions. Plaintiff's wife claims to have merely contacted MSR – not that there was any conversation of substance.**

54.     NCS also had in its possession Plaintiff's communications with Boreland, which further evidenced his dispute of the validity of the account. (Ex. 60, bates no. NCS_0090; Ex. 74, bates no. NCS_0102; Ex. 63, bates no. NCS_0114; Ex. Ex. 61, bates nos. NCS_0149–50; Ex. 75, bates nos. NCS_0175–77; Ex. 76, bates nos. NCS_0181; Ex. 77, bates nos. NCS_0186–91.)

**Response: Disputed. Plaintiff's cited "evidence" does not support these assertions. There were no documents submitted with Plaintiff's June 2020 disputes, and as to Plaintiff's July 2020 disputes, the sum total of the dispute and documents attached are located at ECF 56-3.**

55.     NCS's Rule 30(b)(6) witness repeatedly testified that its investigators followed NCS's protocols. (Ex. 72, Rule 30(b)(6) Dep. at 30:22–31:2, 43:3–10, 71:20–72:2.)

**Response: Undisputed.**

56.     Those protocols fall short of reasonable when considering disputes of identity theft because, for instance, NCS's Rule 30(b)(6) witness testified that it would have liked a police report in response from Plaintiff to a letter NCS supposedly sent him, yet it did not seek one as part of its investigations of Plaintiff's disputes. (Ex. 72, Rule 30(b)(6) Dep. at 71:20–72:23.)

**Response: Disputed. Plaintiff's citation to evidence does not support his assertions. NCS directs attention to Exhibit 85 at 71:20-78-1; ECF 56-2 ¶¶ 31-79.**

57.     That witness also testified that NCS knew about the statements in Plaintiff's F.T.C.

Affidavit that he was authorizing the release of information to law enforcement and that he reported the events to law enforcement and the F.T.C. (Ex. 72, Rule 30(b)(6) Dep. at 86:1–12.)

**Response: Disputed. Mr. Sapp testified that he saw that Plaintiff's form checked a certain box – not that there was an "authorization" or even a "release" to a law enforcement agency, which would have been helpful as there was no police report generated in this case, and the only "police" department that the Plaintiff attempted to submit anything to was the FTC.**

58.     NCS repeatedly complains that Plaintiff did not provide a police report, but its dispute investigator testified she did not contact Plaintiff and request a police report or F.T.C. affidavit, and that is not something she does as a matter of course. (Ex. 82, Woodward Dep. at 60:22–61:8.)

**Response: Disputed. The cited testimony does not state what Plaintiff purports it to state – but, instead, states that Ms. Woodward had a difficult time remembering an investigation from many years ago, and that it would not have been in _her position_ to contact a consumer – i.e., it would be that of a different employee. And, NCS's account notes clearly contradict Plaintiff's narrative at ECF 55-24.**

59.     NCS's dispute investigator confirmed that she had Plaintiff's Identity Theft Affidavit as part of the documentation she was able to review as part of the investigation she conducted, but that document played no role in the outcome of her investigation. (Ex. 62, Boehler Dep. at 20:4–10.)

**Response: Disputed – the cited document does not support Plaintiff's assertion, and NCS's account notes clearly contradict Plaintiff's narrative at ECF 55-24.**

60.     That investigator also knew about Plaintiff's communications with Boreland, but did not contact Boreland as part of her investigation. (Ex. 62, Boehler Dep. at 20:15–17.)

**Response: Disputed. The deponent stated that she could  not recall if she had ever spoken with the Law Office of Brett Borland during an investigation, not that she had not in this instance.**

61.     In instances where the disputing consumer claims a particular residence—here, Plaintiff claimed Colorado—NCS would have sent a letter asking for additional information if it believed the

residence was not adequately documented. (Ex. 62, Boehler Dep. at 20:21–21:1.)

**Response: Undisputed.**

62.           No such letter was sent to Plaintiff (Ex. 51, Ward Decl. ¶ 23.)

**Response: Plaintiff's cited evidence does not support such an assertion. At best, Plaintiff _did not_**

**_receive_ NCS's letter (as opposed to NCS not sending one). However, Megan Henderson confirmed**

**that she received a letter from NCS at their Colorado address in August of 2020. So, other mailings**

**had made it without incident, and there is no reason to believe that prior mailings did not similarly**

**do so. ECF 55-24, pg. 5.**

63.           NCS's dispute investigator confirmed that if additional information is needed, another

department at NCS writes the consumer a letter and asks for that information. (Ex. 62, Boehler Dep. at

21:8–15.)

**Response: Undisputed.**

64.           That request would be made at the same time the investigator responds to the ACDV,

meaning NCS responds to the credit bureaus that it has "verified" its reporting even though it believes it

needs additional information to properly investigate the dispute. (Ex. 62, Boehler Dep. at 21:8–15.)

