**ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,**
**Neal Maynard on 04/19/2023**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

----------------------------------

ROBBIN WARD,

        Plaintiff,

  v.                         CIVIL ACTION NO.
                                 1:21-cv-02597

NATIONAL CREDIT SYSTEMS, INC.,

        Defendant.

----------------------------------

VIDEOTAPED VIDEOCONFERENCE DEPOSITION
UPON ORAL EXAMINATION
OF NEAL MAYNARD
TAKEN ON BEHALF OF THE PLAINTIFF

Wilson, Michigan

April 19, 2023

Job No. 450000

Pages 1 - 96

Reported by:  Penny C. Wile, RPR, RMR, CRR

APPEARANCES:

        CONSUMER LITIGATION ASSOCIATES
        By: CRAIG MARCHIANDO, ESQUIRE
           763 J. Clyde Morris Boulevard
           Suite 1A
           Newport News, VA 23601
           (757)930-3660
           cmarchiando@clalegal.com
           Counsel for the Plaintiff

        DeMARTE LAW, PLLC
        By: KATRINA M. DeMARTE, ESQUIRE
           39555 Orchard Hill Place
           Suite 600
           Novi, MI 48375
           (313)509-7047
           katrina@demartelaw.com
           Counsel for Neal Marchand

ALSO PRESENT:

        JONATHAN GREEN, ESQUIRE
           General Counsel for the Defendant

        Izabella Morrissey, Videographer

I N D E X

WITNESS                        EXAMINATION BY                    PAGE

Neal Maynard              Mr. Marchiando                  5

E X H I B I T S

NO.          DESCRIPTION                                PAGE

Exhibit 1    Subpoena                                   12

Exhibit 2    Resumé                                     12

Exhibit 3    Declaration of Neal Maynard               14

Exhibit 4    Google Subscriber Information             25

Exhibit 5    Google e-mail, October 4, 2022            32

Exhibit 6    Spreadsheet                                54

Exhibit 7    Property photographs                       79

Exhibit 8    Essentials of Defense Investigation   80

Exhibit 9    National Association for Public
             Defense, We The Defenders, Seattle    82

Videotaped videoconference deposition upon oral examination of NEAL MAYNARD, taken on behalf of the Plaintiff, before Penny C. Wile, RPR, RMR, CRR, E-Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 3:14 p.m. EST, on April 19, 2023, in Wilson, Michigan, via Zoom Videoconferencing; and this in accordance with the Federal Rules of Civil Procedure.

                    -    -    -

THE VIDEOGRAPHER:  Good afternoon.  This is the beginning of media number one in the deposition of Neal Maynard in the matter of Robbin Ward versus National Credit Systems, Incorporated, Case No. 1:21-cv-02597.

Today's date is April 19th, 2023, and the time on the monitor is 3:14 p.m.

My name is Izabella Morrissey.  I am the videographer.  The court reporter is Penny Wile.  We are here with Huseby Global Litigation.

Counsel, please introduce yourselves, after which the court reporter will swear in the witness.

MR. MARCHIANDO:  Craig Marchiando with Consumer Litigation Associates for the plaintiff.

MS. DeMARTE:  And Katrina DeMarte on

behalf of Neal Maynard.

MR. GREEN:  And Jonathan Green with National Credit Systems.

NEAL MAYNARD was sworn and deposed on behalf of the Plaintiff as follows:

BY MR. MARCHIANDO:

Q.    Good afternoon.  Mr. Maynard, I don't think I introduced myself off -- off the record, but my name is Craig Marchiando, and my law firm, along with another law firm in Colorado, represents Robbin Ward in this lawsuit.  Do you understand that?

A.    Yes.

MR. MARCHIANDO:  And I want to just confirm with counsel that we're in agreement that the oath that Mr. Maynard just took, although it was done remotely, satisfies Rule 30 for purposes of these -- this deposition?

MS. DeMARTE:  I don't have any objection to that.  That's fine.

BY MR. MARCHIANDO:

Q.    So, Mr. Maynard, have you had your deposition taken before?

A.    No.

Q.    Have you seen a deposition in your -- in

your -- as part of your job responsibilities?

A.   No.

Q.   No?  Okay.  Well, we'll cover a few sort of ground rules to help us have a -- a more -- a clear record and a more like hopefully hiccup-free discussion in the afternoon -- this afternoon.  Okay?

A.   Sure.

Q.   So there's a court reporter taking down everything that you and I say and anything that maybe Ms. DeMarte says, as well, so because of that it's important that you and I not talk over each other.  So the first thing is let me, if you would, please, get my whole question out.  Even though you have your answer all ready and you're ready to give it, let me get my question completed before you give your answer.  Okay?

A.   Okay.

Q.   And then I'll do the same thing.  I'll try to make sure that your answer is complete before I begin my next question.  Is that fair?

A.   Yes.

Q.   Okay.  Also because the court reporter is taking down everything you and I say, it's important that you answer in words -- and you're doing that very well so far -- yes, no, rather than uh-uh or nuh-uh, because those things don't come across very well in the

record.  Okay?

A.    Okay.

Q.    And it's also important that you answer -- that you answer verbally.  Right?  I can see you shake your head for yes because we're on a video connection here, but that doesn't come across very well in the record either.  So can you remember to answer with actual words, please?

A.    Yes.  Sure.

Q.    Mr. Maynard, do you understand that the oath you took a few minutes ago to tell the truth is the same oath that you would take if you were sitting in court testifying in front of the judge and jury?

A.    Yes.

Q.    So, Mr. Maynard, as we go through our discussion today I'm certain to ask a question that's not very well-worded or that you have difficulty understanding.  That's not anything to do with you. It's that I just don't ask a very clear or a very well-worded question.  Okay?

When that happens, will you please speak up and let us know that you didn't understand the question and that I need to reword it so that you do understand it?

A.    Yes.  I'll do that.

Q.   Because that's really the only way we have to know whether you understood the question or not.  Do you follow that?

A.   Yes.

Q.   Okay.  My habit's to break about every hour.  This is not going to be a marathon-long deposition.  We don't have a whole great deal to cover today, so we'll probably talk for a couple of hours and that'll probably be it, but I'm happy to take a break whenever you like.  You need to stretch your legs, refill your coffee or water, whatever it is that you need, just let us know and we'll -- and we'll -- we'll take a break, if not right then just as soon as we can right after that.  Okay?

A.   Yes.

Q.   Just if we could, let's try to take those breaks after you've answered a question rather than when there's a question pending.  Okay?

A.   Yes.

Q.   And, Mr. Maynard, are you -- do you have any medical conditions that'll affect your ability to testify honestly today?

A.   No.

Q.   Do you have any medical conditions that will affect your ability to recall facts today?

A.    No.

Q.    Are you taking any medication that will affect your ability to testify honestly today?

A.    No.

Q.    Are you taking any medication that will affect your ability to recall facts today?

A.    No.

Q.    And just one other thing, Mr. Maynard.  As we go along, if there's anything -- any time that you remember some of your earlier testimony that you want to correct or update or change, would you stop us right then and let's get that earlier testimony corrected while that's all fresh in your mind?

A.    Yes.

Q.    Okay.  So, Mr. Maynard, what do you understand this lawsuit to be about?

MS. DeMARTE:  Objection; foundation.

You can answer if you're able.

THE WITNESS:  The dispute over an amount owed for real estate debt.

BY MR. MARCHIANDO:

Q.    Okay.  And you submitted a declaration in support of NCS's motion for summary judgment in this case, didn't you?

A.    Yes.

Q.   Have you submitted a declaration like that in any other case before?

A.   I have submitted declarations in the past during my career, yes.

Q.   Okay.  Well, I guess let's -- let's -- let's talk about -- let's talk career first.

So you work currently as a legal assistant for DeMarte Law, right?

A.   Correct.

Q.   How long have you worked there?

A.   I started in May of 2020.

Q.   Okay.  Did you have -- what's your position?

A.   I'm legal assistant.

Q.   Okay.  Where did you work immediately before DeMarte Law?

A.   With the Wisconsin Office of Public Defender.

Q.   Okay.  What did you do there?

A.   I was a senior investigator.

Q.   Okay.  What sorts of things did you investigate?

A.   We assisted indigent clients in rural Northwest Wisconsin in gathering evidence to support their claims against pending legal matters, support

their --

Q.   Okay.  (Speaking simultaneously)

A.   -- innocence.

Q.   I cut you off, and I apologize.  What was the last thing you said?

A.   I just said support their innocence or assist them in proving whatever they were hoping to prove.  It wasn't always criminal.  It could have been people fighting to get their kids back, things like that.

Q.   Okay.  Was it a state-level job or a federal-level job?

A.   State.

Q.   So it could have been -- because it was a Public Defender it could have been a non-criminal -- the -- the -- you could have been working with non-criminal parties?

A.   Correct.

Q.   Do you have a sense as to the breakdown; it was about 50/50 criminal versus civil?

A.   I would estimate probably 70 percent criminal, 30 percent civil.

Q.   And so how long did you have that job?

A.   Five years.

Q.   And give me just sort of a -- a quick

summary of what you did all day.

A.    Well, yeah, I think that was in the resumé that was sent over to you there, the -- the position description.  That was basically what I would do for our clients.

Q.    Can you articulate all that or should we get your resumé and take a look at it?  Is that what you're -- you're --

A.    Sure.

Q.    -- trying to do that?

Okay.  Well, let's do this.  I've already marked Exhibit 1, which is the subpoena in this case.  I marked that as -- so we could have an example to talk about.

(Exhibit 1 was marked and attached to the transcript.)

BY MR. MARCHIANDO:

Q.    Now we'll mark your resumé as Exhibit 2.

(Exhibit 2 was marked and attached to the transcript.)

BY MR. MARCHIANDO:

Q.    Okay.  Are you able to -- are you able to see the -- your -- your resumé, Mr. Maynard?

A.    Yes.

Q.    Okay.  So what you would say is your -- or

the job description or the answer to my question, that's on the page 2, right, starting --

A.   Correct.

Q.   -- under the heading of Wisconsin Office of Public Defender?

A.   Yes.  So it's the same job description for Wisconsin and Alaska.

Q.   Okay.

A.   The duties were pretty -- pretty similar.

Q.   Okay.  And you went to that job in Wisconsin straight from a similar job working for the State of Alaska, right?

A.   Correct.

Q.   Similar responsibilities as you just articulated, right?

A.   Correct.

Q.   Is that because you moved?

A.   Correct.

Q.   All right.  And you held a job in Alaska for three years, right?

A.   With the Public Defender for three years, yes.

Q.   Okay.  So -- and just -- I want to just ask a couple of questions about your resumé.  This -- is this a document you created?

A.    Yes.

Q.    And is all the content yours?

A.    Yes.

Q.    How recently was this updated?

A.    Probably a week ago.

Q.    Okay.  Are you -- you're still -- and you're still -- so you work at DeMarte Law currently, and in addition you work at the Island Resort & Casino, right?

A.    Correct.

Q.    Okay.  Then before you worked for the Alaska Public Defender's Office you worked for the TSA, right?

A.    Yes.

MR. MARCHIANDO:  I guess I should get the whole thing out, right, Penny?

BY MR. MARCIANDO:

Q.    So Transportation Security Administration, right?

A.    Correct.

Q.    Okay.  So I want to ask you about -- let's find your declaration that you submitted in this case.  We'll mark that as Exhibit 3.

(Exhibit 3 was marked and attached to the transcript.)

BY MR. MARCHIANDO:

Q.    And, Mr. Maynard, take a look at this document.  And then let me know when you're ready to answer some questions about it.  Okay?

A.    Okay.

Q.    So I want to look at paragraph 6.  That's at the bottom of the first page, and it runs onto the second page.  It says:  This career experience -- and you're referring to the Public Defender systems in Alaska and Wisconsin -- afforded me multiple opportunities to cull case data, analyze case data, as well as multimedia data, and create a variety of reports detailing my findings.

Did I read that accurately?

A.    Yes.

Q.    And how did that sentence get into your declaration?  Did you put it there?

A.    Correct.

MS. DeMARTE:  Object.

THE WITNESS:  Sorry.

MS. DeMARTE:  I was going to object for attorney-client communications and work product and mental impressions.

So if you could allow me to make some objections, Neal, before you answer, that would be

appreciated.

THE WITNESS:  My apologies.

BY MR. MARCHIANDO:

Q.    Neal, do you have a lawyer present at this deposition today?

A.    Katrina.

MS. DeMARTE:  Yes.

BY MR. MARCHIANDO:

Q.    Sorry?

A.    Katrina is representing or defending my deposition.

Q.    Well --

MR. MARCHIANDO:  And, Ms. DeMarte, you -- you two talked over each other, so I didn't hear what you said.

MS. DeMARTE:  I just said I am representing him here today.

BY MR. MARCHIANDO:

Q.    Okay.  So, Mr. -- Mr. Maynard, you consider Ms. DeMarte your lawyer, right?

A.    For the purposes of -- that we're here for, yes.

Q.    Okay.  Are you paying her for her time today?

MS. DeMARTE:  Objection; form, relevance,

harassing the witness.

BY MR. MARCHIANDO:

Q.    You can answer.

A.    No.

Q.    Okay.  So paragraph -- paragraph 6, the one that we just read a second ago, does that -- does that apply to a -- one of the previous jobs in particular or is that experience that you attained from both of the jobs at the Public Defender's offices?

A.    I would say that -- we're talking about number 6 -- while it references the prior number, number 5, which references the Public Defender work, you could look further in my resumé and find other job duties that I've done that also lend themselves to number 6.

Q.    Okay.  Like what?  At the TSA did you do any -- did you -- did you have any responsibilities like that?

A.    Yes.

Q.    Okay.  Any of your prior training involve identity theft, Mr. Maynard?

A.    No.  I can't recall any prior training I've had regarding identity theft.

Q.    And you didn't -- it wasn't a part of any of your responsibilities when you were with the Alaska Public Defender's Office?

A.   No.  That was not a common type of crime that I encountered while working there.

Q.   **What about in Wisconsin, was it common there?**

A.   No.

Q.   **Anything about identity theft in your responsibilities at the TSA?**

A.   I mean -- no.  I -- no.

Q.   **Have you worked on prior litigation in your work with DeMarte Law in cases involving identity theft?**

MS. DeMARTE:  Objection.  Mr. Maynard has a privilege to assert with regard to clients that he has.  It's an ethical obligation.  He cannot release names of any clients that he's taken in a personal investigation capacity.

So if you believe you can answer without violating that, Mr. Maynard, you may answer, but otherwise I will instruct you not to answer.

BY MR. MARCHIANDO:

Q.   **I'm not asking for any names, Mr. Maynard. I'm just asking generally.**

A.   Has there been other -- is the question has there been other cases that DeMarte Law has defended that involve identity theft?

Q.    Well, no.  It's cases -- have you -- have you had occasion to work on cases in your responsibilities at DeMarte Law that involved identity theft?

MS. DeMARTE:  Objection; form.

You can answer if you're able.

THE WITNESS:  I still don't understand.  I mean, so is -- the question, as I understand it, is have I worked on cases at DeMarte Law that involved identity theft allegations?

BY MR. MARCHIANDO:

Q.    Yes.

A.    The answer would be yes.

Q.    Okay.  But you're -- the -- the reason I was making a distinction is because you were making it much broader and saying at DeMarte Law, which could have been the time before you were there.  So I'm interested in what you've done.  I'm not interested in what Ms. DeMarte's --

A.    Yeah.  I can't --

Q.    -- firm --

A.    -- speak to what was done before I was there, so I --

Q.    Of course.

A.    -- wouldn't be bringing that minute.

Q.    Of course.  But just the way you worded the question in response was much broader than what I had asked.

But you testified earlier that you've never submitted a declaration like you did in this case, right?

A.    That's correct.

Q.    Okay.  Do you have any legal training, Mr. Maynard?

A.    I mean, that's -- that's kind of hard to say because -- with eight years of experience in the legal field, I -- I would say yes.  I mean, I'm not trained as a lawyer.

Q.    Have you -- do you have any -- did you graduate from high school?

A.    Yes.

Q.    What year was that?

A.    2005.

Q.    Do you have any post high school education?

A.    Yes.

Q.    Tell me about that.

A.    Bachelor's degree, Lake Superior State University.  Graduated 2009.

Q.    Okay.  In what area is your degree in?

A.    Criminal Justice was my major.

Q.    Did you take any -- any courses or do you have any licenses related to -- to being a legal assistant?

A.    No.

Q.    So I want to ask you some more questions about -- let's go back to Exhibit 2.  This is your -- I'm sorry.  Exhibit 3 is your declaration.

I want to ask you about paragraph 7.  It says:  In this litigation which includes claims of identity theft I examined e-mail traffic involving e-mail address Robbin -- and that's --

MR. MARCHIANDO:  Let me spell that for you, Penny.  It's R-O-B-B-I-N W-A-R-D.

