IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No.    21-cv-2597-LTB-SKC

ROBBIN WARD,

        Plaintiff,

v.

TRANS UNION, LLC, et al.,

        Defendants.

---

**ORDER**

---

This matter is before me on a Motion for Summary Judgment filed by Defendant National Credit Systems, Inc. ("NCS"). [**Doc #55**] Plaintiff Robbin Ward has filed a response to NCS's motion [Doc #62] opposing the relief requested, and NCS has filed a reply [Doc #63] and a supplemental brief [Doc #75]. Oral argument would not materially assist me in my determination of this motion. After consideration of the parties' briefs, and for the reasons stated, I GRANT IN PART AND DENY IN PART NCS's Motion for Summary Judgment.

## I.    BACKGROUND

Based on the briefing, the evidence submitted and the Final Pretrial Order entered in this case [Doc #61], the parties agree on the following facts, unless otherwise noted. (The Court reminds the parties that pursuant to Local Rule 56.1, "[a] motion under Fed. R. Civ. P. 56 for summary judgment or partial summary judgment shall include a statement of <u>undisputed facts</u> . . . ." D.C.COLO.LCivR 56.1(a) (emphasis added). A statement of undisputed facts is no place for a party's argument or advocacy which, unfortunately, is all too prevalent in the parties', and particularly NCS's seventeen-page Statement of Facts [Doc #55-1].)

On January 30, 2019, an online application was submitted to Main Street Renewal, LLC ("MSR" or the "Original Creditor") to rent real property located at 229 Cliff Heights Circle, Dallas, TX 75232. The online application includes the date and time for certain milestones that were completed throughout the online application process as well as the IP (Internet Protocol) address of the computer that was used to complete the application and initiate other pertinent communications. [Doc #55-3] (An "IP address" is the unique identifying number of a device connected to the internet. *Dallas Buyers Club, LLC v. Bowens*, Civil Action No. 15-cv-00010-WYD-MEH, 2015 WL 13215656, at *2 (D. Colo. Oct. 9, 2015), report and recommendation adopted, No. 15-cv-00010-WYD-MEH, 2015 WL 7738389 (D. Colo. Dec. 1, 2015).) The application was in the name of Plaintiff and contained his Colorado home address, the last four digits of his social security number, an email address (robbinward61@gmail.com) and income information. [Doc #55-3] The application lists Laquencilla Allen Antoinette Green, a.k.a. Quen Green (hereinafter "Quen Allen") as an emergency contact, noting the relationship as "Daughter." *Id*. The phone number provided on the application for Quen Allen matches her confirmed phone number. The address for Quen Allen, 624 Priscilla Lane, Desoto, TX 75115, is also provided on the application. *Id*. Color copies of Plaintiff's driver's license and social security card were provided with the application.

Plaintiff denies completing the rental application. He also denies providing anyone with his identifying information for that purpose and states that he provided his daughter with copies of his social security card and driver's license because she told him she needed them to add him as a beneficiary to a life insurance policy.

Income verification submitted with the rental application included pay stubs from the

2

company Neiman Marcus bearing Plaintiff's name [Doc #55-7], but Plaintiff denies having

provided this information, denies ever having worked at Neiman Marcus (though he states in

discovery responses in this case that his daughter, Quen Allen, was an employee of Neiman

Marcus from 2015 to 2022) and asserts that the paystubs are fake. A letter from the Social

Security Administration ("SSA") bearing Plaintiff's name as the addressee and indicating that

disability benefits were being paid was also submitted with the rental application [Doc #55-8],

however Plaintiff maintains that this document is also fake and denies having submitted such

information or seeking it from the SSA. Plaintiff has stated in discovery in this case that he does

not receive Social Security benefits but that his daughter, Quen Allen, does.

The rental application required disclosure of any felony convictions and pending criminal

charges and the responses given on the application to these inquiries are "no." [Doc #55-3] In

2014, Quen Allen pled guilty to a felony of fraud use/possession of identity information. [Doc

#55-22]

The rental application was approved and a lease was signed, with the commencement

date of February 15, 2019 and expiration date of February 14, 2020 (the "Lease"). Not long after,

MSR evicted the tenant at 229 Cliff Heights Circle for failure to pay rent under the Lease.

(Plaintiff maintains that he was not the tenant.) MSR's attorney reported in a letter dated July 8,

2019 that on June 25, 2019 the court entered a final judgment in the eviction matter in favor of

MSR and as a result a Writ of Possession was entered.

On December 12, 2019, MSR placed an account for collection of a deficiency under the

Lease with NCS. At referral, the balance reported by MSR was $5,375.82. Following placement,

on February 21, 2020, NCS furnished data regarding the defaulted Lease to the consumer

reporting agencies, Trans Union, LLC ("Trans Union"), Equifax Information Services, LLC ("Equifax") and Experian Information Solutions, Inc. ("Experian") (collectively, the "CRAs").

NCS first spoke (as opposed to a written communication) with Plaintiff and Megan (Henderson) Ward, Plaintiff's wife, about the defaulted Lease on June 11, 2020. NCS was also notified by the CRAs that Plaintiff disputed the debt on five separate occasions. Specifically, NCS received dispute notices on June 10, 2020 from Experian, and on June 11, 2020 from Equifax and Trans Union. On July 4, 2020, NCS received a second dispute from Equifax, and on July 10, 2020, NCS received a second dispute from Trans Union.

