IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| ROBBIN WARD, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 1:21-cv-02597-NYW |
| | § | |
| NATIONAL CREDIT SYSTEMS, INC., | § | |
| *Defendant*. | § | |

---

**DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING
THE VERDICT AND ALTERNATIVELY, MOTION FOR NEW TRIAL,
OR IN THE ALTERNATIVE, MOTION FOR REMITTITUR**

---

Following a jury trial from June 17 to 21, 2024, despite the Court previously ruling that Plaintiff failed to prove any economic damages and had no entitlement to punitive damages, the Jury returned a Verdict for Plaintiff awarding $500,000.00, ostensibly for emotional distress damages. *See* Doc. 130. The Court entered a *Final Judgment* consistent with the Verdict on June 25, 2024. *See* Doc. 131. From that Verdict, Defendant National Credit Systems, Inc. ("Defendant" or "NCS") files this Motion for Judgment Notwithstanding the Verdict pursuant to Rule 50, and alternatively, Motion for New Trial and alternatively, Motion for Remittitur, both pursuant to Rule 59. In support thereof, Defendant provides as follows:

**I.**

**GROUNDS FOR POST-TRIAL MOTIONS**

**A. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT**

1. NCS was not required to resolve a legal dispute about the validity of the Main Street Renewal ("MSR") Account (also referred to herein as the "debt").

2. Plaintiff's disputes were not objectively and readily verifiable, and thus, Plaintiff's FCRA claim against NCS is not actionable.

1

3. Plaintiff's dispute is an impermissible collateral attack on the MSR Account, particularly in light of the Texas State Court Eviction Judgment, which the Court lacks subject matter jurisdiction to overturn in violation of the *Rooker-Feldman* Doctrine.

## B.  MOTION FOR NEW TRIAL

1. There is legally insufficient evidence that Plaintiff established causation to support his FCRA Claim.  Specifically, Plaintiff failed to point out any facts that NCS could have uncovered in a reasonable investigation that would show the debt was in fact, invalid.

2. The jury's determination that NCS failed to perform a reasonable investigation is against the overwhelming weight of the evidence.  Under Plaintiff's theory, NCS had to blindly accept Plaintiff's conclusory statement that he did not give anyone permission to use his driver's license and identifiers despite, *inter alia*, the suspicious ID Theft Affidavit and Lease Application implicating Plaintiff's daughter, Plaintiff's exact matching Colorado driver's license, and MSR's contention that the debt is valid.

3. The jury's determination that the information furnished by NCS was inaccurate is against the great weight of the evidence.  Specifically, Plaintiff cannot show an inaccuracy when the gravamen of the dispute centers around contested validity, i.e. the dispute (1) requires judicial determination, (2) is not objectively and readily verifiable, and (3) amounts to a collateral attack on the debt.  *See* NCS's JNOV at subsections 1, 2, and 3.

4. The jury's determination that Plaintiff did not fail to mitigate his damages is against the great weight of the evidence, particularly when Plaintiff admitted (1) that he did not track changes to his credit, because if he had, he would have known that his credit score had reverted back to his score prior to the addition of the MSR tradeline, and thus avoided any significant emotional distress following NCS adding Plaintiff's dispute to the information furnished to the CRAs.

5. There is legally insufficient evidence to support an economic damages award of $500,000.00 based on Plaintiff's (and his wife's) conclusory evidence, particularly when considering (1) the degree of the harm (no economic damages, no credit issues, and the length of time the issue affected Plaintiff's credit score which was less than three weeks), (2) the evidence that Plaintiff's conclusory statement regarding the importance of his credit was not substantiated by his actions, (3) the lack of any evidence of medical/health issues, and (4) that no activities of Plaintiff were prevented by NCS's conduct.  *See* NCS's Motion for Remittitur *infra*.

6. The Court wrongfully prevented testimony and exhibits in support of (1) NCS's attempts to obtain the testimony of Plaintiff's daughter, including a court order for her deposition testimony, particularly when Plaintiff argued in closing that NCS did not take any action to prosecute Plaintiff's daughter; and (2) online "how to" videos to remove items from credit reports, despite the fact that Plaintiff claimed to learn how to dispute the debt online.

## C.  MOTION FOR REMITTITUR

The jury's award of $500,000 to Plaintiff for emotional distress is so excessive that it shocks the conscience and raises the irresistible inference that passion, prejudice, corruption, or other improper cause gave rise to the jury's verdict.  Pursuant to FED. R. CIV. P. 59(e), NCS requests that the Court order a remittitur of the damage award. If such remittitur is rejected by Plaintiff, then NCS requests that the Court order a new trial pursuant to FED. R. CIV. P. 59(a).

## II.

## STANDARDS OF REVIEW

## A.  MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

A motion denominated as a motion for directed verdict or for judgment notwithstanding the verdict should be treated as a motion for judgment as a matter of law. *See Lewis v. Powers*, No. 15-cv-02692-MEH, 2019 U.S. Dist. LEXIS 166948, at *1 (D. Colo. Sept. 27, 2019) (citing Fed. R. Civ. P. 50 advisory committee notes on 1991 amendment), *aff'd sub nom. Lewis v. City of Littleton*, 855 F. App'x 448 (10th Cir. 2021) (unpublished) (quoting *Craft v. Yellow Freight Sys.*, No. 97-1029, 1998 U.S. App. LEXIS 2847, at *26 (10th Cir. 1998)). A party must first move for judgment as a matter of law before submission of the case to the jury. *Id.* (citing FED. R. CIV. P. 50(b)). The party may then renew his motion after trial. *Id.* (citing FED. R. CIV. P. 50(c)).

Rule 50(b) is construed liberally. *Wade v. Union Pac. R.R. Co*., No. 12-cv-1772-RM-CBS, 2014 U.S. Dist. LEXIS 65527, at *4 (D. Colo. 2014) (citing *Anderson v. United Telephone Co. of Kansas*, 933 F.2d 1500, 1503 (10th Cir. 1991)).  The Court "may excuse technical non-compliance when the purposes of the rule are satisfied." *Id.* (citing *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co*., 81 F.3d 606, 610 (5th Cir.1996)); *see also E.E.O.C. v. W. Trading Co., Inc*., 291 F.R.D. 615, 619 (D. Colo. 2013) (citing cases). Technical non-compliance is excused when

the movant raised the issues presented in the motion sufficiently at trial to put the non-movant on notice of the alleged errors, which serves the purpose of the provisions of Rule 50(a) and (b). *Id.* (citing *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739 (10th Cir. 2007).

Under the Rule 50(b) standard for judgment notwithstanding the verdict, the court "must affirm if, viewing the record in the light most favorable to [the plaintiff], there is evidence upon which the jury could properly return a verdict for [the plaintiff]." *Casias v. Raytheon Co.*, Nos. 21-1195, 21-1205, 2022 U.S. App. LEXIS 19959, at *4–5 (10th Cir. 2022) (citing *Harold's Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir. 1996). The court may overturn the jury's verdict only if "there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law." *Id.* at *5 (quoting FED. R. CIV. P. 50(a). "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013).

Rule 50(b) states in pertinent part that:

> If for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion....[I]n ruling on a renewed motion, the court may...if a verdict was returned...allow the judgment to stand, order a new trial, or direct entry of judgment as a matter of law....

FED. R. CIV. P. 50(b).  A district court's decision to grant or deny a Rule 50 motion is reviewed de novo. *Engle*, 721 F.3d at 1216.

## B.  MOTION FOR NEW TRIAL

A Rule 59(a) motion for a new trial "normally involves a review of the facts presented at trial, and thus involves the discretion of the trial court." *Engle* at 1216. In deciding a new trial motion based on insufficiency of the evidence, a district court must analyze whether the verdict

4

"is clearly, decidedly or overwhelmingly against the weight of the evidence." *Id.* Discretionary authority of trial judge to grant new trial is aided in part by his/her ability to weigh evidence and assess credibility of witnesses; however, trial judge need not view evidence from perspective most favorable to prevailing party. *Litton Sys. v. Honeywell, Inc.*, 87 F.3d 1559, 96 D.A.R. 9541, 39 U.S.P.Q.2d (BNA) 1321, 1996 U.S. App. LEXIS 15958 (Fed. Cir. 1996), *reh'g, en banc, denied*, 1996 U.S. App. LEXIS 30316 (Fed. Cir. Sept. 11, 1996), *vacated, remanded*, 520 U.S. 1111, 117 S. Ct. 1240, 137 L. Ed. 2d 323, 97 Cal. Daily Op. Service 1938, 97 D.A.R. 3552, 1997 U.S. LEXIS 1641 (1997).  Under Rule 59, the district court has broad discretion in determining whether a new trial is warranted. *Par. Oil Co. v. Dillon Cos.*, No. 05-cv-00081-REB-PAC, 2007 U.S. Dist. LEXIS 2920, at *4 (D. Colo. 2007) (citing *McHargue v. Stokes Division of Pennwalt Corp.*, 912 F.2d 394, 396 (10th Cir. 1990)). A district court's denial of a Rule 59(a) motion is, therefore, reviewed for abuse of discretion. *Engle* at 1216. The standard for a motion for new trial under Rule 59 is less stringent than for judgment as a matter of law under Rule 50. *See Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1216–17 (10th Cir. 2008).

With respect to jury instructions, a court's refusal to give a particular requested instruction is reviewed for abuse of discretion, but reviewed de novo as to whether the instructions given, as a whole, correctly provided the jury with instructions on the issues and an opportunity to determine those issues.  *See Schurr v. Okla. Disability Law Ctr., Inc.*, No. 98-6109, 1999 U.S. App. LEXIS 11884, at *7 (10th Cir. 1999).

## C.  MOTION FOR REMITTITUR

A trial court's decision to deny remittitur of compensatory damages is reviewed for abuse of discretion. *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1314 (10th Cir. 2022). The evidence is reviewed in the light most favorable to the prevailing party. *Id.*

## III.

## LAW OF THE CASE DOES NOT PREVENT REVERSAL

Prior to the appointment of the Hon. Nina Y. Wang, Judge Lewis T. Babcock ruled on NCS's Motion for Summary Judgment (the "MSJ") pursuant to an *Order* entered May 12, 2023. *See* Doc. 76. The final issue decided by Judge Babcock in the MSJ Order was also the focus of NCS's oral motion for directed verdict ("MDV") at the close of evidence and is the gravamen of the motion for judgment notwithstanding the verdict ("JNOV") below. Specifically, whether the Court, as a question of law, should have ruled that Plaintiff's disputes (a) involved a legal dispute (the MSJ, MDV, and JNOV), (b) were not objectively and readily verifiable (MDV and JNOV), or (c) constitute an impermissible collateral attack on the MSR Account (MSJ, MDV and JNOV). As analyzed by the JNOV argument below, each of those issues are determined by case law interpreting the definition of accuracy under the FCRA in the context of a § 1681s-2b claim.

Relying on the law of the case doctrine, Judge Wang consistently followed Judge Babcock's MSJ Order on these issues, which require interpretation whether Plaintiff proved that the information NCS furnished to the CRAs was inaccurate. However, the law of the case must be applied with "good sense" and has three exceptions – all three of which apply in this case. *See Wessel v. City of Alburquerque*, 463 F.3d 1138, 1143 (10th Cir. 2006):

> Generally, "once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002). "Unlike res judicata, the [law of the case doctrine] is not an 'inexorable command,' but is to be applied with good sense." *United States v. Monsisvais*, 946 F.2d 114, 117 (10th Cir. 1991) (quoting *Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981)). Accordingly, the doctrine is subject to three exceptions: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *Grigsby*, 294 F.3d at 1219, n.4. We read "these exceptions narrowly, requiring district courts to apply the law

6

of the case unless one of the exceptions specifically and unquestionably applies." *Monsisvais*, 946 F.2d at 117 (internal quotations omitted).

