## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

ROBBIN WARD

        Plaintiff,

    vs.                    CASE NO. 1:21-cv-02597-NYW-JPO

TRANSUNION, LLC, *et al.*,

        Defendants.

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND ALTERNATIVELY, MOTION FOR NEW TRIAL, OR IN THE ALTERNATIVE, MOTION FOR REMITTITUR

Plaintiff Robbin Ward, by Counsel, opposes Defendant National Credit Systems Inc.'s ("NCS") Motion for Judgment Notwithstanding the Verdict and Alternatively, Motion for New Trial, Or In the Alternative, Motion for Remittitur (ECF 137). For the reasons discussed below, the Court should deny the entirety of NCS's Motion.

### OVERVIEW

This case arose from the theft of Plaintiff's identity and the use of that information to lease a property in Dallas, Texas. As the Court and jury learned at trial, Plaintiff did not authorize anyone to do that, did not consent to being bound on the lease, and was not part of some multi-state conspiracy to destroy his credit over the $5,000 or so the thief wound-up owing the landlord.

The landlord sent the account to NCS for collection, and when the collection account appeared on Plaintiff's credit he disputed, to NCS directly and the credit bureaus ("CRAs"), to no avail. At the end of his patience and emotionally strangled by NCS's steadfast—and unsupportable—belief that the account indeed belonged on Plaintiff's

credit, he sued NCS and the CRAs, asserting claims under the Fair Credit Reporting Act ("FCRA"). (ECF 1.) After the close of discovery, NCS moved for summary judgment on all aspects of Plaintiff's claims against it. (ECF 55.) The Court, Judge Babcock presiding, largely denied that Motion, but granted it on the issues of economic damages and willfulness. *Ward v. Trans Union, LLC*, No. 21-cv-2597-LTB-SKC, 2023 WL 4330849, at *13 (D. Colo. May 12, 2023). The Parties then went to trial on the issues of the accuracy of NCS's credit reporting, the reasonableness of its investigations of Plaintiff's disputes, and Plaintiff's emotional-distress damages. The jury deliberated for three-and-a-half hours before returning a verdict for Plaintiff, awarding him $500,000. (ECF 129.) The Court entered judgment on the verdict on June 25, 2024. (ECF 131.)

NCS now asks the Court to unwind the jury's verdict, arguing multiple grounds that are insufficient for the Court to do that. In a disjointed brief that should probably encompass at least three separate motions, NCS asks the Court to do several things.

**For judgment notwithstanding the verdict:**

(1) Discard the jury's verdict and instead find Plaintiff's claims raise a legal, not factual dispute;

(2) Find claims that survived summary judgment are "not actionable" because Plaintiff's disputes "were not objectively and readily verifiable;" and

(3) Apply the *Rooker-Feldman* doctrine to find that a case that went to trial could not have been brought in federal court. (ECF 137 at 1–2.)

**For new trial:**

(1) Reject the jury's finding that there was sufficient causation to award FCRA damages to Plaintiff;

(2) Discard the jury's conclusion that NCS's investigations of Plaintiff's disputes were unreasonable;

(3) Cast aside the jury's finding that information NCS furnished to the credit

bureaus was inaccurate;

(4) Discard the jury's conclusion that Plaintiff did not fail to mitigate his damages;

(5) Disregard the jury's $500,000 damages award because there is "legally insufficient evidence" to support it; and

(6) Find that the Court's decision to omit (1) testimony relating to NCS's attempts to obtain testimony from Plaintiff's daughter and (2) an undisclosed and un-authenticatable Tik Tok video about credit reporting was error.

(ECF 137 at 2.)

**For remittitur or new trial:**

Agree that the jury's $500,000 award "for emotional distress is so excessive that it shocks the conscience and raises the irresistible inference that passion, prejudice, corruption, or other improper cause gave rise to the jury's verdict" such that the verdict should be reduced or a new trial ordered.

(ECF 137 at 3.) None of these arguments or positions gives appropriate deference to the Court's and jury's decisions, accounts for the fact that NCS had its chance to posture the case as it chose at trial and the jury simply did not agree with NCS.

### BACKGROUND PERTAINING TO THIS MOTION

Plaintiff filed this case against NCS and all three credit bureaus, Equifax, Experian, and TransUnion. (ECF 1.) He asserted claims under FCRA Sections 1681e(b) and 1681i against the bureaus, and under Section 1681s-2(b) against NCS. (*Id.* ¶¶ 96–107, 108–21.) Plaintiff alleged specifically that he suffered harm due to NCS's failure to reasonably investigate his disputes, particularly that it failed to review relevant information and robotically verified the account as belonging to Plaintiff, and failed to correct the inaccuracy as the FCRA requires. (ECF 1 ¶¶ 111–12, 118.)

At trial, Plaintiff and Mrs. Ward testified extensively about his emotional distress. Plaintiff presented testimony from nationally recognized expert Evan Hendricks, who

testified for more than two hours about the credit reporting industry generally, industry standards applicable to dispute investigations by furnishers, and the thoroughness with which Plaintiff disputed his claims of identity theft to NCS.

The Court also guaranteed that the jury would award damages for just Plaintiff's injuries attributable to NCS, instructing the jury specifically about causation and its ability to award damages:

**INSTRUCTION NO. 17**

**FCRA VIOLATION - ELEMENT 3: CAUSATION**

To recover damages, Plaintiff must prove that Defendant's violation of the Fair
Credit Reporting Act proximately caused his injuries. Proximate cause requires that the damage complained of by the Plaintiff is the natural, probable result of *Defendant's investigation* of Plaintiff's disputes.

(ECF 128 at 22 (bold in original, italics added).)

The Court emphasized the causation element in its specific instructions on awarding damages: "Plaintiff can only recover the emotional distress damages that he proves he suffered and that were *caused by Defendant's* negligence." (*Id.* at 25 (emphasis added).) There is no reason, and NCS has not raised one, to believe that the jury did not follow the Court's instructions. *Grant v. Royal*, 886 F.3d 874, 940 (10th Cir. 2018) (explaining jury is presumed to follow court's instructions).

Moreover, NCS argued for, and received, a jury instruction on mitigation of damages. (ECF 128 at 6 (Instruction 4); at 27 (Instruction 21).) The jury considered whether Plaintiff failed to mitigate his damages in its deliberations and concluded he did not. (ECF 130 at 3 (finding NCS did not prove Plaintiff "had an opportunity to mitigate or

avoid some of all of his damages").) Based on the evidence presented, the jury awarded

Plaintiff $500,000 for his emotional-distress damages. (*Id.* at 3.)

### ARGUMENT AS TO RULE 50 MOTION

**I.     NCS Cannot Meet Its Rule 50 Burden To Overturn The Jury's Verdict.**

**A.     NCS Presents No Basis To Cast Aside The Law Of The Case.**

The Tenth Circuit has explained the law-of-the-case doctrine to mean: "[O]nce a

court decides an issue, the same issue may not be relitigated in subsequent proceedings

in the same case." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002). NCS initially

argues that the law of the case—Judge Babcock's summary judgment decision finding

Plaintiff's claims do not present an undecidable legal question—should be disregarded in

favor of a decision that NCS prefers. (ECF 137 at 6–7.) NCS acknowledges that the Tenth

Circuit applies the reasons for overlooking the law of the case narrowly, and instructs that

the law of the case should prevail "unless one of the exceptions specifically and

unquestionably applies." *Id.* (quoting *Wessel v. City of Albuquerque*, 463 F.3d 1138, 1143

(10th Cir. 2006)). The exceptions are: "'(1) when the evidence in a subsequent trial is

substantially different; (2) when controlling authority has subsequently made a contrary

decision of the law applicable to such issues; or (3) when the decision was clearly

erroneous and would work a manifest injustice.'" *Wessel*, 463 F.3d at 1143 (quoting

*Grigsby*, 294 F.3d at 1219 n.4). While NCS claims all three exceptions apply (ECF 137 at

6),[1] they plainly do not, as confirmed by NCS's attention to just the first exception. (*See*

*id.* at 7–8.)

