**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-02597-NYW-JPO

ROBBIN WARD,

     Plaintiff,

v.

NATIONAL CREDIT SYSTEMS, INC.,

     Defendant.

---

## ORDER ON POST-TRIAL MOTIONS

---

This matter is before the Court on Defendant's Motion for Judgment Notwithstanding the Verdict and Alternatively, Motion for New Trial, or in the Alternative, Motion for Remittitur (the "Motion for JNOV," "Motion for New Trial," or "Motion for Remittitur"), [Doc. 137], and Defendant's Motion to Apply One-Satisfaction Rule, [Doc. 138]. For the reasons set forth in this Order, the Motion for JNOV is **DENIED**; the Motion for New Trial is **DENIED**; the Motion for Remittitur is **DENIED**; and the Motion to Apply One-Satisfaction Rule is **DENIED**.

## BACKGROUND

This Court and Judge Babcock have previously set out the factual and procedural history of this case, *see* [Doc. 76; Doc. 112], and the Court repeats it here only briefly. On September 24, 2021, Plaintiff Robbin Ward ("Plaintiff" or "Mr. Ward") initiated this lawsuit against Defendant National Credit Systems, Inc. ("Defendant" or "NCS"), as well

as three credit reporting agencies ("CRAs").[1]  [Doc. 1].  Plaintiff alleged, inter alia, that NCS failed to conduct a reasonable investigation into a disputed debt arising out of a real property lease with Main Street Renewal, LLC ("MSR" or "Main Street").  *See* [*id.* at ¶¶ 109–14]; *see also* [Doc. 107 at 7–8].  During the pendency of this case, information was discovered that tied Plaintiff's daughter to the MSR rental application.  *See* [Doc. 76 at 2–3].  Plaintiff denied completing the rental application and denied giving his daughter permission to fill out the application using his information.  [*Id.*].

After discovery, NCS moved for partial summary judgment, arguing (among other things) that Mr. Ward's claim of identity theft raised a legal dispute about the accuracy of the information NCS provided, not a factual dispute, and the legal dispute could not be resolved in the context of an FCRA claim.  [Doc. 55 at 12–21].  Judge Babcock denied this portion of NCS's motion, concluding that:

> Questions including as to whether NCS should have reviewed the documents in its possession sooner or at all (or rather than passing them on to MSR), whether NCS was reasonable in insisting on a police report, whether NCS should have sought additional documents from the Original Creditor (such as the online Lease application, which contained the tenant's IP address) and, in general, whether NCS conducted a reasonable investigation are questions for the jury.

[Doc. 76 at 26].  Judge Babcock also rejected NCS's argument that Mr. Ward's claim presented a legal dispute as to his liability on the lease, instead concluding that Plaintiff's "claim is that he reported being the victim of identity fraud and his dispute was not reasonably investigated at that time."  [*Id.* at 27].

After Judge Babcock's summary judgment ruling, the case was reassigned to the

---

[1] Plaintiff dismissed his claims against the CRAs in May 2022.  *See* [Doc. 39; Doc. 42; Doc. 44].

undersigned judicial officer. [Doc. 83]. At the motion in limine stage, Defendant attempted to reargue that the identity theft issue presented a legal dispute, not a factual one, but this Court precluded Defendant from re-raising this issue based on law-of-the-case principles. *See* [Doc. 112 at 8–11].

The case proceeded to trial on June 17, 2024. [Doc. 118]. At the close of evidence, the Court instructed the jury on Plaintiff's FCRA claim as follows:

> For Plaintiff to recover from Defendant for a negligent violation of the FCRA, you must find that Plaintiff has established the following elements, by a preponderance of the evidence.
>
> 1.  That the information furnished by Defendant for the Main Street Renewal Account was inaccurate, incomplete, or misleading.
>
> 2.  That Defendant's investigation of Plaintiff's dispute was unreasonable.
>
> 3.  That Defendant's failure to conduct a reasonable investigation caused Plaintiff emotional distress damages.
>
> If you find that any of the elements has not been proven, then your verdict must be for Defendant. On the other hand, if you find that all of the elements have been proven, then your verdict must be for Plaintiff.

[Doc. 128 at 19]. On June 21, 2024, the jury returned a verdict in favor of Plaintiff on his claim—and on Defendant's affirmative defense of failure to mitigate damages—and awarded Plaintiff $500,000 in emotional distress damages. [Doc. 130]. The Court entered final judgment on June 25, 2024. [Doc. 131].

NCS subsequently filed the instant post-trial Motions, moving for (1) judgment notwithstanding the verdict (or "JNOV"); (2) a new trial; (3) remittitur; and (4) a reduction of the jury award under the "one-satisfaction rule." *See* [Doc. 137; Doc. 138]. Plaintiff filed an omnibus response in opposition to Defendant's requests. [Doc. 146]. Defendant filed a reply in support of its requests for JNOV, a new trial, and remittitur, [Doc. 150], but

did not file a reply in support of its request to apply the one-satisfaction rule. The Court addresses Defendant's various requests below.

**MOTION FOR JNOV**

### I.    Legal Standard

"A motion denominated as a motion for directed verdict or for judgment notwithstanding the verdict should be treated as a motion for judgment as a matter of law." *Craft v. Yellow Freight Sys., Inc.*, No. 97-1029, 1998 WL 72783, at *8 (10th Cir. Feb. 23, 1998). "No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b). "Judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *United States ex rel. MMS Constr. & Paving, L.L.C. v. W. Sur. Co.*, 754 F.3d 1194, 1199 (10th Cir. 2014) (quotation omitted). Stated differently, "[j]udgment as a matter of law must be denied if there is any legally sufficient evidentiary basis for a claim." *Sheldon v. Golden Bell Retreat*, No. 19-cv-01371-REB-NYW, 2022 WL 17818297, at *1 (D. Colo. Aug. 24, 2022) (citing *Hampton v. Dillard Dep't Stores Inc.*, 247 F.3d 1091, 1099 (10th Cir. 2001)).

"Arguments presented in a Rule 50(b) motion cannot be considered if not initially asserted in a Rule 50(a) motion." *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017). In ruling on a motion for JNOV, all "evidence and inferences . . . must be construed in the light most favorable to the party against whom the motion is directed," *Symons v. Mueller Co.*, 493 F.2d 972, 976 (10th Cir. 1974), and the Court may not "weigh

evidence, judge witness credibility, or challenge the factual conclusions of the jury," *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000). "[J]udgment notwithstanding the verdict should be cautiously and sparingly granted." *EEOC v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1171 (10th Cir. 1985).

## II.    Analysis

### A.    Whether Mr. Ward's FCRA Claim Presented a Legal or Factual Dispute

NCS's first argument is a reiteration of an argument it has made several times in this case:  it contends that the underlying credit dispute presented a legal question about whether the debt was valid that NCS was not required to resolve in its investigation.  [Doc. 137 at 13–16].  Judge Babcock rejected this argument at summary judgment, *see* [Doc. 76 at 27], and, pursuant to the "law of the case" doctrine, this Court has repeatedly precluded NCS from relitigating this issue, *see, e.g.*, [Doc. 112 at 9–11; Doc. 144 at 7:9–10:13].  Defendant nevertheless contends that this Court should now reverse course and rule in its favor after trial and after entry of judgment.  [Doc. 137 at 6–8, 13–17].[2]

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *Arizona v. California*, 460 U.S. 605, 618 (1983).  While this is "a rule of practice," not a limit on the Court's power, the doctrine promotes the general belief that "a litigant given one good bite at the apple should not have a second."  *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir. 1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 900 (Fed. Cir. 1984)).

The Tenth Circuit has recognized three "exceptionally narrow" exceptions to the

---

[2] NCS never filed a motion for reconsideration of Judge Babcock's order.

law of the case doctrine: (1) "when the evidence in a subsequent trial is substantially different"; (2) "when controlling authority has subsequently made a contrary decision of the law applicable to such issues"; and (3) "when the [court's prior] decision was clearly erroneous and would work a manifest injustice." *Id.* NCS proclaims that "all three" exceptions apply in this case, [Doc. 137 at 6], but only develops an argument under the first exception, *see* [*id.* at 8, 12–13].[3] NCS contends that "[a]dditional trial evidence" requires revisiting Judge Babcock's decision, including (1) the fact that Plaintiff's driver's license presented with the lease application matched the driver's license included in an identity theft report Plaintiff filed with the Federal Trade Commission, [Doc. 152-4 at 2–9; Doc. 152-14]; (2) a Texas state court judgment against Plaintiff for rent charges owed under the MSR lease, [Doc. 152-23]; (3) trial testimony from MSR representatives discussing the subject debt; and (4) testimony from Plaintiff at trial discussing his daughter's identity theft. *See generally* [Doc. 137 at 12–13]. In particular, NCS contends that the Texas judgment "conclusively establishes that a legal dispute exists between Plaintiff and MSR" and asserts that NCS was not required to resolve that dispute. [*Id.* at 15–16].

The Court rejected this argument in ruling on Defendant's Rule 50(a) motion, *see* [Doc. 144 at 9:11–10:5],[4] and makes the same ruling here. First, this limited exception

---

[3] NCS cursorily argues that "additional evidence, along with the failure to apply controlling precedent[,] requires that the Court overturn Judge Babcock's ruling to prevent manifest injustice." [Doc. 137 at 8]. The mere use of the phrases "controlling precedent" or "manifest injustice," without any accompanying substantive argument, is insufficient to present an issue to the Court.