**Response: The cited evidence does not support such an assertion. Rather, an investigation can**

**only take into consideration the evidence which a furnisher has on hand. NCS requests additional**

**documentation to supplement what it already had, and will "re-investigate" the claim if**

**additional information is ever received, consistent with the FCRA. Otherwise, one might never**

**receive supplemental documentation.**

65.           The investigators did not contact Neiman Marcus to determine whether Plaintiff ever

worked there, and they would not normally do that. (Ex. 62, Boehler Dep. at 23:5–18.)

**Response: This request assumes that NCS is required to contact an employer to verify**

**employment. NCS disputes this assertion, but otherwise does not dispute that it did not contact**

**Neiman Marcus.**

66.    One investigator testified that such information would have impacted the results of her investigation, and would have likely resulted in her believing Plaintiff's claims of identity theft. (Ex. 62, Boehler Dep. at 23:19–24:2.)

**Response: Disputed. This testimony was taken subject to objection, and asks the deponent to assume that the examiner is providing all true and correct statements. The whole of Ms. Boehler's testimony reflects that she did carefully consider all documentation that was in her possession, and only if making assumptions and relying on the examiner's representations – could that possibly give rise to a successful dispute, and that she believes the dispute response was accurate at the time it was given. Exhibit 76. She also testified that a dispute packet went out (which Plaintiff does not dispute), and that the dispute packet requests a police report. Exhibit 76 at 58:14 – 60:12.**

67.    Defendant's policies do not allow their investigators to contact employers to verify employment. (Ex. 72, Rule 30(b)(6) Dep. at 68:9–24.)

**Response: Undisputed.**

68.    NCS's investigator agreed that the pay stubs submitted with the application for the residence looked suspicious, but she did not know if she considered that as part of her investigation. (Ex. 62, Boehler Dep. at 31:10–19.)

**Response: Disputed. This testimony was taken subject to objection, and asks the deponent to assume that the examiner is providing all true and correct statements. The whole of Ms. Boehler's testimony reflects that she did carefully consider all documentation that was in her possession, and only if making assumptions and relying on the examiner's representations – could that possibly give rise to a successful dispute, and that she believes the dispute response was accurate at the time it was given. Exhibit 76. She also testified that they responded with all of the information that they had available to them at the time of the dispute. Exhibit 76 at 62:12**

25

**– 63:16.**

69.    NCS's Rule 30(b)(6) witness testified that NCS's investigators are not trained to recognize such forgeries. (Ex. 72, Rule 30(b)(6) Dep. at 33:13–17.)

**Response: Disputed. The cited testimony does not support this assertion. Moreover, Mr. Sapp testifies that there is training to detect income information and to suss out suspicious activity. Exhibit 75, 11:6-18:13.**

70.    NCS's investigators likewise do not contact consumers and request information like police reports. (Ex. 82, Woodward Dep. at 61:4–8.)

**Response: Disputed. The cited testimony does not support this assertion. Ms. Boehler testified that it was not _her job_ to send out such a request – not that a request was not made. Moreover, she also testified that a dispute packet went out (which Plaintiff does not dispute), and that the dispute packet requests a police report. Exhibit 76 at 58:14 – 60:12.**

71.    All NCS did in response to _Bumpus_ was seek additional information from original creditors. (Ex. 72, Rule 30(b)(6) Dep. at 42:19–43:2.)

**Response: Disputed. The cited evidence does not support this assertion. See Exhibit 75, 41:5-43:10.**

72.    The documentation that the original creditor gave NCS proved Plaintiff was an identity theft victim because the maintenance records described the tenant as "her" several times. (Ex. 16, ECF 55-18, p.1.)

**Response: Denied. The cited evidence does not support this assertion. Additionally, "Robbin" is both a male name and a female name – more commonly a female name. It certainly is possible that – when communicating with someone in writing – as Plaintiff cites to here – someone mistakenly called Robbin a "she."**

73.    Plaintiff is obviously a male. (Ex. 45, ECF 55-45, (showing Plaintiff as the person on the right).)

**Response: NCS does not dispute that the Plaintiff identifies as male.**

74.        Following *Bumpus*, NCS did not do a comprehensive review of its processes to make sure they complied with the FCRA. (Ex. 72, Rule 30(b)(6) Dep. at 42:19–43:2.)

**Response: Disputed. The cited evidence does not support this assertion. See Exhibit 75, 41:5-43:10.**

Dated: January 6, 2023

Respectfully submitted,

*/s/ Katrina M. DeMarte*
KATRINA M. DEMARTE (MI bar No. P81476; CO Bar No. 43135)
DEMARTE LAW, PLLC
39555 Orchard Hill Place Suite 600
Novi, MI 48375
Telephone: (313) 509-7047
katrina@demartelaw.com

### CERTIFICATE OF SERVICE

I, Katrina M. DeMarte, hereby state that on January 6, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys of record.

/s/ Katrina M. DeMarte
Katrina M. DeMarte (MI Bar No. P81476; CO Bar No. 43135)
**DEMARTE LAW, PLLC**