BY MR. MARCHIANDO:

Q.    -- 61@gmail.com which was used by the applicant and resident of the rental home at 229 Cliff Heights Circle in Dallas, Texas.

Did I read that correctly, Mr. Maynard?

A.    Yes.

Q.    Now, when you use -- and -- when you say have -- well, let's ask it this way:  Did you put that sentence in your declaration?

MS. DeMARTE:  Objection.  You're calling for attorney work product and mental impressions.

So to the extent that any response would have to do with anything that Mr. Maynard and I have discussed, Mr. Maynard, I would instruct you not to answer, but aside from that you can answer if you're able.

THE WITNESS:  The question was did I put that in there?

BY MR. MARCHIANDO:

Q.  Yes.

A.  Yes.

Q.  Okay.  And when you say -- at the end there when it says:  Which was used by the applicant and resident of the rental home, that's information that you discussed a little further down, right, in paragraphs 8 and 9 and 10, right?

MS. DeMARTE:  Objection; form.

THE WITNESS:  Yes.  That's accurate.

BY MR. MARCHIANDO:

Q.  Okay.  So the way that you know that, the tail end of that -- of paragraph 7:  Which used by the applicant and resident, that's -- you're explaining that in the next -- in the -- in the following paragraphs, right?

A.  Correct.

Q.  Okay.  So let's look at paragraph 8.

There's some Google subscriber information.  Do you see that?

A.    Yes.

Q.    And below that you have a little bit of -- well, you have a -- a statement.  It says:  The above information indicates that when the computer user accepted the terms of service to create the Gmail account on January 23rd, 2019 the computer user was accessing and using the internet via IP address 192.100.72.2, right?

A.    Right.

Q.    What's an IP address?

A.    As I understand it, an IP address is a unique identifier that signifies the pathway that a device is using to access the internet.

Q.    Okay.  Tell me how you learned that.

A.    Just general knowledge of how the internet works.

Q.    Have you had occasion to -- to research that type of thing in other cases?

A.    Have I researched what an IP address is?

Q.    Yes.

A.    Yes.

Q.    As part of your job duties where?

A.    Well, I mean, like growing up as a child

getting on the internet, you need to have an IP address if you're going to access the internet, so, I mean, it's just something I've been familiar with since I was a teenager, I guess.

Q.    Okay.  So what is -- does an IP address give you any -- give you any geographical information?

A.    It -- it does, yes.

Q.    Okay.  But you can't tell by looking at it, right?

A.    You can't tell just by looking at the numbers, no.

Q.    You have to use a tool to determine specific things about the IP address, right?

A.    Correct.

Q.    Okay.  And you discuss that a little bit later in your declaration, don't you?

A.    Yes.

Q.    Okay.  And tell me how you know -- well, where -- where -- where in this -- I guess this is a -- a cutout of some of the Google subscriber information for this Gmail account.  Tell me where it shows the middle part of your sentence in paragraph 9:  The computer user accepted the terms of service to create the Google -- the Gmail account on January 23rd, 2019. How did you -- how do you discern that from this -- from

what we're looking at?

A.   It's on there where it says created on 2019-01-23.

Q.   Okay.  And how do you know this to be the terms of service to create the Gmail account?

A.   Because that's what Google labeled it as.

Q.   Where is that found?

A.   The source for that is right there, Exhibit 10.

Q.   Okay.  So it's not in what you placed here?  It's elsewhere?

A.   This is like a snippet of what -- I think what would be at Exhibit 10.  I'm not sure.  I'd have to see Exhibit 10.

Q.   Okay.  Well, let's take a look at Exhibit 10.  This is going to be actually Exhibit 4 to the deposition, but it's Exhibit 10 to the summary judgment brief that NCS filed in this case.

(Exhibit 4 was marked and attached to the transcript.)

BY MR. MARCHIANDO:

Q.   This is a two-page document, Mr. Maynard. And I'm looking to see if it has a Bates number on it. I don't think it does.  But it has a -- the clerk's header indicates that it's Document 55-12 as filed in

the case.

So, Mr. Maynard, take a look at this document.  And let me know when you're ready to answer some questions about it, please.

A.   Okay.

Q.   Okay.  First of all, I have a question about this document.  It's got some -- some things that are circled in red.  Do you see those two things?  one says terms of service IP.  The other says birthday.  Do you see those?

A.   I do.

Q.   Did you circle those things?

A.   It's possible.  I don't have a specific memory of that.

Q.   Okay.  So where on this document do we find what we were talking about a second ago, that someone accepted the terms of service?

A.   I mean, this is their confidential and proprietary record about what is captured in their system when someone creates an e-mail address.  That's what I understand it to be.

Q.   Okay.  Well, in your declaration you say specific things about this.  And I want to know whether -- where do we find those specific things, where they weren't on what we looked at a second ago?  I want

to find them on here if we can.

A.    I mean, I just don't think it's as explicitly stated as you are implying it to be.

Q.    Okay.  But it's still a conclusion that you've reached, right?

A.    It's a conclusion I've reached based on the documentation that they provided from their company, correct.

Q.    Okay.  But is -- is there some other document that we might look at that you can think of?

A.    That's very vague.  I don't know what you mean by some other document.

Q.    Well, I'm just trying to understand where -- the -- the basis for the statement in here that:  The computer user accepted the terms of service to create the Gmail account on January 23rd, 2019.  It's not on -- in the portion of your declaration we looked at.  You're not able to identify it on Exhibit 4.  I'm just trying to find out where the basis for that statement comes from.

A.    I can't answer that any more clearly than I've already answered it.

Q.    Okay.  Let's go back to Exhibit 3.  And in paragraph 10 you talk about some documents that were provided by Main Street Renewal.  And do you understand

Main Street Renewal to be the landlord in this case?

A.    A property management company, landlord, yes, something of that nature.

Q.    Okay.  And I wasn't trying to be -- give a -- give a legal description of what it was, just -- I was trying to be sort of colloquial, but okay.

So there's some -- if we go onto the page -- I'm trying to keep my pages straight here.  So if we go onto the following page where paragraph 10 continues, there's some more information from other documents pasted in here.  Do you see that?

A.    Yes.

Q.    Okay.  And these -- this is information that you took from a document that Main Street Renewal provided, right?

A.    Correct.

Q.    Okay.  And it has some other information in it too, right?  It has some -- one column has the IP address in it, doesn't it?

A.    It does.

Q.    Okay.  It's the same IP address we were looking at a second ago for the other -- from -- from the Google account, right?

A.    Correct.

Q.    Okay.  And then for paragraph 11 you say:

The above information indicates when the computer user completed and submitted the rental application on January 30th, 2019 the computer user was acc -- accessing the information in -- sorry.

MR. MARCHIANDO:  Penny, I've got to start over.  Sorry.

BY MR. MARCHIANDO:

Q.    Paragraph 11 says:  The above information indicates that when the computer user completed and submitted the rental application on January 30th, 2019 the computer user was accessing and using the internet via IP address 192.100.72.2, right?

A.    Correct.

Q.    And the basis for that statement is everything that's in the right-hand column under IP, right?

A.    Correct.

Q.    Then going down to paragraph 12, there's some additional information from Main Street Renewal about some payments, right?

A.    Yes.

Q.    And I'll just summarize what you say in paragraph 13 here.  And you can tell me if you think I'm unfairly summarizing it.  Basically in paragraph 13 you say five of these payments came from the same IP address

that we've been discussing, right?

A.    Correct.

Q.    Okay.  Did you do anything to look up this IP address before you created your declaration?

A.    Did I look up the IP address before I created the declaration?  Yes.  I believe I did.

Q.    Okay.  What about any of the bank account information?  Did you look for any of that to try to verify whether these payments were actually made or anything like that?

A.    No.

Q.    And the basis for the statement that five of the payments came from the same IP address, is that the -- sort of the bottom right of this pasted in portion of the -- of the Main Street payment report, right, right there where it says IP address?

A.    Correct.

Q.    Okay.  So onto paragraph 14 you talk about information that Google provided.  Do you see that?

A.    Yes.

Q.    Okay.  And it's related to that e-mail address that I read into the record a bit ago, robbinward61@gmail.com, correct?

A.    Correct.

Q.    Okay.  So do you know what a .mbox format

is?

A.    I do now.  I didn't know prior to this.

Q.    Prior to this what?

A.    This case was the first time I'd ever seen anything called a .m-b-o-x file.

Q.    Okay.  Not something you came in contact with or used in your time with the Alaska Public Defender's Office?

A.    Nope.

Q.    Okay.  Same for Wisconsin?

A.    Same.

Q.    Okay.  You say in here that you downloaded and used a publicly available free software program called Mozilla Thunderbird to be able to access and review the m -- the .mbox files.  Do you see that?

A.    Yes.

Q.    What other -- are there other ways besides Mozilla Thunderbird to access and review .mbox files?

MS. DeMARTE:  Objection; foundation.

You can answer if you're able.

THE WITNESS:  Yes, there are other ways.

BY MR. MARCHIANDO:

Q.    Can you name some of them?

A.    It would be the -- there was an e-mail that Google provided where they said to acc -- to look

at this data you can use Mozilla Thunderbird or -- there was a second program that they named.  I can't recall the name of it off the top of my head.

Q.    Okay.  Well, let's pause there and look at another exhibit.  So this is going to be Exhibit 5.

(Exhibit 5 was marked and attached to the transcript.)

BY MR. MARCHIANDO:

Q.    Take a look at this document, Mr. Maynard.  And then let me know when you're ready to answer some questions about it.

A.    Okay.

Q.    Have you seen this document before today, Mr. Maynard?

A.    Yes.

Q.    Is this the e-mail you're talking about?

A.    Correct.

Q.    Okay.  So under -- it's addressed to Ms. DeMarte.  But it says in here what you said:  These files can be accessed using Mozilla Thunderbird or a plain text editor such as TextEdit.  Do you see that?

A.    Yes.

Q.    Is that what you were referring to, there was some other --

A.    Yes.

Q.   -- way to do this?

Okay.  How did you decide between Mozilla Thunderbird and TextEdit to view and access these files?

A.   I don't remember.

Q.   Had you used either one of those before?

A.   No.

Q.   Had you used anything like them before; you know, it may have been a different program that you just didn't care for and you wanted to try something new?

A.   I mean, in a general sense I think the features of Thunderbird are similar to Outlook, like the Microsoft e-mail program.  And I've used Outlook before. But that's the only comparison I can draw.

Q.   But have you ever used Outlook to analyze some e-mail data like is -- like we're doing in your -- in your declaration here?

A.   Not that I can recall.

Q.   Okay.  So paragraph 14 continues:  Upon opening Mozilla Thunderbird and loading .mbox files.  It sort of ends there.  Is that -- it doesn't seem like a complete sentence to me now that I read it again.  Does that seem like a complete sentence to you, Mr. Maynard? I'm talking about the last sentence of paragraph 14.

A.   Yes.  I see there is a period there.  It

does not sound like a complete sentence.

Q.    Okay.  Because it's followed by a --
another pasting of some information that -- that I'll
ask you to identify.  So this is -- above paragraph 15
it's some -- another -- what -- what can we call these
things, just so I'm not sort of fumbling around to
describe it?  Are these like cutouts --

A.    Screen --

Q.    -- or what do you call them?

A.    Screenshots.

Q.    Screenshot?  Okay.  That's a good one.

So above paragraph 15 there is a
screenshot, right?

A.    Correct.  Two screenshots.

Q.    Oh, there's two?  Oh, you're right,
there's two.  Okay.  So let's talk about the -- the
first one, the one that's at the top of the page.  What
is that from?

A.    That's a screenshot of the Mozilla
Thunder -- Thunderbird that -- is that what it's
called -- Thunderbird program after the mbox files had
been loaded in.

Q.    Okay.  Do you recall the process that you
went through when -- to load in those mbox -- the .mbox
files into Mozilla Thunderbird?

A.   Not offhand, no.

Q.   Do you remember -- I don't think it's described here in your -- in your declaration.  I'm just wondering what -- if you remember what you did?

A.   I think it's just -- any -- I mean, going into those menus at the top and finding something similar to open or import and clicking on the --

Q.   (Speaking simultaneously)

A.   -- file from Google.

Q.   So is it -- can you just maybe -- and I know that you're not -- you're not certain, but I'm just trying to understand how this would work.  So can you do your best to describe your understanding of --

A.   Yes.  (Speaking simultaneously)

Q.   -- how it works?  You click here and you click there?

A.   Yeah.  What I stated would be my best understanding that I could give you without actually touching it right now and going through the different menu items.

Q.   Okay.  Would you -- do you remember if you -- do you know what drag and drop means?  Have you ever heard that expression before?

A.   I have.

Q.   Excuse me.

Do you recall or do you think maybe that that's something that you did, you dragged and dropped the .mbox files into Mozilla Thunderbird?

A.    I don't remember the exact method.

Q.    How did -- do you remember how -- how you kept the .mbox files that were received from Google?

MS. DeMARTE:  Objection.

THE WITNESS:  What do you mean?

BY MR. MARCHIANDO:

Q.    Like was it on a flash drive?  Was it on your hard drive of your computer?

A.    I believe it was on the hard drive of my computer.

Q.    Okay.  And that's your work computer, right?

A.    Yes.

Q.    Okay.  So in between these two screenshots it says:  I found that there were 3,992 e-mails included in the production from Google.

Do you see that?

A.    Yes.

Q.    And you learned that from -- there is a highlighted spot in the screenshot we were just talking about that says all mail.  And then it's -- part of it I can't see because there's an ellipsis there.  But at the

end of that it says 3,992, doesn't it?

A.    Yes.

Q.    Is that where you got that number?

A.    Yes.

Q.    Okay.  The next sentence says -- you said:
There is an option to filter the messages to assist
users in searching the messages.

Do you see that?

A.    Yes.

Q.    Okay.  How did you learn how to filter the
messages on Mozilla Thunderbird?

A.    I would have learned that by noticing the
box where it says filter these messages.

Q.    Okay.  And then you chose to filter them
using some terms, right?  I'm going to read -- read and
spell these for -- for Penny here.  One of the terms was
msrenewal.com.  The next one was amherst, A-M-H-E-R-S-T,
.com.  And the last one is L-A-Q-E-N-A-L-L-E-N.

MS. DeMARTE:  You got that one wrong.
It's L-A-Q-U-E-N-A-L-L-E-N.

MR. MARCHIANDO:  Did I not say U?  Okay.

MS. DeMARTE:  You missed it.  Sorry.

MR. MARCHIANDO:  U always goes with Q.
How did I miss that?

BY MR. MARCHIANDO:

Q.    But, anyway, did I read those search terms correctly, Mr. Maynard?

A.    Not initially, but she corrected you.

Q.    Well, as corrected are they accurate?

A.    Yes.

Q.    Okay.  How did you decide on those search terms?

A.    Those were the items that would be pertinent to the property and the rental application.

Q.    Okay.  Why does that matter?  I mean, why are you -- or why would you be interested in the property in the -- in the rental application?  Why does that matter?

MS. DeMARTE:  Objection to the extent they're asking for attorney-client communications and/or mental impressions.

If you think you can answer without, you know, revealing any of that, you may answer.

THE WITNESS:  Can -- can you repeat or Madam Court Reporter repeat the question?

(The question was read by the reporter.)

THE WITNESS:  That would just revert to number 7 in my declaration.  That's -- it spells it out.

BY MR. MARCHIANDO:

Q.    Okay.  Paragraph 7?  Is that what you --

when you say number 7, that's what you mean, paragraph 7?

A.   Yes.

Q.   Okay.  That -- that -- that was important to you because of what you've said in paragraph 7, right?

A.   Correct.

Q.   Because the case involves claims of identity theft?

A.   Correct.

Q.   Okay.  So in paragraph -- I lost my place here.  Sorry about that.

Paragraph 16 you say:  Plaintiff's daughter, Laquencilla --

MR. MARCHIANDO:  And I'll spell that for you, Penny, hopefully correctly.  L-A-Q-U-E-N-C-I-L-L-A Allen, A-L-L-E-N; Antoinette, A-N-T-O-I-N-E-T-T-E, Green, a.k.a. Quen, Q-U-E-N, Green is relevant to the case because her personal information was also included in the rental application.

BY MR. MARCHIANDO:

Q.   Did I read that sentence correctly, Mr. Maynard?

A.   Yes.

Q.   Okay.  Why is the fact that she -- her

name appears on the rental application, why is that
relevant to the case as you say?

A.   Because, as you've noted, the case deals with identity theft.

Q.   Okay.  And is -- is the point of this discussion and analysis in your declaration to try to tie plaintiff's daughter to the identity theft?

MS. DeMARTE:  Objection.

THE WITNESS:  No, I wouldn't -- I wouldn't -- sorry.

MS. DeMARTE:  Objection.