The three June disputes did not include attachments aside from the ACDV itself. ("ACDV" stands for Automated Consumer Dispute Verification, which is an electronic form by which CRAs and furnishers of information communicate with each other regarding consumer disputes. *See* Expert Report of John Ulzheimer ("Ulzheimer Rep.") [Doc #55-44], at 12.) The Trans Union June ACDV stated that "I have not opened any new credit or had any interaction with the original creditor" and "Not Aware of Collections. Provide or confirm complete ID and verify Account Information." The Equifax June ACDV stated "I have no idea why this is reported. I am wondering if someone stole my identity to access Main Street Renewal LLC" and "Not His/Hers." The Experian June ACDV stated "Not his/hers. Provide complete ID. I have no knowledge of this account, I have not opened a new account and do not recognize this credit lender." The July 2020 ACDVs indicated that Plaintiff "claims true identity fraud." Following the conclusion of its investigations, NCS responded to the CRAs that it had verified the delinquent Lease account as furnished by NCS.

Plaintiff filed this lawsuit on September 24, 2021 against the three CRAs and NCS. In his

Complaint [Doc #1], he asserts two claims against NCS that, as a "furnisher" of information, it violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), specifically § 1681s-2, by failing to conduct a reasonable investigation of Plaintiff's credit disputes and by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's dispute from the CRAs prior to the commencement of this action. In May 2022, Plaintiff stipulated to dismiss all claims against the CRA defendants. [Doc ##39, 42, 44]

## II.    THE MOTION

NCS requests summary judgment on Plaintiff's FCRA claims against it (Counts 3 and 4) arguing that: (1) Plaintiff's lack of damages precludes liability on the part of NCS; (2) Plaintiff cannot establish that NCS acted willfully with regard to Plaintiff's disputes; and (3) Plaintiff cannot show that NCS's reporting was inaccurate or that NCS's investigation was unreasonable and that Plaintiff has brought a legal, as opposed to factual, dispute.

## III.    STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if its determination might affect the outcome of the suit under the governing law. *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018).

A party seeking summary judgment bears the initial responsibility of informing the court

of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323; *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992). In so doing, a movant who does not have the burden of proof at trial need not negate the nonmovant's claim, but rather may make its prima facie demonstration by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex,* 477 U.S. at 325). Where the moving party meets this burden, the burden then shifts to the nonmoving party who may not rest on the unverified allegations of its pleadings, but must set forth specific facts, through admissible evidence, showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Panis v. Mission Hills Bank*, 60 F.3d 1486, 1490 (10th Cir. 1995). In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Donahue v. Wihongi,* 948 F.3d 1177, 1187 (10th Cir. 2020).

## IV.    ANALYSIS

FCRA imposes obligations on three types of entities: CRAs, users of consumer reports and furnishers of information to CRAs. *Jarrett v. Bank of Am*., 421 F. Supp.2d 1350, 1353 (D. Kan. 2006) (citing 15 U.S.C. § 1681, *et seq*.). A CRA is defined as any entity that "regularly engages . . . in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). A furnisher is "an entity which transmits information concerning a particular debt owed by a particular consumer to [CRAs]." *Fishback v. HSBC Retail Servs. Inc*., 944 F. Supp.2d 1098, 1107 (D.N.M. 2013) (quoting *Jarrett*, 421 F. Supp.2d at 1352 n.1).

Under FCRA § 1681s-2(b)(1), when a CRA, such as Equifax, notifies a furnisher of

information, such as NCS, of a dispute, the furnisher is required to:

(1) investigate the disputed information;
(2) review all relevant information provided by the CRA;
(3) report the results of the investigation to the CRA;
(4) report the results of the investigation to all other CRAs if the investigation
reveals that the information is incomplete or inaccurate; and
(5) modify, delete, or permanently block the reporting of the disputed information
if it is determined to be inaccurate, incomplete, or unverifiable.

*Llewellyn v. Allstate Home Loans, Inc*., 711 F.3d 1173, 1178-79 (10th Cir. 2013) (quoting

*Pinson v. Equifax Credit Info. Servs., Inc*., 316 F. App'x. 744, 750 (10th Cir. 2009)

(unpublished)). A consumer may recover actual damages caused by a defendant's negligent

violation of FCRA. 15 U.S.C. § 1681o(a); *Llewellyn*, 711 F. 3d at 1179. However, under FCRA,

"the consumer need not prove actual damages if the violation is willful, but may recover punitive

damages and statutory damages ranging from $100 to $1000." 15 U.S.C. §1681n(a); *Llewellyn*,

711 F.3d at 1179 (quoting *Birmingham v. Experian Info. Solutions, Inc*., 633 F.3d 1006, 1009

(10th Cir. 2011)).

In this case, Plaintiff seeks actual damages, both economic and non-economic (for

emotional distress), under § 1681o and statutory and punitive damages under § 1681n. Because a

claim under § 1681s-2 for negligence cannot proceed unless a plaintiff can establish that he has

suffered actual damages that were caused by the defendant (even if the plaintiff has presented

evidence that that the defendant engaged in conduct proscribed by the FCRA), I will proceed

first with NCS's argument that Plaintiff has failed to provide evidence of actual damages as a

result of any negligent violation by NCS.

7

A.  <u>**Whether Plaintiff Has Established Actual Damages**</u>

NCS claims that Plaintiff presents no factual allegations or documentation which could

plausibly suggest that NCS's actions or inactions impacted him in any manner or that he would

have acted differently had NCS altered any of its actions and that, therefore, Plaintiff lacks

Article III standing. Relatedly, NCS argues that Plaintiff cannot sustain a claim for negligence

under FCRA because he has not identified any actual damages stemming from any act taken by

NCS, has not been denied any credit, and could not have been damaged because "the NCS

account consistently reported with compliance code 'XB' which blocks any such account from

consideration in a consumer score . . . ." Mot. at 10-11.

Plaintiff counters that he did suffer damages, both economic – as the result of being

unable to refinance his mortgage to a lower interest rate in "June 2020" due to "derogatory

collection account reporting on his credit report, that resulted in a low credit score of 671" – and

non-economic, including for emotional distress, humiliation, and embarrassment, as a result of

NCS's actions. Resp. at 11, 12. In support of his claimed economic damages, Plaintiff cites his

own declaration, a discovery response and the Rule 26(a)(2) Expert Witness Report of Evan

Hendricks ("Hendricks Rep.").