The issue of whether a legal dispute can provide the basis for an inaccuracy was discussed in the MSJ Order as follows:

> Finally, NCS argues that it cannot be liable for failing to conduct a reasonable investigation because Plaintiff's dispute "constitutes a question of law as whether or not the Plaintiff is, in fact, not liable on the account." Mot. at 16; Reply at 4. NCS claims that this is a matter that can only be resolved by the judiciary and not an entity like NCS who is not meant to be an arbiter of claims or equipped to decide the legal sufficiency of a debtor's allegations. *Id*. I do not agree that Plaintiff's claim against NCS is a legal dispute as to his liability on the Lease. Rather, his claim is that he reported being the victim of identity fraud and his dispute was not reasonably investigated at that time. Moreover, there is no indication that during the relevant time period, i.e. during NCS's investigation of Plaintiff's dispute before this lawsuit was filed, NCS ever suspected that Plaintiff might be legally liable on the Lease, as a conspirator or principal, thus giving NCS an excuse to relax or cease its investigation.

*See* Doc. 76 at p. 27.

Notably, with this single paragraph, Judge Babcock failed to analyze the argument with any caselaw, failed to follow Tenth Circuit and prevailing precedent, and either misunderstood or incorrectly applied undisputed facts. Specifically, Judge Babcock's disagreement with NCS's argument puts the cart before the horse. As detailed in the JNOV briefing below, Plaintiff's burden to show that the debt is inaccurate is a *threshold* burden.

Instead of determining whether Plaintiff's disputes, under this unusual factual scenario, could satisfy the threshold burden to show inaccuracy, Judge Babcock skipped this issue and focused on the second element – whether NCS performed a reasonable investigation – and used it as the basis to deny the ground for summary judgment. Further, Judge Babcock's finding that NCS never suspected Plaintiff might be liable on the Lease is irrelevant to the decision on the first element, as well as unsupported. NCS *verified the debt as accurate* after investigating two sets of

ACDV's and another three direct disputes (in total, seven investigations by seven different investigators, each of whom verified the debt). Each verification denotes NCS's decision that Plaintiff *is* liable on the Lease.

Additional trial evidence also exists beyond the summary judgment record that requires the Court to revisit and overturn Judge Babcock's decision, including MSR's testimony that the debt is valid[1] and the reasons in support, including the fact that (1) Plaintiff's Colorado driver's license ("CO DL") presented with the Lease Application matched the CO DL presented with the ID Theft Report, and (2) MSR's Texas State Court Judgment against Plaintiff that includes rent charges owed under the Lease.  This additional evidence, along with the failure to apply controlling precedent requires that the Court overturn Judge Babcock's ruling to prevent manifest injustice – a $500,000 Verdict for emotional damages despite the lack of any economic damages.

## IV.

## ARGUMENT AND AUTHORITY

## A.  MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

The Court, after reviewing all of the trial evidence, must decide whether Plaintiff's dispute (1) required NCS to resolve a legal dispute, (2) was not objectively and readily verifiable by NCS, or (3) is an impermissible collateral attack on the MSR Account, including the jurisdictional question whether such collateral attack violates the *Rooker-Feldman* doctrine due to the Texas State Court Judgment against Plaintiff on the debt.  If the Court answers any of these three questions in the affirmative, the Court must grant judgment for NCS notwithstanding the verdict.

---

[1] Specifically, MSR testified that it has an ongoing obligation to inform NCS if the debt is determined to be invalid. *See also,* EX 37-002. On three occasions, NCS presented updated disputes from Plaintiff, including attachments, for MSR's evaluation.  In response, MSR did not inform NCS of any invalidity when responding to any of those inquiries.

Importantly, these three issues involve the determination of threshold legal question that the Court must decide—whether the information furnished by NCS regarding the MSR Account was inaccurate, incomplete, or materially misleading.  The Tenth Circuit follows the majority of the Circuits in requiring Plaintiff to prove this threshold inquiry before determining whether a reasonable investigation was performed.  *See Schueller v. Wells Fargo & Co.*, 559 F. App'x 733, 737 (10th Cir. 2014) ("[Plaintiff] bears the burden of showing that the information Wells Fargo furnished was inaccurate or incomplete.") (citing *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37–38 (1st Cir. 2010)).  *See also*:

- *Holden v. Holiday Inn Club Vacations, Inc.,* 98 F.4th 1359, 1369 (11th Cir. 2024) ("To succeed on an FCRA claim, a plaintiff must establish (at least) two things." *Milgram*, 72 F.4th at 1218. First, a plaintiff must "identify[] inaccurate or incomplete information that the furnisher provided to the reporting agency." *Id.* "And second, to prove an investigation was unreasonable, a plaintiff must point out 'some facts the furnisher could have uncovered that establish that the reported information was, in fact, inaccurate or incomplete.'" *Id.* (emphasis omitted) (quoting *Felts*, 893 F.3d at 1313);

- *Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212, 1218 (11th Cir. 2023) ("[A] plaintiff cannot recover on a § 1681s-2(b) claim without identifying inaccurate or incomplete information that the furnisher provided to the reporting agency.");

- *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1251 (9th Cir. 2022) ("[I]f there is no inaccuracy, then the reasonableness of the investigation is not in play.");

- *Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 566-67 (7th Cir. 2021) (stating that a threshold requirement for claims against furnishers under the FCRA is that there must be an inaccuracy in the consumer's credit report);

- *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 629-30 (6th Cir. 2018) ("We agree that a threshold showing of inaccuracy or incompleteness is necessary in order to succeed on a claim under § 1681s-2(b).");

- *Spencer v. Specialized Loan Servicing*, No. 3:19-cv-1536-S, 2021 U.S. Dist. LEXIS 194497, at *17 (N.D. Tex. 2021) ("This Court agrees that § 1681s-2(b) requires an initial showing of factual inaccuracy in the information provided by a furnisher to a CRA as a prerequisite to recovery. As the First Circuit has observed, "it is difficult to see how a plaintiff could prevail on a claim for damages based on an unreasonable investigation of disputed data without a showing that the disputed information was, in fact, inaccurate." *Chiang*, 595 F.3d at 37. This conclusion is

necessitated by both the text and purpose of the FCRA, which is to prevent "furnishers of information from spreading inaccurate consumer-credit information." *Pittman*, 901 F.3d at 629–30.");

- *Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 37 (1st Cir. 2010) (Absent a showing of actual inaccuracy on a reinvestigation, a plaintiff's claim against a furnisher of information to a CRA fails as a matter of law);

- *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 67 (1st Cir. 2008) ("Nevertheless, the weight of authority in other circuits indicates that without a showing that the reported information was in fact inaccurate, a claim brought under § 1681i **must** fail");

- *Suri v. Wells Fargo Bank, NA Defendant*, No. 21-10866, 2023 U.S. Dist. LEXIS 77180, at *23 (E.D. Mich. 2023) ("A threshold showing of inaccuracy or incompleteness is necessary for a successful claim under § 1681s-2(b).");

- *Lieberman v. Am. Express Co*., No. 19-cv-6989 (BMC), 2020 U.S. Dist. LEXIS 167279, at *5 (E.D.N.Y. 2020) ("Accuracy is also an essential element of a claim for negligent or willful violation of § 1681s-2(b) of the FCRA.");

- *Ritz v. Nissan-Infiniti LT*, Civil Action No. 20-13509-GC-DEA, 2023 U.S. Dist. LEXIS 93901, at *10 (D.N.J. 2023) ("As a threshold matter, "courts have explicitly held that a showing of inaccuracy is essential to a [Section] 1681s-2(b) claim.");

- *Woodward v. GEICO Advantage Ins. Co*., Civil Action No. GLR-21-952, 2022 U.S. Dist. LEXIS 132474, at *13 (D. Md. 2022) ("[A] threshold showing of inaccuracy or incompleteness is necessary in order to succeed on a claim under § 1681s-2(b).");

- *Grays v. Navient Sols., LLC*, Civil Action No. 1:20-cv-452-NYW-SKC, 2023 U.S. Dist. LEXIS 62166, at *5 (D. Colo. 2023) (To prevail, a plaintiff must demonstrate the disputed information provided to the CRA was incomplete or inaccurate); and

- *Lewis v. Midland Credit Mgmt*., No. CIV-15-1052-R, 2016 U.S. Dist. LEXIS 123064, at *8–9 (W.D. Okla. 2016) (citing *Chiang*, 595 F.3d at 38) (A plaintiff cannot prevail on a claim against a credit furnisher under 15 U.S.C. § 1681s-2(b) without "a showing of actual inaccuracy.").

Regarding the issue of accuracy, it is important to compartmentalize whether the evidence establishes whether Plaintiff is liable on the Lease, as opposed to whether the Lease was obtained by fraud.  Whether the Lease was obtained by fraud does not exonerate Plaintiff from liability if he provided his driver's license and SSN to his daughter knowing she may use them to obtain a

place to live, otherwise colluded with her, or ratified her actions once she obtained the Lease. The evidence at trial included the following:

| Evidence in support of **inaccuracy** | Evidence in support of **accuracy** | Evidence in support that fraud occurred on MSR (**no weight on accuracy**) |
|---|---|---|
| • Plaintiff's conclusory statement that he is the victim of ID Theft. *See* EX 4 and EX 13-024 to 028 – (Plaintiff's ID Theft Affidavit and Report), signed under penalty of perjury. | • Comparison of the exact copy of Plaintiff's CO DL submitted with MSR Application and ID Theft Report (supported by Testimony of Ron Sapp, Expert John Ulzheimer, and both MSR reps). *See comparison of* EXs 4-008 & 18-002. <br><br> • Comparison of signature of Plaintiff on ID Theft Report and DL *See* Testimony of C. Boehler, NCS Acct Notes at EX 1-003 at entry 07/16/20). <br><br> • NCS provided MSR with a copy of Plaintiff's dispute letter and ID Theft Report with MSR maintaining that the debt was valid. *See* Testimony of MSR, NCS Acct Notes at EX 1-002 at 06/19/20 and 06/25/20 entries).[2] <br><br> • MSR Lease Application, including mix of Plaintiff's daughter's info. with Plaintiff's info., particularly in light of info. in ID Theft Report, suggesting cooperation/permission by Plaintiff. *Compare* EXs 4, 16 and 18. <br><br> • EX 4 - Plaintiff's ID Theft Report/ Affidavit, providing conflicting and suspicious statements re the use of Plaintiff's daughter's information, | • Plaintiff's daughter's (Quen Green) Neiman Marcus paystubs with Plaintiff's name and address. <br><br> • Plaintiff's CO mortgage statements. <br><br> • Plaintiff's EMJD paystubs. <br><br> • Plaintiff's name/address on SSA letter and bogus address on SSA letter. |

---

[2]  MSR testified that it had an ongoing obligation to tell NCS if the debt was invalid and that it would have told NCS the debt was invalid when responding to NCS's dispute / verification inquiries if in fact MSR believed the debt was invalid based on the disputes provided.

| | suggesting Plaintiff is not being truthful. <br><br>• Confirmation that Plaintiff's daughter is the person that occupied the MSR home. *See* EX 33 (video). <br><br>• MSR continuing to maintain the debt's validity during direct disputes when NCS supplied Plaintiff's dispute letters explaining bogus paystubs and SSA letter and attaching Plaintiff's CO mortgage statements and EMJD paystubs. *See* Testimony of MSR, NCS Acct Notes at EX 1-004-5 at entries on 07/30/20 and 1-006-7 at entries on 09/14/20). | |
|---|---|---|

In addition, the following evidence was admitted at trial that was not part of the summary judgment record:

(1)      MSR representative Stacey Holmes testified (a) that the leasing agent would not have access to the full screening report, only the results, along with the documents to verify employment income, none of which raised any red flags during the leasing process, and (b) that Plaintiff's daughter had toured the home a couple of months prior to submission of the leasing application.

(2)      MSR representative Kerry Sullivan testified (a) MSR, while acknowledging after the fact that it appears Plaintiff's daughter committed fraud, MSR considers the subject debt valid based on Plaintiff's exact Colorado Driver's License submitted with the Lease Application matching the License supplied with the ID Theft Report, and the subsequent Texas State Court Eviction Judgment against Plaintiff which included a monetary award for the rent owed (the "Texas State Court Judgment"); and (b) The Texas State Court Judgment is still valid and has not been challenged by Plaintiff. *See* EX. 32.