---

[1] While NCS also argues that the Judge Babcock supposedly failed to apply "controlling
precedent" in reaching his summary-judgment decision (ECF 137 at 8), NCS abandons

Yet even NCS's treatment of the first exception is suspect. While the Tenth Circuit states that the evidence at trial must be "substantially different," *Wessel*, 463 F.3d at 1143, NCS engages in a lengthy discussion of "additional" evidence that "was admitted at trial that was not part of the summary judgment record." (ECF 137 at 12–13.) But the Tenth Circuit has long recognized that "additional" evidence is not the same thing as the "substantially different" evidence as would be necessary to overturn Judge Babcock's decision. *Bishop v. Smith*, 760 F.3d 1070, 1087 (10th Cir. 2014) ("It is true that previously-available evidence often cannot be used to unsettle the law of the case."); *see United States v. Monsisvais*, 946 F.2d 114, 117 (10th Cir.1991) ("The 'different or new evidence' exception does not apply because . . . the additional evidence provided by the government at the supplemental hearing was evidence it had in its possession, but failed to produce, at the time of the original hearing."). NCS fails to discuss why, although available, none of this evidence could not have been included with its summary-judgment motion. (ECF 137 at 12–13.) That is because all of it could have been.[2] And even if NCS might successfully argue that this evidence is "different" from that introduced on summary judgment that still is not enough, as the subsequent evidence must be "*substantially* different." *See Animal Care Sys., Inc. v. Hydropac/Lab Prod., Inc.*, No. 13-cv-00143-MSK-BNB, 2015 WL 1469513, at *5 (D. Colo. Mar. 26, 2015) (explaining that the first exception applies only if "a party produces substantially

---

that argument by not discussing the supposed controlling precedent or explaining how Judge Babcock supposedly misapplied it.

[2] Should NCS argue on reply that deposition transcripts for Plaintiff or the MSR witnesses were not available at the time NCS moved for summary judgment, that problem is entirely of NCS's making. It took no depositions in this case. Since Plaintiff took Mr. Ulzheimer's deposition during the discovery period, his testimony was available for NCS to use on summary judgment.

different evidence *than what was available* at the time of the original decision")
(emphasis added). NCS has failed to explain how the evidence it now wants considered
meets that standard, so it has not shown that this exception "unquestionably applies."
*Id.* NCS's attempt to overturn Judge Babcock's earlier ruling therefore fails on NCS's
sole developed argument.

**B.    NCS Presents No Reasoned Ground To Discard The Jury's Verdict
Over The Question Of Whether Plaintiff's Disputes Present A Legal
Question NCS Need Not Resolve.**

**1.    The Court should decline to render a JNOV because Plaintiff's
disputes do not present a legal question.**

Though NCS does not discuss it, there are genuine questions regarding how
accepted the legal-factual distinction for which NCS advocates is accepted by courts.
*Hammoud v. J.J. Marshall & Assocs., Inc.*, No. 22-10813, 2024 WL 2867783, at *4 (E.D.
Mich. June 6, 2024) ("More recently, Courts of Appeal have rejected the 'legal dispute'
versus 'factual inaccuracy' dichotomy."). Leaving that failure aside, NCS approaches this
argument with a discussion of evidence befitting a motion for summary judgment, as
though the jury has not yet heard evidence and rendered a verdict. (ECF 137 at 13–17.)
But the evidentiary ship sailed on June 21, 2024, when the Court retired the jury for its
deliberations. NCS is far too late to reargue evidence it might have presented to the jury
with an infinite trial schedule or the foresight into the jury's verdict. Stripping NCS's issue
of the improper and unneeded discussion of evidence, the question is whether Plaintiff's
claim that the inaccurate reporting of the lease account as belonging to him presents a
legal question that NCS should not be required to resolve, or a factual one that NCS
should resolve to meet its FCRA obligations. Everything else NCS argues is fluff or
issues that are waived because the jury has rendered its verdict.

For example, NCS argues that to succeed on his claims, Plaintiff must prove that the information NCS reported to the CRAs "was inaccurate, incomplete, or materially misleading." (ECF 137 at 9.) Well, Plaintiff did that, as the jury found:

> QUESTION NO. 1: Did Plaintiff Robbin Ward prove that Defendant National Credit Systems, Inc. furnished inaccurate, incomplete, or misleading information to the credit reporting agencies?
>
> YES __X__  NO ____

(ECF 130 at 1.) It is difficult to discern what NCS means by this argument, as Plaintiff plainly proved the accuracy element at trial. NCS may disagree with the jury's decision, but mere disagreement is not enough for the Court to overturn the jury's conclusion. *Davis v. Akin's*, 463 F. App'x 739, 741 (10th Cir. 2012).

On the substance of the legal versus factual question, NCS still goes begging. It pins most of its arguments on the existence of a default, Texas state-court judgment Main Street obtained against Plaintiff (despite no doubt knowing he lived in Colorado and could be served here), claiming "the existence of a monetary judgment from a state court in favor of MSR against Plaintiff conclusively establishes that a legal dispute exists between Plaintiff and MSR." (ECF 137 at 15–16.) That of course cannot be true, as assuming NCS is right about the strength of that judgment, it confirms that any dispute NCS believes may have existed is resolved. There cannot be a dispute if a judgment exists, and NCS fails to grapple with this reality.

Instead, NCS argues that "[w]hen the dispute necessarily requires a judicial resolution, such as contested contractual liability or a question of law regarding the debt's validity, both of which exist in this case," Tenth Circuit authority allows NCS to throw up its hands and surrender its responsibilities to investigate that dispute. (ECF 137 at 16.)

Even agreeing that NCS correctly states the Tenth Circuit's holding, it is certainly not what is at issue here.

The prevailing view of courts is not favorable to the distinction between legal and factual questions that require consideration in an FCRA dispute. The Ninth Circuit, for example, has explained:

> Although FCRA requires both agencies and furnishers to conduct "reasonable" investigations, a furnisher's investigatory obligations will often be more extensive and more thorough. Credit reporting agencies are third parties that "lack[ ] any direct relationship with the consumer," so they must rely on the representations of the furnishers who usually own the debt. Furnishers, on the other hand, "stand[ ] in a far better position to make a thorough investigation of a disputed debt . . . ." This means that FCRA will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance. As the Consumer Financial Protection Bureau emphasized in its amicus brief, FCRA does not categorically exempt legal issues from the investigations that furnishers must conduct. *The distinction between "legal" and "factual" issues is ambiguous, potentially unworkable, and could invite furnishers to "evade their investigation obligation by construing the relevant dispute as a 'legal' one.*"

*Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1253 (9th Cir. 2022) (citations omitted, emphasis added). The Ninth Circuit is by no means alone. *See Hammoud v. J.J. Marshall & Assocs., Inc.*, No. 22-10813, 2024 WL 2867783, at *4 (E.D. Mich. June 6, 2024) ("More recently, Courts of Appeal have rejected the 'legal dispute' versus 'factual inaccuracy' dichotomy.") (collecting cases).

Even *Wright v. Experian Information Solutions, Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015), a decision in which the Tenth Circuit addressed the legal-factual dispute question and held that it may be applicable under certain FCRA circumstances, does not cut in NCS's favor because it did not deal with a simply verifiable question like Plaintiff presents here. *Wright* involved a consumer's dispute that a reported federal tax lien, filed

in the real property records of the county in which he lived and attributed to him and an entity of which he was the sole owner and manager, was inaccurately reported as live and his personally after Wright paid the IRS the taxes that were the genesis of the lien. *Id.* at 1237. Following Wright's payment, the IRS released the lien but did not withdraw it, meaning it remained in the real property records despite the release. *Id.* When the lien appeared on Wright's credit reports as due and owing, he disputed it has having been paid and therefore inaccurately reported as due and owing. *Id.*

The CRAs, using a vendor to assist in their investigation, verified the reporting of the lien as belonging to Wright but changed the status to "released." *Id.* Not satisfied, Wright disputed again, and after similar results, sued Experian and Trans Union asserting FCRA claims for their supposed misreporting of the status of the lien and failing to reasonably investigate his disputes. *Id.* at 1237–38. The district court granted summary judgment for the CRAs, concluding that nothing they could have uncovered in an investigation would have allowed them to reach the result Wright expected. *Id.* at 1238. The Tenth Circuit affirmed, holding that the CRAs had no FCRA duty to interpret tax law and determine whether the lien was due and owing, explaining Wright should take that question up with the IRS. *Id.* at 1245.