[4] When citing to transcripts filed on the docket, the Court cites to the docket number assigned by the CM/ECF system and to the page and line numbers appearing on the transcript. In addition, because the Parties did not order a complete trial transcript, in some instances, the Court cites to an internal draft version of the trial transcript.

does not apply if Defendant had the additional evidence in its possession at the time it filed its motion for partial summary judgment. *See Wessel v. City of Albuquerque*, 463 F.3d 1138, 1143–44 (10th Cir. 2006). Defendant does not address this requirement in its Motion. *See generally* [Doc. 137]. The Court notes that Defendant filed evidence *referencing* the Texas judgment in support of its summary judgment motion, *see* [Doc. 55-20]; *see also* [Doc. 55-1 at ¶ 38 (Defendant referencing the Texas judgment in its statement of undisputed facts)], and Plaintiff's driver's license, including the copy provided with the FTC identity theft report, was also included in the summary judgment record, *see* [Doc. 55-5 at 2; Doc. 62-11 at 15]. The Court is thus not convinced that this evidence was not available to Defendant when it filed its summary judgment motion. Moreover, the Court is not persuaded that the additional evidence cited by Defendant is substantially different from the evidence presented at summary judgment or that the evidence conclusively renders the dispute legal, as opposed to factual. The additional evidence cited by Defendant provides *factual* context for the underlying dispute, but even with that additional evidence, the underlying dispute is the same: whether Plaintiff was the victim of identity theft and whether NCS reasonably investigated the credit dispute. For these reasons, the Court finds no basis to grant the requested relief.

**B.    Whether the Dispute was "Objectively and Readily Verifiable"**

Next, NCS argues that Plaintiff's FCRA claim was not actionable because the information in dispute was not "objectively and readily verifiable." [Doc. 137 at 18]. Relevant to this argument, the Second and Eleventh Circuits have recently rejected the legal/factual determination advanced by NCS throughout this case, holding that "there is no bright-line rule providing . . . that only purely factual . . . errors are actionable under

the FCRA," and thus "there is no threshold inquiry under the FCRA as to whether any purportedly inaccurate information is legal or factual in nature." *Sessa v. Trans Union, LLC*, 74 F.4th 38, 43 (2d Cir. 2023). "Rather, in determining whether a claimed inaccuracy is potentially actionable under section 1681e(b), a court must determine, inter alia, whether the information in dispute is 'objectively and readily verifiable.'" *Id.* (emphasis omitted) (quoting *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 269 (2d Cir. 2023)); *see also Holden v. Holiday Inn Club Vacations Inc.*, 98 F.4th 1359, 1363 (11th Cir. 2024) ("Whether the alleged inaccuracy is factual or legal is beside the point. Instead, what matters is whether the alleged inaccuracy was objectively and readily verifiable.").

As a preliminary matter, the Court questions the propriety of Defendant formally raising this issue and requesting relief for the first time in a Rule 50(a) motion at the close of Plaintiff's evidence. *See* [Doc. 143 at 2:10–19, 3:14–21, 4:10–12]. To be sure, Defendant referenced the issue in its Proposed Final Jury Instructions, *see* [Doc. 98 at 27 ("While included as an instruction, Defendant advocates that this is an issue to be determined by the Court to determine whether Plaintiff's claim is actionable.")], and "preview[ed]" it at the May 23, 2024 Final Pretrial/Trial Preparation Conference ("TPC"), *see* [TPC Tr. at 55:23–56:11 ("I would love to preview one thing right now. . . . I did want to make clear to the Court that I believe that those are legal issues that the Court has to decide, it is just one way for me to get these issues in front of the Court."); *id.* at 56:12–57:24 (Defendant citing *Sessa* and *Holden*)]. The Court acknowledges that neither *Sessa* nor *Holden* had been decided at the time Defendant moved for partial summary judgment on November 15, 2022, [Doc. 55], but to the extent Defendant believed that recent legal precedent established a new rule that the Court was required to follow—particularly one

that, in Defendant's view, would bar Plaintiff's claim outright—it was incumbent on Defendant to file a formal motion (such as a motion for reconsideration or a motion for leave to file a second summary judgment motion) putting the legal question squarely before the Court.  *See* NYW Civ. Practice Standard 7.1A(a)(5) ("All requests for the Court to take distinct actions must be contained in separate, written motions.").  Instead, Defendant waited until the close of Plaintiff's evidence to formally raise this issue in a truncated, oral motion to the Court.

Regardless, the Court finds no reason to grant relief here.  The Court is not bound by decisions from the Second or Eleventh Circuits, *see Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253, 1257 (10th Cir. 1996), and Defendant directs the Court to no binding authority applying this "new prevailing test," [Doc. 137 at 18]. Moreover, the Court is respectfully unpersuaded by the substance of Defendant's argument.  Defendant contends that the disputed information was not "objectively and readily verifiable" because there is "conflicting and suspicious evidence" about the validity of the MSR debt.  [Doc. 137 at 19].  The Court respectfully disagrees that the existence of disputed facts necessarily means that the subject debt is not objectively and readily identifiable, finding the decision of *Paulino v. Western Funding II Inc.*, 737 F. Supp. 3d 1338 (S.D. Fla. 2024), persuasive.

In *Paulino*, like here, the plaintiff alleged that he was the victim of identity theft and sought relief from his loan furnisher and several credit reporting agencies who allegedly failed to investigate an auto loan that the plaintiff claimed was fraudulent.  *Id.* at 1342. The agencies moved for judgment on the pleadings, arguing that the question of whether the plaintiff applied for the loan was "an unresolved contractual dispute between" the

plaintiff and the loan furnisher and the claimed inaccuracy was not "objectively and readily verifiable." *Id.* at 1346. The court disagreed, holding that "the question of whether [the p]laintiff executed the Disputed Loan [was] objectively and readily verifiable" because whether the plaintiff executed the loan—i.e., whether the plaintiff filled out the loan application or someone else did without his permission—was "a factual question that [would] be answered in the affirmative or negative." *Id.* Because the dispute centered on whether the plaintiff did or did not fill out the loan application—which was a "matter of objectively verifiable fact"—the court denied judgment on the pleadings. *Id.* at 1347.

Despite the different procedural posture of the case, *Paulino* is instructive here. Whether Mr. Ward filled out the lease application or not—or whether his daughter filled out the lease application with his permission—are objectively verifiable facts. Indeed, these facts were implicitly decided by the jury when it returned a verdict in Mr. Ward's favor. Defendant has directed the Court to no case holding that the existence of unclear or uncertain facts relieves a furnisher's obligation to reasonably investigate a dispute. Accordingly, the Court will not grant JNOV on this basis.

### C.    *Rooker-Feldman*

Finally, NCS argues that Plaintiff's FRCA claim is "an impermissible collateral attack" on the Texas judgment and that, as a result, this Court lacks jurisdiction over Plaintiff's claim pursuant to the *Rooker-Feldman* doctrine. [Doc. 137 at 20]. Although this argument was not raised in Defendant's Rule 50(a) motion, *see* [Doc. 143], a party may raise jurisdictional arguments at any time, "even after trial and the entry of judgment," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

"The *Rooker-Feldman* doctrine prevents lower federal courts from exercising

jurisdiction 'over cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Bruce v. City & Cnty. of Denver*, 57 F.4th 738, 746 (10th Cir. 2023) (footnote omitted) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The *Rooker-Feldman* doctrine acts as a jurisdictional bar over federal claims when "(1) the plaintiff lost in state court, (2) the state court judgment caused the plaintiff's injuries, (3) the state court rendered judgment before the plaintiff filed the federal claim, and (4) the plaintiff is asking the district court to review and reject the state court judgment." *Id.*

The *Rooker-Feldman* jurisdictional bar is narrow. *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 515 (10th Cir. 2023). It applies only if the federal plaintiff's claim "seek[s] to modify or set aside a state court judgment." *Id.* Indeed, "*Rooker-Feldman* does not bar a federal court claim merely because it seeks relief inconsistent with a state court judgment." *Id.* "A federal court is free to 'den[y] a legal conclusion that a state court has reached,' provided it does not exercise *de facto* appellate jurisdiction by entertaining a suit that would disrupt the final judgment entered by the state court." *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1238 (10th Cir. 2006) (alteration in original) (quoting *GASH Assocs. v. Vill. of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)). Moreover, *Rooker-Feldman* applies only when the plaintiff alleges an injury that was "caused by" the state court judgment. *Id.* at 1237 (quotation omitted). In other words, an element of the plaintiff's federal claim "must be that the state court wrongfully entered its judgment." *Campbell v. City of Spencer*, 682 F.3d 1278, 1283 (10th Cir. 2012).

Defendant argues that *Rooker-Feldman* bars Plaintiff's FCRA claim because his

"entire FCRA case is premised on the allegation that he does not owe the debt, the same debt at issue in the Texas State Court Judgment." [Doc. 137 at 22]. It asserts that "Plaintiff could not prevail in this case without this Court, effectively, reversing the Texas State Court Judgment that he owes the debt." [*Id.*]. Defendant goes on to argue in its Reply that Plaintiff's FCRA claim is "inextricably intertwined" with the state court judgment because the jury verdict in this case "would, necessarily, require [the Court] to reject the State Court Judgment that Plaintiff is liable for the debt." [Doc. 150 at 14]. Plaintiff responds by arguing that he does not challenge the state court judgment and does not claim an injury caused by the state court judgment; rather, he challenges and alleges an injury arising out of Defendant's investigation (or lack thereof). [Doc. 146 at 19–20].