To the extent you're calling for attorney-client communications or mental impressions, I'd instruct you not to answer.  But if you're able to provide an answer that does not call any of those details into your testimony, you may answer.

THE WITNESS:  Yeah, I provide no answer.

BY MR. MARCHIANDO:

Q.   Based on your attorney's instruction?

A.   Correct.

Q.   But that's the reason you've done this -- all this analysis and everything, isn't it?  You're trying to say Ms. Allen stole his identity, isn't it?

MS. DeMARTE:  Objection.

To the extent that you're calling for

attorney-client communications or attorney mental impressions, I'd instruct you not to answer.  If you think you can provide an answer that does not call into question any of those communications or details, you may answer.

THE WITNESS:  I provide no answer.

BY MR. MARCHIANDO:

Q.    Based on your attorney's instruction?

A.    Correct.

Q.    Well, then how can you submit a declaration under penalty of perjury but then you can't answer anything because they're -- they -- they contain an attorney's mental impressions?  You -- you say these things in your declaration, right, Mr. Maynard?

A.    You have to be more specific by what you mean "say these things".

Q.    You say Quen Green is relevant to the case because her personal identi -- the personal information was also included in the rental application, right?

A.    That's true, yes.

Q.    You've said, right?  Right?

A.    That's true, yes.  Number 16.

Q.    Okay.  And you go through all of this analysis.  Here is pictures of people partying at an apartment.  Here's information relating to payments that

are made.  Right?

A.   Correct.  That's the content of the declaration.

Q.   And -- but the idea is that -- to say that plaintiff's daughter stole his identity, isn't it?

A.   I don't know what you mean when you say "the idea".

Q.   Well, the point of your declaration.  Right?

A.   (Speaking simultaneously)

Q.   You're trying to tie them together, right?

A.   The point of my declaration is to summarize data that was part of the case file and present it in a way that was easily able to be ascertained.

Q.   Okay.  In all of the data that you analyzed and everything that you went through, did you see anything tying Robbin Ward to this identity theft?

MS. DeMARTE:  Objection; form, foundation.

You can answer if you're able.

MR. MARCHIANDO:  Stop coaching the witness, Katrina.  If you're --

MS. DeMARTE:  I'm not having speaking objections.

MR. MARCHIANDO:  You're coaching -- you're

coaching the witness by -- and there's case law on this. When you say "answer if you're able", "answer if you understand", that's coaching the witness. You're not allowed to do that. There's case law.

MS. DeMARTE: I can stop saying "answer if you're able". But in --

MR. MARCHIANDO: (Speaking simultaneously)

MS. DeMARTE: -- my experience people forget to answer if I don't say that.

MR. MARCHIANDO: Your objections are fine; they're concise and they comply. But the -- the ending part, "answer if you know", "answer if you're able", that's all -- that's all coaching. And I'll remind him to answer.

MS. DeMARTE: I can stop -- I can stop saying that. But my -- as I said, my experience is that people forget. They should be answering when those are the objections. If you want to remind him to answer, you can go right ahead.

MR. MARCHIANDO: I'll -- I'll remind him. Thank you.

THE WITNESS: Can someone repeat the question?

MR. MARCHIANDO: Penny, would you read the question back, please?

THE REPORTER:  Let me try and find it.

MR. MARCHIANDO:  That's fine.  If you -- if you have to search, I'll -- I'll -- I can -- I can put it back together.

(The question was read by the reporter.)

THE WITNESS:  Okay.  So for the limited scope that we're here to talk about today, being the declaration and the work that went into the declaration, the answer to that question would be, yes, based on the Google prescriber information listing the name Robbin Ward as the person creating the e-mail address, the e-mail address containing the name Robbin Ward.

BY MR. MARCHIANDO:

Q.    Is your answer complete, Mr. Maynard?

A.    Yes.

Q.    So, first of all, objection; nonresponsive because you don't get to qualify your whole answer by saying what the scope of the deposition is.  There's no -- there's no scope of this deposition.  It's everything that's in your mind.  This is a Rule 30(b)(1) regular old deposition about your personal knowledge.  It's not limited in the way that you suggest.

MS. DeMARTE:  It is limited by the Court's order permitting discovery.

MR. MARCHIANDO:  Sorry?

MS. DeMARTE:  It is limited based upon the Court's order limiting discovery as to Mr. Maynard.

MR. MARCHIANDO:  Yes.  But the Court's order is not so narrow that I only get to ask him about this declaration.  I can ask him what kind of car he drives.  I'm not going to because that's a waste of time.  But it's not limited --

MS. DeMARTE:  I disagree with -- I disagree with your interpretation, but I believe --

MR. MARCHIANDO:  It's not limited --

MS. DeMARTE:  I believe he provided you the answer he's able to.

MR. MARCHIANDO:  Well, I -- well, my objection's noted.

BY MR. MARCHIANDO:

Q.    So, Mr. Maynard, is it your understanding that only the actual Robbin Ward can create an e-mail address using the name Robbin Ward?

MS. DeMARTE:  Objection; form, foundation.

THE WITNESS:  I am assuming anyone can create an address claiming to be anyone else.

BY MR. MARCHIANDO:

Q.    So just because the address --

A.    I don't know --

Q.    (Speaking simultaneously)

A.   I don't know if -- I don't know if different e-mail service providers have different verification requirements, so, I mean, I'm -- I'm just able to offer conjecture.

Q.   Is your answer complete?

A.   Yes.

Q.   Okay.  So I apologize.  I -- I started talking in the middle because I thought you were finished.

So -- but you'd agree with me generally, to your knowledge, anyone can get onto Gmail and name the account whatever they want, right?

MS. DeMARTE:  Objection; form, foundation.

THE WITNESS:  Yeah.  I suppose I could go on there and make up a billybob12@gmail.com address if I felt so inclined.

BY MR. MARCHIANDO:

Q.   Okay.  So the mere fact that the address is called robbinward61 doesn't mean that actually Robbin Ward himself created it, does it?

MS. DeMARTE:  Objection.

THE WITNESS:  Right.  We don't have the information to know whose fingers were typing on the keyboard.

BY MR. MARCHIANDO:

Q.    Okay.  So I want to move to the next paragraph here.  And I've lost where my place is.  Oh.  We were at number 16.

And we'll go on to number 17.  Once these filters were executed on e-mails, I copied data from these e-mails and looked at e-mails where robbinward61@gmail.com had either sent a message or replied to someone else's message.

Do you see that?

A.    Yes.

Q.    Did you use something other than Mozilla Thunderbird to accomplish that task?

A.    (Reading to self)

I mean, I think it goes into greater detail later that I -- I copied the information into a spreadsheet.  So I guess the technical answer to your question was -- would be I would not be exclusively using Mozilla Thunderbird.  I would have used another program to make a spreadsheet.

Q.    Okay.  And I think you do talk about that a little bit later.  You talk about the spreadsheet you created.

So on number 18, you went back into the Mozilla Thunderbird program and you were able to examine the IP addresses of the messages for

robbinward61@gmail.com was the sender.

Did I read that correctly?

A.   Yes.

Q.   What was the point of doing that?

MS. DeMARTE:  Objection.  Attorney -- to the extent you're calling for attorney-client communications or mental impressions, if you think you can answer separate from those types of communications or information you may.

THE REPORTER:  I missed the answer.  There was an interruption in the audio.  The question.

MR. MARCHIANDO:  Oh.  You missed the question?  Okay.  The question -- did you get --

THE REPORTER:  (Speaking simultaneously)

MR. MARCHIANDO:  I read the sentence.  And then he said -- I asked if I read it correctly.  And he said yes.  And you want the question after that?

THE REPORTER:  As -- as long as we're speaking, it goes on the video and I have to transcribe it.  So I have to -- as long as I'm writing I can't search.  And I can't -- I can't do anything if -- as long as we're talking.

If we go off the record I can tell you.  But all of this that we're saying right now I'm going to have to input it after, off the videographer's audio,

so just so you know.  I'm trying to --

MR. MARCHIANDO:  Okay.  Well, I want to -- I want to do whatever is easier.  And I'm just trying to keep the place, that's all.

THE REPORTER:  Right.  But all of this speaking while I'm trying to find this is making -- I'm just going to have to add it later.  I have to -- I'm trying to find --

MS. DeMARTE:  Let's just -- let's just go off the record quickly then.

MR. MARCHIANDO:  Okay.

THE VIDEOGRAPHER:  Okay.  This marks the end of media number one.  The time is 4:04 p.m.  And we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  This is the beginning of media number two in the continuing deposition of Neal May -- Maynard.  Back on the video record at 4:16 p.m.

BY MR. MARCHIANDO:

Q.   Mr. Maynard, we've just returned from a break.  Do you understand that the oath you took to tell the truth at the beginning of the deposition still applies?

A.   Yes.

Q.   Is there any of your earlier testimony

that you want to correct, update, or change?

A.    No.

Q.    So we were looking at paragraph 18 of your declaration which we've marked here as Exhibit 3.

A.    Okay.

Q.    It says -- it says:  I went back into the Mozilla Thunderbird program and was able to examine the IP addresses of the messages where robbinward61@gmail.com was the sender.

Do you see that?

A.    Correct.

Q.    Did I read that correctly?

A.    Yes.

Q.    What's the point of doing that?

A.    Summarizing and analyzing the data provided by -- as noted above:  Google, Main Street.

Q.    But your -- the overall idea is to establish that this same computer or the same IP address is tied to all of these things, right, the Gmail messages that are sent, the payments that were received by the landlord, and the -- the application to the -- the rental property, right?

MS. DeMARTE:  Objection; form, foundation.

THE WITNESS:  The idea?  I -- I mean, the idea is to summarize the data and make it eas --

something easy for the Court to analyze in terms of looking at what they need to have for the motion, the summary judgment.

BY MR. MARCHIANDO:

Q.    Well, then why are we focused on the IP address and all of these different analyses?

MS. DeMARTE:  Objection.

To the extent it calls for attorney-client communications, attorney-client work product or mental impressions, if you can answer not involving any of those things you may.

THE WITNESS:  Yeah.  I have no answer.

BY MR. MARCHIANDO:

Q.    Is that because of your attorney's instruction?

A.    I have no answer.

Q.    Right.  And I'm -- and I have a -- my question is, is it because of your attorney's instruction or do you just -- there -- there is no answer?

A.    It's because of her instruction.

Q.    Okay.  So if -- if not for her instruction you would be able to answer, right?

A.    I have no further insight to provide.

Q.    Well, that's -- objection; nonresponsive.

That's -- that's not answering my question, Mr. Maynard.  I'm not asking you for the answer.  I'm just merely asking if your lawyer hadn't given you the instruction to not answer, is there one?  Do you have one?

MS. DeMARTE:  Objection; foundation.

THE WITNESS:  I guess I don't understand.  We're getting into such a nuanced thing, it seems like.  I don't know.

BY MR. MARCHIANDO:

Q.  Okay.  Well, maybe I can put a little background here.

So I asked you a question, right?

A.  Correct.

Q.  Your -- your lawyer objected and instructed you not to answer with certain conditions, right?

A.  I don't think she instructed me not to answer.

Q.  Okay.  What is your understanding of what her instruction was?

A.  Because I'm her employee it puts us in an odd position of being here because there's things that are privileged communications and things of that nature, so it's at times unclear to me what is okay to answer

and what is not okay to answer.

Q.    Okay.  Well, so are you -- you're refusing to answer the question on the instruction of your lawyer because you're -- you're not sure whether you can answer without revealing an attorney-client communication or mental impression?

A.    Yes.  That's a fair analysis, I believe.

Q.    Okay.  But my question then was if not for that instruction by your lawyer do -- you know, do you have an answer that you could have given?  I don't want to know what it is.  I'm just asking is there something you could have said but you're not saying it because of your lawyer's instruction?

MS. DeMARTE:  Objection; foundation.

THE WITNESS:  Yep.  See, some of this calls for, I feel like, very deep legal analysis.  And if I feel like I can answer a question of yours without getting into any kind of privileged topic area then I will answer that.

BY MR. MARCHIANDO:

Q.    Is your answer complete?

A.    Yes.

Q.    Okay.  So let's see if we can try to summarize what happens in paragraph 19.  It starts off you followed steps outlined below to find the IP

address.  This is your use of Mozilla Thunderbird to try to determine the IP address for these Gmail messages that are sent, right?

A.    Correct.

Q.    Okay.  And you -- part of what you did here was that you created a spreadsheet with some e-mails in either the -- the sender of the e-mail being robbinward61@gmail.com or -- well, let's stop it there. Right?

MS. DeMARTE:  Objection; form.

THE WITNESS:  The spreadsheet had like a chart basically of the dates and the e-mails that were sent and whether he was the -- or not he.  Whether the address robbinward61 was the sender or the recipient.

BY MR. MARCHIANDO:

Q.    Okay.  Is it helpful to look at the spreadsheet?

A.    Sure.

Q.    So we'll mark this as Exhibit 6.

(Exhibit 6 was marked and attached to the transcript.)

BY MR. MARCHIANDO:

Q.    And so, Mr. Maynard, take a look at this deposition -- or this exhibit.  And let me know when you're ready to answer some questions about it, please.

A.    Okay.

Q.    Okay.  Mr. Maynard, have you seen this document before today?

A.    Yes.

Q.    What is it?

A.    This is a spreadsheet that I created, as detailed in the declaration.  It shows the date of the message, who's corresponding, any notes about the communication, and the IP address from the sender.

Q.    Okay.

A.    Or replier.

Q.    Sorry.  I -- (speaking simultaneously)

A.    (Speaking simultaneously)

Oh.  Sorry.

Q.    I did it again.  Excuse me.

Please -- please finish your answer.

A.    As we noted, obviously prior -- this is not exhaustive.  This is the filtered messages.

Q.    Well, this is a -- this is even a finer sort of filter of the filtering, right?  This is not all of 3,992 that originally were returned, right?

A.    Right.  It's just --

MS. DeMARTE:  Objection.

THE WITNESS:  -- a small subset of that, yes.

BY MR. MARCHIANDO:

Q.    Okay.  A small subset based on whether the -- they included information or whether they included the e-mail address robbinward61@gmail.com somehow, right?

A.    Correct.

Q.    Okay.  Excuse me.

So in what -- tell me the second column.  It says who is corresponding.  What does that mean?

A.    Who's the sending party of the message.

Q.    Okay.  So am I right the way I view this, robbinward61@gmail.com is only the sender of three of these messages?

A.    So you're talking about a sender, not a replier?

Q.    Okay.  Maybe I misunderstood what you said the second column was.  I apologize about that.  So it says who is corresponding.  What does that mean?

A.    That would be the original person who sent the first message.

Q.    Okay.  So these are all the people that -- that e-mailed something to robbinward61@gmail.com, right?

A.    Correct.

Q.    Okay.  And what is the point then of the

final column, the IP address?

A.    So that is based on if robbinward61 was either the original sender or was a replier, then that would be the e-mail address that -- the communication given those two parameters, that would be the IP address that was used --

Q.    To send the message?

A.    -- by -- by robbinward61@gmail.com.

Q.    Okay.  That clarifies things for me.

And so is it a fair summary to say that the IP address matches the one that we've been talking about wherever it's invisible as the sender of a robbinward61 -- robbinward61@gmail.com message?

A.    There are multiple times where the robbinward61 is sending a message using the IP address we've talked about prior.  There are also some times where robbinward61 is sending a message using an IP address that's different than the one that we talked about prior.

Q.    Okay.  In your declaration you -- did you analyze the -- analyze might not be the right word.  Did you do any investigation as to the geographic locations of both of those e-mail addresses?  Let's start over.

In your declaration did you do any analysis about the geographic locations of either of

those IP addresses?

A.    When you say either of those, I guess that confuses me because we just talked about the third column of this, and more are listed than two, so that implies more than either.

Q.    Fair.  That's a fair point.

So let's try this way:  In your declaration did you do any analysis about the geographic locations of all of the IP addresses that appear in the last column of the spreadsheet that we're looking at here, Exhibit 6?

A.    No.  There's -- in the declaration there's not geographic analysis of all IP addresses.

Q.    Okay.  You just stuck with the geographic analysis as to 192.100.72.2, right?

A.    Yes.  As the declaration noted, that was the one that was commonly appearing when you looked at the rental application, the payment records, and the creation of the Gmail account.

Q.    Okay.  And is that just the reason that you disregarded the other IP addresses that appear in the last column of paragraph 6 --

MS. DeMARTE:  Objection; form.

BY MR. MARCHIANDO:

Q.    -- of Exhibit 6?

MS. DeMARTE:  Objection; form.

THE WITNESS:  I wouldn't say it was disregarded.  The -- this was a summary of the data in the case as it was pertinent to, you know, the information.  If something shows up multiple times, then that's something you should focus your attention on, I guess.