In his Declaration, Plaintiff states:

> In June 2020, I gave permission to run my credit to Will Hamilton at Fairway
> Independent Mortgage for a mortgage refinance. I learned for the first time of the
> NCS account "in collections" after they pulled my credit, and I learned that I
> would not qualify for the rate I was trying to get, which was 2.75%, due to the
> fraudulent NCS account appearing on my credit report. I did not receive any letter
> confirming that adverse action by Fairway Independent Mortgage.

Ward Decl. [Doc #62-3] ¶ 27. Plaintiff also refers to his discovery response in which he states

8

(presumably regarding the same refinance attempt referenced in his Declaration):

> Plaintiff was unable to refinance his mortgage from 4.35 to a lower interest rate of
> approximately 2.75 – 3% because of the derogatory collection account reporting
> on his credit report, that resulted in a low credit score of 671. Plaintiff was
> advised that because of his credit score he would not qualify for the best rate. One
> of the main risk factors was that a derogatory collection or public record had been
> filed. This information was provided by Experian. (Plaintiff_000001 – 000003)
> The reduction in interest rate would have been approximately $300 per month and
> over the life of the loan would have been a savings of approximately $108,000.

Resp. Ex. 70 [Doc #62-22] at 4.

Plaintiff also highlights a June 11, 2020 Experian report which he says confirms that

multiple parties, including nine creditors with hard inquiries (the most recent of which, by

Advantage/Fairway Independent ("Fairway"), occurred on June 8, 2020), obtained Plaintiff's

credit report with the inaccurate NCS account, which Plaintiff claims is "textbook Article III

injury in fact." Resp. at 10, citing Ex. 69. [Doc # 62-21] While Plaintiff does not specify the date

he attempted his mortgage refinance with Fairway, other than to say it was in June 2020, and he

provides no documentation regarding this attempted transaction, the June 11, 2020 Experian

report (Resp. Ex. 69) confirms that on June 8, 2020, Fairway made a "hard inquiry" on Plaintiff's

credit for "real estate" reasons. [Doc #62-21]

Plaintiff's expert opines that a reported status of "collection account" with a past due

balance rendered Plaintiff ineligible for credit and had a negative impact on his credit score. *See*

Hendricks Rep. at 18 [Doc #62-7] Mr. Hendricks adds that "the significant negative impact of

the NCS collection on Plaintiff's FICO score is demonstrated by the June 2020 response of a

mortgage lender" and that the credit report it pulled showed Plaintiff with FICO scores in the

600s whereas without the NCS collection, Plaintiff's FICO scores would have been well above

9

700. *Id*. Mr. Hendricks neither cites nor attaches any documentation evidencing the "June 2020 response of a mortgage lender," but his source presumably is Mr. Ward.

Plaintiff argues that NCS was responsible for this harm because it reported the debt as "in collection" to the CRAs, citing his June 10, 2020 credit reports from Experian and Trans Union and his June 12, 2020 credit report from Equifax, Exs. 52-54 [Doc ## 62-4, 62-5 & 62-6] (all showing the NCS matter as in "Collection" with a past due balance of $5,375), and the fact that, at least as to the Experian Dispute Results (Ex. 68), this reporting remained even after Plaintiff disputed the account as not belonging to him. [Doc #62-20] Plaintiff further argues that NCS falsely reported to the CRAs that the account belonged to him, citing Exs. 64-66 [Doc ## 62-16, 62-17 & 62-18] (NCS's reports to the CRAs).

The Court in *TransUnion LLC v. Ramirez*, on the issue of damages and Article III standing in a case under FCRA, made clear:

> As *Spokeo* explained, certain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms. If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.
>
> Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion.

*Ramirez*, 141 S.Ct. 2190, 2204, 2005 (2021) (citations excluded) (adding that "[a]s the Court emphasized in *Spokeo*, 'Article III standing requires a concrete injury even in the context of a statutory violation'"). And, as the Tenth Circuit held in *Llewellyn*, the plaintiff in a FCRA case has the "affirmative duty of coming forward with evidence supporting his claim" that the defendant's actions caused him harm. *Id.*, 711 F.3d at 1181 (quoting *Cahlin v. Gen. Motors*

10

*Acceptance Corp.*, 936 F.2d 1151, 1161 (11th Cir. 1991)).

The evidence presented by Plaintiff to demonstrate his economic damages centers on his "June 2020" attempt to refinance his mortgage with Fairway. To recap that evidence: Plaintiff learned for the first time of NCS's negative credit reporting when he attempted to refinance his mortgage with Fairway and they pulled his credit at which time Plaintiff learned that he would not qualify for the interest rate he was trying to get. Ward Decl. [Doc #62-3] ¶¶ 17, 27. The June 11, 2020 Experian report referenced above (Resp. Ex. 69) confirms Plaintiff's refinance attempt with Fairway and indicates that it occurred on June 8, 2020. [Doc #62-21] It is undisputed that <u>after</u> learning of the negative credit report from Fairway and being denied the lower interest rate, Plaintiff then submitted his first dispute to all three CRAs. It is also undisputed that on June 11, 2020, Plaintiff contacted NCS (or its law firm) directly and that on June 10 and 11, 2020, the CRAs notified NCS of Plaintiff's disputes. There is no evidence to suggest that Plaintiff's credit report was pulled by a potential lender or that he was denied credit (or received less favorable terms) <u>after</u> the CRAs notified NCS on June 10 and 11 of Plaintiff's disputes.