(3)      Plaintiff, while never admitting that his daughter was involved in the alleged identity theft throughout the discovery and pre-trial process in this litigation, finally admitted at trial that his daughter stole his identity and used his ID without his permission. *See* EX "A" – R. Ward TR at p. 26, line 21 to p. 27, line 12.

(4)      Plaintiff also admitted at trial that he gave a copy of his Colorado driver's license and SSN to his daughter, but did not have the text forwarding same, and also had no reason to explain why in the full texts with his daughter produced in discovery why there are no texts during the time period from the Lease Application through

his daughter's eviction from the MSR home (January to July 2019) nor any texts about Plaintiff's disputes regarding the MSR Account in the summer of 2020.  *See* EX 58; *see* EX A – R. Ward TR at p. 14, line 7-12.  Notably, EX 5-001 suspiciously shows that Plaintiff, in June, 2020, claimed to give a copy of his ID to his daughter "last fall" which would have been almost a year *after* his daughter used the ID with the Lease Application submission. If Plaintiff's email is true, then he would have given the driver's license to her twice.

(5)    It is also undisputed that, from the time of the Plaintiff's first FCRA dispute to the consumer reporting agencies (the "CRAs"), NCS furnished information to the CRAs that Plaintiff disputed the MSR Account. *See* EX 1-002 (added to Account on 06/18/20 entry, which was uploaded to consumer reporting agencies on 6/21/20 entry; EX 13-031 at Compliance Condition Code – "XB" Account information disputed by consumer). By supplying such information, NCS was furnishing information that the MSR Account was accurate—specifically, a debt verified by the Original Creditor, MSR, as valid, which is disputed by the consumer, Plaintiff. That dispute, placed on the Account by June 21, 2020 also shows that any impact to Plaintiff's credit scores lasted less than three weeks after he learned of the MSR tradeline.  *See* EX "C" - J. Ulzheimer TR at p. 51, line 7 to p. 53, line 8.

1.  <u>NCS was not required to resolve a legal dispute about the validity of the Main Street Renewal ("MSR") account</u>.

As the Court learned at trial, this is not a typical identity theft case.  For identity theft related to leasing debts, where a driver's license is required to apply for and obtain a lease, testimony indicated that there will typically be the follow indicia to indicate identity theft:  (1) use of the victim's personal identifiers, (2) an alteration to the driver's license (picture, signature, address, etc.), (3) the contact information of the "thief" will be used as the contact information for the tenant in the lease application, (4) the victim's ID and/or personal identifiers will be lost or stolen, and (5) more than one fraudulent account exists.  From the testimony of Ron Sapp (in charge of investigating apartment debt disputes at NCS for over thirty years) and the testimony of MSR, the Original Creditor, it is also common for a family member, typically a parent, to use their information to assist their child in obtaining housing.

Plaintiff claimed under oath in the ID Theft Report and ID Theft Affidavit that he is a victim of identity theft.  *See* EX 4-001 to 008 and 13-024 to 028.  Notably, from the chart above,

the remainder of support for Plaintiff's dispute, including the boxes checked on the ID Theft Affidavit and the narratives in both documents, only created suspicions of collusion. They are not relevant to whether Plaintiff provided his consent or permission, but are relevant to whether his daughter committed fraud on MSR to obtain housing. *See* EX 4-002 to 006 and 13-026.  And despite acknowledging the importance of a police report, Plaintiff never provided one to NCS which would also raise suspicions.  *See* EX "A" -  R. Ward TR at p. 56, line 14 to p. 57, line 11.

Conversely, there is ample evidence to question Plaintiff's dispute that he was a victim of identity theft, summarized as follows:[3]

(1) The ID Theft Report provided to the CRAs included Plaintiff's Colorado driver's license matching the color copy of his Colorado driver's license provided with the Lease Application, which provided evidence of collusion, consent, or permission. *Compare* EX 4-008 and 18-002 (Ron Sapp, Kerry Sullivan, and John Ulzheimer all testified regarding the significant impact of a matching unaltered color copy of a driver's license as it would not be common in any actual identity theft which led the investigators to indicate that the MSR account was valid). *See e.g.,* EX "C" – J. Ulzheimer TR at p. 25, line 7 to 15.

(2) Plaintiff admitted knowing that the contact information used for the prospective tenant in the Lease Application was his daughter's information, indicating that Plaintiff's daughter was the person seeking the Lease.  *See* EX 16-001 and EX "A" - R. Ward TR at p. 51, line 7 to p. 52, line15.

(3) Plaintiff admitted in the ID Theft Affidavit that his driver's license or personal identifiers were not lost or stolen, again suggesting collusion, consent, or permission to use his identifiers and driver's license as a color copy was submitted with the Lease Application.  *See* EX 4-003 at Q13.

(4) Plaintiff admitted at trial that he provided a copy of his driver's license and his identifiers to his daughter.  *See* EX "A" - R. Ward TR at p. 14, lines 7-12.

(5) In addition, and due to the importance of the matching Colorado driver's license copies in concluding the MSR Account was valid, Plaintiff admitted at trial that he never told NCS that his daughter might be the "thief" or that his daughter was living in the house,

---

[3] *See Wright v. Experian Info. Solutions, Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015) (J. Bacharach concurring in part and dissenting in part) ("Trans Union and Experian could reasonably reject the account of [Plaintiff and Plaintiff's wife] because of their self-interest.").

together indicating collusion or dishonesty.  *See* EX "A" - R. Ward TR at p. 53, line 18 to p. 55, line 19.

(6) Then there are the suspicions raised from a comparison of the Lease Application and ID Theft Affidavit/Report where (a) Plaintiff's daughter is listed as the emergency contact on the Application (*see* EX 16-002), and (b) Plaintiff admits in the ID Theft Report that his daughter's information and pay stubs were used in the application process, but with his address, and at the same time, also claiming that he doesn't know who is suspected as the "thief," indicating that Plaintiff is not being honest in the ID Theft Report.  *See* EX. 4-004, 003 at Q15, 010.

(7) There is also the trial admission by Plaintiff that in fact his daughter is the one that occupied the MSR home.  *See* EX "A" - R. Ward TR at p. 26, line 21 to p. 27, line 12.

(8) NCS also relied on its other eviction account for Plaintiff, including that another lease application in Dallas using Plaintiff's information triggered the sending of a letter to Plaintiff informing him of the application.  *See* EXs 38 and 45.

(9) False fraud accounts for a significant percentage of ID theft claims, where Ron Sapp testified it could be as high as 95%, Evan Hendricks indicated that he would not disagree with his testimony from another proceeding that "true" identity theft in cases like this would only be 25-30% (conversely then, 70-75% is false fraud). *See* EX "B" - E. Hendricks TR at p. 56, line 9 to p. 57, line 12; *See also* EX "C" - J. Ulzheimer (fake fraud more than you'd expect) at TR p. 26, lines 13-15.

With that backdrop, the question surrounding Plaintiff's dispute is whether (a) he gave permission or consent to his daughter to use his driver's license and identifiers to obtain housing (or ratified such action after the fact), or (b) he is a victim of identity theft, better described as familial fraud.  The dispute itself involves two different legal questions.  First, a contractual legal question—is Plaintiff liable under the Lease under the facts presented?  Plaintiff claims a lack of consent, while MSR claims that the color copy of the DL presented with the Application suggests otherwise, and MSR has a monetary Texas State Court Judgment against Plaintiff that indicates good personal service under Texas law to support the debt.  Which leads to the second legal question, is the Judgment valid?  While the impact of the Judgment is discussed more fully in the third ground of for the JNOV below, the existence of a monetary judgment from a state court in favor of MSR against Plaintiff conclusively establishes that a legal dispute exists between Plaintiff

15

and MSR.  For which NCS is not required to examine Texas law or supplant the full faith and credit clause to resolve such a legal dispute between Plaintiff and MSR.[4]  As argued by NCS, the determination of these legal and contractual disputes requires resolution by a direct attack on the MSR Account between MSR and Plaintiff (and likely his daughter).

When the dispute necessarily requires a judicial resolution, such as contested contractual liability or a question of law regarding the debt's validity, both of which exist in this case, the Tenth Circuit follows the majority view that the FCRA does not require the data furnisher to resolve that dispute and the FCRA claim fails.  *See Wright v. Experian Info. Solutions, Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015):[5]

> A reasonable reinvestigation, however, does not require [credit reporting agencies] to resolve legal disputes about the validity of the underlying debts they report. *See Carvalho v. Equifax Info. Servs., LLC,* 629 F.3d 876, 892 (9th Cir. 2010) ("We agree that reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts."); *DeAndrade v. Trans Union LLC,* 523 F.3d 61, 68 (1st Cir. 2008) (holding a reasonable reinvestigation does not entail resolving legal issue[s] that a credit agency ... is neither qualified nor obligated to resolve  under the FCRA").

*See also*:

- *Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 37 (1st Cir. 2010) (Like CRAs, furnishers are "neither qualified nor obligated to resolve" matters that "turn[] on questions that can only be resolved by a court of law.");

---

[4] Notably, the full faith and credit clause mandates that this Court must afford the state judgment full faith and credit, "giving it the same preclusive effect as would the courts of the state issuing the judgment."  *Momou v. SSM Healthcare of Wis., Inc.*, No. 23-3167, 2024 U.S. App. LEXIS 12140, at *6 (10th Cir. May 21, 2024).

[5] *See also,* the *Order Granting Motion for Summary Judgment* in Civil Action No. 1:22-cv-01048-DDD-JPO, *Coy L. Daniels v. National Credit Systems, Inc.* (D. Co. Feb. 23, 2024).  In the *Daniels* opinion, the Court explains that this rationale in favor of CRAs applies to data furnishers such as Defendant here, providing that, "[The FCRA] requires [an] investigation, and correction of mistakes and factual inaccuracies, **but does not provide a mechanism for resolving legal disputes about the status of a claimed debt**." (emphasis added) (*citing Chiang v. Verizon New Eng., Inc.*, 595 F.3rd 26, 27 (1st Cir. 2010)).  *See* ECF 91-1 (in this case) at p. 7.

16

- *Carvalho v. Equifax Info. Servs., LLC,* 629 F.3d 876, 891 (9ᵗʰ Cir. 2010) ("Because CRAs are ill equipped to adjudicate contract disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims.");

- *Denan v. Trans Union LLC*, 959 F.3d 290, 296 (7th Cir. 2020):

  > In this conclusion we join the First, Ninth, and Tenth Circuits in holding that a consumer's defense to a debt "is a question for a court to resolve in a suit against the [creditor,] not a job imposed upon consumer reporting agencies by the FCRA." *Carvalho*, 629 F.3d at 892 (quoting *DeAndrade*, 523 F.3d at 68; *accord Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1244 (10th Cir. 2015) (citing *Carvalho*, 629 F.3d at 892) ("The FCRA expects consumers to dispute the validity of a debt with the furnisher of the information or append a note to their credit report to show the claim is disputed."). The correct way to resolve legal defenses to Plain Green and Great Plains' loans was in a lawsuit against those lenders. "If a court had ruled the [loans] invalid and Trans Union had continued to report it as a valid debt, *then* [plaintiffs] would have grounds for a potential FCRA claim." *DeAndrade*, 523 F.3d at 68.