Here, even if they were necessary for the Court's decision, no such interpretive issues exist. The question Plaintiff's disputes presented is a binary one—he either agreed to the apartment lease (or authorized his daughter to do that) or he did not. As one court has noted in rejecting the argument that whether someone agreed to be bound by a contract was a legal dispute a furnisher need not consider in fulfilling its FCRA duties: "[u]ltimately, Plaintiff either did — or did not — execute the Disputed Loan. In other words,

this case hinges on a matter of objectively verifiable fact." *Paulino v. W. Funding II Inc.*, No. 23-24172-CIV, 2024 WL 2976744, at *6 (S.D. Fla. June 13, 2024). The Second Circuit recently reached a similar conclusion, rejecting arguments like NCS makes, regarding whether a CRA accurately reported that a vehicle lease contained a balloon payment:

> [E]ven if the District Court had been correct that the legal or factual nature of an inaccuracy was decisive, there does not appear to be any legitimate <u>legal</u> dispute regarding the inaccuracy of the reported balloon payment. There simply was no balloon payment due -- as a matter of <u>fact</u>. The lease provided for an option to purchase, not a required balloon payment.

*Sessa v. Trans Union, LLC*, 74 F.4th 38, 43 (2d Cir. 2023) (emphasis in original). Court-after-court have reached similar conclusions, some on more complex questions than the simple question presented here, all rejecting arguments like those NCS presses. *See Kanani v. Experian Info. Sols., Inc.*, No. 6:23-cv-2483-JSS-EJK, 2024 WL 3729484, at *3 (M.D. Fla. Aug. 8, 2024) ("In contrast, Plaintiffs' allegations regarding the inaccuracy in their credit information are objectively and readily verifiable. Plaintiffs allege that they 'paid all the rent owed,' 'did not and do not owe any debt,' and 'entered into a spoken walkaway agreement' with the landlord, 'which absolved [Plaintiffs] of any financial obligations' from the apartment rentals. Therefore, the reporting that Plaintiffs owed $5,380 to the Encantada at Dove Mountain Apartments was allegedly inaccurate as to the amount and existence of the debt. Rather than turning on any disputed provision in the lease agreements, Plaintiffs' allegations are a 'straightforward application of law to facts.'") (citation omitted); *Dorsey v. Trans Union, LLC*, No. 2:22-cv-1489-ACA, 2024 WL 3362466, at *4 (N.D. Ala. July 9, 2024) ("[T]he legal standard applicable to this contractual dispute is straightforward. No party disputes that if Ms. Dorsey received services from AT&T, she owed the debt, and if AT&T failed to provide those services, she did not. Ms.

Dorsey testified that she did not receive the services from AT&T. Taking the facts in the light most favorable to Ms. Dorsey, the answer to the contractual dispute is 'objectively and readily verifiable,' . . . in Ms. Dorsey's favor.") (citation omitted); *Wechsler v. Trans Union, LLC*, No. CV 21-3085, 2022 WL 1173008, at *6 (E.D. Pa. Apr. 20, 2022) ("Trans Union's ability to invent a reading of the lease extension that, if accepted, would render its report accurate does not compel the conclusion that Wechsler's disagreement with Hyundai was legal. Otherwise, credit reporting agencies could thwart viable FCRA claims by burying real factual disputes under imagined legal issues.").

One would think that if things were as settled in NCS's favor as it believes, it would be able to cite at least one case going its way in an FCRA case involving identity theft. Yet, it does not. The closest it comes is citing *Daniels v. National Credit Systems, Inc.*, No. 22-cv-01048-DDD-JPO, 2024 WL 2194270 (D. Colo. Feb. 23, 2024), which this Court has already found inapplicable. *Ward v. Nat'l Credit Sys., Inc.*, No. 21-cv-02597-NYW-JPO, 2024 WL 2846609, at *5 (D. Colo. June 5, 2024). That is because this case does not present the legal-factual distinction NCS hopes. Whether Plaintiff agreed to be bound by the MSR lease or gave his daughter permission sign it on his behalf[3] is a question of fact, and it is objectively verifiable—he either signed or authorized the signing of the lease, or he did not. *Paulino*, 2024 WL 2976744, at *6; *Dorsey*, 2024 WL 3362466, at *4. Nothing to which NCS directs the Court counsels a different result than the Court reached on summary judgment.

---

[3] Though NCS argued this agency/permission point on its Rule 50 motion at trial it does not meaningfully do so in its brief. (ECF 137 at 19–20.) Regardless, there has been no evidence adduced during discovery or at trial to suggest that Plaintiff gave his daughter permission to sign the lease and now wants to avoid that obligation.

### 2. Plaintiff's claim against NCS is based on objectively verifiable facts.

Ample evidence existed that Plaintiff did not take out the lease, including a host of red flags that NCS ignored. *See* e.g. Ex. 2, Tr Trn 6/18/24 38:12-25; 39:1-25; 40:1-25; 41:1-25; 42:1-25; 43:1-25; 44:1-25; 45:1-25; 46:1-25; 47:1-25; 48:1-25; 49:1-25; 50:1-25; 51:1-25; 52:1-10. NCS had a copy of Mr. Ward's driver's license showing he was a male, and the apartment's notes showed that it was a female who rented the apartment. Ward provided NCS with evidence that he never lived in Texas, did not take out the lease, that his identity was stolen, that he did not work at Neiman's, that the Social Security Administration letter was a fake, and the numerous red flags that Mr. Sapp admitted to during his testimony. *Id.* The mere fact that NCS chose to ignore all these glaring red flags does not mean it was reasonable as a matter of law to do so.

Moreover, NCS has not argued, and it did not present any evidence at trial, that the legal-factual distinction was on its mind at all when it was investigating Plaintiff's disputes. Judge Babcock noted as much in his memorandum opinion denying NCS's Motion for Summary Judgment. *Ward*, 2023 WL 4330849, at *13 ("[T]here is no indication that during the relevant time period, i.e. during NCS's investigation of Plaintiff's dispute before this lawsuit was filed, NCS ever suspected that Plaintiff might be legally liable on the Lease, as a conspirator or principal, thus giving NCS an excuse to relax or cease its investigation."). Put differently, whatever NCS may dream up after the close of discovery and a loss at trial, what matters is what it was doing during the time it was investigating Plaintiff's disputes. And it has provided no evidence that the question of whether the disputes presented a legal question versus a factual one was something NCS considered during its FCRA investigation.

One additional point bears mentioning. Agreeing with NCS's arguments extinguishes any rights an identity-theft victim has under the FCRA. After all, the FCRA preempts state law claims against furnishers. 15 U.S.C. § 1681t. The FCRA is the only protection consumers have from false credit reporting by furnishers. Were NCS correct, all a furnisher has to do is label the consumer's dispute a "legal" one, and it would abdicate any responsibility to reasonably investigate those disputes. Such an outcome would leave the consumer with no remedy whatsoever, except perhaps prosecuting the thief, though that would still not help with false credit reporting. The irrationalness of such an outcome is obvious, and certainly cannot be anything Congress or courts intended as an interpretation of Section 1681s-2(b). Not to mention, this would contradict the purpose of the FCRA, with Congress finding that "[t]he banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681(a)(1). Allowing furnishers like NCS to report false information about consumers in perpetuity simply because the furnisher labels it a "legal dispute" or "not objectively verifiable" frustrates the purposes of the FCRA.