The Court agrees with Plaintiff. *Rooker-Feldman* is a narrow doctrine that applies only if the plaintiff alleges an injury *caused by* a state court judgment. *Mo's Express*, 441 F.3d at 1237; *see, e.g.*, *Campbell*, 682 F.3d at 1280 (*Rooker-Feldman* barred claims alleging that seizure of the plaintiff's horses pursuant to court order violated her constitutional rights); *McDonald v. Arapahoe Cnty.*, 755 F. App'x 786, 787–89 (10th Cir. 2018) (*Rooker-Feldman* barred claims alleging that court-ordered eviction violated the plaintiff's rights). In this case, Plaintiff sought redress for NCS's failure to reasonably investigate his disputes under the FCRA and claimed injuries caused by that conduct. *See* [Doc. 1 at ¶¶ 109–14]; *see also* [Doc. 107 at 2 ("Plaintiff alleges that Defendant negligently violated 15 U.S.C. § 1681s-2(b), including by failing to perform reasonable investigations into Plaintiff's disputes.")]. He did not allege a defect in, seek any relief from, or even mention the state court judgment throughout this litigation, and his FCRA claim is not reliant in any way on the state court judgment. *Rooker-Feldman* does not

apply to claims, like Plaintiff's, "that would be identical even had there been no state-court judgment; that is, claims that do not rest on any allegation concerning the state-court proceedings or judgment." *Bolden v. City of Topeka*, 441 F.3d 1129, 1145 (10th Cir. 2006); *see also Driskill v. Experian Info. Sols., Inc.*, No. 3:24-cv-00583-AMO, 2024 WL 3463820, at *3 (N.D. Cal. July 17, 2024) (concluding that *Rooker-Feldman* did not apply where the plaintiff sought "redress for [the credit reporting agency's] failure to reasonably investigate his disputes and correct reports of improper debts," but did not seek relief from state court decree).

Defendant's arguments to the contrary are respectfully unpersuasive. Insofar as it argues that Plaintiff's FCRA claim is "inextricably intertwined" with the state court judgment, the Tenth Circuit has backed away from this standard, instructing that the "inextricably intertwined" language is "not helpful in analyzing the applicability of *Rooker-Feldman*." *Graff*, 65 F.4th at 516 n.18 (citing *Campbell*, 683 F.3d at 1282–83); *see also Campbell*, 682 F.3d at 1283 ("We think it best to follow the Supreme Court's lead, using the *Exxon Mobil* formulation and not trying to untangle the meaning of *inextricably intertwined*."). The "essential point" of *Rooker-Feldman* is that it bars claims "complaining of injuries caused by state-court judgments." *Campbell*, 683 F.3d at 1283 (quoting *Exxon Mobil*, 544 U.S. at 284). As explained above, Plaintiff's FCRA claim does not allege an injury caused by the Texas judgment.

Moreover, Defendant's "inextricably intertwined" argument is premised on the incorrect position that *Rooker-Feldman* bars a federal court from entering a judgment that is inconsistent with a prior state court judgment. *See* [Doc. 137 at 22 ("Plaintiff could not prevail in this case without this Court, effectively, reversing the Texas State Court

Judgment that he owes the debt."); Doc. 150 at 14 ("For Plaintiff to prevail on his claims in this action, this Court would have to reject the State Court Judgment.")].  "[T]he *Rooker-Feldman* doctrine does not bar an action just because it seeks relief inconsistent with, or even ameliorative of, a state-court judgment."  *Campbell*, 682 F.3d at 1282; *see also id.* at 1284 (rejecting the notion that a federal judgment would "undo" a state judgment simply because the federal judgment would be contrary to the state judgment).  "To the contrary, a party may lose in state court and then raise precisely the same legal issues in federal court, so long as the *relief sought* in the federal action would not reverse or undo the *relief granted* by the state court."  *Mo's Express*, 441 F.3d at 1237.  "To be sure, the judgments in the two cases could be inconsistent; but that is a problem to be resolved under preclusion doctrine, not *Rooker-Feldman*."  *Mayotte v. U.S. Bank Nat'l Ass'n for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates*, 880 F.3d 1169, 1174 (10th Cir. 2018).

Relatedly, Defendant's reliance on unpublished Tenth Circuit decisions using the "inextricably intertwined" standard, *see* [Doc. 137 at 22–24], which are not binding authority, does not change the Court's analysis.  *See United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005) ("In this circuit, unpublished orders are not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel, and we have generally determined that citation to unpublished opinions is not favored.").  In *LeCates v. Barker*, the plaintiff asserted a fraud claim on the basis that the defendants had fraudulently procured a state court judgment against him.  No. 00-4026, 2000 WL 1717184, at *2 (10th Cir. Nov. 16, 2000).  Using the "inextricably intertwined" standard, the *LeCates* court concluded that *Rooker-Feldman* barred the fraud claim because

adjudication of the claim "would require the [federal] court to determine that [the] state court judgment was erroneously entered or was void." *Id.* But it is clear that the *LeCates* plaintiff alleged an injury *caused by* the purportedly fraudulent state court judgment. *See id.* at *1 ("LeCates' complaint [in federal court] charged that the [defendants] had obtained the [state court] default judgment against him by fraud and deceit in collusion with Barker."). *Bisbee v. McCarty* and *Ellis v. CAC Financial Corporation*, which NCS also relies on, similarly used the "inextricably intertwined" standard. *See Bisbee v. McCarty*, 3 F. App'x 819, 822 (10th Cir. 2001); *Ellis v. CAC Fin. Corp.*, 6 F. App'x 765, 769 (10th Cir. 2001). The *Bisbee* and *Ellis* plaintiffs both complained of the methods allegedly used to obtain state court judgments against them, and in both cases, the Tenth Circuit concluded that *Rooker-Feldman* applied because it would be "impossible" to resolve the federal claims without calling the state court judgments into question. *See Bisbee*, 3 F. App'x at 823; *Ellis*, 6 F. App'x at 769. Not only do these cases rely on a standard the Tenth Circuit has disclaimed, but both cases are distinguishable because Plaintiff's FCRA claim does not challenge the validity of the state court judgment or the manner in which it was obtained. Thus, the Court disagrees that *Rooker-Feldman* bars Plaintiff's claim.

In sum, the Court finds no basis to grant relief under Rule 50(b). The Motion for JNOV is respectfully **DENIED**.

## MOTION FOR NEW TRIAL

NCS also moves for a new trial under Rule 59, primarily arguing that there was insufficient evidence to support the jury's verdict in Plaintiff's favor. [Doc. 137 at 25].

## I.    Legal Standard

After a jury trial, "[t]he court may, on motion, grant a new trial on all or some of the

issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "A new trial cannot be granted unless the [asserted] error was prejudicial and affects the party's substantial rights." *Henning v. Union Pac. R.R.*, 530 F.3d 1206, 1217 (10th Cir. 2008). A motion for new trial "is not regarded with favor and should only be granted with great caution." *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991). Whether to grant a new trial is within the discretion of the trial court. *Id.*

"If a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009) (quotation omitted). The Court views the evidence in the light most favorable to the prevailing party, keeping in mind that the jury "has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." *Snyder v. City of Moab*, 354 F.3d 1179, 1188 (10th Cir. 2003) (quotation omitted).[5]

## II.    Analysis

### A.    Causation

First, NCS argues that there was "legally insufficient evidence that Plaintiff

---

[5] Defendant asserts that, in reviewing a motion for new trial, the "trial judge need not view evidence from perspective most favorable to prevailing party [sic]." *See* [Doc. 137 at 5]. But the Tenth Circuit has repeatedly said that the evidence should be viewed in the light most favorable to the prevailing party. *See, e.g.*, *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1062 (10th Cir. 2016); *M.D. Mark*, 565 F.3d at 762–63; *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156–57 (10th Cir. 2006).

established causation to support his FCRA [c]laim." [Doc. 137 at 25 (emphasis omitted)].
It contends that "[a] plaintiff asserting a claim against a furnisher for failure to conduct a
reasonable investigation cannot prevail on the claim without demonstrating that, *had* the
furnisher conducted a reasonable investigation, the result would have been different,"
citing a few non-binding cases in support. [*Id.*].  However, the Court rejected Defendant's
request to include this language in the jury instructions because (1) there is no Tenth
Circuit authority imposing such a requirement for FCRA liability and (2) such an instruction
would, "in some ways, go against" Tenth Circuit precedent establishing the requirements
of a reasonable investigation under the FCRA.  *See* [Day 3 Trial Tr. at 140:2–142:20];
*see also Maiteki v. Marten Transp. Ltd.*, 828 F.3d 1272, 1275 (10th Cir. 2016) (setting out
the steps the furnisher must take to conduct a reasonable investigation under the FCRA).
In other words, Plaintiff was not required to prove, and the jury was not required to find,
that had NCS conducted a reasonable investigation, the result would have been different.
*See* [Doc. 128 at 19 (jury instruction setting out the elements for Plaintiff's FCRA claim)].
Defendant does not acknowledge this ruling whatsoever in its Motion or argue that the
Court erred in its jury instructions.[6]  *See* [Doc. 137 at 25–30].  Nor does NCS point the
Court to any binding authority holding that this is a required element in an FCRA claim.
*See* [*id.*].  Because Defendant's argument is based on a rule of law this Court concluded
is not applicable to this case, there is no basis for ordering a new trial here.