BY MR. MARCHIANDO:

Q.   Okay.  But you didn't -- you didn't -- my point is you didn't analyze these other -- the geographic locations of these other IP addresses, right?

A.   Well, not in the declaration.  You can look at that column in the spreadsheet.  Was it Exhibit 6 that we're -- have in the other program where it has geographic locations for other IP addresses?

Q.   Exhibit 6 is the one we were just looking at, right, the one --

A.   Right.

Q.   The spreadsheet you created?

A.   Correct.

Q.   Okay.  So --

A.   You see it says Leander, Texas for one. It says --

Q.   This is very small, so I'm having trouble following where you -- where you are here.

A.    There's one that says Louisiana, the second one down, the second one down -- the third one down on the far right column.  I'm able to zoom in using the buttons on the top.

Q.    Right.

A.    I don't know if you can use that.

Q.    Okay.  So that one has a different IP address.  And it says at the tail end of this description Louisiana, Monroe.  Louisiana, city: Monroe, right?

A.    Correct.  And then continuing down, you'll see other cities and states mentioned there.

Q.    Okay.  And is that information that you put in there?

A.    Yes.

Q.    So you looked -- let's just focus on the -- the third row here on the spreadsheet.  The -- the date on the left-hand side is February 14th, 2019.

Do you see that?

A.    I do.

Q.    Okay.  So is it your testimony that you learned the originating IP address of 174.255.132.161 from the Gmail information that was provided?

A.    Correct.

Q.    Okay.  And then you did something to

determine that that IP address has some sort of a connection to Monroe, Louisiana, right?

A.   Correct.

Q.   How did you do that?

A.   Following the steps outlined in the declaration to search the IP address.

Q.   Okay.  Maybe I didn't understand your earlier testimony.  Did you do that sort of geographic analysis for every IP address that appears in -- in Exhibit 6 or just for some of them?

A.   Exhibit 6 is the spreadsheet here?

Q.   Right.

Excuse me.

A.   Yeah.  I believe -- most -- most of them have a city and state.  It's -- if it's not the main one that we talked about prior, then it's one of the other ones.  Most of them have a city and state.  I'm seeing on the bottom of page 1 --

Q.   So could I move the exhibit --

A.   (Speaking simultaneously)

Q.   I'm sorry.  I talked over you.

I was going to move the exhibit sticker to see if we could see that a little bit more clearly.

A.   Yeah.  So those don't have -- or the -- well, the only one that doesn't have it is the second

one from the bottom, and that's because I think it's the exact same as the one above it, so I didn't feel the need to put the same information in there.

Q.   Okay.  So let's go back to Exhibit 3. This is your declaration.  I want to talk about paragraph 21.  It says:  There are many publicly available and free websites which can be accessed to learn more information about any given IP address.

Do you see that?

A.   Correct.

Q.   You used Google, right?

A.   Correct.

Q.   What are some of the other publicly available and free websites that you could have used?

A.   If you turn to page -- the next page of the -- I'm sorry -- page 8 of the declaration, you can see I circled in red there's -- above that whatismyipaddress.com, rdpguard.com, ipinfo.io.

Q.   Okay.  So the screenshot --

A.   (Speaking simultaneously)

Q.   -- that you took -- I apologize, Mr. Maynard.  I keep talking over you.

Was your answer complete?

A.   Yes.

Q.   Okay.  And what we're looking at is a

screenshot of what?

A.    A screenshot of a Google search result page.

Q.    A results page of a Google search that you did, right?

A.    Correct.

Q.    Okay.  And then the red circles, in each one of these there's three entries that we're looking at, right?

A.    Correct.

Q.    And there's a red oval around -- in each one -- the Neiman Marcus Group, one of them is Inc. and two of them are LLC, right?

A.    Correct.

Q.    Did you put those red ovals in there?

A.    Yes.

Q.    Okay.  Is that to highlight the Neiman Marcus Group, that -- that business?

A.    Correct.

Q.    Okay.  Then a little bit further down we've got another screenshot, right?

A.    Correct.

Q.    We have cats and dogs invading this deposition.

A.    She's -- I apologize.  She's a pest.

Q.   No.  Ms. DeMarte had her dog there, too, so you -- she's -- you're not alone.

Anyway, so what is the second screenshot we're looking for here -- looking at here?  It -- it -- the top left, it says ipinfo.io, right?

A.   Correct.

Q.   Tell us -- tell us what this is.

A.   So as the one above it would be a Google search result screenshot, this would be a search result screenshot from that site that you just named.

Q.   Okay.  And -- and mechanically what you do is you go to this site and you type in the numbers, the IP address, and this is what gets returned, right?

A.   I mean, essentially.  You don't have to type it in; you can copy and paste it, but yes.

Q.   Fair enough.

And then there's also a -- one of the entries in this screenshot says the Neiman Marcus Group, LLC, right?

A.   Yes.

Q.   There's a red oval around that, isn't there?

A.   Correct.

Q.   You put that red oval in there --

A.   Correct.

Q.   -- to highlight the Neiman Marcus Group, that entity, right?

A.   Correct.

Q.   Okay.  So is it your conclusion from having done this bit of analysis that the IP address that we've been talking about, 192.100.72.2, belongs to the Neiman Marcus Group?

A.   Correct.

Q.   And then on paragraph 22 you say:  An indication of the reliability of these sites is evidenced by the fact that multiple sites are returning the same result.

Do you see that?

A.   Yes.

Q.   That's -- you're -- you're sort of affirming the conclusion that we just talked about, right?  You're -- this -- this is probably accurate because two different sites gave us the same answer?

A.   Well, I think -- if you count specifically, it would be three different sites: whatismyipaddress.com, rdpguard.com, ipinfo.io.

Q.   Okay.

A.   But in essence, correct.

Q.   Okay.  And then let's look at paragraph 23.

Well, I guess I want to ask you one other question about the spreadsheet. All the information about the e-mail senders and recipients, that doesn't have anywhere -- let me ask it this way: There is no way to tell, as you indicated earlier, who's actually at a keyboard typing these messages, right?

A. Correct.

Q. So the mere fact that it says robbinward61@gmail.com doesn't mean that the actual person Robbin Ward is the one sending the e-mail, right?

MS. DeMARTE: Objection; form.

THE WITNESS: Correct.

BY MR. MARCHIANDO:

Q. So paragraph 23 says: All of the above information as outlined and detailed indicates that the computer user who created the Gmail address -- well, let me try it this way: I'm trying to make things easier on Penny because I'm reading all these things and it's probably not helpful.

So let me see if I can summarize paragraph 23, and you tell me whether or not I've adequately summarized it. Basically you're saying the person that did these things: applied for the -- completed the rental application, made payments, sent some e-mails, was operating from the IP address

192.100.72.2, right?

A.   Yeah.  I prefer my -- my paragraph in 23, but you're doing a -- an adequate job summarizing.

Q.   And then just to finish it up, that that's a -- that's a Neiman Marcus Group IP address, right?

A.   It's what was indicated by the search results, yes.

Q.   Okay.  Well, but that's what you're saying, right?  The search results tell me these things, right?

A.   Correct.

Q.   Okay.  So then you went onto Facebook, right?

A.   Correct.

Q.   Okay.  Excuse me.

And you looked for -- well, tell me -- tell us how you arrived at -- at -- well, let me ask it this way:  In paragraph 24, you went onto Facebook to look for something related to Laquen -- Laquena Allen, right?

A.   Correct.

Q.   How did you decide what to go onto Facebook and search for?

A.   I would reference number 16, paragraph 16.

Q.    Paragraph 16 is where you say Ms. Allen is relevant to the case because she has a connection to her father, right?

A.    That's what I typed -- whatever I typed in paragraph 16.

Q.    Okay.  But in -- when you went onto Facebook -- and what you describe on -- in paragraph 24, you looked for -- and I'm just going to read the tail end of the -- of the URL here.  It says L-A-Q-U-E-N-A-L-L-E-N, right?

A.    Correct.

Q.    That's not Ms. Allen's full name, is it?

MS. DeMARTE:  Objection; foundation.

THE WITNESS:  I understand that she has a very long full name.  So this URL in number 24 is not her full name.

BY MR. MARCHIANDO:

Q.    Right.

And then I'm asking, well, you -- but you -- what you indicate in paragraph 24, you went onto the internet and you typed this information in to get to Facebook, right?

A.    Well, I wouldn't say that I typed in that exact URL.  I probably accessed Facebook, searched the name, and then was able to find the profile and identify

it as being hers.  And it says how I did that in the latter part of paragraph 24.

Q.   Well, I'm trying to figure out how you decided to use Laquen Allen rather than some longer version of her name.  That's all.

A.   Again, I must -- I don't know if I even decided to use that.  That could be I found a profile just by searching as you would type -- I could have typed in the search bar on Facebook the name as it appears on the rental application, the shorter version, and then find the profile and the URL, the profile, has a different name than what I typed.

Q.   Okay.

A.   Is that clear?

Q.   Yes.

A.   Okay.

Q.   So the end of paragraph 24 you say:  By way of Robbin Ward being "tagged", in quotes, by Quen in multiple posts -- Quen is Q-U-E-N -- it was discerned that this profile belonged to the daughter.

Do you see that?

A.   Yes.

Q.   And where you use Robbin Ward in that sentence, you mean the plaintiff in this lawsuit, right?

A.   Correct.

Q.    And what is it your understanding -- what is your understanding of someone being, quote, "tagged" in Facebook posts?

A.    A tagging, like it's -- the way I think it's traditionally used, if you're in a picture with your friend, if you say I'm here with Billy Bob, and you would click a little link that would lead to whoever views the picture to possibly go to Billy Bob's profile by clicking on it.

Q.    Okay.  And is that what you did to sort of connect these two?

A.    Yes, as explained there at the latter part of number 24.

Q.    Well, you don't say what you did, though. You -- this is the result.  I'm trying to understand what you did to get the -- I mean, just tell me if you think I'm being unfair.  The last sentence says "the result", right?  I -- I put these -- connected these two because Robbin Ward was tagged, right?

A.    Correct.

Q.    Okay.  And I'm trying to, I guess, take one step back and figure out how you -- you're able to see someone that is tagged and then connect them with this other person.

A.    Yeah.  I mean, he -- well, he has a unique

name; it's not like Jim Smith.  So you see -- you see Quen who you found by searching for Quen.  And you see she's tagged someone with a unique name.  I mean, this -- I just -- you know, common sense analytical reasoning that that's the person.

Q.    Okay.  Have you done some similar sort of searches on Facebook and that kind of analysis before?

A.    Searching Facebook?  Yes.  That's a common thing that I've done just as a user of the site and as an investigator, sure.

Q.    Okay.  I'm more interested in your work as an investigator rather than what you do personally.  So as -- in your experience as an investigator you've had occasion to do things like this on Facebook, right?

MS. DeMARTE:  Objection; form.

THE WITNESS:  Yes.  You could find -- as an investigator you could find multitudes of information on Facebook and multiple other social media sites.

BY MR. MARCHIANDO:

Q.    Well, fair enough.  But I'm trying to understand what you've done personal.

A.    I think I answered that.

Q.    Well, you -- I'm not certain that you did, but -- so let me try to ask it again.

Have you had occasion to get on Facebook

in your capacity as an investigator and gather or compare this type of information?

A.   Yes.

MS. DeMARTE:  Object.

MR. MARCHIANDO:  Go ahead.  If you want to object, go ahead.

MS. DeMARTE:  It was just a form objection.

MR. MARCHIANDO:  Okay.

BY MR. MARCHIANDO:

Q.   But so -- and just -- I want to make -- just make sure I understand what -- like what happened. So you see a picture on Facebook and there's two people on it, right?  There's a lady and a gentleman, right?

A.   A lady -- are you talking about the specific picture that I'm talking about in number 24?

Q.   I'm just talking about generalities so I understand how tagging works and how you get from A to B.

A.   Yeah.  I think I answered that earlier.

Q.   Okay.  Well, I'm -- it's not all that clear to me, so I'm going to try to dumb it down for myself.

A.   Okay.

Q.   So there's a picture on Facebook that has

two individuals on it, right, a man and a woman.  Okay?

A.   Correct, I guess in the terms of your example.

Q.   Okay.  Right.  And so if the -- if the man is tagged, you can sort of hover on the picture of him and you can see what his name is, right?

A.   Yes.

Q.   Okay.  And then is it that you click on wherever his name appears and that will show you who that person is?  It'll show you their Facebook profile?

A.   Yes.

Q.   Okay.  Is that a fair sort of description of what you did to determine that a picture of -- a picture appearing on Ms. Allen's Facebook page or history contained Robbin Ward?

A.   Well, I guess I could specify or clarify.

In the example you gave, like if -- if I have a child that I take a -- a picture on Facebook with my child and I want to draw my mom's attention to her grandchild, I could tag my mother.  Even though she's not in the photo, she could still be tagged.  So just to clarify that point, you can be tagged in a post and not be anywhere in the post other than have your tag on there.

Q.   Okay.  So do you recall how you determined

that Mr. Ward was tagged by Ms. Allen?

A.    I can't specifically recall if it was a photo of the two of them together with the tag on there or if it was a post, picture of a grandchild, with his name just being tagged on there.

Q.    Okay.  So you searched her profile on -- on Facebook, and you found some video on there, right?

A.    Correct.

Q.    Did you download the video?

A.    I took a screenshot, a video screenshot, of it so it creates a -- a file per se but there's no audio.  So --

Q.    Okay.

A.    So it's just a --

Q.    And this is -- this is what -- screenshots are what you're describing in paragraph -- starting in paragraph 27, right?

A.    Correct.

Q.    Okay.  When you're taking these -- this -- these screenshots of the video off of Facebook, what did you do to verify that these were authentic or accurate?

A.    I think that's detailed in the comparison that followed towards the end of the document.

Q.    Well, my question is a little bit --

A.    (Speaking simultaneously)

Q.    Sorry.  I talked over you.

A.    No.  I was just making a clarification when I said document.  I'm sorry.

Q.    No.  That's okay.

Well, my question is a little bit different, though.  I'm wondering what you did to verify that the Facebook -- that something that appears on Facebook is -- is correct, accurate, genuine.

A.    I guess I'm not understanding what you mean by that.

Q.    Well, you're -- you've taken some video of some pictures, and you're making some comparisons in your declaration, right?

A.    Correct.

Q.    They're not pictures you took, are they?

A.    No, they're not.

Q.    You didn't use a camera that you know, right?

A.    Correct.

Q.    So I'm wondering how you know that this is a genuine, authentic, correct picture of anything?

A.    Well, I guess that's alluded to in item -- or paragraph 26.  If she goes live, you know, someone makes a live video and says this is me celebrating my birthday with all my friends, I don't particularly have

a reason to believe that that's not them on their birthday celebrating with all their friends.  I mean, you see it as what it is.  And that's what it appeared to be.

Q.    Okay.  Did you -- did you receive any information from Facebook about the authenticity of any of the information that's discussed in your declaration?

A.    Not that I recall, no.

Q.    Okay.  And so the remaining paragraphs -- let's see -- 27, 28, 29, those are comparisons of, on the left-hand side, screenshots you took of the video that you're describing, right?

A.    Correct.

Q.    And then on the right-hand side, these are photos that you took off of a real estate website?  Was it Zillow?

A.    Actually, in this instance the photos on the right-hand side would be the move-out property condition photos provided by Main Street.

Q.    That's right.  Okay.

And based on the comparison of what you took off Facebook on the left and what's depicted in the photos on the right, your belief is that it's the same apartment, right?

MS. DeMARTE:  Objection; form.

THE WITNESS:  Yes.  I believe that, yes.

BY MR. MARCHIANDO:

Q.    And there's -- let's go down to paragraph 30 where you talk about getting some information.  This is where I had Zillow on the mind.  Right?

Do you remember going to Zillow and looking for some information about this property?

A.    Yes.

Q.    Okay.  And so in paragraph 30 you have a -- pasted in here a wider -- sort of a full view of the whole kitchen, right?

A.    Yes.

Q.    Okay.  Did you do anything to verify the accuracy of this photo with Zillow?

A.    I did not.  I saw the watermark on there from Main Street, which led me to believe that this was at one time a photo that they had taken and applied their watermark on.

Q.    But you don't know that, right?

A.    I don't know that with 100 percent certainty, no.

Q.    And you didn't contact Zillow to verify the authenticity or accuracy of any of these photos, right?

A.    When you say "any of these photos", there's really only one photo from Zillow.

Q.    The second one's not from Zillow, the one that --

A.    That's just like a cropping of the first photo.

Q.    It's helpful probably to talk about paragraphs.

So the only -- the -- paragraph 30 and paragraph 31 are -- well, let's try it this way: There's a photograph pasted into paragraph 30 that you took from Zillow, right?

A.    Correct.

Q.    And so in paragraph 31 on the right-hand side, is it your testimony that that's just a cropping of part of the -- of the photograph that appears in paragraph 30?