The law is clear that a furnisher's duty to investigate a dispute under FCRA "arises only after a CRA notifies the furnisher of a dispute . . . ." *Willis v. Capital One Corp.*, 611 F. App'x 500, 502 (10th Cir. 2015) (unpublished); *see also Llewellyn*, 711 F.3d at 1178 (noting that § 1681s-2(b) of FCRA imposes certain requirements on a furnisher of information "who has received notice of a dispute from a CRA"); *Lowe v. Surpas Res. Corp.*, 253 F. Supp. 2d 1209, 1254 (D. Kan. 2003) ("[c]ourts have consistently held that this duty is triggered 'only after the furnisher . . . receives notice of the dispute from a consumer reporting agency, not just the consumer'") (citations omitted)). Moreover, a lowered FICO score is not enough to support a

claim for economic damages based on a furnisher's FCRA violation. Rather, a plaintiff must show that he was denied credit or received less favorable terms based on the challenged conduct. *See Llewellyn*, 711 F.3d at 1180 (plaintiff was required at summary judgment stage to come forward with evidence that he had applied for and been denied credit due to the defendant's FCRA violations); *Peterson v. Experian Info. Sols*., 44 F.4th 1124, 1127 (8th Cir. 2022) ("[t]o the extent Peterson alleges injury solely from diminution in her credit score, that type of abstract harm does not support actual damages"); *Remaly v. Wyndham Resort Dev. Corp*., No. 20-cv-3028-LTB-NYW, 2021 WL 5504628, at *4 (D. Colo. Nov. 23, 2021) (in the absence of evidence that plaintiff applied for credit, a lowered FICO score alone is not enough to support a claim for economic damages as a result of a FCRA violation).

Plaintiff's only evidence of economic damages – that he applied for and was denied favorable credit terms from Fairway – is not sufficient to support his claim for economic damages because the attempted refinance occurred <u>before</u> he submitted his dispute to the CRAs and before NCS received notice from the CRAs of his dispute, i.e. before FCRA liability could attach. Because there is no evidence that Plaintiff applied for and was denied credit <u>after</u> the CRAs notified NCS of Plaintiff's dispute, I conclude that Plaintiff has not met his burden of demonstrating that NCS's actions caused him to suffer economic damages. I therefore grant this portion of NCS's motion.

Plaintiff's non-economic damages, however, are another matter. Plaintiff supports his claim for non-economic damages with only his declaration [Doc #62-3] in which he states, under penalty of perjury, and with some detail, that he experienced embarrassment in March 2022 when he applied for a home equity loan at Bellco Credit Union and in September 2020 when he

needed to be a co-signor for his wife's car and had to explain, in both cases, the issues with his credit over NCS's reporting. *Id*. ¶ 28, 29. He also explains that NCS's actions caused him to feel devastated over the damage done to his credit score (which he had worked hard to rebuild) as well as frustrated, angry, depressed and hopeless in disputing the claim with NCS, which also caused him to gain over 30 pounds, affected his sleep, increased his stress level and negatively impacted his work performance. *Id*. ¶ 30.

NCS argues that recovery of damages for emotional distress typically requires some type of compelling evidence, such as medical records or evidence of counseling, and not just conclusory testimony. Reply at 2, citing *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503-04 (4th Cir. 2007). In the Tenth Circuit, however, a FCRA plaintiff is not required to produce corroborating evidence to establish emotional distress damages so long as the plaintiff describes his or her emotional distress in sufficient detail and does not rely on conclusory statements. *See Llewellyn*, 711 F.3d at 1182, 1183.

While not quite as compelling or detailed as the statements offered by the plaintiff in *Llewellyn*, I do not find Plaintiff's statements to be outright conclusory and his assertion that NCS's actions caused those symptoms is not so incredible or conclusory that it can be ignored. Therefore, viewing the evidence of Plaintiff's emotional distress in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, I conclude that Plaintiff has described his emotional injury in sufficient detail to create a genuine issue of material fact that NCS's actions caused him to suffer emotional damages. I, therefore, deny this portion of NCS's motion.

13

### B. **Whether Plaintiff Can Establish that NCS Acted Willfully**

Under FCRA § 1681n(a), as noted above, "the consumer need not prove actual damages if the violation is willful, but may recover punitive damages and statutory damages ranging from $100 to $1000." *See* 15 U.S.C. § 1681n(a); *Llewellyn,* 711 F. 3d at 1179. A "willful" violation is either an intentional violation or a violation that is committed in reckless disregard of a defendant's duties under FCRA. *See Birmingham*, 633 F.3d at 1009 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57–58 (2007)).

> Recklessness is measured by an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known. A company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

*Llewellyn*, 711 F.3d at 1183–84 (internal quotations and citations omitted).

NCS argues that it is entitled to summary judgment because Plaintiff cannot establish that NCS acted willfully with regard to Plaintiff's dispute. NCS claims that Plaintiff proffers nothing except unsubstantiated allegations that NCS failed to implement policies that contravene the rights of consumers. To the contrary, NCS asserts, it has implemented policies and procedures to protect consumers' rights and argues that where a creditor has policies in place to ensure that it complies with FCRA's investigation requirements and, despite allegedly reaching the wrong conclusion, it complied with the policies, it can be said as a matter of law that the creditor did not act recklessly under FCRA. NCS adds that Plaintiff must, but cannot, show something beyond mere carelessness to support his claim under § 1681n. Mot. at 11 (citing, *inter alia*, *Llewellyn*, 711 F.3d at 1183-84 (stating that evidence showing more than mere carelessness is required to

14

demonstrate a willful violation)).

Plaintiff counters, first, that there is "substantial evidence" that NCS knowingly violated FCRA because "NCS had multiple reasons to know that a more robust investigation was necessary because of Plaintiff's disputes that the account resulted from the theft of his identity, yet all NCS did was compare data that it was already reporting yet was on notice was suspect. And NCS's corporate representative confirmed that the dispute investigators followed NCS's dispute-investigation policies, PSOF ¶ 4, meaning NCS knowingly fell short of a reasonable identity-theft investigation when all it did was match data used fraudulently." Resp. at 26-27 (citing Plaintiff's Statement of Undisputed Facts ("PSOF") ¶ 4 [Doc #62-2]).