*See also,* several district court opinions: *Onosode v. Equifax Info. Servs.*, 2023 U.S. Dist. LEXIS 61251, at *34 (reasonable investigation under the FCRA does not put a furnisher into the position to decide legal questions because it is "neither qualified nor obligated to resolve [such questions] under the FCRA.") (quoting *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 69 (1st Cir. 2008)); *Block v. Real Time Resols., Inc*., No. 3:20-CV-01592, 2021 WL 2559260, at *9 (W.D. La. June 8, 2021) (quoting *Solus v. Regions Bank*, No. 19-2650, 2020 U.S. Dist. LEXIS 126826, 2020 WL 4048062, at *4 (N.D. Ga. July 17, 2020)) ("In fact, a 'reasonable investigation does not require [credit reporting agencies] to resolve legal disputes about the validity of the underlying debts they report.'"), report and recommendation adopted, No. 3:20-CV-01592, 2021 U.S. Dist. LEXIS 116629, 2021 WL 2554919 (W.D. La. June 22, 2021); *Batterman v. BR Carroll Glenridge, LLC*, No. 1:19-CV-1598-CC-RDC, 2020 U.S. Dist. LEXIS 63117, 2020 WL 1821322, at *6 (N.D. Ga. Apr. 10, 2020), *aff'd*, 829 F. App'x 478 (11th Cir. 2020); *Belair v. Holiday Inn Club Vacations Inc*., No. 6:21-cv-165-WWB-DCI, 2022 U.S. Dist. LEXIS 235853, at *7–8 (M.D. Fla. 2022) ("Generally, unresolved contract disputes constitute legal disputes and not factual inaccuracies."); *Wilson v. SunTrust Bank, Inc*., 533 F. Supp. 3d 1363, 1369 (S.D. Ga. 2021) (finding that the question of whether the plaintiff was contractually obligated to make loan payments was one of legal interpretation and not factual accuracy); *Baldeosingh v. TransUnion, LLC*, No. 8:20-cv-925-WFJ-JSS, 2021 U.S. Dist. LEXIS 61726, 2021 WL 1215001, at *3 (M.D. Fla. March 31, 2021) ("A consumer fails to establish a factual inaccuracy . . . by merely asserting a challenge to the legal validity of a reported debt.").

2. Plaintiff's disputes were not objectively and readily verifiable, and thus, Plaintiff's FCRA claim against NCS is not actionable.

Rather than make a distinction whether a dispute involves a fact question (and thus applicable to be an inaccuracy actionable under the FCRA) or legal question (and thus not applicable to be an inaccuracy actionable under the FCRA), the two most recent Circuit Courts of Appeal to address the issue developed a test that eliminates the distinction.  Both the Second and Eleventh Circuits held that, to be actionable under the FCRA, the information in dispute must be "objectively and readily verifiable."  *See*:

- *Sessa v. Trans Union, LLC*, 74 F.4th 38, 43-44 (2d Cir. 2023) (quoting *Mader v. Experian Info. Sols., Inc*., 56 F.4th 264, 269 (2d Cir. 2023) (whether a claimed inaccuracy is potentially actionable under Section 1681e(b), a court must determine, *inter alia*, whether the information in dispute is "objectively and readily verifiable."); and

- *Holden v. Holiday Inn Club Vacations, Inc.,* 98 F.4th 1359, 1369 (11th Cir. 2024) ("[I]n determining whether a claimed inaccuracy is potentially actionable under [FCRA § 1681s-2 against a furnisher], a court must determine, *inter alia*, whether the information in dispute is 'objectively and readily verifiable.'" (quoting *Mader*, 56 F. 4th at 269).

Other district courts are following this new prevailing test to determine whether a dispute is actionable under the FCRA when analyzing whether Plaintiff can establish an inaccuracy in the information furnished.  *See e.g.*:

- *Hammoud v. J.J. Marshall & Assocs., Inc.*, 2024 U.S. Dist. LEXIS 101015, at *14-16 (E.D. Mich. June 6, 2024) (The plaintiff argued that a request for medical records would reveal that there were no records for a doctor's visit on the relevant date. However, the Court noted that it was undisputed that the two sides had met, and the question was whether the meeting was a "properly billable office visit". *Id. at 15*.  As a result, the Court found that Plaintiff's claim under the FCRA failed because it was not the role of the defendant to determine whether the doctor properly billed a visit, such that the dispute was not "objectively and readily verifiable" and therefore, not an actionable FCRA claim).

- *Hossain v. Portfolio Recovery Assocs., LLC*, ___ F.Supp.3d ___, 2023 U.S. Dist. LEXIS 168573, at *10, 2023 WL 6155974, at *4 (E.D.N.Y. Sept. 21, 2023) ("Plaintiff's claim is not cognizable under the FCRA because the question of whether the statute of

limitations has elapsed is an unresolved legal question requiring legal reasoning based on factual analysis and consequently, is 'not objectively and readily verifiable.'");

- *Reyes v. Equifax Info. Servs., LLC*, 2023 WL 7272368, at *6 (E.D. Tex. Sept. 14, 2023), *report and recommendation adopted*, 2024 U.S. Dist. LEXIS 55027, 2024 WL 1308000 (E.D. Tex. Mar. 27, 2024) (Where the plaintiff conceded that she did not pay the amounts due to Citibank because she believed that the charges were fraudulent and where Citibank considered the charges a valid portion of the account balance, there was a "live legal dispute" between the parties over whether the plaintiff was responsible for the outstanding balance. Accordingly, the court found that balance was not "objectively and readily verifiable.").

Applying the new prevailing test to the facts here, Plaintiff's dispute is likewise not objectively and readily verifiable as it does not meet the normal indicia of identity theft. There is a Lease, purportedly electronically signed by Plaintiff using Plaintiff's personal identifiers with an exact DL match used in the application process in which his daughter and granddaughter are living in the leased house, not to mention all of the conflicting and suspicious evidence discussed above, along with MSR's contention that the debt is valid, including its Texas State Court Judgment against Plaintiff for the debt.

Regarding the Texas State Court Judgment, Plaintiff has presented no evidence to show that a reasonably investigation would show that it was not valid. The Judgment, on its face, indicates that the requirements of personal service were satisfied and that Plaintiff owes the judgment amount for the debt.

Moreover, NCS performed an exhaustive investigation during this litigation, including unsuccessfully trying to secure Plaintiff's daughter's testimony (which the Court wrongfully excluded, as a point of error below), and still could not determine whether Plaintiff was liable under the Lease. When there is no Lease signature to compare, no elements of a falsified ID but an exact ID match, no original creditor confirming the identity theft, and no other indicia of identity theft but rather a family member living at the residence and the Plaintiff supplying suspicious or

apparently dishonest information, this specific factual scenario requires application of this test – there is no objectively and readily verifiable information to answer the question whether Plaintiff is liable under the lease or a victim of familial fraud.

    3.   <u>Plaintiff's dispute is an impermissible collateral attack on the MSR Account, particularly in light of the Texas State Court Eviction Judgment, whereby the Court lacks jurisdiction to overturn in violation of the *Rooker-Feldman* Doctrine</u>.

While *Wright* is instructive that an FCRA claim is an improper mechanism to collaterally attack the validity of the debt,[6] here, there is the added evidence that MSR obtained a Texas State Court Judgment against Plaintiff for the debt.  On June 25, 2019, the Justice of the Peace for Justice Court Precinct 1 Place 2, Dallas County, Texas signed a monetary *Judgment* in favor of US SFE Asset Company 3, LLC (the owner of the home managed by Main Street Renewal, LLC and collectively the "Original Creditor" or "MSR") and against Robbin Ward ("Plaintiff") for possession of the property at 229 Cliff Heights Circle, Dallas, Texas 75241 (the "Texas State Court Judgment" or the "Judgment"). The Judgment reflects valid personal service under Texas law and includes an award to the Original Creditor and against Plaintiff for "rent owing in the sum of $2,698.50." *See* EX 32.

Pursuant to FED. R. CIV. P. 12(h)(3), the Court must dismiss an action if the Court lacks subject matter jurisdiction.  The issue of subject matter jurisdiction may be raised *sua sponte* by the Court at any time during the course of the proceedings. *Marner v. Lokshina*, Civil Action No. 15-cv-0991-LTB, 2015 U.S. Dist. LEXIS 106648, at *19–20 (D. Colo. 2015) (citing *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1252 (10th Cir. 1988)).  A lack of subject matter jurisdiction

---

[6] *Wright v. Experian Info. Solutions, Inc.*, 805 F.3d 1232, 1245 (10th Cir. 2015) ("Because CRAs are ill equipped to adjudicate contract disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims." *citing Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 891 (9th Cir. 2010).

may be raised at any time and may be examined for the first time on appeal. *Joslin v. Sec'y of Dep't of Treas.*, 832 F.2d 132, 134 (10th Cir. 1987). "The party seeking to invoke the jurisdiction of a federal court must demonstrate that the case is within the court's jurisdiction." *Id.* (citing *United States v. Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994)).

The *Rooker-Feldman* doctrine bars a "federal action that tries to modify or set aside a state-court judgment because the state proceeding should not have led to that judgment." *Mayotte v. U.S. Bank National Ass'n for Structured Asset Inv. Loan Trust Mortg. Pass-Through Certificates, Series 2006-4*, 880 F.3d 1169, 1174 (10th Cir. 2018) (emphasis in original). A district court has no jurisdiction over a matter in which: "(i) a state-court loser; (ii) is asking a federal district court; (iii) to review the correctness of a judgment rendered by a state court; and (iv) [the state court] judgment was rendered before the commencement of the federal proceeding." *Valdez v. Metro. Prop. & Cas. Ins. Co.*, 867 F. Supp. 2d 1143, 2012 WL 1132374, at *38 (citing *Guttman v. Khalsa*, 446 F.3d 1027, 1032 (10th Cir. 2006)). If the federal court would have to review and reject the state court findings for the plaintiff to prevail on his claims in federal court, then the plaintiff's claims are clearly within the scope of the *Rooker-Feldman* doctrine. *Collins v. CFAM Fin. Servs., LLC*, Civil Action No. 16-cv-00377-GPG, 2016 U.S. Dist. LEXIS 35411, at *4 (D. Colo. 2016) (citing *Mann v. Boatright*, 477 F.3d 1140, 1147 (10th Cir. 2007)).

*Rooker-Feldman* is related to the principle that federal courts possess only original jurisdiction. *See Rooker v. Fidelity Trust Co.*, 263 U.S. at 416 ("Under the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the [state court] judgment . . . . To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the [federal] District Courts is strictly original."); *Bolden v. City of Topeka*, 441 F.3d at 1145 (discussing that, where Rooker-Feldman is not a bar, "[a] myriad of

doctrines, including res judicata, would almost certainly bar the suit" which was brought after a state court judgment adverse to the plaintiff). *See also Campbell v. City of Spencer*, 682 F.3d 1278, 1283 (10th Cir. 2012) ("*Rooker-Feldman* does not . . . override or supplant preclusion doctrine.") (citing *Exxon Mobil v. Saudi Basic Indus. Corp*., 544 U.S. at 282).

Plaintiff was the loser in the Texas State Justice Court action.  The Texas State Court Judgment against Plaintiff for the debt was issued before Plaintiff filed this lawsuit. Plaintiff's FCRA claims against NCS in this suit necessarily seek to set aside or call into question the Texas State Justice Court's Judgment. Plaintiff's entire FCRA case is premised on the allegation that he does not owe the debt, the same debt at issue in the Texas State Court Judgment, thereby making NCS's reporting of the debt to the CRAs a violation of the FCRA. Thus, Plaintiff could not prevail in this case without this Court, effectively, reversing the Texas State Court Judgment that he owes the debt. Under the *Rooker-Feldman* doctrine, the Court does not have subject matter jurisdiction to reverse the Texas State Justice Court Judgment.

The fact that the judgment was obtained by default is irrelevant.  *See Lecates v. Barker*, No. 00-4026, 2000 U.S. App. LEXIS 29306, at *6 (10th Cir. Nov. 16, 2000) (noting that "[i]n order to grant LeCates relief on his fraud claim, it would be necessary to determine that the Utah state court default judgment was fraudulently obtained and therefore void. We therefore conclude that the fraud claim is barred by the *Rooker-Feldman* doctrine."); *Soriano v. Wells Fargo Bank*, *N.A. (In re Soriano)*, 587 B.R. 371, 387 (Bankr. W.D. Okla. 2018) (noting that *Rooker-Feldman* "can be applicable to a judgment that was entered by default"); *Knapper v. Bankers Tr. Co. (In re Knapper)*, 407 F.3d 573, 581 (3d Cir. 2005) (stating that "Knapper's due process attack on the state court judgments asserts that the state lacked personal jurisdiction over her because of defective service of process. Knapper can only prevail if a federal court concludes that the state

courts' default judgments were improperly obtained. Therefore, she can not prevail on her federal claim without obtaining an order that 'would negate the state court[s'] judgment[s].' Accordingly, Knapper's federal claim is inextricably intertwined with the state adjudications and thus barred by *Rooker-Feldman*).