### C.    The *Rooker-Feldman* Doctrine Has No Application Here.

#### 1.    The doctrine generally.

Again raising arguments based on MSR's Texas judgment that it has known about for months, yet never mentioned before trial, NCS claims the *Rooker-Feldman* doctrine deprives the Court of subject-matter jurisdiction over Plaintiff's claims. (ECF 137 at 20.) According to NCS, "Plaintiff's FCRA claims against NCS in this suit necessarily seek to

set aside or call into question the Texas State Justice Court's Judgment." (*Id.* at 22.) If that were correct, one would expect the state-court judgment to have been a subject of a dispositive motion or be mentioned by NCS before trial. *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228 (10th Cir. 2000) (A party may not circumvent Rule 50(a) by raising for the first time in a post-trial motion issues not raised in an earlier motion for directed verdict.) It of course was not but, even so, *Rooker-Feldman* does not rescue NCS because it is not applicable here.

"Under [the *Rooker-Feldman*] doctrine, 'a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights.'" *Knox v. Bland*, 632 F.3d 1290, 1292 (10th Cir. 2011) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994)). "In light of *Exxon* [*Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)], [the Tenth Circuit has] concluded that 'the type of judicial action barred by *Rooker-Feldman* [ ] consists of a review of the proceedings already conducted by the "lower" tribunal to determine whether it reached its result in accordance with law.'" *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1193 (10th Cir. 2010) (quoting *Bolden v. City of Topeka*, 441 F.3d 1129, 1143 (10th Cir. 2006)). The doctrine therefore "precludes a losing party in state court who complains of injury caused by the state-court judgment from bringing a case seeking review and rejection of that judgment in federal court." *Miller v. Deutsche Bank Nat'l Trust Co.*, 666 F.3d 1255, 1261 (10th Cir. 2012). For the doctrine to apply, the Court must also conclude that the federal claims are "inextricably intertwined" with the state-court judgment, and that therefore success on the federal claim would require the Court to overturn the state-

court decision. *Eaves v. Paxton*, No. 23-CV-01628-GPG-KAS, 2024 WL 3650446, at *3 (D. Colo. Aug. 5, 2024); *see Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987) (Marshall, J., concurring) ("Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment."). The Supreme Court has cautioned that the doctrine occupies "narrow ground," and the inquiry as to its application is claim specific. *Copeland v. C.A.A.I.R.*, No. 21-5024, 2023 WL 3166345, at *5 (10th Cir. May 1, 2023) (citing Exxon, 544 U.S. at 283–84). And as this Court has held, "if the plaintiff presents an independent claim, even if it denies a legal conclusion that a state court has reached, the federal district court has jurisdiction." *McDonald v. Citibank N.A.*, No. 21-cv-00427-PAB-NRN, 2021 WL 3743157, at *7 (D. Colo. July 22, 2021), *report & recommendation adopted*, No. 21-cv-00427-PAB-NRN, 2021 WL 3743516 (D. Colo. Aug. 24, 2021), *aff'd*, No. 21-1313, 2022 WL 16557957 (10th Cir. Nov. 1, 2022).

With these principles in mind, the Tenth Circuit has long-recognized that the focus of a *Rooker-Feldman* analysis is on "the relief sought by federal-court plaintiffs." *PJ ex rel. Jensen*, 603 F.3d at 1193. Along those lines, the Circuit teaches, "'we approach the question by asking whether the state-court judgment *caused*, actually and proximately, the *injury* for which the federal-court plaintiff seeks *redress*,' paying 'close attention to the *relief* sought' in the federal suit.'" *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1237 (10th Cir. 2006) (emphasis in original). NCS's arguments do not hew to these principles.

### 2.   NCS has not shown that *Rooker-Feldman* applies here*.*

Congress passed the FCRA "'to ensure fair and accurate credit reporting' and to provide consumers with a mechanism to challenge and correct disputed information." *Ruiz v. Rocket Mortg.*, No. 1:24-cv-00019 JCH/JFR, 2024 WL 983745, at *2 (D.N.M. Mar. 7, 2024). The Act established a system of recourse against furnishers of information for consumers who identified inaccurate information on their credit reports—a process by which they could dispute and have those disputes investigated. *Id.* To succeed on a claim against a furnisher under 15 U.S.C. § 1681s-2(b), Plaintiff must prove that NCS furnished inaccurate or incomplete information about him to the CRAs, and that NCS failed to reasonably investigate Plaintiff's disputes. *Ward*, 2024 WL 2846609, at *4.

NCS's *Rooker-Feldman* arguments focus exclusively on the MRS default judgment, which again was never mentioned during the discovery period in this case, by which NCS claims Plaintiff "was the loser" in that action, and that "Plaintiff could not prevail in this case without this Court, effectively, reversing the Texas State Court Judgment that he owes the debt." (ECF 137 at 22.) NCS is wrong on both points, dooming application of the *Rooker-Feldman* doctrine.

First, Plaintiff was not the loser in state court—US SFE Asset C, LLC obtained judgment by default, which by definition is not a decision on the merits and therefore has no preclusive effect. *In re Haese*, No. AP 06-1194 M, 2007 WL 9729221, at *7–8 (D.N.M. Sept. 26, 2007); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmt. e (1982) (explaining a judgment by default is not accorded collateral estoppel effect.). NCS's *Rooker-Feldman* arguments therefore falter on the first element.

At the next step, things get worse for NCS because Plaintiff is not asking this Court to do anything about the state-court judgment. Plaintiff learned of the NCS account on his

credit, disputed it as the FCRA requires, and after NCS failed to reasonably investigate his disputes, he sued to enforce his FCRA rights. Despite knowing about the default judgment for months, NCS did not mention it during the discovery period or when it moved for summary judgment. That effort failed and the case went to trial, where again the default judgment was not raised. Plaintiff proved all elements of his claims and negated NCS's mitigation defense at trial, and the jury awarded Plaintiff $500,000 for his injuries due to NCS's failure to reasonably investigate his claims. The Court entered judgment on the verdict, and NCS now argues that the Court lacks subject-matter jurisdiction over a case that NCS litigated for years, and through trial, without ever raising this supposed jurisdictional exemption. Yet, nothing that occurred at trial or that will occur after requires the Court to do anything with the default judgment. The jury awarded damages for NCS's FCRA violations, and that conclusion has nothing to do with, or seeks to overturn or set aside, the default judgment.

Neither of NCS's cited cases change the analysis. Both are unreported decisions, and neither dealt with claims of identity theft in the Section 1681s-2(b) context. *Ellis v. CAC Fin. Corp.*, 6 F. App'x 765 (10th Cir. 2001); *Bisbee v. McCarty*, 3 F. App'x 819 (10th Cir. 2001). More meaningfully, and in contrast to this case, both of those cases involved direct challenges to lower-court judgments, asking the federal courts to set aside or declare them void. *Ellis*, 6 F. App'x at 769 ("It would be impossible for a federal court to resolve their claims of fraud, malicious prosecution and abuse of process based on these allegations, however, without calling into question the state court judgment in favor of CAC Financial."); *Bisbee*, 3 F. App'x at 823 ("There is simply no way for a federal court to resolve this claim in Bisbee's favor without determining that the state court judgment,

or interlocutory orders entered in the course of the state court proceedings, were erroneously entered or void."). NCS argues otherwise, but nothing close to that is occurring here.

NCS does not deal with the reality that Plaintiff's claims have nothing to do with the default judgment, because he did not know about it. NCS sprung it on him at trial, long after discovery closed, and obtained a "certified copy" the month before trial on May 9, 2024. (TR Ex. 32, p.2.[4]) It cannot therefore be reasonably argued that through this action Plaintiff is appealing something he never knew about. Regardless, because Plaintiff is not asking the Court to do anything with the default judgment, and nothing about the default judgment caused the injury of which Plaintiff complains with his FCRA claims against NCS, *Rooker-Feldman* does not deprive the Court of jurisdiction.