---

[6] "A motion for new trial may raise errors of law arising out of jury instructions, but a new
trial is warranted only when, 'having given full respect to the jury's findings and viewing
the entire evidence, the trial judge is left with the definite and firm conviction that a mistake
has been committed.'"  *United States Welding, Inc. v. TECSYS, Inc.*, No. 14-cv-00778-
REB-MEH, 2017 WL 4331061, at *1 (D. Colo. Aug. 24, 2017) (quoting *Hughes v. Regents
of Univ. of Colo.*, 967 F. Supp. 431, 437 (D. Colo. 1996)).

B.      **Reasonable Investigation**

Defendant next asserts that "[t]he jury's determination that NCS failed to perform a reasonable investigation is against the great weight of the evidence."  [Doc. 137 at 30 (emphasis omitted)].    In support of its argument, NCS compares the testimony of Plaintiff's expert, Evan Hendricks, about what steps NCS could or should have taken in its investigation with various evidence that shows, in NCS's view, that NCS did in fact perform those tasks.  *See* [*id.* at 25–29].  It argues that "NCS performed all the activities that Plaintiff advocated should have occurred," and so "the overwhelming evidence confirms that NCS satisfied its obligations to perform a reasonable investigation."  [*Id.* at 31 (incorporating arguments made earlier in its briefing)].

NCS's argument is unavailing.   Determining the credibility of witnesses and drawing inferences and conclusions from conflicting evidence is the duty of the jury.  *Ellis v. Union Pac. R.R.*, 329 U.S. 649, 653 (1947).  "[W]here . . . there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion."  *Lavender v. Kurn*, 327 U.S. 645, 653 (1946).  "A jury verdict may be upset '[o]nly when there is a complete absence of probative facts to support the conclusion reached.'"  *Wilson v. Burlington N. R.R.*, 804 F.2d 607, 610 (10th Cir. 1986) (quoting *Lavender*, 327 U.S. at 635) (alteration in original).  The question before the Court is whether "there is a reasonable basis in the record to support the jury's findings."  *Id.*

There is a reasonable basis in the record to support the jury's conclusion that NCS's investigation was not reasonable.   Plaintiff's expert testified at length about industry standards governing credit investigations and explained why he formed his opinion that NCS did not conform with those standards.  *See generally* [Doc. 134]; *see*

*also, e.g.*, [*id.* at 34:23–35:16, 37:8–17, 53:8–54:2]. The jury was free to credit Mr. Hendricks's testimony and disbelieve any conflicting evidence (or at least construe that conflicting evidence differently than Defendant). Other evidence also supported the jury's conclusion on this element; for example, NCS's vice president of operations, Ronn Sapp, testified at trial that there were inconsistencies, or "red flags," in the Main Street rental application, *see* [Doc. 142 at 40:6–41:24, 44:10–14], and that NCS did not contact any third parties in its investigation, such as verifying Plaintiff's employment, *see* [*id.* at 82:8–23]; *see also* [Doc. 128 at 23 (jury instructions stating that data furnishers may contact third parties as part of their investigation of a consumer's dispute)]. In addition, Mr. Hendricks testified that the FTC report would be relevant to NCS's investigation. [Doc. 134 at 33:25–35:8]. But Cathy Boehler, an NCS employee who investigated Mr. Ward's claim, testified that she could not recall whether she reviewed Mr. Ward's FTC identity theft report in her investigation, and there was nothing in the investigation description stating that she had reviewed the report. [Doc. 142 at 177:21–24, 178:18–179:6, 185:2–8, 194:6–24, 196:1–6]. The evidence presented at trial, as a whole, provides rational and reasonable support for the jury's conclusion.

###     C.    Inaccurate Information

Defendant's next argument is difficult to understand. It first asserts, in a heading, that "[t]he jury's determination that the information furnished by NCS was inaccurate is against the great weight of the evidence." [Doc. 137 at 32 (emphasis omitted)]. It then states that if the Court determines that the issue of whether the information was inaccurate is a fact question for the jury (as opposed to a legal one), then NCS "requests, in the alternative to the JNOV, that the Court consider the three grounds for reversal under

the JNOV [sic] to be considered under the alternative standard for a new trial pursuant to Rule 59(b)." [*Id.*]. There is no argument accompanying NCS's "alternative" request. [*Id.*].

The "three grounds" supporting Defendant's request for JNOV were all *legal* arguments—that (1) NCS was not required to determine whether the debt was valid because that presented a legal dispute; (2) Plaintiff's claim is not cognizable because the dispute was not objectively and readily verifiable; and (3) the *Rooker-Feldman* doctrine bars Plaintiff's claim. [*Id.* at 1–2]. It is unclear how Defendant's arguments about applicable legal standards or doctrines are relevant to Defendant's cursory assertion that the jury's verdict was against the great weight of the evidence, and Defendant makes no substantive arguments explaining why a new trial is appropriate under any of these bases.

Nevertheless, within its JNOV arguments, Defendant provides a chart that cites trial evidence it believes supports a finding that the information it furnished was accurate, as well as evidence that supports a finding that the information was inaccurate, *see* [*id.* at 11–12], and also cites what it classifies as "ample evidence to question Plaintiff's dispute that he was a victim of identity theft," [*id.* at 14–15]. The Court assumes that Defendant is attempting to argue that, based on this evidence, the jury's verdict was against the weight of the evidence, but the Court is unpersuaded by this argument. There is a reasonable basis in the record to support the jury's conclusion that the information NCS furnished was inaccurate. Mr. Ward testified that he did not fill out the application and did not give his daughter permission to use his information to fill out the application, [Doc. 135 at 10:7–12, 26:18–27:17, 47:9–12, 79:9–10], which was consistent with his identity theft affidavit, [Doc. 152-4 at 3–4], and his wife's testimony, [Doc. 141 at 7:7–9, 23:2–15]. The jury was free to disregard any conflicting evidence. *Lavender*, 327 U.S.

at 653. Accordingly, the Court concludes that sufficient evidence supports the jury's conclusion and a new trial is not warranted on this basis.

### D. Failure to Mitigate

At trial, the jury found in favor of Plaintiff on Defendant's affirmative defense of failure to mitigate damages. [Doc. 130 at 3]. Defendant contends that this determination was against the great weight of the evidence. [Doc. 137 at 32].

Because failure to mitigate is an affirmative defense, Defendant had the burden of proof on the defense at trial. *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1230 (10th Cir. 2000); [Doc. 128 at 27]. The jury was instructed that it should find in Defendant's favor if NCS proved by a preponderance of the evidence that (1) Mr. Ward failed to take reasonable steps to mitigate his damages; and (2) Mr. Ward incurred increased damages because he did not take those steps. [Doc. 128 at 27].

NCS asserts that Mr. Ward "admitted" at trial that "despite subscribing to Credit Karma, . . . he did not track changes to his credit file by checking any email alerts from Credit Karma." [Doc. 137 at 132]. According to Defendant, Plaintiff's purported failure to check his Credit Karma emails necessitates a jury verdict that he failed to mitigate his damages. [*Id.* at 32–33]. Specifically, Defendant cites the testimony of its own expert, John Ulzheimer, explaining that NCS added an "XB" code "on the NCS collection that was appearing on Mr. Ward's credit reports," which indicated a dispute and rendered the collection "harmless in credit scoring systems." [Doc. 136 at 22:4–11]. Defendant concludes that "[h]ad Plaintiff just opened his own emails or otherwise checked his credit," he would have realized that his credit score had recovered fewer than three weeks after he first saw the MSR account on his credit report, and "any alleged emotional distress

damages would have been, at a minimum, significantly reduced.  [Doc. 137 at 33].
Plaintiff responds by pointing out evidence supporting the conclusion that he did mitigate
his damages.  [Doc. 146 at 25].

At trial, the following exchange occurred between NCS's counsel and Mr. Ward:

Q. Credit Karma is a service that you pay a monthly fee for; correct?

A. No.

Q. No.  You signed up for free?

A. Yeah.

Q. When you signed up, you had to provide your contact information;
correct?

A. Correct.

Q. And that involves your phone number or your email address.

A. My email address.

Q. Okay.  So you received emails from Credit Karma?

A. I will tell you right now, I have 3,300 unread emails.  I got my phone with
me right now, I can show you that.

Q. Okay.  So I guess what you are trying to tell me is that you got emails
from Credit Karma, but you just didn't care to open them.

A. Well [the credit score] scrolls up, it[] scrolls it down.  You know, like two
points here or one point there because I bought something.

[Doc. 137-1 at 82:13–83:8].

The Court disagrees with Defendant and concludes that the jury's verdict on
Defendant's affirmative defense was not clearly, decidedly, or overwhelmingly against the
weight of the evidence.  As a preliminary matter, the Court notes that Defendant did not
rely on the Credit Karma emails to argue failure to mitigate—or reference the Credit

Karma emails at all—in its closing argument.  *See* [Day 4 Trial Tr. at 9:24–21:11].  Instead, Defendant argued that Plaintiff failed to mitigate his damages by not disclosing information about his daughter.  [*Id.* at 13:18–14:5].  To be clear, the Court does not suggest that this is conclusive of the issue, but the Court finds it relevant to its analysis because Defendant did not expressly ask the jury to consider this specific theory of failure to mitigate during its deliberations.