A.    Correct.

Q.    Okay.  Now I understand.

So it's the same photo; it's just you -- you altered it a little bit for paragraph 31, right?

A.    Yes.  It was cropped to show the detailed area.

Q.    Okay.  And you have the same answer, right?  You didn't do anything with Zillow to verify the

authenticity of this photograph, right?

A.    Correct.

Q.    So let me reveal a couple of more exhibits here.

So let's look at -- this is going to be Exhibit 7.

(Exhibit 7 was marked and attached to the transcript.)

BY MR. MARCHIANDO:

Q.    And, Mr. Maynard, take a look at Exhibit 7.  And let me know when you're ready to answer some questions about it, please.

A.    Okay.

Q.    Have you seen this -- well, tell -- tell me what this document is, Mr. Maynard.

A.    This appears, to me, to show pictures that Main Street would have taken as part of the move-out.

Q.    And is this the source of some of the pictures that you pasted into your declaration?

A.    Oh, there's a lot here.  Let me just make sure.

Q.    I guess let me ask that a little more clearly.  Is this the source of the photos that you attributed to Main Street Renewal in your declaration?

A.    I just wanted to make sure they're in

here.

Q.    Of course.

A.    Yes.

Q.    And do you know where these -- where this -- these photos originated?  Is this from a website or --

A.    I -- I could only speculate.  I assume it's something that Main Street provided through the course of discovery.

Q.    Okay.  Let's mark Exhibit 8, one of the documents you produced in this case pursuant to our subpoena.

(Exhibit 8 was marked and attached to the transcript.)

BY MR. MARCHIANDO:

Q.    As I said, these aren't Bates numbered so I'm going to sort of just read the title of the first page.  It says Essentials of Defense Investigation, Faubush, Kentucky, 2015.

Do you see that?

A.    Yes.

Q.    Okay.  Mr. Maynard, take a look at that document.  And let me know when you're ready to answer some questions about it, please.

A.    Okay.

Q.    Have you seen this document before today?

A.    Yes.

Q.    What is it?

A.    It's a training agenda for a defense seminar.

Q.    Is that a seminar you attended?

A.    Yes.

Q.    So this is 2015.  So would you have been -- you would have been in Wisconsin at that time, right?

A.    Alaska.

Q.    My math's not as good as I thought.

Did you regularly attend seminars like this?

A.    Not -- regular?  I don't know.  We had a conference every year when I was in Wisconsin, a state Public Defender conference.  This was kind of a -- a special one.  I don't think very many people from my agency in Alaska went to this one.

Q.    Okay.  Anything that you recall learning in this seminar that would be applicable to what you did in this case?

A.    No.

Q.    All right.  Let's look at -- let's mark Exhibit 9.

(Exhibit 9 was marked and

attached to the transcript.)

BY MR. MARCHIANDO:

Q.   And this is a 10-page document.  And, again, it's one you provided to us, but it doesn't have a Bates number on it or Bates numbers on any of the pages.  It says the National Association for Public Defense Presents.  And I guess what they're presenting is what's called We the Defenders in Seattle.

Do you see that?

A.   Yes.

Q.   Is this a similar type of gathering like the one we just discussed in Exhibit 8?

A.   Yes.

Q.   Is this one of the yearly ones you were talking about?

A.   No.  This is separate from that.

Q.   Well, this is in 2019.  So you would have been in Wisconsin for this particular conference, right?

A.   Correct.

Q.   Okay.  Anything you can recall learning at this conference that's -- that is applicable to what you did in this case?

A.   I don't recall anything that would speak to the review and summarizing that I did in the

declaration, so no.

Q.   Okay.  Let's go back to Exhibit 1.  I want to ask you about some of the documents we asked for and I don't see.  Let's go to page 4 of Exhibit 1.  It says Exhibit A at the top.

Do you see that?

A.   Yes.

Q.   Okay.  And there's -- on this page there's five categories of documents, but I'm not going to read the categories so I want to take it easy on Penny.  So is it fair for me to say that Exhibit 8 and Exhibit 9, the ones we've just discussed, are responsive to category number 1?

A.   And the resumé, I think, would be responsive to item number 1.

Q.   Okay.  That's fair.

What about number 2?  I didn't see anything about training, education, or knowledge regarding the interpretation of Google, LLC information.  Was there anything that you have that you didn't produce?

A.   No.  I think what's responsive to that is the e-mail from them where they recommend using the Thunderbird program.

Q.   Okay.  And you didn't have anything

separate, right?

A.    Correct.

Q.    Okay.  What about number 3, category 3?
What -- of the documents you produced, can you tell me
which ones you believe to be responsive to category 3,
if -- if any?

A.    Yes.  So if we're talking about comparing
the pictures from Main Street to the screenshots from
the Facebook video, I -- I don't -- I can't think of any
document that I would have that would speak to that, so
no responsive documents on my end.

Q.    Okay.  But in your experience as an
investigator you've done things like that before, right?

A.    Well, sure, to -- I mean, if you're a
little kid and you go into a restaurant, they give you a
place mat with the pictures, find the differences
between these two things, so, I mean, we've been doing
some of this stuff your whole life.

Q.    Well, but I'm talking about you and in
your work history.  Right?  So you --

A.    I'm thinking about the --

Q.    (Speaking simultaneously)

A.    Sorry.  I didn't -- I didn't mean to
overstep you.

Q.    Okay.  I just was -- want to finish my

question.  I mean, I'm talking about you and your work history.  You've done things like that before as an investigator, right?

A.   I've used critical thinking as an investigator.  I've exercised attention to detail as an investigator.  I've exercised inductive reasoning as an investigator.

Q.   And you've done these like compared one photograph to another and decided what one to pick versus another depicting as an investigator, right?

A.   Yes.

Q.   Okay.  So number 4 -- probably you've answered number 4.  The responsive document you have is probably the Google e-mail, right?

A.   Correct.

Q.   You don't have anything separate from that, right?

A.   Nope.

Q.   Okay.  What about number -- paragraph or category 5, verification of IP addresses?  Was there anything that you supplied that you -- that would be responsive to category 5?

A.   I mean, that's -- as -- as stated in the declaration, that's almost as simple as a Google search, so I wouldn't have any documents reflecting that, so no.

Q.    But that's the type of thing that you did as an investigator, too, right?

A.    Rarely.  I mean, as an investigator, you know, working in rural areas with indigent clients, they weren't really doing computer crimes; it was, you know, more assaults, drug crimes.  So, I mean, I didn't encounter many needs during my time working there to get in the weeds about IP addresses.  It just wasn't the type of crimes that came to my desk.

Q.    Uh-huh.  But you -- but you've done -- you did do it a time or two, right?

A.    Well, just in -- in -- like I think I mentioned prior in relation to IP, just as the fundamentals of how the internet worked I know how to search, you know, IPs.

      And you participate -- I participate in online gaming.  You know, people taunt -- people taunt on there in those chat rooms.  If you do something they don't like, they say, I've got your IP; I'm coming to your house, you know, and stuff like that.  So I'm familiar with the method of looking up an IP, but I don't have any training documents that speak to that.

Q.    Okay.

A.    Just life experience.

Q.    Okay.  What about category 6, obtaining

information -- searching for and obtaining information from Facebook?

A.   As an investigator, going to trainings we talk about various social media.  As I think I mentioned earlier, you can get a wealth of information from social media.  The way I know the way around Facebook is from being a user.  I was there probably in 2006 back when you had to have a college e-mail address to be even on Facebook, which is far different from nowadays.  So I've been there pretty much from the beginning, so familiar with how to use it.  So it's a combination, I guess, of my life experience and the things I've learned throughout my career.

Q.   Okay.

A.   No documents that I can point to that reflect that.

Q.   All right.  What about paragraph 7, information from Zillow?  Same answer?

A.   Similar answer.

I've been a home seller.  I've been a home buyer.  I have the Zillow app on my phone.  I learned how to use Zillow by using the app.  Life experience.  I don't have any documents about Zillow.

Q.   Okay.  And then for number 8, are there drafts of your declaration?

ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,
Neal Maynard on 04/19/2023                                    Page 88

MS. DeMARTE:  So I would object to work product and mental impressions.

So unless you can answer without revealing those, then I'd instruct you not to answer.

THE WITNESS:  I believe there was one initial draft.  And then a few things were added.  And then there was one final draft that was filed as part of the case.

BY MR. MARCHIANDO:

Q.    Okay.  Did you save those drafts?

A.    Yes.

Q.    Okay.  Were they not produced because of the objection that your lawyer just gave?

A.    That's what I understand, yes.

Q.    Okay.  Mr. Maynard, have you ever heard of a privilege log?

MS. DeMARTE:  Objection; foundation.

THE WITNESS:  Am I supposed to answer that?

BY MR. MARCHIANDO:

Q.    Yes.  I'm sorry.  You can answer that.

A.    Okay.  A privilege log is like -- I think in the context of what I've seen as far as being an employee at the law firm, like documents something that exists that wasn't turned over and the reasoning for

that.

Q.    Okay.  Do you understand that -- do you understand it to be describing documents that aren't turned over because there's a claim that they're privileged?

MS. DeMARTE:  Object.

THE WITNESS:  Again, I'm -- I'm not an attorney.  I can't provide much insight, unfortunately, besides what I said.

BY MR. MARCHIANDO:

Q.    Have you ever created a privilege log for a case?

A.    I don't believe so.

Q.    Okay.  Do you know why there wasn't one given to us when there's privileged information being withheld here?

MS. DeMARTE:  Objection; foundation.

THE WITNESS:  No.  I can't answer that.

BY MR. MARCHIANDO:

Q.    Okay.  Was that -- that wasn't your decision, right, whether to create a privilege log?

MS. DeMARTE:  Objection; calls for attorney-client communications.

I'm instructing you not to answer.

BY MR. MARCHIANDO:

Q.    Number 9, I think you testified before you've never done a declaration like this before, right?

A.    Well, if we're talking about here in federal court, no, I've never done a declaration.  I've had other statements or affidavits in the past in the course of my employment.

Q.    In the course of your employment as an investigator?

A.    Correct.

Q.    Okay.  But nothing like -- not a declaration in a civil case as a legal assistant doing the kind of discussion and -- and analysis as the one that you filed in this case, right?

A.    Correct.  Nothing similar to this.  I mean, it was like fieldwork that you would do as an investigator, you know.  I went here and I saw the property line type of stuff.

Q.    Okay.  And then for number 10, you testified before that you'd never given a deposition before, right?

A.    Correct.

Q.    Okay.  Not even as an investigator you never gave -- you never gave a deposition?

A.    No.  We would testify at motion hearings or, you know, trials, things like that, but never

deposition.

Q.    Okay.  So you've testified in court and gone to court proceedings, but nothing like this, correct?

A.    Correct.

Q.    So why don't we take a break here and let me go through my notes?  I think I might be through.

THE VIDEOGRAPHER:  This marks the end of media number two.  The time is 5:09 p.m.  And we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  This is the beginning of media number three in the continuing deposition of Neal Maynard.

BY MR. MARCHIANDO:

Q.    Mr. Maynard --

THE VIDEOGRAPHER:  The time -- the time is 5:16 p.m.  And we are back on the record.

BY MR. MARCHIANDO:

Q.    Mr. Maynard, we just returned from a break.  Is there any of your earlier testimony you want to correct, update, or change in any way?

A.    No.

Q.    I don't have any other questions for you. I'm grateful for your time.  I appreciate being able to

ask you some questions.  Ms. DeMarte, if she wants to ask you some questions she can.

MS. DeMARTE:  I do not have questions at this time.

MR. MARCHIANDO:  Okay.  We're all finished.

THE VIDEOGRAPHER:  Okay.  This concludes today's --

(Speaking simultaneously)

THE VIDEOGRAPHER:  This concludes today's deposition of Neal Maynard.  Total media used is three. The time is 5:17 p.m.  And we are off the record.

(A discussion took place off the record.)

(Signature having not been waived, the videotaped videoconference deposition of NEAL MAYNARD was concluded at 5:17 p.m. EST.)

CERTIFICATE OF WITNESS

Assignment #450000

Robbin Ward v. National Credit Systems, Inc.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 2023.


_____
                    NEAL MAYNARD

DEPOSITION ERRATA SHEET

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

DEPOSITION ERRATA SHEET

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

Page No. ____ Line No. ____ Change to: _____

_____

Reason for change: _____

SIGNATURE: _____ DATE: _____

NEAL MAYNARD

C E R T I F I C A T E


COMMONWEALTH OF VIRGINIA,

CITY OF NORFOLK, to wit:


I, Penny C. Wile, RPR, RMR, CRR, E-Notary Public in and for the Commonwealth of Virginia at Large, do hereby certify that the foregoing deposition was duly taken and sworn to before me at the time and place in the caption mentioned, and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, nor am I a relative or employee of any attorney or counsel employed by the parties hereto, nor am I financially interested in the action.

Given under my hand this 24th day of April, 2023.

_____
Notary Public, #212528
My Commission expires:  January 31, 2025

**ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,**
**Neal Maynard on 04/19/2023**                Index: 1..30(b)(1)

**Exhibits**

**MaynardN 1 OCR**
3:12
12:12,15
83:2,4

**MaynardN 2 OCR**
3:13
12:18,19
21:7

**MaynardN 3 OCR**
3:14
14:23,24
21:8 27:23
50:4 62:4

**MaynardN 4 OCR**
3:15
25:16,19
27:18

**MaynardN 5 OCR**
3:16 32:5,
6

**MaynardN 6 OCR**
3:17
54:19,20
58:11,25
59:14,16
61:10,11

**MaynardN 7 OCR**
3:18 79:6,
7,11

**MaynardN 8 OCR**
3:19
80:10,13
82:13

83:11

**MaynardN 9 OCR**
3:20 81:25
82:1 83:11

---

**1**

**1**  12:12,15
61:18
83:2,4,13,
15

**10**  22:15
25:9,13,
14,16,17
27:24 28:9
90:18

**10-page**  82:4

**100**  77:21

**11**  28:25
29:8

**12**  29:18

**13**  29:23,24

**14**  30:18
33:19,24

**14th**  60:18

**15**  34:4,12

**16**  39:13
41:22 47:3
67:25
68:1,5

**17**  47:4

**174.255.132.**
**161**  60:22

**18**  47:23
50:3

**19**  4:6
53:24

**192.100.72.2**
23:10
29:12
58:15 65:6
67:1

**19th**  4:15

**1:21-cv-02597**
4:14

---

**2**

**2**  12:18,19
13:2 21:7
83:17

**2005**  20:18

**2006**  87:7

**2009**  20:24

**2015**  80:19
81:8

**2019**  23:8
24:24
27:16
29:3,10
60:18
82:18

**2019-01-23**
25:3

**2020**  10:11

**2023**  4:6,15

**21**  62:6

**22**  65:9

**229**  21:17

**23**  65:25
66:14,21
67:2

**23rd**  23:8
24:24
27:16

**24**  67:19
68:7,15,20
69:2,17
70:13
72:16

**26**  75:23

**27**  74:17
76:10

**28**  76:10

**29**  76:10

---

**3**

**3**  14:23,24
21:8 27:23
50:4 62:4
84:3,5

**3,992**  36:18
37:1 55:21

**30**  5:17
11:22
77:4,10
78:9,11,17

**30(b)(1)**
44:20

**ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,**
Neal Maynard on 04/19/2023                    Index: 30th..address

**30th** 29:3, 10

**31** 78:10, 14,21

**3:14** 4:5,16

**4**

**4** 25:16,19 27:18 83:4 85:12,13

**4:04** 49:13

**4:16** 49:18

**5**

**5** 17:12 32:5,6 85:20,22

**50/50** 11:20

**55-12** 25:25

**5:09** 91:9

**5:16** 91:18

**5:17** 92:12, 17

**6**

**6** 15:6 17:5,11,14 54:19,20 58:11,22, 25 59:14, 16 61:10, 11 86:25

**61@gmail.com** 21:16

**7**

**7** 21:9 22:20 38:23,25 39:1,2,5 79:6,7,11 87:17

**70** 11:21

**8**

**8** 22:14,25 62:16 80:10,13 82:13 83:11 87:24

**9**

**9** 22:15 24:22 81:25 82:1 83:11 90:1

**A**

**A-L-L-E-N** 39:17

**A-M-H-E-R-S-T** 37:17

**A-N-T-O-I-N-E-T-T-E** 39:17

**a.k.a.** 39:18

**ability** 8:21,25 9:3,6

**acc** 29:3 31:25

**accepted** 23:7 24:23 26:17 27:15

**access** 23:15 24:2 31:14,18 33:3

**accessed** 32:20 62:7 68:24

**accessing** 23:9 29:4, 11

**accomplish** 47:12

**accordance** 4:7

**account** 23:8 24:21,24 25:5 27:16 28:23 30:7 46:12 58:19

**accuracy** 77:15,24

**accurate** 22:17 38:4

65:17 74:21 75:8

**accurately** 15:14

**actual** 7:8 45:17 66:9

**add** 49:7

**added** 88:6

**addition** 14:8

**additional** 29:19

**address** 21:12 23:9,12, 13,21 24:1,5,13 26:20 28:19,21 29:12,25 30:4,5,13, 16,22 44:11,12 45:18,21, 23 46:15, 18 50:18 51:6 54:1, 2,14 55:9 56:4 57:1, 4,5,11,15, 18 60:8,22 61:1,6,9 62:8 64:13 65:5 66:16,25