Plaintiff also claims that NCS failed to mark his account as "in dispute" or include the compliance code "XB" to the results it posted to the CRAs in ACDVs processed in June 2020, even though NCS was aware, based on communications "independent of the communications from the CRAs," including with Plaintiff starting June 11, 2020 that he was the victim of identity theft and other information from other non-CRA sources. Resp. at 27, citing PSOF ¶¶ 50, 51. Plaintiff argues that NCS, therefore, knew of Plaintiff's dispute independent of the communications from the CRAs, and failed to accurately report the same in its ACDV responses. Resp. at 27, citing *Miller v. Westlake Servs. LLC*, __ F. Supp. 3d __, No. 8:21-cv-00692-JLS-KES, 2022 WL 16556836, at *10 (C.D. Cal. Oct. 28, 2022).

Finally, Plaintiff alleges that NCS disregarded key evidence appended to Plaintiff's disputes, wrongly insisted on a police report and failed to consider or give enough weight to information and documents Plaintiff did provide, including Plaintiff's FTC Affidavit, all of which, Plaintiff claims, is evidence of "perfunctory investigations that recklessly violate the

15

FCRA." Resp. at 28. In support, Plaintiff points to the deposition testimony of Ronald V. Sapp (NCS's Vice President of Operations) and NCS's investigators. *Id*. at 28-29. Plaintiff is also critical of the fact (which NCS does not dispute) that NCS's policies do not allow NCS investigators to contact employers to verify a claimant's employment due to NCS's concerns over violating the FDCPA. Resp. at 29, citing Rule 30(b)(6) deposition testimony of Mr. Sapp [Doc #62-24] (explaining that it's risky for NCS to contact third parties about a debt). Plaintiff argues that NCS's alleged reason for this policy is unjustifiable, citing *Marx v. Gen. Revenue Corp*., 668 F.3d 1174, 1177 (10th Cir. 2011), in which the court held that there was no violation of the FDCPA where the debt collector sent a fax to the plaintiff/debtor's employer to verify the debtor's employment, but gave no indication or implication in the fax that the communication had anything to do with a debt. *Id*. Plaintiff also highlights a case against NCS from the Northern District of Georgia, *Bumpus v. National Credit Systems*, No. 1:16-cv-01209-TWT, in which the jury assessed $105,000 in punitive damages against NCS based on its willful violations of FCRA. Resp. at 26, 30.

As to his first point, I note that the support Plaintiff cites, PSOF ¶ 4, does not address his allegations that NCS knowingly fell short of a reasonable identity theft investigation. *See* PSOF ¶ 4 [Doc #62-2] (regarding the rental application and Plaintiff's denial that he submitted or authorized it). Plaintiff likely intended to cite PSOF ¶¶ 44 or 45 (discussing Mr. Hendricks' report (at 5-7) wherein he opines that NCS "failed to give due regard to . . . compelling information" and "did not follow its own procedures for investigating identity theft," and "essentially disregarded" red flags such as Plaintiff's FTC fraud affidavit), or possibly PSOF ¶¶ 46 or 55 (discussing and citing Mr. Sapp's Rule 30(b)(6) deposition testimony that NCS's

16

investigators followed company protocols, including, among other things, by circling back to

MSR and requesting additional documents). While it is not my job to comb the record to make a

party's case, *see Adler*, 144 F.3d at 672, even considering this additional support, there is still no

evidence that NCS knowingly violated FCRA or recklessly disregarded its FCRA duties. At

most, Plaintiff raises a question of negligence. Moreover, Plaintiff's mere argument that "NCS

knowingly fell short of a reasonable identity-theft investigation when all it did was match data

used fraudulently" (Resp. at 27) does not satisfy Plaintiff's burden to support his claim with

admissible evidence.

Plaintiff's second point, that NCS knew, starting June 11, 2020, based on its

communications "independent of the communications from the CRAs," that Plaintiff claimed he

was the victim of identity theft, yet failed to mark its June ACDV responses as "in dispute" or

with the proper compliance code, at most raises a question as to negligence. I say "at most"

because there is no evidence that NCS's failure (if any) to apply the XB compliance code was

willful or reckless and because, as discussed above, there can be no liability under FCRA on the

part of a furnisher until it receives notice of a dispute from a CRA. *Willis*, 611 F. App'x at 502;

*Llewellyn*, 711 F.3d at 1178. (It goes without saying that there can be no liability on the part of a

furnisher for <u>intentional</u> violation of FCRA without an underlying FCRA violation. *See*

*Llewellyn*, 711 F.3d at 1183-84.) In addition, *Miller* does not advance Plaintiff's argument that

NCS acted intentionally. In *Miller*, on plaintiff's motion for summary judgment, the court held

only that the furnisher was negligent as a matter of law for not reporting to the CRAs that the

plaintiff's claim was in dispute. *Id.*, 2022 WL 16556836, at \*9. However, as to the plaintiff's

willful violation claim, the *Miller* court denied summary judgment holding that "[a]lthough the

record here compels the conclusion that Defendant failed to conduct a reasonable investigation in response to Plaintiff's disputes, it does not compel the conclusion that it did so knowingly or recklessly. Defendant's requests to Plaintiff for additional documentation and [defendant's director of compliance] testimony that it would be impossible to follow every lead Defendant receives about an account dispute can support a finding that Defendant did not knowingly or recklessly disregard its obligations under the FCRA." *Id.*, at *11.