In *Ellis v. Cac Fin. Corp*, CAC Financial Corp. sued Ellis in Oklahoma state court, seeking to collect debts assigned to it by the original creditor that arose from hospital services provided to Ellis' ex-husband. 6 F. App'x 765, 767 (10th Cir. 2001). Ellis claimed in state court that she was not a guarantor of the debt owed by her ex-husband. *Id*. The state district court granted judgment in favor of CAC in the amount of $ 1,676.90, the amount she owed the hospital. *Id*. Ellis and her ex-husband then sued CAC in federal court, alleging violations of the Fair Debt Collection Practices Act ("FDCPA") and the FCRA, as well as claims for fraud, perjury, libel, conspiracy, mail fraud, legal malpractice, malicious prosecution, abuse of process, defamation, violation of privacy, and unauthorized practice of law. *Id*. The federal district court granted summary judgment for CAC. On appeal, the Tenth Circuit considered whether it had federal subject matter jurisdiction over the claims raised. *Id*. at 767–68. Under the *Rooker-Feldman* doctrine, the Tenth Circuit held that it did not have subject matter jurisdiction. *Id.* at 767-68. The court reasoned that although the plaintiffs did not expressly seek to overturn the state court judgment, they complained about procedures used to obtain the judgment, such as improper assignments of the amount due, perjury, and notarization of rubber-stamped signatures. *Id*. at 768. The court noted that it would be impossible for a federal court to grant the plaintiff's FDCPA claims without calling the state court judgment into question. *Id*. The court concluded that the plaintiffs' claims against CAC were "inextricably intertwined" with the state court judgment and barred by *Rooker-Feldman*. *Id*. (citing *Jordahl v. Democratic Party of Va*., 122 F.3d 192, 202 (4th Cir. 1997); *Charchenko v. City of*

*Stillwater*, 47 F.3d 981, 983 (8th Cir. 1995) ("Rooker-Feldman precludes a federal action if the relief requested in the federal action would effectively reverse the state court decision or void its ruling.").

This finding is further reinforced by the 10th Circuit's decision in *Bisbee v. McCarty*, 3 F. App'x 819 (10th Cir. 2001).  In that case, the Plaintiff filed suit under the FDCPA, alleging that a state court lawsuit was fraudulent.  *Id*. at 823.  The Tenth Circuit found that it could not resolve the claim in plaintiff's favor without determining that the state court judgment was erroneously entered or void.  *Id*. at 824-25.  *See also Nikkel v. Wakefield & Assocs.*, Civil Action No. 10-cv-02411-PAB-CBS, 2011 U.S. Dist. LEXIS 109044, at *10 (D. Colo. Sep. 26, 2011); *Toney v. Keil*, Civil Action No. 13-cv-03386-CMA-MJW, 2014 U.S. Dist. LEXIS 136105, at *10 (D. Colo. Sep. 26, 2014).

## CONCLUSION OF JNOV ARGUMENTS

The nature of Plaintiff's dispute, whether (a) he is liable under the Lease because he gave permission or consent to his daughter to use his DL and identifiers to obtain housing or ratified such action after the fact, or (b) he is a victim of identity theft better described as familial fraud, *under this factual record*, requires the Court to determine that Plaintiff failed to prove the threshold burden of an actionable inaccuracy under the FCRA.  Because the dispute (1) requires judicial determination to determine whether it is accurate, (2) is not capable of being objectively and readily verified, and (3) presents an impermissible collateral attack on the debt, including a violation of the *Rooker-Feldman* doctrine, the Court must grant a judgment in favor of NCS notwithstanding the verdict.

**B.  MOTION FOR NEW TRIAL**

1.  <u>There is legally insufficient evidence that Plaintiff established causation to support his FCRA Claim.</u>

A plaintiff asserting a claim against a furnisher for failure to conduct a reasonable investigation cannot prevail on the claim without demonstrating that, *had* the furnisher conducted a reasonable investigation, the result would have been different.  *See e.g.*:

- *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018) ("Regardless of the nature of the investigation a furnisher conducted, a plaintiff asserting a claim against a furnisher for failure to conduct a reasonable investigation cannot prevail on the claim without demonstrating that *had* the furnisher conducted a reasonable investigation, the result would have been different; *i.e.*, that the furnisher would have discovered that the information it reported was inaccurate or incomplete, triggering the furnisher's obligation to correct the information."); cited by *Zamora v. Mt. Am. Credit Union*, No. 1:22-cv-89, 2023 U.S. Dist. LEXIS 13612, at *8 (D. Utah Aug. 3, 2023);

- *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1252 (9th Cir. 2022) (Establishing an inaccuracy is not enough; the consumer must also show that the inaccuracy was the product of an unreasonable investigation by the data furnisher.);

- *Holden v. Holiday Inn Club Vacations, Inc.,* No. 22-11014 and No. 22-11734, 98 F.4th 1398, 1367 (11th Cir. 2024) ("[T]o prove an investigation was unreasonable, a plaintiff must point out 'some facts the furnisher could have uncovered that establish that the reported information was, in fact, inaccurate or incomplete.'" (emphasis omitted) (citing *Milgram* that is quoting *Felts*, 893 F.3d at 1313);

- *Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212, 1218 (11th Cir. 2023) ("[T] to prove an investigation was unreasonable, a plaintiff must point out "some facts the furnisher could have uncovered that establish that the reported information was, in fact, inaccurate or incomplete.") (quoting *Felts*, 893 F.3d at 1313); and

- *Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 41 (1st Cir. 2010) (a Plaintiff must show that had a furnisher conducted a reasonable investigation, there would have been a different result.)

The following evidence comprises the investigation activities that Plaintiff's expert, Evan Hendricks, testified that NCS could or should have performed in its investigations, along with the evidence regarding such activities:

Mr. Hendricks testified that NCS only performed a "matching" exercise, comparing Plaintiff's identifiers provided in the ACDV to the identifiers in NCS's system. *See* EX "B" - E. Hendricks TR at p. 28, lines 3-8. However, the overwhelming evidence suggested otherwise with respect to the second set of ACDVs (the only ones that were not a bare dispute code of "not his/hers") that included a dispute letter, ID Theft Report and copy of his ID. *See* EX 13-024 to 028. Specifically, Ron Sapp testified NCS performed the following, supported by the Account Notes and Exhibits:

- Received and reviewed the ACDV and attached ID Theft Report and ID. *See* EX 1-003 at 07/21/20 entries, "reviewed information submitted by consumer who claims true identity fraud");

- Contacted the Original Creditor, MSR, to provide a copy of Plaintiff's dispute, including the ID Theft Report and ID for evaluation. *See* EX 1-002 at 06/19/20 entries;

- Reviewed system notes for past efforts, which included verification with the Original Creditor, MSR. *See* EX 1-003 at 07/21/20 and EX 1-002 at 06/18 to 6/25/20 entries (MSR responding to inquiry without indicating any identity theft issues and providing its leasing documents for review);

- Reviewed the MSR Account in NCS's collection software, WinDebt, including the MSR documents (the Lease application, ID submitted, and other application documents) and the prior Robbin Ward account with Berkshire Apartments, noting the letter that was sent to Plaintiff about a lease application in Texas. *See* EX 1-003 at 07/21/20 entries, EX 1-002 at 06/25/20 entries (for the MSR documents and verification), and EXs 38, 45, 68 (for documents regarding Plaintiff's second account);

- Investigators relied on the matching IDs and other information. EX 1-003 at 07/21/20 entries (reviewed personal identifiers "for accuracy and matching information"); and

- One investigator performed a signature comparison. *See* EX 1-003 at 07/16/20 entry ("signatures are the same").

Mr. Hendricks, despite any personal knowledge or evidence in support, testified that NCS should have contacted the Original Creditor as part of its investigation. *See* EX "B" - E. Hendricks

TR at p. 31, line 6 to p. 31, line 14.  However, it is clear from the NCS Account Notes as described above, as well as Ron Sapp's and Kerry Sullivan's testimony, that contact and MSR verification occurred.  On June 19, 2020, NCS, with its form FCRA investigation letter ("Client email 71") sent Plaintiff's dispute and ID Theft Affidavit and ID to MSR for evaluation. *See* EX 1-002 at 06/19/20 entries.  On June 25, 2020, MSR responded, without indicating any issue regarding the validity of the debt and providing leasing documents.  *See* EX 1-002 at 06/25/20 entry. Ms. Sullivan testified that MSR would have reviewed the documents supplied by NCS and if there was a concern about the validity of the debt, raised it at that time.  NCS followed the same procedures when investigating Plaintiff's direct disputes, again as testified by Ron Sapp and Kerry Sullivan. *See* EX 1-004-5 at July 30, 2020 entries and 1-006-7 at September 14, 2020 entries.  MSR's representative, Kerry Sullivan, testified that MSR claimed, and continues to claim, that the debt is valid, and has the Texas State Court Judgment against Plaintiff for the debt in support.

Mr. Hendricks testified that NCS should have evaluated all of the documents establishing fraud attached or described in Plaintiff's disputes, such as reviewing mortgage statements for home ownership in Colorado, reviewing the bogus pay stubs and the SSA letter for a bogus address in Colorado. *See* EX "B" - E. Hendricks TR at p. 40, line 22 to p. 41, line 18. However, the evidence from Cathy Boehler's testimony, Ron Sapp's testimony, and the Account Notes indicates that NCS reviewed Plaintiff's disputes and those attachments in the direct investigations and determined the debt to be valid based on the matching DL copies, signatures on DL and ID Theft Report matching, its review of the Account and Plaintiff's disputes, and MSR's validation of the debt. EX 1-003 at July 21, 2020 entries. Mr. Sapp also testified that such documents supplied by Plaintiff indicate that *MSR was a victim of fraud*, but such documents would not resolve Plaintiff's dispute, particularly when it was clear that his daughter was involved and likely lived in the home.

Mr. Hendricks testified that NCS should have contacted Plaintiff for additional information, however, the law does not support any such requirement as part of any investigation of a consumer's dispute.  *See* EX "B" - E. Hendricks TR at p. 31, line 17 to p. 31, line 22.  *See e.g.*:

- *Westra v Credit Control of Pinellas*, 409 F3d 825, 827 (7th Cir. 2005) ("[Plaintiff] further argues that [Defendant] should have contacted him directly about the disputed account. While that would have undoubtedly helped matters in the instant case, requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by the FCRA. As such, the fact that Credit Control did not contact Westra does not make their investigation unreasonable.");

- *Chiang v. Verizon New Eng., Inc.,* 595 F.3d 26, 36 (1st Cir. 2010) ("Although a furnisher may choose to contact a consumer directly about a dispute reported to the furnisher by a CRA, 'requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by the FCRA.'" *citing Westra*);

- *Woods v. LVNV Funding, LLC*, No. 1:19-cv-03451-TWP-MJD, 2021 U.S. Dist. LEXIS 84723, at *25-26 (S.D. Ind. 2021) *affirmed on appeal,* 27 F.4th 544 (7th Cir. 2022) ("*See Walton v. EOS CCA*, 885 F.3d 1024, 1028 (7th Cir. 2018) (Barrett, J.) (holding that a furnisher's "investigation was unquestionably reasonable" when a CRA's report to it "stated solely that [the plaintiff] claimed the account did not belong to her" and the furnisher verified the plaintiff's "personal information with her [ ] file on record"); *cf. Westra*, 409 F.3d at 827 (suggesting that "requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by the FCRA."); and

- *White v. Equifax Info. Servs., Ltd. Liab. Co.*, No. 21-11840, 2021 U.S. App. LEXIS 38093, at *6 (11th Cir. 2021) ("As the Seventh Circuit has held, 'requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by FCRA.' *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005). What [Plaintiff] wants [Defendant] to do …reach out to her directly to clarify and confirm [her dispute]… goes beyond what FCRA reasonableness requires.").