*Driskill v. Experian Information Solutions, Inc.*, No. 24-CV-00583-AMO, 2024 WL 3463820, at *1 (N.D. Cal. July 17, 2024), illustrates this point in the FCRA context. In *Driskill*, the plaintiff sued Experian and Affirm, Inc. after discovering 11 Affirm accounts on his credit reports that were the result of identity theft. *Id.* Experian deleted all but two accounts after Driskill disputed, so he sued over the remaining two, asserting claims against Affirm under Section 1681s-2(b), just as Plaintiff did here. *Id.* Around the same time Driskill was disputing with the CRAs and Affirm, he divorced his wife. *Id.* As part of the divorce decree, an Arizona state court assigned to him all debts in his name, but did not specifically list the two Affirm accounts he claimed resulted from identity theft. *Id.*

Affirm moved to dismiss, arguing that *Rooker-Feldman* prohibited the federal court from considering Driskill's claims because he was essentially appealing the Arizona

---

[4] Notably, the Judgment does not even name NCS as a party. In fact, the Plaintiff who got the default judgment is "US SFE Asset C, LLC."

court's decision to assign him the Affirm debts upon his divorce. *Id.* at *2. The Driskill

court declined to apply *Rooker-Feldman*, holding:

> Here, Driskill seeks redress for Affirm's failure to reasonably investigate his
> disputes and correct reports of improper debts. Compl. ¶ 101-35. Driskill
> does not seek any relief from the Arizona court's consent decree. He does
> not request for this Court to set the decree aside, alter it, strike it, or to
> reassign legal responsibility for any debts to his ex-wife. Driskill does not
> assert that the consent decree was erroneous or that he suffered a legal
> wrong at the hands of the Arizona court. Indeed, since the Arizona court
> entered the consent decree, Driskill did not "lose" anything there – he
> agreed to the entry of the decree. *See* RJN, Ex. 4 ¶ 12 ("Both parties agree
> to proceed in this matter by Consent Decree for Dissolution of Marriage.").
> Moreover, the Arizona court did not consider Driskill's disputes of the
> inaccurate credit reporting because those issues were not before it. *Rooker-
> Feldman* therefore cannot apply to bar Driskill's FCRA claims. *See Fowler
> v. Guerin*, 899 F.3d 1112, 1119 (9th Cir. 2018) (finding *Rooker-Feldman* did
> not bar claims because "[n]o state-court judgment resolved the precise
> issues presented in this case, and the [plaintiffs] do not complain of any
> error by the state court or seek relief from the state court's judgments").
> Focusing, as the Court must on "the relief sought by the federal-court
> plaintiff" – damages for Affirm's failures to appropriately investigate
> Plaintiff's disputes – Driskill does not assert a de facto appeal of the division
> of marital debts by the Arizona court. *Hooper*, 56 F. 4th at 624.

*Id.* at *3.

This case mirrors *Driskill*. Plaintiff is not asking the Court to do anything with the

default judgment, as he has all along only sought his actual damages for NCS's failure to

reasonably investigate his disputes. NCS is the only one to mention the default judgment,

and did that so far into the case that it cannot meaningfully argue that Plaintiff is seeking

a do-over of that judgment by his FCRA claims against NCS. *See Norcom v. Lease Fin.

Grp., LLC*, No. 3:13-CV-2252-KI, 2014 WL 2747652, at *4 (D. Or. June 17, 2014) (finding

*Rooker-Feldman* inapplicable because plaintiff did "not allege in these claims that the

state court committed legal error or that she is entitled to relief from the state court

judgment"); *Graham v. Select Portfolio Servicing, Inc.*, 156 F.Supp.3d 491, 507–08

(S.D.N.Y. 2016) (concluding *Rooker-Feldman* did not apply to "causes of action for fraud, breach of contract, breach of the implied covenant of good faith, unjust enrichment, conversion, and deceptive business practices" because they did "not require that this Court review and reject the state foreclosure judgment, nor does the success of Graham's claims depend on this Court's conclusion that the state court improperly entered a judgment of foreclosure"). And *Driskill* is not an outlier, even in the FCRA context. *Williams v. Cap. One Bank (USA) N.A.*, 785 F. App'x 741, 744–45 (11th Cir. 2019) (confirming *Rooker-Feldman* inapplicable to FCRA claims where plaintiff "sought damages against Capital One and Equifax for their alleged actions in listing the judgment on his credit report without verifying the basis for the judgment (namely, the amount of the underlying debt and the associated signed cardholder agreement), and for failing to immediately remove information about the judgment from his credit report when he disputed it").

Boiled down, NCS's arguments for the application of *Rooker-Feldman* fall short. Nothing about Plaintiff's claims or allegations implicate the default judgment, and nothing about the relief the jury and Court awarded require the Court to overturn, set aside, or declare void the default judgment. The *Rooker-Feldman* doctrine therefore does not deprive the Court of jurisdiction over Plaintiff's claims.

## ARGUMENT AS TO NCS'S MOTION FOR NEW TRIAL AND REMITTITUR

### I.    Applicable Legal Standards.

In considering a motion for new trial, "[t]he question is not whether there is literally no evidence supporting the nonmoving party but whether there is evidence upon which a jury could properly find for that party." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 685 (10th Cir. 2007) (internal quotations omitted). "The bar is high for overturning a jury verdict

based on insufficiency of the evidence." *Harris v. City Cycle Sales, Inc.*, __ F.4th__, No. 23-3116, 2024 U.S. App. LEXIS 20970, at *30–31 (10th Cir. Aug. 4, 2024). As the Tenth Circuit has explained, overturning a jury's verdict requires more than just a repackaging of the movant's case and arguing that the jury reached the wrong decision: "We do not retry issues, second guess the jury's decision-making, or assess the credibility of witnesses and determine the weight to be given to their testimony, as it is the province of the jury and not this court to resolve conflicts in the evidence." *Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1157 (10th Cir. 2022) (brackets and internal quotation marks omitted). A district court must analyze whether the verdict is "clearly, decidedly or overwhelmingly against the weight of the evidence" when deciding a new trial motion based on insufficiency of the evidence. *Elm Ridge Expl. Co., LLC c. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013). All of the evidence shall be viewed in the light most favorable to prevailing party. *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006).

Once "a reasonable degree of persuasiveness in the proof of the fact of damages or injury is established," then "the amount of damages to be awarded is a matter within the sole province of the jury." *Loughridge v. Chiles Power Supply Co., Inc.*, 431 F.3d 1268, 1280-81 (10th Cir. 2005) (internal citations omitted). It is the exclusive function of the jury to fix the amount of damages. *Loew's Inc. v. Cinema Amusements, Inc.*, 210 F.2d 86, 95 (10th Cir. 1954). "It is the prerogative of the jury to make a just and reasonable estimate of the damages based upon relevant data, and render its verdict accordingly." *Id.*

## II. The evidence, which must be viewed in Plaintiff's favor, clearly establishes Plaintiff's FCRA claim, and that NCS did not perform a reasonable investigation. The same evidence shows that the information furnished by NCS was inaccurate.

NCS wants the Court to review the jury's verdict and the evidence presented in

this case, while leaving common sense and applicable legal standards at the door. NCS asserts that Plaintiff failed to establish that had NCS, the furnisher, conducted a reasonable investigation, the result would have been different. The facts show, as the jury found, that is exactly the case here. During the trial, Plaintiff's wife testified and explained her involvement in the dispute process with Defendant and the credit reporting agencies. (*See* Ex. 1, Tr. Trans. 6/17/24 Pg. 3–30.) Mrs. Ward testified that when she initially contacted NCS to attempt to dispute the account on Plaintiff's credit, she was directed to contact The Law Office of Brett Borland. (*Id.* at 10:20–11:2.) In an attempt to be as transparent as possible, Mrs. Ward provided employment records and other documentation to Borland to try to help clear the false information from Plaintiff's credit report. (*Id.* at 25:5-26:14.) Further, Mrs. Ward testified about how this process affected Plaintiff. He lost sleep, was having difficulties at work, and was just generally hopeless surrounding the false reporting on his credit. The jury obviously believed this testimony in deciding its verdict.