Whether Mr. Ward failed to reasonable steps to reduce his damages, including whether checking his email for alerts from Credit Karma would be "reasonable," is a question of fact for the jury to decide.  *See Vail Summit Resorts, Inc. v. Zip-Flyer, LLC*, No. 18-cv-01763-MEH, 2020 WL 4287196, at *11 (D. Colo. July 27, 2020) ("[M]itigation of damages is an issue best decided by the trier of fact.")].  The jury was not required to construe Mr. Ward's equivocal testimony in the way defense counsel did, i.e., as an "admi[ssion] . . . that [Plaintiff] did not track changes to his credit file by checking any email alerts."  Indeed, Mr. Ward never expressly confirmed that he received Credit Karma emails or neglected to open them.  [Doc. 137-1 at 82:13–83:8].  And notably, Defendant did not introduce as evidence any Credit Karma emails received by Plaintiff that would have informed Plaintiff that his credit score had adjusted and the MSR collection was no longer on his account.  Nor were the jurors required to credit Mr. Ulzheimer's testimony.  "It is the jury's exclusive province to assess the credibility of witnesses and determine the weight to be given to their testimony."  *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1158 (10th Cir. 2006).  Defendant's argument that "[h]ad Plaintiff just opened his own emails . . ., any alleged emotional distress damages would have been, at a minimum, significantly reduced," [Doc. 137 at 33], is speculative and insufficient to warrant a new trial.

### E.    Economic Damages Award

NCS next argues that there is legally insufficient evidence to support the jury's $500,000 verdict in Plaintiff's favor, so "remittitur is appropriate." [Doc. 137 at 33]. It does not raise any substantive arguments in support of its contention, instead directing the Court generally to its Motion for Remittitur. [*Id.*]. Because NCS does not raise any argument here that is not raised in its Motion for Remittitur, and requests only remittitur on this point (as opposed to an entirely new trial), the Court limits its analysis of this issue to its ruling on the Motion for Remittitur below.

### F.    Exclusion of Evidence

Finally, NCS argues that the Court erred in excluding two categories of evidence: (1) evidence of NCS's attempts to obtain Plaintiff's daughter's testimony, and (2) social media videos explaining how to remove items from credit reports. [Doc. 137 at 34].

#### 1.    NCS's Attempts to Contact Plaintiff's Daughter

In Plaintiff's Motion in Limine, he asked the Court to exclude evidence of Defendant's Texas lawsuit against his daughter. [Doc. 90 at 3]. NCS opposed this request, arguing that evidence of the lawsuit was relevant "to show that Plaintiff cannot affirmatively establish that the account is inaccurate." [Doc. 93 at 6]. In support, it cited cases discussing drawing a negative inference from a refusal to testify, but those citations were not supported by accompanying argument. *See* [*id.*]. The Court ultimately granted Plaintiff's request, excluding the evidence under Rules 401 and 403 of the Federal Rules of Evidence, [Doc. 112 at 11–12], because Plaintiff's daughter's failure to respond to the Texas lawsuit "[did] not make it more or less probable that Mr. Ward's account was inaccurate or incomplete, or that NCS conducted a reasonable investigation," [*id.* at 12].

The Court also concluded that any minimal probative value from the evidence was substantially outweighed by the danger of prejudice to Plaintiff and the risk of confusing the jury by suggesting that Plaintiff did or could control his daughter's actions. [*Id.*].

NCS now contends that "evidence that Plaintiff's daughter would not cooperate with any investigation had she been contacted is relevant to the issue of causation." [Doc. 137 at 34]. For a number of reasons, this undeveloped argument is unconvincing.

First, this argument was not raised in opposition to Plaintiff's Motion in Limine, *see* [Doc. 93], even though Defendant had the burden of demonstrating the evidence's relevance, *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1149 (10th Cir. 2009). "[M]otions under Rule 59 are not vehicles to 'advance arguments that could have been raised in prior briefing.'" *Hamstein Cumberland Music Grp. v. Williams*, 556 F. App'x 698, 703 (10th Cir. 2014) (quoting *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)). Second, Defendant does not address the Court's conclusion that the evidence would be excluded under Rule 403 or argue that this was error. *See* [Doc. 137 at 34]. And third, Defendant's argument fails on the merits. As the Court already explained, Plaintiff's failure to respond to NCS's Texas lawsuit does not make it more or less likely that Plaintiff's account was inaccurate or incomplete or that NCS conducted a reasonable investigation into Plaintiff's dispute.[7] A new trial is not warranted on this basis.[8]

---

[7] Because Defendant's argument is not developed, it is unclear what Defendant means when it says that this evidence is relevant to "the element of causation." [Doc. 137 at 34]. To the extent Defendant argues that this evidence is relevant to whether Plaintiff could prove that "*had* the furnisher conducted a reasonable investigation, the result would have been different," [*id.* at 25], the Court has explained above that this was not an element Plaintiff was required to prove in this case.

[8] Insofar as Defendant argues that the Court's exclusion of this evidence "allowed Plaintiff

2.    **TikTok Video**

On the second day of trial, Plaintiff's counsel informed the Court that, during a break, defense counsel had expressed his intent to play a TikTok video as part of NCS's case. [Day 2 Trial Tr. 102:24–103:6]. To the Court, defense counsel explained that the TikTok video depicted "some of the problems they have to deal with and some of the problems they research" and that "[t]hey use it in their practice dealing with some of the problems they have, right, so they understand what consumers are out there doing in fraud investigations." [*Id*. at 103:11–18].[9] Defense counsel conceded that "Mr. Ward may never have seen a video like this," but argued that because "we have this society that is basically educated by TikTok," the video was relevant to "explain[] some of the issues they deal with and direct rebuttal to Mr. Hendricks's testimony." [*Id*. at 104:7–11]. The Court sustained Plaintiff's objection and excluded the video under Rules 403 and 901. [*Id*. at 104:12–105:14].

NCS argues that it was error for the Court to exclude the TikTok video[10] because

---

to improperly imply at [closing] argument that NCS failed to take any action to prosecute Plaintiff's daughter," this argument is not supported by any citation to the trial transcript. [Doc. 137 at 34]. The Court has reviewed the transcript of Plaintiff's counsel's closing argument and could not ascertain which portion of the argument Defendant takes issue with. Moreover, Defendant did not object to any part of Plaintiff's closing argument at trial, *see* [Day 4 Trial Tr. at 1:18–9:21, 21:14–24:6], and cannot raise this argument for the first time now, *see Dailey v. Hecht*, 757 F. App'x 664, 672 (10th Cir. 2018) ("A party cannot observe an error, choose not to raise it, and use it to seek relief if the verdict does not go her way."); *Glenn v. Cessna Aircraft Co.*, 32 F.3d 1462, 1465 (10th Cir. 1994) (counsel cannot "remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial" (quotation omitted)). And the Court observes no plain error that would require review in the absence of a timely objection.

[9] The Court believes defense counsel's use of "they" refers generally to collection agencies. *See* [Day 2 Trial Tr. at 103:15–22, 104:3–11].

[10] The Motion for New Trial argues that it was error for the Court to exclude "online video<u>s</u>." *See* [Doc. 137 at 34 (emphasis added)]. But at trial, Defendant referenced only

Plaintiff testified "that he learned how to dispute a debt by watching videos online," so Defendant "should have been allowed [to introduce] evidence of the video[]."  [Doc. 137 at 34].  It argues that "it was an abuse of discretion to exclude the videos that would have provided the jurors with insight to the fraudulent or 'fake' identity theft claims," [*id.*], though it raises no argument explaining how the exclusion was "a clear error of judgment," exceeded "the bounds of permissible choice," or was "arbitrary, capricious or whimsical, or result[ed] in a manifestly unreasonable judgment, *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1309 (10th Cir. 2015).  Nor does Defendant address either of the Court's grounds for excluding the evidence at trial.  *See* [Doc. 137 at 34].

The Court's decision to exclude the TikTok video does not entitle NCS to a new trial.  Even assuming that Defendant could authenticate the video—which the Court does not find, s*ee* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce sufficient evidence to support a finding that the item is what the proponent claims it is.")—the danger of unfair prejudice substantially outweighed any minimal probative value the video had.  Defendant's argument that the video was relevant because Plaintiff "testi[fied] that he learned how to dispute a debt by watching videos online," [Doc. 137 at 34], relies on an inaccurate summation of Mr. Ward's testimony.  Mr. Ward testified that he looked up "how to handle fraud" on the internet, but he did not mention watching any videos on the topic.  *See* [Doc. 135 at 49:18–50:5].  This, coupled with defense counsel's concession that there is no indication that Mr. Ward watched the subject TikTok video, renders the probative value of the video miniscule at best.  On the other hand, introducing a video explaining how a

---

a singular video.  *See, e.g.*, [Day 2 Trial Tr. at 103:8–9, 104:8–11].

person could fraudulently get a debt removed from their credit report, even though the video has no relation or connection whatsoever to this case, would have created a substantial risk that the jury would draw unsupported and prejudicial conclusions about Mr. Ward and his conduct in this case.  A new trial is not warranted on this basis.