67:5 87:8

**addressed**
32:18

**addresses**
47:25 50:8
57:23
58:1,9,13,
21 59:11,
15 85:20
86:8

**adequate**
67:3

**adequately**
66:22

**Administration**
14:18

**affect** 8:21,
25 9:3,6

**affidavits**
90:5

**affirming**
65:16

**afforded**
15:10

**afternoon**
4:10 5:8
6:6

**agency** 81:19

**agenda** 81:4

**agree** 46:10

**agreement**
5:15

**ahead** 43:19
72:5,6

**Alaska** 13:7,
12,19
14:12
15:10
17:24 31:7
81:11,19

**allegations**
19:10

**Allen** 39:17
40:23
67:20 68:1
69:4 74:1

**Allen's**
68:12
73:14

**allowed** 43:4

**alluded**
75:22

**altered**
78:21

**amherst**
37:17

**amount** 9:19

**analyses**
51:6

**analysis**
40:6,22
41:24
53:7,16
57:25
58:8,13,15
61:9 65:5

71:7 90:12

**analytical**
71:4

**analyze**
15:11
33:15 51:1
57:21
59:10

**analyzed**
42:17

**analyzing**
50:15

**and/or** 38:15

**answering**
43:17 52:1

**Antoinette**
39:17

**apartment**
41:25
76:24

**apologies**
16:2

**apologize**
11:4 46:7
56:17
62:21
63:25

**app** 87:21,
22

**appeared**
76:3

**appearing**
58:17

73:14

**appears** 40:1
61:9 69:10
73:9 75:7
78:16
79:16

**applicable**
81:21
82:22

**applicant**
21:17
22:12,21

**application**
29:2,10
38:9,12
39:20 40:1
41:19
50:21
58:18
66:24
69:10

**applied**
66:23
77:18

**applies**
49:23

**apply** 17:7

**appreciated**
16:1

**April** 4:6,15

**area** 20:25
53:18
78:23

**areas** 86:4

arrived
  67:18

articulate
  12:6

articulated
  13:15

ascertained
  42:15

assaults
  86:6

assert  18:13

assist  11:7
  37:6

assistant
  10:7,14
  21:4 90:11

assisted
  10:23

Associates
  4:24

Association
  82:7

assume  80:7

assuming
  45:20

attached
  12:16,20
  14:25
  25:20 32:7
  54:21 79:8
  80:14 82:2

attained
  17:8

attend  81:13

attended
  81:6

attention
  59:6 73:19
  85:5

attorney
  21:25 41:1
  48:5 89:8

attorney's
  40:19
  41:8,13
  51:14,18

attorney-
client  15:22
  38:15
  40:13 41:1
  48:6 51:8,
  9 53:5
  89:23

attributed
  79:24

audio  48:11,
  25 74:12

authentic
  74:21
  75:21

authenticity
  76:6 77:24
  79:1

_____
        B
_____

Bachelor's
  20:23

back  11:9
  21:7 27:23
  43:25 44:4
  47:23
  49:18 50:6
  62:4 70:22
  83:2 87:7
  91:18

background
  52:12

bank  30:7

bar  69:9

based  27:6
  40:19 41:8
  44:9 45:1
  56:2 57:2
  76:21

basically
  12:4 29:24
  54:12
  66:22

basis  27:14,
  19 29:14
  30:12

Bates  25:23
  80:16 82:6

begin  6:18

beginning
  4:11
  49:16,22
  87:10
  91:12

behalf  4:2
  5:1,6

belief  76:23

belonged
  69:20

belongs  65:6

Billy  70:6,8

billybob12@
gmail.com
  46:15

birthday
  26:9 75:25
  76:2

bit  23:4
  24:15
  30:22
  47:21
  61:23
  63:20 65:5
  74:24 75:5
  78:21

Bob  70:6

Bob's  70:8

bottom  15:7
  30:14
  61:18 62:1

box  37:13

break  8:5,9,
  13 49:21
  91:6,21

breakdown
  11:19

breaks  8:17

bringing
  19:25

broader
  19:16  20:2

business
  63:18

buttons   60:4

buyer   87:21

_____

C
_____

call   34:5,9
  40:15  41:3

called   31:5,
  14  34:21
  46:19  82:9

calling
  21:24
  40:12,25
  48:6

calls   51:8
  53:16
  89:22

camera   75:17

capacity
  18:16  72:1

captured
  26:19

car   45:5

care   33:9

career   10:4,
  6  15:8
  87:13

case   4:13
  9:24  10:2

12:12
14:22
15:11  20:5
25:18  26:1
28:1  31:4
39:8,19
40:2,3
41:17
42:13
43:1,4
59:4  68:2
80:11
81:22
82:23  88:8
89:12
90:11,13

cases   18:10,
  24  19:1,2,
  9  23:20

Casino   14:8

categories
  83:9,10

category
  83:13
  84:3,5
  85:20,22
  86:25

cats   63:23

celebrating
  75:24  76:2

certainty
  77:22

change   9:11
  50:1  91:22

chart   54:12

chat   86:18

child   23:25
  73:18,19

chose   37:14

circle   21:18
  26:12

circled   26:8
  62:17

circles   63:7

cities   60:12

city   60:9
  61:15,17

civil   4:8
  11:20,22
  90:11

claim   89:4

claiming
  45:21

claims   10:25
  21:10  39:8

clarification
  75:2

clarifies
  57:9

clarify
  73:16,22

clear   6:4
  7:19  69:14
  72:22

clerk's
  25:24

click   35:15,

16  70:7
73:8

clicking
  35:7  70:9

clients
  10:23  12:5
  18:13,15
  86:4

Cliff   21:17

coaching
  42:21,25
  43:1,3,13

coffee   8:11

college   87:8

colloquial
  28:6

Colorado
  5:11

column   28:18
  29:15
  56:8,17
  57:1  58:4,
  10,22
  59:13  60:3

combination
  87:11

commencing
  4:5

common   18:1,
  3  71:4,8

commonly
  58:17

Commonwealth

4:4

**communication**
53:5 55:9
57:4

**communications**
15:22
38:15
40:13
41:1,4
48:7,8
51:9 52:24
89:23

**company** 27:7
28:2

**compare** 72:2

**compared**
85:8

**comparing**
84:7

**comparison**
33:14
74:22
76:21

**comparisons**
75:12
76:10

**complete**
6:18
33:22,23
34:1 44:14
46:5 53:21
62:23

**completed**
6:15 29:2,

9 66:24

**comply** 43:11

**computer**
23:6,8
24:23
27:15
29:1,3,9,
11 36:11,
13,14
50:18
66:16 86:5

**concise**
43:11

**concluded**
92:17

**concludes**
92:7,10

**conclusion**
27:4,6
65:4,16

**condition**
76:19

**conditions**
8:21,24
52:16

**conference**
81:16,17
82:19,22

**confidential**
26:18

**confirm** 5:15

**confuses**
58:3

**conjecture**
46:4

**connect**
70:11,23

**connected**
70:18

**connection**
7:5 61:2
68:2

**Consumer**
4:24

**contact** 31:6
77:23

**contained**
73:15

**content** 14:2
42:2

**context**
88:23

**continues**
28:10
33:19

**continuing**
49:17
60:11
91:13

**copied** 47:5,
15

**copy** 64:15

**correct** 9:11
10:9 11:18
13:3,13,
16,18

14:10,20
15:18 20:7
22:24
24:14 27:8
28:16,24
29:13,17
30:2,17,
23,24
32:17
34:14
39:7,10
40:20 41:9
42:2 50:1,
11 52:14
54:4 56:6,
24 59:20
60:11,24
61:3
62:10,12
63:6,10,
14,19,22
64:6,23,25
65:3,8,23
66:7,12
67:12,15,
22 68:11
69:25
70:20 73:2
74:8,18
75:8,14,
19,21
76:13
78:13,18
79:2 82:20
84:2 85:15
90:9,14,21
91:4,5,22

ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,
Neal Maynard on 04/19/2023          Index: corrected..Defenders

corrected
  9:12 38:3,
  4

correctly
  21:19 38:2
  39:16,22
  48:2,16
  50:12

counsel  4:20
  5:15

count  65:19

couple  8:8
  13:24 79:3

courses  21:2

court  4:18,
  21 6:8,21
  7:13 38:20
  51:1 90:4
  91:2,3

Court's
  44:23
  45:2,3

cover  6:3
  8:7

Craig  4:23
  5:10

create  15:12
  23:7 24:23
  25:5 27:16
  45:17,21
  89:21

created
  13:25 25:2
  30:4,6

46:20
47:22 54:6
55:6 59:19
66:16
89:11

creates
  26:20
  74:11

creating
  44:11

creation
  58:19

Credit  4:13
  5:3

crime  18:1

crimes  86:5,
  6,9

criminal
  11:8,20,22
  21:1

critical
  85:4

cropped
  78:22

cropping
  78:5,15

CRR  4:3

cull  15:11

cut  11:4

cutout  24:20

cutouts  34:7

——————
      D
——————

Dallas  21:18

data  15:11,
  12 32:1
  33:16
  42:13,16
  47:5
  50:15,25
  59:3

date  4:15
  55:7 60:18

dates  54:12

daughter
  39:14 40:7
  42:5 69:20

day  12:1

deal  8:7

deals  40:3

debt  9:20

decide  33:2
  38:6 67:23

decided
  69:4,7
  85:9

decision
  89:21

declaration
  9:22 10:1
  14:22
  15:17 20:5
  21:8,23
  24:16

26:22
27:17
30:4,6
33:17 35:3
38:23 40:6
41:11,14
42:3,8,12
44:8 45:5
50:4 55:7
57:20,24
58:8,12,16
59:12 61:6
62:5,16
75:13 76:7
79:19,24
83:1 85:24
87:25
90:2,4,11

declarations
  10:3

deep  53:16

defended
  18:24

Defender
  10:18
  11:15
  13:5,21
  15:9 17:12
  81:17

Defender's
  14:12
  17:9,25
  31:8

Defenders
  82:9

ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,
Neal Maynard on 04/19/2023        Index: defending..documents

defending
  16:10

defense
  80:18 81:4
  82:8

degree
  20:23,25

Demarte  4:25
  5:19 6:10
  9:17 10:8,
  16 14:7
  15:19,21
  16:7,13,
  16,20,25
  18:10,12,
  24 19:3,5,
  9,16 21:24
  22:16
  31:19
  32:19 36:7
  37:19,22
  38:14
  40:8,11,24
  42:19,23
  43:5,8,15
  44:23
  45:1,8,11,
  19 46:13,
  21 48:5
  49:9 50:23
  51:7 52:6
  53:14
  54:10
  55:23
  58:23 59:1
  64:1 66:11
  68:13

71:15
72:4,7
76:25
88:1,17
89:6,17,22
92:1,3

Demarte's
  19:19

depicted
  76:22

depicting
  85:10

deposed  5:5

deposition
  4:1,11
  5:18,23,25
  8:7 16:5,
  11 25:17
  44:18,19,
  21 49:17,
  22 54:24
  63:24
  90:19,23
  91:1,13
  92:11,16

describe
  34:7 35:13
  68:7

describing
  74:16
  76:12 89:3

description
  12:4 13:1,
  6 28:5
  60:9 73:12

desk  86:9

detail  47:15
  85:5

detailed
  55:7 66:15
  74:22
  78:22

detailing
  15:13

details
  40:16 41:4

determine
  24:12 54:2
  61:1 73:13

determined
  73:25

device  23:15

differences
  84:16

difficulty
  7:17

disagree
  45:8,9

discern
  24:25

discerned
  69:19

discovery
  44:24 45:2
  80:9

discuss
  24:15

discussed
  22:3,14
  76:7 82:13
  83:12

discussing
  30:1

discussion
  6:5 7:16
  40:6 90:12
  92:13

dispute  9:19

disregarded
  58:21 59:3

distinction
  19:15

document
  13:25 15:3
  25:22,25
  26:3,7,15
  27:10,12
  28:14
  32:9,13
  55:3 74:23
  75:3 79:15
  80:23 81:1
  82:4 84:10
  85:13

documentation
  27:7

documents
  27:24
  28:11
  80:11
  83:3,9
  84:4,11

ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,
Neal Maynard on 04/19/2023          Index: dog..exhaustive

85:25
86:22
87:15,23
88:24 89:3

dog   64:1

dogs   63:23

download
  74:9

downloaded
  31:12

draft   88:6,7

drafts   87:25
  88:10

drag   35:22

dragged   36:2

draw   33:14
  73:19

drive   36:10,
  11,12

drives   45:6

drop   35:22

dropped   36:2

drug   86:6

dumb   72:22

duties   13:9
  17:13
  23:24

_____

        E
_____

e-mail
  21:11,12

26:20
30:21
31:24
32:16
33:13,16
44:11,12
45:17 46:2
54:7 56:4
57:4,23
66:3,10
83:23
85:14 87:8

e-mailed
  56:22

e-mails
  36:18
  47:5,6
  54:7,12
  66:25

E-NOTARY   4:3

earlier
  9:10,12
  20:4 49:25
  61:8 66:5
  72:20 87:5
  91:21

eas   50:25

easier   49:3
  66:17

easily   42:14

easy   51:1
  83:10

editor   32:21

education

20:20
83:18

ellipsis
  36:25

else's   47:8

employee
  52:22
  88:24

employment
  90:6,7

encounter
  86:7

encountered
  18:2

end   22:11,
  20 37:1
  49:13 60:8
  68:9 69:17
  74:23
  84:11 91:8

ending   43:11

ends   33:21

entity   65:2

entries   63:8
  64:18

essence
  65:23

essentially
  64:14

Essentials
  80:18

EST   4:5
  92:17

establish
  50:18

estate   9:20
  76:15

estimate
  11:21

ethical
  18:14

evidence
  10:24

evidenced
  65:11

exact   36:4
  62:2 68:24

examination
  4:2

examine
  47:24 50:7

examined
  21:11

exclusively
  47:17

Excuse   35:25
  55:15 56:7
  61:13
  67:16

executed
  47:5

exercised
  85:5,6

exhaustive
  55:18

exhibit
  12:12,15,
  18,19
  14:23,24
  21:7,8
  25:9,13,
  14,16,17,
  19 27:18,
  23 32:5,6
  50:4
  54:19,20,
  24 58:11,
  25 59:14,
  16 61:10,
  11,19,22
  62:4 79:6,
  7,11
  80:10,13
  81:25
  82:1,13
  83:2,4,5,
  11

exhibits
  79:3

exists  88:25

experience
  15:8 17:8
  20:11
  43:8,16
  71:13
  84:12
  86:24
  87:12,22

explained
  70:12

explaining

22:21

explicitly
  27:3

expression
  35:23

extent  22:1
  38:14
  40:12,25
  48:6 51:8

_____

F
_____

Facebook
  67:13,19,
  24 68:7,
  22,24 69:9
  70:3 71:7,
  8,14,18,25
  72:13,25
  73:10,14,
  18 74:7,20
  75:7,8
  76:6,22
  84:9 87:2,
  6,9

fact  39:25
  46:18
  65:11 66:8

facts  8:25
  9:6

fair  6:19
  53:7 57:10
  58:6 64:16
  71:20
  73:12
  83:11,16

familiar
  24:3 86:21
  87:10

father  68:3

Faubush
  80:19

features
  33:12

February
  60:18

federal  4:8
  90:4

federal-level
  11:12

feel  53:16,
  17 62:2

felt  46:16

field  20:12

fieldwork
  90:15

fighting
  11:9

figure  69:3
  70:22

file  31:5
  35:9 42:13
  74:11

filed  25:18,
  25 88:7
  90:13

files  31:15,
  18 32:20
  33:3,20

34:21,25
  36:3,6

filter  37:6,
  10,13,14
  55:20

filtered
  55:18

filtering
  55:20

filters  47:5

final  57:1
  88:7

find  14:22
  17:13
  26:16,24
  27:1,19
  44:1 49:6,
  8 53:25
  68:25
  69:11
  71:16,17
  84:16

finding  35:6

findings
  15:13

fine  5:20
  43:10 44:2

finer  55:19

fingers
  46:23

finish  55:16
  67:4 84:25

finished

46:9 92:6

**firm** 5:10,
11 19:21
88:24

**flash** 36:10

**focus** 59:6
60:16

**focused** 51:5

**follow** 8:3

**forget** 43:9,
17

**form** 16:25
19:5 22:16
42:19
45:19
46:13
50:23
54:10
58:23 59:1
66:11
71:15 72:7
76:25

**format** 30:25

**found** 25:7
36:18 69:7
71:2 74:7

**foundation**
9:17 31:19
42:19
45:19
46:13
50:23 52:6
53:14
68:13

88:17
89:17

**free** 31:13
62:7,14

**fresh** 9:13

**friend** 70:6

**friends**
75:25 76:2

**front** 7:13

**full** 68:12,
15,16
77:11

**fumbling**
34:6

**fundamentals**
86:14

———————————
**G**
———————————

**gaming** 86:17

**gather** 72:1

**gathering**
10:24
82:12

**gave** 65:18
73:17
88:13
90:23

**general**
23:17
33:11

**generalities**
72:17

**generally**
18:22
46:10

**gentleman**
72:14

**genuine**
75:8,21

**geographic**
57:22,25
58:8,13,14
59:11,15
61:8

**geographical**
24:6

**give** 6:14,
15 11:25
24:6 28:4,
5 35:18
84:15

**Global** 4:19

**Gmail** 23:7
24:21,24
25:5 27:16
46:11
50:19 54:2
58:19
60:23
66:16

**good** 4:10
5:8 34:11
81:12

**Google** 23:1
24:20,24
25:6 28:23
30:19

31:25 35:9
36:6,19
44:10
50:16
62:11
63:2,4
64:8 83:19
85:14,24

**graduate**
20:15

**Graduated**
20:24

**grandchild**
73:20 74:4

**grateful**
91:25

**great** 8:7

**greater**
47:14

**Green** 5:2
39:18
41:17

**ground** 6:4

**Group** 63:12,
18 64:18
65:1,7
67:5

**growing**
23:25

**guess** 10:5
14:15
24:4,19
47:16 52:7
58:2 59:7

ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,
Neal Maynard on 04/19/2023          Index: habit's..information