As to Plaintiff's final point, regarding NCS's insistence on a police report, its failure to adequately consider the information provided by Plaintiff and its failure to contact Neiman Marcus, again, the evidence might support a claim for negligence, but provides no evidence demonstrating that NCS's actions were intentional or reckless. In addition, as NCS points out regarding its admitted failure to contact Neiman Marcus, the Tenth Circuit in *Marx* stated that under different circumstances, a debt collector's communication with a third-party could constitute a violation of the FDCPA where the communication conveys information regarding a debt or could be construed to imply a debt. *Id.*, 668 F.3d at 1177. Finally, Plaintiff's reference to *Bumpus v. National Credit Systems*, is equally non-compelling. *Bumpus* was a 2016 FCRA case against NCS in the Northern District of Georgia in which, after a 2018 trial, the jury found that NCS violated Section 1681s-2(b) by failing to conduct a reasonable investigation and that its violations were willful, prompting the jury to award $105,000 in punitive damages. There is no showing by Plaintiff that the circumstances in *Bumpus* are analogous to the facts here. For example, *Bumpus* did not involve allegations of identity theft, but rather involved a dispute with the creditor, the plaintiff's landlord, concerning move-out fees.

In conclusion, the evidence Plaintiff submits regarding alleged willful or reckless conduct

18

on the part of NCS, while it might support his claim that NCS negligently violated its § 1681s–2

obligations, does not support his claim that NCS acted willfully or recklessly in its investigation

or reporting of Plaintiff's dispute. *See Llewellyn*, 711 F.3d at 1185 (finding that the district court

did not err in granting summary judgment to defendant where there was no evidence of

willfulness or recklessness); *Birmingham*, 633 F.3d at 1012 (affirming grant of summary

judgment to defendant on the issue of willfulness because there was no evidence that defendant's

specific actions with respect to plaintiff were reckless). For these reasons, I grant this portion of

NCS's motion.

### C. <u>Whether NCS Conducted a Reasonable Investigation</u>

Having concluded above that Plaintiff's claimed emotional distress damages survive this

motion, I now must consider whether Plaintiff has made a sufficient showing that NCS

negligently failed to conduct a reasonable investigation.

When a furnisher receives a dispute notice from a CRA, it must undertake a reasonable

investigation of the dispute. *Maiteki v. Marten Transp. Ltd*., 828 F.3d 1272, 1275, 1276 (10th

Cir. 2016) (adding that an investigation need not be exhaustive to be reasonable). The Tenth

Circuit has defined a "reasonable investigation" as "one that a reasonably prudent person would

undertake under the circumstances." *Id.* (quoting *Seamans v. Temple Univ*., 744 F.3d 853, 864

(3d Cir. 2014)). The reasonableness of an investigation is to be determined by an objective

standard and "[t]he burden of showing the investigation was unreasonable is on the plaintiff." *Id.*

(quoting *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37 (1st Cir. 2010)).

NCS argues that it is entitled to summary judgment because Plaintiff cannot demonstrate

any actual inaccuracies in NCS's reporting and because its investigation was objectively

19

reasonable. NCS claims (twice, on the same page) that "[r]ather than simply confirming that the

disputed information were [was] consistent with their reporting – which was all that NCS was

obliged to do, under *Howard* – NCS instead conducted a full audit to confirm that there were no

errors and reviewed *all* information it had on file, requested information from the original

creditor, and even confirmed with the original creditor that the balance was, in fact, correct."

Mot. at 16 (referring to *Howard v. Pinnacle Cred. Svcs., LLC*, No. 4:09-cv-85 (CDL), 2010 WL

2600753 (M.D. Ga. June 24, 2010)). NCS's statements on this subject are not supported with any

detail or specific citation to record evidence, such as an affidavit or deposition testimony, or any

of the parties' nearly 90 exhibits. Instead, NCS discusses case law regarding what constitutes a

reasonable investigation under FCRA and the investigation it conducted during discovery *after*

this case was filed. *See* Mot. at 12-21. (I do not consider NCS's investigation during discovery in

this case to be relevant for purposes of this motion. NCS's investigation during discovery into,

among other things, IP address(es) from computers that were used to communicate with MSR

about the Lease, which was the subject of Plaintiff's Motion to Exclude the Declaration and

Testimony of Neal Maynard [Doc #64] and NCS's supplemental brief regarding the within

motion [Doc #75], has no bearing on the dispute investigation NCS undertook in 2020.)

For his part, Plaintiff, who has the burden of demonstrating that the investigation was

unreasonable, claims that NCS acted negligently by: (1) reporting the account as belonging to

Plaintiff and, for a time, not designating it as being in dispute; and (2) failing to conduct a

reasonable investigation of the disputes it received from the CRAs, but instead simply matching

data, which is not acceptable when there are allegations of identity theft. In support of Plaintiff's

claim, record evidence indicates that Plaintiff disputed that the debt was his and reported to a

20

CRA that someone may have stolen his identity in June 2020, as reflected in Equifax's June 11, 2020 ACDV. [Doc #62-17] NCS's Account Notes also contain two entries reflecting Plaintiff's direct communications with NCS on June 11, 2020. Mot. Ex. 23 [Doc #55-24] at 1 ("Debtor called in Talked to Debtor/ Gave MM Negotiating Debt. dtr called in says fraud affidavit 2 signature" and "Debtor called in Talked to Debtor/ Gave MM Negotiating Debt. Megan Henderson ok to speak with her spouse ///id theft"). In the two July ACDVs, Equifax and Trans Union both noted that Plaintiff "claims true identity fraud." [Doc ## 62-17, 62-16] Plaintiff also points to documents that NCS had in its possession, but allegedly disregarded in its investigation, such as his notarized Identity Theft Affidavit [Doc #62-12] (also noted in NCS's Account Notes [Doc #55-24 at 2] as being received on or around June 18, 2020) in which Plaintiff discloses, among other things, that he reported the events described in the Affidavit to the police but the police did not write a report, and the conflicting pay stubs (the "fake" Neiman Marcus stubs with Plaintiff's name and Colorado address in a different font and slanted, but showing Texas as the state for purposes of tax exemptions versus Plaintiff's pay stubs from his actual employer, EMJD Corporation ("EMJD"), in Colorado. [*See* Doc ##62-11, 62-13, 62-8 & 55-7]