Finally, Mr. Hendricks suggested that NCS should have contacted Plaintiff's employer in Colorado to verify employment and contacted Neiman Marcus to verify a lack of employment. *See* EX "B" -  E. Hendricks TR at p. 31, line 23 to p. 31, line 25.  While NCS admitted it has a policy

not to contact third persons as it may reveal that Plaintiff has an alleged debt in violation of the Fair Debt Collection Practices Act, again, that information would have no bearing on the resolution of Plaintiff's dispute (did he provide consent/permission or ratify the use of his driver's license and personal identifiers, or is he a victim of familial fraud).

Based on the decidedly overwhelming weight of the evidence, NCS *performed* all of the lawful activities that Plaintiff indicated should have happened in the investigation. But none of those activities compel a different result, nor would they have led to a different result, barring the satisfaction of the causation element. NCS performed two sets of FCRA investigations and three direct dispute investigations (seven investigations total by seven different investigators), all of whom verified the Account. Described another way, in the face of the matching driver's licenses and suspicious ID Theft Report/Affidavit, the other information and documents used to challenge the legitimacy of the Lease Application do not exonerate Plaintiff. The employment and income verification documents are completely irrelevant to whether Plaintiff colluded with his daughter or gave her permission or consent to use his driver's license and personal identifiers.

The only evidence that Plaintiff did not collude or consent or ratify, etc. is his own self-serving testimony with no corroborating evidence. In fact, the only possible corroborating evidence could have come from Plaintiff's daughter – who Plaintiff did not call as a witness, did not advocate that NCS contact as part of the investigation, and from the evidence the Court excluded in the Order on NCS's Motion in Limine, Doc. 112 at pp. 11-12, NCS would have shown that she would not have cooperated regardless. Plaintiff failed to establish the causation element because he did not point out any facts that NCS could have uncovered that establish that the reported information was, in fact, inaccurate.

There is no evidence that, had NCS conducted a reasonable investigation, that doing so would have resulted in a request for deletion.  Plaintiff failed to prove that any additional investigation by NCS would have shown that Plaintiff actually was a victim of ID theft, and that the debt was invalid. It simply could not have been objectively verified under these circumstances. Consequently, there is insufficient evidence that NCS's alleged failure to perform such actions caused NCS to report inaccurate information the CRAs.

2.   The jury's determination that NCS failed to perform a reasonable investigation is against the great weight of the evidence.

The requirements for a data furnisher under the FCRA, when presented with an indirect dispute (an ACDV) from a consumer through the CRAs is as follows:

- *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1178 (10thr Cir. 2013):

  Plaintiff alleges that [Defendants] violated § 1681s-2(b) of the FCRA. Under this section, a furnisher of information who has received notice of a dispute from a CRA is required to:

  (1) investigate the disputed information; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable. *Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 750 (10th Cir. 2009).

- *Maiteki v. Marten Transp. Ltd.*, 828 F.3d 1272, 1275 (10th Cir. 2016):

  A "reasonable" investigation "is one that a reasonably prudent person would undertake under the circumstances." *Seamans v. Temple Univ.*, 744 F.3d 853, 864 (3d Cir. 2014) (internal quotation marks omitted). "[H]ow thorough an investigation must be to be 'reasonable' turns on what relevant information was provided to a furnisher by the CRA giving notice of a dispute." *Boggio*, 696 F.3d at 617; *see Chiang v. Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010) ("[A] more limited investigation may be appropriate when CRAs provide the furnisher with vague or cursory information about a consumer's dispute."); *Gorman v. Wolpoff &*

30

> *Abramson, LLP*, 584 F.3d 1147, 1160 (9th Cir. 2009) ("Congress could not have intended to place a burden on furnishers continually to reinvestigate a particular transaction, without any new information or other reason to doubt the result of the earlier investigation . . . ."). "[T]he reasonableness of the investigation is to be determined by an objective standard," and "[t]he burden of showing the investigation was unreasonable is on the plaintiff." *Chiang*, 595 F.3d at 37.
>
> ***
>
> "[A]n investigation does not have to be exhaustive to be reasonable; an information furnisher may balance the costs and benefits of engaging in additional procedures. *See Seamans*, 744 F.3d at 865; *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 432-33 (4th Cir. 2004). If the circumstances warrant, a company may rely on its own records. *Gorman*, 584 F.3d at 1159-60; *Westra*, 409 F.3d at 827.

The testimony at trial regarding the activities performed by NCS in its investigation was summarized in the previous MNT subsection at pp. 26-27.   As also detailed in the previous subsection, as NCS performed all the activities that Plaintiff advocated should have occurred (save for contacting third parties to verify employment, which would not have resolved the dispute and contact the Plaintiff, which is not required by law), the overwhelming evidence confirms that NCS satisfied its obligations to perform a reasonable investigation.

Plaintiff's real complaint is that NCS's investigation did not resolve his dispute in his favor – and certainly, the Jury thought likewise by the Verdict.  But whether NCS failed to get the resolution of Plaintiff's dispute correct does not indicate that NCS failed to reasonably investigate.

*See*:

- *Stewart v Equifax Info Servs, LLC*, 320 F Supp 3d 1186, 1205 (D Kan., 2018) quoting *Alston v. United Collections Bureau, Inc.*, No. DKC 13-0913, 2014 U.S. Dist. LEXIS 27124, 2014 WL 859013, at *8 (D. Md. Mar. 4, 2014) ("[T]he FCRA does not require perfection, only a reasonable response.");

- *Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212, 1218(11th Cir. 2023) (citing *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1312 (11th Cir. 2018) ("Consumers have no private right of action against furnishers for reporting inaccurate information to [reporting agencies] regarding consumer accounts. . . . Instead, the only private right of action consumers have against furnishers is for a violation of § 1681s-2(b), which requires furnishers to conduct an investigation following notice of a dispute."); 15

U.S.C. § 1681s-2(c)(1) (providing that there is no liability for violating section 1681s-2(a)… "consumers cannot sue directly for the outcome of an investigation…"); and

- *Gorman v Wolpoff & Abramson, LLP,* 584 F3d 1147, 1161 (9th Cir. 2009) ("An investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate.").

Considering all evidence, the great weight is against the jury's determination that NCS failed to conduct a reasonable investigation.

3. The jury's determination that the information furnished by NCS was inaccurate is against the great weight of the evidence.

In an abundance of caution to prevent any potential waiver, if the Court determines that the threshold burden to show that NCS furnished inaccurate information (as defined by FCRA caselaw) is a question for the Jury, NCS requests, in the alternative to the JNOV, that the Court consider the three grounds for reversal under the JNOV to be considered under the alternative standard for a new trial pursuant to Rule 59(b).

4. The jury's determination that Plaintiff did not fail to mitigate his damages is against the great weight of the evidence.

Plaintiff admitted, despite subscribing to Credit Karma, that he did not track changes to his credit file by checking any email alerts from Credit Karma. *See* EX "A" – R. Ward TR at p. 82, line 13 to p. 83, line 8. If Plaintiff had done so, he would have realized his credit score adjusted back to his score prior to the addition of the MSR tradeline because NCS added the "XB" code indicating that Plaintiff disputed the Account. *See* EX "C" – J. Ulzheimer TR at p. 52, lines 13 to p. 53, line 8. The time period between Plaintiff realizing the MSR Account was included in his credit file, June of 2020, and NCS furnishing the XB code to the consumer reporting agencies on June 21, 2020 is less than three weeks. *See* EX 1-003 at 07/18/20 and 07/21/20 entries (adding the

dispute to NCS's system, and thereafter uploading the information to the consumer reporting agencies). As plaintiff's damages under the FCRA claim could not begin to accrue until the first verification of the Account, which occurred on June 12, 2020 (*See* EX 13-005 to 007), the time period of an impaired credit score following the investigation results is <u>nine (9) days</u>. Had Plaintiff just opened his own emails or otherwise checked his credit that he claimed was so important to him, any alleged emotional distress damages would have been, at a minimum, significantly reduced. *See e.g.*, *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 680 (Colo. 1994) (plaintiff may not recover damages for injuries which he reasonably might have avoided).

5. <u>There is legally insufficient evidence to support an economic damages award of $500,000.00</u>.

The Jury's Verdict should shock the judicial conscience and raise an irresistible inference that passion, prejudice, corruption or other improper cause gave rise to the decision. *See Clawson v. Mt. Coal Co., L.L.C.*, Civil Action No. 01-cv-02199-MSK-MEH, 2007 U.S. Dist. LEXIS 87499, at *7 (D. Colo. 2007) (citing *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998)). Based on Plaintiff's (and his wife's) conclusory evidence regarding economic damages, particularly when considering (1) the degree of the harm (no economic damages, no credit issues, and the length of time the MSR Account affected Plaintiff's credit score after the investigation – nine (9) days), (2) the evidence that Plaintiff's conclusory statement regarding the importance of his credit was not substantiated by his actions, such as failing to monitor his credit despite having a Credit Karma account and email alerts, (3) the lack of any evidence of medical/health issues, and (4) that no activities of Plaintiff were prevented by NCS's conduct – a remittitur is appropriate. *See* NCS's Motion for Remittitur *infra*.

6. The Court wrongfully prevented testimony and exhibits in support of (1) NCS's attempts to obtain the testimony of Plaintiff's daughter, including a court order for her deposition testimony, particularly when Plaintiff argued in closing that NCS did not take any action to prosecute Plaintiff's daughter; and (2) online "how to" videos to remove items from credit reports, despite the fact that Plaintiff claimed to learn how dispute the debt online.

As argued in MNT point of error 1 at p. 29, evidence that Plaintiff's daughter would not cooperate with any investigation had she been contacted is relevant to the issue of causation. NCS's proposed Exhibit 59, showing that Plaintiff's daughter ignored an Order for Deposition and Order to Show Cause for the failure to appear for deposition would have provided the evidence required to show that the only person who could provide corroboration for Plaintiff's dispute, refused to testify. The failure of the Court to allow the evidence by its ruling in the Motion in Limine (*see* Doc. at 11-12) also allowed Plaintiff to improperly imply at argument that NCS failed to take any action to prosecute Plaintiff's daughter. Such refusal was an abuse of discretion and would have impacted the Jury's decision whether Plaintiff's dispute was accurate and whether the element of causation was satisfied.

In addition, despite Plaintiff's testimony that he learned how to dispute a debt by watching videos online, the Court excluded NCS's offer to display online videos that explain how to use the FTC Identity Theft Report to get debts removed from credit reports. Once introduced by Plaintiff, NCS should have been allowed evidence of the videos, and it was an abuse of discretion to exclude the videos that would have provided the jurors with insight to the fraudulent or "fake" identity theft claims.

## C.  MOTION FOR REMITTITUR

<u>Standards and Guiding Principles</u>

Remittitur, which is used in connection with Fed. R. Civ. P. 59(a), "is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." *Cline v. Wal-Mart Stores*, 144 F.3d 294, 305 (4th Cir. 1998). "The permissibility of remittiturs is now settled." *Id*. Therefore, if a reviewing court concludes that a verdict is excessive, "it is the court's duty to require a remittitur or order a new trial." *Id*. (citing *Linn v. United Plant Guard Workers, Local 114*, 383 U.S. 53, 65–66, 15 L. Ed. 2d 582, 86 S. Ct. 657 (1966)). The failure to do so constitutes an abuse of discretion. *Id.*

To be excessive, the award must "shock the judicial conscience" and "raise an irresistible inference that passion, prejudice, corruption or other improper cause" gave rise to the jury's verdict. *Clawson v. Mt. Coal Co., L.L.C*., Civil Action No. 01-cv-02199-MSK-MEH, 2007 U.S. Dist. LEXIS 87499, at *7 (D. Colo. 2007) (citing *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998)). It is appropriate that such analysis should be "informed by a review of awards granted in comparable cases." *Id*. (citing *Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir. 1989)). Once again, however, the question is not whether the award "seems high" to the Court, nor whether the Court would have made the same award on its own. *Id*. (citing *Goico v. Boeing Co*., 358 F.Supp.2d 1028, 1030 (D. Kan. 2005)). In assessing whether an award is excessive, the Court considers factors such as the severity of the conduct directed at the plaintiff and the context in which it took place, the nature of the harm suffered by the plaintiff, and other economic and convenience factors. *Clawson v. Mt. Coal Co., L.L.C*., Civil Action No. 01-cv-02199-MSK-MEH, 2007 U.S. Dist. LEXIS 87499, at *6–7 (D. Colo. 2007) (citing *Smith v. Northwest Financial Acceptance, Inc*., 129 F.3d 1408, 1416–17 (10th Cir. 1997).