Ron Sapp, the Vice President of Operations for NCS, also testified at trial. During his testimony, Plaintiff's Counsel pointed out several inconsistencies in the rental application. (Ex. 2, Tr. Trans. 6/18/24 Pg. 38:25–42:6.) He even agreed that these inconsistencies were red flags. (*Id.*) Mr. Sapp admitted that NCS's policy was that if they cannot verify the information as true, then they were required to delete it. (*Id.* at 74:19-21.) At best, NCS could not verify the information to be true, so by failing to delete the account, NCS violated its own policies.

NCS's trial presentation proposed that it conducted a reasonable investigation "with the information provided to us at the time our investigation as conducted, and there

were a number of suspicious items that were provided by the Wards that didn't add up. Our only conclusion is that the debt was verifiable." (*Id.* at 51:11–18.) The jury disagreed, however, as that conclusion is completely contrary to the evidence. The sheer number of inaccuracies and suspect information included on the application and the information provided to NCS shows that Plaintiff was not the individual who applied for and lived in the property in question. NCS even went so far as to assert that the rental of this property using Plaintiff's name was a conspiracy, in which he was at least complicit. (*Id.* at 52:23–53:4.) None of this resonated with jurors.

As for the investigation, nothing about it was reasonable. NCS was so dead set on calling this a conspiracy that common sense flew out the window as its employees were reviewing the evidence presented by Plaintiff. Mr. Sapp's testimony demonstrates NCS's willingness to look away from reason in order to call this a conspiracy, but that was his opinion just at trial, as nothing NCS presented suggests its belief in a conspiracy at the time it was investigating Mr. Ward's disputes. (*See generally id.* at 59.) On the other hand, other evidence firmly supports the jury's rejection of the conspiracy theory. The doctored paystubs were from Neiman Marcus, where Plaintiff's daughter, Ms. Green, worked. Plaintiff obviously did not, and he maintained that throughout the dispute process. NCS, on the other hand, specifically refused to verify employment of Plaintiff, which would have cleared up the issue of the fraudulent paystubs. (*Id.* at 82:8–23.) The jury was also instructed that NCS could have contacted third parties when investigating Plaintiff's disputes. (ECF 128 at 23 (Instruction No. 18).) Likewise, Plaintiff submitted an FTC Identity Theft Report to NCS, which he made under penalty of perjury, and that NCS totally discounted despite having nothing made under oath from the original creditor

verifying the debt as belonging to Plaintiff.

Viewing this evidence, and the mountain of other evidence discussed above, in the light most favorable to the Plaintiff, it is clear that he proved his FCRA claim by a preponderance of the evidence, and that Defendant NCS furnished inaccurate information due to its unreasonable investigation. The case law is clear that a jury's verdict should not be overturned unless it is completely without support in the record. *Belfor USA Grp.,* 159 P.3d 672 (Colo. App. 2006). Here there is substantial evidence to support Plaintiff's claim, therefore the jury's verdict should not be disturbed.

### III.    The Jury rightly found that Plaintiff did not fail to mitigate his damages.

In closing, NCS presented the argument to the jury that Plaintiff failed to mitigate his damages. The jury rejected this argument and found that Plaintiff did not fail to mitigate. (ECF 130 at 3 (Question No. 5).) Through its challenge to the jury's award, NCS has failed to show that the evidence supporting Plaintiff's damages is insufficient to support the verdict. Furthermore, there is nothing to suggest that the jurors who gave countless hours of their time and attention were even remotely biased. Nor is there anything to suggest that these people, who have real world experiences, were unfairly swayed by counsel's statements or any other consideration. There were certainly no such objections by NCS. The evidence shows that Plaintiff mitigated his damages by immediately beginning to investigate the fraudulent account that was reported on his credit as soon as he became aware of it, and by disputing it with directly with NCS and the credit bureaus multiple times.  Plaintiff also mitigated his damages by seeking out lenders who only obtained credit reports from Experian (after Experian deleted it), so that he would not get denied credit or get a higher interest rate.  (Ex. A, Tr. Trans. 6/20/24 Pg.

17:5–25; 20:1–23.) "Whether a party mitigated his damages and, 'if not, how much his damage was enhanced by his failure to do so are questions of fact to be determined by a jury . . . .'" *CMI Roadbuilding, Inc. v. SpecSys Inc.*, No. CIV-18-1245-G, 2024 U.S. Dist. LEXIS 15122, 15 (Jan. 29, 2024) (internal citations omitted). Again, "[t]he jury is presumed to have understood and followed the Court's instructions" on mitigation. *Id.* Because failure to mitigate is a question of fact for the jury, as the prevailing party, all reasonable inferences are afforded to Plaintiff. NCS's best argument seems to be that, allegedly, Credit Karma emailed Plaintiff that his score was not affected, but Plaintiff testified that he did not see those emails. (Ex. A, Tr. Trans. 6/20/24 Pg. 82:24–25; 83:1–8.) The jury may do with that testimony and evidence as it pleases, and it found it to favor Plaintiff rather than NCS. Courts may not "'re-examin[e]' any 'fact tried by a jury.'" *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 25 (2021) (quoting U. S. Const., Amdt. 7). As the prevailing party, Plaintiff is entitled to the reasonable inference that the jury believed his testimony, and such questions of fact are to be left undisturbed once a jury reaches that decision. *Id.*

## IV.    The non-economic damages award of $500,000 is appropriate based on the evidence.

As an initial matter, NCS's argument that the evidence was insufficient to support the jury's verdict of non-economic damages was not preserved. "To preserve a sufficiency of the evidence claim for appellate review, a party must move for judgment as a matter of law (directed verdict) under [Rule] 50(a) at the close of the evidence." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228 (10th Cir. 2000). Defendant did not move for a directed verdict on the grounds that the evidence was insufficient on actual damages to go to the jury.  Ex. 3, Trl. Trans. 6/20/24 (Directed Verdict) 2:3- 6:11.

The Tenth Circuit has warned "[a] party may not circumvent Rule 50(a) by raising for the first time in a post-trial motion issues not raised in an earlier motion for directed verdict." *Id.* at 1228.  But NCS attempts to do exactly that, which must be rejected.

Even assuming the Court could consider NCS's unpreserved argument, the evidence of non-economic damages is more than sufficient to support the jury's award to Plaintiff. (*See, e.g.*, Ex. 2, Tr. Trans. 6/18/24 Pg. 15:24–25; 16:1–25; 17:1–6; *see also* Ex A, Tr. Trans. 6/20/24 Pg. 13:14–21, 14:22–25; 15:1–25; 16:1–16.) The jury heard evidence that Plaintiff lost countless hours of sleep, had medical issues, and was emotionally distressed over this situation, among a host of other difficulties NCS's actions caused. Nothing at trial undercut this testimony. Additionally, Mrs. Ward testified that they were not able to move forward with the refinancing on their shared home. She even went so far as to state there had been a loss of consortium between herself and Plaintiff due to the stress he was under. Plaintiff further recounted an instance where his NCS-induced inattentiveness at work caused him to ship more than $60,000 in product to the wrong customer. NCS made these arguments at trial, and once again, the jury rejected them and properly found that Plaintiff had non-economic damages and valued those damages at $500,000. It is improper for the Parties or the Court to guess what the jury's intentions were during deliberations. All that matters is that there is some evidence to support the jury's award, because the Court's duty now is to view that evidence in favor of preserving the award. *Stroup*, 26 F.4th at 1157.

NCS submitted to this Court an affidavit of Defense Counsel retelling a conversation he had with the jurors after the verdict was read. Not only is this "evidence" hearsay, but it is also wholly improper pursuant to Federal Rule of Evidence 606(b). Rule

801 provides that any out of court statement offered for the truth of the matter asserted is hearsay and shall not be admitted unless an exception is met. FED. R. EVID. 801. In this case, there is no exception that would fit this situation, and NCS offers none. (ECF 137 at 43–44.)