For all of these reasons, the Court will not grant a new trial under Rule 59.  The Motion for New Trial is respectfully **DENIED**.

## MOTION FOR REMITTITUR

**I.    Legal Standard**

"Trial by jury is the bedrock right of our legal system."  *Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1061 (10th Cir. 2013).  The right to a jury trial "is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment."  *Jacob v. City of N.Y.*, 315 U.S. 752, 752 (1942).  "A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts."  *Id.* at 752–53.

A request for remittitur is essentially a request to alter or amend the judgment under Rule 59(e).  *See In re Universal Serv. Fund Tel. Billing Prac. Litig.*, 619 F.3d 1188, 1209 (10th Cir. 2010).  To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict, *Burke v. Regalado*, 935 F.3d 960, 1035 (10th Cir. 2019), viewing the evidence "in the light most favorable to the prevailing party," *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1062 (10th Cir. 2016).  "The jury ha[s] wide latitude to choose an award based on the evidence," *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 668 (10th Cir. 2016), and "the amount of damages awarded by a jury can be supported by any competent evidence tending to sustain it," *Bennett v.*

*Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985). "[T]he jury's award is inviolate unless [the Court] find[s] it so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *M.D. Mark*, 565 F.3d at 766 (quotation omitted).

## II.    Analysis

Defendant asks the Court to remit the $500,000 jury verdict by 90%, to $50,000. [Doc. 137 at 48]. It argues that remittitur is appropriate because the award, in light of the evidence presented at trial, "creates an irresistible inference that passion, prejudice or another improper cause invaded the trial." [*Id.* at 39]. In fact, NCS argues that it inadvertently "learned that [this] in fact did take place" during deliberations. [*Id.*].

### A.    Direct Evidence of Improper Cause

NCS contends that there is "actual evidence that an[] improper cause invaded the trial" based on certain statements some jurors made to defense counsel after the trial. [*Id.* at 43].[11] Specifically, defense counsel states that three jurors told him that they "intend[ed] for [Plaintiff] to receive a 'net' of $200,000" but increased the award to account for possible attorney's fees. [*Id.*]. In addition, another juror purportedly told defense counsel that she thought NCS "needed to be punished for 'not doing more to protect consumers'" and "'needed to be slapped.'" [*Id.* at 43–44]; *see also* [Doc. 137-4 (declaration from defense counsel attesting to these statements)]. NCS contends that, based on these statements, the jury based its verdict "on improper extraneous evidence," which shows that the verdict was motivated "by improper purposes." [Doc. 137 at 44].

---

[11] After the trial, the Court permitted the attorneys to speak with the jurors if the jurors permitted.

Plaintiff responds that the Court cannot consider the alleged statements relayed by defense counsel because they are (1) hearsay and (2) barred by Rule 606(b).  [Doc. 146 at 34–35].  NCS does not respond to either of these arguments.  *See* [Doc. 150].

> Rule 606 provides that
>
> [d]uring an inquiry into the validity of a verdict . . ., a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1).  A juror may testify, however, about whether "extraneous prejudicial information was improperly brought to the jury's attention."  Fed. R. Evid. 606(b)(2).  "Generally speaking, information is deemed 'extraneous' if it derives from a source 'external' to the jury," such as "publicity and information related specifically to the case the jurors are meant to decide."  *Warger v. Shauers*, 574 U.S. 40, 51 (2014).  On the other hand, "'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room."  *Id.*  Relevant here, "evidence of discussions among jurors . . . and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict."  *United States v. Lakhani*, 480 F.3d 171, 184 (3d Cir. 2007).

The Court agrees with Plaintiff that the Court cannot consider these out-of-court statements in deciding Defendant's Motion for Remittitur.  First, the statements are hearsay, and Defendant has not identified any applicable exception to Rule 801.  *See* [Doc. 137; Doc. 150].  Second, the statements plainly fall within Rule 606 and do not fall within its exceptions.  Statements that jurors considered attorney's fees in reaching their verdict or that one juror wanted to punish NCS do not amount to extraneous prejudicial

information; rather, these comments reflect the "general knowledge, opinions, feelings and bias that every juror carries into the jury room." *Hard v. Burlington N. R.R.*, 870 F.2d 1454, 1461 (9th Cir. 1989). A number of courts have declined to consider such statements in ruling on post-trial motions. *See, e.g.*, *Int'l Safety Access Corp. v. Integrity Worldwide, Inc.*, No. 09-cv-00315-MBS, 2011 WL 6826855, at *6 (D.S.C. Dec. 28, 2011) (relying on Rule 606 and declining to consider hearsay statements that jurors considered attorney's fees in reaching verdict); *Procter & Gamble Co. v. Haugen*, No. 95-cv-00094-TS, 2008 WL 2518716, at *3 (D. Utah June 20, 2008) (statements during deliberation "regarding [a] juror's personal experience with the hourly rates for lawyers or the high costs of legal fees" were not "extraneous information" that the court could consider because they were "confined to discussions amongst jurors during their deliberations" and were matters "fall[ing] within the general knowledge or opinion that every juror carries into the jury room by reason of their life experiences"); *Morgan v. Woessner*, 997 F.2d 1244, 1261 (9th Cir. 1993) ("The juror's observations about sending messages to City Hall and speculation as to the amount of Morgan's attorney's fees simply do not constitute the sort of 'extraneous prejudicial information' that falls within the scope of [Rule 606(b)].").

Accordingly, because the alleged juror statements are barred from consideration by the Court under Rule 606, the Court will not consider them in ruling on Defendant's Motion for Remittitur.[12]

---

[12] Defendant did not request that the Court hold an evidentiary hearing on this issue, *see* [Doc. 137; Doc. 150], and the Court does not find it necessary to hold a hearing. A court may forgo a hearing if it "would likely have not produced any valuable information." *United States v. Cornelius*, 696 F.3d 1307, 1325 (10th Cir. 2012) (quotation omitted). Because, as discussed above, the Court can only inquire "into external forces on the jury," and

**B.    Whether There Is Otherwise an Inference of Improper Cause**

Defendant contends that remittitur is appropriate because passion, prejudice, or another improper cause invaded the jury and affected its verdict. [Doc. 137 at 39].  It first discusses the "context of the events surrounding the emotional distress," asserting that the evidence presented at trial does not support Plaintiff's testimony about the level of importance he placed on maintaining his credit because—in Defendant's view—Plaintiff purportedly did not check his emails from Credit Karma that would have informed Plaintiff of his credit score.  [*Id.* at 39–40 ("[h]ad Plaintiff actually cared enough to routinely review his credit scores or open alerts . . .")].  Then, Defendant argues that Plaintiff's evidence of emotional distress was insufficient because he relies only on his and his wife's testimony, which NCS contends was conclusory.  [*Id.* at 40–42].  Defendant also cites cases in which remittitur was granted, arguing that "[t]he Tenth Circuit recognizes comparison to other cases as an appropriate measure of excessiveness."  [*Id.* at 44–48].

Plaintiff responds that there is sufficient evidence supporting the jury's award in this case.  First, he argues that it is "well established that an FCRA plaintiff's testimony alone regarding their emotional distress is sufficient proof for the jury."  [Doc. 146 at 31].  He recounts his and his wife's testimony at trial and their discussion about how Plaintiff had worked to build up his credit and lost hours of sleep and struggled at work.  [*Id.* at 31–33].  And Mr. Ward, like NCS, directs the Court to cases in which similar amounts of emotional distress were awarded in similar cases.  [*Id.* at 33–34].

---

defense counsel directs the Court only to statements made in the jury's internal deliberations and discussions and their states of mind, a hearing would not provide any valuable information.  *See id.* ("[A] hearing is inappropriate when the alleged influence has to do with a juror's internal state of mind.").

*Plaintiff's Testimony and Other Evidence.*   As for Defendant's first argument about the Credit Karma emails, the Court has already explained that the jury was not required to adopt Defendant's interpretation of Plaintiff's unclear testimony, and because the Court must view the evidence in the light most favorable to Plaintiff, *see Lompe*, 818 F.3d at 1062, the Court does not credit Defendant's framing of this evidence.  There was sufficient evidence for the jury to conclude that Plaintiff placed great importance on maintaining his credit score.  *See, e.g.*, [Doc. 135 at 7:22–8:1 (Mr. Ward testifying about how, after he recovered from drug addition, he worked to restore his credit); Doc. 141 at 16:2–4, 18:13–25 (Ms. Ward testifying that Plaintiff "worked so hard to get his credit back")].   Accordingly, the Court's discussion is limited to NCS's challenge to the sufficiency of the testimony about Mr. Ward's emotional distress.

At trial, Mr. Ward adduced the following evidence related to his emotional distress. He testified that, due to NCS, he experienced sadness or depression that was "so bad," [Doc. 135 at 24:25–25:2], and he was embarrassed by the inaccurate report, [*id.* at 20:2–20].  He stated that he would cry in the middle of the night "[b]ecause [he] didn't know what else to do."  [*Id.* at 15:18–25].  Ms. Ward also testified about Mr. Ward's distress, explaining that he was "deflated and sad," "really just struggled with everything," was "withdrawn" and "depressed," appeared hopeless, and lacked energy.  [Doc. 141 at 16:7, 16:13–16, 18:25–19:1, 21:2–12].  She stated that Mr. Ward was "not the same person that" she first knew, as he changed from a "confident[,] . . . happy, positive person" to a "very defeated person."  [*Id.* at 16:6–8, 16–24].  She also testified that Mr. Ward gained weight and "his health started to fail . . . because of the weight gain."  [*Id.* at 20:19–25].