66:1 70:21
73:2,16
75:9,22
79:22 82:8
87:11

**H**

habit's  8:5

happened
72:12

happy  8:9

harassing
17:1

hard  20:10
36:11,12

head  7:5
32:3

header  25:25

heading  13:4

hear  16:14

heard  35:23
88:15

hearings
90:24

Heights
21:18

held  13:19

helpful
54:16
66:19 78:7

hiccup-free
6:5

high  20:15,
19

highlight
63:17 65:1

highlighted
36:23

history
73:15
84:20 85:2

home  21:17
22:13
87:20

honestly
8:22 9:3

hoping  11:7

hour  8:6

hours  8:8

house  86:20

hover  73:5

Huseby  4:19

**I**

idea  42:4,7
50:17,24,
25

identi  41:18

identifier
23:14

identify
27:18 34:4
68:25

identity
17:20,22
18:6,10,25
19:3,9
21:11 39:9
40:4,7,23
42:5,18

immediately
10:15

implies  58:5

implying
27:3

import  35:7

important
6:11,22
7:3 39:4

impression
53:6

impressions
15:23
21:25
38:16
40:13
41:2,13
48:7 51:10
88:2

inclined
46:16

included
36:18
39:19
41:19
56:3,4

includes

21:10

Incorporated
4:13

indication
65:10

indigent
10:23 86:4

individuals
73:1

inductive
85:6

information
22:13
23:1,6
24:6,20
28:10,13,
17 29:1,4,
8,19 30:8,
19 34:3
39:19
41:18,25
44:10
46:23
47:15 48:9
56:3 59:5
60:13,23
62:3,8
66:2,15
68:21
71:17 72:2
76:6,7
77:5,8
83:19
87:1,5,18
89:15

initial  88:6

initially
  38:3

innocence
  11:3,6

input  48:25

insight
  51:24 89:8

instance
  76:17

instruct
  18:19 22:3
  40:14 41:2
  88:4

instructed
  52:16,18

instructing
  89:24

instruction
  40:19 41:8
  51:15,19,
  21,22
  52:4,21
  53:3,9,13

interested
  19:17,18
  38:11
  71:11

internet
  23:9,15,17
  24:1,2
  29:11
  68:21
  86:14

interpretation
  45:9 83:19

interruption
  48:11

introduce
  4:20

introduced
  5:9

invading
  63:23

investigate
  10:22

investigation
  18:16
  57:22
  80:18

investigator
  10:20
  71:10,12,
  13,17 72:1
  84:13
  85:3,5,6,
  7,10 86:2,
  3 87:3
  90:8,16,22

invisible
  57:12

involve
  17:19
  18:25

involved
  19:3,9

involves
  39:8

involving
  18:10
  21:11
  51:10

IP  23:9,12,
  13,21
  24:1,5,13
  26:9
  28:18,21
  29:12,15,
  25 30:4,5,
  13,16
  47:25
  50:8,18
  51:5 53:25
  54:2 55:9
  57:1,5,11,
  15,17
  58:1,9,13,
  21 59:11,
  15 60:7,22
  61:1,6,9
  62:8 64:13
  65:5 66:25
  67:5 85:20
  86:8,13,
  19,21

ipinfo.io
  64:5

ipinfo.io.
  62:18
  65:21

IPS  86:15

Island  14:8

item  75:22
  83:15

items  35:20
  38:8

Izabella
  4:17

---

**J**

---

January  23:8
  24:24
  27:16
  29:3,10

Jim  71:1

job  6:1
  11:11,12,
  23 13:1,6,
  10,11,19
  17:13
  23:24 67:3

jobs  17:7,9

Jonathan  5:2

judge  7:13

judgment
  9:23 25:18
  51:3

jury  7:13

Justice  21:1

---

**K**

---

Katrina  4:25
  16:6,10
  42:22

Kentucky
  80:19

**keyboard**
  46:24 66:6

**kid**  84:15

**kids**  11:9

**kind**  20:10
  45:5 53:18
  71:7 81:17
  90:12

**kitchen**
  77:12

**knowledge**
  23:17
  44:21
  46:11
  83:18

---

**L**

---

**L-A-Q-E-N-A-L-
L-E-N**  37:18

**L-A-Q-U-E-N-A-
L-L-E-N**
  37:20
  68:10

**L-A-Q-U-E-N-C-
I-L-L-A**
  39:16

**labeled**  25:6

**lady**  72:14,
  15

**Lake**  20:23

**landlord**
  28:1,2
  50:21

**Laquen**  67:20
  69:4

**Laquena**
  67:20

**Laquencilla**
  39:14

**large**  4:4

**law**  5:10,11
  10:8,16
  14:7
  18:10,24
  19:3,9,16
  43:1,4
  88:24

**lawsuit**  5:12
  9:16 69:24

**lawyer**  16:4,
  20 20:13
  52:3,15
  53:3,9
  88:13

**lawyer's**
  53:13

**lead**  70:7

**Leander**
  59:22

**learn**  37:10
  62:8

**learned**
  23:16
  36:22
  37:12
  60:22
  87:12,21

**learning**
  81:20
  82:21

**led**  77:17

**left**  64:5
  76:22

**left-hand**
  60:18
  76:11

**legal**  10:7,
  14,25
  20:8,12
  21:3 28:5
  53:16
  90:11

**legs**  8:10

**lend**  17:14

**licenses**
  21:3

**life**  84:18
  86:24
  87:12,22

**limited**
  44:6,22,23
  45:1,7,10

**limiting**
  45:2

**link**  70:7

**listed**  58:4

**listing**
  44:10

**litigation**
  4:19,24

  18:9 21:10

**live**  75:23,
  24

**LLC**  63:13
  64:19
  83:19

**load**  34:24

**loaded**  34:22

**loading**
  33:20

**locations**
  57:22,25
  58:9
  59:11,15

**log**  88:16,
  22 89:11,
  21

**long**  10:10
  11:23
  48:18,20,
  22 68:15

**longer**  69:4

**looked**  26:25
  27:17 47:6
  58:17
  60:16
  67:17 68:8

**lost**  39:11
  47:2

**lot**  79:20

**Louisiana**
  60:1,9
  61:2

---

**M**

---

**m-b-o-x** 31:5

**Madam** 38:20

**made** 30:9 42:1 66:24

**mail** 36:24

**main** 27:25 28:1,14 29:19 30:15 50:16 61:15 76:19 77:17 79:17,24 80:8 84:8

**major** 21:1

**make** 6:18 15:24 46:15 47:19 50:25 66:17 72:11,12 79:20,25

**makes** 75:24

**making** 19:15 49:6 75:2, 12

**man** 73:1,4

**management** 28:2

**marathon-long** 8:6

**Marchiando** 4:23 5:7, 10,14,21 9:21 12:17,21 14:15 15:1 16:3,8,13, 18 17:2 18:20 19:11 21:13,15 22:8,18 25:21 29:5,7 31:22 32:8 36:9 37:21,23, 25 38:24 39:15,21 40:18 41:7 42:21,25 43:7,10, 20,24 44:2,13,25 45:3,10, 13,15,22 46:17,25 48:12,15 49:2,11,19 51:4,13 52:10 53:20 54:15,22 56:1 58:24 59:8 66:13 68:17

**71:19 72:5,9,10 77:2 79:9 80:15 82:3 88:9,20 89:10,19, 25 91:15, 19 92:5**

**MARCIANDO** 14:17

**Marcus** 63:12,18 64:18 65:1,7 67:5

**mark** 12:18 14:23 54:19 80:10 81:24

**marked** 12:12,13, 15,19 14:24 25:19 32:6 50:4 54:20 79:7 80:13 82:1

**marks** 49:12 91:8

**mat** 84:16

**matches** 57:11

**math's** 81:12

**matter** 4:12

38:10,13

**matters** 10:25

**Maynard** 4:2, 12 5:1,5, 8,16,22 7:10,15 8:20 9:8, 15 12:23 15:2 16:19 17:20 18:12,18, 21 20:9 21:19 22:2,3 25:22 26:2 32:9,14 33:23 38:2 39:23 41:14 44:14 45:2,16 49:18,20 52:2 54:23 55:2 62:22 79:10,15 80:22 88:15 91:14,16, 20 92:11, 16

**mbox** 30:25 31:15,18 33:20 34:21,24 36:3,6

means   35:22

mechanically
  64:11

media   4:11
  49:13,17
  71:18
  87:4,6
  91:9,13
  92:11

medical
  8:21,24

medication
  9:2,5

memory   26:14

mental   15:23
  21:25
  38:16
  40:13
  41:1,13
  48:7 51:9
  53:6 88:2

mentioned
  60:12
  86:13 87:4

menu   35:20

menus   35:6

mere   46:18
  66:8

message
  47:7,8
  55:8
  56:10,20
  57:7,13,
  15,17

messages
  37:6,7,11,
  13 47:25
  50:8,20
  54:2 55:18
  56:13 66:6

method   36:4
  86:21

Michigan   4:6

Microsoft
  33:13

middle   24:22
  46:8

mind   9:13
  44:20 77:5

minute   19:25

minutes   7:11

missed   37:22
  48:10,12

misunderstood
  56:16

mom's   73:19

monitor   4:16

Monroe   60:9,
  10 61:2

Morrissey
  4:17

mother   73:20

motion   9:23
  51:2 90:24

move   47:1
  61:19,22

move-out
  76:18
  79:17

moved   13:17

Mozilla
  31:14,18
  32:1,20
  33:2,20
  34:19,25
  36:3 37:11
  47:11,18,
  24 50:7
  54:1

msrenewal.com.
  37:17

multimedia
  15:12

multiple
  15:10
  57:14 59:5
  65:11
  69:19
  71:18

multitudes
  71:17

_____

N
_____

named   32:2
  64:10

names   18:15,
  21

narrow   45:4

National
  4:13 5:3

82:7

nature   28:3
  52:24

NCS   25:18

NCS's   9:23

Neal   4:2,12
  5:1,5
  15:25 16:4
  49:17
  91:14
  92:11,16

Neiman
  63:12,17
  64:18
  65:1,7
  67:5

non-criminal
  11:15,16

nonresponsive
  44:16
  51:25

Northwest
  10:24

noted   40:3
  45:14
  50:16
  55:17
  58:16

notes   55:8
  91:7

notice   4:5

noticing
  37:12

**nowadays**
  87:9

**nuanced**  52:8

**nuh-uh**  6:24

**number**  4:11
  17:11,14
  25:23 37:3
  38:23 39:1
  41:22
  47:3,4,23
  49:13,17
  67:25
  68:15
  70:13
  72:16 82:6
  83:13,15,
  17 84:3
  85:12,13,
  19 87:24
  90:1,18
  91:9,13

**numbered**
  80:16

**numbers**
  24:11
  64:12 82:6

**O**

**oath**  5:16
  7:11,12
  49:21

**object**
  15:19,21
  72:4,6
  88:1 89:6

**objected**
  52:15

**objection**
  5:19 9:17
  16:25
  18:12 19:5
  21:24
  22:16
  31:19 36:7
  38:14
  40:8,11,24
  42:19
  44:16
  45:19
  46:13,21
  48:5 50:23
  51:7,25
  52:6 53:14
  54:10
  55:23
  58:23 59:1
  66:11
  68:13
  71:15 72:8
  76:25
  88:13,17
  89:17,22

**objection's**
  45:14

**objections**
  15:25
  42:24
  43:10,18

**obligation**
  18:14

**obtaining**

  86:25 87:1

**occasion**
  19:2 23:19
  71:14,25

**odd**  52:23

**offer**  46:4

**offhand**  35:1

**Office**  10:17
  13:4 14:12
  17:25 31:8

**offices**  17:9

**one's**  78:3

**online**  86:17

**open**  35:7

**opening**
  33:20

**operating**
  66:25

**opportunities**
  15:11

**option**  37:6

**oral**  4:2

**order**  44:24
  45:2,4

**original**
  56:19 57:3

**originally**
  55:21

**originated**
  80:5

**originating**

  60:22

**outlined**
  53:25 61:5
  66:15

**Outlook**
  33:12,13,
  15

**oval**  63:11
  64:21,24

**ovals**  63:15

**overstep**
  84:24

**owed**  9:20

**P**

**p.m.**  4:5,16
  49:13,18
  91:9,18
  92:12,17

**pages**  28:8
  82:7

**paragraph**
  15:6 17:5
  21:9
  22:20,25
  24:22
  27:24
  28:9,25
  29:8,18,
  23,24
  30:18
  33:19,24
  34:4,12
  38:25

39:2,5,11,
13 47:2
50:3 53:24
58:22 62:6
65:9,25
66:14,21
67:2,19,25
68:1,5,7,
20 69:2,17
74:16,17
75:23
77:4,10
78:9,10,
11,14,17,
21 85:19
87:17

**paragraphs**
22:14,23
76:9 78:8

**parameters**
57:5

**part** 6:1
17:23
23:24
24:22
36:24
42:13
43:12 54:5
69:2 70:12
78:16
79:17 88:7

**participate**
86:16

**parties**
11:17

**party** 56:10

**partying**
41:24

**past** 10:3
90:5

**paste** 64:15

**pasted** 28:11
30:14
77:11
78:11
79:19

**pasting** 34:3

**pathway**
23:14

**pause** 32:4

**paying** 16:23

**payment**
30:15
58:18

**payments**
29:20,25
30:9,13
41:25
50:20
66:24

**penalty**
41:11

**pending** 8:18
10:25

**Penny** 4:3,18
14:16
21:14 29:5
37:16
39:16
43:24

66:18
83:10

**people** 11:9
41:24
43:8,17
56:21
72:13
81:18
86:17

**percent**
11:21,22
77:21

**period** 33:25

**perjury**
41:11

**permitting**
44:24

**person** 44:11
56:19
66:10,23
70:24 71:5
73:10

**personal**
18:15
39:19
41:18
44:21
71:21

**personally**
71:12

**pertinent**
38:9 59:4

**pest** 63:25

**phone** 87:21

**photo** 73:21
74:3
77:15,18
78:2,6,20

**photograph**
78:11,16
79:1 85:9

**photos**
76:15,17,
19,23
77:24 78:1
79:23 80:5

**pick** 85:9

**picture**
70:5,8
72:13,16,
25 73:5,
13,14,18
74:4 75:21

**pictures**
41:24
75:12,15
79:16,19
84:8,16

**place** 39:11
47:2 49:4
84:16
92:13

**plain** 32:21

**plaintiff**
4:3,24 5:6
69:24

**plaintiff's**
39:13 40:7
42:5

point   40:5
  42:8,12
  48:4 50:14
  56:25 58:6
  59:10
  73:22
  87:15

portion
  27:17
  30:15

position
  10:13 12:3
  52:23

possibly
  70:8

post   20:19
  73:22,23
  74:4

posts   69:19
  70:3

prefer   67:2

prescriber
  44:10

present   16:4
  42:14

presenting
  82:8

Presents
  82:8

pretty   13:9
  87:10

previous
  17:7

prior   17:11,
  19,21 18:9
  31:2,3
  55:17
  57:16,19
  61:16
  86:13

privilege
  18:13
  88:16,22
  89:11,21

privileged
  52:24
  53:18
  89:5,15

Procedure
  4:8

proceedings
  91:3

process
  34:23

produce
  83:21

produced
  80:11 84:4
  88:12

product
  15:22
  21:25 51:9
  88:2

production
  36:19

profile
  68:25

69:7,11,20
  70:8 73:10
  74:6

program
  31:13 32:2
  33:8,13
  34:21
  47:19,24
  50:7 59:14
  83:24

property
  28:2 38:9,
  12 50:22
  76:18 77:8
  90:17

proprietary
  26:19

prove   11:8

provide
  40:15,17
  41:3,6
  51:24 89:8

provided
  27:7,25
  28:15
  30:19
  31:25
  45:11
  50:16
  60:23
  76:19 80:8
  82:5

providers
  46:2

proving   11:7

Public   4:4
  10:17
  11:15
  13:5,21
  14:12 15:9
  17:9,12,25
  31:7 81:17
  82:7

publicly
  31:13
  62:6,13

purposes
  5:17 16:21

pursuant   4:5
  80:11

put   15:17
  21:22 22:6
  44:4 52:11
  60:14 62:3
  63:15
  64:24
  70:18

puts   52:22

_____

Q

_____

Q-U-E-N
  39:18
  69:19

qualify
  44:17

Quen   39:18
  41:17
  69:18,19
  71:2

**question**
  6:13,15,19
  7:16,20,23
  8:2,17,18
  13:1 18:23
  19:8 20:2
  22:6 26:6
  38:20,21
  41:4
  43:23,25
  44:5,9
  47:17
  48:11,13,
  17 51:18
  52:2,13
  53:3,8,17
  66:2 74:24
  75:5 85:1