In addition, Plaintiff's expert opines in his report that NCS disregarded an established set of industry-standard red flags during its investigation of Plaintiff's disputes, which included: (1) the presentation of suspicious documents with the application for a residence in Texas, including contradictory pay stubs (pay stubs from a Texas employer – Neiman Marcus – showing the alleged employee's Colorado address); (2) the use of suspicious personal identifying information, such as a suspicious address change, which is inconsistent when compared with paystubs that Plaintiff provided from his employer EMJD in Englewood, Colorado; (3)

21

disregarding the consumer's claims of identity theft (from Plaintiff and the CRAs) and not

accounting for documents like the FTC Dispute and Identity Theft Affidavit; and (4) not heeding

the suspicious fact that the fraudster made only the first payment but no subsequent payments.

Hendricks Rep. at 5-7. [Doc #62-7] Mr. Hendricks further opines that NCS's review was

"robotic" and insufficient in this case where there were concerns of identity theft in that NCS

essentially only compared data on the ACDVs to the information in its computer system, rather

than using other relevant information available to it. *Id*. at 2 (adding that in cases of identity

fraud, the identifying information in the furnisher's records predictably will "match" the

identifying information of the disputing consumer/victim). It is Mr. Hendricks' opinion that NCS

failed to give due regard to the compelling information that it had in its possession when it

reported to the CRAs that the disputed information was accurate. *Id*. at 6, 7.

I find that Plaintiff has come forward with enough evidence to satisfy his burden of

showing that there is a genuine issue for trial as to whether NCS, after receiving the June and

July 2020 ACDVs, conducted a reasonable investigation.

As noted above, a furnisher's § 1681-s2(b) investigation must be "reasonable," that is,

"one that a reasonably prudent person would undertake under the circumstances." *Maiteki*, 828

F.3d at 1275. Whether a defendant's investigation is reasonable is a factual question normally

reserved for trial. *Id*. (citing *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir.

2005)). However, summary judgment may be proper if "the reasonableness of the defendant's

procedures is beyond question." *Id*. How thorough an investigation must be in order to be

"reasonable" turns on what relevant information was provided to the furnisher by the CRA

giving notice of a dispute. *Id.* (quoting *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th

Cir. 2012) and citing *Chiang*, 595 F.3d at 38 ("[A] more limited investigation may be appropriate when CRAs provide the furnisher with vague or cursory information about a consumer's dispute.")). When a furnisher ends its investigation by reporting that the disputed information has been verified as accurate, "the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303, 1306 (11th Cir. 2016) (denying summary judgment to defendant on the issue of the furnisher's reasonable investigation and holding, in part, that the plaintiff's failure to send a police report or fraud affidavit to the furnisher does not entitle the furnisher to cease its investigation and inform the CRAs that the debt was verified as accurate).

It is undisputed, as noted above, that NCS received dispute notices (with no attachments) on June 10 from Experian and on June 11, 2020 from Equifax and Trans Union. NCS responded to the Experian and Trans Union ACDVs on June 11, 2020 that the disputed information was accurate. [Doc ##62-18, 62-16] NCS similarly responded to the Equifax ACDV on June 12, 2020. [Doc #62-17] Whether these June notices, particularly the Equifax June 11th ACDV conveying Plaintiff's concern as "wondering if someone stole my identity," combined with Plaintiff's direct communications with NCS (or its law firm) on June 11, 2020 (as noted above), were enough to trigger a higher level of review is an issue for the jury. I cannot say that it is beyond question that NCS, with the knowledge and information it had, conducted a reasonable investigation as a matter of law when it merely confirmed the identification associated with the account and responded that the disputed information was accurate.

A higher level of review was clearly warranted after the July ACDVs (with attachments)

23

were received by NCS. As noted above, the July 2020 ACDVs from Equifax and Trans Union

indicated that Plaintiff "claims true identity fraud" and "account fraudulently opened." [Doc ##

62-16, 62-17] NCS responded to Equifax on July 13 and to Trans Union on July 16, 2020 stating

in both that the disputed information was accurate. *Id*.

Relevant to NCS's conclusory statement that it conducted a "full audit" regarding

Plaintiff's dispute, Mot. at 16, is this statement from Mr. Sapp's Declaration:

> Based upon the information from the Original Creditor, which included Plaintiff's
> lease, correspondence between the Plaintiff & the Original Creditor, a move-out
> statement, a verification of the amount as due-and-owing (with which NCS
> confirmed the amount as due-and-owing), color copies of Plaintiff's driver's
> license and social security card, and, as supplied by Plaintiff's wife Megan Ward,
> the Plaintiff's FTC theft affidavit, paystubs from Plaintiff's employer[,] Plaintiff's
> allegations that the Neiman Marcus pay advices and social security statement
> were "fake" and "slightly slanted", both the Original Creditor and NCS
> determined that the account was not opened based upon "identity theft" or
> "fraud." See Account Notes at Exhibit 23 to Motion for Summary Judgment, pgs.
> 3-6.

Sapp. Decl. [Doc #56-2] ¶ 48. This statement, however, does not describe what NCS actually did

during its investigation. For example, Mr. Sapp does not state that NCS (or MSR) actually

analyzed or reviewed the Neiman Marcus pay stubs (on which Mr. Ward's name appears slanted

and in a different font [Doc # 55-7]) for possible forgery (or whether NCS compared them to Mr.