[I]f the court determines that the verdict was the result of passion or prejudice, or for any other reason it appears that the jury erred or abused its discretion not only on the issue of damages but also on the issue of liability, the court must unconditionally order a new trial and cannot give the plaintiff the option to accept a lesser amount." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1983). If, however, "the court concludes there was error only in an excessive damage award, but not one also tainting the finding of liability, the . . . court may order a remittitur and alternatively direct a new trial if the plaintiff refuses to accept the remittitur." *Id.*

Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others. *Carey v. Piphus*, 435 U.S. 247, 264 n.20, 98 S. Ct. 1042, 1052 (1978). Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury. *Id.* (*citing Gertz v. Robert Welch, Inc*., 418 U.S. 323, 350 (1974)); *Taylor v. Tenant Tracker, Inc*., 710 F.3d 824, 828 (8th Cir. 2013) (noting the expansion of *Carey* to other federal statutes, including the FCRA). "Not only is emotional distress fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims." *Sloane v. Equifax Info. Servs*., 510 F.3d 495, 503 (4th Cir. 2007) (FCRA case) (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996)). A plaintiff who relies on his own testimony to support his claim of damages must "reasonably and sufficiently explain[] the circumstances surrounding the injury," "explain [his] injury in reasonable detail and not rely on conclusory statements." *Llewellyn v. Allstate Home Loans, Inc*., 711 F.3d 1173, 1182–83 (10th Cir. 2013).

Although, *Llewellyn* did not define "conclusory" for a FCRA claim, other courts have. Conclusory allegations include statements that the plaintiff was "frustrated," "disappointed,"

36

"embarrassed," experiencing a "low point," or "concerned." *Williams v. USAA Sav. Bank*, Case No. 4:21-00579-CV-RK, 2022 U.S. Dist. LEXIS 206824, at \*19 (W.D. Mo. Nov. 15, 2022); *Edeh v. Equifax Info. Servs., LLC*, 974 F. Supp. 2d 1220, 1244 (D. Minn. 2013). At least one recent federal court analyzing a Fair Debt Collection Practices Act violation found that statements that a plaintiff was "stressed" and "confused" and lost sleep "fit squarely into the category of conclusory and unreasonably detailed allegations." *Johnson v. Waypoint Res. Grp.*, 596 F. Supp. 3d 1184, 1196 (S.D. Ind. 2022).

Courts consider whether the plaintiff suffered physical injury or sought medical treatment to substantiate claims of injury for emotional distress. *Taylor v. Tenant Tracker, Inc*., 710 F.3d at 829; *Williams*, 2022 U.S. Dist. LEXIS 206824, at \*19; *Edeh*, 974 F. Supp. 2d at 1244. In Colorado, for tort claims generally, a plaintiff cannot substantiate a claim of emotional distress unless the emotional distress is accompanied by physical injury, physical manifestations, or mental illness, such as "continued nausea or headaches," and/or "repeated hysterical attacks, or mental aberration." *Towns v. Anderson*, 579 P.2d 1163, 1165 (Colo. 1978). In considering the matter, some Colorado courts have found that loss of sleep is <u>not</u> considered to be a physical manifestation of emotional distress. *Admiral Ins. Co. v. Hosler*, 626 F. Supp. 2d 1105, 1113–14 (D. Colo. 2009).

The Fourth Circuit Court of Appeals has referred to factors that assist in properly considering the potential excessiveness of an award for emotional distress, including in cases involving FCRA violations. Those factors include the factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention

resulting from the emotional duress; psychiatric or psychological treatment; and the loss of income, if any. *Id.* (citing *Knussman v. Maryland*, 272 F.3d 625, 640 (4th Cir. 2001)).

In affirming the remittitur of compensatory damages, the Third Circuit has considered four factors: (1) the plaintiff did not lose the esteem of her peers; (2) the plaintiff suffered no physical injury as a consequence of her emotional distress; (3) the plaintiff received no psychological counseling; and (4) the plaintiff suffered no loss of income. *See Spence v. Board of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986). The Second Circuit followed *Spence* and considered the same factors in reviewing an award for a like claim challenged on sufficiency grounds. *See Miner v. City of Glens Falls*, 999 F.2d 655, 663 (2d Cir. 1993). The Tenth Circuit contemplated the following factors in analyzing a claim for emotional distress premised on a constitutional violation: (1) the degree of emotional distress; (2) the context of the events surrounding the emotional distress; (3) the evidence tending to corroborate the plaintiff's testimony; (4) the nexus between the challenged conduct and the emotional distress; and (5) any mitigating circumstances. *Fitzgerald v. Mountain States Telephone and Telegraph Co.*, 68 F.3d 1257, 1265–66 (10th Cir. 1995). Various courts also consider medical attention, if any, that the plaintiff received as a result of the emotional distress, *see, Fitzgerald*, 68 F.3d at 1266; *Miner*, 999 F.2d at 663; *Ramsey*, 772 F.2d at 1313–14, and psychological or psychiatric treatment, if any, that the plaintiff received, *see, e.g.*, *Spence*, 806 F.2d at 1201; *Ramsey*, 772 F.2d at 1313. All these factors aid triers of fact in determining the propriety of awarding compensatory damages for emotional distress.

### EXAMINING THE REMITTITUR FACTORS

Here, because of the MSJ Order, the Court previously decided that Plaintiff suffered no credit or other economic damages. Rather Plaintiff could only recover emotional distress damages,

if a negligent violation of FCRA § 1681s-2(b) was established entitling Plaintiff to an award under 1681o. Importantly, as explained below, the fact that Plaintiff suffered no economic damages should impact the claimed severity of any emotional distress damages.

Based on the evidence at trial, NCS requests a remittitur of the jury's verdict awarding a half million dollars ($500,000.00) for emotional distress damages. The jury's award of $500,000 for emotional distress damages in this case is excessive, disproportionate to any injury, and should shock the Court's judicial conscience. The award, in light of the evidence presented at trial, creates an irresistible inference that passion, prejudice or another improper cause invaded the trial.  In fact, without meaning to learn the jury's deliberations, NCS learned that in fact did take place.  *See* EX "D" - *Declaration of John W. Bowdich*.

1. The context of the events surrounding the emotional distress:

While Plaintiff testified about the importance to him of building and maintaining his credit, and that he was embarrassed about seeking credit while the MSR Account was included in his credit file, the evidence does not support such conclusions.  While Plaintiff subscribed to Credit Karma beginning in October 2, 2019 (*see* EX 13-011), a service that monitors your credit and provides alerts when changes to the credit file occur, Plaintiff admitted that he did not open any email alerts from Credit Karma. *See* EX "A" – R. Ward TR at p. 84, lines 19-23.  Such a blind eye to changes in his credit file also explains why Plaintiff did not know of the MSR tradeline in his credit file until June, 2020 (*see* EX "A" – R. Ward TR at p. 11, lines 19-21) despite NCS furnishing information on the MSR Account starting February 21, 2020.  *See* EX 1-001 at Feb. 21, 2020 entry. In fact, after Plaintiff learned of the MSR Account lowering his credit score that led to his disputes to the CRAs, he provided no documentary evidence at trial whether his credit score remained negatively impacted after the first round of disputes.  Plaintiff did not even present any evidence

how long the MSR tradeline was included in his credit file.  Had Plaintiff actually cared enough to routinely review his credit scores or open alerts sent to him when a change to his credit file occurred, he would have known that, once NCS added the "XB" code following the first set of ACDV disputes, which occurred on June 21, 2020 (*see* EX 1-002 at June 18, 2020 entry, which was uploaded to CRAs with June 21, 2020 entry), and included on all subsequent credit reports or credit scores, Plaintiff's credit score would have returned to its previous level.  *See* EX "C" - J. Ulzheimer TR at p. 23, line 15 to p. 24, line 2; p. 52, lines 13-25; *acknowledged by* EX "B" - E. Hendricks TR at p. 29, line 23 to p. 30, line 13.

Simply, from Plaintiff learning of his lowered credit score to the alleviation of the impact was less than three weeks.  And from the date of the first dispute results, June 12, 2020 (EX 13-00 to 007) to the upload containing the inclusion of Plaintiff's dispute of the Account on June 21, 2020 is just nine (9) days.  The fact that Plaintiff's score would have returned to its previous level was undisputed at trial.  *See* EX "C" - J. Ulzheimer TR at p. 23, line 15 to p. 24, line 2; p. 52, lines 13-25; *acknowledged by* EX "B" - E. Hendricks TR at p. 29, line 23 to p. 30, line 13. This also explains why Plaintiff could not establish any credit damages (*see* Doc. 76, law of the case) and why Plaintiff admitted that the two loans for which he applied, he received good credit terms. *See* EX "A" – R. Ward TR at p. 85, lines 21-22.

2.   The degree of Plaintiff's claimed emotional distress (in large part, all conclusory):

Plaintiff testified that he had trouble sleeping, but he offered no testimony as to how often this occurred or over what duration of time. *Id.* at p. 14, line 24; p. 15, line 17 to p. 16, line 11.  He also did not testify that he took any medications to help with his sleep or otherwise sought treatment for sleeplessness. *See e.g. Admiral Ins.*, 626 F. Supp. 2d at 1113.  He testified that he had difficulty concentrating at work, that he made errors in shipping products to customers, and

that his boss spoke to him about the errors. *See* EX "A" – R. Ward TR at p. 14, line 22 to p. 15, line 16; p. 25, lines 5-17. But he did not testify that he suffered any adverse consequences at work as a result.  He also did not specify how long he experienced difficulty at work. He also mentioned taking off a day of work to work on his disputes, *Id.* at p. 85, lines 21-22, but did not testify that he lost any income.  He stated that he would sometimes cry about the issues regarding the Account *Id.* at p. 15, lines 20-25, but he did not testify that such crying interfered with his daily life, that it was uncontrollable, how often or for how many weeks or months such crying occurred. He made a single, conclusory statement that his and his wife's sex life suffered *Id.* at p. 24, line 25 to p. 25, line 3. Except for a few examples of errors at work, Plaintiff's testimony was wholly conclusory. *See Kittle v. Accredited Collection Agency Inc.,* No. 07-cv-01716-REB-BNB, 2010 U.S. Dist. LEXIS 80036, at *7 (D. Colo. 2010) ("conclusory, general, and uncorroborated testimony concerning emotional distress is not sufficient to support an award of damages for emotional distress." *citing Dill v. City of Edmund, OK*, 155 F.3d 1193, 1209 (10th Cir. 1998).

During this time, however, Plaintiff was able to go on vacation and could not cite any examples of any activities that he was prevented from doing as a result of NCS's conduct.  *Id.* at p. 90, lines 6-22. This speaks to the lack of any adverse financial or emotional effect on him and his ability to have stress-free time.