Even if the Court finds that there is a hearsay exception that fits, Rule 606 still requires exclusion of this evidence. Specifically, the Rule provides that "a juror may not testify about any statement made or incident that occurred during the jury's deliberations . . . ." FED. R. EVID. 606(b)(1). The Tenth Circuit has long recognized the near-complete prohibition on the tactic NCS takes with its *ex parte* communications with jurors: "a juror's statements about 'the effect of anything on that juror's or another juror's vote' or 'any juror's mental processes concerning the verdict' may not be used to challenge the validity of a verdict." *Housley v. Spirit Aerosystems, Inc.*, 628 F. App'x 571, 578 (10th Cir. 2015). That is because trials would be rendered essentially obsolete if post-verdict discussions with jurors were available to unwind the jury's hard work. *See United States v. Benally*, 546 F.3d 1230, 1233 (10th Cir. 2008) ("Jury decision-making is designed to be a black box: the inputs (evidence and argument) are carefully regulated by law and the output (the verdict) is publicly announced, but the inner workings and deliberation of the jury are deliberately insulated from subsequent review."). The problem is particularly salient here, as Counsel's Declaration does not state what he said to jurors to prompt the responses NCS claims are so meaningful.

Simply because Defense Counsel characterizes the statements made by the jurors in a certain way, that does not mean that those statements fall into the exceptions contemplated by Rule 606. Moreover, Counsel's affidavit is insufficient as any testimony

allowed under Rule 606 would need to be provided by the specific jurors, not through Defense Counsel recounting hearsay discussions. Any evidence of what a juror said about deliberations is improper, and not appropriately considered by this Court. A juror "may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention," but a juror "may not testify as to . . . the effect of anything . . . concerning the juror's mental processes in connection therewith." *United States v. Davis* 60 F.3d 1479, 1483 (10th Cir. 1995). NCS's arguments focus on the impermissible latter option, not the former. The Court should therefore decline to consider them.

## V.    The court did not abuse its discretion by prohibiting testimony and exhibits in support of (1) Defendant's attempts to obtain the testimony of Plaintiff's daughter; and (2) online "how to" videos to remove items from credit reports.

A court's ruling on admitting or denying evidence is reviewed for abuse of discretion. *United States v. Archuleta*, 737 F.3d 1287, 1292 (10th Cir. 2013). "Our abuse of discretion review affords the district court considerable discretion in performing the Rule 403 balancing test because district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues." *Id.* (quotations omitted).

Whether NCS attempted to procure Plaintiff's daughter for a deposition is irrelevant to the question of whether NCS reasonably investigated his disputes. It is at least arguable from the evidence and testimony that Plaintiff's daughter rented the property in question, but did it using Plaintiff's information without his permission. The fact that Ms. Green did not cooperate with the discovery process in this case is irrelevant – it does not make a fact of consequence more or less probable. FED. R. EVID. 401. Even if it was relevant, the evidence was properly excluded on Rule 403 grounds – it would only serve to confuse the jury on an issue that NCS already made confusing enough. FED. R. EVID. 403. Whether Plaintiff's daughter cooperated in a Texas proceeding to which Plaintiff was

not a party does not advance NCS's conspiracy theory at all, and would simply confound the jury and waste everyone's time. FED. R. EVID. 403 (allowing courts to exclude evidence that is a waste of time).[5] Plaintiff's argument that NCS did not file a police report against Plaintiff's daughter was a fair argument because NCS argued that Plaintiff should have filed a police report regarding identity theft, and Plaintiff's counterargument was that if NCS was itself a victim of fraud as they claim, they could have also filed a police report.

Finally, NCS's attempt to tie error to the Court's refusal to admit a TikTok video should be rejected. In the middle of trial on a break, NCS randomly announced its intention to play a TikTok video to the jury (which was never disclosed pursuant to Rule 26(a)(1), nor was it on the exhibit list). Ostensibly, the video was a random stranger telling people to submit fake disputes to the credit bureaus. The Court ruled that the video could not be properly authenticated by the suggested witness pursuant to Federal Rule of Evidence 901 and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under Federal Rule of Evidence 403.[6] There was no evidence to suggest that Plaintiff had seen the TikTok video, or that Plaintiff had submitted a "fake dispute" as the video supposedly instructed. And, as the Court pointed out, NCS had no ability to authenticate the video. Therefore, the TikTok video would only be confusing and prejudicial, assuming there was some way to authenticate it, because at no time did Plaintiff indicate that he had learned how to submit a credit-reporting dispute

---

[5] As the Court will recall, Defendant had only 17 minutes of trial time remaining to do their closing argument. Had they introduced evidence of the Texas proceeding they filed against Plaintiff's daughter, they likely would not have enough time to do a closing argument.

[6] An independent ground to refuse the video is Rule 37(c) and the Court's Pre-Trial order that all exhibits had to be on the exhibit list and exchanged well before trial. The TikTok video was not.

from TikTok.

## VI.    Remittitur is Not Appropriate Here.

Remittitur is a "highly deferential standard, [with courts] reversing only if we can discern a 'manifest abuse of discretion.'" *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009) (internal citations omitted). "[A] jury's award is inviolate unless we find it 'so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial.'" *Id.* Damages awards are particularly protected from scrutiny or disturbance, with the Tenth Circuit noting: "[T]he amount of damages to be awarded is a matter within the sole province of the jury." *Loughridge*, 431 F.3d at 1268. Like a motion for a new trial, evidence is viewed in the light most favorable to the prevailing party. *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 668 (10th Cir. 2016). "The amount of damages awarded by a jury can be supported by any competent evidence tending to sustain it." *Prager v. Campbell County Mem. Hosp.*, 731 F.3d 1046, 1063 (10th Cir. 2013) (internal citations omitted).

It is well established that an FCRA plaintiff's testimony *alone* regarding their emotional distress is sufficient proof for the jury. *Llewellyn, supra* at 1183. Because there is sufficient evidence to support the $500,000 award, remittitur is not appropriate in this case. Throughout the trial the jury heard testimony from Plaintiff and his wife about how having this fraudulent account on his credit affected Plaintiff. Mrs. Ward indicated that he was losing hours and hours of sleep, tossing and turning each night, seemed overall hopeless, and was struggling at work due to the stress of it all. Plaintiff testified about the effects he felt going through this process due to the fraudulent account. How he felt

31

frustrated that a company could make such a huge mistake. Mrs. Ward was deeply involved in the process of disputing the fraudulent account, so Plaintiff also had to witness the toll that it took on his wife. NCS put on no evidence to counter this, and spent its time on cross-examination discussing topics other than Plaintiff's damages.

The jury also heard that Plaintiff and Mrs. Ward had been working on their credit together for years, and this incident took the wind right out of his sails. It is logical, and the jury apparently agreed, that just because someone has a credit monitoring service such as Credit Karma that they do not obsessively check their credit or read the emails from that service regularly. Life is busy. But that does not mean that Plaintiff was not concerned about his credit and what was going to happen with this account that was not his.

Defendant asserts that because Plaintiff did not have to take any medications and did not have to be medicated to sleep that he did not suffer emotional damages.  But loss of sleep and emotional distress have long been considered to be a type of "actual damages" under the FCRA.  *Cook v Mountain Am. Fed. Credit Union*, 2019 WL 4081142 *10 (D. Ariz. Aug 29, 2019); *Williams v. First Advantage LNS Screening Sols., Inc.*, 238 F. Supp. 3d 1333 (N.D. Fla. 2017) (confirming jury verdict of $250,000 for lost wages, emotional distress, and reputational damages—as well as $3.3 million in punitive damages), *on appeal* 947 F.3d 735 (11th Cir. 2020) (verdict upheld as to compensatory damages, with punitive damage award reduced to $1 million). There is no requirement that an FCRA Plaintiff seek medical attention or pop pills, as NCS argues, to support an award of damages for emotional distress.