Mr. Ward also testified that he "wasn't sleeping" at this time.  [Doc. 135:22–24].

He explained that he would go to bed around 8:00 or 9:00 P.M. and would wake up around 12:00 or 1:00 A.M.  [*Id.* at 14:24, 15:17–22].   He attributed the sleeplessness to his thoughts about how to get NCS "to understand" that he "didn't do this."  [*Id.* at 16:5–7]. Ms. Ward also testified that Mr. Ward was not sleeping well.  [Doc. 141 at 19:1–3].  She stated that he was up "every night" and would wake up within a couple of hours of going to sleep.  [*Id.* at 19:6–9].  She believed that Mr. Ward's sleep issues were attributable to the NCS credit report.  [*Id.* at 19:18–23].  Mr. and Ms. Ward each testified that their sex life suffered "as a result of NCS."  [Doc. 135 at 24:25–25:3; Doc. 141 at 16:14–15].

Mr. Ward also testified that his emotional distress affected his work life.  He testified that he could not concentrate at work, because he "[was] trying to fight" the inaccurate account and that he "didn't do it, and [NCS] just kept saying [he] did."  [Doc. 135 at 15:5–13].  He was "miserable at work" and made "constant[]" mistakes on the job, which was out of character for him.  [*Id.* at 14:24–15:3, 25:4–11].  Mr. Ward's mistakes caused his boss to speak with him about how the mistakes cost the company money.  [*Id.* at 25:8–11].  Ms. Ward also testified that Mr. Ward was "not performing like he normally does in his job, all these things that he takes pride" in and that he was "frustrated at work."  [Doc. 141 at 19:1–4, 20:5–6].  She believed his issues at work were attributable to the fact that he was more focused on the "NCS portion of his life."  [*Id.* at 20:12–18].

NCS argues that this evidence is insufficient to support the jury's verdict because there is no evidence that Plaintiff sought medical or psychological treatment related to his mental distress and because the only evidence Plaintiff provided in addition to his own testimony was his wife's testimony.  [Doc. 137 at 42].  It also argues that Mr. Ward's testimony was largely conclusory because he did not testify how often he lost sleep, how

long he experienced difficulty at work, or whether his crying interfered with his daily life or how long the crying occurred.  [*Id.* at 40–41].  It raises the same argument with respect to Ms. Ward's testimony.  [*Id.* at 42].

"[I]n the Tenth Circuit, a FCRA plaintiff is not required to produce corroborated testimony to establish emotional distress damages, so long as the plaintiff describes his or her emotional distress in sufficient detail and does not rely on conclusory statements." *Remaly v. Wyndham Resort Dev. Corp.*, No. 20-cv-03028-LTB-NYW, 2021 WL 5504628, at *5 (D. Colo. Nov. 23, 2021) (citing *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1182 (10th Cir. 2013)).  "An injured person's testimony *alone* may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements."  *Llewellyn*, 711 F.3d at 1183 (quotation omitted).  The Wards' testimony, in combination, provides sufficient detail about Mr. Ward's demeanor before and after the inaccurate NCS report and how the inaccurate report and NCS's conduct affected his mood, health, and daily life.  *See Fresquez v. BNSF Ry. Co.*, No. 17-cv-00844-WJM-SKC, 2021 WL 857626, at *6 (D. Colo. Mar. 8, 2021) (denying motion for remittitur on $800,000 award where the plaintiff "did not describe his emotional distress in the most graphic or descriptive terms" but still testified about how his termination "caus[ed] him to feel stress about feeding his son, affecting his ability to sleep, causing him to gain weight, and causing him to quit taking part in activities that he loved"), *aff'd*, 52 F.4th 1280 (10th Cir. 2022); *cf. Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1149 (D. Kan. 2017) (finding plaintiff's testimony sufficient to support a $230,000 verdict where she testified that she lost weight, lost sleep, was depressed, and scared to go to work).

The Court is respectfully unpersuaded by NCS's attempt to discount the weight of this evidence, which the Court must view in Plaintiff's favor. As for NCS's suggestion that Plaintiff "offered no evidence of any medical or psychological treatment related to any mental distress," [Doc. 137 at 42], Defendant cites no authority to support the proposition that, to obtain emotional distress damages, a plaintiff must have received mental health treatment. *But see Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1318 (10th Cir. 2022) (affirming denial of remittitur even where the plaintiff "admitted to never having seen a therapist to deal with the stress caused by his termination"). NCS also points to evidence that Plaintiff went on vacation while he was dealing with the NCS dispute and that he "could not cite any examples of activities that he was prevented from doing as a result of NCS's conduct," which NCS says "speaks to the lack of any adverse financial or emotional effect on [Plaintiff] and his ability to have stress-free time." [Doc. 137 at 41]. This argument is simply unpersuasive; a vacation does not invalidate, or even necessarily conflict with, the testimony about Plaintiff's mental distress. And finally, Defendant also asks the Court to consider the fact that Plaintiff did not lose any income as a result of NCS's actions. [*Id.* at 43]. But "[t]here is no requirement that the award for mental distress bear any relationship to the financial loss incurred as the result of the tortious acts." *Osterhout v. Bd. of Cnty. Comm'rs*, 10 F.4th 978, 996 (10th Cir. 2021) (quotation omitted).

***Comparison With Other Cases.*** Both Parties direct the Court to comparator cases to argue that remittitur either is or is not warranted. *See* [Doc. 137 at 44–48; Doc. 146 at 33–34]. However, while the Tenth Circuit previously recognized comparison cases as a factor relevant to the remittitur analysis, *see, e.g.*, *Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir. 1989), more recent cases make clear that the Tenth Circuit

"discourage[s] comparisons to awards from other cases," *Hill*, 815 F.3d at 670. "In general, 'comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations' and 'detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence.'" *Osterhout*, 10 F.4th at 999 (quoting *Burke*, 935 F.3d at 1036 n.60). A limited exception to this rule "may exist when 'a previous case is similar enough to serve as a meaningful benchmark.'" *Id*. (quoting *Hill*, 815 F.3d at 671).

The Court finds that the cases cited by Defendant are largely too dissimilar to warrant any consideration in the remittitur analysis. *Wulf* is a 35-year-old § 1983 case that does not account for three decades' worth of shifts in our society's approach to mental health. *See Osterhout*, 10 F.4th at 999–1000 (refusing to consider cases that were "at least 25 years old and d[id] not reflect current public attitudes or spiraling costs for medical care"). *Blangsted* is a 15-year-old § 1983 employment case in which the court relied, in part, on the fact that "the Title VII limitation for compensatory damages [was] $50,000 to $300,000, depending upon the size of the employer," as the court believed this statutory limit "support[ed] a conclusion [that] the upper limit for emotional distress damages is significantly less than awarded by the jury in this case." *Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1258 (D. Colo. 2009).[13]

For his part, Plaintiff cites a number of cases in which similar damages awards were entered. *See* [Doc. 146 at 33–34]. But while he attaches various documents

---

[13] In addition, *Wantz* is a now-abrogated 20-year-old case decided at summary judgment, which is a different legal standard than the one applicable here. *See Wantz v. Experian Info. Sols.*, 386 F.3d 829 (7th Cir. 2004), *abrogated by Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007).

reflecting the size of the verdicts, *see* [Doc. 146-4; Doc. 146-5; Doc. 146-6; Doc. 146-7], the Court is without any information concerning the evidence presented in those cases and they provide little help here.  Similarly, the two arbitration awards cited by Plaintiff provide little detail about the emotional distress evidence presented in those proceedings. *See* [Doc. 146-8 at 17–18; Doc. 146-9 at 5].

At best, Defendant cites a Colorado district court case, *Peters v. American Pacific Mortgage Co.*, No. 22CV30141 (Colo. Dist. Ct., Larimer Cnty.), and details the testimony purportedly adduced in that case, but it does not provide any citation to the case or include a copy of the unpublished decision with its Motion.  *See* [Doc. 137 at 46–47].  The Court has located the order of remittitur independently and finds that, while *Peters* has some similarities to this case, there are also differences; for example, in *Peters*, "[t]here was no evidence that the dispute negatively impacted [the plaintiff's] employment."  *See Peters*, No. 22CV30141 (Colo. Dist. Ct., Larimer Cnty. Aug. 7, 2023).  Moreover, the *Peters* court relied on points that this Court has already deemed are unpersuasive—such as the fact that there was no evidence that the plaintiff received medical care resulting from his emotional distress.  *Id.*  And in any event, one somewhat similar case is not sufficient to convince the Court that remittitur is appropriate here.

For these reasons, the Court cannot conclude that the jury's award is against the weight of the evidence or is so excessive that it shocks the judicial conscience or raises an inference that some improper cause invaded the trial.  Accordingly, the Motion for Remittitur is respectfully **DENIED**.

## MOTION FOR APPLICATION OF ONE-SATISFACTION RULE

In the alternative, Defendant asks the Court to apply the "one-satisfaction rule" and

reduce Plaintiff's award by the amount he received via settlement with the CRAs. [Doc. 138 at 1]. Plaintiff responded in opposition, [Doc. 145], but NCS did not file a reply.