**questions**
  13:24 15:4
  21:6 26:4
  32:11
  54:25
  79:12
  80:24
  91:24
  92:1,2,3

**quick**  11:25

**quickly**
  49:10

**quote**  70:2

**quotes**  69:18

————————
      **R**
————————

**R-O-B-B-I-N**

21:14

**Rarely**  86:3

**rdpguard.com**
  62:18
  65:21

**reached**
  27:5,6

**read**  15:14
  17:6 21:19
  30:22
  33:22
  37:15
  38:1,21
  39:22
  43:24 44:5
  48:2,15,16
  50:12 68:8
  80:17 83:9

**reading**
  47:13
  66:18

**ready**  6:14
  15:3 26:3
  32:10
  54:25
  79:11
  80:23

**real**  9:20
  76:15

**reason**  19:14
  40:21
  58:20 76:1

**reasoning**
  71:5 85:6
  88:25

**recall**  8:25
  9:6 17:21
  32:2 33:18
  34:23 36:1
  73:25 74:2
  76:8 81:20
  82:21,24

**receive**  76:5

**received**
  36:6 50:20

**recently**
  14:4

**recess**  49:15
  91:11

**recipient**
  54:14

**recipients**
  66:3

**recommend**
  83:23

**record**  5:9
  6:5 7:1,7
  26:19
  30:22
  48:23
  49:10,14,
  18 91:10,
  18 92:12,
  13

**records**
  58:18

**red**  26:8
  62:17
  63:7,11,15

64:21,24

**reference**
  67:25

**references**
  17:11,12

**referring**
  15:9 32:23

**refill**  8:11

**reflect**
  87:16

**reflecting**
  85:25

**refusing**
  53:2

**regard**  18:13

**regular**
  44:21
  81:15

**regularly**
  81:13

**related**  21:3
  30:21
  67:20

**relating**
  41:25

**relation**
  86:13

**release**
  18:14

**relevance**
  16:25

**relevant**

39:18 40:2 41:17 68:2

**reliability** 65:10

**remaining** 76:9

**remember** 7:7 9:10 33:4 35:2,4,21 36:4,5 77:7

**remind** 43:13,18, 20

**remotely** 5:17

**Renewal** 27:25 28:1,14 29:19 79:24

**rental** 21:17 22:13 29:2,10 38:9,12 39:20 40:1 41:19 50:22 58:18 66:24 69:10

**repeat** 38:19,20 43:22

**replied** 47:8

**replier** 55:11 56:15 57:3

**report** 30:15

**reporter** 4:18,21 6:8,21 38:20,21 44:1,5 48:10,14, 18 49:5

**reports** 15:12

**representing** 16:10,17

**represents** 5:11

**requirements** 46:3

**research** 23:19

**researched** 23:21

**resident** 21:17 22:13,21

**Resort** 14:8

**response** 20:2 22:1

**responsibiliti es** 6:1 13:14 17:16,24 18:7 19:3

**responsive** 83:12,15, 22 84:5,11 85:13,22

**restaurant** 84:15

**result** 63:2 64:9 65:12 70:15,18

**results** 63:4 67:8,10

**resumé** 12:2, 7,18,23 13:24 17:13 83:14

**returned** 49:20 55:21 64:13 91:20

**returning** 65:11

**reveal** 79:3

**revealing** 38:18 53:5 88:3

**revert** 38:22

**review** 31:15,18 82:25

**reword** 7:23

**right-hand** 29:15

76:14,18 78:14

**RMR** 4:3

**Robbin** 4:12 5:11 21:12 42:18 44:10,12 45:17,18 46:19 66:10 69:18,23 70:19 73:15

**robbinward61** 46:19 54:14 57:2,13, 15,17

**robbinward61@ gmail.com** 30:23 47:7 48:1 50:9 54:8 56:4, 12,22 57:13 66:9

**robbinward61@ gmail.com.** 57:8

**rooms** 86:18

**row** 60:17

**RPR** 4:3

**Rule** 5:17 44:20

**rules** 4:8 6:4

ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,
*Neal Maynard on 04/19/2023*                    Index: runs..sort

runs   15:7

rural   10:23
  86:4

—————————————
          s
—————————————

satisfies
  5:17

save   88:10

school
  20:15,19

scope   44:7,
  18,19

Screen   34:8

screenshot
  34:11,13,
  19 36:23
  62:19
  63:1,2,21
  64:3,9,10,
  18 74:10

screenshots
  34:10,14
  36:17
  74:15,20
  76:11 84:8

search   38:1,
  6 44:3
  48:21 61:6
  63:2,4
  64:9 67:7,
  10,24 69:9
  85:24
  86:15

searched

68:24 74:6

searches
  71:7

searching
  37:7 69:8
  71:2,8
  87:1

Seattle   82:9

Security
  14:18

seller   87:20

seminar
  81:5,6,21

seminars
  81:13

send   57:7

sender   48:1
  50:9 54:7,
  14 55:9
  56:12,14
  57:3,12

senders   66:3

sending
  56:10
  57:15,17
  66:10

senior   10:20

sense   11:19
  33:11 71:4

sentence
  15:16
  21:23
  24:22

33:22,23,
  24 34:1
  37:5 39:22
  48:15
  69:24
  70:17

separate
  48:8 82:17
  84:1 85:16

service   23:7
  24:23 25:5
  26:9,17
  27:15 46:2

shake   7:4

shorter
  69:10

show   73:9,
  10 78:22
  79:16

shows   24:21
  55:7 59:5

side   60:18
  76:11,14,
  18 78:15

signature
  92:15

signifies
  23:14

similar
  13:9,11,14
  33:12 35:7
  71:6 82:12
  87:19
  90:14

simple   85:24

simultaneously
  11:2 35:8,
  14 42:10
  43:7 45:25
  48:14
  55:12,13
  61:20
  62:20
  74:25
  84:22 92:9

site   64:10,
  12 71:9

sites   65:10,
  11,18,20
  71:18

sitting   7:12

small   55:24
  56:2 59:24

Smith   71:1

snippet
  25:12

social   71:18
  87:4,5

software
  31:13

sort   6:3
  11:25 28:6
  30:14
  33:21 34:6
  55:20
  61:1,8
  65:15
  70:10 71:6

ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,
Neal Maynard on 04/19/2023                    Index: sorts..support

73:5,12
77:11
80:17

**sorts**  10:21

**sound**  34:1

**source**  25:8
79:18,23

**speak**  7:21
19:22
82:24
84:10
86:22

**speaking**
11:2 35:8,
14 42:10,
23 43:7
45:25
48:14,19
49:6
55:12,13
61:20
62:20
74:25
84:22 92:9

**special**
81:18

**specific**
24:13
26:13,23,
24 41:15
72:16

**specifically**
65:20 74:2

**speculate**
80:7

**spell**  21:13
37:16
39:15

**spells**  38:23

**spot**  36:23

**spreadsheet**
47:16,19,
21 54:6,
11,17 55:6
58:10
59:13,19
60:17
61:11 66:2

**start**  29:5
57:23

**started**
10:11 46:7

**starting**
13:2 74:16

**starts**  53:24

**state**  11:13
13:12
20:23
61:15,17
81:16

**state-level**
11:11

**stated**  27:3
35:17
85:23

**statement**
23:5
27:14,20
29:14

30:12

**statements**
90:5

**states**  60:12

**step**  70:22

**steps**  53:25
61:5

**sticker**
61:22

**stole**  40:23
42:5

**stop**  9:11
42:21
43:5,15
54:8

**straight**
13:11 28:8

**Street**  27:25
28:1,14
29:19
30:15
50:16
76:19
77:17
79:17,24
80:8 84:8

**stretch**  8:10

**stuck**  58:14

**stuff**  84:18
86:20
90:17

**submit**  41:10

**submitted**

9:22 10:1,
3 14:22
20:5 29:2,
10

**subpoena**
12:12
80:12

**subscriber**
23:1 24:20

**subset**  55:24
56:2

**suggest**
44:22

**summarize**
29:22
42:13
50:25
53:24
66:20

**summarized**
66:22

**summarizing**
29:24
50:15 67:3
82:25

**summary**  9:23
12:1 25:17
51:3 57:10
59:3

**Superior**
20:23

**supplied**
85:21

**support**  9:23

ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,
Neal Maynard on 04/19/2023          Index: suppose..time

10:24,25
11:6

**suppose**
46:14

**supposed**
88:18

**swear**  4:21

**sworn**  5:5

**system**  26:20

**systems**  4:13
5:3 15:9

---

**T**

**tag**  73:20,
23 74:3

**tagged**  69:18
70:2,19,23
71:3 73:5,
21,22
74:1,5

**tagging**  70:4
72:18

**tail**  22:20
60:8 68:8

**taking**  6:8,
22 9:2,5
74:19

**talk**  6:11
8:8 10:6
12:13
27:24
30:18
34:16 44:7

47:20,21
62:5 77:4
78:7 87:4

**talked**  16:14
57:16,18
58:3
61:16,21
65:16 75:1

**talking**
17:10
26:16
32:16
33:24
36:23 46:8
48:22
56:14
57:11
62:22 65:6
72:15,16,
17 82:16
84:7,19
85:1 90:3

**task**  47:12

**taunt**  86:17

**technical**
47:16

**teenager**
24:4

**terms**  23:7
24:23 25:5
26:9,17
27:15
37:15,16
38:1,7
51:1 73:2

**testified**
20:4 90:1,
19 91:2

**testify**  8:22
9:3 90:24

**testifying**
7:13

**testimony**
9:10,12
40:16
49:25
60:21 61:8
78:15
91:21

**Texas**  21:18
59:22

**text**  32:21

**Textedit**
32:21 33:3

**that'll**  8:9,
21

**theft**  17:20,
22 18:6,
11,25
19:4,10
21:11 39:9
40:4,7
42:18

**thing**  6:12,
17 9:8
11:5 14:16
23:20 52:8
71:9 86:1

**things**  6:25

10:21 11:9
24:13
26:7,8,12,
23,24 34:6
41:14,16
50:19
51:11
52:23,24
57:9
66:17,18,
23 67:10
71:14
84:13,17
85:2 87:12
88:6 90:25

**thinking**
84:21 85:4

**thought**  46:8
81:12

**Thunder**
34:20

**Thunderbird**
31:14,18
32:1,20
33:3,12,20
34:20,21,
25 36:3
37:11
47:12,18,
24 50:7
54:1 83:24

**tie**  40:7
42:11

**tied**  50:19

**time**  4:16

ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,
Neal Maynard on 04/19/2023                    Index: times..vague

9:9 16:23
19:17
31:4,7
45:7 49:13
77:18 81:9
86:7,11
91:9,17,25
92:4,12

**times** 52:25
57:14,16
59:5

**title** 80:17

**today** 7:16
8:8,22,25
9:3,6
16:5,17,24
32:13 44:7
55:3 81:1

**today's** 4:15
92:8,10

**tool** 24:12

**top** 32:3
34:17 35:6
60:4 64:5
83:5

**topic** 53:18

**Total** 92:11

**touching**
35:19

**traditionally**
70:5

**traffic**
21:11

**trained**
20:13

**training**
17:19,21
20:8 81:4
83:18
86:22

**trainings**
87:3

**transcribe**
48:19

**transcript**
12:16,20
14:25
25:20 32:7
54:21 79:8
80:14 82:2

**Transportation**
14:18

**trials** 90:25

**trouble**
59:24

**true** 41:20,
22

**truth** 7:11
49:22

**TSA** 14:12
17:15 18:7

**turn** 62:15

**turned** 88:25
89:4

**two-page**
25:22

**tying** 42:18

**type** 18:1
23:20
64:12,15
69:8 72:2
82:12
86:1,9
90:17

**typed** 68:4,
21,23
69:9,12

**types** 48:8

**typing** 46:23
66:6

—————————

**U**

—————————

**Uh-huh** 86:10

**uh-uh** 6:24

**unclear**
52:25

**understand**
5:12 7:10,
22,24 9:16
19:7,8
23:13
26:21
27:13,25
35:12 43:3
49:21 52:7
61:7 68:14
70:15
71:21
72:12,18
78:19
88:14

89:2,3

**understanding**
7:18
35:13,18
45:16
52:20
70:1,2
75:9

**understood**
8:2

**unfair** 70:17

**unfairly**
29:24

**unique** 23:14
70:25 71:3

**University**
20:24

**update** 9:11
50:1 91:22

**updated** 14:4

**URL** 68:9,
15,24
69:11

**user** 23:6,8
24:23
27:15
29:1,3,9,
11 66:16
71:9 87:7

**users** 37:7

—————————

**V**

—————————

**vague** 27:11

**ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,**
**Neal Maynard on 04/19/2023**                    Index: variety..zoom

variety
  15:12

verbally  7:4

verification
  46:3 85:20

verify  30:9
  74:21 75:6
  77:14,23
  78:25

version
  69:5,10

versus  4:12
  11:20
  85:10

video  7:5
  48:19
  49:18
  74:7,9,10,
  20 75:11,
  24 76:11
  84:9

videoconference
  4:1 92:16

Videoconferencing  4:7

videographer's
  48:25

view  33:3
  56:11
  77:11

views  70:8

violating
  18:18

Virginia  4:4

———————————
        W
———————————

W-A-R-D
  21:14

waived  92:15

wanted  33:9
  79:25

Ward  4:12
  5:11 42:18
  44:11,12
  45:17,18
  46:20
  66:10
  69:18,23
  70:19
  73:15 74:1

waste  45:6

water  8:11

watermark
  77:16,19

ways  31:17,
  21

wealth  87:5

website
  76:15 80:5

websites
  62:7,14

weeds  86:8

week  14:5

well-worded
  7:17,20

whatismyipaddress.com
  62:18
  65:21

wider  77:11

Wile  4:3,18

Wilson  4:6

Wisconsin
  10:17,24
  13:4,7,11
  15:10 18:3
  31:10
  81:9,16
  82:19

withheld
  89:16

woman  73:1

wondering
  35:4 75:6,
  20

word  57:21

worded  20:1

words  6:23
  7:8

work  10:7,
  15 14:7,8
  15:22
  17:12
  18:10 19:2
  21:25
  35:12
  36:14 44:8
  51:9 71:11
  84:20 85:1

88:1

worked  10:10
  14:11,12
  18:9 19:9
  86:14

working
  11:16
  13:11 18:2
  86:4,7

works  23:18
  35:15
  72:18

writing
  48:20

wrong  37:19

———————————
        Y
———————————

year  20:17
  81:16

yearly  82:15

years  11:24
  13:20,21
  20:11

———————————
        Z
———————————

Zillow  76:16
  77:5,7,15,
  23 78:2,3,
  12,25
  87:18,21,
  22,23

zoom  4:6
  60:3

**ROBBIN WARD vs NATIONAL CREDIT SYSTEMS INC.,**
Neal Maynard on 04/19/2023                              Index: ..zoom