Ward's EMJD pay stubs), or whether NCS analyzed or reviewed the SSA letter to determine

whether it might be fake. In addition, Mr. Sapp does not state that NCS actually reviewed

Plaintiff's notarized FTC theft affidavit [Doc #55-37], which NCS received on or around June

18, 2020 [Doc # 55-24 at pg. 2] or any of the documents mentioned. NCS Account Notes provide

a little more detail. *See* NCS Account Notes, Ex. 23 [Doc #55-24] at 3 (on 7/21/20, "reviewed

information submitted by consumer who claims true identity fraud/account fraudulently opened

24

with information supplied by client. I reviewed name, address, ssn/dob, account information, checked for accuracy and matching information. I have also reviewed the system notes for past efforts. Documentation supporting the consumer's claim was provided."); *id.* at 4, 5 (regarding Plaintiff's fraud affidavit and paystubs from EMJD, Plaintiff's employer, "we received employer paycheck stubs but this does not serve as proof of identity" and "[w]e submitted her fraud affidavit to the client last month but the client's responding by only sending us the documents they have. We need to know how the client wants us to proceed. This debtor claims he never lived in TX" and "[w]e have sent the dispute documents (Police Report and fraud affidavit) to the client in the past and they responded with confirmation that the account is not fraud"). An account note on June 25, 2020 states that "client [MSR] provided ID, pay stub, and social security benefits letter, ID's match." *Id*. at 2. The referenced pay stub is presumably the Neiman Marcus pay stub(s); however, it is not until August 21, 2020 that there is a note indicating that Mr. Ward's name and address on the Neiman Marcus paystubs are "slightly slanted." *Id*. at 6. In addition, while the Account Notes indicate that NCS received Plaintiff's ID theft affidavit/fraud affidavit around June 18, 2020, there is no indication that NCS actually reviewed it; instead, it appears that NCS may have merely forwarded it to MSR. *See id.* at 2, 3. NCS's Account Notes also indicate that Plaintiff informed NCS starting June 29, 2020 that he never worked for Neiman Marcus and never lived in Texas. *Id.* at 3, 4.

While I recognize that a furnisher's investigation need not be exhaustive to be reasonable and that MSR, the Original Creditor here, may have had better access to the tenant's information than NCS, I note that during the relevant time period it appears that NCS made no inquiry into whether MSR had identified the IP address(es) that were used by the tenant to complete the

online Lease application and failed to consider whether income verification documents submitted with the Lease application came from the Plaintiff's actual employer. Some courts, in denying a FCRA defendant's motion for summary judgment, have done so, at least in part, on the basis that a reasonable jury could find that the furnisher's failure to check IP addresses or to confirm income verification documents, where there are concerns over identity fraud, is not objectively reasonable. *See Romero v. Monterey Fin. Svcs, LLC*, Case No. 19cv1781 JM (KSC), 2021 WL 268635, at *3 (S.D.Cal. Jan. 27, 2021); *cf. Hampton v. Barclay's Bank Delaware*, 478 F. Supp 3d 1113, 1138-39 (D. Kan. 2020) (granting original creditor's summary judgment motion, finding that the creditor's investigation, which included a confirmation that the IP address on plaintiff's loan application "pinged" to Topeka, Kansas, where Plaintiff lived, and that plaintiff's income verification documents came from his actual employer, was reasonable as a matter of law), *aff'd*, 2021 WL 3237082 (10th Cir. July 30, 2021). Moreover, even if the Original Creditor had access to more information about the Lease and the apparent tenant, this would not relieve NCS of its responsibility to conduct a reasonable investigation and does not establish as a matter of law that NCS conducted a reasonable investigation.

Questions including as to whether NCS should have reviewed the documents in its possession sooner or at all (or rather than passing them on to MSR), whether NCS was reasonable in insisting on a police report, whether NCS should have sought additional documents from the Original Creditor (such as the online Lease application, which contained the tenant's IP address) and, in general, whether NCS conducted a reasonable investigation are questions for the jury. The reasonableness of a furnisher's investigation under the FCRA is a fact-intensive and context-specific inquiry that is particularly difficult to resolve as a matter of law. *See Hinkle*, 827

26

F.3d at 1303. I see no basis here to take this classic factual question away from the jury.

Finally, NCS argues that it cannot be liable for failing to conduct a reasonable investigation because Plaintiff's dispute "constitutes a question of law as whether or not the Plaintiff is, in fact, not liable on the account." Mot. at 16; Reply at 4. NCS claims that this is a matter that can only be resolved by the judiciary and not an entity like NCS who is not meant to be an arbiter of claims or equipped to decide the legal sufficiency of a debtor's allegations. *Id*. I do not agree that Plaintiff's claim against NCS is a legal dispute as to his liability on the Lease. Rather, his claim is that he reported being the victim of identity fraud and his dispute was not reasonably investigated at that time. Moreover, there is no indication that during the relevant time period, i.e. during NCS's investigation of Plaintiff's dispute before this lawsuit was filed, NCS ever suspected that Plaintiff might be legally liable on the Lease, as a conspirator or principal, thus giving NCS an excuse to relax or cease its investigation.

I therefore conclude that the evidence here is not so one-sided as to mandate a finding that NCS's investigation was reasonable as a matter of law when it reported to the CRAs that the disputed information was accurate. For these reasons, I deny this portion of NCS's motion.

## V.    CONCLUSION

For the reasons stated above, it is HEREBY ORDERED that NCS's Motion for Summary

Judgment [Doc #55] is GRANTED IN PART AND DENIED IN PART as follows:

1)  the motion is GRANTED on the issue of Plaintiff's economic damages;

2)  the motion is DENIED on the issue of Plaintiff's non-economic (emotional distress)

    damages;

3)  the motion is GRANTED on the issue of whether NCS acted willfully; and

4)  the motion is DENIED on the issue of whether NCS conducted a reasonable

    investigation.

DATED:    May 12, 2023 in Denver, Colorado.


BY THE COURT:

    s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE

28