3.   The nexus between the conduct of NCS and the emotional distress:

There is little nexus between NCS's conduct and Plaintiff's emotional distress. Most of Plaintiff's alleged distress centered around his frustration around his claim that the Account in his name did not belong to him but NCS stating that its investigation indicated that the Account was his. But, despite claiming that maintaining a good credit score was important to him, *Id.* at p. 13, lines 9-10, he did not check his credit scores again after disputing the debt to see that his credit

score had returned to its previous level, *Id.* at p. 84, lines 19-23, which would have reduced or potentially eliminated his emotional distress. Moreover, as Plaintiff had no evidence of credit damages, his emotional distress was not the result of actual harm to him or his credit, but solely out of the idea that NCS had not deleted the Account, which makes an award of $500,000 for such emotional distress shocking and the result of something other than the trial evidence. Undoubtedly, some of Plaintiff's emotional distress was due to his identity being used, allegedly without permission, which was not the fault of NCS. Worse yet, such use, allegedly without permission, was committed by his own daughter, which likely increased the distress; but that is unrelated to any conduct by NCS.  It is unusual that an alleged victim of identity theft is so familiar with the perpetrator. Plaintiff could have confronted his daughter and obtained more information from her that would have resolved his dispute and eased any emotional distress, but he testified that he has never spoken to his daughter about her actions.  *Id.* at p. 43, lines 4-16; p. 85, lines 10-12; p. 77, line 18 to p. 78, line 14.

4.  <u>Evidence corroborating Plaintiff's testimony</u>:

The only additional evidence Plaintiff provided was from his wife, similarly an interested witness supporting her husband. Although her testimony corroborated some of Plaintiff's testimony, her testimony was similarly conclusory and lacked specifics regarding the frequency and duration Plaintiff's alleged distress.

5.  <u>Physical injuries suffered due to the emotional distress; medical attention resulting from the emotional duress; psychiatric or psychological treatment</u>:

Plaintiff offered no evidence of any medical or psychological treatment related to any mental distress—no doctor visits, counseling, or medication. He provided no testimony regarding any physical manifestations caused by his alleged emotional distress, other than the conclusory statements about lost sleep.

42

6.  <u>Loss of income</u>:

It is undisputed that Plaintiff suffered no loss of income as a result of NCS's conduct or as a result of any emotional distress. Although he testified about mistakes at work, he offered no evidence that he suffered any adverse employment action or loss of income. The Court had already granted NCS's Motion for Summary Judgment on Plaintiff's claim for economic damages.

7.  <u>Evidence supporting the inference that passion, prejudice or another improper cause invaded the trial</u>:

At trial, Plaintiff did not identify and describe the kind of severe emotional distress that warranted $500,000 in damages. The award of $500,000, when compared to the relatively scant, conclusory evidence of Plaintiff's emotional distress, is so excessive and shocking that it creates an irresistible inference that passion, prejudice or another improper cause invaded the trial.

This inference is further supported by actual evidence that another improper cause invaded the trial.  Following the trial, with permission of the Court obtained through the Courtroom deputy, one of NCS's trial attorneys, John W. Bowdich, spoke with all eight jurors. Jurors 3, 10, and 11 explained that the jury awarded Plaintiff $500,000, intending for him to receive a "net" of $200,000. Their award was based on how much the jury anticipated Plaintiff's attorneys would take from the award for the attorneys' fees and how much Plaintiff would have to pay in taxes. Juror 11 admitted that she improperly inserted extraneous prejudicial information to the jury's attention. Specifically, that Plaintiff's attorneys "would get at least 40% of the amount." The jury panel would have a reason to listen to Juror number 11 because she indicated during voir dire that her mother is a medical malpractice attorney.

Juror 13 stated she originally only wanted to award $0 or perhaps $1,000. However, after further deliberations, she decided that NCS needed to be punished for "not doing more to protect

consumers" for which a couple of jurors, including Juror 1 agreed. Juror 13 followed up by saying, "I just decided that NCS needed to be slapped."

The Jury made it clear that they did not award $500,000 to Plaintiff as an amount to compensate him for his emotional distress, but rather based on improper extraneous evidence regarding his attorneys' contingent fee and to punish NCS. All but two of the panel members (Juror 1 and Juror 6 who had already left the discussion) expressed remorse for their verdict and admitted to Mr. Bowdich that they made mistakes in considering facts that were not in evidence and ignoring the Jury Instructions regarding damages. The jury clearly ignored Jury Instruction 20 and used improper extraneous information introduced by Juror 11. This evidence shows that, not only was the award shocking to the conscience, it was also motivated by improper purposes in rendering it.

## EXAMPLES OF REMITTITUR FOR EMOTION DISTRESS DAMAGES FROM OTHER COURTS

The Tenth Circuit recognizes comparison to other cases as an appropriate measure of excessiveness. *Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1258 (D. Colo. 2009) (citing *Wulf*, 883 F.2d at 875).

In a Section 1983 case, the Tenth Circuit ordered remittitur of a jury's $250,000 award for mental anguish damages. The plaintiff testified that that his dismissal from his job on the police force for a whistleblower letter he wrote was "very stressful," that he was angry, depressed, scared and frustrated. *Wulf* at 875. His wife testified that he was under "tremendous emotional strain" and that they experienced significant financial difficulties. *Id*. The plaintiff provided no other testimony or evidence of his emotional or mental suffering. *Id*. While the court agreed with the defendants that the plaintiff's testimony and the evidence presented are not the most graphic and detailed display of emotional and mental anguish and distress, it could not conclude that some

award for such anguish and distress was unsupported by substantial evidence. *Id*. So the court affirmed the district court's conclusion that an award for Wulf's mental and emotional pain was appropriate but remanded for a recalculation of the award, holding that the jury's award of $250,000 was excessive. *Id*. The court held that the award should have been no greater than $50,000 and remanded the case for the district court to reconsider damages on the issue and enter an award not to exceed $50,000. *Id*.

In a 2009 First Amendment retaliation case, the United States District Court for the District of Colorado granted remittitur and offered Plaintiff a new trial or a reduction of the emotional distress damages award of the $500,000 non-economic compensatory damages award to $250,000. *Blangsted*, 642 F. Supp. 2d at 1268. The court made such a reduction despite evidence that the plaintiff lost his job in his chosen field as a result of exercising his First Amendment rights. *Id*. at 1257.   Notably, Plaintiff in this case did not suffer any adverse monetary or employment consequences. The *Blangsted* court noted that although such evidence is not required, the plaintiff apparently did not seek medical or psychological aid from a healthcare provider and such testimony was certainly a suggested method of proving emotional damage. *Id*. Plaintiff in this this case similarly lacked such evidence. The *Blangsted* plaintiff's entire case rested solely on his own testimony. *Id*. That evidence indicated harm resulting from the termination, including emotional distress caused by loss of his desired career position, being labeled a liar, difficulty sleeping and other negative impacts. *Id*. at 1257–58. The court balanced that evidence against the reality that the plaintiff was a comparatively young person and had obtained other employment with higher compensation. *Id*. at 1258. The absence of any physical manifestation of emotional distress other than some difficulty sleeping and the absence of any corroborating, objective evidence from any

source weighed against such a high damage award. *Id*. There is even less evidence in this case to justify the massive damage award to Plaintiff.

In an FCRA case, the Seventh Circuit Court of Appeals in *Wantz* affirmed the trial court's granting of summary judgment against the plaintiff for failure to create a fact issue as to actual damages regarding emotional distress. The plaintiff's own testimony was his only evidence of emotional damages, and the court stated that the plaintiff "must explain the circumstances of his injury in reasonable detail" and not rely on conclusory statements, unless the "facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action." *Wantz v. Experian Info. Sols*., 386 F.3d 829, 834 (7th Cir. 2004) (quoting *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003)). The plaintiff's only evidence as to emotional damages was his testimony that: (1) he was "'humiliated and embarrassed' every time he was rejected for credit"; (2) it is "mentally and emotionally distressful when dealing with credit reporting agencies"; and (3) it is "embarrassing to go somewhere and have them check your credit report and see all that stuff on there." *Id*. The court held that the case was not one of the few cases in which the facts are so inherently degrading that a jury could infer the existence of emotional distress. *Id*. (citing *Denius*, 330 F.3d at 929 (reasoning that the plaintiff's assertion that he was "embarrassed and humiliated" did not fall into the inherently degrading category)). Without further evidence to buttress those assertions, the plaintiff's case could not go forward. *Id*. (citing *Cousin v. Trans Union Corp*., 246 F.3d 359, 371 (5th Cir. 2001) (reasoning that the plaintiff's conclusory assertions about being "very upset" and "angry" were insufficient)).

In Cause No. 2022 CV 30141, *Peters v. American Pacific Mortgage Company*, in the District Court of Larimer County, Colorado, the state District Judge granted remittitur of emotional distress damages in an FCRA case from $800,000 to $250,000. In that case, the plaintiff's wife

testified that the plaintiff was unable to purchase an engagement ring for her because he was denied credit. She testified that she observed her husband repeatedly dealing with his negative credit reporting on a weekly basis and that he would be on the phone for hours. She testified that as a result of these interactions she observed that the plaintiff was frustrated, annoyed and felt defeated. She testified that he would raise his voice in conversations regarding his negative credit scoring and that was not typical for him. She testified that the credit dispute negatively impacted their relationship, that the plaintiff would become withdrawn and that they were fighting more because of the stress of the situation. The plaintiff had testified that during an approximately 8-month period of time he was denied credit twice—once when he was denied credit when applying to purchase a wedding ring for his wife and once when he applied for credit and was denied by Wells Fargo. He testified that it was embarrassing and "a dagger to the heart" that he was unable to purchase the ring he wanted to purchase for his fiancé. The plaintiff also testified that he was denied credit when he made an application for a home equity line of credit. He testified that he applied for the loan to pay off credit card debt and also to make improvements to one of his properties. He testified that he was sad and embarrassed that he could not obtain financing. He testified that he felt like he was letting his wife down because he was not able to obtain the loan due to his credit reporting. He conceded, however, that approximately 4 months later he did qualify for a HELOC loan through another lender. The plaintiff testified that dealing with his negative credit reporting was stressful, involving phone call after phone call without having any results and remaining at a standstill. He testified that it impacted his ability to sleep while his credit score was under dispute. He testified that his lack of sleep impacted his activities during the day—he stopped working out because he was tired in the mornings and that he began to drink more alcohol thinking it would help him sleep—which only compounded the problem. The plaintiff testified that he felt

like his body just kind of "shut down" and testified that he lost weight during this stressful period of 10 to 20 pounds. The plaintiff testified that the stress of dealing with his negative credit reporting impacted the relationship with his wife—that he felt disconnected and that their relationship lacked the spark they had enjoyed before. The plaintiff presented no evidence of any economic losses; all evidence was of non-economic damages. The court held that it was unable to resist the inference that passion, prejudice, or some other improper cause invaded the jury's determination of damages.

In light of such examples, and the evidence at trial, NCS requests a remittitur of Plaintiff's emotional distress damages to a significantly lower amount, suggesting ten percent of the amount awarded, $50,000.00, or, if rejected by Plaintiff, order a new trial.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Defendant National Credit Systems, Inc. prays that the Court grant NCS's Motion for Judgment Notwithstanding the Verdict as Plaintiff's dispute was not actionable under the FCRA.  In the alternative, NCS prays for a new trial based on the points of error presented, or in the alternative, the Court grant the Motion for Remittitur in an amount it deems appropriate under the facts of this case, and if rejected by Plaintiff, order a new trial.  NCS further prays for such other and further relief, consistent with this pleading, that it may be entitled.

Dated: July 23, 2024

                                   Respectfully submitted,

                                   By: ___*John W. Bowdich*_____
                                       JOHN W. BOWDICH
                                       TX Bar No. 00796233

                                 BOWDICH & ASSOCIATES, PLLC
                                 8150 N. Central Expressway, Suite 500
                                 Dallas, Texas 75206
                                 (214) 307-5173 – Telephone
                                 (214) 307-5137 – Telecopy
                                 jbowdich@bowdichlaw.com

                                     KATRINA M. DEMARTE
                                     MI Bar No. P81476; CO Bar #43135

                                 DEMARTE LAW, PLLC
                                 39555 Orchard Hill Place, Suite 600
                                 Novi, MI 48375
                                 (313) 509-7047 – Telephone
                                 katrina@demartelaw.com

                                 COUNSEL FOR DEFENDANT
                                 NATIONAL CREDIT SYSTEMS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2024, I electronically submitted the foregoing document with the District Clerk for the District of Colorado using the ECF system, which will send notification of such filing to all attorneys of record.

                                   By: ___*s/ John W. Bowdich*___
                                       JOHN W. BOWDICH