NCS further claims that Plaintiff's testimony regarding his emotional damages was

"wholly conclusory." To the contrary, Mr. Ward described his damages with specificity, and was brought to tears in open court. Not to mention that Mrs. Ward corroborated all of Plaintiff's testimony about the struggles he was facing as a result of this incident. NCS countered none of this, with cross-examination questions or evidence of its own. The Supreme Court of the United States uses the term "distress" to "include mental suffering or emotional anguish." *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978). The Court goes on to add that although this evidence is "subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others." *Id.* It is unreasonable to expect an individual to keep specific track of days that they did not sleep well or specific dates that they broke down in tears over the stress of the situation. If the jury finds this lack of documentation meaningful, it may consider that in rendering its award. With NCS offering nothing in rebuttal, the Wards' testimony easily met the standards on emotional distress set forth in *Llewellyn, supra at* 1183. Plaintiff and his wife clearly explained that the hopelessness, issues at work, and changes to their sex life were not normal for Plaintiff and were caused by NCS's refusal to call the account fraudulent and have it removed from Plaintiff's credit report.

The evidence Plaintiff presented surrounding his emotional distress is more than sufficient to support the jury's verdict. It is not so excessive that it shocks the conscience. In fact, the verdict is in line with other cases that Plaintiff's Counsel have recently tried, including:

- May 2023 – *Peters v American Pacific Mortgage*: $800,000 emotional distress under FCRA, Ex. 4

- Nov 2023 – *McCurdy v Copart, Inc.*: $2,100,000 under Colorado Consumer Protection Act for selling fifth wheeler with frame damage without disclosure (including $613,760 in emotional distress), Ex. 5, p.15.

- Dec 2023 – *Farrington v. Freedom Mortgage*: $3,522,000 under RESPA and New Jersey Consumer Fraud Act (including $500,000 in emotional distress), Ex. 6.

- July 2024 – *Duncan v. Experian*: $1,100,000 FCRA JAMS arbitration award (awarding $400,000 emotional distress), Ex. 8.

This year, other plaintiff's lawyers have achieved similar, or even better, results:

- June 2024 – *Hustedt-Mai v. Hunter Warfield*: $1,975,000 FCRA verdict (including $200,000 emotional distress), Ex. 7.

- Aug 2024 – *Lee v. CitiGroup*: $2,200,000 EFTA JAMS arbitration award (awarding $623,000 emotional distress), Ex. 9.

Because this verdict is an average verdict in line with what other juries and arbitrators are awarding in such cases in Colorado and the U.S., the verdict does not create an irresistible inference that passion, prejudice, or another improper cause invaded the trial. Plaintiff greatly suffered at the hands of NCS's botched "investigations" by failing to remove this fraudulent account from his credit report. He and his wife testified unequivocally about his emotional distress in court, without any genuine opposition by NCS.

In support of these arguments, NCS cites the conversation that Defense Counsel had with the jurors after the trial had concluded as a large reason that the Court should order remittitur. Following this discussion, a case that began as a supposed conspiracy between Plaintiff and his daughter has now devolved, in NCS's eyes, as a conspiracy among Plaintiff and jurors. However, as set forth above, the Court should not even consider that conversation as it (1) is hearsay; and (2) impermissibly delves into the deliberation and thought processes that the jurors had when deciding their verdict. Considering such evidence is explicitly barred by Rule 606(b); *Cole v. Salt Creek, Inc.*, No. 2:08-cv-928-DN, 2014 U.S. Dist. LEXIS 60819, *19 (D. Utah Apr. 28, 2014) (refusing

to consider affidavit from juror that they had considered stricken evidence during deliberations); *United States v. Benally*, 546 F.3d 1230, 1238 (10th Cir. 2008) (finding an abuse of discretion for district court to receive affidavit from juror about deliberative process). As the Tenth Circuit has pointed out,

> If what went on in the jury room were judicially reviewable for reasonableness or fairness, trials would no longer truly be by jury, as the Constitution commands. Final authority would be exercised by whomever is empowered to decide whether the jury's decision was reasonable enough, or based on proper considerations. Judicial review of internal jury deliberations would have the result that "every jury verdict would either become the court's verdict or would be permitted to stand only by the court's leave."

*Id,* at 1233 (citing *Carson v. Polley*, 689 F.2d 562, 581 (5th Cir. 1982)).

Here, Defendant takes it a step further, but no better. Instead of introducing affidavits from the jurors themselves, NCS presents the affidavit of its counsel Mr. Bowdich, which is hearsay. Further, because Plaintiff's Counsel were not present for this conversation, the statements cannot be verified, nor it is clear from the record what questions Mr. Bowdich asked the jurors to allegedly obtain this information. And more importantly, what questions Mr. Bowdich did not ask. For example, did Mr. Bowdich inform the jurors that NCS was trying to get the verdict thrown out so that it could pay $0? Did he tell the jurors that NCS was seeking a setoff from the credit bureaus to reduce the total amount NCS would have to pay? Did Mr. Bowdich tell the jurors that NCS was planning to tie this case up on appeal for years, and not pay the verdict until those appeals were exhausted? Did he tell jurors that NCS could potentially use their comments to seek a new trial, hoping to have all their time and hard work wasted? It is impossible to know how this information would have affected the juror's response to Mr. Bowdich's questions, but they likely could have affected them, not to mention, Mr. Bowdich does not allege that the entire panel told him

this, instead, he relies on one juror, which does not represent the perspective of the entire panel. Even still, such comments are not sufficient to support the requested remittitur, Plaintiff respectfully requests that this Court deny Defendant's motion for remittitur.

NCS's proposed solution to the supposed overly large award also makes little sense in light of the applicable standards. Despite the jury's conclusion and the bevy of caselaw that prohibits disturbing it, NCS believes that Plaintiff should receive 10% ($50,000) or a new trial. (ECF 137 at 48.) So while NCS complains that the jury "made up" the $500,000 amount it awarded to Plaintiff, NCS makes up the number that is its proposed solution. It does not tie that to anything rational, let alone evidence, so siding with NCS here merely substitutes its judgment for that of the jury. Since courts within the Tenth Circuit have held that when considering a remittitur the Court "may not substitute its judgment for that of the jury," substituting the defendant's judgment for the jury's is even less appropriate. *Garcia v. Tyson Foods, Inc.*, 890 F. Supp. 2d 1273, 1291 (D. Kan. 2012), *aff'd*, 770 F.3d 1300 (10th Cir. 2014) (citing *Goico v. Boeing Co.*, 358 F. Supp. 2d 1028, 1030 (D. Kan. 2005)). The Court should therefore decline to order a remittitur of the jury's award.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court deny Defendant's Motion for Judgment Notwithstanding the Verdict, Motion for a New Trial and Remittitur.

Dated: Sept. 13, 2024                                    Respectfully submitted,

                                        /s/ Matthew Osborne
                                        Matthew Osborne
                                        10190 Bannock Street
                                        Suite 200
                                        Northglenn, CO 80260
                                        (720) 623-0098
                                        mosborne@ramoslaw.com


                                        Leonard A. Bennett (*pro hac vice*)
                                        Craig C. Marchiando (*pro hac vice*)
                                        **CONSUMER LITIGATION ASSOCIATES, P.C.**
                                        763 J. Clyde Morris Blvd., Suite 1-A
                                        Newport News, VA 23601
                                        (757) 930-3660
                                        (757) 930-3662 fax
                                        len@clalegal.com
                                        craig@clalegal.com

                                        *Attorneys for Plaintiff*


### CERTIFICATE OF SERVICE

I certify that on 09/13/2024, I served a true and correct copy of the foregoing Opposition via CM/ECF to:

John W. Bowdich and Katrina M. DeMarte
*Attorneys for Defendant National Credit Systems,*
        *Inc.*


                                                        s/ Mike Nobel