**I.    Legal Standard**

"[U]nder the 'one satisfaction rule,' when the conduct of multiple defendants results in a single injury with common damages, and one of the defendants settles with the plaintiff, the amount of the settlement is credited against the amount that may be recovered from the non-settling defendants." *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1209 (10th Cir. 2009). The rule applies "only where the defendants' conduct resulted in a single injury." *FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1379 (10th Cir. 1998) (quotation omitted).

**II.    Analysis**

NCS's Motion presents two issues for the Court: (1) whether the one-satisfaction rule even applies in FCRA cases; and (2) if so, whether the one-satisfaction rule applies to this case specifically. *See generally* [Doc. 138].

As for the first issue, NCS argues that the one-satisfaction rule does apply to FCRA cases. [*Id.* at 4]. It acknowledges that the Tenth Circuit has not ruled on this issue, but directs the Court to a few district court cases applying the rule to FCRA claims. [*Id.* at 4–7]. While NCS briefly mentions a few cases going the other way, it writes off those decisions as "dicta." [*Id.* at 4 & n.1]. Plaintiff, however, argues that Defendant's cases represent the "minority view" and asserts that "there is no shortage of cases concluding that the one-satisfaction rule does not apply in FCRA cases." *See* [Doc. 145 at 6].

The FCRA does not itself contain any offset language. *See* 15 U.S.C. §§ 1601– 93. Some district courts, primarily sitting in the Eleventh Circuit, have held that the one-

satisfaction rule applies to FCRA cases.  *See, e.g.*, *Haston v. Gold Coast Fed. Credit Union*, No. 9:22-cv-80004-RS, 2022 WL 17477531, at *2 (S.D. Fla. Nov. 8, 2022); *Williams v. LVNV Funding, LLC*, No. 4:15-cv-02219-KOB, 2017 WL 1331014, at *2 (N.D. Ala. Apr. 11, 2017) (denying motion for reconsideration of prior order finding that one-satisfaction rule applies).[14]  Many of these courts rely on *BUC International Corp. v. International Yacht Council Ltd.*, wherein the Eleventh Circuit "not[ed] that ample authority supports applying the [one-satisfaction] rule to federal causes of action."  517 F.3d 1271, 1278 n.7 (11th Cir. 2008); *see, e.g.*, *Haston*, 2022 WL 17477531, at *2; *Williams*, 2017 WL 1331014, at *2; *see also Scudder v. SoFi Lending Corp.*, No. 3:21-cv-00741-TJC-SJH, 2024 WL 4443204, at *1 (M.D. Fla. Sept. 16, 2024) ("Relying on *BUC*, the Southern District of Florida and Northern District of Alabama have held that the rule does apply to FCRA cases.").  Other courts have concluded that equitable offset rules do not apply in FCRA cases.  *See, e.g.*, *Nelson v. Equifax Info. Servs., LLC*, 522 F. Supp. 2d 1222, 1239 (C.D. Cal. 2007); *Vasquez-Estrada v. Collecto, Inc.*, No. 3:14-cv-01422-ST, 2015 WL 6163971, at *2 (D. Or. Oct. 20, 2015).

---

[14] NCS cites *Wellemeyer v. Trans Union, LLC*, No. 3:20-cv-00814-DJH-LLK, 2022 WL 1651877 (W.D. Ky. May 24, 2022) ("*Wellemeyer I*"), for the proposition that the *Wellemeyer* "concluded that the plaintiff had a singular injury to which the one satisfaction rule applied."  [Doc. 138 at 6–7].  This is not an entirely accurate explanation of the *Wellemyer* case.  In *Wellemeyer I*, in the context of ruling on a discovery dispute about the discoverability of settlement agreements, the magistrate judge assigned to the case discussed the split in authority on this issue and "[found] persuasive the argument that the one satisfaction rule is a tort law principle applicable to the FCRA in the present case."  *Wellemeyer I*, 2022 WL 1651877, at *5.  But the magistrate judge made no official ruling about the applicability of the rule; in fact, he expressly stated that "[u]ltimately, the District Judge will determine whether the one satisfaction rule applies to this case."  *Id.* at *6.  However, the district judge assigned to the case ultimately *declined to rule* whether the one-satisfaction rule applied in FCRA cases because "the essential requirement of the one-satisfaction rule [was] missing."  *See Wellemeyer v. Trans Union, LLC*, No. 3:20-cv-00814-DJH-LLK, 2023 WL 11262971, at *12 (W.D. Ky. Sept. 22, 2023) ("*Wellemeyer II*").

From the Court's independent research and review of applicable caselaw, it appears that many courts avoid answering the question altogether. In doing so, however, courts have largely expressed skepticism that the one-satisfaction rule applies to FCRA claims. *See, e.g.*, *Hoerchler v. Equifax Info. Servs., LLC*, 568 F. Supp. 3d 931, 936 (N.D. Ill. 2021) (declining to resolve the question but recognizing that "[c]ase law from outside the Seventh Circuit establishes that most courts to have considered this question hold that the one-satisfaction rule, which is also referred to as an equitable offset, does not apply in FCRA cases."); *Cheetham v. Specialized Loan Servicing LLC*, No. 2:20-cv-00762-JCC-DWC, 2021 WL 2137823, at *2 & n.3 (W.D. Wash. May 26, 2021) (recognizing that "Courts in the Ninth Circuit have determined the 'one satisfaction rule' does not apply in FCRA cases" but declining to rule on the issue); *Scudder*, 2024 WL 4443204, at *1–2; *Grant v. RentGrow, Inc.*, No. 5:21-cv-01172-JKP, 2023 WL 5813140, at *7 (W.D. Tex. Sept. 6, 2023).

The Court need not decide if the one-satisfaction rule applies to FCRA claims because even if it does apply in the FCRA context generally, it does not apply here. "The one satisfaction rule does not apply when the plaintiff has suffered separate injuries by different defendants—even when a non-settling defendant's harmful conduct relates to and overlaps with the harmful conduct of the settling defendant." *Valle v. Westhill Exch., LLC*, No. 8:19-cv-02304-GJH, 2021 WL 6064866, at *3 (D. Md. Dec. 21, 2021).

Defendant cursorily argues that "Plaintiff had only one injury in this case—emotional distress" and that this emotional distress is "indistinguishable from the emotional distress he claims was caused by the CRAs' alleged failure to conduct reasonable investigations and/or reinvestigations of Plaintiff's dispute of the Account that

would lead to correction or deletion of the Account." [Doc. 138 at 7]. It insists that "[n]o conduct from the settling CRAs resulted in an injury to Plaintiff that is distinguishable from the injury he testified about at trial." [*Id.* at 8]. But as Plaintiff points out, he and his wife each testified at trial about injuries *caused by NCS's conduct specifically*. *See, e.g.*, [Doc. 135 at 15:5–13, 16:5–7, 24:25–25:11; Doc. 141 at 15:24–16:16, 19:18–23, 20:12–18]. Defendant did not file a reply brief and does not respond to Plaintiff's argument highlighting this testimony, which establishes an injury tied to NCS, as opposed to the CRAs. *See also Hoerchler*, 568 F. Supp. 3d at 938 (in FCRA case, concluding there was not a singular injury where the plaintiff "interacted with Equifax more frequently and to a greater extent than with each of the Settling Defendants" and "attempted to fix distinct errors, was prevented from fixing those errors in distinct ways, and each of these interactions caused separate and distinct instances of emotional harm").

Moreover, Plaintiff argues that the one-satisfaction rule cannot apply here because his settlements with the CRAs were all for lump-sum payments, such that it is unascertainable whether the settlement amounts were for emotional distress damages. [Doc. 145 at 10–12]. Defendant does not reply to this argument.

In *Scudder*, an FCRA case, the court held that the one-satisfaction rule did not apply in part because the plaintiff's settlement agreements "with the credit bureaus include[d] lump-sum payments" and presumably accounted for the defendants' "total risk exposure," such as "attorneys' fees, costs, statutory damages, and punitive damages." 2024 WL 4443204, at *2. Because the court could not say which portion of the settlement agreements were attributable to actual damages, the court "[could not] reduce the award under the one-satisfaction rule." *Id.*

The same is true here. Plaintiff's counsel represents that the settlement agreements with the CRAs were for lump-sum payments with no apportionment for emotional distress damages and contain no admissions of liability. [Doc. 145 at 11].[15] It would not be possible to determine the portion of the settlement amounts that is properly attributable to emotional distress damages. Accordingly, the Court declines to apply the one-satisfaction rule here and will not amend the judgment to reduce the jury's award.

## CONCLUSION

For the reasons set forth above, it is **ORDERED** that:

(1)    Defendant's Motion for Judgment Notwithstanding the Verdict and Alternatively, Motion for New Trial, or in the Alternative, Motion for Remittitur [Doc. 137] is **DENIED**; and

(2)    Defendant's Motion to Apply One-Satisfaction Rule [Doc. 138] is **DENIED**.

DATED:  February 3, 2025                    BY THE COURT:

Nina Y. Wang
United States District Judge

---

[15] Plaintiff states that if counsel's representations about the contents of the settlement agreements "are not sufficient, Plaintiff agrees to provide the settlement agreements to the Court for *in camera* review." [Doc. 145 at 11 n.1]. The Court accepts counsel's representations as true without the need to review for *in camera* review. *See Holloway v. Arkansas*, 435 U.S. 475, 486 (1978) ("[A]ttorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath." (quotation omitted)).